1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  DARREN J. ROBBINS (168593)
   DAVID C. WALTON (167268)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101
4  Telephone:  619/231-1058
   619/231-7423 (fax)
5  darrenr@rgrdlaw.com
   davew@rgrdlaw.com
6
   JOHNSON & WEAVER, LLP
7  FRANK J. JOHNSON (174882)
   BRETT M. WEAVER (204715)
8  110 West A Street, Suite 750
   San Diego, CA  92101
9  Telephone:  619/230-0063
   619/255-1856 (fax)
10 frankj@johnsonand weaver.com
   brettw@johnsonandweaver.com
11
   Attorneys for Plaintiff
12
                    UNITED STATES DISTRICT COURT
13
                  SOUTHERN DISTRICT OF CALIFORNIA
14
   DONALD K. FRANKE, Individually and on    )  No. '12CV1737 JM   WMC
15 Behalf of All Others Similarly Situated,  )
                                             )
16                   Plaintiff,              )  CLASS ACTION
                                             )
17         vs.                               )  COMPLAINT FOR VIOLATION OF THE
                                             )  FEDERAL SECURITIES LAWS
18 BRIDGEPOINT EDUCATION, INC.,              )
   ANDREW S. CLARK, DANIEL J. DEVINE         )
19 and JANE McAULIFFE,                       )
                                             )
20                   Defendants.             )
   _____  )  DEMAND FOR JURY TRIAL
21
22
23
24
25
26
27
28

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") between May 3, 2011 and July 6, 2012, inclusive (the "Class Period"), against Bridgepoint and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"). These claims are asserted against Bridgepoint and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

2.      Bridgepoint is a for-profit provider of postsecondary education services.   The Company's academic institutions include Ashford University ("Ashford") located in Clinton, Iowa, and University of the Rockies located in Colorado Springs, Colorado, as well as online institutions. Its institutions deliver programs primarily online, as well as at their traditional campuses.

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.   Specifically, defendants concealed accreditation problems with the Company's Ashford campus.   As a result of defendants' false statements, Bridgepoint stock traded at artificially inflated prices during the Class Period, reaching a high of $30.50 per share on July 22, 2011.

4.      In May and June 2011, the Western Association of Schools and Colleges ("WASC") and its eligibility review committee notified Ashford of several concerns, including: (a) inadequate student retention and completion, (b) insufficient student progress tracking, (c) an insufficient core of full-time faculty members, and (d) lack of an empowered and independent governing board. Thus, by the Spring of 2011, at the latest, the Company had been advised that Ashford's future accreditation was at risk.

5.      On June 25, 2012, the Higher Learning Commission ("HLC") informed Ashford that it must demonstrate, no later than December 1, 2012, that it has a "substantial presence" in the 19-state north central region of the United States.

6.      Then, on July 9, 2012, Bridgepoint filed a Form 8-K with the SEC advising that on July 5, 2012, Ashford had received an official notice denying its accreditation application by the Accrediting Commission for Senior Colleges and Universities of the WASC.

7.      Subsequently on July 9, 2012, Bridgepoint issued a press release announcing that Ashford would appeal the decision and re-apply for WASC accreditation.

8.      On this news, Bridgepoint stock plunged $7.25 per share to close at $14.25 per share on July 9, 2012, a decline of nearly 34% on volume of 1.2 million shares.

9.      The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)      the Company had failed to implement plans, procedures and practices to sufficiently assist students in staying with the programs they enrolled in and complete the courses;

(b)      the Company failed to align resources with educational requirements such that students were not benefitting from the resources available and were therefore not progressing to an acceptable level;

(c)      Ashford failed to maintain a sufficient core of faculty and programs to develop faculty, leading to poor teaching and poor completion rates by students and also leading to a less rigorous curriculum causing even students who completed the programs to be ill-prepared in their respective disciplines;

(d)      Bridgepoint had inadequate review procedures such that shortfalls were not quickly identified and remedied; and

(e)      Ashford failed to maintain an empowered and independent governing board.

10.      As a result of defendants' false statements and omissions, Bridgepoint's common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 53% from their Class Period high.

**JURISDICTION AND VENUE**

11.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

12.     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

13.     Bridgepoint's principal executive offices are located at 13500 Evening Creek Drive North, Suite 600, San Diego, California 92128.

14.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

15.     Plaintiff Donald K. Franke purchased Bridgepoint common stock as described in the attached certification and was damaged thereby.

16.     Defendant Bridgepoint is a for-profit post-secondary education company in the United States.  It offers associate's, bachelor's, master's, and doctoral programs in the disciplines of business, education, psychology, social sciences, and health sciences.

17.     Defendant Andrew S. Clark ("Clark") co-founded the Company and is, and at all relevant times was, Chief Executive Officer ("CEO"), President and a director of Bridgepoint.  During the Class Period, defendant Clark sold 778,286 shares of his Bridgepoint stock for proceeds of nearly $18.2 million.

18.     Defendant Daniel J. Devine ("Devine") is, and at all relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of Bridgepoint.  During the Class Period, defendant Devine sold 299,100 shares of his Bridgepoint stock for proceeds of $6.7 million.

19.     Defendant Jane McAuliffe ("McAuliffe") is, and at all relevant times was, Chief Academic Officer of Bridgepoint.  During the Class Period, defendant McAuliffe sold 280,000 shares of her Bridgepoint stock for proceeds of nearly $6.2 million.

1     20.    The defendants named above in ¶¶17-19 are referred to herein as the "Individual

2 Defendants."

3     21.    The Individual Defendants, because of their positions with the Company, possessed

4 the power and authority to control the contents of Bridgepoint's quarterly reports, press releases and

5 presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*,

6 the market.  They were provided with copies of the Company's reports and press releases alleged

7 herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to

8 prevent their issuance or cause them to be corrected.  Because of their positions with the Company,

9 and their access to material non-public information available to them but not to the public, the

10 Individual Defendants knew that the adverse facts specified herein had not been disclosed to and

11 were being concealed from the public and that the positive representations being made were then

12 materially false and misleading.  The Individual Defendants are liable for the false statements

13 pleaded herein.

14           **FRAUDULENT SCHEME AND COURSE OF BUSINESS**

15     22.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose

16 adverse facts known to them about Bridgepoint.  Defendants' fraudulent scheme and course of

17 business that operated as a fraud or deceit on purchasers of Bridgepoint common stock was a

18 success, as it: (i) deceived the investing public regarding Bridgepoint's prospects and business; (ii)

19 artificially inflated the price of Bridgepoint common stock; (iii) caused plaintiff and other members

20 of the Class to purchase Bridgepoint common stock at inflated prices; and (iv) permitted the

21 Individual Defendants of Bridgepoint to sell 1,357,386 shares of their Bridgepoint stock at

22 artificially inflated prices for proceeds of over $31 million.

23           **CLASS ACTION ALLEGATIONS**

24     23.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

25 of Civil Procedure on behalf of all persons who purchased or otherwise acquired Bridgepoint

26 common stock during the Class Period (the "Class").  Excluded from the Class are defendants and

27 their families, the officers and directors of the Company, at all relevant times, members of their

28

1   immediate families and their legal representatives, heirs, successors, or assigns and any entity in

2   which defendants have or had a controlling interest.

3       24.    The members of the Class are so numerous that joinder of all members is

4   impracticable.  The disposition of their claims in a class action will provide substantial benefits to

5   the parties and the Court.  Bridgepoint has over 52.4 million shares of stock outstanding, owned by

6   hundreds if not thousands of persons.

7       25.    There is a well-defined community of interest in the questions of law and fact

8   involved in this case.  Questions of law and fact common to the members of the Class which

9   predominate over questions which may affect individual Class members include:

10       (a)    whether the 1934 Act was violated by defendants;

11       (b)    whether defendants omitted and/or misrepresented material facts;

12       (c)    whether defendants' statements omitted material facts necessary to make the

13   statements made, in light of the circumstances under which they were made, not misleading;

14       (d)    whether defendants knew or deliberately disregarded that their statements

15   were false and misleading;

16       (e)    whether the price of Bridgepoint common stock was artificially inflated; and

17       (f)    the extent of damage sustained by Class members and the appropriate measure

18   of damages.

19       26.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

20   sustained damages from defendants' wrongful conduct.

21       27.    Plaintiff will adequately protect the interests of the Class and has retained counsel

22   who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

23   with those of the Class.

24       28.    A class action is superior to other available methods for the fair and efficient

25   adjudication of this controversy.

26   **BACKGROUND**

27       29.    Bridgepoint is a post-secondary education company in the United States.  The

28   Company's academic institutions include Ashford and University of the Rockies.  Its institutions

- 5 -

1  deliver programs primarily online, as well as at their traditional campuses.  Bridgepoint's institutions

2  conduct ongoing faculty and student assessment processes and provide a range of student services.

3  The Company is also focused on developing new technologies, such as through Waypoint Outcomes,

4  Constellation, and the development of its institutions' mobile learning platforms.  The Company has

5  developed Constellation to replace third-party textbooks with digital course materials. Constellation

6  materials are displayed in a browser-based platform.

7       30.    In May and June 2011, the WASC and its eligibility review committee notified

8  Ashford of several concerns, including: (a) inadequate student retention and completion,

9  (b) insufficient student progress tracking, (c) an insufficient core of full-time faculty members, and

10  (d) lack of an empowered and independent governing board.  Thus, by the Spring of 2011, at the

11  latest, the Company had been advised that Ashford's future accreditation was at risk.

12       31.    That the WASC accreditation of Ashford was important to investors is highlighted by

13  an analyst comment from October 2011, which stated in part:

14       [W]e continue to believe that the more meaningful catalyst for the shares remains
     accreditation approval by the Western Association of Schools and Colleges (WASC),
15       which we still consider likely.  For this reason our enthusiasm for the shares remains
     unabated.

16

17  **DEFENDANTS' FALSE AND MISLEADING**
**STATEMENTS ISSUED DURIN G THE CLASS PERIOD**

18       32.    On May 3, 2011, Bridgepoint issued a press release reporting its first quarter 2011

19  earnings results.  The Company reported net income of $53.9 million or $0.92 diluted earnings per

20  share ("EPS") and revenue of $229.4 million for the quarter ending March 31, 2011.  Additionally,

21  Bridgepoint updated its full-year 2011 outlook, with expectation of revenue of between $886.5

22  million and $901.5 million and net income of between $145.5 million and $151.4 million.  The

23  release stated in part:

24       "We are pleased with the results we achieved in the first quarter as our new
     enrollments were in-line with our expectations, and I am particularly pleased that our
25       year over year student persistence increased for the fourth consecutive quarter. The
     increased persistence not only resulted in better than anticipated revenue for the
26       quarter, but it more importantly reinforces that the student support initiatives we
     made in 2010 to enhance student persistence are working as we planned. Our focus
27       will remain on continuing to improve the programs we have in place to further
     enhance the academic readiness of the students who attend our institutions, and to

28

provide students with an innovative, high quality learning experience that enriches their lives," said Andrew Clark, Chief Executive Officer of Bridgepoint Education.

33.     After releasing its first quarter 2011 results on May 3, 2011, Bridgepoint hosted a conference call for analysts, media representatives and investors during which defendant McAuliffe represented the following:

> Let me start with brief updates on the annual meeting of the Higher Learning Commission and on the Academic Resource Conference of the Western Association of Schools and Colleges. We had the opportunity to attend both accreditation meetings, which were held over the past few weeks. Both accreditation organizations give updates on the revision of their accreditation standards and reaffirmation processes.
>
> For WASC, a thorough review of standards, policies and processes will result in changes beginning in 2012, and a new handbook will be adopted no later than 2013. For the Higher Learning Commission the new criteria will be acted upon by the HLC Board in February 2012, and the revised criteria for accreditation are effective for all accredited institutions on January 1, 2013.
>
> The new standards for both accreditors feature a much greater emphasis on the collection of in-depth information on key data, as well as accurate and complete public disclosure of information.
>
> Although these changes will not have an immediate impact on our current review, *Ashford University is well on its way to providing a very transparent view on key data regarding its students*.
>
> *              *              *
>
> I would also like to update you on the status of Ashford University's migration to WASC accreditation. As you know, Ashford University has applied for eligibility, which is a preliminary review of an institution to determine that an institution is potentially accreditable.
>
> WASC has reviewed the application and determined that Ashford University is eligible to proceed with an application for candidacy for accreditation. This is a preliminary finding that indicates that the University can proceed to the next step, which includes writing a self-study in preparation for a site visit. The team is very excited to be moving forward in the process.
>
> Ashford University continues to keep HLC well-informed each step of the way, and our liaison is very cooperative and supportive.

34.     On this news, Bridgepoint stock closed up $1.48 per share to close at $19.87 per share on May 3, 2011.

35.     On July 22, 2011, Bridgepoint reached its Class Period high of $30.50 per share.

36.     On August 2, 2011, Bridgepoint issued a press release reporting its second quarter 2011 earnings results.  The Company reported net income of $52.1 million or $0.90 diluted EPS and revenue of $239.9 million for the quarter ending June 30, 2011.

37.     After releasing its second quarter 2011 results on August 2, 2011, Bridgepoint hosted a conference call for analysts, media representatives and investors during which defendant McAuliffe represented the following:

> I am pleased to report that the eligibility review panel the, The WASC Accrediting Commission on Senior Colleges and Universities approved Ashford University as eligible to seek initial accreditation after meeting all 23 WASC eligibility criteria.
>
> The University was approved to pursue initial accreditation through an application and review process known as Pathway B in the WASC Accreditation manual. Pathway B is reserved for those institutions already accredited by department recognized institutional crediting agency and enables an institution to obtain initial accreditation more rapidly than those seeking institutional accreditations for the first time.
>
> At the time of Ashford's eligibility approval in May, WASC noted that while Ashford is now eligible to move forward with its process toward initial accreditation, all available slots for an onsite visit in the fall 2011 had already been taken and WASC subsequently assigned Ashford an onsite visit in March 2012.
>
> Under the Pathway B procedure and because Ashford met the eligibility requirements for accreditation, Ashford is next required to submit a self study in December of 2011 that demonstrates that at a substantial level that it meets the WASC criteria for accreditation. The December timing reflects a point in time 12 weeks in advance with the currently scheduled onsite visit in March 2012.

38.     On September 15, 2011, Bridgepoint executives appeared at the BMO Capital Markets Back to School Education Conference for analysts, media representatives and investors, during which defendant Clark represented the following:

> From a gainful employment perspective, very quickly, none of our programs – all of our programs are expected to meet the new requirements.  We've not had to make any material changes in that regard. In terms of the WASC migration, which I mentioned earlier where Ashford University is going through the process to become WASC accredited, we have met all the eligibility criteria.  We are submitting our self-study in the fourth quarter of this year.  And we will have our visit by WASC in March of next year

39.     On November 1, 2011, Bridgepoint issued a press release reporting its third quarter 2011 earnings results.  The Company reported net income of $43.8 million or $0.78 diluted EPS and revenue of $242.8 million for the quarter ending September 30, 2011.  Additionally, the Company

- 8 -

1   provided its full-year 2011 outlook, with expectation of revenue of between $920 million and $926

2   million and net income of between $168.5 million and $170.3 million.

3       40.   After releasing its third quarter 2011 results on November 1, 2011, Bridgepoint

4   hosted a conference call for analysts, media representatives and investors during which defendant

5   McAuliffe represented the following:

6           I want to provide you an update on accreditation for Ashford University.
        Having already established eligibility to move forward with an application for initial
7           accreditation with the Western Association of Schools and Colleges, Ashford
        University continues its focused preparations for the submission of the WASC self-
8           study in December 2011.

9           The self-study effort has brought university faculty, staff, and administrators
        together in positive, well-coordinated, and collaborative discussions to develop
10          appropriate documentation on how the University demonstrates compliance with the
        current WASC standards for accreditation. This self-study process is a worthy
11          process, as it allows University faculty and leadership to reflect on current practices
        and build towards the future.
12
            As we have reported previously, Ashford University plans to host a visiting
13          team from WASC in March 2012. Ashford's materials and the report of the visiting
        team will be considered by the WASC commission at a meeting following the on-site
14          team visit and completion of the team's reports. A decision relative to Ashford's
        application for accreditation is expected to be made at that time.
15
            The University leadership values its collegial relationship with the WASC
16          staff as we work through each stage of this process. The President of the University
        also continues to keep the Higher Learning Commission informed of progress, in
17          [sic] the University continues to be accredited by the Higher Learning Commission.

18          I am very pleased with how the University leadership has continued to move
        forward and commend them on their focus and dedication to this project.
19
        41.   On March 6, 2012, Bridgepoint issued a press release reporting its full year and fourth
20
    quarter earnings results. The Company reported net income of $22.9 million or $0.41 diluted EPS
21
    and revenue of $221.3 million for the fourth quarter ending December 31, 2011. Further, the
22
    Company reported net income of $172.8 million or $3.02 diluted EPS and revenue of $933.3 million
23
    for the full year ended December 31, 2011. The release stated in part:
24
            "In 2011, I am very pleased to report that both our institutions improved the
25          quality of the student learning experience through the increased use of innovative
        technologies. To this end, we have made and will continue to make investments
26          designed to improve our students' learning outcomes and their educational
        experience at our institutions. In 2011, we believe these investments in the student
27          learning experience were responsible for improved student persistence and
        graduation rates, and we expect that our focus on these investments will continue to
28

- 9 -

produce similar results in the future," said Andrew Clark, chief executive officer of Bridgepoint Education.

42.    After releasing its fourth quarter and full-year 2011 results on March 6, 2012, Bridgepoint hosted a conference call for analysts, media representatives and investors during which defendant McAuliffe represented the following:

> No[w] I would like to give you an update on Ashford University's WASC migration process. The leadership is pleased with its interactions with the WASC team. The faculty and staff submitted the self-study and all required documentation in a timely fashion. Ashford University is ready to welcome the WASC visiting team members later this month. Once complete, the visiting team will prepare a report to the WASC Board.

> We continue to expect a decision on Ashford University's application to WASC in mid-2012. We believe this move will enhance the institution's ability to succeed in its mission of providing accessible, affordable, innovative, and high-quality learning opportunities and degree programs that meet the diverse needs of our students.

43.    On May 1, 2012, Bridgepoint issued a press release reporting its first quarter 2012 earnings results.  The Company reported net income of $33.0 million or $0.59 diluted EPS and revenue of $250.4 million for the quarter ending March 31, 2012.  Additionally, the Company updated its full-year 2012 outlook, expecting revenue of between $1.01 billion and $1.03 billion and net income of between $131.5 million and $136.9 million.  The release stated in part:

> "We are pleased that our operating and financial results were in-line with our internal expectations for the quarter, and we are particularly pleased by the strong increase in student persistence at our universities," said Andrew Clark, Chief Executive Officer of Bridgepoint Education. "Increasing persistence reflects our success with the student support and quality initiatives we are implementing, which help assure the academic readiness of students and help provide students with an innovative, high quality learning experience that enriches their lives."

44.    After releasing its first quarter 2012 results on May 1, 2012, Bridgepoint hosted a conference call for analysts, media representatives and investors during which defendant McAuliffe represented the following:

> Just a brief update on Ashford University's WASC process. As previously reported, the self-study was submitted in December of 2011. As planned, a team visited the University in March 2012. We expect a final decision midyear and will provide an update when Ashford University is formally notified in writing.

45.     On June 25, 2012, the Higher Learning Commission ("HLC") informed Ashford that it must demonstrate, no later than December 1, 2012, that it has a "substantial presence" in the 19-state north central region of the United States.

46.     On July 3, 2012, WASC had sent Ashford an action letter regarding its review of Ashford for initial accreditation.   The letter stated in part:

> The Commission acted to deny initial accreditation to Ashford University. The Commission found that Ashford had not demonstrated at this time that it complied with multiple aspects of the Standards of Accreditation at a substantial level, which is the requisite degree of compliance for initial accreditation. . . .

> Notably, Ashford was notified about WASC concerns in each of these areas by WASC and its Eligibility Review Committee in letters to Ashford dated May 23 and June 3, 2011, providing Ashford with early notice about these concerns.  Given that there were multiple areas in which substantial compliance could not be demonstrated and that these areas fell into several aspects of the Standards of Accreditation, the Commission determined that a denial of initial accreditation of Ashford was the appropriate action.

> *          *          *

> **Attrition, support for student achievement, and adequate levels of degree completion**.  The WASC Standards of Accreditation place great emphasis on student achievement and success. Retention of students, their persistence toward a degree, and completion of their desired degree within a reasonable amount of time are of critical importance. The Commission evaluated Ashford's effectiveness in this area in the context of the University's mission, the nature and qualifications of the students that the University serves, the programs it offers, and the modalities that it uses to deliver instruction.  As detailed in the team report. a large proportion of students who enter the degree programs at Ashford withdraw, most within a short period of time – nearly 128.000 students have withdrawn in the last five years, during which time 240.000 new students were enrolled.  This level of attrition is, on its face, not acceptable.

> *          *          *

> WASC Standards reflect the Commission expectation that "[r]esources are aligned with educational purposes and objectives" (CFR 3.5) and that sufficient qualified staff and faculty are employed "to achieve the institution's educational objectives, to establish and oversee academic policies, and to ensure the integrity and continuity of its academic programs...." (CFRs 3.1, 3.2) Among the areas in which resources were found by the evaluation team to be inadequate are the availability and staffing of student advising and other support services. Among the examples noted by the team are that *Ashford employs only 14 writing specialists and 38 instructional specialists for a faculty of 2600 and a student body of 90,000*. (CFRs 2.11-2.14) As noted below, the academic infrastructure of faculty and leadership for the size and complexity of the institution is also inadequate, with about 50 full-time faculty members, most recently hired, and a small cadre of academic administrators to oversee the work of thousands of adjunct faculty members. (CFRs 2.1, 3.1-3.2).

> *          *          *

The Commission found that a core of *about 50 full-time faculty* members, *most recently hired*, for the entire online division of more than 90,000 students, is not sufficient to provide leadership and oversight of an academic enterprise of the size and complexity of Ashford. (CFRs 3.1, 3.2, 3.11) Related is the lack of sound policies and practices about faculty, including. the role of faculty in governance in the online division.  At the time of the visit, Ashford had not established a clear role for the faculty to fulfill its responsibilities of oversight of the academic enterprise and had not set appropriate expectations about teaching load: advising and mentoring of students; and research, scholarship and creative activity of the faculty, especially in graduate-level programs where greater emphasis on these activities is expected.

\*      \*      \*

Serious concerns also exist about the rigor of coursework, which varied from course to course and was not always at the appropriate level for the course.  In addition. there was variation in the quality and extent of discourse between faculty members and students in online courses, which is a key component of the Ashford instructional model.  By way of example, the team noted that faculty responses to required student posts were often limited to a few words of encouragement and lacking in substantive exchange between student and teacher. (CFRs 2.1, 2.5).

47.     Then, on July 9, 2012, Bridgepoint filed a Form 8-K with the SEC, which stated in part:

**Item 8.01    Other Information**.

***Denial of Initial Accreditation for Ashford University***

On July 5, 2012, Ashford University received official notice from the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("WASC") that WASC has acted (1) to deny initial accreditation to the institution and (2) to permit the institution to reapply for accreditation with a single special visit to occur as early as spring 2013. This reapplication process would allow WASC to act in June 2013 and does not require Ashford University to undertake another full self-study.

WASC found that Ashford University had not yet demonstrated substantial compliance with certain of the WASC Standards for Accreditation, as would be required for initial accreditation. Ashford University intends to appeal this decision and simultaneously to undertake the process for reapplying for initial accreditation. Under WASC rules, if Ashford University decides to reapply for accreditation, the institution will be required to demonstrate that it has satisfactorily addressed the report's conclusions and has come into compliance with the WASC Standards of Accreditation.

\*      \*      \*

Ashford University remains regionally accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools ("Higher Learning Commission"), with the next comprehensive evaluation scheduled for 2014-15. Ashford University intends to work collaboratively with both WASC and the Higher Learning Commission to ensure it continues to satisfy the Higher Learning Commission's accreditation requirements while it seeks accreditation with WASC.

*Notification from Higher Learning Commission regarding Jurisdiction over Ashford University*

On June 25, 2012, the Higher Learning Commission informed Ashford University that the institution must demonstrate, no later than December 1, 2012, that it has a "substantial presence," as defined by commission policy, in the 19-state north central region and accordingly is within the Higher Learning Commission's jurisdiction under new requirements which became effective on July 1, 2012. Ashford University is communicating with the Higher Learning Commission regarding the timing and components of becoming compliant with the commission's jurisdictional requirements in light of the institution's plans to reapply for initial accreditation with WASC.

If Ashford University is required to comply with the Higher Learning Commission's jurisdictional requirements, it is expected that the institution would need to consolidate a significant portion of its educational administration and activity, business operations and executive and administrative leadership in the 19-state north central region. Additionally, if Ashford University is unable to demonstrate in a timely manner that it has a substantial presence in the north central region, the Higher Learning Commission has stated that it will begin a process of reconsidering the institution's accreditation. Ashford University intends to maintain its accreditation with the Higher Learning Commission until such time as it can transfer its accreditation to WASC.

48.     On this news, Bridgepoint stock plunged $7.25 per share to close at $14.25 per share on July 9, 2012, a decline of nearly 34% on volume of 1.2 million shares.

49.     Subsequently, on July 9, 2012, Bridgepoint issued a press release entitled "Ashford University to Run Parallel Process of Appeal and Re-application for WASC Accreditation," which stated in part:

Bridgepoint Education's Ashford University received notice on July 5, 2012 that the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges (WASC) acted to deny Ashford University's application for initial accreditation. WASC is one of seven regional accrediting commissions, with jurisdiction over schools located in the states of California and Hawaii, as well as the U.S. Pacific Islands.

50.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     the Company had failed to implement plans, procedures and practices to sufficiently assist students in staying with the programs they enrolled in and complete the courses;

(b)     the Company failed to align resources with educational requirements such that students were not benefitting from the resources available and were therefore not progressing to an acceptable level;

- 13 -

1      (c)    Ashford failed to maintain a sufficient core of faculty and programs to

2  develop faculty, leading to poor teaching and poor completion rates by students and also leading to a

3  less rigorous curriculum, causing even students who completed the programs to be ill-prepared in

4  their respective disciplines;

5      (d)    Bridgepoint had inadequate review procedures such that shortfalls were not

6  quickly identified and remedied; and

7      (e)    Ashford failed to maintain an empowered and independent governing board.

8      51.    As a result of defendants' false statements and omissions, Bridgepoint common stock

9  traded at artificially inflated prices during the Class Period.  However, after the above revelations

10  seeped into the market, the Company's shares were hammered by massive sales, sending them down

11  53% from their Class Period high.

**LOSS CAUSATION/ECONOMIC LOSS**

13      52.    During the Class Period, as detailed herein, the defendants made false and misleading

14  statements and engaged in a scheme to deceive the market and a course of conduct that artificially

15  inflated the price of Bridgepoint common stock and operated as a fraud or deceit on Class Period

16  purchasers of Bridgepoint common stock by misrepresenting the Company's business and prospects.

17  Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the

18  market, the price of Bridgepoint common stock fell precipitously, as the prior artificial inflation

19  came out of the price over time.  As a result of their purchases of Bridgepoint common stock during

20  the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages,

21  under the federal securities laws.

**NO SAFE HARBOR**

23      53.    Bridgepoint's verbal "Safe Harbor" warnings accompanying its oral forward-looking

24  statements ("FLS") issued during the Class Period were ineffective to shield those statements from

25  liability.

26      54.    The defendants are also liable for any false or misleading FLS pleaded because, at the

27  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

28  authorized and/or approved by an executive officer of Bridgepoint who knew that the FLS was false.

None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

55.     Plaintiff incorporates ¶¶1-54 by reference.

56.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes and artifices to defraud;

        (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Bridgepoint common stock during the Class Period.

58.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bridgepoint common stock.  Plaintiff and the Class would not have purchased Bridgepoint common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

59.     Plaintiff incorporates ¶¶1-58 by reference.

60.     The Individual Defendants acted as controlling persons of Bridgepoint within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Bridgepoint common stock, the Individual Defendants had the power and authority to cause Bridgepoint to engage in the wrongful conduct complained of herein.  Bridgepoint controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiff and the members of the Class damages, including interest;

C.      Awarding plaintiff's reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 13, 2012                         ROBBINS GELLER RUDMAN
                                                                  & DOWD LLP
                                                              DARREN J. ROBBINS
                                                              DAVID C. WALTON


                                                              /s/ David C. Walton
                                               _____
                                                              DAVID C. WALTON

                                                              655 West Broadway, Suite 1900
                                                              San Diego, CA  92101
                                                              Telephone:  619/231-1058
                                                              619/231-7423 (fax)

- 16 -

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
BRETT M. WEAVER
110 West A Street, Suite 750
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Bridgepoint Education.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Donald K. Franke ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 8/23/11 | 850 | $21.88 |
| 8/23/11 | 300 | $21.62 |

**Sales:** *Not applicable*

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| *NA* | | |

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification.

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12TH day of JULY , 2012.

Donald K. Franke

BRIDGEPOINT