1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  DAVID C. WALTON (167268)
   JONAH H. GOLDSTEIN (193777)
3  FRANCIS A. DIGIACCO (265625)
   AUSTIN P. BRANE (286227)
4  655 West Broadway, Suite 1900
   San Diego, CA  92101
5  Telephone:  619/231-1058
   619/231-7423 (fax)
6  jonahg@rgrdlaw.com
   fdigiacco@rgrdlaw.com
7  abrane@rgrdlaw.com

8  Lead Counsel for Plaintiffs

9  [Additional counsel appear on signature page.]

10              UNITED STATES DISTRICT COURT

11             SOUTHERN DISTRICT OF CALIFORNIA

12  In re BRIDGEPOINT EDUCATION, INC.    )   No. 3:12-cv-01737-JM-WMC
    SECURITIES LITIGATION                )
13  _____  )   CLASS ACTION
                                         )
14  This Document Relates To:            )   CONSOLIDATED COMPLAINT FOR
                                         )   VIOLATION OF THE FEDERAL
15       ALL ACTIONS.                    )   SECURITIES LAWS
                                         )
16  _____  )

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3  INTRODUCTION ....................................................................................1

4  JURISDICTION AND VENUE ................................................................6

5  PARTIES ................................................................................................6

6  CLASS ACTION ALLEGATIONS .........................................................10

7  BACKGROUND .....................................................................................11

8      For-Profit Education ....................................................................11

9      Accreditation and Title IV Funding............................................13

10      Ashford University: Small University Turned For-Profit Education Machine ................14

11      Accreditation: The Key to Bridgepoint's Financial Success .............................16

12      Ashford's Failed Pursuit of WASC Accreditation.............................................17

13      WASC Denies Ashford's Application for Initial Accreditation ........................20

14  THE TRUTH EMERGES .......................................................................31

15      WASC Denial Revealed ..............................................................31

16      The Second Shoe Drops, HLC Puts Ashford on "Special Monitoring Status" ................33

17  DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD  STATEMENTS AND
18  OMISSIONS ...........................................................................................34

19      First Quarter 2011 Earnings Release and Conference Call ............................34

    Analysts' Response to May 3, 2011 Earnings Release and Conference Call...................38

20      Analysts' Response to 2Q11 Earnings Release and Conference Call and
21      Bridgepoint's 2Q11 Form 1Q-Q ...................................................................43

22      September 15, 2011 BMO Capital Markets Back to School Education Conference.........48

23      Analysts' Response to BMO Conference ......................................................48

24      Third Quarter 2011 Earnings Release and Conference Call............................51

25      Analysts' Response to 3Q11 Earnings Release and Conference Call ..............54

26      November 15, 2011 Citi U.S. Small & Mid Cap Conference.........................58

27      Fourth Quarter 2011 Earnings Release and Conference Call and Bridgepoint's
28      2011 Annual Report..............................................................................64

**Page**

Analysts' Response to 4Q11 Earnings Release and Conference Call and Bridgepoint's 2011 Annual Report.................................................................69

March 13, 2012 Credit Suisse Global Services Conference and Analysts' Response ......................................................................................................71

First Quarter 2012 Earnings Release and Conference Call ...............................74

Analysts' Response to 1Q12 Earnings Release and Conference Call ...............76

Additional Allegations of Scienter........................................................................80

Insider Trading.............................................................................................81

POST-CLASS PERIOD EVENTS .......................................................................86

LOSS CAUSATION/ECONOMIC LOSS .............................................................88

Analysts' Response to WASC Denial............................................................89

Analysts' Response to HLC's Action ...........................................................91

APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE ...................................................................................................93

NO SAFE HARBOR ..............................................................................................94

COUNT I ...............................................................................................................94

For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against Defendants Bridgepoint, Clark, Devine, and McAuliffe .............................................94

COUNT II ..............................................................................................................98

For Violation of §20(a) of the 1934 Act Against Defendants Bridgepoint, Clark, Devine, and McAuliffe ...................................................................98

COUNT III.............................................................................................................99

For Violation of §20A of the 1934 Act Against Defendants Clark, Devine, and McAuliffe ...............................................................................................99

PRAYER FOR RELIEF .......................................................................................101

JURY DEMAND ..................................................................................................102

**INTRODUCTION**

1.     Lead Plaintiffs City of Atlanta General Employees Pension Fund and Teamsters Local 677 Health Services & Insurance Plan (collectively, "plaintiffs"), on behalf of themselves and all other persons similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys.

2.     This is a class action for violations of the federal securities laws on behalf of all purchasers or acquirers of Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") securities from *May 3, 2011 through July 13, 2012* (the "Class Period"), and who were damaged thereby (the "Class").

3.     This action concerns defendants' false statements and omissions regarding Bridgepoint's Ashford University ("Ashford") and its accreditation. Accreditation is the key to Bridgepoint's survival. Without it, Bridgepoint loses access to federal financial aid and other federal funding that make up over 90% of Bridgepoint's revenue. Thus, without accreditation, Bridgepoint cannot survive.

4.     In 2010, Bridgepoint learned that Ashford's current accreditation with the Higher Learning Commission ("HLC") was in jeopardy because the increase of its nationwide student body enrolled in online classes caused Ashford to primarily operate well outside of HLC's region. Thus, Bridgepoint sought to migrate from HLC to the Western Association of Schools and Colleges ("WASC"). WASC accreditation was paramount to Bridgepoint's survival because without it Ashford would potentially be left without any accreditation.

5.     Notwithstanding the obvious and apparent need for accreditation, defendants were fully aware, but concealed the fact that Ashford could not meet the standards for WASC accreditation. In May and June 2011, the WASC and its Eligibility Review Committee "outlined the

        

specific areas of focus that would need close attention . . . in order to demonstrate substantial compliance with all [WASC accreditation] standards."   The outlined concerns included: (a) inadequate student retention and completion; (b) insufficient student progress tracking; (c) an insufficient core of full-time faculty members; and (d) lack of an empowered and independent governing board.  In May 2011, Ashford necessarily began preparing to submit an extensive self-study to WASC in December 2011, meaning that defendants reviewed each of these concerns, and thus, knew at that time that Ashford fell well short of meeting these standards.  Indeed, many of the deficiencies identified by WASC stem from Bridgepoint's aggressive student recruiting practices, which have recently become the subject of an investigation by the United States Department of Justice ("DOJ").

6.     Knowing this stark reality, defendants continually assured investors and the market that Ashford would receive accreditation.  Throughout the Class Period, defendants made numerous materially false and misleading statements while omitting other material information regarding Ashford's current and future ability to meet the WASC standards necessary for accreditation.  These false statements and omissions regarding accreditation also rendered Bridgepoint's financial projections throughout the Class Period similarly false because without accreditation Bridgepoint simply would not be able to continue to receive federal financial aid making up 90% of its revenues, and thus, would not achieve its financial projections.  With a denial of accreditation looming, defendants knew full well that Bridgepoint could not meet these financial projections.

7.     In July 2012, investors and the market finally learned that Ashford was ***nowhere near*** meeting the accreditation standards.  On July 9, 2012, Bridgepoint was forced to disclose that WASC had denied Ashford's initial application for accreditation.  The denial was based on the very same areas of concern identified as significantly problematic and well below WASC's accreditation standards in May and June 2011 by WASC and its Eligibility Review Committee.  Although

Bridgepoint attempted to gloss over this denial with the promise of an appeal, the market was not fooled.  As an analyst with Deutsche Bank reported that day, "*[g]iven WASC notified Ashford in May and June 2011 of the concerns flagged in this report* and the university was unable to adequately address them, we believe the chances of a successful appeal or re-application for initial accreditation are low."  Tellingly, Bridgepoint abandoned its appeal just a few months later, recognizing the significant extent of Ashford's shortcomings in light of WASC accreditation standards.

8.     Making matters worse, on that same day, Bridgepoint also told investors that it was now at serious risk of losing its current accreditation with HLC, meaning it could be left without any accreditation whatsoever.  On June 25, 2012, HLC had informed Ashford that it would lose its accreditation if it was unable to demonstrate a "substantial presence" in HLC's governing region.

9.     The disclosures on July 9, 2012 revealed the truth concealed by defendants' false statements and omissions made during the Class Period, and eliminated the stock price inflation caused thereby.  Bridgepoint's stock price dropped $7.25 per share, declining to less than half of its Class Period high of $30.50 per share.

10.     Days later, on July 13, 2012, Ashford's accreditation status continued to worsen.  Because of Ashford's failed WASC accreditation, HLC went a step further by placing Ashford on "special monitoring status," and thus, further jeopardizing Ashford's only remaining accreditation if it could not "provide certain information and evidence of compliance with HLC accreditation standards."

11.     This disclosure further revealed the true risks concealed by defendants' false statements and omissions and further eliminated the artificial inflation in Bridgepoint's stock.  Bridgepoint's stock price declined another $3.20 per share, ending at less than a third of its Class Period high of $30.50 per share.

12.     Subsequently, Bridgepoint disclosed a DOJ investigation into the manner in which it compensated its admissions personnel.

13.     Unlike investors who suffered significant damages, defendants Clark, Devine, and McAuliffe profited handsomely from their fraud.   During the Class Period, they collectively exercised hundreds of thousands of stock options at less than a dollar per share for proceeds of ***over $30 million***.  After exercising these options to make their highly suspicious insider sales, defendants Clark, Devine, and McAuliffe were left holding insubstantial amounts of Bridgepoint shares, such that they never suffered any significant consequences of their fraud once the truth was revealed:



**JURISDICTION AND VENUE**

14.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §78aa, as the claims asserted herein arise under §§10(b), 20(a) and 20A of the 1934 Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC").

15.     Venue is proper pursuant to §27 of the 1934 Act as Bridgepoint's principal executive offices are located at 13500 Evening Creek Drive North, Suite 600, San Diego, California 92128, and many of the acts and transactions constituting the violations of the securities laws alleged herein occurred in this District.

16.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

**PARTIES**

17.     City of Atlanta General Employees Pension Fund is a public pension fund based in Atlanta, Georgia. Established for the benefit of current and former employees of the City of Atlanta, it has approximately 11,400 members. During the Class Period, City of Atlanta General Employees Pension Fund purchased and held shares of Bridgepoint stock. As a result of defendants' conduct detailed herein, it suffered damages in connection with its purchases of Bridgepoint securities.

18.     Teamsters Local 677 Health Services & Insurance Plan ("Local 677") is an occupational pension fund based in the northwest region of Connecticut. Established for the benefit of current and former employees in a wide range of occupations, including warehouse workers, truck drivers, and skilled maintenance employees, it has approximately 2,400 members from more than 67 employers. During the Class Period, Local 677 purchased and held shares of Bridgepoint stock. As

a result of defendants' conduct detailed herein, it suffered damages in connection with its purchases of Bridgepoint securities.

19.     Defendant Bridgepoint is a for-profit post-secondary education company that owns and operates Ashford University and University of the Rockies.  Through these brands, it offers associate's, bachelor's, master's, and doctoral programs in the disciplines of business, education, psychology, social sciences, information technology, organizational leadership, and health sciences. Bridgepoint enrolls students in every state, and despite each brand's physical campus, approximately 99% of Bridgepoint's students attend class exclusively online.  Bridgepoint was formed in 2003 by private equity firm Warburg Pincus.  In 2009, Bridgepoint held its initial public offering ("IPO"). During the Class Period, Bridgepoint traded under the symbol "BPI" on the New York Stock Exchange, which is an efficient market.

20.     Defendant Andrew S. Clark ("Clark") co-founded Bridgepoint and is, and at all relevant times was, Chief Executive Officer ("CEO"), President and a director at Bridgepoint. During the Class Period, Clark participated in the issuance of false and misleading statements and failed to disclose the true facts about Ashford's accreditation.  In addition to issuing public statements throughout the Class Period, Clark repeatedly had the opportunity to correct the misstatements and omissions made by and on behalf of Bridgepoint, alleged herein, and failed to do so.

(a)     As CEO, President and a director, Clark was responsible for directing Bridgepoint's business.  During conference calls and meetings with analysts and investors, Clark repeatedly held himself out as knowledgeable about Bridgepoint's business and financial results, including, specifically, Ashford's accreditation with HLC and pursuit of accreditation with WASC. Moreover, in conjunction with each of Bridgepoint's Class Period financial reports publicly filed with the SEC, Clark assured investors that he, together with Daniel J. Devine, was "responsible for . . . maintaining disclosure controls and . . . [d]esigned such disclosure controls and procedures . . . to

1    ensure that material information relating to the registrant, including its consolidated subsidiaries, is

2    made known to us by others within those entities." Further, Clark served on the Board of Trustees at

3    Ashford from March 2005 to December 2008, and thus, was intimately aware of its operations. At

4    no time during the Class Period did Clark, or any other defendant, assert that they were not aware of

5    material aspects of Ashford's accreditation.

6            (b)      Clark also has extensive knowledge of the for-profit and primarily online post-

7    secondary education sector. Prior to joining Bridgepoint, Clark consulted with several private equity

8    firms examining the post-secondary education sector. Before that, Clark worked for Career

9    Education Corporation and American InterContinental University. Clark also spent almost a decade

10   working for Apollo Group, Inc., which is the company behind University of Phoenix. After Clark

11   left Apollo Group, that company was fined by the U.S. Department of Education ("DOE") for high

12   pressure recruitment.

13           (c)      *During the Class Period, Clark sold 725,525 shares of his Bridgepoint stock*

14   *for proceeds of over $17 million.*

15           21.     Defendant Daniel J. Devine ("Devine") is, and at all relevant times was, Chief

16   Financial Officer ("CFO") and Executive Vice President of Bridgepoint. During the Class Period,

17   Devine participated in the issuance of false and misleading statements, including signing each of

18   Bridgepoint's financial statements, and failed to disclose the true facts about Ashford's accreditation.

19   In addition to issuing public statements throughout the Class Period, Devine repeatedly had the

20   opportunity to correct the misstatements and omissions made by and on behalf of Bridgepoint,

21   alleged herein, and failed to do so.

22

23           (a)      As CFO and Executive Vice President, Devine was responsible for monitoring

24   and reporting Bridgepoint's financial results. During conference calls and meetings with analysts

25   and investors, Devine repeatedly held himself out as knowledgeable about Bridgepoint's financial

26   results and business. Moreover, in conjunction with each of Bridgepoint's Class Period financial

27   reports publicly filed with the SEC, Devine assured investors that he, together with Clark, was

28   "responsible for . . . maintaining disclosure controls and . . . [d]esigned such disclosure controls and

1   procedures . . . to ensure that material information relating to the registrant, including its
2   consolidated subsidiaries, is made known to us by others within those entities." At no time during
3   the Class Period did Devine or any other defendant assert that they were not aware of material
4   aspects of Ashford's accreditation.

5          (b)    Devine is a Certified Public Accountant and has served as a CFO at many
6   other companies in his over 20 years of senior finance experience.

7          (c)    ***During the Class Period, Devine sold 299,100 shares of his Bridgepoint***
8   ***stock for proceeds of almost $7 million***.

9          22.    Defendant Jane McAuliffe ("McAuliffe") is, and at all relevant times was, Chief
10  Academic Officer ("CAO") and Executive Vice President of Bridgepoint. During the Class Period,
11  McAuliffe participated in the issuance of false and misleading statements, and failed to disclose the
12  true facts about Ashford's accreditation. In addition to issuing public statements throughout the
13  Class Period, McAuliffe repeatedly had the opportunity to correct the misstatements and omissions
14  made by and on behalf of Bridgepoint, alleged herein, and failed to do so.

15
16         (a)    As CAO and Executive Vice President, McAuliffe was responsible for
17  monitoring and reporting Bridgepoint's business affairs, specifically as they related to academics,
18  Bridgepoint's core business. During conference calls and meetings with analysts and investors,
19  McAuliffe repeatedly held herself out as knowledgeable about Bridgepoint's academic operations,
20  specifically Ashford's accreditation with HLC and pursuit of accreditation with WASC. Further,
21  McAuliffe served as Chancellor and President of Ashford from July 2005 to December 2010, and
22  thus, was intimately aware of its operations. At no time during the Class Period did McAuliffe or
23  any other defendant assert that they were not aware of material aspects of Ashford's accreditation.

24         (b)    McAuliffe has extensive experience in the for-profit and primarily online
25  post-secondary education field. Before serving as Chancellor and President of Ashford, she was the
26  President at the Sarasota Campus of Argosy University – a for-profit college accredited by WASC.
27  Prior to that, she was the Vice President for Academic Affairs at American InterContinental

28

University and the Dean, Associate Dean and Program Director in the College of Education at the University of Phoenix.

(c)     *During the Class Period, McAuliffe sold 300,000 shares of her Bridgepoint stock for proceeds of almost $6.5 million.*

**CLASS ACTION ALLEGATIONS**

23.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Bridgepoint securities during the Class Period and were damaged thereby.  Excluded from the Class are: (i) defendants; (ii) any person who was an officer or director of Bridgepoint during the Class Period; (iii) members of the immediate family of any of the individual defendants; (iv) any firm, trust, corporation, officer, director or other entity in which any defendant has a controlling interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any excluded party.

24.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of December 31, 2011, Bridgepoint had 51.7 million shares of common stock outstanding, and there were presumably thousands of beneficial owners of Bridgepoint common stock.  While the precise number of Class members is unknown to plaintiffs at this time, it is in the thousands.  The names and contact information of the Class members can be ascertained from the books and records maintained by or on behalf of Bridgepoint and/or its transfer agent.

25.     The claims of plaintiffs are typical of the claims of other Class members.  Plaintiffs and all Class members acquired their Bridgepoint securities on the open market and sustained damages as a result of defendants' violations of the federal securities laws.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) Whether defendants' public statements contained misstatements or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) The extent of damages sustained by Class members and the appropriate measure of damages.

27. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs' claims are typical of the claims of other members of the Class because plaintiffs' and Class members' damages arise from and were caused by the same false statements and omissions made by or chargeable to defendants. Plaintiffs have no interests which conflict with those of the Class.

28. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

**BACKGROUND**

**For-Profit Education**

29. From 2004 to 2010, the number of bachelor's degrees awarded by for-profit institutions of higher education rose by 136% and the number of associate's degrees rose by 77%. The explosive growth in the for-profit sector of higher education over recent years has occurred as for-profit colleges have increasingly been created or acquired by publicly-traded companies and private equity firms. By 2009, students attending for-profit colleges that were owned by either a private equity firm or a company traded on a major stock exchange accounted for at least 76% of all students attending for-profit colleges. The entities now owning and operating these institutions of

higher education are closely tracked by Wall Street analysts and investors.  These institutions now face earnings expectations and quarterly conference calls where they must answer to investors and analysts for the decisions they have made and, ultimately, the bottom line.

30.     The growing demand for higher education, coupled with state cutbacks of higher education funding, create a niche for for-profit educators.  Their convenient locations and online classes, frequent start dates, and flexibility in starting and stopping programs can appeal to the needs of non-traditional students.  Students enrolling in these institutions, however, take on a significant financial burden.  An associate's degree in business at Ashford University Online costs $30,574, while Eastern Iowa Community Colleges, located in the same state as Ashford's Clinton campus, charges only $7,936 for the same degree.  Ashford University Online's bachelor's degree in business administration costs $53,680, while an Iowa-based public college, University of Iowa, charges only $43,816 for the same degree.

31.     With financial forecasts in mind, for-profit educators operate more like high-pressured sales machines than institutes of higher learning.  Recruiters are under tremendous pressure to meet enrollment quotas.  Before amendment to the Higher Education Act of 1965 ("HEA") took effect in mid-2011, recruiters' compensation was directly based on the number of enrollments they secured.  A recent audit by the DOE Inspector General revealed that 74% of the criteria upon which Bridgepoint recruiters were evaluated was according to the number of students enrolled.  Among for-profit educators' targets are low-income and minority students, which have made up 50% and 37% of students at for-profit colleges, respectively.[1]  These targeted individuals are called "leads," and institutions like Ashford expend significant assets to purchase these "leads."

---

[1]     *See* "Subprime Opportunity: The Unfulfilled Promise of For-Profit Colleges and Universities," *The Education Trust* (Nov. 22, 2010), available for download in PDF format at http://www.edtrust.org/dc/subprime.

**Accreditation and Title IV Funding**

32.     "Accreditation is a process of external quality review created and used by higher education to scrutinize colleges, universities and programs for quality assurance and quality improvement."[2]   The DOE requires, among other things, that institutions be accredited by an accrediting agency recognized by the DOE prior to receiving Title IV funds.  Thus, accreditors act as gatekeepers to the primary source of for-profit college revenues.  Accreditors are non-profit, private entities that arrange peer reviews of higher education institutions.   There are two types of accreditors: national and regional.  Six DOE approved regional accreditors currently operate in the United States.[3]

33.     For students with financial need, the federal government helps pay for higher education through Title IV of the HEA.  Title IV covers the administration of the United States federal student financial aid programs, and includes Pell Grants, Stafford Loans, and other forms of federal financial aid.  Title IV aid is a combination of grants and low-interest loans available in limited quantity to students enrolled at any type of college.  A report issued by the HELP Committee on July 30, 2012 ("HELP 2012 Report"),[4] found that "98 percent of students who enroll in a 2-year degree program, and 96 percent who enroll in a 4-year program at a for-profit college take out loans."[5]

---

[2]     Council for Higher Education Accreditation, *An Overview of U.S. Accreditation*, Judith S. Eaton, available in pdf format at:
http://www.chea.org/pdf/overview%20of%20us%20accreditation%202012.pdf.

[3]     http://www.chea.org/pdf/CHEA_USDE_AllAccred.pdf.

[4]     U.S. Senate Committee on Health, Education, Labor, and Pensions ("HELP Committee").

[5]     *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, Committee on Health, Education, Labor and Pensions, U.S. Senate, July 30, 2012.

34.     The HEA stipulates that for-profit institutions *may not* obtain more than 90% of their revenue from Title IV funds in a given year ("90/10 Rule").  An institution who violates the 90/10 Rule in any given year is placed on provisional status for two years.  Institutions who exceed 90% for two consecutive years lose Title IV fund eligibility altogether.  ***In 2009, 2010, and 2011, Ashford received 85.5%, 85.0%, and 86.8%, respectively, of revenues from federal aid***.

35.     An important exception to the 90/10 Rule permits monies received from the Department of Defense and Veteran Affairs ("DOD") education programs to not count against the 90%.  Thus, an institution like Bridgepoint can exceed the 90/10 rule by recruiting military personnel and their families.

**Ashford University: Small University Turned For-Profit Education Machine**

36.     Bridgepoint was formed in 2003 with the backing of Warburg Pincus, a private equity firm that still owns two-thirds of Bridgepoint's outstanding shares.  Prior to 2005, lacking regional accreditation, Bridgepoint exclusively offered online courses to students already holding associate's degrees.

37.     In 2005, Bridgepoint purchased a small, regionally accredited non-profit college – The Franciscan University of the Prairies ("Franciscan University") – in Clinton, Iowa, and renamed it Ashford University.  When acquired by Bridgepoint, Franciscan University enrolled 312 students and was in financial distress.  As of December 31, 2011, this once small religious school had total enrollment of 84,713, growth of over 27,000% since 2005, with 99% of those students taking courses exclusively online.  Bridgepoint's revenues have grown from $7.9 million in 2005 to $933 million in 2011, growth of over 11,500%.

38.     Although the acquisition of Franciscan University gave Bridgepoint a physical campus from which to base its aggressive growth strategy, what Bridgepoint valued much more was Franciscan University's accreditation status.  At the time of acquisition, Franciscan University was

regionally accredited by the HLC, a regional accreditor recognized by the DOE.  In 2005, in response to Bridgepoint's acquisition of Franciscan University, HLC performed a "change of control" accreditation review and affirmed Ashford's accreditation status.  Bridgepoint now had what it needed to begin years of unparalleled growth in its online student base: a regional accreditor. In 2006, HLC performed an accreditation review and granted Ashford a new ten-year accreditation term.  On April 15, 2009, Bridgepoint held its IPO of 13,500,000 shares at $10.50 per share.  In response to Bridgepoint's IPO, HLC again performed a "change of control" accreditation review, affirming Ashford's accreditation status with the next review to be performed in 2014-2015.

39.     To facilitate Ashford's astounding growth, Bridgepoint has historically expended significant resources on recruitment and marketing.  It spent 32.1%, 29.7%, and 28.6%, of its revenue on marketing and recruiting in 2009, 2010, and 2011, respectively, compared to only 26.4%, 26.3%, and 27.8% on instructional costs and services in those same years.  Bridgepoint's 2010 marketing expenditure was more than any other publicly-traded education company.

40.     In late 2010, with 77,179 students, Bridgepoint employed only one career services employee and 386 student services employees, compared to 1,703 recruiters.  The HELP 2012 Report noted that "Bridgepoint has taken the position that it does not need to offer career services" because 70% of Ashford students are employed at the time of enrollment and nearly 85% of graduates are employed.  This explanation is hardly compelling given that it is safe to assume Ashford enrollees do not enroll to maintain their current job, but instead, to advance.  The lack of investment in student support is not due to a lack of revenue.  For example, in 2010, Bridgepoint had total revenues of $713.2 million and defendants Clark, Devine, and McAuliffe received nearly $4 million in total compensation.  To that point, Bridgepoint expanded their recruitment workforce by 31.5% in 2011, including an addition of 510 employees dedicated to recruitment.

**Accreditation: The Key to Bridgepoint's Financial Success**

41.     Because it cannot survive without federal funding, Ashford must, among other things, remain accredited by an accrediting commission recognized by the DOE.  Bridgepoint's business model only works if Ashford remains accredited because it receives more than 90% of its revenue in federal funding.  While in 2009, 2010, and 2011, Ashford received 85.5%, 85.0%, and 86.8%, respectively, of revenues from Title IV funds, it also successfully utilized the military exception to the 90/10 Rule by marketing to military and their families.  This pointed marketing strategy resulted in military enrollments making up 18.7% of total Bridgepoint enrollments as of December 31, 2011. With DOD federal funds included, Bridgepoint received 93.7% of revenue in 2010 from the federal government.

42.     Further illustrating the central role Title IV funds play in Bridgepoint's business model is the fact that Ashford tuition and fees are priced such that Title IV funds should cover all, or nearly all, of an Ashford student's expenses.  Bridgepoint's highly advertised affordable pricing is more a product of limiting the Company's exposure to relying on cash or private loan payments from students, which bear more risk than Title IV funds, *i.e.*, Bridgepoint prices are not set lower than for-profit college averages to benefit students but rather to avoid receiving private funds versus federal funds.  An example from the HELP 2012 Report shows the importance of Title IV Funds to Bridgepoint's business model:

> In February 2009, Bridgepoint created a new fee for most courses, called the "Course Digital Materials" fee, pushing the total cost of attendance approximately $400 above the $9,500 Stafford first-year loan limit.  Bridgepoint's CEO, Andrew Clark, learned of this $400 difference, which the company described internally as a "shortfall" of money the student would have to provide, and emailed the CFO, Dan Devine, saying:

>> The tuition increase for bachelor degree students is going to cause a $400 short fall!!!  People are talking about crazy stuff like alternative financing.  You told me there would be no short fall!  You need to follow up with Sheng [the vice president for operations] immediately and then follow up with me.

43.     In early 2010, Ashford notified HLC of its intent to seek accreditation by WASC. WASC, like HLC, is one of the six regional accreditors approved by the DOE.   Unlike HLC, WASC's jurisdiction includes California, where the majority of Bridgepoint's operations are located. Ashford's decision to seek WASC accreditation was based on its significant growth of operations in San Diego, California, compared to Clinton, Iowa – within the jurisdiction of HLC – and a bylaw adopted by the HLC in 2010, requiring "all institutions accredited by HLC to have a majority of their educational administration activities, business operations and leadership located 'substantially in the 19-state north central region.'"  With the bylaw taking effect on July 1, 2012, Ashford had over two years to take the actions necessary to comply.

**Ashford's Failed Pursuit of WASC Accreditation**

44.     In August 2010, Ashford applied for eligibility status with WASC.  WASC's "How to Become Accredited" guide states:  "An institution begins the process [of seeking eligibility] by submitting the Notification of Intent to Apply Form, which includes stipulations executed by both the president/chief executive officer and the chair of the governing board, indicating its commitment to comply with WASC policies and procedures."   Institutions seeking eligibility are reviewed according to 23 Eligibility Criteria, "which anticipate the WASC Standards."

45.     Prior to applying, applicants are "strongly encouraged" to "[c]onsult[] with WASC staff" and "[a]ttend[] a WASC-sponsored workshop that describes the level of readiness expected of the institution at each step as it moves through Eligibility, Candidacy, and Initial Accreditation."  On May 3, 2011, defendant McAuliffe informed investors that prior to receiving WASC's grant of eligibility to pursue initial accreditation, Bridgepoint executives "had the opportunity to attend both [HLC and WASC] accreditation meetings, which were held" in April 2011.  At the meetings, "[b]oth accreditation organizations g[a]ve updates on the revision of their accreditation standards and reaffirmation processes."

46.     WASC notified Ashford in April 2011 that Ashford's application for eligibility had been approved.  The WASC "How to Become Accredited" guide explains that "[t]he Eligibility Criteria are basic qualifications that an institution of higher education must meet to be considered for" accreditation.  Furthermore, the goal of the Eligibility Criteria is to simply determine whether there is a "reasonable basis for believing that [accreditation] could be achieved within" the four year eligibility period.  "Eligibility is not an official status with" WASC, but merely permits an institution to proceed its pursuit of accreditation.  Thus, Ashford being deemed eligible to pursue WASC accreditation was not a significant endorsement by WASC of Ashford's quality or its ability to ultimately attain accreditation.  Instead, Ashford was simply permitted to formally apply for initial accreditation.

47.     Ashford initiated its formal pursuit of WASC accreditation through a process labeled "Pathway B" in May 2011.  "Pathway B" is a distinct accreditation policy for established institutions that are accredited by another DOE-recognized accrediting agency.  The first component of the application for initial accreditation is a self-study conducted by the applicant institution, *e.g.*, Ashford.  In that self-study, Ashford would be required to "respond to each of the applicable Criteria for Review (CFRs) and provide supporting documentation as appropriate."  The second step is a site visit conducted by a WASC visiting team.  The site visit can be one comprehensive visit, or divided into two visits, at the discretion of the WASC review panel.  In the case of Ashford, the WASC determined one comprehensive site visit would be appropriate.

48.     Regardless of the procedure applicable to an applicant institution, *i.e.*, Pathway B or otherwise, the institution is expected to meet WASC Eligibility Criteria and Standards of Accreditation ("WASC Standards").  In fact, the WASC "How to Become Accredited" guide states that Pathway B "procedures ensure that an applicant is evaluated against WASC Eligibility Criteria and Standards for Accreditation, regardless of its accreditation by another agency."

49.     When an applicant is proceeding pursuant to "Pathway B," the WASC Eligibility Review Committee will highlight any issues that the institution should address in the self-review and site visit.  In letters dated May 23, 2011 and June 3, 2011, WASC's Executive Vice President and the WASC Eligibility Review Committee "*outlined the specific areas of focus that would need close attention . . . in order to demonstrate substantial compliance with all [WASC accreditation] standards*."  The specific areas included: (a) inadequate student retention and completion, (b) insufficient student progress tracking, (c) an insufficient core of full-time faculty members, and (d) lack of an empowered and independent governing board.  These "early notice" letters spelled out precisely what defendants knew and/or recklessly disregarded throughout the Class Period, that Ashford was woefully short of accreditation on multiple aspects of the WASC Standards and, therefore, Ashford's WASC application for initial accreditation would very likely be denied.  In fact, in later denying Ashford's application in July 2012 for WASC accreditation, WASC emphasized that Ashford had been given "*early notice*" *of* "*WASC concerns in each of*" *the accreditation standards upon which denial was based*.

50.     Ashford's self-study was scheduled to be submitted in December 2011, twelve weeks prior to the scheduled site visit in March 2012.  The WASC Pathway B Visit Team ("Visit Team"), following its March 2012 Ashford site visit, would later characterize Ashford's self-study as

> more descriptive of current initiatives underway at the University rather than self-reflective of strategic issues faced by the institution [and] lack[ing] in-depth or sophisticated understanding of the assets and vulnerabilities of the institution.  The report represented more compliance-driven responses rather than analysis of longitudinal findings and areas needing development at the institution.

> *          *          *

> In general, the self-study report was data rich but information/analysis weak.

51.     The site visit was conducted by twelve members "with extensive experience in higher education and specialized expertise in one or more areas of the WASC Standards."  Before conducting the site visit, the visiting team undertook extensive preparation including, but not limited

to, reviewing Ashford's self-study, along with 329 documents Ashford appended to the study as exhibits, required data elements, and supporting evidence, and observing Ashford Online courses. The Visit Team also considered the items addressed in the WASC May 2011 and June 2011 letters as "prior issues raised."

52.     The site visit was divided, such that five team members visited Ashford's Clinton, Iowa campus on March 12, 2012, and the entire team visited Bridgepoint headquarters in San Diego, California, on March 14-16, 2012.   The Visit Team, in its in-depth report submitted to the Commission ("Visit Team Report"), which was endorsed by the WASC Accrediting Commission ("Commission") in denying Ashford's application, summarized the extent of their visit:

> In the aggregate, the team interviewed full-time and part-time faculty (80+), University and Bridgepoint senior management/administrators (6), academic administrators and support staff (73), Bridgepoint services staff (61), graduate and undergraduate students (112), Ashford Board of Trustees (8), Bridgepoint Board of Governors (9), auditors, and community members.

53.     The Visit Team Report was considered, and endorsed, by the Commission at the Commission's June 13-15, 2012 meeting.  Bridgepoint was permitted to prepare a written response to the Visit Team Report, which was also reviewed by the Commission prior to taking action on Ashford's application for initial accreditation.

**WASC Denies Ashford's Application for Initial Accreditation**

54.     In acting on Ashford's application for initial accreditation, the Commission had the option to defer action with another site visit.  According to WASC's "Handbook of Accreditation," deferral allows the Commission to indicate to an institution "the need for additional information or progress in one or more specified areas before a positive decision can be made."  A deferral is "interlocutory in nature and designed to provide time for the institution to correct specified deficiencies."  The Commission found deferral inappropriate for Ashford "[b]ecause the areas in which substantial compliance was not demonstrated spanned across several key aspects of the Standards."  The decision by WASC not to defer Ashford's application demonstrates the multiple and significant deficiencies at Ashford and thereby, that defendants knew or recklessly disregarded,

1   since the beginning of the Class Period, that Ashford's WASC application for accreditation would

2   very likely be denied.

3         55.    On July 3, 2012, WASC sent Ashford an Action Letter denying Ashford's application

4   for initial accreditation as it "had not demonstrated at this time that it complied with ***multiple aspects***

5   of the Standards of Accreditation at a ***substantial level***."   As noted, WASC emphasized the

6   remarkable fact that Ashford had been notified in May 2011, seven months prior to submitting its

7   self-study in December 2011, that WASC had specific areas of substantial concern regarding

8   Ashford's ability to achieve accreditation and was ultimately denied for these very same reasons:

9

10         ***Notably, Ashford was notified about WASC concerns in each of these areas***
     ***by WASC and its Eligibility Review Committee in letters to Ashford dated May 23***

11   ***and June 3, 2011, providing Ashford with early notice about these concerns.***
     ***Given that there were multiple areas in which substantial compliance could not be***

12   ***demonstrated and that these areas fell into several aspects of the Standards of***
     ***Accreditation, the Commission determined that a denial of initial accreditation of***

13   ***Ashford was the appropriate action***.

14         56.    WASC's denial of Ashford's accreditation is more fully set forth below.  To begin,

15   WASC evaluates applications for initial accreditation based on four publicly available Standards of

16   Accreditation: (1) Defining Institutional Purposes and Ensuring Educational Objectives; (2)

17   Achieving Educational Objectives Through Core Functions; (3) Developing and Applying Resources

18   and Organizational Structures to Ensure Sustainability; and (4) Creating an Organization Committed

19   to Learning and Improvement.  Within the Standards of Accreditation are topical sub-sections and,

20   within those, Criteria for Review ("CFR"), both publicly available and intended to aide in assessing

21   an applicant's compliance with the WASC Standards.  Further illustrating defendants' pre-class

22   knowledge, or reckless disregard, that Ashford's WASC application would be denied, is WASC's

23   conclusion that Ashford was not accreditable pursuant to all four WASC Standards.

24

25         57.    The areas of Ashford operations upon which the WASC denial was based include

26   core operations at Ashford and specific topics about which defendants made numerous Class Period

27

28

misstatements and omissions.  Specifically, the areas and accompanying CFRs in which Ashford

failed to demonstrate substantial compliance, as outlined in the July 3, 2012 Action Letter were:

(a)     Student retention and completion, methods of tracking student progress, and

support for student success (CFR 2.6, 2.10-2.14);

(b)     Alignment of resource allegations with educational purposes and objectives

(CFR 3.5);

(c)     A sufficient core of full-time faculty members, and a faculty model that

provides for faculty development and oversight of academic policies and ensures the integrity and

continuity of academic programs (CFRs 3.2, 3.11);

(d)     An effective system of program review (CFR 2.7);

(e)     An effective system for assessing and monitoring student learning and

assuring academic rigor (CFRs 2.1, 2.2, 2.6, 4.4); and

(f)     An empowered and independent governing board and a clear and acceptable

relationship with the parent company (CFRs 1.6, 3.9, 3.10).

58.     The first area of Ashford deficiencies upon which WASC based its denial, was

"Student retention and completion, methods of tracking student progress, and support for student

success," corresponding to CFRs 2.6 and 2.10-2.14.  Demonstrating Ashford's historical failures in

this regard, the HELP 2012 Report found that of the 48,797 undergraduate students who enrolled at a

Bridgepoint institution in 2008-2009, 66.8%, or 32,589 students, had withdrawn by mid-2010.

Specifically, students seeking a bachelor's degree withdrew at a rate of 63.4% and students seeking

an associate's degree withdrew at a rate of 84.4%.  Of the 30 for-profit education companies

examined in the HELP 2012 Report, Bridgepoint's associate's degree withdrawal rate was the worst,

remarkably 14% higher than the next college.

59.     On this topic, the Action Letter stated, in part:

*Attrition, support for student achievement, and adequate levels of degree completion*.  The WASC Standards of Accreditation place great emphasis on student achievement and success.  Retention of students, their persistence toward a degree, and completion of their desired degree within a reasonable amount of time are of critical importance.  The Commission evaluated Ashford's effectiveness in this area in the context of the University's mission, the nature and qualifications of the students that the University serves, the programs it offers, and the modalities that it uses to deliver instruction.  As detailed in the team report, a large proportion of students who enter the degree programs at Ashford withdraw, most within a short period of time – nearly 128,000 students have withdrawn in the last five years, during which time 240,000 new students were enrolled.  *This level of attrition is, on its face, not acceptable*. . . .

As found by the team, Ashford has not yet developed a method to collect and display data on retention, persistence, and completion in a manner that can be easily understood, that lends itself to analysis, and that accounts for each student who is recruited and enrolled in a degree program. . . .

. . . *[C]oncerted and systematic approaches to improve retention, persistence, and completion, with evidence-based plans, targets, and timelines, are not in place* and the impact of recent changes cannot yet be measured.

60.     The particular findings of the Visit Team Report upon which these conclusions were based, included:

When evaluating evidence regarding CFRs 1.6 through 1.9, the team had concerns about Ashford University's record on enrollment growth and student completion.  The primary issue that drove this concern is the fact that the online division of the institution has only been operating in its current form since 2005, has experienced extremely rapid growth in a short period of time, and has experienced a high rate of enrollment turnover.  *It is important to understand the level of difficulty the team had with understanding how data about retention, persistence and completion were constructed and reported by Ashford University.  Repeatedly the team found the various data sets to be confusing.  Moreover, the team had concerns that Ashford's awareness and ownership of the fundamental challenges of retention, graduation and attrition are not sufficiently developed*. . . .

. . . Taking the fall 2011 headcount enrollment of 74,596, the ratio of students to enrollment counselors is 32:1 while staff reported that the ratio of students to advisors is 300:1.  The team was concerned that *this does not suggest an optimum alignment of institutional resources with stated mission and priorities*;

\*          \*          \*

The team's review found that Ashford collects student data on retention and graduation rates . . . .  However, . . . the team found these institutional data efforts inconsistent, and sometimes lacking depth and analytical sophistication.  *Systematic development and display of student outcomes across student characteristics and fields of study were not evident*.  Student surveys are employed, but on a fairly rudimentary level.  (CFR 2.10)  *Given the high rate of student withdrawal, the failure to have developed a series of institutional research studies that assess factors associated with student success is significant*.

. . . The team had concerns regarding whether the fall cohort method used by Ashford provides the institution with data that would help it becomes truly informed as to which students are withdrawing, when they are withdrawing, and why. . . .

. . . [I]t was revealed that from Fall 2007 to Fall 2011, 240,911 students have been recruited to the institution and 127,879 of those students have withdrawn. . . .

***The level of withdrawal led to consideration of whether the institution's level of growth coupled with attrition meets the WASC standards about operational integrity and support for student success and achievement***. . . .

The team appreciates that the institution recognizes the need to improve its persistence efforts but it also finds that acceptance of the retention challenge and the focus on finding remedies to improve it need further attention. . . . Both faculty and staff members reported on the multiple initiatives underway and, while there is excitement about the new efforts, ***the atmosphere appeared at times to verge on frenetic. The team observed a lack of organizational maturity and capacity to take the institution to the next level***. Partly, this concern regarding capacity stems from the narrow range of experience demonstrated by the staff and in part from the ***limited academic leadership depth available to the massive online programs***.

\*     \*     \*

Given the high rates of student attrition, the university's challenge remains to assess more rigorously how student support services are or are not meeting the needs of specific types of students.

\*     \*     \*

The institution needs to have a planning process which defines, and to the extent possible, aligns academic, personnel, fiscal, physical, and technological need with strategic objectives and priorities of the institution. . . .

. . . ***Until very recently, there is lacking a comprehensive process to align the academic needs of the institution to improve student retention and graduation through the strategic planning process***. . . .

. . . ***More detailed analytics, in particular self-reflection about the institutions patterns of access, retention and degree attainment, are markedly lacking in the strategic plans. The issue of retention and degree attainment has not received the attention the team believes it merits***.

\*     \*     \*

[T]here does not appear to be a critical institutional research function that has examined in an analytically rigorous fashion the nature of student outcomes . . . . ***Even something as basic as tracking and comparing over time retention and graduation rates for each of the four Ashford colleges appears to be missing***.

Ashford stresses that traditional snapshot measures of retention [used by others in the for-profit sector] underestimate actual persistence of Ashford students . . . . However, Ashford does not deal with these issues directly . . . . Rather the institution both publishes and emphasizes graduation rates for just subpopulations surviving early attrition.

61.     The second area in which Ashford failed to demonstrate substantial compliance with WASC Standards is "[a]lignment of resource allocations with educational purposes and objectives," corresponding to CFR 3.5.  This area highlights issues such as Ashford's historical pattern of spending more on marketing and recruitment than instruction.  In 2010, Bridgepoint's marketing expenditure was more than any other publicly-traded education company.  Further evidencing Bridgepoint's priority on growth over quality of education, Bridgepoint grew its recruitment force by 31.5%, or 510 recruiters, in 2011, ending the year with 2,129 recruiters.

62.     With regard to this area, the Action Letter stated, in part:

WASC Standards reflect the Commission expectation that "[r]esources are aligned with educational purposes and objectives" (CFR 3.5) and that sufficient qualified staff and faculty are employed "to achieve the institution's educational objectives, to establish and oversee academic policies, and to ensure the integrity and continuity of its academic programs. . . ." (CFRs 3.1, 3.2) Among the areas in which resources were found by the evaluation team to be inadequate are the availability and staffing of student advising and other support services. Among the examples noted by the team are that *Ashford employs only 14 writing specialists and 38 instructional specialists for a faculty of 2600 and a student body of 90,000*. (CFRs 2.11-2.14)  As noted below, *the academic infrastructure of faculty and leadership for the size and complexity of the institution is also inadequate*, with about 50 full-time faculty members, most recently hired, and a small cadre of academic administrators to oversee the work of thousands of adjunct faculty members. (CFRs 2.1, 3.1-3.2).

63.     The particular findings of the Visit Team Report upon which these conclusions were based, included:

Taking the fall 2011 headcount enrollment of 74,596, the ratio of students to enrollment counselors is 32:1 while staff reported that the ratio of students to advisors is 300:1.  The team was concerned that *this does not suggest an optimum alignment of institutional resources with stated mission and priorities*.

*        *        *

[Ashford's] financial statements . . . include external audits that are consolidated with Bridgepoint . . . .  The fiscal relationship between Ashford and Bridgepoint raises some issues of control as well as internal and external accountability. . . . *The practice . . . suggests a lack of full control by the Ashford President and Board of Trustees over the allocation of resources and alignment of resources with institutional priorities*.  The team also has concerns about the historic spending patterns, in particular the relatively high funding levels for recruitment as compared to resources to support academic quality and student success . . . .

*        *        *

Ashford University is a financial subsidiary of Bridgepoint Education, Inc., a publicly traded company.  Roughly 96% of revenues to Bridgepoint Education come from Ashford University.  As noted above, *there is no separate audited financial statement for Ashford University, as expected under WASC Standards*. . . .

. . . [T]he Ashford board and president have no fiscal information about spending on support services provided by Bridgepoint, or control over them.

The University's spending patterns and evidence of alignment of revenues with educational purposes and objectives are a concern.  Related to the issues of fiscal control is a more important concern to the team, that of the history of allocation decisions and the relative underfunding of the academic program compared to an emphasis on student recruitment and enrollment – and revenue – growth.  Spending on student recruitment constitutes over 31% of Ashford spending, well above spending for instructional costs and services, which in the case of Ashford includes both direct spending on faculty and the administration of financial aid, student services and academic support.

. . . *The team therefore has concerns about a potential imbalance in human resource investments in admissions versus academic services and academic quality assurance* . . . .  Seven of 25 organization leaders, as identified by the institution, work in admissions.  This is 28% of the institutional leadership. . . .  [M]ore than 2,300 staff work in admissions, representing about 32:1 enrollment staff to student ratio while the advisor to student ratio exceeds 300:1.  Ashford has a Vice President of Admissions and six Divisional Vice Presidents of Admissions. . . .

. . . *The evidence of student early departure . . . may suggest a need to reallocate resources from recruitment and promotion to investment in faculty and student support services, particularly in early-level online courses.  In the current environment, these types of trade-offs do not appear to have been discussed by Ashford and Bridgepoint decision makers*.

\*       \*       \*

The institution needs to have a planning process which defines, and to the extent possible, aligns academic, personnel, fiscal, physical, and technological needs with strategic objectives and priorities of the institution.

64.     The Commission labeled the third area of Ashford shortcomings in light of WASC Standards "[a] sufficient core of full-time faculty members, and a faculty model that provides for faculty development and oversight of academic policies and ensures the integrity and continuity of academic programs," corresponding to CFRs 3.2 and 3.11.

65.     For this area, the Action Letter stated, in part:

The Commission found that a core of *about 50 full-time faculty* members, *most recently hired*, for the entire online division of more than 90,000 students *is not sufficient to provide leadership and oversight of an academic enterprise of the size and complexity of Ashford*. (CFRs 3.1, 3.2, 3.11) Related is the lack of sound policies and practices about faculty, including the role of faculty in governance in the online division.  At the time of the visit, Ashford had not established a clear role for

1  the faculty to fulfill its responsibilities of oversight of the academic enterprise and
   had not set appropriate expectations about teaching load; advising and mentoring of
2  students; and research, scholarship and creative activity of the faculty, especially in
   graduate-level programs where greater emphasis on these activities is expected.

3
4      66.    The particular findings of the Visit Team Report upon which these conclusions were

5  based, included:

6      The team observed a lack of organizational maturity and capacity to take the
       institution to the next level.  Partly, this concern regarding capacity stems from the
7      narrow range of experience demonstrated by the staff and in part from the limited
       academic leadership depth available to the massive online programs.

8                              *        *        *

9      At the time of the self-study submission, Ashford University employed 56 full-time
10     faculty members, 2,458 part-time faculty members, and 875 instructional staff
       personnel to serve the 74,319 students in academic programs on-ground and
11     online. . . .  Administrators explain the difference in faculty/student ratios between
       the traditional campus in Clinton and the online division in San Diego by describing
12     how the University uses an "unbundled" faculty model.  In this model, many of the
       activities of traditional faculty members are provided, instead, by qualified
13     professional instructional staff (112) whose positions augment the full-time faculty in
       roles such as oversight of part-time and adjunct/associate faculty, assessment
14     support, curriculum development and technology applications/design of curriculum.
       (CFR 3.1, 3.2)

15                             *        *        *

16     The team . . . had difficulty understanding the recent expenditures for new
17     enrollment advising staff which were more than double expenditures for faculty and
       academic staff. . . .  [T]he team also found that the academic culture at Ashford
18     University is dominated by an emphasis on efficiency . . . .  [N]umerous interviews
       with faculty and staff by several members of the team revealed consistently a lack of
19     academic dialogue and informed judgment underlying the decisions regarding
       curriculum development, pedagogy, and learning theory. . . .

20         . . . Ashford University describes itself as an institution whose faculty
21     numbers "are substantially augmented by academic support staff" . . . .  [T]he team
       was not convinced that reducing the full-time faculty based on this model could
22     support an academic culture with diverse ideas and approaches to program and
       curriculum.

23                             *        *        *

24     **Faculty Role in Governance and Decision-Making**.  Faculty participation
25     in governance and decision-making at Ashford University is provided through a
       Faculty Assembly which includes [multiple committees] . . . .  In interviews with the
26     President of Ashford University, the faculty governance system was described as in
       transition. . . .  (CFR 3.11)

27                             *        *        *

28

The Ashford University online faculty is organized in an "unbundled" or disaggregated approach to faculty workload in which not all faculty members perform all traditional roles or faculty duties. . . .  Academic advising for the online division is provided by an advising staff rather than by faculty. . . .  Curriculum development is assigned to associate faculty with full-time online faculty acting as reviewers for new courses in development. . . .  Faculty peer review responsibilities are augmented by Instructional Specialists who monitor online faculty activities . . . .

. . . For the team, this model . . . reduces the role of faculty to technician and heavily restrains the ability of faculty to react to individual student/class needs.

67.    Next, the Commission found, based on the Visit Team Report, that Ashford did not have "an effective system of program review," corresponding to CFR 2.7.  The lack of an effective system of program review logically implies that the quality of the programs themselves is also lacking.  The Visit Team Report's findings on inconsistent course quality and lack of academic rigor, as discussed in ¶72, show this to be the case and together, illustrate the overall inadequacy of the Ashford product.

68.    As to the program review, the Action Letter stated, in part:

Ashford has only recently adopted and implemented program review, and only a small fraction of academic programs have been reviewed – six out of approximately 80 programs.  As noted by the team, Ashford is in the "initial" stages of program review development, which is not adequate for initial accreditation.  In addition to the small sample of program reviews that were completed, the team found that small data samples and lack of standards of performance in assessment tools raised questions about the reliability of learning data, which is an essential element of effective program review.

69.    The particular findings of the Visit Team Report upon which these conclusions were based, included:

[T]he site team's review of 51 selected Ashford courses showed inconsistent course quality, indicating the *need for continued commitment to course quality improvement*.

*          *          *

[T]he team questions whether the processes currently in place to train instructors and manage the quality of their performance adequately assures the validity of the [course review] data as evidence of student mastery of the program/university's learning outcome goals.

*          *          *

Of special concern was the ***lack of a robust assessment tool for measuring student learning***.

* * *

***The institution is at the initial stage of development of its program review process***.

* * *

The institution also provides students an opportunity to be awarded credit through Sponsored Professional Training. . . .   This institutional practice does not appear to conform to the WASC policies . . . .   This practice needs to be evaluated and revised to conform to WASC policies.

70.     The fifth area in which Ashford fell short of WASC accreditation, despite, as with the other four areas, "early notice" of WASC's concerns in this area, was failure to have "an effective system for assessing and monitoring student learning and assuring academic rigor," corresponding to CFRs 2.1, 2.2, 2.6 and 4.4.

71.     For this, the Action Letter stated, in part:

Ashford's capacity to assess student learning in a systematic and manageable way in its large online division is also in the "initial" or "emerging" stages, as defined by WASC rubrics, and does not yet provide adequate assurance that students are learning what they are intended to learn. . . .

***Serious concerns also exist about the rigor of coursework***, which varied from course to course and was not always at the appropriate level for the course.  In addition, there was variation in the quality and extent of discourse between faculty members and students in online courses, which is a key component of the Ashford instructional model.  By way of example, the team noted that faculty responses to required student posts were often limited to a few words of encouragement and lacking in substantive exchange between student and teacher.

72.     The particular findings of the Visit Team Report upon which these conclusions were based, included:

***Inconsistencies were observed . . . in several course curricula in levels of academic rigor and learning***.   For example, some upper-division courses required less academic rigor than lower-division courses within the same college.  The seasoned academic leadership required for the institution to be effective in the oversight and teaching of such a large student body and in an online environment is an area of concern. . . .   ***[T]he ratio of qualified full-team faculty to both the volume of programs and students appears to be inadequate*** . . . .   It is recommended that the institution develop and execute a faculty capacity model . . . to support and sustain educational effectiveness.

* * *

[T]he site team's review of 51 selected Ashford courses showed inconsistent course quality, *indicating the need for continued commitment to course quality improvement*.

\*       \*       \*

Although Ashford is in the midst of setting up a variety of assessment systems to establish, review, and demonstrate the attainment of its learning and student attainment expectations, it has *yet to set up the necessary processes for analyzing data and making meaningful data-informed decisions*.

\*       \*       \*

[I]n the majority of the cases reviewed, the aspect of the course that often/frequently contributes the highest single percentage of a student's grade was found to be "discussion." . . . While the instructors make comments in these online discussion sessions, it was found to be rare for an instructor to challenge a student's comments or have the student correct or elaborate on the comments.  This observation belies the assurances that the system for monitoring the 2,600 adjunct instructors can adequately identify situations in which the instructors might not be performing in ways that assure student learning. . . . *[T]his locked-in structure makes some sense as a management system but may not from a learning perspective*.

\*       \*       \*

[T]he online tests/quizzes sample by the review team appeared to be not very demanding and did not reflect the level of challenge for any usual practices used to assess the mastery of the material typically found in the courses reviewed.

\*       \*       \*

[T]he team questions whether the processes currently in place to train instructors and manage the quality of their performance adequately assures the validity of the [course review] data as evidence of student mastery of the program/university's learning outcome goals.

\*       \*       \*

[T]here does not appear to be a critical institutional research function that has examined in an analytically rigorous fashion the nature of student outcomes . . . . *Even something as basic as tracking and comparing over time retention and graduation rates for each of the four Ashford colleges appears to be missing*. . . .

Ashford stresses the traditional snapshot measures of retention [used by others in the for-profit sector] underestimate actual persistence of Ashford students . . . .   However, Ashford does not deal with these issues directly . . . . Rather the institution both publishes and emphasizes graduation rates for just subpopulations surviving early attrition.

73.     Lastly, the Commission found that Ashford lacked "[a]n empowered and independent governing board and a clear and acceptable relationship with the parent company," corresponding to CFRs 1.6, 3.9, 3.10.  As with the prior five areas discussed, but perhaps even more here due to the

1   objective nature of whether or not Ashford has an independent governing board, the Visit Team

2   Report illustrates the significant distance between a WASC accreditable institution, according to the

3   published WASC Standards and CFRs, and Ashford.

4

5        74.    The Action Letter stated, in part:

6   Ashford must be able to demonstrate sufficient independence from Bridgepoint to
    assert control over the academic and fiscal elements of its programs. . . .

7          The Ashford board is only recently beginning to transition from one that has

8   not operated independently from its parent company, with a majority of members,
including the chair, appointed by the parent.  Although the board is beginning to act
more autonomously, draft agreements that would establish Ashford as having an

9   independent board have not yet been implemented. . . .

10          . . . [T]he Ashford board does not yet have sufficient control over its budget
and plans, and key decisions about the allocation of resources continue to rest with

11   Bridgepoint.

12       75.    The particular findings of the Visit Team Report upon which these conclusions were

13   based, included:

14

15          The team found there are technical compliance issues with the make-up of the
University Board of Trustees. . . .  Under the current [Operating] Agreement . . . the
parent Bridgepoint company CEO appoints the members and the chair of the

16   institution's Board of Trustees. . . .  Furthermore, the . . . [Operating] Agreement
requires that the majority of Board of Trustee members be appointed by the

17   Bridgepoint CEO.  ***This is in direct conflict with CFR 3.9 that requires "an
independent governing board***."

18                *      *      *

19

20   To some extent, the Ashford trustees are a board in transition, from being appointed
in an essentially advisory capacity by the parent company to becoming a more
independent governing body with a majority of independent members.

21

22                *      *      *

23   [T]he parent company appears to exercise influence over the activities of the
university through dotted line relationships in its organizational structure.

24   **THE TRUTH EMERGES**

25   **WASC Denial Revealed**

26       76.    After receiving the Action Letter, Bridgepoint shocked the market when it filed a

27   Form 8-K with the SEC on July 9, 2012, which stated, in part:

28       **Item 8.01    Other Information.**

***Denial of Initial Accreditation for Ashford University***

On July 5, 2012, Ashford University received official notice from the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("WASC") that WASC has acted (1) to ***deny initial accreditation to the institution*** and (2) to permit the institution to reapply for accreditation with a single special visit to occur as early as spring 2013. This reapplication process would allow WASC to act in June 2013 and does not require Ashford University to undertake another full self-study.

\*       \*       \*

Ashford University remains regionally accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools ("Higher Learning Commission"), with the next comprehensive evaluation scheduled for 2014-15. Ashford University intends to work collaboratively with both WASC and the Higher Learning Commission to ensure it continues to satisfy the Higher Learning Commission's accreditation requirements while it seeks accreditation with WASC.

77.     Subsequently, on July 9, 2012, Bridgepoint issued a press release entitled "Ashford University to Run Parallel Process of Appeal and Re-application for WASC Accreditation," which stated in part:

Bridgepoint Education's Ashford University received notice on July 5, 2012 that the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges (WASC) acted to deny Ashford University's application for initial accreditation. WASC is one of seven regional accrediting commissions, with jurisdiction over schools located in the states of California and Hawaii, as well as the U.S. Pacific Islands.[6]

78.     On this point, the July 9, 2012 Form 8-K also stated:

WASC found that Ashford University had not yet demonstrated substantial compliance with certain of the WASC Standards for Accreditation, as would be required for initial accreditation. Ashford University intends to appeal this decision and simultaneously to undertake the process for reapplying for initial accreditation. Under WASC rules, if Ashford University decides to reapply for accreditation, the institution will be required to demonstrate that it has satisfactorily addressed the report's conclusions and has come into compliance with the WASC Standards of Accreditation.

79.     Also in the July 9, 2012 Form 8-K, Bridgepoint disclosed receipt of a June 25, 2012 letter from HLC requiring Ashford to demonstrate compliance with HLC's "substantial presence"

---

[6]     As discussed in ¶208, Ashford dropped the appeal on September 28, 2012, after receiving an appeal report from WASC.  Prior to this, analysts read Ashford's appeal prospects as low.

requirement announced in June 2010.  The market learned that Bridgepoint had taken no steps to

ensure continued HLC accreditation in light of the "substantial presence" requirement.  Instead,

defendants had put the future of Bridgepoint on the WASC application for accreditation, which they

knew, or recklessly disregarded, would very likely be denied.

80.     On this news, Bridgepoint stock plunged $7.25 per share to close at $14.25 per share

on July 9, 2012, a decline of nearly 34% on high volume of 7.8 million shares.

**The Second Shoe Drops, HLC Puts Ashford on "Special Monitoring Status"**

81.     The damage caused by defendants' Class Period misstatements and omissions

continued to mount when, on July 13, 2012, Bridgepoint filed a Form 8-K with the SEC that

revealed to the market that Ashford's only accreditor HLC placed them on "special monitoring

status" because of WASC's denial of accreditation and Ashford's significant deficiencies:

> On July 12, 2012, Bridgepoint Education's subsidiary, Ashford University,
> received a letter from the Higher Learning Commission of the North Central
> Association of Schools and Colleges ("HLC") requiring Ashford University to
> provide certain information and evidence of compliance with HLC accreditation
> standards.  HLC is a regional accrediting body recognized by the U.S. Department of
> Education and is the principal accreditor of Ashford University and its programs.
> The HLC letter relates to the recent visiting team report and action letter received by
> the University from the Accrediting Commission for Senior Colleges and
> Universities of the Western Association of Schools and Colleges ("WASC") on July
> 5, 2012.
>
> The letter requires that Ashford University submit a report to HLC no later
> than August 10, 2012 that will be followed by an Advisory Visit that will occur no
> later than October 9, 2012.  The University's report must demonstrate that the
> University remains in compliance with the HLC's Criteria for Accreditation and
> include: (i) evidence that Ashford University meets the HLC Criteria for
> Accreditation relating to the role and autonomy of the University's governing board
> and its relationship with Bridgepoint Education, including the role of faculty in
> overseeing academic policies and the integrity and continuity of academic programs,
> (ii) evidence that Ashford University's resource allocations are sufficiently aligned
> with educational purposes and objectives in the areas of student completion and
> retention, the sufficiency of full-time faculty and model for faculty development, and
> plans for increasing enrollments, and (iii) evidence demonstrating that Ashford
> University has an effective system for assessing and monitoring student learning and
> assuring academic vigor.
>
> The letter states that HLC's President will present the report of the Advisory
> Visit team and the President's recommendation to the HLC Board for action at its
> February 2013 meeting.  At that meeting, the HLC Board may act to continue
> accreditation, with or without further monitoring, continue accreditation under

sanction or "Show Cause" order, or withdraw accreditation.  The letter further states that Ashford University would be scheduled for a HLC Board Committee Hearing prior to any Board action to withdraw accreditation. HLC policies also provide for a right to appeal any Board action to withdraw accreditation.

82.     On this news, Bridgepoint stock plummeted $3.20 per share to close at $9.77 on July 13, 2012, a decline of nearly 25% on high volume of 6.7 million shares.

## DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

**First Quarter 2011 Earnings Release and Conference Call**

83.     The Class Period commences on May 3, 2011, shortly after Ashford had been deemed eligible to pursue WASC accreditation.  Defendants made numerous false and misleading statements and omissions which were designed to, and did, lead investors to believe that Ashford would successfully achieve WASC accreditation.

84.     On May 3, 2011, Bridgepoint issued a press release reporting its first quarter 2011 earnings results ("1Q11").  The Company reported net income of $53.9 million or $0.92 diluted earnings per share ("EPS") and revenue of $229.4 million for the quarter ending March 31, 2011.  Additionally, Bridgepoint updated its full-year 2011 outlook, with expectation of revenue to be between $886.5 million and $901.5 million and net income to be between $145.5 million and $151.4 million.  The release stated in part:

> "We are pleased with the results we achieved in the first quarter as our new enrollments are in-line with our expectations, and I am particularly pleased that our year over year student persistence increased for the fourth consecutive quarter.  The increased persistence not only resulted in better than anticipated revenue for the quarter, but it more importantly reinforces that ***the student support initiatives we made in 2010 to enhance student persistence are working as we planned.  Our focus will remain on continuing to improve the programs we have in place to further enhance the academic readiness of the students who attend our institutions, and to provide students with an innovative, high quality learning experience that enriches their lives***," said Andrew Clark, Chief Executive Officer of Bridgepoint Education.

85.     Analysts responded to defendants' statements contained in the 1Q11 press release and the importance of Bridgepoint's initiatives to future success – initiatives which WASC, in denying accreditation in July 2012, found to be too new to have produced any measureable effects.  A J.P.

Morgan analysts' report dated May 3, 2011, noted that "[l]ast quarter, [Bridgepoint] reiterated its focus on initiatives designed to establish student preparedness and increase student retention" and that "the company began rolling out its new admissions counselor evaluation policy in compliance with the new [DOE] rules that take effect July 1."  Analysts from William Blair & Company ("William Blair"), emphasized the importance of the 1Q11 earnings call in preparing their guidance and noted "[m]anagement commentary on quality initiatives and its retention assumptions will also be key for where our numbers end up."

86.    This press release prompted analysts to focus on the critical issue of Ashford's planned migration to WASC accreditation, which the student initiatives described in the press release sought to address.  The William Blair report stated that "***in our view a successful switch from HLC to WASC may be the only thing that finally lays some major fears to rest***." Highlighting those same concerns, analysts at Credit Suisse stated in a May 3 report prior to the 1Q11 earnings call that "[w]e hope to learn more about: 1) progress of already implemented internal quality initiatives; 2) new quality initiatives to be implemented in 2011; [and] ***3) progress of [Ashford]'s pursuit of WASC accreditation***."

87.    After releasing its 1Q11 results on May 3, 2011, Bridgepoint hosted a conference call for analysts, media representatives, and investors.  Defendants Clark, Devine, and McAuliffe actively participated in the call.  During the call, defendant McAuliffe represented the following:

> Let me start with brief updates on the annual meeting of the Higher Learning Commission and on the Academic Resource Conference of the Western Association of Schools and Colleges.  We had the opportunity to attend both accreditation meetings, which were held over the past few weeks.  Both accreditation organizations give updates on the revision of their accreditation standards and reaffirmation processes.
>
> For WASC, a thorough review of standards, policies and processes will result in changes beginning in 2012, and a new handbook will be adopted no later than 2013.  For the Higher Learning Commission the new criteria will be acted upon by the HLC Board in February 2012, and the revised criteria for accreditation are effective for all accredited institutions on January 1, 2013.

1   The new standards for both accreditors feature a much greater emphasis on the collection of in-depth information on key data, as well as accurate and complete public disclosure of information.

2

3   Although these changes will not have an immediate impact on our current review, *Ashford University is well on its way to providing a very transparent view on key data regarding its students*.

4

5                    *        *        *

6   *I would also like to update you on the status of Ashford University's migration to WASC accreditation*. As you know, Ashford University has applied for eligibility, which is a preliminary review of an institution to determine that an institution is potentially accreditable.

7

8   WASC has reviewed the application and determined that Ashford University is eligible to proceed with an application for candidacy for accreditation. This is a preliminary finding that indicates that the University can proceed to the next step, which includes writing a self-study in preparation for a site visit. *The team is very excited to be moving forward in the process.*

9

10

11   Ashford University continues to keep HLC well-informed each step of the way, and our liaison is very cooperative and supportive.

12

13   88.   Later in the call, defendant Clark, in response to an analyst's question concerning the

14   status of Ashford's WASC application, stated, "we are very pleased with our progress so far" and

15   "*as we have in the past, we will be very transparent with everybody*." Defendant McAuliffe chimed

16   in on the same question by stating "I think in the coming weeks the President and the Provost will be

17   meeting with WASC and sort of mapping it all out, and getting feedback from them as to what we'll

18   focus on, and the self study and what that process will look like. *So stay tuned, and we will keep*

19   *you informed, as we have all along*."

20

21   89.   In touting the rigorous coursework at Bridgepoint institutions, including Ashford –

22   one of numerous points upon which WASC's denial would later be based, as discussed in ¶¶70-72 –

23   defendant Clark represented that "*[w]e pride ourselves on our broad selection of rigorous . . .*

24   *courses*" and that Bridgepoint "institutions share a single goal, to offer rigorous, high-quality degree

25   programs . . . that ensure that the student has the best possible learning experience."

26

27   90.   Additionally, in response to questions from analysts, defendant Clark spoke to

28   "quality initiatives" implemented "back in 2010," and represented to investors that "*[w]e saw . . .*

1   *positive changes*" from the initiatives "as early as the second quarter" in 2010 and "we continue to

2   realize the positive outcomes from [the initiatives] in the third quarter and fourth quarter [of 2010],

3   and now again in the first quarter" of 2011.  Also that "*everything that we implemented last year*

4   *has really done what we thought it would do, which is improve our persistence*."   In denying

5   accreditation in July 2012, WASC found these initiatives were either nonexistent or had no

6

7   measurable impact.

8       91.    Defendant Clark, responding to an analyst's question, represented the following about

9   persistence for the quarter – an aspect of Ashford that WASC, in denying accreditation, found "on its

10  face, not acceptable":

11          [T]he increase in persistence was fairly similar across students.  Students in their first
            and second course, those are the folks that are [always], as you know, most likely to
12          drop and not persist.  And so we're doing quite a bit inside our organization to try
            and focus in on those students and try and help them through those first couple of
13          courses.

14          These adults haven't been to school in a while, and it's a completely kind of
            new experience for them in many cases.  So anything that we can do to better assist
15          them in those first few courses, we are working on that internally on various
            initiatives and ways in which we can increase that persistence.
16

17                          *       *       *

18          So we are pleased overall with our initiatives . . . .

19      92.    Defendant Clark further stated that "we are very focused on doing everything we can

20  at our institutions to improving persistence and improving our graduation rates, and setting students

21  to be as successful as they can possibly be."  Further that "right now we are very focused on our

22  initiatives for 2011 on student persistence, student graduation – anything we can do to improve the

23  student experience in the classroom or administratively."  Not coincidentally, the July 2012 WASC

24  Action Letter denying Ashford's application found that the impact of these initiatives could not "yet

25  be measured and assessed."

26

27      93.    On this news, Bridgepoint stock closed up $1.48 per share to close at $19.87 per share

28  on May 3, 2011.

**Analysts' Response to May 3, 2011 Earnings Release and Conference Call**

94.     Analysts paid particular attention to the positive remarks made by defendants regarding Ashford's accreditation.  In reacting to the May 3 earnings call, J.P. Morgan analysts, in a report issued May 3, 2011, again keyed in on defendants' discussion of initiatives in noting that "BPI reiterated its focus on initiatives designed to establish student preparedness . . . and increase student retention."  As to the central issue of accreditation, the J.P. Morgan report stated that "BPI also reported to be on plan in its process of switching its institutional accreditor (from [HLC] to WASC)."  Among Bridgepoint's "downside risks," the J.P. Morgan report keenly recognized that "[Bridgepoint] is in the process of switching its institutional accrediting agency . . . which adds to execution risk."  Analysts at RBC Capital Markets, in a report dated May 4, 2011, also listed Bridgepoint "receiv[ing] WASC accreditation" as a "potential catalyst" for Bridgepoint stock.  Further recognizing the importance of accreditation to investors, analysts from William Blair, in a report dated May 4, 2011, stated the following:

> ***We recognize the switch from HLC to WASC accreditation stands as a huge issue for many investors, but we remain confident Bridgepoint will be successful in this regard***, particularly with its "new" growth profile as a backdrop for how WASC will view the risk of Bridgepoint becoming one of its institutions.  Management noted on the call that it has proceeded to the next step in the switch from HLC to WASC (meaning WASC views Bridgepoint as "accreditable"), but clearly there is a long road that lies ahead and the issue is likely to constrain the multiple until its resolution.

95.     As defendants downplayed the risks, so did the market.  Analysts from Credit Suisse, in a report dated May 4, 2011, provided their impressions of defendants' discussion in the May 3 earnings call:  "Ashford University is currently accredited by the [HLC], but seeks to shift to the [WASC] due to its headquarters location in California . . . .  This is a long and complex process, but *we see only minor risk* . . . ." but noted what defendants did not; that "if Ashford University does not receive WASC accreditation and loses accreditation from HLC, Ashford would no longer be accredited and would be ineligible to participate in Title IV programs."

96.     Defendants' May 3, 2011 statements made in the press release and conference call, as set forth in ¶¶84, 87-92, were materially false and misleading when made because defendants failed to disclose that:

(a)     Ashford had failed to develop and implement reforms to address the WASC concerns communicated to defendants in the spring of 2011 which would be required for WASC accreditation, including that:

(i)     Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition;

(ii)     Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion;

(iii)     Ashford had failed to implement plans, procedures, practices and personnel to sufficiently support students in achieving positive outcomes, including failing to implement a robust assessment tool for measuring student learning;

(iv)     Ashford failed to maintain an empowered and independent governing board; and

(v)     Ashford failed to maintain separate audited financial statements.

(b)     Bridgepoint had failed to retain a sufficient core of full-time faculty for Ashford Online and failed to implement procedures and processes to monitor and develop faculty and establish clear roles for faculty in academic oversight, leading to inconsistent levels of faculty involvement with students and a less rigorous curriculum than that appropriate for the level of course, resulting in both student attrition and poor outcomes for students who completed their programs with Ashford;

(c)    Bridgepoint had failed to align resources with educational purposes and objectives such that Bridgepoint's high level of expenditures on marketing and recruitment resulted in abundant personnel levels in recruitment versus inadequate levels in student support and academic quality, leading to poor student outcomes;

(d)    Bridgepoint failed to implement strategic planning processes to emphasize academic quality and student support and align institutional resources with successful student outcomes over revenue growth;

(e)    Bridgepoint failed to timely implement adequate program review procedures and failed to review an adequate proportion of Ashford programs when new program review procedures were being developed;

(f)    Bridgepoint was not making significant progress on key initiatives to attain WASC accreditation but rather any such efforts had not even commenced or were in the very initial stages; and

(g)    Bridgepoint would not be able to attain the financial projections made in its public statements without WASC accreditation, which was highly unlikely due to the Company's failure to address WASC concerns.

97.    Defendants' May 3, 2011 financial projections stated in the Bridgepoint press release and during the conference call, as set forth in ¶84, were similarly materially false and misleading as they incorporated defendants' false and misleading statements and omitted the information set forth in ¶96 above.

98.    As a result of defendants' false and misleading statements in the May 3, 2011 press release and conference call, Bridgepoint's securities traded at artificially inflated levels.

99.    On July 22, 2011, Bridgepoint reached its Class Period high of $30.50 per share.

100.    Also on July 22, 2011, in a Form 8-K filed with the SEC, Bridgepoint announced that "[o]n July 22, 2011, we filed a registration statement on Form S-3 . . . to register the resale of 34,589,220 shares of our common stock held by Warburg Pincus Private Equity VIII, L.P."

101.    Conveniently, on July 21 and July 22, 2011 – the same day as Bridgepoint stock reached its Class Period high and it was announced that Warburg Pincus, the holder of roughly two-thirds of Bridgepoint's outstanding stock may sell some or all of his stake – defendant Clark sold 67,466 shares for over $2 million in proceeds.  In addition, on July 21, 2011, defendant Devine sold 21,600 shares for proceeds of $648,648.

**Second Quarter 2011 Earnings Release and Conference Call and Bridgepoint's Second Quarter 2011 Form 10-Q**

102.    On August 2, 2011, Bridgepoint issued a press release reporting its second quarter 2011 ("2Q11") earnings results.  The Company reported net income of $52.1 million or $0.90 diluted EPS and revenue of $239.9 million for the quarter ending June 30, 2011.  Additionally, Bridgepoint updated its full-year 2011 outlook, maintaining its projected revenue to be between $886.5 million and $901.5 million, and increasing projections of net income to between $148.3 million and $155.2 million.  The release stated in part:

> "During the first half of 2011, our institutions continued to make progress on key initiatives to improve the academic readiness of students and to provide students with an innovative, high quality learning experience. . . ," said Andrew Clark, Chief Executive Officer of Bridgepoint Education.

103.    In response, analysts expressed interest in Bridgepoint's highly touted quality initiatives which WASC later characterized as immature when denying accreditation.  A William Blair report stated "Management commentary on quality initiatives and its retention assumptions will also be key for where our numbers end up."  Similarly, J.P. Morgan analysts stated:

> In recent quarters, BPI reiterated its focus on initiatives designed to establish student preparedness . . . and increase student retention.  Also, in 4Q10, the company began rolling out its new admissions counselor evaluation policy in compliance with the new regulations that took effect July 1.  We would be interested in [management's] comments about the impact of these initiatives on new enrollments and student retention.

1   . . . On the call, we would like to learn more about 1) [management's]
2   outlook on new enrollments with comments around the potential impact of BPI's
    operating initiatives (new orientation program, change in incentive compensation for
    admissions advisors); . . . 3) more commentary on quality proxies and metrics
3   (completion rate, persistence, cohort default rate, etc.).

4   104.   After releasing its 2Q11 results, Bridgepoint hosted a conference call on August 2,

5   2011 for analysts, media representatives, and investors.  Defendants Clark, Devine, and McAuliffe

6   actively participated in the call.  During the call, defendant Clark represented the following:

7
    We continue to believe that maintaining a high level – *high level of persistence level*
8   *is an important goal for both of our institutions and demonstrates that our*
    *institutions are successfully engaging students and delivering a quality education*
9   *experience that enhances student's lives*.  We will continue to focus on improving
    persistence . . . .
10
                                    *       *       *
11
    We are pleased with our progress in the first half of 2011.  *We have achieved*
12  *significant key initiatives, strengthened our support for students and faculty*
    through developing new technologies and enhanced transparency for prospective
13  students.

14  105.   During the call, defendant McAuliffe represented the following:

15  I am pleased to report that the eligibility review panel the, The WASC Accrediting
    Commission on Senior Colleges and Universities approved Ashford University as
16  eligible to seek initial accreditation after meeting all 23 WASC eligibility criteria.

17      The University was approved to pursue initial accreditation through an
    application and review process known as Pathway B in the WASC Accreditation
18  manual. Pathway B is reserved for those institutions already accredited by
    department recognized institutional crediting agency and enables an institution to
19  obtain initial accreditation more rapidly than those seeking institutional
    accreditations for the first time.
20
        At the time of Ashford's eligibility approval in May, WASC noted that while
21  Ashford is now eligible to move forward with its process toward initial accreditation,
    all available slots for an onsite visit in the fall 2011 had already been taken and
22  WASC subsequently assigned Ashford an onsite visit in March 2012.

23      Under the Pathway B procedure and because Ashford met the eligibility
    requirements for accreditation, *Ashford is next required to submit a self study in*
24  *December of 2011 that demonstrates that at a substantial level that it meets the*
    *WASC criteria for accreditation*. The December timing reflects a point in time 12
25  weeks in advance with the currently scheduled onsite visit in March 2012.

26      The University faculty and staff are hard at work preparing a self study that
    portrays the institution's strengths and achievements, as well as reflecting on what
27  can further be developed in order to advance the institution.  *I couldn't be more*
    *pleased with where Ashford University is in the process*.
28

106.    On August 2, 2011, Bridgepoint filed its 2Q11 Form 10-Q with the SEC, as approved and signed by Clark and Devine, and reviewed and approved by McAuliffe, in which defendants discussed Ashford's pursuit of WASC accreditation:

> *WASC determination of eligibility for Ashford University.* In September 2010, Ashford University applied for eligibility from the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("WASC"). **On May 12, 2011, Ashford University received a letter from WASC stating** that the WASC Eligibility Review Committee has reviewed the application and determined that **the university meets all of the WASC eligibility criteria and may proceed with an application for initial accreditation**. Additionally, the letter confirmed that Ashford University is authorized to pursue WASC accreditation under Pathway B, the process for institutions that currently hold accreditation with an institutional accreditor recognized by the Department. A determination of eligibility is not a formal status with WASC, nor does it ensure eventual accreditation; it is a preliminary finding that Ashford University is potentially accreditable and can proceed within four years of its eligibility determination to be reviewed for initial accreditation status with WASC.

>                      *        *        *

> Ashford University has applied for accreditation by the Western Association of Schools and Colleges ("WASC") with the intention of relinquishing its HLC accreditation and designating WASC as its primary accreditor for Title IV purposes upon the completion of that process.

>                      *        *        *

> Ashford University has applied for authorization with CSAC independent of its HLC accreditation in the event that is required under the new regulation, and because **such registration will in any event be necessary when WASC becomes its primary accreditor**.

**Analysts' Response to 2Q11 Earnings Release and Conference Call and Bridgepoint's 2Q11 Form 1Q-Q**

107.    In response to the Bridgepoint earnings release and corresponding conference call on August 2, 2011, analysts continued to view WASC accreditation with minimal or no risk – a direct result of defendants' Class Period misstatements and omissions.  William Blair analysts again keyed in on defendants' progress reports, without even a hint of potential difficulties, concerning the WASC application:

> We recognize **the switch from . . . (HLC) to . . . (WASC) accreditation stands as a huge issue for many investors, but we remain confident that Bridgepoint will be successful in this regard**, particularly with its "new" growth profile as a backdrop for how WASC will view the risk of Bridgepoint becoming one of its institutions.  **Management noted on the call that it has proceeded in the next step** in the switch from HLC to WASC (a self-study report is due in December

2011 . . . ), but clearly there is a long road that lies ahead, and the issue is likely to constrain the multiple until its resolution.

108.    Analysts' reports from BMO Capital Markets ("BMO Capital") and Credit Suisse, issued August 2, 2011 and August 3, 2011, respectively, illustrate the rosy and apparently risk-free accreditation picture being painted by defendants' Class Period misstatements and omissions.  The BMO Capital report stated, in part:

> In 2Q11, Ashford was notified that it was deemed eligible to pursue accreditation from WASC through a modified process available to currently accredited schools known as Pathway B.  This should enable a more rapid accreditation process.  The next stage of the process enables Ashford to submit a self-study in December 2011, followed by a site visit in March 2012.

109.    Similarly, the Credit Suisse report stated, in part:

> The site visit is now scheduled for March, 2012 due to WASC's full schedule; we believe [Bridgepoint] had previously expected it to be this year.  ***Management remains optimistic about this issue***.

110.    In a report dated August 12, 2011, ten days after defendants' 2Q11 earnings release and corresponding conference call, analysts from Wunderlich Securities ("Wunderlich") recognized the extreme importance of Bridgepoint's continued accreditation:

> ***WASC accreditation is the catalyst***.  Because of a rule change with its existing accreditor (HLC), [Bridgepoint]'s flagship Ashford U. must pursue accreditation in the west (WASC).  The process is slow and opaque and because of the intensity of criticism that [Bridgepoint] has received, investors appear nervous about the school's ability to secure accreditation on comparable terms.  But ***we expect that 12 months from now, Ashford will have received at least tentative accreditation*** and that as a result, [Bridgepoint]'s valuation will be more in line with other post-sec schools.

111.    The report continued, commenting on recent initiatives implemented by Bridgepoint, which WASC later found had not yet produced measurable effects:

> The dramatic slowdown in starts we rather view as a function of the company's additional orientation process as well as greater selectivity in its admissions process.  The contemplated expense increase we believe is for the benefit of WASC evaluators.  These changes are intended to neutralize concerns WASC may have regarding Ashford's ability to provide quality service and instruction.

112.    In addition, the report analyzed Ashford's prospects of receiving WASC accreditation in light of recent criticisms of Bridgepoint and the for-profit education sector.  The report illustrates

how defendants' positive comments regarding Bridgepoint's dedication to student retention, persistence, graduation, rigorous coursework, and quality initiatives implemented to address concerns in those areas, instilled in investors and analysts alike a sense of optimism towards the Ashford product and, therefore, the prospects of receiving initial accreditation from WASC.

> *We believe the risk that WASC does not accredit Ashford is small as we have confidence in both the integrity of the WASC process and in the substance of Ashford's product.*

*   *   *

> [D]oubts regarding the integrity of Bridgepoint's processes or quality should be effectively resolved with an acceptable WASC review. Like other regional accreditors, WASC has received criticism for the opaque and seemingly clubby nature of its processes. As a result, it is in the process of adopting a ***more explicit set of accreditation criteria***. We believe this change represents a positive for Bridgepoint, as it ***provides more clarity and precision around the process and removes the prospect for bias*** resulting from the negative publicity the for-profit sector and Bridgepoint in particular has received.

> *We believe that clear and straightforward rules should allow a well-run institution to excel. . . . Any effort to make that system more objective can only be taken as a positive that will enhance the investment merits of any institution that passes muster. . . . The fact that the goal is well-defined means that bias engendered by bad publicity political attacks on Ashford can have no bearing on the decision to grant accreditation.*

> . . . [W]e have strong conviction that the quality of the education product is well-deserving of accreditation and that WASC is not likely to be cowed by unsubstantiated accusations.

113. At the time of their August 2, 2011 material misstatements and omissions, defendants were in possession of two letters from WASC "outlining the specific areas of focus that would need close attention . . . in order to demonstrate substantial compliance with all [WASC accreditation] standards" – the same areas upon which denial of accreditation was based in July 2012. Despite this, defendants knowingly withheld these letters and the clear risk they presented to Ashford's accreditation, and Bridgepoint's continued viability.

114. Furthermore, Bridgepoint was required to submit an extensive self study to WASC in December 2011, a mere four months from the time of defendants' August 2 material misstatements and omissions. In the self study, defendants were required to "respond to each of the applicable

Criteria for Review (CFRs) and provide supporting documentation as appropriate." But, Ashford's self study would later be characterized by WASC as lacking "deeper self-analysis, reflection, and inclusion of plans for improvement in identified areas" – referencing the specific areas of concerns outlined in the May 23, 2011 and June 3, 2011 "early notice" letters from WASC.

115.    Defendants' August 2, 2011 statements made in the Bridgepoint Form 10-Q, press release, and conference call, as set forth in ¶¶102, 104-106, were materially false and misleading when made because defendants failed to disclose that:

(a)    Ashford had failed to develop and implement reforms to address the WASC concerns communicated to defendants in the spring of 2011 which would be required for WASC accreditation, including that:

(i)    Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition;

(ii)    Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion;

(iii)    Ashford had failed to implement plans, procedures, practices and personnel to sufficiently support students in achieving positive outcomes, including failing to implement a robust assessment tool for measuring student learning;

(iv)    Ashford failed to maintain an empowered and independent governing board; and

(v)    Ashford failed to maintain separate audited financial statements.

(b)    Bridgepoint had failed to retain a sufficient core of full-time faculty for Ashford Online and failed to implement procedures and processes to monitor and develop faculty and establish clear roles for faculty in academic oversight, leading to inconsistent levels of faculty

involvement with students and a less rigorous curriculum than that appropriate for the level of course, resulting in both student attrition and poor outcomes for students who completed their programs with Ashford;

(c)     Bridgepoint had failed to align resources with educational purposes and objectives such that Bridgepoint's high level of expenditures on marketing and recruitment resulted in abundant personnel levels in recruitment versus inadequate levels in student support and academic quality, leading to poor student outcomes;

(d)     Bridgepoint failed to implement strategic planning processes to emphasize academic quality and student support and align institutional resources with successful student outcomes over revenue growth;

(e)     Bridgepoint failed to timely implement adequate program review procedures and failed to review an adequate proportion of Ashford programs when new program review procedures were being developed;

(f)     Bridgepoint was not making significant progress on key initiatives to attain WASC accreditation but rather any such efforts had not even commenced or were in the very initial stages; and

(g)     Bridgepoint would not be able to attain the financial projections made in its public statements without WASC accreditation, which was highly unlikely due to the Company's failure to address WASC concerns.

116.   Defendants' August 2, 2011 financial projections stated in the Bridgepoint press release and during the conference call, as set forth in ¶102, were similarly materially false and misleading as they incorporated defendants' false and misleading statements and omitted the information set forth in ¶115 above.

117.    As a result of defendants' false and misleading statements in the August 2, 2011 press release and during the August 2, 2011 conference call, Bridgepoint's securities continued to trade at artificially inflated levels.

**September 15, 2011 BMO Capital Markets Back to School Education Conference**

118.    On September 15, 2011, defendants Clark and Devine appeared at the BMO Capital Markets Back to School Education Conference for analysts, media representatives, and investors during which defendant Clark represented the following as to academic rigor and program development – both specific factors upon which WASC would base its denial of accreditation:

> Just a little bit about how we approach things from an academic standpoint and a quality standpoint in addition to innovation.  We really are looking at exemplary learning models. ***Ashford University's learning models uses a rigorous course program development process*** where we're actually encapsulating instructional design advances that have been developed over the past [four] years. It's very student-centered.  Courses and program learning outcomes then are aligned with the assessments.

*       *       *

> [W]e use a faculty mentoring process to ensure that our faculty are able to deliver the kind of learning experience that we expect.

119.    Later in the call, defendant Clark represented the following:

> In terms of the WASC migration, which I mentioned earlier where Ashford University is going through the process to become WASC accredited, we have met all the eligibility criteria.  We are submitting our self-study in the fourth quarter of this year.  And we will have our visit by WASC in March of next year

120.    As throughout the Class Period, defendants' statements concerning Ashford's pursuit of WASC accreditation omitted that defendants knew or recklessly disregarded the fact that Ashford could not demonstrate substantial compliance with multiple aspects of the WASC Standards.

**Analysts' Response to BMO Conference**

121.    Defendants' false and misleading statements at the BMO Conference sparked positive analyst commentary.  On September 15, 2011, BMO Capital reported that Bridgepoint "appears to be making progress on its accreditation switch. . . ."  Similarly, on September 19, 2011, J.P. Morgan reported that "[Bridgepoint management] suggested that its pursuit of . . . (WASC) was proactive"

1  and "[Bridgepoint management] confirmed that the process is on an accelerated track and is

2  proceeding as planned."

3      122.    In a report dated October 5, 2011, analysts from Wunderlich recognized the vital

4  nature of accreditation in the Bridgepoint valuation analysis and the positive effect defendants'

5  misstatements and omissions have had on reassuring investors:

6

7      [W]e continue to believe that *the more meaningful catalyst for the shares remains*
       *accreditation approval by the . . . (WASC), which we still consider likely*.  For this
8      reason, our enthusiasm for the shares remains unabated.

9      123.    The Wunderlich report continued, now commenting on the message recently

10  communicated by defendants to the market:  "[P]oints raised by the company include strong

11  objective measures of student satisfaction, engagement, and outcomes – all supporting the thesis that

12  the quality at Ashford is as good or better than at any peer school."  This view, created and promoted

13  by defendants' Class Period misstatements and omissions as to the quality of the Ashford product

14  and the effects of recently implemented quality initiatives, led the Wunderlich analysts and the

15  market to conclude that "*the risk that WASC does not accredit Ashford is small as we have*

16  *confidence in both the integrity of the WASC process and in the substance of Ashford's product.*"

17

18      124.    Defendants' September 15, 2011 statements made at the BMO Capital Markets Back

19  to School Education Conference, as set forth in ¶¶118-119, were materially false and misleading

20  when made because defendants failed to disclose that:

21      (a)    Ashford had failed to develop and implement reforms to address the WASC

22  concerns communicated to defendants in the spring of 2011 which would be required for WASC

23  accreditation, including that:

24

25      (i)    Ashford had not developed a method for tracking, collecting and

26  displaying data on retention, persistence, and completion in a manner that could be understood and

27  analyzed to improve student outcomes, which resulted in high levels of attrition;

28

1    (ii)    Ashford had not implemented concerted and systematic approaches to

2   improve retention, persistence, and completion;

3    (iii)    Ashford had failed to implement plans, procedures, practices and

4   personnel to sufficiently support students in achieving positive outcomes, including failing to

5   implement a robust assessment tool for measuring student learning;

6

7    (iv)    Ashford failed to maintain an empowered and independent governing

8   board; and

9    (v)    Ashford failed to maintain separate audited financial statements.

10    (b)    Bridgepoint had failed to retain a sufficient core of full-time faculty for

11   Ashford Online and failed to implement procedures and processes to monitor and develop faculty

12   and establish clear roles for faculty in academic oversight, leading to inconsistent levels of faculty

13   involvement with students and a less rigorous curriculum than that appropriate for the level of

14   course, resulting in both student attrition and poor outcomes for students who completed their

15   programs with Ashford;

16

17    (c)    Bridgepoint had failed to align resources with educational purposes and

18   objectives such that Bridgepoint's high level of expenditures on marketing and recruitment resulted

19   in abundant personnel levels in recruitment versus inadequate levels in student support and academic

20   quality, leading to poor student outcomes;

21

22    (d)    Bridgepoint failed to implement strategic planning processes to emphasize

23   academic quality and student support and align institutional resources with successful student

24   outcomes over revenue growth;

25    (e)    Bridgepoint failed to timely implement adequate program review procedures

26   and failed to review an adequate proportion of Ashford programs when new program review

27   procedures were being developed;

28

(f)      Bridgepoint was not making significant progress on key initiatives to attain WASC accreditation but rather any such efforts had not even commenced or were in the very initial stages; and

(g)      Bridgepoint would not be able to attain the financial projections made in its public statements without WASC accreditation, which was highly unlikely due to the Company's failure to address WASC concerns.

125.     As a result of defendants' false and misleading statements at the September 15, 2011 BMO Capital Markets Back to School Education Conference, Bridgepoint's securities continued to trade at artificially inflated levels.

**Third Quarter 2011 Earnings Release and Conference Call**

126.     On November 1, 2011, Bridgepoint issued a press release reporting its third quarter 2011 ("3Q11") earnings results.  The Company reported net income of $43.8 million or $0.78 diluted EPS and revenue of $242.8 million for the quarter ending September 30, 2011.  Additionally, the Company raised its previous full-year 2011 outlook, with expectations of revenue to be between $920 million and $926 million and net income to be between $168.5 million and $170.3 million.

127.     Analysts remained focused on Bridgepoint's efforts to secure WASC accreditation for Ashford.  In response to the release, analysts at J.P. Morgan reported:  "In recent quarters, BPI reiterated its focus on initiatives designed to establish student preparedness (*e.g.*, orientation programs) and increase student retention.  We would be interested in mgmt's comments about the impact of these initiatives on new enrollments and student retention."  Analysts at Credit Suisse and William Blair, in reports dated November 1, 2011, recognized the importance accreditation played in the continued success of Bridgepoint, stating "[w]e hope to learn about . . . WASC accreditation pursuit."

128.     After releasing its 3Q11 results on November 1, 2011, Bridgepoint hosted a conference call for analysts, media representatives, and investors.  Defendants Clark, Devine, and McAuliffe actively participated in the call.  During the call, defendant Clark spoke to the effects of technology innovations recently put in place at Ashford:  "These new innovations expand and enhance our efforts to offer students a ***broad selection of rigorous, engaging, and practical courses***."

129.     Clark ended his initial comments with the following:

> Taking a broader viewer of our accomplishments to date in 2011, our institutions have successfully managed through a major transition in how our industry operates.  ***We have made significant progress on key initiatives***.  ***We have strengthened our support for students and faculty*** through innovative technologies.  And we have enhanced transparency for prospective students.

> We are pleased with this progress, and we believe we are increasingly well positioned to meet the educational needs of students.

130.     Notably, in acting to deny Ashford's application for accreditation, WASC found such innovations to be in the "'initial' or 'emerging' stages" and stated that "[s]erious concerns also exist about the rigor of coursework" at Ashford.  WASC further found that Ashford's initiatives were only recently implemented and their "impact" could not "yet be measured and assessed," and that "Ashford has only recently sought to . . . develop programs to support students to succeed in meeting their educational goals."

131.     Later in the call, defendant McAuliffe represented the following as to persistence rates at Bridgepoint institutions – one of multiple aspects of the WASC Standards upon which accreditation was denied: "Our success with persistence and graduation is also due in part to our long-standing practice of seeking the highest quality prospective students, which is a practice that remains central to our recruitment focus.  Having well-prepared students and maintaining high persistence levels are important goals for both of our institutions."

132.     In addition, defendant McAuliffe addressed Ashford's migration to WASC:

I want to provide you an update on accreditation for Ashford University. Having already established eligibility to move forward with an application for initial accreditation with the Western Association of Schools and Colleges, Ashford University continues its focused preparations for the submission of the WASC self-study in December 2011.

The self-study effort has brought university faculty, staff, and administrators together in positive, well-coordinated, and collaborative discussions to develop appropriate documentation on *how the University demonstrates compliance with the current WASC standards for accreditation*. This self-study process is a worthy process, as it allows University faculty and leadership to reflect on current practices and build towards the future.

As we have reported previously, Ashford University plans to host a visiting team from WASC in March 2012.  Ashford's materials and the report of the visiting team will be considered by the WASC commission at a meeting following the on-site team visit and completion of the team's reports.  *A decision relative to Ashford's application for accreditation is expected to be made at that time*.

The University leadership values its collegial relationship with the WASC staff as we work through each stage of this process.  The President of the University also continues to keep the Higher Learning Commission informed of progress, in the University continues to be accredited by the Higher Learning Commission.

I am very pleased with how the University leadership has continued to move forward and commend them on their focus and dedication to this project.

133.    William Blair analyst Brandon Dobell, pointedly asked for elaboration on just how Bridgepoint's praised quality initiatives were improving retention and persistence.

[Dobell:]  Looking for a little more color or commentary on what seems to be a pretty good persistence or retention quarter, I guess from a couple points of view.  One, are you seeing outsize improvements on the front end?  So students that are there one, two, three courses.

Or is it more apparent on students that have been there a year or between a year and two years?  Thanks.

*            *            *

[McAuliffe:]  I think we are starting to see the effects of all the work that we are doing upfront.  If you think about the quality initiatives we put into place with the orientation; with required attendance in the beginning courses; how we walk our students to class and make sure they are prepared and are comfortable in that learning environment.

So by the time they get there, all that upfront preparation has really given them a sense of confidence that they can succeed and they can achieve and they know what to expect.  So we think that is having a good impact for us.

134.    Defendant McAuliffe was asked to comment on the "predictive analytics" defendants had represented were being used at Bridgepoint.  She responded with the following:

It is new.  We are excited to be looking at some of that initial data, and the teams are really going to use that to make some quality decisions within the classroom, within their instructional practices, within the day-to-day support for students from an academic perspective, and where we might be able to jump in and coach them as far as what we are seeing and what behaviors we can tend to see across-the-board with all students, and how those trends can help better inform how that student can be successful himself in the classroom.

So it is new for us, and we are just excited to get it rolling and to start using some of that data.

Defendant Clark chimed in on the topic:

Yes, I mean I would just add to [McAuliffe's] comments that there is a tremendous amount of insight that we have gained from that investment, and we are just at the beginning.  So we expect that we are going to have even further insight that is going to lead to even more improvements, as Jane mentioned.

It's very exciting for us as an organization and for our institutions to be able to have that predictive capability and to proactively reach a student before they start having some significant type of issues that might lead them to dropping out of the institution.

135.    Defendants' statements and responses falsely represented and omitted the fact that Bridgepoint's initiatives to improve retention, persistence, and completion were not yet meaningful even as late as July 2012, months after their statements.

136.    On November 1, 2011, defendant Clark sold 43,560 shares for proceeds of $986,931. Only a few days later on November 4, 2011, defendant Devine sold 18,500 shares for proceeds of $427,720.

**Analysts' Response to 3Q11 Earnings Release and Conference Call**

137.    Analyst commentary continued to reflect the positive outlook defendants provided regarding accreditation.  Following defendants' 3Q11 earnings release and conference call, analysts at William Blair, in a report dated November 1, 2011, observed the following:

*We recognize the switch from . . . (HLC) to . . . (WASC) accreditation stands as a huge issue for many investors, but we remain confident Bridgepoint will be successful in this regard*, particularly with its "new" growth profile (in line with the group's growth, improving retention, etc.) as a backdrop for how WASC will view the risk of Bridgepoint becoming one of its institutions.  Management recapped on the call that its self-study report is due in December 2011, and then an on-site visit will commence sometime in March 2012 . . . .

138.    In a report dated November 1, 2011, analysts at BMO Capital made similar observations:

> In 2Q11, Ashford was notified that it was deemed eligible to pursue accreditation from WASC through a modified process available to currently accredited schools known as Pathway B.  This should enable a more rapid accreditation process.  The next stage of the process enables Ashford to submit a self-study in December 2011, followed by a site visit in March 2012.

139.    Notably, the BMO Capital comments are identical to those made following Bridgepoint's 2Q11 earnings call – illustrating that defendants' misstatements and omissions regarding Ashford's WASC accreditation prospects had their intended effect of continuing to lead investors to believe accreditation was forthcoming.

140.    Analysts at Wunderlich raised their price target for Bridgepoint to $33, stating "[w]e believe this valuation – and maybe better – is realistic following clarity around WASC approval. *We believe the risk that WASC does not accredit Ashford is small as we have confidence in both the integrity of the WASC process and in the substance of Ashford's product*."

141.    Similarly, in a report dated November 2, 2011, analysts at Craig-Hallum recognized the importance of accreditation to Bridgepoint's share price:

> Given that the stock still sells at an extreme discount to its peer group, it is clear that the market is still fixated on the outcome of [Ashford's] new accreditation. . . . *[A] negative outcome . . . would certainly be detrimental to the company.  We think this risk, while not 0%, is quite low* and that when this gets resolved (summer 2012), the stock could rally significantly.

> *         *         *

> *New Accreditation on Plan* – We think that many of the shorts in the stock . . . are looking at Bridgepoint's accreditation transfer from HLC to WASC as a significant risk.  *We feel that this risk is very low for the following reasons*.  First, the person leading this transfer, Jane McAuliffe, has been through this process before with other companies and has demonstrated success in obtaining accreditation.   Second, Bridgepoint has been approved to pursue initial accreditation through an application and review process known as Pathway B.  This process is reserved for those institutions already accredited by recognized institutional accrediting agencies and enables an institution to obtain initial accreditation more rapidly than those seeking accreditations for the first time.  Third, WASC struggles with many institutions with regards to outcomes and will most likely be positively surprised by both the depth of information and the high level of outcomes provided in the application.  We think it

is likely that WASC could use Bridgepoint's outcomes package as a "best practices" for future applicants.

142.    As of the November 1, 2011 conference call, defendants were only one month away from submitting an "extensive self-study" that would include "required exhibits, and selected additional documents," and had been worked on extensively by Bridgepoint.  By defendant McAuliffe's own admission:

> The self-study effort has brought university faculty, staff, and administrators together in positive, well-coordinated, and collaborative discussions to develop appropriate documentation on how the University demonstrates compliance with the current WASC standards for accreditation. This self-study process is a worthy process, as it allows University faculty and leadership to reflect on current practices and build towards the future.

143.    Defendants' November 1, 2011 statements made in the press release and during the conference call, as set forth in ¶¶126, 128-129, 131-134, were materially false and misleading when made because defendants failed to disclose that:

(a)    Ashford had failed to develop and implement reforms to address the WASC concerns communicated to defendants in the spring of 2011 which would be required for WASC accreditation, including that:

(i)    Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition;

(ii)    Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion;

(iii)    Ashford had failed to implement plans, procedures, practices and personnel to sufficiently support students in achieving positive outcomes, including failing to implement a robust assessment tool for measuring student learning;

(iv)    Ashford failed to maintain an empowered and independent governing board; and

1    (v)  Ashford failed to maintain separate audited financial statements.

2   (b)  Bridgepoint had failed to retain a sufficient core of full-time faculty for

3 Ashford Online and failed to implement procedures and processes to monitor and develop faculty

4 and establish clear roles for faculty in academic oversight, leading to inconsistent levels of faculty

5 involvement with students and a less rigorous curriculum than that appropriate for the level of

6 course, resulting in both student attrition and poor outcomes for students who completed their

7 programs with Ashford;

8   (c)  Bridgepoint had failed to align resources with educational purposes and

9 objectives such that Bridgepoint's high level of expenditures on marketing and recruitment resulted

10 in abundant personnel levels in recruitment versus inadequate levels in student support and academic

11 quality, leading to poor student outcomes;

12   (d)  Bridgepoint failed to implement strategic planning processes to emphasize

13 academic quality and student support and align institutional resources with successful student

14 outcomes over revenue growth;

15   (e)  Bridgepoint failed to timely implement adequate program review procedures

16 and failed to review an adequate proportion of Ashford programs when new program review

17 procedures were being developed;

18   (f)  Bridgepoint was not making significant progress on key initiatives to attain

19 WASC accreditation but rather any such efforts had not even commenced or were in the very initial

20 stages; and

21   (g)  Bridgepoint would not be able to attain the financial projections made in its

22 public statements without WASC accreditation, which was highly unlikely due to the Company's

23 failure to address WASC concerns.

144.    Defendants' November 1, 2011 financial projections stated in the Bridgepoint press release and during the conference call, as set forth in ¶126, were similarly materially false and misleading as they incorporated defendants' false and misleading statements and omitted the information set forth in ¶143 above.

145.    As a result of defendants' false and misleading statements in the November 1, 2011 press release and during the November 1, 2011 conference call, Bridgepoint's securities continued to trade at artificially inflated levels.

**November 15, 2011 Citi U.S. Small & Mid Cap Conference**

146.    On November 15, 2011, defendants Clark, Devine, and McAuliffe appeared at the Citi U.S. Small & Mid Cap Conference for analysts and investors.  Defendant McAuliffe represented the following:  "Ashford University is currently accredited by the [HLC], and we are in the middle of applying for WASC accreditation, which is also a regional accreditor.  We have a site visit coming up, you may have heard, in March; and hope to have a decision mid-year 2012."

147.    In speaking about the student experience and Bridgepoint institutions generally, defendant McAuliffe made the following representations:

> We look at – as soon as a student enters our university as a prospective student, we look at sort of the quality aspects coming in and then follow that all the way through to the time they graduate with us.  ***From an admissions standpoint we are looking at our student data as they come in the door***.

> *            *            *

> From a course perspective ***we have quality assessments***, checkpoints throughout the course.  [Defendant Clark] mentioned our Waypoint assessment that we use.

> *            *            *

> ***Always looking at our data, because we can from a technology standpoint. And truly focused on the student learning, so we have assessment teams in place that work with our faculty and our administration at both institutions to really understand how our students are learning***. . . .

> ***Our learning model is very rigorous***.

148.    Contrary to defendants' statements, the WASC Visit Team Report found that Ashford "has yet to set up the necessary processes for analyzing data and making meaningful data-informed decisions."  The Visit Team Report also found that Ashford "lack[ed] . . . a robust assessment tool for measuring student learning."  As to rigor of coursework, WASC stated that "[s]erious concerns also exist about the rigor of coursework, which . . . was not always at the appropriate level for the course."

149.    Defendants' November 15, 2011 statements made at the Citi U.S. Small & Mid Cap Conference, as set forth in ¶¶146-147, were materially false and misleading when made because defendants failed to disclose that:

(a)    Ashford had failed to develop and implement reforms to address the WASC concerns communicated to defendants in the spring of 2011 which would be required for WASC accreditation, including that:

(i)    Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition;

(ii)    Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion;

(iii)    Ashford had failed to implement plans, procedures, practices and personnel to sufficiently support students in achieving positive outcomes, including failing to implement a robust assessment tool for measuring student learning;

(iv)    Ashford failed to maintain an empowered and independent governing board; and

(v)    Ashford failed to maintain separate audited financial statements.

(b)     Bridgepoint had failed to retain a sufficient core of full-time faculty for Ashford Online and failed to implement procedures and processes to monitor and develop faculty and establish clear roles for faculty in academic oversight, leading to inconsistent levels of faculty involvement with students and a less rigorous curriculum than that appropriate for the level of course, resulting in both student attrition and poor outcomes for students who completed their programs with Ashford;

(c)     Bridgepoint had failed to align resources with educational purposes and objectives such that Bridgepoint's high level of expenditures on marketing and recruitment resulted in abundant personnel levels in recruitment versus inadequate levels in student support and academic quality, leading to poor student outcomes;

(d)     Bridgepoint failed to implement strategic planning processes to emphasize academic quality and student support and align institutional resources with successful student outcomes over revenue growth;

(e)     Bridgepoint failed to timely implement adequate program review procedures and failed to review an adequate proportion of Ashford programs when new program review procedures were being developed;

(f)     Bridgepoint was not making significant progress on key initiatives to attain WASC accreditation but rather any such efforts had not even commenced or were in the very initial stages; and

(g)     Bridgepoint would not be able to attain the financial projections made in its public statements without WASC accreditation, which was highly unlikely due to the Company's failure to address WASC concerns.

150.     As a result of defendants' false and misleading statements and omissions at the November 15, 2011 Citi U.S. Small & Mid Cap Conference, Bridgepoint's securities continued to trade at artificially inflated levels.

**December 7, 2011 William Blair & Company, LLC Global Services Growth Stock Conference**

151.     On December 7, 2011, defendants Clark and Devine attended the William Blair & Company, LLC Global Services Growth Stock Conference and discussed several aspects of Ashford's accreditation.

152.     In response to a question about recent persistence trends – a point of emphasis by WASC in acting to deny Ashford's application for accreditation – defendant Clark, as he had repeatedly throughout the Class Period, touted recent initiatives:

> ***We did a lot back in 2010 and throughout 2011 around quality initiatives for our students and student preparedness.  That has impacted our persistence in a very positive way*** . . . .
>
> . . . ***If I was an investor, the thing I'd want to know most about with any public education company is what does persistence look like?***

153.     Later in the conference, defendant Clark and analyst Dobell spoke regarding Ashford's migration to WASC accreditation:

> [Dobell:]  From the accreditation perspective, given what you guys have going on between HLC and WASC, maybe an update on where that stands and probably more importantly what the next couple of data point and timing on those? The next time the market may have some information on how that process is going?
>
> [Clark:]  Yes, I mean, ***it's a very straightforward process***.  We submit our self-study in December.  ***The visit is in March.  We expect a decision kind of midyear next year***.  You know, it not – you're not isolated in the process.  It's not like you submit the self-study and walk away.  ***There is a lot of dialogue back and forth***, back when we put our application in, throughout the entire process, and so that's very positive.  ***We have a deep, deep bench academically.  Dr. McAuliffe, who is our Chief Academic Officer, has been tremendously successful at changes of ownership, reaccreditation, receiving the full ten years allowed.  Doctor Tice is the President of Ashford.  I mean we have a lot of confidence in the academic team there***.
>
> WASC has been delightful to work with.  They're very focused on assessment, which is great from our standpoint.  Some investors in this room might not know this, but we own a software company at Bridgepoint that's called Waypoint Outcomes.  Waypoint Outcomes allows for about 40 other institutions, including Ashford and the Rockies, to aggregate learning outcome data by electronically via

Web interface and be able to provide direct feedback to students on written assignments but then aggregate that data and demonstrate those outcomes.

So some just fascinating stats on that.  We – Ashford for example processes about 20,000 documents in a week through Waypoint.  I think when WASC comes in and sees, they don't have that experience going to most universities.  They don't come in and they don't have an institution and say, hey, *here's the outcomes and the objectives and then here actually is a data that supports that the students are achieving those objectives*.  Most traditional institutions just simply don't have that because the professor corrects the paper and hands it back to the students and the student walks off with it and they're not able to provide anything. So I'm, as you can probably tell, *I feel very good about where we are at*.

154.   Dobell also focused in on Ashford's faculty model and lack of full-time faculty:

[Dobell:] Some of the companies in the group have gone towards a full-time faculty model for a variety of reasons, one of which being your student satisfaction or engagement.  How do you guys think about the right use of faculty?  Let's focus just I guess just on instruction . . . .

[Clark:] So we have – in terms of instruction, *we continue to focus on full-time faculty and adding full-time faculty*.  I think you can go out to right now to Ashford's job board and probably see quite a few postings for full-time faculty.

I think you want to strike the right balance.  I think engagement with your adjunct faculty is very important.

155.   At the time of defendants' November 15, 2011 and December 7, 2011 statements, defendants had nearly concluded Ashford's self-study and were no doubt preparing for the WASC site visit in March 2012, and thus, had knowledge of, or recklessly disregarded, the many areas in which Ashford did not comply with WASC accreditation standards.

156.   Defendants' December 7, 2011 statements made at the William Blair & Company, LLC Global Services Growth Stock Conference, as set forth in ¶¶152-154, were materially false and misleading when made because defendants failed to disclose that:

(a)    Ashford had failed to develop and implement reforms to address the WASC concerns communicated to defendants in the spring of 2011 which would be required for WASC accreditation, including that:

(i)        Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition;

(ii)       Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion;

(iii)      Ashford had failed to implement plans, procedures, practices and personnel to sufficiently support students in achieving positive outcomes, including failing to implement a robust assessment tool for measuring student learning;

(iv)      Ashford failed to maintain an empowered and independent governing board; and

(v)       Ashford failed to maintain separate audited financial statements.

(b)      Bridgepoint had failed to retain a sufficient core of full-time faculty for Ashford Online and failed to implement procedures and processes to monitor and develop faculty and establish clear roles for faculty in academic oversight, leading to inconsistent levels of faculty involvement with students and a less rigorous curriculum than that appropriate for the level of course, resulting in both student attrition and poor outcomes for students who completed their programs with Ashford;

(c)      Bridgepoint had failed to align resources with educational purposes and objectives such that Bridgepoint's high level of expenditures on marketing and recruitment resulted in abundant personnel levels in recruitment versus inadequate levels in student support and academic quality, leading to poor student outcomes;

(d)      Bridgepoint failed to implement strategic planning processes to emphasize academic quality and student support and align institutional resources with successful student outcomes over revenue growth;

(e)     Bridgepoint failed to timely implement adequate program review procedures and failed to review an adequate proportion of Ashford programs when new program review procedures were being developed;

(f)     Bridgepoint was not making significant progress on key initiatives to attain WASC accreditation but rather any such efforts had not even commenced or were in the very initial stages; and

(g)     Bridgepoint would not be able to attain the financial projections made in its public statements without WASC accreditation, which was highly unlikely due to the Company's failure to address WASC concerns.

157.     As a result of defendants' false and misleading statements at the December 7, 2011 William Blair & Company, LLC Global Services Growth Stock Conference, Bridgepoint's securities continued to trade at artificially inflated levels.

**Fourth Quarter 2011 Earnings Release and Conference Call and Bridgepoint's 2011 Annual Report**

158.     As a decision by WASC neared, the market placed even greater importance and attention on Ashford's pending accreditation application.  On March 5, 2012, analysts at Wunderlich issued a report prior to Bridgepoint's anticipated earnings release on March 6, 2012.  The report recognized Bridgepoint's recent attempts to remedy historical problems, *e.g*., student retention, insufficient levels of full-time faculty for the online student base – the same factors that WASC would characterize as immature and insufficient to warrant accreditation:

> We believe higher spending on services and product enhancements, though helpful to Ashford's long-term competitive strength, also represents an attempt to signal to the market and to WASC evaluators its strong intention to offer a high quality, student-centric product.

> *            *            *

> We believe the risk that WASC does not accredit Ashford is small as we have confidence in both the integrity of the WASC process and in the substance of Ashford's product.

159.    Similarly, on March 6, 2012, J.P. Morgan analysts, also in anticipation of the earnings call later that day, stated the following:

> **Impact of internal initiatives**.  In recent quarters, [Bridgepoint] reiterated its focus on initiatives designed to establish student preparedness (*e.g.*, orientation programs) and increase student retention.  We would be interested in [management]'s comments about the impact of these initiatives on new enrollments and student retention.

160.    In anticipation of the fourth quarter 2011 ("4Q11") earnings call, analysts at William Blair issued a report on March 6, 2012.  Stressing that accreditation was absolutely necessary to Bridgepoint's success, the report stated that "a successful switch from HLC to WASC may be the only factor that finally lays major fears to rest."

161.    On March 6, 2012, Bridgepoint issued a press release reporting its full year and 4Q11 earnings results.  The Company reported net income of $22.9 million or $0.41 diluted EPS and revenue of $221.3 million for the fourth quarter ending December 31, 2011.  Further, the Company reported net income of $172.8 million or $3.02 diluted EPS and revenue of $933.3 million for the full year ended December 31, 2011.  Additionally, Bridgepoint updated its full-year 2012 outlook, with expectation of revenue to be between $1.01 billion and $1.03 billion and net income to be between $138.2 million and $143.7 million.  The release stated in part:

> "In 2011, *I am very pleased to report that both our institutions improved the quality of the student learning experience through the increased use of innovative technologies*.  To this end, *we have made and will continue to make investments designed to improve our students' learning outcomes* and their educational experience at our institutions.  *In 2011, we believe these investments in the student learning experience were responsible for improved student persistence and graduation rates*, and we expect that our focus on these investments will continue to produce similar results in the future," said Andrew Clark, chief executive officer of Bridgepoint Education.

162.    After releasing its 4Q11 and full-year 2011 results on March 6, 2012, Bridgepoint hosted a conference call for analysts, media representatives, and investors.  Defendants Clark, Devine, and McAuliffe actively participated in the call.  During the call defendant Clark represented the following in his opening comments:

We recognize that Bridgepoint's success depends on providing students a high-quality education at our institutions.  To this end, *we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experiences at our institutions*.

. . . [W]e will continue to invest in innovations to improve the student learning experience and we anticipate that these investments will provide continued improved persistence and graduation rates over the long term.

163.    Defendant McAuliffe expanded on defendant Clark's comments:

We will be investing more in identifying prospective students in 2012 to ensure that the students we acquire will have the right attributes to be successful at our institutions. . . .

We are making several investments in curriculum and faculty beginning at the time of enrollment that should lead to better outcomes for the students.

164.    Later on the call, in response to a question concerning rising student acquisition costs, defendant Clark represented the following:

We are consciously and deliberately increasing our investment in prospective students, allowing us to target a student that has a profile that performs and persists better and we have – as we have mentioned, *we made a tremendous investment in data analytics throughout 2011* and so we have data that supports that thesis and we expect and have included in our guidance increased persistence as a result of being able to attract those students.

165.    Later on the call, defendant McAuliffe represented the following as to Ashford's migration from HLC to WASC accreditation:

No[w] I would like to give you an update on Ashford University's WASC migration process. *The leadership is pleased with its interactions with the WASC team*.  The faculty and staff submitted the self-study and all required documentation in a timely fashion. Ashford University is ready to welcome the WASC visiting team members later this month.  Once complete, the visiting team will prepare a report to the WASC Board.

*We continue to expect a decision on Ashford University's application to WASC in mid-2012.  We believe this move will enhance the institution's ability to succeed in its mission of providing accessible, affordable, innovative, and high-quality learning opportunities and degree programs that meet the diverse needs of our students.*

Ashford University remains in good standing with our current [accreditor] and we are keeping them well informed of our work to date with WASC.  We will keep you updated on the process.

166.   On March 7, 2012, Bridgepoint filed its 2011 Form 10-K with the SEC, as approved and signed by Clark and Devine, and reviewed and approved by McAuliffe, in which defendants discussed at length Ashford's accreditation status and pursuit of WASC accreditation:

In September 2010, we announced that Ashford University had initiated the process of seeking regional accreditation from the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("WASC"). Ashford University is working collaboratively with both WASC and the Higher Learning Commission to facilitate the change in the University's institutional accrediting body. During the process, Ashford University will continue to maintain its current regional accreditation with the Higher Learning Commission. Prior to initiating the accreditation process with WASC, Ashford University notified the Department [of Education] of its intention to change its primary accreditor.

The decision to seek WASC accreditation reflects careful analysis performed by the institution's faculty and administration, taking into account the dynamics of its student enrollment, its faculty and staff profile, and the development of its programmatic offerings. Based on this analysis, and taking into account how the institution's academic and administrative activity is becoming concentrated in California, Ashford University's governing board concluded that it is appropriate for the institution to operate under the auspices of WASC, which is the regional accrediting body having jurisdiction over California institutions.

WASC has established procedures through which institutions may move through the stages leading to accreditation. To begin the accreditation process, in January 2011, Ashford University submitted an application to enable WASC to verify that the institution meets all of WASC's eligibility criteria. In May 2011, Ashford University received a letter from WASC stating that the WASC Eligibility Review Committee has reviewed the application and determined that the university meets all of the WASC eligibility criteria and may proceed with an application for initial accreditation. Additionally, the letter confirmed that Ashford University is authorized to pursue WASC accreditation under Pathway B, the process for institutions that currently hold accreditation with an institutional accreditor recognized by the U.S. Department of Education. As stated under WASC policy, determination of eligibility is not a formal status with WASC, nor does it ensure eventual accreditation; it is a preliminary finding that Ashford University is potentially accreditable and can proceed within four years of its eligibility determination to be reviewed for initial accreditation status with WASC . . . .

Upon receiving the application for accreditation and related materials, including an institutional self-study, WASC then appointed a site visit team and scheduled visits for March 2012, the purpose of which is to validate the information provided in the institution's application, particularly its compliance with WASC standards. Prior to the submission of the final team report to WASC, Ashford University will be given an opportunity to review the report for correction of errors of fact and to prepare a written response to the final team report, which will be provided to WASC for consideration along with the report. If upon review of the application and supporting documentation, including the team report and the institution's response, Ashford University is found to be in substantial compliance with all of WASC's standards, WASC may grant initial accreditation, typically with a comprehensive review cycle of five years. Depending on the circumstances, WASC may also grant initial accreditation with requirements for interim reports,

special visits or both.  If initial accreditation from WASC is secured, then Ashford University will commence the process of redesignating its primary institutional accreditor from the Higher Learning Commission to WASC.

*          *          *

**Risks Related to the Extensive Regulation of Our Business**

*          *          *

***Our institutions' failure to maintain accreditation would result in a loss of eligibility to participate in Title IV programs**.*

An institution must be accredited by an accrediting agency recognized by the Department to participate in Title IV programs.  Each of our institutions is accredited by the Higher Learning Commission, which is recognized by the Department as a reliable authority regarding the quality of education and training provided by the institutions it accredits.  Ashford University was reaccredited by the Higher Learning Commission in 2006 for a term of ten years, and the University of the Rockies was reaccredited by the Higher Learning Commission in 2008 for a term of seven years.  To remain accredited, our institutions must continuously meet accreditation standards relating to, among other things, performance, governance, institutional integrity, educational quality, faculty, administrative capability, resources and financial stability.  If either of our institutions fails to satisfy any of the Higher Learning Commission's standards, it could lose its accreditation.  Loss of accreditation would denigrate the value of our institutions' educational programs and would cause them to lose their eligibility to participate in Title IV programs, which would have a material adverse effect on our enrollment, revenues and results of operations.

*          *          *

***Ashford University could experience difficulties or delays in changing its primary accreditor**.*

In September 2010, we announced that Ashford University has initiated the process of seeking regional accreditation from the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("WASC").  Ashford University is currently accredited by, and in good standing with, the Higher Learning Commission.

Although Ashford University is working collaboratively with both WASC and the Higher Learning Commission to facilitate the migration of accreditation, it could experience difficulties or delays in receiving initial accreditation from WASC.  If Ashford University is unable to obtain initial accreditation from WASC, the institution's academic reputation and ability to grow enrollments could be negatively affected.  Additionally, if Ashford University does not receive WASC accreditation and loses accreditation from the Higher Learning Commission (*e.g.*, due to the Higher Learning Commission's proposed new jurisdictional requirements requiring a "substantial presence" in the 19-state north central region, which will become effective on July 1, 2012), the institution would no longer be accredited by an accrediting body recognized by the Department and would be ineligible to participate in Title IV programs until it obtained accreditation by another accrediting body recognized by the Department, at which time it would need to file an application with the Department for reinstatement.  If Ashford University becomes ineligible to

participate in Title IV programs, it will have a material adverse effect on our enrollments, revenue and results of operations.

**Analysts' Response to 4Q11 Earnings Release and Conference Call and Bridgepoint's 2011 Annual Report**

167.    Analysts at Credit Suisse, in a report dated March 7, 2012, responded to defendants' March 6 earnings release and conference call statements concerning WASC accreditation for Ashford:

> On yesterday's call, *management reiterates previous comments they have made about the WASC accreditation pursuit*. In September of 2010, Bridgepoint announced that it was seeking to migrate its regional accreditor for Ashford University (which accounts for most of its students) from the Midwest based . . . (HLC) to the . . . (WASC). Management reported in early August 2011 that the WASC review panel approved Ashford University in May as eligible to seek initial accreditation after meeting all 23 WASC eligibility requirements. Ashford submitted a self-study report in December 2011 demonstrating that it meets the WASC criteria for accreditation. An onsite visit is currently scheduled for March 2012 and management continues to expect a decision on Ashford's application to WASC in mid-2012.

168.    Analysts at Wunderlich, in a report dated March 7, 2012, expressed their view that "WASC approval is likely, but may not be simple. . . . We believe the school is worthy but consider it possible that WASC will make initial approval provisional or conditional."

169.    In a report dated March 7, 2012, analysts at William Blair commented on the importance of accreditation to investors:

> *We recognize the switch from HLC to WASC accreditation stands as a huge issue for many investors, but we remain confident Bridgepoint will be successful in this regard*, particularly with its "new" growth profile . . . as a backdrop for how WASC will view the risk of Bridgepoint becoming one of its institutions.

170.    Defendants' March 6-7, 2012 statements, made in Bridgepoint's Form 10-K, press release, and conference call, as set forth in ¶¶161-166, were materially false and misleading when made because defendants failed to disclose that:

(a)    Ashford had failed to develop and implement reforms to address the WASC concerns communicated to defendants in the spring of 2011 which would be required for WASC accreditation, including that:

(i)      Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition;

(ii)      Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion;

(iii)      Ashford had failed to implement plans, procedures, practices and personnel to sufficiently support students in achieving positive outcomes, including failing to implement a robust assessment tool for measuring student learning;

(iv)      Ashford failed to maintain an empowered and independent governing board; and

(v)      Ashford failed to maintain separate audited financial statements.

(b)      Bridgepoint had failed to retain a sufficient core of full-time faculty for Ashford Online and failed to implement procedures and processes to monitor and develop faculty and establish clear roles for faculty in academic oversight, leading to inconsistent levels of faculty involvement with students and a less rigorous curriculum than that appropriate for the level of course, resulting in both student attrition and poor outcomes for students who completed their programs with Ashford;

(c)      Bridgepoint had failed to align resources with educational purposes and objectives such that Bridgepoint's high level of expenditures on marketing and recruitment resulted in abundant personnel levels in recruitment versus inadequate levels in student support and academic quality, leading to poor student outcomes;

(d)      Bridgepoint failed to implement strategic planning processes to emphasize academic quality and student support and align institutional resources with successful student outcomes over revenue growth;

(e)     Bridgepoint failed to timely implement adequate program review procedures and failed to review an adequate proportion of Ashford programs when new program review procedures were being developed;

(f)     Bridgepoint was not making significant progress on key initiatives to attain WASC accreditation but rather any such efforts had not even commenced or were in the very initial stages; and

(g)     Bridgepoint would not be able to attain the financial projections made in its public statements without WASC accreditation, which was highly unlikely due to the Company's failure to address WASC concerns.

171.    Defendants' March 6, 2012 financial projections stated in Bridgepoint's Form 10-K, press release, and during the conference call, as set forth in ¶161, were materially false and misleading as they incorporated defendants' false and misleading statements and omitted the information set forth in ¶170 above.

172.    As a result of defendants' false and misleading statements in the March 6-7, 2011 Form 10-K, press release, and conference call, Bridgepoint's securities continued to trade at artificially inflated levels.

**March 13, 2012 Credit Suisse Global Services Conference and Analysts' Response**

173.    On March 13, 2012, defendants Clark and Devine presented at the Credit Suisse Global Services Conference.  During his opening remarks, defendant Clark represented the following: "When we think about quality we really think about investment in our students . . . . Obviously, transparency is very important, both to our students as well as to regulators and accreditors." He continued, "[f]rom a learning standpoint, this year *we have invested last year* and we will continue to invest this year *in more full-time faculty more terminally degreed faculty*." As

to student support, defendant Clark represented that "we are focused on making sure that we provide aide to the students who really most need it by using data analytics."

174.    In a report dated March 27, 2012, investors at William Blair noted the following:

> Bridgepoint's Ashford University is in the midst of applying to change its regional accreditor from the . . . (HLC) to the . . . (WASC).  The outcome of this process is critical to Bridgepoint's business and its stock. . . .

> . . . We spoke with several people in the industry with granular knowledge of both HLC and WASC accreditation criteria and processes and *the consensus view was that Bridgepoint will secure WASC accreditation.  We believe Ashford will be successful in receiving WASC accreditation* . . . .

175.    Similarly, in a report dated April 12, 2012, analysts at Piper Jaffray included the following in their discussion of potential catalysts for Bridgepoint in 2012:  "we expect WASC to rule favorably on the company's accreditation sometime this summer."

176.    Defendants' March 13, 2012 statements made at the Credit Suisse Global Services Conference, as set forth in ¶173, were materially false and misleading when made because defendants failed to disclose that:

(a)    Ashford had failed to develop and implement reforms to address the WASC concerns communicated to defendants in the spring of 2011 which would be required for WASC accreditation, including that:

(i)    Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition;

(ii)    Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion;

(iii)    Ashford had failed to implement plans, procedures, practices and personnel to sufficiently support students in achieving positive outcomes, including failing to implement a robust assessment tool for measuring student learning;

1    (iv)    Ashford failed to maintain an empowered and independent governing

2  board; and

3    (v)    Ashford failed to maintain separate audited financial statements.

4  (b)    Bridgepoint had failed to retain a sufficient core of full-time faculty for

5  Ashford Online and failed to implement procedures and processes to monitor and develop faculty

6

7  and establish clear roles for faculty in academic oversight, leading to inconsistent levels of faculty

8  involvement with students and a less rigorous curriculum than that appropriate for the level of

9  course, resulting in both student attrition and poor outcomes for students who completed their

10  programs with Ashford;

11  (c)    Bridgepoint had failed to align resources with educational purposes and

12  objectives such that Bridgepoint's high level of expenditures on marketing and recruitment resulted

13

14  in abundant personnel levels in recruitment versus inadequate levels in student support and academic

15  quality, leading to poor student outcomes;

16  (d)    Bridgepoint failed to implement strategic planning processes to emphasize

17  academic quality and student support and align institutional resources with successful student

18  outcomes over revenue growth;

19  (e)    Bridgepoint failed to timely implement adequate program review procedures

20  and failed to review an adequate proportion of Ashford programs when new program review

21

22  procedures were being developed;

23  (f)    Bridgepoint was not making significant progress on key initiatives to attain

24  WASC accreditation but rather any such efforts had not even commenced or were in the very initial

25  stages; and

26

27

28

1         (g)     Bridgepoint would not be able to attain the financial projections made in its

2 public statements without WASC accreditation, which was highly unlikely due to the Company's

3 failure to address WASC concerns.

4        177.    As a result of defendants' false and misleading statements at the March 13, 2012

5 Credit Suisse Global Services Conference, Bridgepoint's securities continued to trade at artificially

6

7 inflated levels.

8 **First Quarter 2012 Earnings Release and Conference Call**

9        178.    On May 1, 2012, Bridgepoint issued a press release reporting its first quarter 2012

10 ("1Q12") earnings results.  The Company reported net income of $33.0 million or $0.59 diluted

11 earnings per share and revenue of $250.4 million for the quarter ending March 31, 2012.

12 Additionally, the Company updated its full-year 2012 outlook, expecting revenue to be between

13 $1.01 billion and $1.03 billion and net income to be between $131.5 million and $136.9 million.

14 The release stated in part:

15

16    "We are pleased that our operating and financial results were in-line with our internal expectations for the quarter, and *we are particularly pleased by the strong*

17 *increase in student persistence at our universities*," said Andrew Clark, Chief Executive Officer of Bridgepoint Education.  "*Increasing persistence reflects our*

18 *success with the student support and quality initiatives we are implementing, which help assure the academic readiness of students* and help provide students with an

19 innovative, high quality learning experience that enriches their lives."

20        179.    After releasing its 1Q12 results on May 1, 2012, Bridgepoint hosted a conference call

21 for analysts, media representatives, and investors.  Defendants Clark, Devine, and McAuliffe

22 actively participated in the call.  During the call, defendant Clark represented the following in his

23 initial comments concerning 1Q12 performance:  "Most importantly, *our efforts to instill quality in*

24 *all that we do are producing student and alumni outcomes that prove we are serving the academic*

25 *needs of our students at both of our institutions*."

26

27        180.    Contrary to defendant Clark's comments, in denying Ashford's application just

28 months later, WASC found Bridgepoint's "recent . . . efforts to address" areas such as student

support and retention, among others, to not have made a measureable effect.  Specifically, the Action

Letter stated Ashford's "level of attrition is on its face, not acceptable" and that "the institution's

analysis of and attentiveness to its retention and graduation data, the quality and clarity of its student

data systems, and the steps being taken to improve identified areas in need of improvement."

181.    Later in the call, defendant McAuliffe represented the following as to Ashford's

WASC application.

> ***Just a brief update*** on Ashford University's WASC process. ***As previously***
> ***reported***, the self-study was submitted in December of 2011.  As planned, a team
> visited the University in March 2012.  We expect a final decision midyear and will
> provide an update when Ashford University is formally notified in writing.

> *          *          *

> A number of our faculty and administrators have recently given presentations
> at the 2012 Higher Learning Commission Conference and the 2012 WASC
> Academic Resource Conference. . . .

> At the WASC Academic Resource Conference [base] members from Ashford
> University and Bridgepoint Education presented sessions on ensuring course quality
> through scalable course development model, online faculty evaluation and
> mentoring, the new ecology in higher education, academic program review, degree
> qualifications profile, leveraging institutional research offices, and curriculum
> mapping and calculating course credit hours.  I'm pleased that so many of our
> colleagues are contributing to the advancement of higher education.

182.    Defendants Clark and McAuliffe had the following exchange with Barrington

Research analyst Joe Jansen in which defendants again concealed the truth from investors despite a

direct question seeking insight beyond defendants' statements concerning Ashford's accreditation

prospects:

> [Jansen:] Okay, great.  And then just one other question regarding WASC, in
> March when they did the onsite visit did – was there an exit interview, and if there
> was any pending issues or do you care to comment on that?

> *          *          *

> [McAuliffe]:  ***I don't think we're going to comment on the informal***
> ***processes along the way***.  I think our intent really is to wait until we're through the
> whole process and then we'll be sure to give you an update at that time.

> [Clark:] But they did come and conduct their visit, Joe, so that did happen as
> was scheduled.

183.     In response to a question from a Barclays Capital analyst, asking essentially which recently implemented and highly-proclaimed quality initiatives – initiatives characterized by WASC as needing "further attention" – have contributed to recent positive trends in persistence, defendant McAuliffe vaguely responded, in part:  "It's our focus on quality.  It's our focus on increasing the value of that student experience that's so important to us."

184.     On May 1, 2012, defendant Clark sold 35,964 shares of Bridgepoint stock for proceeds of $732,594.  In addition, on May 2, 2012, defendant Devine sold 18,500 shares of Bridgepoint stock for $374,995 in proceeds.

**Analysts' Response to 1Q12 Earnings Release and Conference Call**

185.     Analysts immediately noted defendants' evasiveness regarding the details of Ashford's accreditation process.  In a report dated May 1, 2012, analysts at Deutsche Bank pointedly recognized defendants' refusal to provide updates on the WASC accreditation process in the May 1 earnings call:  "***Bridgepoint*** is in the process of transferring its accreditation between regional accreditors and ***would not comment on what, if anything, came out of the March exit interview with WASC***."  Analysts at Credit Suisse also noticed the lack of transparency into the WASC accreditation process provided by defendants on the May 1 earnings call in their report dated May 2, 2012, that stated, in part:  "***On yesterday's call, management*** reiterated previous comments made about the company's pursuit of WASC accreditation, but ***provided no material update***."  Clearly, the market's desire for meaningful insight into the prospects of Ashford's WASC application continued to be met with defendants' knowing omission or reckless disregard of the true, adverse facts.

186.     Notwithstanding, analysts continued to stress Ashford's WASC accreditation as forthcoming and an upside to Bridgepoint's share price.  A Deutsche Bank report dated May 1, 2012, listed "successful migration of Ashford University's accreditation to WASC from HLC" as a potential upside to Bridgepoint stock.  Similarly, the Piper Jaffray report dated May 2, 2012, stated:

"We expect a positive outcome in [Bridgepoint]'s accreditation transfer from HLC to WASC sometime this summer . . . ."

187.   As of defendants' May 1, 2012 misstatements and omissions, defendants had submitted their extensive self-study, including 329 attached documents, and hosted the Visit Team over a five-day period, involving over 350 interviews.  In addition, a number of Bridgepoint faculty and administrators attended the 2012 HLC and WASC conferences, as they did in April 2011.  However, at the 2012 conferences, Bridgepoint members did more than just attend, they actually presented on several topics.

188.   Defendants' May 1, 2012 statements in the press release and conference call, as set forth in ¶¶178-183, were materially false and misleading when made because defendants failed to disclose that:

(a)   Ashford had failed to develop and implement reforms to address the WASC concerns communicated to defendants in the spring of 2011 which would be required for WASC accreditation, including that:

(i)   Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition;

(ii)   Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion;

(iii)   Ashford had failed to implement plans, procedures, practices and personnel to sufficiently support students in achieving positive outcomes, including failing to implement a robust assessment tool for measuring student learning;

(iv)   Ashford failed to maintain an empowered and independent governing board; and

1        (v)     Ashford failed to maintain separate audited financial statements.

2       (b)     Bridgepoint had failed to retain a sufficient core of full-time faculty for Ashford Online and failed to implement procedures and processes to monitor and develop faculty and establish clear roles for faculty in academic oversight, leading to inconsistent levels of faculty involvement with students and a less rigorous curriculum than that appropriate for the level of course, resulting in both student attrition and poor outcomes for students who completed their programs with Ashford;

(c)     Bridgepoint had failed to align resources with educational purposes and objectives such that Bridgepoint's high level of expenditures on marketing and recruitment resulted in abundant personnel levels in recruitment versus inadequate levels in student support and academic quality, leading to poor student outcomes;

(d)     Bridgepoint failed to implement strategic planning processes to emphasize academic quality and student support and align institutional resources with successful student outcomes over revenue growth;

(e)     Bridgepoint failed to timely implement adequate program review procedures and failed to review an adequate proportion of Ashford programs when new program review procedures were being developed;

(f)     Bridgepoint was not making significant progress on key initiatives to attain WASC accreditation but rather any such efforts had not even commenced or were in the very initial stages; and

(g)     Bridgepoint would not be able to attain the financial projections made in its public statements without WASC accreditation, which was highly unlikely due to the Company's failure to address WASC concerns.

189.   Defendants' May 1, 2012 financial projections stated in the press release and conference call, as set forth in ¶178, were similarly materially false and misleading as they incorporated defendants' false and misleading statements and omitted the information set forth in ¶188, above.

190.   As a result of defendants' false and misleading statements in the May 1, 2012 press release and conference call, Bridgepoint's securities continued to trade at artificially inflated levels.

191.   Positive outlook from analysts continued.  Over a month after defendants' 1Q12 earnings release and conference call, in a report dated June 12, 2012, analysts at Barrington Research commented on the imminent WASC decision: "While the decision can range from full accreditation through denial, we feel cautiously optimistic that Ashford will receive accreditation. . . ."

192.   More optimism as to Bridgepoint's WASC accreditation prospects was expressed in a June 19, 2012 report issued by Wells Fargo:

We expect Bridgepoint's dramatic discount to its peers, the result of mistrust regarding the drivers of its rapid growth, to be corrected following full accreditation by the . . . (WASC) review, which is currently pending.

\*      \*      \*

[W]e believe a successful independent WASC accreditation review (the result of which should be revealed in July,) . . . could . . . unlock potential value.

\*      \*      \*

[I]n our opinion, . . . doubts regarding the integrity of Bridgepoint's processes or quality should be effectively resolved with an acceptable WASC review.  In response to broad criticisms of the accreditation process generally, *WASC has adopted a more explicit application process that is particularly rigorous toward for-profit institutions, but also, and importantly, explicit*.  We believe this new approach should be positive for Bridgepoint, as *it provides more clarity and precision around the process and reduces prospective bias* resulting from the negative publicity the for-profit sector and Bridgepoint in particular has received.  *Put another way, clear and straightforward rules should allow a well-run institution to excel*.  We have strong conviction that the quality of the education production is well-deserving of accreditation and that WASC is not likely to be cowed by unsubstantiated accusations.

    . . . [WASC] [a]pproval could then be a potential catalyst . . . .

\*      \*      \*

In our view, much is riding on the WASC approval set to be voted on at the accreditor's mid-year meeting June 13-15 and announced some time shortly after. We think a straight approval would be a powerful potential catalyst for the stock . . . .

193.   Because of defendants' false and misleading statements and omissions, the market was completely unaware of the risks associated with Ashford's accreditation.  Not until July 9, 2012, when defendants revealed the WASC denial, and on July 13, 2012, when defendants announced the potential loss of HLC accreditation, did investors learn the truth.  By then, it was too late.

### ADDITIONAL ALLEGATIONS OF SCIENTER

194.   As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of such statements or documents as primary violations of the federal securities laws.

195.   Bridgepoint held monthly Quality Review Meetings ("QRM") with Bridgepoint leadership and all Ashford department managers.  These meetings included the presentation of "trends, statistics, and profiles . . . to generate discussion on solutions to problems identified.  All areas of the University are covered" at QRMs.  Defendants Clark, Devine, and McAuliffe, as described in ¶¶20-22, were Bridgepoint leadership and, therefore, would have attended the QRMs throughout the Class Period.  Given the "early notice" from WASC of "the areas of focus that would need close attention" to receive accreditation, there were problems identified concerning Ashford's WASC application.  Thus, defendants would logically have discussed the identified deficiencies in Ashford's WASC application at QRMs since the beginning of the Class Period.

196.   Additionally, the fraud alleged herein relates to the core business of Bridgepoint and Ashford University so knowledge of the fraud may be imputed to defendants.  Defendants held high-ranking positions, as described in ¶¶20-22, and made numerous Class Period statements on the topic of Ashford's pursuit of WASC accreditation and the underlying operations of Ashford that WASC would base its determination on, *e.g.*, retention, persistence, faculty, student support, course rigor.  Those same areas of Ashford operations, and even more so, the vitally important issue of Ashford's

1   accreditation, are operations and functions at the heart of Bridgepoint.  In addition, defendants made

2   statements concerning Bridgepoint's outlook and financial projections, which necessarily depend on

3   the same Bridgepoint core operations.

4   **Insider Trading**

5       197.   As defendants made false and misleading statements and omissions throughout the

6   Class Period, defendants Clark, Devine, and McAuliffe suspiciously sold their personally-held

7   Bridgepoint common stock for gross proceeds of over $30 million.   These insider sales are

8   suspicious in amount and timing, and provide an additional inference of scienter.   The sales are

9

10  summarized in the chart below:

| Name | Date | Sold | Price | Proceeds |
|------|------|------|-------|----------|
| Clark | 01-Jun-2011 | 51,102 | $23.74 | $1,213,161 |
| | 01-Jul-2011 | 49,496 | $25.25 | $1,249,774 |
| | 06-Jul-2011 | 900 | $28.00 | $25,200 |
| | 13-Jul-2011 | 71,016 | $28.06 | $1,992,709 |
| | 21-Jul-2011 | 17,297 | $30.02 | $519,256 |
| | 22-Jul-2011 | 50,169 | $30.35 | $1,522,629 |
| | 01-Aug-2011 | 47,940 | $24.81 | $1,189,391 |
| | 01-Sep-2011 | 3,000 | $21.81 | $65,430 |
| | 01-Sep-2011 | 43,433 | $21.24 | $922,517 |
| | 03-Oct-2011 | 42,574 | $16.89 | $719,075 |
| | 03-Oct-2011 | 2,400 | $17.72 | $42,528 |
| | 01-Nov-2011 | 33,660 | $22.45 | $755,667 |
| | 01-Nov-2011 | 9,900 | $23.36 | $231,264 |
| | 01-Dec-2011 | 42,191 | $21.31 | $899,090 |
| | 03-Jan-2012 | 9,441 | $23.50 | $221,864 |
| | 03-Jan-2012 | 31,424 | $22.65 | $711,754 |
| | 01-Feb-2012 | 39,580 | $25.01 | $989,896 |
| | 01-Mar-2012 | 38,336 | $23.89 | $915,847 |
| | 02-Apr-2012 | 37,131 | $24.95 | $926,418 |
| | 01-May-2012 | 32,564 | $20.27 | $660,072 |
| | 01-May-2012 | 3,400 | $21.33 | $72,522 |
| | 01-Jun-2012 | 34,833 | $18.88 | $657,647 |
| | 02-Jul-2012 | 33,738 | $21.75 | $733,802 |
| | | **725,525** | | **$17,237,513** |
| Devine | 05-May-2011 | 18,500 | $18.86 | $348,910 |
| | 03-Jun-2011 | 7,730 | $24.56 | $189,849 |
| | 03-Jun-2011 | 10,770 | $25.10 | $270,327 |
| | 01-Jul-2011 | 18,500 | $25.25 | $467,125 |
| | 21-Jul-2011 | 21,600 | $30.03 | $648,648 |
| | 03-Aug-2011 | 18,500 | $21.83 | $403,855 |
| | 06-Sep-2011 | 18,500 | $20.06 | $371,110 |

| Name | Date | Sold | Price | Proceeds |
|------|------|------|-------|----------|
| | 03-Oct-2011 | 17,400 | $16.88 | $293,712 |
| | 03-Oct-2011 | 1,100 | $17.71 | $19,481 |
| | 04-Nov-2011 | 18,500 | $23.12 | $427,720 |
| | 01-Dec-2011 | 18,500 | $21.31 | $394,235 |
| | 04-Jan-2012 | 17,428 | $20.88 | $363,897 |
| | 04-Jan-2012 | 1,072 | $21.62 | $23,177 |
| | 03-Feb-2012 | 18,500 | $26.87 | $497,095 |
| | 05-Mar-2012 | 18,500 | $23.62 | $436,970 |
| | 04-Apr-2012 | 17,300 | $24.31 | $420,563 |
| | 04-Apr-2012 | 1,200 | $25.02 | $30,024 |
| | 02-May-2012 | 18,500 | $20.27 | $374,995 |
| | 04-Jun-2012 | 18,500 | $18.22 | $337,070 |
| | 03-Jul-2012 | 18,500 | $21.67 | $400,895 |
| | | **299,100** | | **$6,719,657** |
| McAuliffe | 12-May-2011 | 20,000 | $21.17 | $423,400 |
| | 13-Jun-2011 | 20,000 | $23.59 | $471,800 |
| | 11-Jul-2011 | 17,439 | $26.26 | $457,948 |
| | 11-Jul-2011 | 2,561 | $27.04 | $69,249 |
| | 09-Aug-2011 | 7,750 | $20.27 | $157,093 |
| | 09-Aug-2011 | 12,250 | $21.09 | $258,353 |
| | 12-Sep-2011 | 20,000 | $20.17 | $403,400 |
| | 10-Oct-2011 | 20,000 | $19.61 | $392,200 |
| | 11-Nov-2011 | 20,000 | $22.12 | $442,400 |
| | 09-Dec-2011 | 20,000 | $21.63 | $432,600 |
| | 10-Jan-2012 | 20,000 | $23.59 | $471,800 |
| | 08-Feb-2012 | 20,000 | $26.20 | $524,000 |
| | 12-Mar-2012 | 20,000 | $24.15 | $483,000 |
| | 10-Apr-2012 | 4,600 | $20.96 | $96,416 |
| | 10-Apr-2012 | 15,400 | $20.34 | $313,236 |
| | 09-May-2012 | 20,000 | $20.08 | $401,600 |
| | 11-Jun-2012 | 20,000 | $18.39 | $367,800 |
| | 09-Jul-2012 | 3,300 | $15.76 | $52,008 |
| | 09-Jul-2012 | 6,700 | $16.69 | $111,823 |
| | 09-Jul-2012 | 9,800 | $14.79 | $144,942 |
| | 09-Jul-2012 | 200 | $17.42 | $3,484 |
| | | **300,000** | | **$6,478,552** |
| | **Total:** | **1,324,625** | | **$30,435,722** |

198.    Defendant Clark's insider sales are unusual and suspicious in timing and amount sold. During the Class Period, defendant Clark sold a total of 725,525 shares of Bridgepoint stock for proceeds of over $17 million.  In the year prior to the beginning of the Class Period, defendant Clark sold only 557,590 shares of Bridgepoint stock – 167,935 less shares than during the Class Period – for proceeds of $9,334,984 – nearly $8 million less than during the Class Period.

199.     The timing of defendant Clark's insider sales is also highly suspicious as they were timed to take maximum advantage of the artificial inflation caused by defendants' misrepresentations.  Bridgepoint steadily traded at its highest price in July 2011, including a peak of $30.50 per share on July 22, 2011.  During July 2011, defendant Clark sold a total of 188,878 shares – more than double (and in many cases triple) the amount of shares sold in any other month during the Class Period.  Not only did defendant Clark trade consistently and in mass amounts during July 2011, but he also traded on the highest and second-highest trading days of the Class Period – July 21 and 22, 2011.  On those two days alone, defendant Clark sold 67,466 shares for proceeds of over $2 million, or nearly 12% of his total stock proceeds for the Class Period.  Making these trades even more suspicious is the fact that defendant Clark did not trade a single share of Bridgepoint stock on the 21st or 22nd of any other month during the Class Period or in the year prior to the beginning of the Class Period.

200.     Defendant Devine's insider sales are similarly unusual and suspicious in timing and amount sold.   During the Class Period, defendant Devine sold a total of 299,100 shares of Bridgepoint stock for proceeds of over $6.7 million.  In the year prior to the beginning of the Class Period, defendant Devine sold only 170,853 shares of Bridgepoint stock – a little more than half of what he sold during the Class Period – for proceeds of $2.8 million – less than half of the proceeds from his sales during the Class Period.

201.     The timing of defendant Devine's insider sales is also highly suspicious as they, like defendant Clark's sales, were timed to take maximum advantage of the artificial inflation caused by defendants' misrepresentations.  During July 2011, when Bridgepoint traded at its highest, defendant Devine sold a total of 40,100 shares of Bridgepoint stock, representing more than double the amount of shares sold in any other month during the Class Period.  Like defendant Clark, defendant Devine also took full advantage of Bridgepoint's second-highest trading day on July 21, 2011.  On that day,

1    defendant Devine sold 21,600 shares for proceeds of over $1 million, or more than 16% of his total

2    stock proceeds for the Class Period.  The amount sold by defendant Devine that day is not only more

3    than he sold on any other day during the Class Period, but is also more than he sold in any other

4    month during the Class Period.  Making these trades even more suspicious is the fact that defendant

5    Devine did not trade a single share of Bridgepoint stock on the 21st of any other month during the

6    Class Period or in the year prior to the beginning of the Class Period.

7

8            202.    Defendant McAuliffe's insider sales are also unusual and suspicious in timing and

9    amount sold.  During the Class Period, defendant McAuliffe sold a total of 300,000 shares of

10   Bridgepoint stock for proceeds of nearly $6.5 million.  In the year prior to the beginning of the Class

11   Period, defendant McAuliffe sold only 210,000 shares – 90,000 less than during the Class Period –

12   for nearly $3.5 million – $3 million less than during the Class Period.

13

14           203.    The entirety of defendants Clark's, Devine's, and McAuliffe's sales were the result of

15   exercising stock options.  Because of these options, defendants Clark, Devine, and McAuliffe

16   obtained this stock at prices ranging from $0.315 to $0.585 per share – a miniscule fraction of the

17   price that other shareholders paid.  Further, most, if not all, of defendants Clark's, Devine's, and

18   McAuliffe's holdings in Bridgepoint are shares subject to options.  Thus, upon exercising these

19   options and immediately selling the acquired stock, defendants Clark, Devine and McAuliffe

20   retained an insubstantial amount of Bridgepoint stock, especially relative to the number of stock

21   options held by each.  After each of defendant Clark's sales during the Class Period, he retained just

22   100 shares of Bridgepoint stock, representing 0.004% of his total number of shares, including those

23   subject to option, at the end of the Class Period.  Similarly, after each of defendant Devine's sales

24   during the Class Period, he held 32,385 shares of Bridgepoint stock, representing 6% of his total

25   number of shares, including those subject to option, at the end of the Class Period.  Finally, after

26   each of defendant McAuliffe's sales during the Class Period, she was left with zero shares of

27

28

Bridgepoint stock, meaning that the entirety of her holdings in Bridgepoint were stock options. Because defendants Clark, Devine and McAuliffe retained such miniscule amounts of Bridgepoint stock by immediately selling exercised stock options, they were able to capitalize on Bridgepoint's inflated stock price resulting from their fraud without being vulnerable to the eventual stock price drop that would (and did) occur once WASC denied Bridgepoint's application for accreditation.

204.   Prior to the Class Period, on August 11, 2010, defendants Clark, Devine, and McAuliffe each entered into trading plans pursuant to Rule 10b5-1 of the 1934 Act through which they planned sales of their Bridgepoint stock.  As alleged elsewhere herein, each of the defendants had knowledge of the accreditation standards of WASC and Ashford's inability to meet such standards at the time they entered into this August 11, 2010 trading plan.  Further, as described in the terms of these trading plans, the form of which was filed with the SEC on August 13, 2010, defendants Clark, Devine, and McAuliffe could amend or modify these plans at any time.  Further, there is no public information regarding the details of the plans entered into on August 11, 2010, including the timing and amount of shares to be sold.  Thus, the insider sales described above may not have been planned on August 11, 2010, when defendants Clark, Devine, and McAuliffe entered into their plans, but instead, much later and during the Class Period when defendants were making the alleged false statements and misrepresentations.  Indeed, as alleged in ¶201, the suspicious amounts and timing of defendants Clark's and Devine's July 2011 sales raises a reasonable inference that they did modify their plans to allow insider sales at times when Bridgepoint's stock price was at its highest.

205.   In addition, at the same time defendants were unloading their shares of Bridgepoint stock, they were causing the Company to repurchase over 3.5 million shares at cost to Bridgepoint of over $80 million.  For example, during 2Q11, while the three individual defendants sold at least 117,695 shares of their Bridgepoint stock, they caused the Company to repurchase 1.9 million shares

of Bridgepoint stock.  Then during 3Q11, while the three individual defendants sold 420,351 shares of their Bridgepoint stock, they caused the Company to repurchase 1.7 million shares of Bridgepoint stock.  These repurchases had the effect of stabilizing or increasing Bridgepoint's stock price at the same time defendants were profitably cashing out their holdings.

### POST-CLASS PERIOD EVENTS

206.    On August 7, 2012, defendants held a conference call for investors, media, and analysts, following release of Bridgepoint's second quarter 2012 ("2Q12") results.  During the call, defendant Clark informed investors that due to reduced "financial and operating visibility. . . we have elected to suspend the full year 2012 financial guidance that we customarily provide on these quarterly calls."  Defendant Clark further stated that "we will take whatever steps are necessary to ensure Ashford's accreditation status."  These steps, as illustrated in analysts' reports following the WASC denial, are likely to be substantial and costly.  Unfortunately for plaintiffs and the Class, they have come too late.

207.    On September 24, 2012, Bridgepoint issued a release titled: "Ashford University Announces New Initiatives to Boost Student Support and Success, Reorganizes Staff in San Diego and Denver."  The release announced that 450 Ashford employees were being laid off and another 400 were being reassigned.  The 450 positions eliminated "focused solely on admissions."  Ashford reassigned 200 admissions personnel to a new Student Inquiry department.  The Student Inquiry department "will work with prospective students to ensure they are sufficiently prepared for the demands of a university education."  Another 200 Ashford admissions personnel were moved to the Student Services department to "provide further support to new and existing students."  All in all, 850 Ashford admissions personnel were either eliminated or moved to departments with stated purposes of supporting or counseling prospective and current students.  This drastic move by Ashford further illustrates the glaring inadequacies of the Ashford product, particularly when

considered against the WASC standards for Accreditation.  Ashford is now taking the necessary and substantial steps to comply with WASC Standards and, in addition, HLC Standards as demanded by HLC's July 12, 2012 letter placing Ashford on "special monitoring" status.  These actions are too late for plaintiffs and the Class.

208.    On September 28, 2012, Bridgepoint issued a release titled:  "Ashford University Withdraws WASC Review Request."  In its July 9, 2012 release, Bridgepoint had stated its intent to appeal the WASC denial.  Pursuant to WASC procedures, a review committee prepared an analysis concerning an appeal by Ashford.  The report was provided to both WASC and Ashford. Bridgepoint's announcement that it would not seek an appeal of the denial came shortly after receiving the appeal report.  As illustrated in various analysts' reports following the WASC denial, and apparently made clear in the appeal report, the number and significance of areas in which Ashford was unable to demonstrate compliance with WASC Standards made a successful appeal extremely unlikely.  Bridgepoint's decision to drop the appeal further evidences the fact that Ashford fell well short of WASC accreditation standards.

209.    Since the WASC denial, Ashford has made several hiring and reassignment decisions to improve its prospects in future accreditation reviews.  For example, on October 11, 2012, Ashford announced Richard L. Pattenaude, then chancellor emeritus of the University of Maine system, would be the new Ashford President Elect – Ashford's top leadership role.  A fact revealing of Ashford's motive in the hire is that Mr. Pattenaude is chairman of the Commission on Institutions of Higher Education of the New England Association of Schools and Colleges, one of the six regional accrediting agencies recognized by the DOE.

210.    On October 15, 2012, Bridgepoint filed a Form 8-K with the SEC announcing that it had received a letter from the DOJ informing Bridgepoint that the DOJ "is investigating the Company's compensation of its admissions personnel."  The DOJ informed Bridgepoint that it was

"considering a formal process to obtain evidence" but was open to voluntary presentation of related evidence by Bridgepoint.  Specifically, the DOJ sought information concerning compensation of certain admissions personnel reviewed in a recent DOE Inspector General's audit report.  As of July 1, 2012, the HEA prohibits admissions personnel compensation to be based in any way on number of enrollments secured.  Given that the WASC denial was based, in part, on Bridgepoint's sector-leading expenditures on marketing and recruitment versus inadequate investment in instruction, the DOJ investigation further demonstrates that Ashford, with a clear focus on recruitment over quality of education, in contradiction to WASC accreditation standards, could not receive WASC accreditation.

## LOSS CAUSATION/ECONOMIC LOSS

211.    During the Class Period, as detailed herein, defendants made false statements and omissions that artificially inflated and maintained Bridgepoint's stock price and operated as a fraud or deceit on Class Period purchasers of Bridgepoint's publicly-traded securities.  When defendants' prior misrepresentations and omissions were revealed, Bridgepoint's stock price fell precipitously as the prior artificial inflation came out of the stock.  As a result of their purchases of Bridgepoint stock, during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

212.    Defendants' false statements and omissions, as alleged herein, had the intended effect and caused Bridgepoint's stock to trade at artificially inflated levels up to and above $30 per share during the Class Period.

213.    As a direct result of disclosures on July 9, 2012 and July 13, 2012, Bridgepoint's stock price suffered significant declines.  On July 9, 2012, when defendants disclosed that WASC denied Bridgepoint's application for accreditation because it "had not yet demonstrated substantial compliance with certain of the WASC Standards for Accreditation," the Company's stock price

dropped $7.25 per share on unusually high trading volume. *See* ¶¶76-80. Days later, on July 13, 2012, when HLC – Bridgepoint's sole source of accreditation – announced that it placed Bridgepoint on "special monitoring status" while it confirmed Bridgepoint's compliance with HLC's standards, the Company's stock price dropped an additional $3.20 per share on significantly high trading volume. *See* ¶¶81-82. Individually and collectively, these drops removed the inflation from Bridgepoint's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

**Analysts' Response to WASC Denial**

214.    Analysts' reports following these disclosures conveyed surprise over both the denial and the significant deficiencies cited by WASC known by Bridgepoint as far back as 2011, and the negative implications for Bridgepoint's accreditation with HLC.

215.    In a report dated July 9, 2012, analysts at J.P. Morgan directly linked the WASC denial to Bridgepoint's stock drop on July 9, 2012: ***"The BPI stock dropped 34% today due to this accreditation change."***

216.    In a report dated July 9, 2012, analysts at Deutsche Bank explicitly noted that Bridgepoint knew of the precise concerns upon which accreditation was denied as far back as May and June 2011 – over a year prior to denial of accreditation:

> [T]his report is a clear negative. . . . The biggest issue now for BPI is its relationship with HLC and the potential negative impact this WASC report will have on BPI's 2014-2015 accreditation renewal with HLC. The HLC renewal is certainly no longer a given, even if BPI moves its operations.

> \*       \*       \*

> In light of the numerous, significant deficiencies (in our view) highlighted in WASC's report, we are concerned that Ashford's HLC accreditation may now also be called into question.

> \*       \*       \*

> [Bridgepoint] plants to appeal the WASC rejection . . . . ***Given WASC notified Ashford in May and June 2011 of the concerns flagged in this report and***

*the university was unable to adequately address them, we believe the chances of a successful appeal or re-application for initial accreditation are low* . . . .

217.    In a report dated July 9, 2012, analysts at Barrington Research stated, in part: "This morning. . . [Bridgepoint] released an 8K stating Ashford has been denied WASC accreditation. This is clearly a disappointment for investors. . . ."

218.    In a reported dated July 9, 2012, analysts at William Blair stated, in part:

*With the stock down over 30% on the day, the decision was clearly a surprise to . . . investors and analysts.*

. . . [W]e are downgrading . . . based on the lack of identifiable positive catalysts, the threat of potential loss of accreditation, and the likely need for institutional change, or at the very least, a period of slow or no growth and decreasing margins while management determines a new course of action or addresses the WASC decision with more spending.

\*          \*          \*

And language like "[addressing attrition levels will] require reconsideration of current student acquisition strategies," "improving persistence will be a challenge for the institution," and "for the online program it is not evident that the faculty is providing the range of academic service to the institution that will be essential to long-term sustainability" indicate to us that WASC sees a large gap between acceptable academic practices and those in effect at Bridgepoint.

While concrete remedies are given in some instances, and the report notes many examples of strong practices at Bridgepoint, on the whole, it leads us to believe that Bridgepoint is not close to being accredited by WASC, and even if it reapplies for 2013, it may not show sufficient, quantifiable progress. . . .

. . . We believe Bridgepoint/Ashford's next step will be to appeal the decision, although we believe the chances of the decision being overturned are very small (less than 10% and probably closer to zero.). . . . [W]e believe numerous (and potentially expensive) changes will need to occur before WASC accredits Bridgepoint, and it could take several years.

\*          \*          \*

*Based on conversations we have had today, we believe management has lost a significant amount of credibility with investors*, which we expect will be a long-term headwind to valuation . . . .

\*          \*          \*

We also struggle to find a potential positive catalyst for the stock over the next year. In many ways, management is in a no-win situation right now . . . .

219.     In a report dated July 9, 2012, analysts at Wells Fargo stated, in part: "This news is surprising.  While we had anticipated some qualification attached to accreditation, we rated the chances of an outright denial as very low."

220.     In a report dated July 9, 2012, analysts at Credit Suisse stated, in part: "Our View: Significant Negative Surprise.  We believe even the most skeptical observers had generally assumed WASC would grant Ashford accreditation this year."

221.     In a report dated July 10, 2012, analysts at Wells Fargo stated, in part:  [T]he denial of accreditation by . . . (WASC) represents a significant setback."  The report continued, discussing Bridgepoint's options going forward:

> Bridgepoint management must make a financial decision between the cost of complying with WASC's requirements, or those of the . . . (HLC) . . . .  Satisfying WASC likely includes hiring more faculty, allowing more faculty determination over course structure and design, and doing a better job of weeding out non-committed students through orientation or more generous refund policies.  Complying with HLC could involve a significant amount of relocation of at least Ashford's management . . . .

222.     In a  report dated July 10, 2012, analysts at Piper Jaffray stated, in part: "Much to our (and the market's) surprise, the . . . (WASC) has denied Ashford University's . . . application for accreditation."  The report also commented on the denial itself:

> WASC denied Ashford its initial request for accreditation citing Ashford's failure to comply with multiple aspects of the Standards of Accreditation at a substantial level.
>
> Specifically, WASC cited six areas of deficiency.  We view the shortcoming as more than just procedural and as fundamental issues that will take considerable effort to remediate.

**Analysts' Response to HLC's Action**

223.     With regard to the HLC's July 13, 2012 announcement that it had placed Bridgepoint on "special monitoring status" regarding its accreditation, analysts were quick to connect the negative news and corresponding stock drop to the WASC accreditation denial revealed on July 9, 2012.  In a report dated July 13, 2012, analysts at Piper Jaffray stated, in part: "[T]he risk of losing

accreditation [has] driven further significant downside in the stock. . . . [T]he level of regulatory

uncertainty makes the stock uninvestable."  The report continued:

> When it rains, it pours:  In response to the . . . (WASC) rejection of Ashford University's application for accreditation, the university's accreditor, . . . (HLC), has initiated an examination of Ashford's compliance with HLC accreditation standards. . . . HLC is specifically focused on . . . the same issues WASC cited in rejecting Ashford's application for accreditation.

A report dated July 13, 2012, by analysts at Wells Fargo stated, in part:

> BPI:  Second Shoe Drops; HLC Announces Review
>
> *       *       *
>
> As expected, items raised in Monday's . . . (WASC) team report have prompted Ashford University's current accreditor, . . . (HLC), to seek assurances that the university is in compliance with HLC standards. . . . [T]he school will be hard-pressed to explain the previous oversight.

224.    In a report dated July 13, 2012, analysts at BMO Capital Markets noted that HLC, "the current accreditor of Ashford University, had placed Ashford on 'special monitoring' status until it can conform with HLC requirements."  The report continued:  "On its website, HLC explains that special monitoring is used when the integrity of the institution and its programs might be in jeopardy."

225.    In a report dated July 13, 2012, analysts at Credit Suisse stated, in part:  "Ashford may need to make substantial changes to its enrollment standards and cost structure to avoid losing accreditation and access to Federal aid (close to 90% of revenue)."

226.    In a report dated July 26, 2012, analysts at Deutsche Bank stated, in part:  "Significantly lowering valuation due to accreditation risk. . . .  We have rethought our valuation in light the risks to [Bridgepoint]'s current accreditation and unlikely successful appeal or reapplication for WASC accreditation in our view."

227.    In a report dated August 6, 2012, analysts at Wells Fargo noted that "Ashford's accreditation issues are significant, [but] they remain solvable with sufficient resolve.  The question

remaining is the extent to which the company is prepared to go to address the accreditors' concerns

regarding in particular institutional independence, full-time faculty and faculty control."

228.    The decline in Bridgepoint's stock price at the end of the Class Period was a direct

result of the nature and extent of defendants' prior false statements and omissions being revealed to

investors and the market.  The timing and magnitude of Bridgepoint's stock price declines negate

any inference that the loss suffered by plaintiffs and other Class members was caused by changed

market conditions, macroeconomic or industry factors or Company-specific facts unrelated to

defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiffs and other

members of the Class, was a direct result of defendants' misstatements and omissions which

artificially inflated Bridgepoint's stock price and maintained the price at artificially inflated levels,

and the subsequent significant decline in the value of Bridgepoint's stock when defendants' prior

misrepresentations and omissions were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE**

229.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-

market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts

during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an open efficient and well-developed market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to

misjudge the value of the Company's stock; and

(e)    Plaintiffs and other members of the Class purchased Bridgepoint securities

between the time defendants misrepresented or failed to disclose material facts and the time the true

facts were disclosed, without knowledge of the misrepresented or omitted facts.

**NO SAFE HARBOR**

230.     Statements issued during the Class Period were ineffective to shield those statements from liability.

231.     The defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Bridgepoint who knew that the forward-looking statement was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**COUNT I**

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against Defendants Bridgepoint,
Clark, Devine, and McAuliffe**

232.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. Count I is brought pursuant to §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, on behalf of all Class members against defendants.

233.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and did: (a) deceive the investing public, including plaintiffs and other members of the Class, regarding Bridgepoint's business, operations, financial results and the intrinsic value of Bridgepoint's publicly-traded securities; (b) artificially inflate and maintain the market price of Bridgepoint's securities; and (c) cause plaintiffs and other members of the Class to

purchase Bridgepoint's securities at artificially inflated prices and, as a result, suffer economic losses when the truth and impact about defendants' fraud was revealed. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

234.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's publicly-traded securities in an effort to maintain artificially high market prices for Bridgepoint's publicly-traded securities in violation of §10(b) of the 1934 Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

235.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bridgepoint's current compliance with and ability to meet the standards necessary for accreditation as specified herein.

236.    Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Bridgepoint's value and financial performance, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about Bridgepoint's current compliance with and ability to meet the standards necessary for accreditation, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Bridgepoint's publicly-traded securities during the Class Period.

237.   Each of defendants Clark's, Devine's, and McAuliffe's primary liability, and controlling person liability, arises from the following facts: (a) these individual defendants were high-level executives, and in defendant Clark's case, a director, at Bridgepoint during the Class Period as well as members of the Company's senior executive team; (b) each of these defendants, by virtue of his or her responsibilities and activities as a senior executive, and in defendant Clark's case, a director, of the Company was privy to and participated in the filings and reporting on Bridgepoint's current compliance with and ability to meet the standards necessary for accreditation; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the true status of Bridgepoint's current compliance with and ability to meet the standards necessary for accreditation, at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading and omitted material information.

238.   In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §210.01, *et seq*., and Regulation S-K, 17 C.F.R. §229.10, *et seq*., and other SEC regulations, including accurate and truthful information with respect to Bridgepoint's current compliance with and ability to meet the standards necessary for accreditation so that the market price of the Company's securities would be based on truthful, complete and accurate information.

239.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were made knowingly or with a reckless disregard for the truth and for the purpose and effect of inflating Bridgepoint's financial results, concealing the significant concerns and risks associated with Bridgepoint's current compliance with and ability to meet the standards necessary for accreditation and supporting the artificially inflated prices of the Company's publicly-traded securities.

240.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Bridgepoint's publicly-traded securities were artificially inflated during the Class Period.  In ignorance of the fact that the market price of Bridgepoint's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the markets in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Bridgepoint publicly-traded securities during the Class Period at artificially inflated prices and were damaged when the artificial inflation came out of the securities.

241.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs, the other members of the Class and the marketplace known the truth regarding Bridgepoint's current compliance with and ability to meet the standards necessary for accreditation, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Bridgepoint publicly-traded securities, or, if they had acquired such

securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

242.    By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

243.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly-traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against
### Defendants Bridgepoint, Clark, Devine, and McAuliffe

244.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. Count II is brought pursuant to §20(a) of the 1934 Act, 15 U.S.C. §78t(a), on behalf of all Class members against defendants.

245.    Defendants Clark, Devine, and McAuliffe acted as controlling persons of Bridgepoint within the meaning of §20(a) of the 1934 Act, as alleged herein. Bridgepoint controlled all of its employees and each of the individual defendants.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's finances and operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  These defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by plaintiffs to be misleading, prior to and/or shortly after these statements were

1    issued and had the ability to prevent the issuance of the statements or cause the statements to be

2    corrected.

3         246.    In particular, each of these defendants had direct and supervisory involvement in the

4    day-to-day operations of the Company and, therefore, is presumed to have had the power to control

5    or influence the particular transactions giving rise to the securities violations as alleged herein, and

6

7    exercised the same.  Bridgepoint controlled defendants Clark, Devine, and McAuliffe and the

8    Company's other officers and employees.

9         247.    As set forth above, defendants each violated §10(b) and Rule 10b-5 by their acts and

10   omissions as alleged in this complaint.  By virtue of their positions as controlling persons, these

11   defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of

12   defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in

13   connection with their purchases of the Company's publicly-traded securities during the Class Period.

14

15                                    **COUNT III**

16                      **For Violation of §20A of the 1934 Act**
                      **Against Defendants Clark, Devine, and McAuliffe**

17        248.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

18   forth herein.  Count III is brought pursuant to §20A of the 1934 Act against defendants Clark,

19   Devine, and McAuliffe on behalf of plaintiffs who were damaged by defendant Clark's, Devine's,

20

21   and McAuliffe's insider trading.

22        249.    As detailed herein, defendants Clark, Devine, and McAuliffe were in possession of

23   material, non-public information concerning Bridgepoint.  Defendants Clark, Devine, and McAuliffe

24   took advantage of their possession of material, non-public information regarding Bridgepoint to

25   obtain millions of dollars in insider trading profits during the Class Period.

26

27

28

250.     Defendant Clark's, Devine's, and McAuliffe's sales of Bridgepoint securities were made contemporaneously with City of Atlanta General Employees Pension Fund's purchases of Bridgepoint common stock during the Class Period.

251.     For example, on April 2, 2012, defendant Clark sold 37,131 shares of stock at $24.95 per share for proceeds of $926,418.  On April 2, 2012, City of Atlanta General Employees Pension Fund purchased 870 shares of Bridgepoint stock at $25.29 per share, for a total cost of $22,002.  On April 4, 2012, defendant Devine sold 18,500 shares of stock at an average price of $24.36 per share for proceeds of $450,587.  On April 4, 2012, City of Atlanta General Employees Pension Fund purchased 2,014 shares of Bridgepoint stock at $24.38 per share, for a total cost of $49,101. Additionally, on April 3, 2012, City of Atlanta General Employees Pension Fund purchased 2,649 shares of Bridgepoint stock at $25.37 per share, for a total cost of $67,205.

252.     In addition, on April 10, 2012, defendant McAuliffe sold 20,000 shares of stock at an average of $20.48 per share for proceeds of $409,652.  On April 12, 2012, City of Atlanta General Employees Pension Fund purchased 1,574 shares of Bridgepoint stock at an average price of $21.54 per share, for a total cost of $33,910.

253.     City of Atlanta General Employees Pension Fund, who purchased shares of Bridgepoint common stock contemporaneously with sales by defendants Clark, Devine, and McAuliffe suffered damages because: (1) in reliance on the integrity of the market, it paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the 1934 Act as alleged herein; and (2) it would not have purchased the securities at the prices it paid, or at all, if it had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

254.    Defendant Clark's and defendant Devine's sales of Bridgepoint securities were made contemporaneously with Local 677's purchases of Bridgepoint common stock during the Class Period.

255.    For example, on July 20, 2011, Local 677 purchased 10,000 shares of Bridgepoint stock at $29.54 per share, for a total cost of $295,400.  On July 21, 2011, defendant Clark sold 17,297 shares of stock at $30.02 per share for proceeds of $519,256.  Also on July 21, 2011, defendant Devine sold 21,600 shares of stock at $30.03 per share for proceeds of $648,648.  On July 22, 2011, defendant Clark sold 50,169 shares of stock at $30.35 per share for proceeds of $1,522,629.

256.    Local 677, who purchased shares of Bridgepoint common stock contemporaneously with sales by defendants Clark and Devine, suffered damages because: (1) in reliance on the integrity of the market, it paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the 1934 Act as alleged herein; and (2) it would not have purchased the securities at the prices it paid, or at all, if it had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

**PRAYER FOR RELIEF**

257.    WHEREFORE, plaintiffs, on behalf of themselves and the Class, respectfully pray for judgment as follows:

A.    Determining that this action is a proper class action, and certifying plaintiffs as a class representative under Federal Rule of Civil Procedure 23;

B.    Awarding compensatory damages in favor of plaintiffs and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

1          C.          Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this

2     action, including counsel fees and expert fees; and

3          D.          Such equitable, injunctive or other and further relief as the Court may deem just and

4     proper.

5                                                   **JURY DEMAND**

6          Plaintiffs demand a trial by jury.

7     DATED:  December 21, 2012               ROBBINS GELLER RUDMAN
8                                                  & DOWD LLP
                                             DAVID C. WALTON
9                                             JONAH H. GOLDSTEIN
                                             FRANCIS A. DIGIACCO
10                                            AUSTIN P. BRANE

11

12                                                   s/ Jonah H. Goldstein
                                             JONAH H. GOLDSTEIN
13
                                             655 West Broadway, Suite 1900
14                                            San Diego, CA  92101
                                             Telephone:  619/231-1058
15                                            619/231-7423 (fax)

16                                            Lead Counsel for Plaintiffs

17                                            ROBERT M. CHEVERIE & ASSOCIATES
                                             GREGORY S. CAMPORA
18                                            Commerce Center One
                                             333 E. River Drive, Suite 101
19                                            East Hartford, CT  06108
                                             Telephone:  860/290-9610
20                                            860/290-9611 (fax)

21                                            Additional Counsel for Plaintiff

22

23

24

25

26

27

28

797788_1                                     - 102 -                     3:12-cv-01737-JM-WMC

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 21, 2012.

 s/ JONAH H. GOLDSTEIN
JONAH H. GOLDSTEIN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:jonahg@rgrdlaw.com

# Mailing Information for a Case 3:12-cv-01737-JM-WMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis A. DiGiacco**
  fdigiacco@rgrdlaw.com,nhorstman@rgrdlaw.com
- **Lionel Z Glancy**
  lglancy@glancylaw.com,lboyarsky@glancylaw.com,info@glancylaw.com
- **Jonah H. Goldstein**
  JonahG@rgrdlaw.com,e_File_SD@rgrdlaw.com
- **Richard M Heimann**
  rheimann@lchb.com,slee@lchb.com
- **Nina F Locker**
  nlocker@wsgr.com,lkoontz@wsgr.com
- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Joni L. Ostler**
  jostler@wsgr.com,pbaird@wsgr.com
- **Ignacio E. Salceda**
  isalceda@wsgr.com,rlustan@wsgr.com
- **David C Walton**
  davew@rgrdlaw.com,hdemag@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Jeff S Westerman**
  jwesterman@milberg.com,cchaffins@milberg.com,ckiyotoki@milberg.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Jeremy              A. Lieberman
Pomerantz, Grossman, Hufford, Dahlstrom & Gross, LLP
600 Third Avenue
20th Floor
New York, NY 10016
```