1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

9

| In re BRIDGEPOINT EDUCATION, INC. SECURITIES LITIGATION | CASE NO. 3:12-CV-1737 JM (WMC)<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS |
| --- | --- |

On July 17, 2013, plaintiff Donald K. Franke filed a class action lawsuit against Bridgepoint Education Inc. ("Bridgepoint"). Several related class action lawsuits followed. The court later granted a motion consolidating Sacharczyk v. Bridgepoint Education, Inc. et al., No. 3:12-CV-01759-JM (WMC) (filed July 17, 2012), and Stein v. Bridgepoint Education, Inc., No. 3:12-CV-01841-JM (WMC) (filed July 26, 2012) with this matter. The court also granted a motion by the City of Atlanta General Employees Pension Fund ("Plaintiff") to be appointed lead plaintiff. On December 21, 2012, Plaintiff filed a consolidated complaint. On February 19, 2013, Bridgepoint filed this motion to dismiss. Following extensive briefing, this matter was taken under submission on July 16, 2013. For the following reasons, the court grants in part and denies in part Bridgepoint's motion to dismiss with leave to amend.

## I.    JURISDICTION AND VENUE

This Court has federal question jurisdiction of this action pursuant to 28 U.S.C. §1331, and venue exists under 28 U.S.C. §1391(a), (b), and (d).

## II.   BACKGROUND

### A.  Parties

Bridgepoint is a for-profit, post-secondary education services provider with academic institutions online and at least two physical locations, including Ashford University ("Ashford") in Clinton, Iowa, and University of the Rockies located in Colorado Springs, Colorado.  Consolidated Complaint ("CC") at ¶ 19.

Andrew S. Clark co-founded Bridgepoint and, at all relevant times, was the Chief Executive Officer ("CEO"), President, and a director at Bridgepoint.  CC at ¶ 20.  He was responsible for directing Bridgepoint's business.  CC at ¶ 20.  Prior to Bridgepoint, Clark consulted with several private equity firms examining the post-secondary education sector and worked almost a decade for Apollo Group, Inc., the company behind the University of Phoenix.  CC at ¶ 20.  During the proposed Class Period, Clark sold 725,525 shares of his Bridgepoint stock for more than $17 million.  CC at ¶ 20.

Daniel J. Devine, at all relevant times, was Chief Financial Officer ("CFO") and Executive Vice President of Bridgepoint.  CC at ¶ 21.  He is a Certified Public Accountant and has served as a CFO at many other companies during the last 20 years.  CC at ¶ 21.  During the proposed Class Period, Devine sold 299,100 shares of his Bridgepoint stock for almost $7 million.  CC at ¶ 21.

Jane McAuliffe, at all relevant times, was Chief Academic Officer ("CAO") and Executive Vice President of Bridgepoint.  CC at ¶ 22.  She was responsible for monitoring and reporting Bridgepoint's academics-related business affairs.  CC at ¶ 22.  During the Class Period, McAuliffe sold 300,000 shares of her Bridgepoint stock for proceeds of almost $6.5 million.  CC at ¶ 22.  Throughout the remainder of this order, Bridgepoint, Clerk, Devine, and McAuliffe will be collectively referred to as "Defendants."

### B. Ashford's Accreditation

Bridgepoint derives a substantial amount of its revenue from various federal

student financial assistant programs under Title IV of the Higher Education Act of 1965 (e.g. Pell Grants, Stafford Loans, etc.). Higher education institutions must be accredited by a Department of Education approved accreditor to enable students to access these Title IV financial assistance programs. Conversely, students at unaccredited higher education institutions cannot obtain federal student financial assistance. An overwhelming majority of students who enroll in for-profit colleges, such as and including Ashford, take out loans.[1] CC at ¶ 33. Accreditation is therefore allegedly vital to Bridgepoint's financial health. CC at ¶ 41.

Higher education institutions may obtain their accreditation from national or regional accreditors. CC at ¶ 32. Six regional accreditors currently operate in the United States. CC at ¶ 32. Each accreditor has its own accreditation requirements.

In 2005, Bridgepoint obtained accreditation for its university by purchasing The Franciscan University of Prairies ("Franciscan University"), a small, regionally accredited, non-profit school in Clinton, Iowa. CC at ¶ 37. Franciscan University's regional accreditor was the Higher Learning Commission ("HLC"), which has jurisdiction in the 19-state north central region. CC at ¶ 4. It had been accredited for decades prior to its acquisition. MTD at 3. When Bridgepoint purchased Franciscan University in 2005, HLC performed a "change of control" review and affirmed accreditation. MTD at 3. HLC again reviewed and affirmed Ashford's accreditation in 2006. MTD at 3. HLC performed another "change of control" review soon after Bridgepoint's 2009 initial public offering. MTD at 3.

Soon after the acquisition, Bridgepoint changed Franciscan University's name to Ashford University and began an aggressive marketing campaign to increase enrollment, which eventually swelled its enrollment numbers to 84,713 students. These students were increasingly located in San Diego, California, which was outside HLC's jurisdiction and endangered Ashford's accreditation. CC at

---

[1] In 2009, 2010, and 2011, Ashford received 85.5%, 85.0%, and 86.8%, respectively, of revenues from Title IV funds. However, with DOD federal funds included, Bridgepoint received 93.7% of revenue in 2010 from the federal government.

¶¶ 37, 43.  Ashford's growing number of students located outside of HLC's region became a problem when HLC adopted a policy requiring institutions to demonstrate a "substantial presence" in the HLC's region in 2010.  CC at ¶ 43.

Thus, in August 2010, Bridgepoint sought to obtain accreditation from the Western Association of Schools and Colleges ("WASC").  CC at ¶ 44.  As applicants are strongly encouraged to consult with WASC and attend a WASC-sponsored workshop describing the level of readiness expected of an institution at each step in accreditation, Bridgepoint met with WASC and HLC accreditation officials in April 2011.  CC at ¶ 45.  Bridgepoint informed its investors of these meetings on May 3, 2011.  CC at ¶ 45.  At the WASC meeting, WASC informed Bridgepoint that it had approved Ashford's application for eligibility, which meant that Ashford met the basic criteria necessary to be considered for accreditation.  CC at ¶ 46.

Thereafter, Bridgepoint initiated its formal pursuit of WASC accreditation through "Pathway B," which is the WASC accreditation process for established institutions that are already accredited by another DOE-recognized accrediting agency.  CC at ¶ 46.  Pathway B first requires institutions to engage in a self-study by responding to each applicable "Criteria for Review" ("CFRs") and provide supporting documentation.  CC at ¶ 47.  This is followed by one or more site visits by the WASC visiting team.  For Ashford's accreditation, WASC decided that only one comprehensive visit was necessary.  CC at ¶ 47.  Irrespective of the accreditation process, the requirements that Bridgepoint needed to meet to obtain WASC accreditation were still the same as for any other applicant.  CC at ¶ 48.

Prior to and during the pendency of Ashford's WASC accreditation application, Bridgepoint leadership and Ashford department managers attended monthly Quality Review Meetings ("QRMs").  CC at ¶ 195.  At QRMs, Bridgepoint leadership and Ashford department managers allegedly discussed trends, statistics, and profiles to promote discussion on solutions to problems identified.  CC at ¶ 195.

Plaintiff alleges that they would therefore have discussed areas that needed more attention to receive accreditation.  CC at ¶ 195.

On May 23 and June 3, 2011, WASC provided Bridgepoint with areas of focus that Bridgepoint needed to address to obtain WASC accreditation.  CC at ¶ 49.  WASC purportedly wanted Bridgepoint to address (a) inadequate student retention and completion, (b) insufficient student progress tracking, (c) an insufficient core of full-time faculty members, and (d) lack of an empowered and independent governing board.  CC at ¶ 49.  Despite these warnings, Bridgepoint allegedly continued to portray the company positively, including Ashford's accreditation, in various press releases, conferences, and other communications with the public from May 2011 to May 2012.

Ashford submitted its self-study in December 2011.  CC at ¶ 50.  WASC's Pathway B Visiting Team reviewed this self-study and its supporting documents prior to its onsite visit.  It found that this self-study

> was more descriptive of current initiatives underway at the University rather than self-reflective of strategic issues faced by the institution [and] lack[ing] in-depth or sophisticated understanding of the assets and vulnerabilities of the institution. The report represented more compliance-driven responses rather than analysis of longitudinal findings and areas needing development at the institution.

CC at ¶ 50.  After its visit, the WASC Pathway B Visiting Team recommended denying accreditation.  CC at ¶ 52.  Although the WASC commission still had the option of delaying accreditation to provide Ashford with more time to meet CFRs, it declined to do so, purportedly because the areas in which substantial compliance were not demonstrated spanned several key aspects of the Standards.  CC at ¶ 54.

In a July 3, 2012 "Action Letter" to Ashford's President and CEO, Elizabeth Tice, WASC's president Ralph A. Wolff informed Ashford that it had failed to

demonstrate substantial compliance in multiple areas and WASC would be denying Ashford's initial accreditation as a result.  CC at ¶ 55.  Specifically, the letter cited Ashford's failure: (1) to implement plans, procedures, and practices to sufficiently assist students in staying with the programs they enrolled in and complete courses; (2) to align resources with educational requirements such that students were not benefitting from the resources available and were therefore not progressing to an acceptable level; (3) to maintain a sufficient core faculty and programs to develop faculty, leading to poor teaching and completion rates by students as well as a less rigorous curriculum; (4) to provide an effective review program for assessing and monitoring student learning; (5) to provide an effective system of program review; (6) to implement adequate review procedures that prevented shortfalls from being quickly identified and remedied; and (7) to maintain an empowered and independent governing board.  CC at ¶ 57.  The Action Letter provided extensive details regarding each of these failures and noted that Ashford had been aware of these issues, which had been addressed in the WASC's May 23, 2011 and June 3, 2011 letters.  Specifically, the Action letter stated:

> Notably, Ashford was notified about WASC concerns in each of these areas by WASC and its Eligibility Review Committee in letters to Ashford dated May 23 and June 3, 2011, providing Ashford with early notice about these concerns.  Given that there were multiple areas in which substantial compliance could not be demonstrated and that these areas fell into several aspects of the Standards of Accreditation, the Commission determined that a denial of initial accreditation of Ashford was the appropriate action.

CC at ¶ 55.

Bridgepoint disclosed Ashford's lack of accreditation to investors in a Form 8-K dated July 9, 2012, which stated

Item 8.01 Other Information.

Denial of Initial Accreditation for Ashford University

On July 5, 2012, Ashford University received official notice from the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("WASC") that WASC has acted (1) to deny initial accreditation to the institution and (2) to permit the institution to reapply for accreditation with a single special visit to occur as early as spring 2013. This reapplication process would allow WASC to act in June 2013 and does not require Ashford University to undertake another full self-study.

* * *

Ashford University remains regionally accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools ("Higher Learning Commission"), with the next comprehensive evaluation scheduled for 2014-15. Ashford University intends to work collaboratively with both WASC and the Higher Learning Commission to ensure it continues to satisfy the Higher Learning Commission's accreditation requirements while it seeks accreditation with WASC.

CC at ¶ 76. That same day, Bridgepoint issued a press release indicating that Ashford University would both appeal the decision and reapply for WASC accreditation. CC at ¶ 77. Following these disclosures, Bridgepoint's shares fell $7.25 per share to close at $14.25, or an approximately 34 percent drop. CC at ¶ 78.

On July 12, 2012, Bridgepoint received a letter indicating that HLC, then Ashford's only accreditor, had placed Ashford on "special monitoring status" because of WASC's denial of accreditation and other allegedly significant deficiencies. CC at ¶ 81. In the letter, HLC requested that Ashford demonstrate its compliance with HLC's accreditation standards by providing:

(I) evidence that Ashford University meets the HLC Criteria for Accreditation relating to the role and autonomy of the University's governing board and its relationship with Bridgepoint Education, including the role of faculty in overseeing academic policies and the integrity and continuity of academic programs, (ii) evidence that Ashford University's resource allocations are sufficiently aligned with educational purposes and objectives in the

areas of student completion and retention, the sufficiency of full-time faculty and model for faculty development, and plans for increasing enrollments, and (iii) evidence demonstrating that Ashford University has an effective system for assessing and monitoring student learning and assuring academic vigor.

CC at ¶ 81. The letter went on to warn Bridgepoint that, based on the HLC President's presentation of Ashford's response, the HLC board would decide whether to continue accreditation, with or without further monitoring, continue accreditation under sanction or "Show Cause" order, or withdraw accreditation. CC at ¶ 81. On July 13, 2012, the day that Bridgepoint revealed the concerns in HLC's letter in another Form 8-K, Bridgepoint stock plummeted another $3.20 per share to close at $9.77, a decline of nearly 25 percent on high volume of 6.7 million shares. CC at ¶¶ 81, 82.

### C. Alleged Misrepresentations

#### 1. May 3, 2011 Press Release & Associated Conference Call

Plaintiff alleges that Defendants began making numerous misrepresentations regarding Ashford's accreditation status shortly after Ashford sought accreditation from WASC. Plaintiff first points to a May 3, 2011 press release regarding its first quarter earning results in which Bridgepoint reported its net income and its projected revenue and net income for the upcoming year. CC at ¶ 84. In this May 3, 2011 press release, it announced that its "year over year student persistence" had increased for the fourth quarter, indicating that its student support initiatives were having a positive impact. CC at ¶ 84. In addition to the press release, Defendants Clark, Devine, and McAuliffe hosted a conference call. McAuliffe allegedly stated that:

WASC has reviewed the application and determined that Ashford University is eligible to proceed with an application for candidacy for accreditation. This is a preliminary finding that indicates that the University can proceed to the next step, which includes writing a

> self-study in preparation for a site visit. The team is very excited to be moving forward in the process. Ashford University continues to keep HLC well-informed each step of the way, and our liaison is very cooperative and supportive.

CC at ¶ 87.

Later during the same call, Clark answered an analyst's question concerning the status of Ashford's WASC application by stating that "we are very pleased with our progress so far" and "as we have in the past, we will be very transparent with everybody." CC at ¶ 87. Clark also re-emphasized the positive changes coming from Ashford's initiatives, stating that "everything that we implemented last year has really done what we thought it would do, which is improve our persistence." CC at ¶ 89. He further stated that "right now we are very focused on our initiatives for 2011 on student persistence, student graduation – anything we can do to improve the student experience in the classroom or administratively." CC at ¶ 92. That day, Bridgepoint stock closed up $1.48 per share to close at $19.87 per share on May 3, 2011. CC at ¶ 93.

At least two analysts' reports, one from J.P. Morgan and another from William Blair & Company ("William Blair"), commented that these student support initiatives were important for Bridgepoint's future success. CC at ¶ 85. The William Blair report stated that "in [its] view a successful switch from HLC to WASC may be the only thing that finally lays some major fears to rest." CC at ¶ 86. Analysts at RBC Capital Markets made similar statements in a May 4, 2011 report. CC at ¶ 94. However, in denying accreditation later in July 2012, "WASC [allegedly] found these initiatives were either nonexistent or had no measurable impact." CC at ¶ 90.

### 2.    August 2, 2011 Press Release & Associated Conference Call

On August 2, 2011, Bridgepoint issued a press release containing its second quarter 2011 ("2Q11") earnings results and projections through 2011. CC at ¶ 102. The release contained a statement by Clark that "[d]uring the first half of 2011, our

institutions continued to make progress on key initiatives to improve the academic readiness of students and to provide students with an innovative, high quality learning experience . . . ."  CC at ¶ 102.  That same day, Bridgepoint also hosted a conference call in which Clark, Devine, and McAuliffe participated.  During the call, Clark asserted that Bridgepoint

> We continue to believe that maintaining a high level – high level of persistence level is an important goal for both of our institutions and demonstrates that our institutions are successfully engaging students and delivering a quality education experience that enhances student's lives. We will continue to focus on improving persistence . . . .
>
> * * *
>
> We are pleased with our progress in the first half of 2011. We have achieved significant key initiatives, strengthened our support for students and faculty through developing new technologies and enhanced transparency for prospective students.

CC at ¶ 104.

In addition, McAuliffe explained that Ashford had been approved for WASC's Pathway B application, that Ashford would be required to submit a self-study in December 2011, and that the WASC's onsite visit for its accreditation would happen in March 2012.  McAuliffe  voiced her optimism that Ashford would receive accreditation, stating that "[t]he University faculty and staff are hard at work preparing a self-study that portrays the institution's strengths and achievements, as well as reflecting on what can further be developed in order to advance the institution."  CC at ¶ 105.

On August 2, 2011, Bridgepoint also filed its 2Q11 Form 10-Q with the SEC, which was approved and signed by Clark and Devine and reviewed and approved by McAuliffe.  CC at ¶ 106.  It contained the following statement regarding Ashford's WASC accreditation application:

> WASC determination of eligibility for Ashford University. In September 2010, Ashford University applied for

- 10 -

eligibility from the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("WASC"). On May 12, 2011, Ashford University received a letter from WASC stating that the WASC Eligibility Review Committee has reviewed the application and determined that the university meets all of the WASC eligibility criteria and may proceed with an application for initial accreditation. Additionally, the letter confirmed that Ashford University is authorized to pursue WASC accreditation under Pathway B, the process for institutions that currently hold accreditation with an institutional accreditor recognized by the Department. A determination of eligibility is not a formal status with WASC, nor does it ensure eventual accreditation; it is a preliminary finding that Ashford University is potentially accreditable and can proceed within four years of its eligibility determination to be reviewed for initial accreditation status with WASC.

CC at ¶ 106.

Plaintiff notes that Bridgepoint had already received at least two letters that highlighted certain problem areas that it needed to address prior to receiving accreditation. Plaintiff claims that these letters prove that Bridgepoint's optimistic projections regarding its accreditation from the WASC were misleading. CC at ¶ 113.

Plaintiff alleges that analysts continued to view WASC accreditation with minimal or no risk due to Bridgepoint's purportedly misleading earnings release, corresponding conference call on August 2, 2011, and 2Q11 Form 10-Q. CC at ¶ 107. The analysts with sanguine views in light of these allegedly misleading disclosures included William Blair, BMO Capital Markets ("BMO"), Credit Suisse, and Wunderlich Securities ("Wunderlich"). CC at ¶¶ 103, 107-12. Many of these analysts also emphasized the importance of Ashford obtaining accreditation. CC at ¶¶ 107-12.

### 3. September 15, 2011 BMO Capital Markets Back to School Education Conference

On September 15, 2011, Clark and Devine appeared at the BMO Capital Markets Back to School Education Conference for analysts, media representatives,

and investors.  CC at ¶ 118.  During that call, Clark made several positive remarks about Ashford's student-centered learning models that aligned outcomes with assessments.  CC at ¶ 118.  In addition, Clark stated that

> In terms of the WASC migration, which I mentioned earlier where Ashford University is going through the process to become WASC accredited, we have met all the eligibility criteria.  We are submitting our self-study in the fourth quarter of this year.  And we will have our visit by WASC in March of next year.

CC at ¶ 119.  Based on these statements, BMO Capital, J.P. Morgan, and Wunderlich reported that Bridgepoint's accreditation switch was progressing well and was likely to occur.  CC at ¶¶ 121-23.  However, Plaintiff claims that "[D]efendants' statements concerning Ashford's pursuit of WASC accreditation omitted that defendants knew or recklessly disregarded the fact that Ashford could not demonstrate substantial compliance with multiple aspects of the WASC Standards."  CC at ¶ 120.

### 4.      November 1, 2011 Earnings Release & Associated Conference Call

On November 1, 2011, Bridgepoint issued an earnings release containing its third quarter 2011 ("3Q11") earnings results and full-year projections for 2011, which were above previously issued projections.  CC at ¶ 126.  On the same day that it issued its earnings release, Bridgepoint also held a conference call in which Clark, Devine, and McAuliffe actively participated.  CC at ¶ 128.

During the conference call, Clark purportedly touted recent technology initiatives implemented at Ashford. CC at ¶ 128.  Clark also summarized Ashford's progress with the following statement

> Taking a broader viewer of our accomplishments to date in 2011, our institutions have successfully managed through a major transition in how our industry operates.  We have made significant progress on key initiatives.  We have strengthened our support for students and faculty through innovative   technologies.    And   we   have   enhanced

transparency for prospective students. We are pleased with this progress, and we believe we are increasingly well positioned to meet the educational needs of students.

CC at ¶ 129.

In addition, McAuliffe made the following comments about Ashford's accreditation application:

I want to provide you an update on accreditation for Ashford University. Having already established eligibility to move forward with an application for initial accreditation with the Western Association of Schools and Colleges, Ashford University continues its focused preparations for the submission of the WASC self-study in December 2011.

The self-study effort has brought university faculty, staff, and administrators together in positive, well-coordinated, and collaborative discussions to develop appropriate documentation on how the University demonstrates compliance with the current WASC standards for accreditation. This self-study process is a worthy process, as it allows University faculty and leadership to reflect on current practices and build towards the future.

As we have reported previously, Ashford University plans to host a visiting team from WASC in March 2012. Ashford's materials and the report of the visiting team will be considered by the WASC commission at a meeting following the on-site team visit and completion of the team's reports. A decision relative to Ashford's application for accreditation is expected to be made at that time.

The University leadership values its collegial relationship with the WASC staff as we work through each stage of this process. The President of the University also continues to keep the Higher Learning Commission informed of progress, in [sic] the University continues to be accredited by the Higher Learning Commission.

I am very pleased with how the University leadership has continued to move forward and commend them on their focus and dedication to this project.

CC at ¶ 132. When asked directly for additional detail on what constituted good persistence or retention, McAuliffe responded that Bridgepoint was:

starting to see the effects of all the work that we are doing

1
2
3
4
5

> upfront. If you think about the quality initiatives we put into place with the orientation; with required attendance in the beginning courses; how we walk our students to class and make sure they are prepared and are comfortable in that learning environment. So by the time they get there, all that upfront preparation has really given them a sense of confidence that they can succeed and they can achieve and they know what to expect. So we think that is having a good impact for us.

6
7
8
9
10
11

CC at ¶ 133.  McAuliffe also acknowledged that the "predictive analytics" was new and that Bridgepoint was looking forward to begin using the data.  CC at ¶ 134. Clark echoed McAuliffe's comment, adding that it was "very exciting for us as an organization and for our institutions to be able to have that predictive capability and to proactively reach a student before they start having some significant type of issues that might lead them to dropping out of the institution."  CC at ¶ 134.

12
13
14
15
16
17
18
19
20

Based on these statements, William Blair, BMO Capital, Craig-Hallum Capital Group LLC, and Wunderlich commented on Bridgepoint's improving retention and the perceived high likelihood that Bridgepoint would be accredited. CC at ¶¶ 137-41.  But Plaintiff claims that these statements surrounding the 3Q11 earnings release and conference call "falsely represented and omitted the fact that Bridgepoint's initiatives to improve retention, persistence, and completion were not yet meaningful even as late as July 2012, months after their statements."  CC at ¶ 135.  As a result, Plaintiff contends that Bridgepoint continued to trade at artificially inflated levels.  CC at ¶ 145.

21

### 5.    November 15, 2011 Citi U.S. Small & Mid Cap Conference

22
23
24
25
26

On November 15, 2011, Clark, Devine, and McAuliffe appeared at the Citi U.S. Small & Mid Cap Conference for analysts and investors.  CC at ¶ 146. McAuliffe made several representations regarding Ashford's use of data to enhance the quality of education provided.  Specifically, McAuliffe stated

27
28

> We look at – as soon as a student enters our university as a prospective student, we look at sort of the quality aspects coming in and then follow that all the way through to the time they graduate with us. From an admissions standpoint

we are looking at our student data as they come in the door.

\* \* \*

From a course perspective we have quality assessments, checkpoints throughout the course. [Defendant Clark] mentioned our Waypoint assessment that we use.

\* \* \*

Always looking at our data, because we can from a technology standpoint. And truly focused on the student learning, so we have assessment teams in place that work with our faculty and our administration at both institutions to really understand how our students are learning. . . .

Our learning model is very rigorous.

CC at ¶ 147.

However, Plaintiff claims that the WASC Visit Team Report found that Ashford had yet to set up the necessary processes for analyzing data and making meaningful data-informed decisions and lacked a robust assessment tool to measure student learning.  CC at ¶ 148.  In addition, WASC had serious concerns regarding the rigor of Ashford's course work.  CC at ¶ 148.  Again, Plaintiff maintains that these misrepresentations resulted in Bridgepoint's stock being overvalued.  CC at ¶ 150.

**6.    December 7, 2011 William Blair & Company, LLC Global Services Growth Stock Conference**

On December 7, 2011, Clark and Devine discussed Ashford's possible accreditation at the William Blair Global Services Growth Stock Conference.  CC at ¶ 151.  Clark touted Ashford's 2010 and 2011 initiatives for student preparedness.  CC at ¶ 152.  In response to a question asked about Ashford's attempt to obtain accreditation from WASC, Clark made the following statements:

Yes, I mean, it's a very straightforward process. We submit our self-study in December. The visit is in March. We expect a decision kind of midyear next year. You know, it not – you're not isolated in the process. It's not like you submit the self-study and walk away. There is a lot of dialogue back and forth, back when we put our application

1
2
3
4

in, throughout the entire process, and so that's very positive. We have a deep, deep bench academically. Dr. McAuliffe, who is our Chief Academic Officer, has been tremendously successful at changes of ownership, reaccreditation, receiving the full ten years allowed. Doctor Tice is the President of Ashford. I mean we have a lot of confidence in the academic team there.

5
6
7
8
9

WASC has been delightful to work with. They're very focused on assessment, which is great from our standpoint. Some investors in this room might not know this, but we own a software company at Bridgepoint that's called Waypoint Outcomes. Waypoint Outcomes allows for about 40 other institutions, including Ashford and the Rockies, to aggregate learning outcome data by electronically via Web interface and be able to provide direct feedback to students on written assignments but then aggregate that data and demonstrate those outcomes.

10
11
12
13
14
15
16
17

So some just fascinating stats on that. We – Ashford for example processes about 20,000 documents in a week through Waypoint. I think when WASC comes in and sees, they don't have that experience going to most universities. They don't come in and they don't have an institution and say, hey, here's the outcomes and the objectives and then here actually is a data that supports that the students are achieving those objectives. Most traditional institutions just simply don't have that because the professor corrects the paper and hands it back to the students and the student walks off with it and they're not able to provide anything. So I'm, as you can probably tell, I feel very good about where we are at.

18
19
20
21
22
23
24
25

CC at ¶ 153.  In addition, Clark claimed that Ashford continued to focus on adding full-time faculty and striking the right balance with adjunct faculty.  CC at ¶ 154. Plaintiff claims that, when these statements were made, Defendants had almost concluded Ashford's self-study, were likely preparing for the WASC site visit in March 2012, and thus had knowledge of, or recklessly disregarded, the many areas in which Ashford did not comply with WASC accreditation standards.  CC at ¶ 155. Plaintiff claims that, as a result of these alleged misrepresentations, Bridgepoint's securities continued to trade at artificially inflated levels.  CC at ¶ 157.

26
27

       7.     **March 6, 2012 Earnings Release and Conference Call and Bridgepoint's 2011 Annual Report**

28

On March 6, 2012, Bridgepoint issued an earnings release containing its

- 16 -

fourth quarter 2011 ("4Q11") earnings results and full-year projections for 2012. CC at ¶ 161.  The 4Q11 earnings release also contained the following statement by Clark:

> In 2011, I am very pleased to report that both our institutions improved the quality of the student learning experience through the increased use of innovative technologies. To this end, we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experience at our institutions. In 2011, we believe these investments in the student learning experience were responsible for improved student persistence and graduation rates, and we expect that our focus on these investments will continue to produce similar results in the future.

CC at ¶ 161.  A conference call was also held to discuss the 4Q11 earnings release. During the call, Clark affirmed Bridgepoint's commitment to investments that would improve persistence and graduation rates.  CC at ¶ 162.  Clark and McAuliffe added that Bridgepoint would be investing more in identifying prospective students. CC at ¶¶ 163-64.  Finally, McAuliffe made the following statements regarding Ashford's accreditation:

> No[w] I would like to give you an update on Ashford University's WASC migration process. The leadership is pleased with its interactions with the WASC team. The faculty and staff submitted the self-study and all required documentation in a timely fashion. Ashford University is ready to welcome the WASC visiting team members later this month. Once complete, the visiting team will prepare a report to the WASC Board.
>
> We continue to expect a decision on Ashford University's application to WASC in mid-2012. We believe this move will enhance the institution's ability to succeed in its mission of providing accessible, affordable, innovative, and high quality learning opportunities and degree programs that meet the diverse needs of our students.
>
> Ashford University remains in good standing with our current [accreditor] and we are keeping them well informed of our work to date with WASC. We will keep you updated on the process.

CC at ¶ 165.

The following day, Bridgepoint filed its 2011 Form 10-K with the SEC. Bridgepoint's 2011 Form 10-K had been approved and signed by Clark and Devine, and reviewed and approved by McAuliffe.  It discussed the WASC procedure for accreditation.  Additionally, it contained the following risk factors related to Bridgepoint's attempt to obtain WASC accreditation for Ashford.

### Risks Related to the Extensive Regulation of Our Business

\* \* \*

***Our institutions' failure to maintain accreditation would result in a loss of eligibility to participate in Title IV programs.***

An institution must be accredited by an accrediting agency recognized by the Department to participate in Title IV programs. Each of our institutions is accredited by the Higher Learning Commission, which is recognized by the Department as a reliable authority regarding the quality of education and training provided by the institutions it accredits. Ashford University was reaccredited by the Higher Learning Commission in 2006 for a term of ten years, and the University of the Rockies was reaccredited by the Higher Learning Commission in 2008 for a term of seven years. To remain accredited, our institutions must continuously meet accreditation standards relating to, among other things, performance, governance, institutional integrity, educational quality, faculty, administrative capability, resources and financial stability. If either of our institutions fails to satisfy any of the Higher Learning Commission's standards, it could lose its accreditation. Loss of accreditation would denigrate the value of our institutions' educational programs and would cause them to lose their eligibility to participate in Title IV programs, which would have a material adverse effect on our enrollment, revenues and results of operations.

\* \* \*

***Ashford University could experience difficulties or delays in changing its primary accreditor.***

In September 2010, we announced that Ashford University has initiated the process of seeking regional accreditation from the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("WASC"). Ashford University is currently accredited by, and in good standing with, the Higher Learning Commission.

Although Ashford University is working collaboratively with both WASC and the Higher Learning Commission to

- 18 -

facilitate the migration of accreditation, it could experience difficulties or delays in receiving initial accreditation from WASC. If Ashford University is unable to obtain initial accreditation from WASC, the institution's academic reputation and ability to grow enrollments could be negatively affected. Additionally, if Ashford University does not receive WASC accreditation and loses accreditation from the Higher Learning Commission (e.g., due to the Higher Learning Commission's proposed new jurisdictional requirements requiring a "substantial presence" in the 19-state north central region, which will become effective on July 1, 2012), the institution would no longer be accredited by an accrediting body recognized by the Department and would be ineligible to participate in Title IV programs until it obtained accreditation by another accrediting body recognized by the Department, at which time it would need to file an application with the Department for reinstatement. If Ashford University becomes ineligible to participate in Title IV programs, it will have a material adverse effect on our enrollments, revenue and results of operations.

CC at ¶ 166.

Prior to Bridgepoint's 4Q11 earnings release, 4Q11 conference call, and 2011 Form 10-K, analysts had discussed Bridgepoint's attempts to remedy historical problems, including student retention and full-time faculty retention. CC at ¶ 158. Wunderlich, J.P. Morgan, and William Blair all emphasized the importance of Ashford's accreditation to Bridgepoint's financial health. CC at ¶¶ 158-60. Wunderlich even stated that it believed that the risk that Ashford would not obtain WASC accreditation was low. CC at ¶ 158. Of these analysts, Wunderlich and William Blair expressed their confidence that Ashford would obtain WASC accreditation. CC at ¶¶ 167-68.

Plaintiff insists that Defendants' comments regarding Ashford's student persistence programs and student identification programs were misleading, especially as Bridgepoint has not yet developed methods of processing the student data that they had collected. These alleged failures to put in place such programs likely has a material impact on Ashford's ability to obtain WASC accreditation. Accordingly, Plaintiff again insists that "[a]s a result of defendants' false and misleading statements in the March 6-7, 2011 Form 10-K, press release, and conference call, Bridgepoint's securities continued to trade at artificially inflated

levels."  CC at ¶ 172.

### 8. March 13, 2012 Credit Suisse Global Services Conference

On March 13, 2012, Clark and Devine spoke at the Credit Suisse Global Services Conference.  Clark stated that Bridgepoint would continue to invest more in full-time faculty and more terminally degreed faculty.  CC at ¶ 173.  In addition, Plaintiff suggests but does not provide more specific details of statements by Clark and Devine regarding the WASC accreditation at this conference.  After the conference, analysts William Blair and Piper Jaffray expressed confidence about Ashford obtaining WASC accreditation that summer.  CC at ¶¶ 174-75.  Plaintiff asserts that Defendants' statements at the Credit Suisse Global Services Conference were materially misleading because Ashford had failed to address the concerns WASC expressed in their spring 2011 letters to Bridgepoint, including the retention of full-time staff, student perseverance, improving educational quality.  CC at ¶ 176.

### 9. May 1, 2012 Earnings Release and Conference Call

On May 1, 2012, Bridgepoint issued an earnings release containing its first quarter 2012 ("1Q12") earnings results and updated full-year projections for 2012.  CC at ¶ 178.  In the earnings release, Clark is quoted as saying:

> We are pleased that our operating and financial results were in-line with our internal expectations for the quarter, and we are particularly pleased by the strong increase in student persistence at our universities.  Increasing persistence reflects our success with the student support and quality initiatives we are implementing, which help assure the academic readiness of students and help provide students with an innovative, high quality learning experience that enriches their lives.

CC at ¶ 178.  However, Plaintiff notes that WASC found that Bridgepoint's efforts to address student support and retention had no measurable effect.  CC at ¶ 180.

In addition, McAuliffe provided the following update on Ashford's WASC accreditation application:

> Just a brief update on Ashford University's WASC process. As previously reported, the self-study was submitted in December of 2011. As planned, a team visited the University in March 2012. We expect a final decision midyear and will provide an update when Ashford University is formally notified in writing.
>
> * * *
>
> A number of our faculty and administrators have recently given presentations at the 2012 Higher Learning Commission Conference and the 2012 WASC Academic Resource Conference. . . .
>
> At the WASC Academic Resource Conference [base] members from Ashford University and Bridgepoint Education presented sessions on ensuring course quality through scalable course development model, online faculty evaluation and mentoring, the new ecology in higher education, academic program review, degree qualifications profile, leveraging institutional research offices, and curriculum mapping and calculating course credit hours. I'm pleased that so many of our colleagues are contributing to the advancement of higher education.

CC at ¶ 181.  However, when a research analyst inquired about a possible exit interview after WASC's onsite visit, McAuliffe refused to provide specifics, stating only, "I don't think we're going to comment on the informal processes along the way. I think our intent really is to wait until we're through the whole process and then we'll be sure to give you an update at that time."  CC at ¶ 182.  When asked to identify recently implemented initiatives at Ashford which allegedly contributed to persistence, McAuliffe limited her response, stating it was Bridgepoint's "focus on quality . . . [and] increasing the value of that student experience . . . ."  CC at ¶ 183.

Deutsche Bank and Credit Suisse analysts immediately noted Defendants' evasive comments about Ashford's WASC accreditation application.  CC at ¶ 185. However, even then, some analysts, including analysts at Deutsche Bank and Piper Jaffray, continued to expect that the WASC would accredit Ashford.  CC at ¶ 186.

Here, too, Plaintiff insists that Defendants' comments regarding Ashford's WASC accreditation application were misleading due to Bridgepoint's failure to implement programs to improve student persistence, education, and full-time faculty

retention.  Accordingly, Ashford was less likely to obtain WASC accreditation.

Thus, Plaintiff alleges that, "[a]s a result of defendants' false and misleading

statements in the March 6-7, 2011 Form 10-K, press release, and conference call,

Bridgepoint's securities continued to trade at artificially inflated levels."  CC at

¶ 188.

**D.  Bridgepoint Stock Sales by Clark, Devine, and McAuliffe**

Plaintiff alleges that "Clark, Devine, and McAuliffe suspiciously sold their

personally-held Bridgepoint common stock for gross proceeds of over $30 million."

CC at ¶ 197.  Plaintiff summarizes all trades made by Clark, Devine, and McAuliffe

during the Class Period. CC at ¶ 197.

Plaintiff alleges that Clark's trades are suspicious because Clark sold a large

number of Bridgepoint shares (188,878 total) during July 2011 with some 67,466

shares sold around Bridgepoint's peak stock price on July 21 and 22, 2011.  CC at

¶ 199.  Plaintiff further contends that Clark's trades are more suspicious because he

"did not trade a single share of Bridgepoint stock on the 21st or 22nd of any other

month during the Class Period or in the year prior to the beginning of the Class

Period."  CC at ¶ 199.

Plaintiff contends that Devine's insider sales are similarly unusual and

suspicious because he sold 299,100 Bridgepoint shares for a total of $6.7 million

during the Class Period, while he had only sold 170,853 shares for a total of $2.8

million the year prior to the commencement of the Class Period.  CC at ¶ 200.

Additionally, Plaintiff finds the timing of Devine's trades suspicious because

Devine sold a total of 40,100 shares of Bridgepoint stock during July 2011.  CC at

¶ 201.  Of the 40,100 Bridgepoint shares sold in July 2011, 21,600 shares were sold

on Bridgepoint's July 21, 2011 peak day, for $1 million in total proceeds.  CC at

¶ 201.

Finally, McAuliffe sold a total of 300,000 shares of Bridgepoint stock for

proceeds of nearly $6.5 million during the Class Period.  The year prior to the Class

1   Period, she sold only 210,000 shares for nearly $3.5 million in proceeds.

2   **E. Procedural Background**

3         The first complaint in this matter was filed on July 13, 2012.  It defined the

4   relevant class as "all persons who purchased or otherwise acquired the common

5   stock of Bridgepoint . . . between May 3, 2011 and July 6, 2012, inclusive (the

6   "Class Period"), against Bridgepoint and certain of its officers and/or directors for

7   violations of the [Exchange Act]."  Dkt. 1, Compl. at 1.  Two related actions were

8   later filed asserting similar factual allegations: Sacharczyk v. Bridgepoint

9   Education, Inc. et al., No. 3:12-CV-01759-JM (WMC) (filed July 17, 2012), and

10  Stein v. Bridgepoint Education, Inc., No. 3:12-CV-01841-JM (WMC) (filed July 26,

11  2012).  These related actions were later consolidated with this action.  The

12  consolidated complaint alleges violations of §§ 10(b) and 20(a) of the Exchange

13  Act.

14  **III.   LEGAL STANDARD**

15        A Fed. R. Civ. P. 12(b)(6) motion to dismiss challenges the legal sufficiency

16  of the pleadings.  De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978).  In

17  evaluating the motion, the court must construe the pleadings in the light most

18  favorable to the non-moving party, accepting as true all material allegations in the

19  complaint and any reasonable inferences drawn therefrom.  See, e.g., Broam v.

20  Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003).  While a Rule 12(b)(6) dismissal is

21  proper only in "extraordinary" cases, United States v. Redwood City, 640 F.2d 963,

22  966 (9th Cir. 1981), the complaint's "[f]actual allegations must be enough to raise a

23  right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S.

24  544, 555 (2007).  The court should grant 12(b)(6) relief only if the complaint lacks

25  either a "cognizable legal theory" or facts sufficient to support a cognizable legal

26  theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

27        In addition, Rule 9(b) requires that the complaint "state with particularity the

28  circumstances constituting fraud."  The Ninth Circuit has explained that

"[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting <u>Cooper v. Pickett</u>, 137 F.3d 616, 627 (9th Cir. 1997)).

**IV.    DISCUSSION**

### A. Section 10(b) and Rule 10b-5 Claim

A private securities fraud cause of action under § 10(b) and Rule 10b-5 of the Securities Exchange Act requires six elements: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005)(internal citations omitted).

The Private Securities Litigation Reform Act ("PSLRA") heightened the pleading standards for private securities fraud claims to provide "a check against abusive [securities fraud] litigation by private parties." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 313 (2007).  PSLRA's "[e]xacting pleading requirements . . . . require[] plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." <u>Id.</u>  Where a plaintiff claims that a defendant "made an untrue statement of material fact" or "omitted to state a material fact" in connection with a purchase or sale of securities, PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  In addition, PSLRA states that, where liability depends upon a defendant having "acted with a particular state of mind, the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  If a private plaintiff does not meet two PSLRA

1   requirements, the "the court shall, on the motion of any defendant dismiss the
2   complaint . . . ."  15 U.S.C. § 78u-4(b)(3)

3       Rule 9(b) similarly requires that the complaint "state with particularity the
4   circumstances constituting fraud."  The Ninth Circuit has applied Rule 9(b)'s
5   requirements to federal securities fraud claims.  See Yourish v. Cal. Amplifier, 191
6   F.3d 983, 993 (9th Cir. 1999) (citing Wool v. Tandem Computers, Inc., 818 F.2d
7   1433, 1439 (9th Cir. 1987).  Like PSLRA, Rule 9(b) requires that a plaintiff "set
8   forth more than the neutral facts necessary to identify the transaction.  The plaintiff
9   must set forth what is false or misleading about a statement, and why it is false.  In
10  other words, the plaintiff must set forth an explanation as to why the statement or
11  omission complained of was false or misleading."  In re GlenFed Sec. Litig., 42
12  F.3d 1541, 1548 (9th Cir. 1987).

13      Bridgepoint contends that Plaintiff has failed to allege any material
14  misrepresentation or omission about either Ashford's WASC application or the
15  quality of Ashford's education.  In addition, Bridgepoint asserts that Plaintiff has
16  failed to allege facts giving rise to a strong inference of scienter.  Bridgepoint
17  therefore contends that Plaintiff's § 10(b) claims should be dismissed.  These
18  arguments are discussed in turn below.

19                    **1. Material Misrepresentation or Omission**

20      A misrepresentation or omission must create "an impression of a state of
21  affairs that differs in a material way from the one that actually exists."  Brody v.
22  Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).  A misleading
23  statement is material under § 10(b) and Rule 10b-5 if there is "a substantial
24  likelihood that the disclosure of the omitted fact would have been viewed by the
25  reasonable investor as having significantly altered the 'total mix' of information
26  made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting
27  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

28      Accordingly, "a company cannot be held liable for failing to educate the

public about publicly known facts." <u>Wenger v. Lumisys, Inc.</u>, 2 F. Supp. 2d 123, 1245 (citing <u>Howard Gunty Profit Sharing v. Quantum Corp.</u>, 1997 WL 514993, *4 (N.D. Cal. Aug. 14, 1997)).  A company may also not be held liable for vague statements that are not sufficiently specific to perpetuate a fraud.  <u>See id.</u> at 1246.

However, general statements of optimism amount to nothing more than non-actionable puffery.  <u>In re Surebeam Corp. Sec. Litig.</u>, 2004 U.S. Dist. Lexis 26951 at *54 (S.D. Cal. 2004) (citing <u>Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.</u>, 365 F.3d 353, 372 (5th Cir. 2004)).  When determining whether statements amounted only to puffery, the court must analyze the context in which the statements were made.  <u>See</u> <u>FTC v. Trudeau</u>, 579 F.3d 754, 766 (7th Cir.2009) ("In determining whether a statement is puffery, the context matters.") (citation omitted); <u>Casella v. Webb</u>, 883 F.2d 805, 808 (9th Cir.1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").  In addition, forward-looking statements about future earnings are analyzed differently under § 10(b) and Rule 10b-5. "[T]hat a prediction proves to be wrong in hindsight does not render the statement untrue when made."  <u>In re Syntex Corp. Sec. Litig.</u>, 95 F.3d 922, 930 (9th Cir. 1996).

Plaintiff asserts that Defendants made material misrepresentations or omissions regarding (1) Ashford's student persistence initiatives, (2) Ashford's application for WASC accreditation, (3) Ashford's quality of education, and (4) Bridgepoint's financial projections.  Defendants deny that they made any material misrepresentations in any of these categories.  Each is discussed in turn.

### a. Ashford's Student Persistence Initiatives

The WASC's May 23 and June 3, 2011 letters allegedly highlighted certain areas of focus that Bridgepoint needed to address to obtain WASC accreditation, including inadequate student retention and completion and insufficient student

progress tracking.  CC at ¶ 49.  Bridgepoint claims that it implemented persistence programs at Ashford to remedy these problems starting as early as 2010. Throughout the Class Period, Bridgepoint emphasized that student persistence programs were improving student retention.  See, e.g., CC at ¶¶ 84 ("[S]tudent support initiatives we made in 2010 to enhance student persistence are working as we planned."), 152 ("We did a lot back in 2010 and through 2011 around quality initiatives for our students . . . .  That has impacted our persistence in a very positive way."), 178 ("We are pleased that our operating and financial results were in-line with our internal expectations for the quarter, and we are particularly pleased by the strong increase in student persistence at our universities").  Plaintiff alleges that these statements concerning Ashford's student persistence initiatives, specifically statements made in Bridgepoint's 1Q11, 2Q11, 3Q11, and 4Q11 earnings statements and during related press conferences as well as during conferences such as the William Blair Global Services Conference in December 2011, were false and misleading.

As proof that these statements were misleading, Plaintiff relies on the WASC's criticisms in their March 2012 report and their July 2012 letter.  The March 2012 report, which was based on WASC's onsite visit to Ashford, the WASC's visiting team found that Ashford's level of attrition was still "unacceptable."  CC at ¶ 59.  WASC explained that its team had difficulty "with understanding how data about retention, persistence and completion were constructed and reported by Ashford University. The team repeatedly found the various data sets to be confusing.  It also had concerns that Ashford's awareness and ownership of the fundamental challenges of retention, graduation and attrition were "not sufficiently developed . . . ."

In addition, the WASC's March 2012 report noted that, while Ashford had put several programs into place, those programs had only been launched within the last six to eight months and that Ashford lacked the "organizational maturity and

capacity" to take the institution to the next level.  See MTD, Ex. 20 at 21.  The July 2012 letter to Bridgepoint was equally critical, noting that Ashford had "not yet developed a method to collect and display data on retention, persistence, and completion in a manner that can be easily understood, that lends itself to analysis, and that accounts for each student who is recruited and enrolled in a degree program."  See MTD, Ex. 21 at 4.

Defendants contend that student persistence has improved year-over-year since the 2007-2008 school year.  See MTD at 13.  Defendants explain that their comments regarding student persistence programs were regarding programs that they launched in 2010, while WASC's comments were geared at programs launched in 2011.  Finally, Defendants argue that their positive comments were "soft," non-actionable statements.  See, e.g., Allison v. Brooktree Corp., 999 F. Supp. 1342, 1348 (S.D. Cal. 1998) (finding that "vague statements of optimism" were not actionable); In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) (finding that investors do not rely on vague statements of optimism like "good," "well-regarded," or other feel-good monikers).

The court finds Defendants' arguments regarding persistence unpersuasive. Even if WASC's comments primarily concerned newer 2011 initiatives, WASC's conclusions concerned Ashford's student persistence generally.  The WASC found that a "concerted and systematic approach to improve retention, persistence, and completion, with evidence-based plans, targets, and time lines, *[were] not in place* and the impact of recent changes *cannot yet be measured*."  See MTD, Ex. 21 at 5 (emphasis added).  This comment suggests that Defendants could not have concluded that student persistence was improving.  Unlike soft statements, which are subjective, Defendants' statements were arguably objective and quantifiable. WASC, a third party, confirmed that Defendants' statements regarding persistence were unsubstantiated.  Moreover, Defendants' comments could have led an investor to assume that Bridgepoint was analyzing Ashford's student persistence and finding

that the numbers had actually improved.

The cases cited by Defendants are to no avail as they concerned qualitative statements about a project that was being developed, not alleged progress that could have been monitored as was the case here.  In addition, the facts pled by Plaintiff indicate that acceptable levels of persistence were crucial to obtaining accreditation, thereby rendering any statements about persistence potentially material.  The court therefore concludes that Plaintiff has stated a § 10(b) claim with respect to Defendants' statements regarding Ashford's student persistence.

### b. Ashford's Quality of Education

Plaintiff further claims that Bridgepoint's positive statements regarding its course quality and rigor were deceptive.  See, e.g., CC at ¶¶ 89 ("We pride ourselves on our broad selection of rigorous, innovative, and practical courses . . . ."); 128 ("These new innovations [Constellation and Waypoint Technology] expand and enhance our efforts to offer students a broad selection of rigorous, engaging and practical courses."); 179 ("[O]ur efforts to instill quality in all that we do are producing . . . . outcomes that prove we are serving the academic needs of our students . . . .").  Plaintiff also asserted that Defendants' representations regarding the number of faculty on staff at Ashford were similarly misleading.  See, e.g., CC at ¶¶ 153 ("We have a deep, deep bench academically."); 154 ("[W]e continue to focus on full-time faculty and adding full-time faculty."); 173 ("[W]e have invested last year and we will continue to invest this year in more full-time faculty more terminally degreed faculty.").  Plaintiff cites statements regarding the quality of staffing, alleging that Defendants failed to reveal that they only employed 50 full-time faculty members, 14 writing specialists, and 38 instructional specialists for a faculty of 2,600 and a student body of 90,000.  See Opp. MTD at 11 (citing CC ¶¶ 62, 65).

Defendants counter that "[c]ourts have repeatedly held that vague and subjective statements regarding the quality of a company's educational offerings are

not actionable as a matter of law."  See, e.g., In re ITT Educ. Svcs., Inc. Sec. & S'holder Deriv. Litig., 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (finding that statements regarding the quality of education provided to students "amount[ed] to typical corporate puffery, and as such, . . . [were] not actionable under the securities laws"); Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co., 873 F. Supp. 2d 1070. 1081 (D. Minn. 2012) (finding that statements about student placement rates and focus on student outcomes were only tenuously connected to Capella's financial success and could not form the basis for a securities fraud action).

Defendants further argue that Plaintiff has not and cannot show that the aforementioned statements about educational quality were false when made.  To support this argument, Defendants cite the WASC's report on its visit to Ashford, which found that "Ashford is committed to providing quality courses to its student" and commented approvingly of Ashford's use of an external peer-review agency. See MTD, Decl. Ostler, Exh. 20 at 14.

Plaintiff counters that Bridgepoint "falsely highlighted its ability to analyze data and to meaningfully assess student learning."  CC ¶ 147.  Plaintiff points to the WASC's findings that Defendants had "yet to set up the necessary processes for analyzing data and making meaningful data-informed decisions."  See MTD, Decl. Ostler, Exh. 20 at 15.  WASC also expressed concern in its action letter, stating that "[s]erious concerns also exist about the rigor of the coursework, which varied from course to course and was not always at the appropriate level for the course."  CC ¶ 71.  The WASC Action Letter further noted that Ashford had only recently adopted and implemented program review, and only reviewed "six out of approximately 80 programs."  CC ¶ 68.

The court concludes that Defendants' vague, but rosy statements amount to nothing more than puffery.  Defendants' statements expressing their opinion about the quality of education offered are not false merely because they had not established a process to assess the "quality" of education.  The word "quality" and

its synonyms, without more, are subjective, not objective words.  Had Defendants made misleading objective statements about the quality of education provided at Ashford, such as specifically misrepresenting the number of full-time faculty or alleging that they had taken certain steps to assess the quality of education at Ashford when they had not in fact taken those steps, Plaintiff might have a valid claim.  However, Defendants appear to have been careful about making only vague statements concerning quality without providing specific details about what "quality" meant.  These statements about educational quality alone are insufficient to serve as the basis for a securities fraud action.

### c. Ashford's Application for WASC Accreditation

Plaintiff alleges that Defendants' accreditation updates misrepresented their alleged actions to remedy WASC's concerns regarding Ashford's persistence rate, the number of full-time faculty, and other areas.  These misrepresentations led investors to believe that the accreditation process was progressing well and that accreditation was likely.  Plaintiff notes that these deficiencies were so significant that WASC did not give Defendants a deferral to cure them.  Relying on WASC's March and June 2011 letters to Bridgepoint, Plaintiff alleges that Defendants knew, but failed to disclose, that WASC would not accredit Ashford.  As previously explained, failure to obtain accreditation from WASC would have had and did have a strong negative financial impact on Bridgepoint.

Defendants counter that Plaintiff has not and cannot "identify a single instance in which any defendant assured investors that WASC would grant accreditation to Ashford."  MTD at 7.  Defendants further note that its official disclosures in its SEC filings warned that WASC accreditation was not assured and that the inability to obtain accreditation could negatively affect the companies' growth.  See MTD at 7 (citing Ex. 7, March 2012 10-K, at 27; Ex. 3, March 2011 10-K. At 47; Ex. 5, March 2011 8-K, at 2).  Defendants assert that their optimistic statements were, as previously discussed, nothing more than puffery or feel-good

monikers that cannot form the basis of a fraud claim.  See In re Cutera Sec. Litig.,

610 F.3d 1103, 1111 (9th Cir. 2010) (finding that "investors do not rely on vague

statements of optimism like 'good,' 'well-regarded,' or other feel good monikers").

Defendants also argue that Plaintiff is mischaracterizing the nature of the

March and June 2011 letters, which simply outlined WASC's concerns regarding

certain areas.  See MTD at 9.  Defendants note that these same letters also informed

them of WASC's approval of Ashford's application for eligibility.  See id.

Finally, Defendants argue that they had "no duty to provide continuing

updates on interim communications with WASC.  Defendants rely on Fanni v.

Northrop Grumman Corp., 2000 WL 35905106 (C.D. Cal. 2000), aff'd, 23 F. App'x

782 (9th Cir. 2011).  In Northrop, the plaintiffs alleged that top insiders at Northrop

allegedly knew that the Department of Justice's Antitrust Division would not

approve a merger of Northrop and Lockheed Martin and would likely take legal

action to block the merger.  See id. at *9-10.  The plaintiffs pointed to the

Department of Justice's statements to top insiders expressing serious concerns about

the merger.  The district court, however, dismissed the plaintiffs' claims as Northrop

had no duty to provide continuing updates on the specifics of its conversations with

the Department of Justice during its inquiry.  The court relied on Epstein v.

Washington Energy, 83 F.3d 1136 (9th Cir. 1996), which held that "a utility that has

announced it has submitted an application for a rate increase normally has no duty

to inform the public of any facts or circumstances in addition to those set forth in

the application."  See id. 1141-42.

Plaintiff, however, claims that the WASC's May and June 2011 letters

constituted early notice regarding inadequate student retention, completion, methods

of tracking students, and student support.  See Opp. MTD at 6.  Plaintiff explains

that Defendants' failure to remedy these identified deficiencies would result in

denial of Ashford's accreditation.  See id. at 7.  By failing to take the steps

necessary to address the deficiencies identified by the WASC while making

statements that Bridgepoint would be transparent about the approval process and that Bridgepoint was very pleased with how the accreditation process was going, Plaintiff contends that Defendants made material misrepresentations about the accreditation process.

Once Defendants made statements concerning Ashford's accreditation application, Plaintiff claims that they had a duty to speak completely and truthfully so as not "to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Opp. MTD at 8-9 (citing 17 C.F.R. § 240.10b-5(b); see also Berzon v. Applied Signal Tech. Inc., 527 F.3d 982, 987 (9th Cir. 2008) ("But once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of.").  Plaintiff cites the May and June 2011 letters and Defendants' failure to implement systems, programs, or processes necessary to remedy the deficiencies as evidence that Defendants knew that Ashford would not be accredited.  See id. at 9.

The court finds that Defendants' statements appear to constitute optimistic puffery.  The May and June 2011 letters, which have not been produced, appear to have merely informed Bridgepoint of concerns that it needed to address.  Plaintiff's current allegations do not support its claim that Defendants could not have remedied the deficiencies in time and misrepresented their ability to do so.  But the court notes that Plaintiff may eventually be able to demonstrate  that Defendants were aware that WASC would not accredit Ashford well before the WASC denied accreditation in July 2012.  If discovery reveals that Defendants knew that denial of accreditation would be denied, then Plaintiff may be permitted to amend its complaint to reassert this claim based on prior misleading statements made during conference calls or other disclosures to investors.

### d. Bridgepoint's Financial Projections

Plaintiff alleges that "Defendants made fiscal year ("FY") 2011 and FY

1   2012 financial projections with actual knowledge that the statements were false or

2   misleading."  Opp. MTD at (citing 15 U.S.C. §78u-5(c)(1)(B)).  Defendants counter

3   first that Bridgepoint exceeded its financial forecasts for revenue and net income in

4   2011.[2]  See MTD at 15.  Defendants also argue that Plaintiff has no basis for

5   asserting that Bridgepoint's 2012 financial projections were false because

6   Bridgepoint has not yet released its final 2012 revenue and net income.  See id.

7   Defendants further observe that Plaintiff has not pled any facts indicating actual

8   knowledge of falsity, which is especially untrue as Bridgepoint met its 2011

9   financial forecasts.  See id. at 16.

10          Finally, Defendants argue that Bridgepoint's financial forecasts were

11  "protected by the Reform Act's safe harbor for forward-looking statements, which

12  protects forecasts accompanied by meaningful cautionary language or made without

13  actual knowledge of its falsity."  Id. at 15 (citing 15 U.S.C. §78u-5(c)(1)).

14  Defendants note that "[e]ach of the challenged forecasts [were] accompanied by

15  specific, detailed risk disclosures."  MTD at 15 (citing Ex. 3, March 2011 10-K, at

16  22, 24, 46, and 47; Ex. 7, March 2012 10-K, at 1, 12, 14, 26, and 27).

17          Plaintiff counters that Bridgepoint was able to meet its FY 2011 projections

18  because they concealed the truth, "e.g., that over 90% of Bridgepoint revenues were

19  in serious jeopardy, such that Defendants' misleading projections would surely go

20  unmet upon revelation of the truth."  Opp. MTD at 12-13.  Plaintiff further notes

21  that Bridgepoint released its 2012 earnings on March 12, 2013.  For 2012,

22  Bridgepoint's revenue was $968.2 million and its net income was $172.8 million.

23  See Opp. MTD at 13 n. 6 (citing a News Release issued by Bridgepoint,

24  http://www.sec.gov/Archives/edgar/data/1305323/000130532313000014/ex-991q42

25  012earningsreleas.htm).  Defendants concede that these numbers are accurate, but

26  notes that Bridgepoint only missed its revenue and net income for FY 2012 by 4.1

27

28          [2] For 2011, Bridgepoint's financial projections were between $920 and $926 million for
    revenue and $168.5 and $170.3 million for net income.  In 2011, Bridgepoint's revenue was $933.3
    million and its net income was $172.8 million.  See MTD at 15.

1   percent and 2.7 percent respectively.

2        The court finds that Plaintiff has not sufficiently pled Defendants' alleged

3   misrepresentations relating to Bridgepoint's financial projections.  Plaintiff only

4   provides conclusory statements about Defendants' alleged knowledge that Ashford

5   would not be accredited and claims that Bridgepoint's financial projections should

6   have reflected this knowledge.  In addition, Plaintiff argues that the cautionary

7   statements were misleading.  But conclusory statements are insufficient to meet the

8   PSLRA's heightened pleading requirements.

9        **2. Scienter**

10       To recover damages, a plaintiff must prove that a defendant "made a

11   material misstatement with an intent to deceive – not merely innocently or

12   negligently." Tellabs, 551 U.S. at 319; Ernst & Ernst v. Hochfelder, 425 U.S. 185,

13   193 n. 12 (1976) (defining scienter as "a mental state embracing intent to deceive,

14   manipulate, or defraud").  Reckless conduct may suffice to meet the scienter

15   requirement if it leads to

16

17           a highly unreasonable omission, involving not merely
             simple, or even inexcusable negligence, but an extreme
18           departure from the standards of ordinary care, and which
             presents a danger of misleading buyers or sellers that is
19           either known to the defendant or is so obvious that the
             actor must have been aware of it.

20

21   Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990) (adopting

22   Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977))

23   (internal quotations omitted).

24       PSLRA's heightened pleading requirement provides that complaints must

25   "state with particularity facts giving rise to a strong inference that the defendant

26   acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  "Vague or

27   ambiguous allegations are now properly considered as a part of a holistic review

28   when considering whether the complaint raises a strong inference of scienter."

- 35 -

South Ferry LP v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008) (citing Tellabs, 551 U.S. at 325).  Allegations that analysts "were issuing recommendations that were contrary to their true evaluations of the relevant securities or were other tainted by conflicts of interest [are] strong circumstantial evidence of conscious misbehavior." Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274, 293 (S.D.N.Y. 2004).

Defendants contend that Plaintiff has failed to plead adequately because: (1) WASC's May and June 2011 letters are not indicative of scienter; (2)  Plaintiff's "boilerplate allegations" about meetings and involvement in accreditation standards do not demonstrate scienter; (3) the core operations doctrine is inapplicable; (4) Defendants' stock transactions do not support an inference of scienter; and (5) Defendants' repeated warnings negate scienter.  Each of these arguments is addressed separately below.

### a.  WASC's May and June 2011 Letters

Defendants dispute Plaintiff's claim that the WASC's May and June 2011 letters informed Bridgepoint that Ashford fell "woefully short" of WASC's accreditation standards.  First, Defendants note that Plaintiff has never even asserted that it has read those letters.  Second, Defendants contend that this theory is contradicted by WASC permitting Ashford to proceed with its application, which Defendants claim WASC would not have done had there been no reasonable basis for believing that accreditation could not have been achieved within four years.

Finally, Defendants argue that the areas of concern described in the letters from regulators do not raise an inference of scienter and cites numerous cases supporting this argument.  See MTD at 17 (citing In re Medimmune, Inc. Sec. Litig., 873 F. Supp. 953, 966 (D. Md. 1995) (finding that constant disclosures during the drug approval process could mislead investors and cause undue price volatility); Sarafin v. BioMimetic Therapeutics, Inc., 2013 WL 139521 (M.D. Tenn. Jan. 10, 2013) (" The fact that the FDA told BMTI to give 'serious consideration' to certain matters and said several things that should be done, does not mean that the approved

protocol was somehow rejected."); <u>Noble Asset Mgmt. v. Allos Therapeutics, Inc.</u>, 2005 WL 4161977, at *7 (D. Colo. 2005) ("The fact that the FDA staff members raised questions did not impose a duty upon the defendants to revise their opinions about the drug's efficacy or to report to the public the substance of their conversations with the FDA."); and <u>Fanni</u>, 2000 WL 35905106, at *11 ("[A]nticipating a final decision of an administrative regulatory agency, once initially disclosed, does not constitute an actionable misleading statement or omission.").

Defendants further note that Plaintiff has "alleged no facts even suggesting the Defendants believed Ashford would not successfully address those concerns by the time the accreditation review was complete more than one year later."  MTD at 18 (citing <u>In re Genzyme Corp.</u>, 2012 WL 1076124 (D. Mass. 2012) ("They point to the fact that the FDA later concluded Genzyme did not adequately implement its corrective plans.  However, the fact that the FDA later made such a conclusion does not make earlier statements about the Lumizyme approval process false or misleading.")).

Plaintiff counters that the May and June 2011 letters constituted "early notice" that WASC would not accredit Ashford because Defendants knew that the issues cited in those letters could not be addressed in time.  Plaintiff counters that "Defendants' own statements describing the initiatives and improvements taken to achieve accreditation - including answers to pointed questions from analysts - show Defendants' knowledge and involvement in the accreditation process and further demonstrate that they knew or were consciously reckless of the facts demonstrating Ashford would not achieve accreditation."  Opp. MTD at 17 (citing <u>In re Countrywide Financial Corp. Securities Litigation</u>, 588 F. Supp.2d 1132, 1190 (C.D. Cal. 2008) (finding that each Officer Defendant's publicly professed knowledge of the subject of the fraud favored a finding of scienter); <u>Institutional Investors Group v. Avaya, Inc.</u>, 564 F.3d 242, 270 (3d. Cir. 2009) (finding that the

specificity and repetition of defendants' questions concerning the fraud at issue created a strong inference of recklessness)).  For example, Plaintiff notes that Defendants implemented several initiatives to address issues cited by WASC, assured investors that Ashford had the necessary leadership and faculty to ensure student progress and development, described data tracking student learning, and discussed Ashford's academic rigor.  <u>See</u> Opp. MTD at 17.  Plaintiff also notes that Defendants attended QRMs with Bridgepoint and Ashford management, which would have alerted Defendants to Ashford's inability to address WASC's concerns. Plaintiff then alleges that "WASC found that these initiatives and improvements did not meaningfully exist."  Opp. MTD at 17 (citing CC ¶¶ 72, 89, 128, 147, and 153). Even if they did exist, Plaintiff notes that WASC found that these programs were only implemented "recently," although it is unclear what the precise meaning of "recently" is.  <u>See</u> <u>id.</u>

      Plaintiff also attempts to distinguish each of the cases cited by Defendant. Plaintiff claims that in <u>Sarafin</u>, the regulator's concerns were not mandatory, whereas Defendants were required to address the concerns in the May and June 2011 letters.  <u>See</u> <u>Sarafin</u>, 2013 WL 139521, at *11.  In <u>Genzyme</u>, the defendants received the letters from the regulators one and a half years into the class period, while the WASC expressed its concerns at the beginning of the accreditation process.  <u>See</u> <u>In re Genzyme Corp.</u>, 2012 WL 1076124, at *10.  Similarly, in <u>Fanni</u>, the letter at issue was a second request from the Department of Justice.  <u>See</u> <u>Fanni</u>, 2000 WL 35905106, at *10.  And, finally, Plaintiff distinguishes <u>Noble Asset</u> and <u>Medimmune</u> from the matter at hand because, unlike here, defendants allegedly did not know their products could not meet the concerns of the regulatory agency.  <u>See</u> <u>In re Medimmune</u>, 873 F. Supp. at 966;  <u>Noble Asset Mgmt.</u>, 2005 WL 4161977, at *13.

      The court agrees that the WASC's May and June 2011 letters are not themselves indicative of scienter.  At best, they indicate that Defendants should

have been aware of what issues needed to be addressed to obtain accreditation by the WASC, and, by extension, what areas of improvement might interest investors. Plaintiff has pled no facts indicating that Defendants knew that Ashford could not meet WASC's accreditation standards.

But Defendants' statements relating to persistence are different.  The May and June 2011 letters appear to have emphasized the importance of improving persistence to obtain accreditation.  By extension, Defendants therefore may or should have known that persistence rates would be important to investors.  With this in mind, Defendants claimed that student persistence had been improving during conference calls.  See CC ¶¶ 84, 89, 92, 104, 133, and 161.  But the WASC found that persistence could not yet be measured and that a systematic approach to managing persistence was not yet in place.  See supra at 27.  If Defendants were aware that persistence could not be adequately measured and yet made representations indicating that persistence was improving, then scienter could be reasonably inferred.  The heightened pleading standard therefore has been met for statements relating to persistence.

### b. Meetings and Involvement in Accreditation Standards

Defendants next contend that their attendance at QRMs and WASC accreditation meetings are insufficient to indicate scienter because the timing of those meetings, the participants who attended, or topics discussed were not specified in the complaint.  See MTD at 19.  Plaintiff responds only by reiterating Defendants' attendance at these meetings and noting that the WASC similarly found that Defendants had attended these meetings to discuss all areas about Ashford.

The court notes that the Ninth Circuit has previously found that "[i]n the securities fraud context, general allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient to create a strong inference of scienter.  However, specific admissions from top

executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter." Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 746 (9th Cir. 2009); see also Wozniak v. Align Tech., 850 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012) (finding that sales conference calls, sales meetings, financial reviews, manufacturing meetings, and executive management meetings were insufficient to establish a strong inference of scienter because plaintiff did not allege that specific information about new revenues orders was discussed).  Given the Ninth Circuit's holding in Glazer, the court finds that Plaintiff has not shown that Defendants' attendance at QRMs and WASC accreditation meetings are indicative of scienter.  No minute meetings, reports, or other evidence suggest that the Defendants were aware that Ashford would be unable to meet WASC's accreditation standards.

### c. Core Operations Doctrine

Under the "core operations" doctrine, a plaintiff may rely on circumstantial evidence if it creates a "strong inference" of fraud.  See In re Silicon Graphics, 183 F.3d 970, 986 (9th Cir. 1999).  Specifically, upon the laying of a proper factual foundation that information was known within a corporation, it may be inferred that "facts critical to a business's core operations or an important transaction are known to a company's key officers."  See In re NorthPoint Comm. Grp. Sec. Litig., 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001).

Defendants contend that Plaintiff is asking the court to infer scienter based on knowledge of a future event–i.e. how the WASC members would vote a year later–rather than facts, and that the core operations doctrine therefore does not apply.  See MTD at 20.  To support this contention, Defendants rely on Berson v. Applied Signal Technology Inc., 527 F.3d 982 (9th Cir. 2008), in which the Ninth Circuit explained that the "core operations" doctrine does not apply to predictions of future events.  See id. at 989 ("Where defendants make cheerful predictions that do not come to pass, plaintiffs may not argue, based only on defendants' prominent

positions in the company, that they ought to have known better." ). Defendants note that WASC's accreditation standards are subjective and are "necessarily a matter of judgment." MTD at 21; MTD, Exh. 22 at 12 ("Each standard is set forth in broad holistic terms that are applicable to all institutions."). Defendants also cite the WASC's observation that Ashford had made efforts to address areas identified for improvement, even though it also noted that the impact of these efforts could not yet be measured. See MTD, Ex. 21, at 2-3.

Plaintiff, however, asserts that WASC's standards were objective and not met by Ashford. See Opp. MTD at 20. Plaintiff provides some examples of standards that were clearly objective, such as having an independent governing board, and some areas that it describes as slightly less objective, such as reviewing and tracking graduation rates. See id. at 20. In fact, Plaintiff claims that "Ashford was so far from achieving accreditation that no level of discretion exercised by WASC relieves Defendants' knowledge that Ashford did not meet accreditation standards." Id.

The court finds Defendants' argument persuasive. Plaintiff is asking the court to find that Defendants should have known that WASC would decline to accredit Ashford. Although Defendants were aware of the areas that needed attention, on these allegations and the current record, it does not appear that denial was a foregone conclusion.

### d. Defendants' Stock Transactions

Defendants argue that the stock sales of the individual Defendants are not unusual, suspicious, or dramatically out of line with prior trading practices at a time calculated to maximize personal benefit and therefore scienter cannot be inferred from said stock sales. See Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1066-67 (9th Cir. 2008) (quoting In re Silicon Graphics, 183 F.3d at 986) ("While 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter, such sales only give rise to an inference of

1  scienter when they are dramatically out of line with prior trading practices at times

2  calculated to maximize the personal benefit  from undisclosed inside information.")

3  (internal quotations removed).  Defendants claim that "[h]ere, without exception,

4  Defendants' sales were made pursuant to established Rule 10b5-1 trading plans

5  entered on August 11, 2010."  MTD, Exh.1 (disclosing that Defendants Clark and

6  Devine had entered into a trading plan with a broker to sell a certain number of

7  shares per month depending on certain factors).[3]  As Defendants could not have

8  predicted that WASC would not accredit Ashford nearly two years prior to WASC's

9  denial of accreditation, Defendants assert that no inference of scienter could arise

10 from their trading activities.  See, e.g., Constr. Laborers Pension Trust of Greater St.

11 Louis v. Neurocine Biosciences, Inc., 2008 WL 2053733 (S.D. Cal. 2008) ("Where

12 an insider's trading is scheduled under a Rule 10b-5 trading plan in place before the

13 alleged inside information is received, no inference of scienter arises.").  Defendants

14 add that their consistent trading patterns also undermines any inference of scienter.

15 See MTD at 22.

16        Plaintiff maintains that Defendants' sales were inconsistent with prior

17 trading history because Clark, Devine, and McAuliffe had all sold significantly

18 fewer shares during the year prior to the commencement of the Class Period.  See

19 CC ¶¶ 197-201.[4]  Plaintiff further notes that Defendants retained "little if any

20 Bridgepoint stock after their sales."  Opp. MTD at 21-22.  Finally, Plaintiff argues

21 that Defendants improperly rely on their 10b5-1 trading plan at the pleading stage.

22 See, e.g., In re Infosonics Corp. Derivative Litig., 2007 WL 2572276, at *9

23 ("[W]hether these trading plans were legitimately adopted or were put in place after

24

25        [3] Notably, Defendants have not submitted any evidence of a trading plan for Defendant
26 McAuliffe.

27        [4] Clark sold 725,525 shares for proceeds over $17 million during the Class Period, or 167,935
   fewer shares than the year prior.  Devine sold 299,100 shares for proceeds of over $6.7 million during
28 the Class Period, though he had sold half the number of shares for less than half the proceeds the year
   prior.  McAuliffe sold 300,000 shares for nearly $6.5 million, which was considerably higher than the
   90,000 shares she had sold the year prior to the commencement of the Class Period.

learning of material, nonpublic information that could affect the price of stock, can not be resolved at the pleading stage."); In re UTStarcom, Inc. Sec. Litig., 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("The Court finds that, although evidence of the nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales.").

　　　　　"To evaluate suspiciousness of stock sales, [a court considers] three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004).  Problematically, the court notes that Plaintiff has not set forth allegations regarding the amount of stock that Defendants held prior to the commencement of the Class Period, the percentage of shares sold prior to the Class Period, or the amount of stock that Defendants received as compensation prior to and during the Class Period.  This backdrop would be highly relevant in establishing whether Defendants' sales were truly inconsistent with past trading activity.  Without this backdrop, the court has little context to analyze allegations regarding Defendants' trading activity.  However, the court notes that, if Plaintiff is able to allege that Defendants' trading activity was suspicious in context, Defendants may not use trading plans at the pleading stage to defeat an inference of scienter.

　　　　**e. Repeated Warnings**

　　　　Defendants argue that their repeated cautionary language warning investors that Ashford's accreditation was not ensured negates an inference of intent to defraud.  See MTD at 24 (citing In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1425 (9th Cir. 1994) (finding that detailed risk disclosure in a prospectus negated an inference of scienter); In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148 (C.D. Cal. 2007) (finding the repeated disclosures that hoped-for turnaround would never

materialize negated an inference of scienter)).  Defendants note that the cautionary language specifically addressed the risk that WASC would not accredit.  <u>See</u> MTD at 24-25.

Plaintiff, however, argues that the cautionary language cited by Defendants consisted of nothing more than boilerplate risk disclosures that accreditation was not assured.  <u>See</u> Opp. MTD at 24.  Plaintiff argues that these disclosures failed to reveal known specific shortcomings.  <u>See</u> <u>id.</u>  (citing <u>Berson</u>, 527 F.3d at 987 (finding that defendant misled investors when it disclosed that stop work orders might be placed when they had in fact been placed)).  Plaintiff, however, does not specify the specific shortcomings, other than Ashford's failure to obtain WASC accreditation.

"A motion to dismiss for failure to state a claim will succeed only when the documents containing the defendants' challenged statements include 'enough cautionary language or risk disclosure,' that 'reasonable minds' could not disagree that the challenged statements were not misleading."  <u>Fecht v. Price Co.</u>, 70 F.3d 1078, 1082 (9th Cir. 1995) (quoting <u>In re Worlds of Wonder Sec. Litig.</u>, 35 F.3d at 1413).  Here, the court concludes that the cautionary language created a negative inference of intent regarding the WASC's possible accreditation of Ashford.  As previously discussed, Plaintiff has provided no evidence that Defendants conclusively knew that Ashford would not be accredited.  The cautionary language therefore negates an inference of scienter with respect to accreditation only.

### C.  Section 20(A) and 20A Claim

Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") provides:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  In contrast, Section 20A of the Exchange Act creates liability for "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information." 15 U.S.C. § 78t-1.

To prove a prima facie case under Section 20(a), a plaintiff must prove that there was a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator. See Howard v. Everex Systems, Inc., 228 F.3d 1057, 1065 (9th Cir. 2000); In re Surebeam Corp. Sec. Litig., 2004 U.S. Dist. LEXIS 26951, at *71 (S.D. Cal. 2004).  Similarly, an insider may be liable under Section 20A only upon proof of an independent violation of the securities laws.  See Lipton v. PathoGenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002); In re VeriFone Sec. Litig., 11 F.3d 865, 872 (9th Cir. 1993).

Defendants argue that Plaintiff's claims under the Sections 20(a) and 20A of the Exchange Act should be dismissed because Plaintiff does not adequately allege an underlying primary violation. See MTD at 25.  The court agrees that Plaintiff has not asserted a valid claim under  Section 20A of the Exchange Act as the court has dismissed Plaintiff's insider trading claims against individual Defendants. However, the court concludes that a claim may exist under Section 20(a) as a Section 10(b) claim survives.

//
//
//
//
//
//
//
//
//

- 45 -

**V.    CONCLUSION**

This court hereby GRANTS Defendants' motion to dismiss with leave to amend for the alleged misrepresentations relating to Ashford's quality of education, the WASC accreditation process, and Bridgepoint's financial forecasts.  The court DENIES Defendants' motion to dismiss for the alleged misrepresentations concerning Ashford's persistence rates.  In addition, the court dismisses Plaintiff's Section 20A claim, but not Plaintiff's Section 20(a) claim.  Plaintiff must file any amended complaint on or before October 31, 2013.

**IT IS SO ORDERED.**

DATED:  September 13, 2013

_____
Hon. Jeffrey T. Miller
United States District Judge