1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re BRIDGEPOINT EDUCATION, INC. SECURITIES LITIGATION | CASE NO. 12-cv-1737 JM (JLB) |
| | ORDER GRANTING MOTION FOR CLASS CERTIFICATION |

This order addresses Plaintiffs' motion for class certification.  (Doc. No. 70.) The motion was fully briefed, and the court determined that the matter was suitable for resolution without oral argument pursuant to Local Civil Rule 7.1.d.1.  For the reasons set forth below, the court grants Plaintiffs' motion to certify the proposed class for the period between May 3, 2011, and July 13, 2012; appoints Plaintiffs as class representatives; and appoints their counsel as class counsel.

## BACKGROUND

**A.     Consolidation of Cases and Appointment of Lead Plaintiffs**

This case is a putative securities-fraud class action against Bridgepoint Education, Inc. ("Bridgepoint"), and three of its officers, Andrew Clark, Daniel Devine, and Jane McAuliffe (collectively, "Defendants").  Donald Franke filed the initial complaint on July 13, 2012.  (Doc. No. 1.)  Several similar lawsuits followed. On motion by the parties, the court consolidated this case with Sacharczyk v. Bridgepoint Education, Inc., No. 12-cv-1759, and Stein v. Bridgepoint Education, Inc., No. 12-cv-1841, and appointed two pension plans, City of Atlanta General Employees Pension Fund, and Teamsters Local 677 Health Services & Insurance

Plan (collectively, "Plaintiffs"), as lead plaintiffs pursuant to the Private Securities Litigation Reform Act ("PSLRA").  (Doc. No. 21.)

**B.     The Operative Complaint[1]**

On December 21, 2012, Plaintiffs filed a consolidated complaint.  (Doc. No. 26.)  They asserted claims for violations of three provisions of the Securities Exchange Act of 1934:  (1) securities fraud, under § 10(b) and Rule 10b-5; (2) control-person liability, under § 20(a); and (3) insider trading, under § 20A. (Id. ¶¶ 232–56.)

According to the consolidated complaint, Bridgepoint is a for-profit post-secondary education company that owns and operates Ashford University ("Ashford").  (Id. ¶ 19.)  Ashford's main campus is in Clinton, Iowa, but the vast majority of its students attend classes exclusively online.  (Id. ¶¶ 19, 37.)  In 2011, Bridgepoint's revenue was $933 million, over 90% of which came from Title IV federal funds.  (Id. ¶¶ 37, 41.)  Maintaining accreditation with a Department of Education recognized accreditor is a prerequisite for receiving Title IV funds and, hence, essential to Bridgepoint's financial health.  (Id. ¶¶ 32, 41.)

In 2010, the Higher Learning Commission of the North Central Association of Colleges and Schools ("HLC"), Ashford's only accreditor, announced a "substantial presence" requirement, which would become effective on July 1, 2012. (Id. ¶¶ 43, 79.)  Under the new requirement, institutions accredited by HLC would be required to have a majority of their educational administration activities, business operations, and leadership located substantially in the 19-state north-central region of the country.  (Id. ¶ 43.)  Although Ashford is in Iowa, the majority of Bridgepoint's operations are located in San Diego, California, so Ashford would not qualify for accreditation under the new requirement.  (Id.)  Accordingly, Ashford sought accreditation from the Western Association of Schools and Colleges

---

[1]  The facts in this section are drawn from the complaint and are not to be taken as proven.

("WASC"), whose jurisdiction includes California.  (Id.)

In letters dated May and June 2011, WASC informed Ashford that it was eligible to pursue accreditation, and it identified the areas the school would need to address to demonstrate substantial compliance with WASC standards.  (Id. ¶¶ 49, 83.)  WASC's concerns included inadequate student retention and completion, insufficient student-progress tracking, an insufficient core of full-time faculty members, and the lack of an empowered and independent governing board.  (Id. ¶ 49.)

According to Plaintiffs, beginning with a press release on May 3, 2011, Defendants made a series of false and misleading statements and omissions about the quality of education at Ashford, Bridgepoint's efforts to address the problem areas WASC had identified, the likelihood that WASC would grant accreditation, and Bridgepoint's financial forecasts.  (Id. ¶¶ 83–193.)

On July 3, 2012, WASC sent Ashford an action letter denying the school's application for initial accreditation and detailing the numerous ways in which the school had failed to demonstrate substantial compliance with WASC accreditation standards, including in the problem areas noted in the May and June 2011 letters.  (Id. ¶¶ 55, 57–75.)

According to Plaintiffs, the truth emerged in two disclosures Defendants made soon after receiving WASC's denial.  (Id. ¶¶ 76–82.)  First, on July 9, 2012, Bridgepoint filed a Form 8-K with the Securities and Exchange Commission notifying investors that WASC had denied Ashford's application for initial accreditation and that the denial was based on the school's failure to demonstrate substantial compliance with WASC standards.  (Id. ¶¶ 76, 78.)  Later that day, Bridgepoint issued a press release reporting that accreditation had been denied and that it planned to appeal and reapply.  (Id. ¶ 77.)  Following this news, Bridgepoint's stock fell $7.25 per share, to close at $14.23 per share that evening, a decline of nearly 34% on high volume of 7.8 million shares.  (Id. ¶ 80.)

1    Second, on July 13, 2012, Bridgepoint filed a Form 8-K reporting that HLC,

2  Ashford's only accreditor, had put the school on "special monitoring status"

3  because of the WASC denial, and that Ashford risked losing its accreditation with

4  HLC.  (Id. ¶ 81.)  The notice read as follows:

> On July 12, 2012, Bridgepoint Education's subsidiary, Ashford University, received a letter from [HLC] requiring Ashford University to provide certain information and evidence of compliance with HLC accreditation standards.  HLC is a regional accrediting body . . . and is the principal accreditor of Ashford University and its programs.  The HLC letter relates to the recent visiting team report and action letter received by the University from [WASC] on July 5, 2012.
>
> The letter requires that Ashford University submit a report to HLC no later than August 10, 2012 that will be followed by an Advisory Visit that will occur no later than October 9, 2012.  The University's report must demonstrate that the University remains in compliance with the HLC's Criteria for Accreditation and include:  (i) evidence that Ashford University meets the HLC Criteria for Accreditation relating to the role and autonomy of the University's governing board and its relationship with Bridgepoint Education, including the role of faculty in overseeing academic policies and the integrity and continuity of academic programs, (ii) evidence that Ashford University's resource allocations are sufficiently aligned with educational purposes and objectives in the areas of student completion and retention, the sufficiency of full-time faculty and model for faculty development, and plans for increasing enrollments, and (iii) evidence demonstrating that Ashford University has an effective system for assessing and monitoring student learning and assuring academic vigor.
>
> The letter states that HLC's President will present the report of the Advisory Visit team and the President's recommendation to the HLC Board for action at its February 2013 meeting.  At that meeting, the HLC Board may act to continue accreditation, with or without further monitoring, continue accreditation under sanction or "Show Cause" order, or withdraw accreditation.  The letter further states that Ashford University would be scheduled for a HLC Board Committee Hearing prior to any Board action to withdraw accreditation.  HLC policies also provide for a right to appeal any Board action to withdraw accreditation.

23  (Id.)  Following this news, Bridgepoint stock fell $3.20 per share to close at $9.77

24  per share that evening, a decline of nearly 25% on high volume of 6.7 million

25  shares.  (Id. ¶ 82.)

26  **C.    The Motion to Dismiss**

27    In February 2013, Defendants moved to dismiss the complaint for failure

28  to state a claim.  (Doc. No. 28.)  In September 2013, after extensive briefing, the

1   court entered a written order granting the motion in part and denying it in part.

2   (Doc. No. 39.)

3         In the order, the court concluded that the only allegations that supported a

4   claim for relief regarded Ashford's alleged misrepresentations or omissions about

5   its efforts to improve student retention and completion and student-progress

6   tracking.  (Id. at 26–29.)  Bridgepoint had emphasized throughout the class period

7   that it had implemented student-support initiatives in 2010 and 2011 and that

8   student persistence had improved.  (Id. at 27.)  But WASC had found that a

9   "concerted and systematic approach to improve retention, persistence and

10  completion, with evidence-based plans, targets, and time lines, [were] *not in place*

11  and the impact of recent changes *cannot yet be measured*."  (Id. at 28.)  These facts

12  supported a plausible claim regarding student-persistence and tracking initiatives

13  because WASC's finding suggested that Defendants could not have concluded that

14  student persistence was improving, and Defendants' comments could have led an

15  investor to assume that Bridgepoint was analyzing Ashford's student persistence

16  and finding that the numbers had actually improved.  (Id. at 28–29.)  The court

17  dismissed the remaining claims and granted Plaintiffs leave to file an amended

18  complaint, (id. at 46), but they did not do so.

19        Accordingly, at this point, the consolidated complaint remains the operative

20  complaint, and the only remaining claims are for securities fraud under § 10(b) and

21  Rule 10b-5 and control-person liability under § 20(a), both related to the alleged

22  misrepresentations regarding student-persistence and tracking.

23  **D.    The Instant Motion for Class Certification**

24        There was some delay in this case so that the parties would have an

25  opportunity to resolve discovery issues and address the impact of Halliburton Co.

26  v. Erica P. John Fund, Inc., — U.S. —, 134 S. Ct. 2398 (2014), which held that

27  defendants in a securities-fraud action "must be afforded an opportunity before

28  class certification to defeat the presumption [of reliance] through evidence that an

alleged misrepresentation did not actually affect the market price of the stock." Id.
at 2417.  On August 6, 2014, Plaintiffs filed the instant amended motion for class
certification.  (Doc. No. 70.)  Defendants opposed the motion on October 7, (Doc.
No. 72), and Plaintiffs replied on November 19, (Doc. No. 75).  The matter, which
was originally set for hearing on December 8, was taken under submission
on December 1.

**LEGAL STANDARDS**

"The class action is an exception to the usual rule that litigation is conducted
by and on behalf of the individual named parties only." Wal-Mart Stores, Inc. v.
Dukes, — U.S. —, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks omitted).
To come within the exception, a putative class-action plaintiff must provide facts
sufficient to show that the claim meets the requirements of Federal Rule of Civil
Procedure 23.  See Comcast Corp. v. Behrend, — U.S. —, 133 S. Ct. 1426, 1432
(2013).  Under Rule 23(a), a class may be certified only if "(1) the class is so
numerous that joinder of all members is impracticable; (2) there are questions of law
or fact common to the class; (3) the claims or defenses of the representative parties
are typical of the claims or defenses of the class; and (4) the representative parties
will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Additionally, the party seeking certification must show that the action
satisfies at least one of the three subsections of Rule 23(b).  In this case, Plaintiffs
seek certification under Rule 23(b)(3), which requires the court to find that "the
questions of law or fact common to class members predominate over any questions
affecting only individual members, and that a class action is superior to other
available methods for fairly and efficiently adjudicating the controversy." Fed. R.
Civ. P. 23(b)(3).

"[C]ertification is proper only if the trial court is satisfied, after a rigorous
analysis," that these requirements are satisfied. Comcast, 133 S. Ct. at 1432
(internal quotation marks omitted).  "Such an analysis will frequently entail overlap

with the merits of the plaintiff's underlying claim." Id. (internal quotation marks omitted).  But "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  Amgen, Inc. v. Conn. Ret. Plans & Trust Funds, — U.S. —, 133 S. Ct. 1184, 1194–95 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Id. at 1195.

## DISCUSSION

Plaintiffs move to certify a class consisting of all persons who purchased Bridgepoint common stock between May 3, 2011, and July 13, 2012, excluding Defendants, directors and officers of Bridgepoint, and their families and affiliates. (Doc. No. 70-1 at 1 & n.1.)  Defendants do not oppose class certification generally, but they contend that the class period must end on July 9, 2012, because Plaintiffs cannot show predominance after that date.  (Doc. No. 72.)  The court addresses this issue and the other Rule 23 requirements below.

**A.     Rule 23(a) Requirements**

**1.     Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all class members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs assert, and Defendants do not dispute, that Bridgepoint had more than 51.3 million shares of common stock outstanding during the proposed class period, a reported trading volume of more than 160.4 million shares, and an average reported daily trading volume of more than 529,000 shares.  (Doc. No. 70-1 at 7–8.)  Joinder of individual class members of a class this size would undoubtedly be impracticable.

**2.     Commonality**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  For this inquiry, "even a single common question will do."  Wal-Mart Stores, 131 S. Ct. at 2556 (brackets and internal quotation marks omitted).  Here there are a number of common questions, including whether

1   Bridgepoint made false statements, whether those statements were material, whether
2   they were intentionally false, and whether they caused class members' losses.

3   **3.    Typicality**

4   Rule 23(a)(3) requires that "the claims or defenses of the representative
5   parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).
6   "[R]epresentative claims are 'typical' if they are reasonably coextensive with those
7   of absent class members; they need not be substantially identical." Hanlon v.
8   Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998). Here, Plaintiffs' claims arise
9   from the same events and conduct that gave rise to the claims of other class
10  members. They are, therefore, typical of the class.

11  **4.    Adequacy of Representation**

12  Rule 23(a)(4) requires that "the representative parties will fairly and
13  adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution
14  of two questions determines legal adequacy: (1) do the named plaintiffs and their
15  counsel have any conflicts of interest with other class members and (2) will the
16  named plaintiffs and their counsel prosecute the action vigorously on behalf of the
17  class?" Hanlon, 150 F.3d at 1020.

18  Plaintiffs assert, and the court agrees, that these requirements are met. As
19  Plaintiffs point out, there is no antagonism because all class members have allegedly
20  suffered losses due to the same conduct, and they are institutional investors who
21  have every incentive to actively litigate this case. Plaintiffs submitted declarations
22  attesting to their commitment to vigorously litigating this case, and their counsel,
23  Robbins Geller Rudman & Dowd LLP, has documented its experience in litigating
24  securities-fraud class actions.

25  **B.    Rule 23(b)(3) Requirements**

26  Rule 23(b)(3) requires "that the questions of law or fact common to class
27  members predominate over any questions affecting only individual members, and
28  that a class action is superior to other available methods for fairly and efficiently

1   adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

2       **1.    Predominance**

3       The predominance analysis "focuses on the relationship between the common

4   and individual issues." Hanlon, 150 F.3d at 1022. "When common questions

5   present a significant aspect of the case and they can be resolved for all members of

6   the class in a single adjudication, there is clear justification for handling the dispute

7   on a representative rather than on an individual basis." Id.

8       To recover damages for violation of § 10(b) and Rule 10b-5, a private

9   plaintiff must prove "(1) a material misrepresentation or omission by the defendant;

10   (2) scienter; (3) a connection between the misrepresentation or omission and the

11   purchase or sale of a security; (4) reliance upon the misrepresentation or omission;

12   (5) economic loss; and (6) loss causation." Halliburton, 134 S. Ct. at 2407 (internal

13   quotation marks omitted).

14       In the typical securities-fraud case, as in this case, the factual and legal issues

15   related to most of these elements are common to the class, so the requirements for

16   class certification are usually "readily met." Amchem Prods., Inc. v. Windsor, 521

17   U.S. 591, 625 (1997). Typically, the only individualized issue is damages, which,

18   alone, cannot defeat class treatment under Rule 23(b)(3). See Leyva v. Medline

19   Indus., Inc., 716 F.3d 510, 514 (9th Cir. 2013).

20       The main sticking point in securities-fraud class actions is reliance. To avoid

21   the need to prove the reliance of individual investors, plaintiffs in securities-fraud

22   class actions ordinarily show reliance by establishing "fraud on the market," which

23   gives rise to a rebuttable presumption of reliance. Halliburton, 134 S. Ct. at 2408.

24   The premise is that "the price of a security traded in an efficient market will reflect

25   all publicly available information about a company," so that "a buyer of the security

26   may be presumed to have relied on that information in purchasing the security."

27   Amgen, 133 S. Ct. at 1190.

28       To establish the presumption, a plaintiff must show "(1) that the alleged

misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." <u>Halliburton</u>, 134 S. Ct. at 2408.  The defendant may rebut the presumption, for example, "by appropriate evidence, including evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock," <u>id.</u> at 2414 (internal quotation marks omitted), or "by showing that the market was already aware of the truth behind the defendant's supposed falsehoods and thus that those falsehoods did not affect the market price (the so-called 'truth-on-the-market' defense), or . . . that a particular plaintiff would have bought the stock without relying on the integrity of the market price." <u>Conn. Ret. Plans & Trust Funds v. Amgen, Inc.</u>, 660 F.3d 1170, 1174 (9th Cir. 2011). To make use of the presumption at the class certification stage, however, "[t]he only elements a plaintiff must prove . . . are whether the market for the stock was efficient and whether the alleged misrepresentations were public." <u>Id.</u> at 1177.

In this case, Plaintiffs have shown that Defendants' alleged misrepresentations and omissions were publicized in various releases, statements, and on Bridgepoint's website, and they provided an expert report demonstrating that Bridgepoint common stock traded in an efficient market over the course of the class period. (Doc. No. 70-3.)  The court is satisfied, based on the report, that the market was efficient, and Defendants have not offered any contrary evidence or otherwise suggested that the market was inefficient.  Accordingly, Plaintiffs have adequately established the prerequisites for invoking the presumption at this stage.

Defendants contend, however, that the class period must end on July 9, 2012, because the July 13 disclosure was unrelated to student persistence, and the July 9 disclosure fully revealed the alleged truth related to student persistence, so that "Plaintiffs cannot use the fraud-on-the-market presumption of reliance to establish predominance for any investors who purchased Bridgepoint stock after

July 9, 2012." (Doc. No. 72.)

The court is not persuaded two reasons. First, it is not clear that the July 13 disclosure was entirely unrelated to student persistence, as part of the message was that HLC was concerned that Ashford's resource allocations were not "sufficiently aligned with educational purposes and objectives in the areas of *student completion and retention*." (Emphasis added.) Second, as Plaintiffs point out, a truth-on-the-market defense cannot be used to rebut the presumption of reliance at the class-certification stage because the defense "is a method of refuting an alleged representation's *materiality*," and it is well established that "a plaintiff need not prove materiality at the class certification stage to invoke the presumption." Amgen, 660 F.3d at 1177 (affirming the district court's refusal to consider a truth-on-the-market defense at the class- certification stage), aff'd, 133 S. Ct. at 1203. Halliburton did not change that. See Halliburton, 134 S. Ct. at 2416 ("[M]ateriality . . . should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3)."); see also Aranaz v. Catalyst Pharm. Partners, Inc., 302 F.R.D. 657, 669–71 (S.D. Fla. 2014) (rejecting the applicability of the truth-on-the-market defense at class certification post-Halliburton for this reason).

Accordingly, for now, the class period is May 3, 2011, through July 13, 2012. If it is later shown that the presumption does not apply after July 9, 2012, the court can modify the class period at that time. See Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

### 2. Superiority

Whether a class action is the superior method of litigation depends on (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or

1  undesirability of concentrating the litigation of the claims in the particular forum;

2  and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3).

3       In this case, given the identical claims shared by members of the class,

4  the relatively small size of the typical claim, and the geographical dispersion of

5  the class members, a class action is superior to individual litigation.  See Epstein v.

6  MCA, Inc., 50 F.3d 644, 668 (9th Cir. 1995) (shareholder claims based on identical

7  facts and law fit Rule 23's requirements "like a glove"), rev'd on other grounds sub

8  nom. Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367 (1996).

9  **C.     Appointment of Class Representatives**

10      Plaintiffs ask to be appointed as class representatives.  This inquiry, which

11  is governed by Rule 23, is distinct from the inquiry regarding their appointment

12  as lead plaintiffs under the PSLRA.  See In re Chiron Corp. Sec. Litig., 2007 WL

13  4249902, at *13 (N.D. Cal. Nov. 30, 2007) (reviewing authorities on the issue).

14  The court has concluded that Plaintiffs will adequately represent the class under

15  Rule 23's requirements.  Accordingly, the court appoints City of Atlanta General

16  Employees Pension Fund and Teamsters Local 677 Health Services & Insurance

17  Plan as class representatives.

18  **D.     Appointment of Class Counsel**

19      Rule 23(g) requires the court to appoint class counsel when certifying a

20  case as a class action.  The court must consider "(i) the work counsel has done in

21  identifying or investigating potential claims in the action; (ii) counsel's experience

22  in handling class actions, other complex litigation, and the types of claims asserted

23  in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources

24  that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g).  Having

25  reviewed their submissions, the court is satisfied that Plaintiffs' counsel should

26  serve as class counsel.  Accordingly, the court appoints Robbins Geller Rudman

27  & Dowd LLP as class counsel.

28  ///

**CONCLUSION**

The court GRANTS Plaintiffs' motion for class certification, (Doc. No. 70). The court appoints City of Atlanta General Employees Pension Fund and Teamsters Local 677 Health Services & Insurance Plan as class representatives, and appoints their counsel, Robbins Geller Rudman & Dowd LLP, as class counsel.

IT IS SO ORDERED.

DATED:  January 15, 2015

_____
Hon. Jeffrey T. Miller
United States District Judge

12cv1737