# EXHIBIT 50

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

CASE NO.: 3:12-CV-01737 JM JLB

In re BRIDGEPOINT EDUCATION, INC.,
SECURITIES LITIGATION

## EXPERT REPORT OF
## WATSON SCOTT SWAIL, ED.D.

000001
Exhibit 50

## I.     BACKGROUND AND SCOPE OF ANALYSIS

1.     Bridgepoint Education, Inc. ("Bridgepoint"), the owner and operator of Ashford University and the University of the Rockies, has contracted me to provide some light on the issue of student retention in higher education and provide an expert testimony regarding retention initiatives implemented by Bridgepoint and/or its universities during the timing related to this lawsuit.

2.     It is my opinion that Bridgepoint implemented several evidence-based strategies for improving student retention at its institutions. These include several orientation activities, including an orientation course and a Walk to Class webinar, as well as minimum age, class size, and mandatory attendance requirements.  In addition, Bridgepoint developed an online text and information system called "Constellation."

3.     In certain cases, Bridgepoint has conducted random-controlled trials (RCT) to measure the impacts of their strategies. When RCT was not possible, they still managed to collect data, including perceptions of students, via surveys and other vehicles. It is my professional opinion that Bridgepoint has conducted due diligence to provide the necessary support to allow for student success, knowing that not all students can be saved and not all students are destined to graduate. In the end, we expect our institutions of higher education to do whatever is appropriate and applicable in the day-to-day effort to educate students. Those strategies vary greatly from institution to institution, and even from program to program. This is not an exact science, in any estimation. An institution can only make reasonable efforts to establish programs to support student success. My conclusion is that Bridgepoint appears to have met that level of effort.

-2-

## II.    QUALIFICATIONS AND REMUNERATION

4.      I am the founder, president, and chief executive officer of the Educational Policy Institute ("EPI"), a non-governmental organization dedicated to policy-based research on educational opportunity for all students.  I earned my Doctorate in Education Policy from the George Washington University (1996), my Master's in Science (Technology) from Old Dominion University (1991), and my Bachelor's of Education from the University of Manitoba (1985). I have published extensively in national peer-reviewed journals and publications.

5.      I am noted for developing the geometric framework for student retention, which provides a model for institutions of higher education to improve their service to students and increase graduation rates. The model is used at institutions around the world in their strategic planning and was published in several journals and monographs, as well as the 2003 Jossey-Bass book, *Retaining Minority Students in Higher Education.*

6.      I have conducted and continue to conduct research for dozens of organizations, including the Lumina Foundation for Education, Bill & Melinda Gates Foundation, Alfred P. Sloan Foundation, The Ford Foundation, the US Department of Education, institutions of higher education, and school districts across the US and Canada. I am a frequent keynote speaker at conferences and professional development workshops on issues of educational opportunity, college access and affordability, and future issues in education.

7.      I write a weekly blog, *The Swail Letter on Education*, as well as have written several books, including Educated Thoughts (2015), *Finding Superman: Debating the Future of American Public Education* (2012), and *Retaining Minority Students in Higher Education* (2003). I am currently working on *The ROI of Higher Education* (2015) and *The Higher Education Arms*

-3-

*Race* (2016). I have served on a number of national advisory committees, including technical review panels for the major U.S. longitudinal and cross-sectional surveys sponsored by the U.S. Department of Education's National Center for Education Statistics. Prior to establishing EPI, I served as the founding director of the Pell Institute and vice president of the Council for Opportunity in Education in Washington, DC. I also previously served as senior policy analyst with SRI International and associate director for policy analysis with the College Board. I am a former adjunct faculty member at the George Washington University and Old Dominion University.

8.      My curriculum vitae, which sets forth my publications and qualifications in further detail, is attached as **Exhibit A**.

9.      Defendants are compensating me for my time at a rate of $600 per hour, and are reimbursing me for out-of-pocket expenses. My compensation is not contingent on my opinions and conclusions.

10.     The materials I reviewed for purposes of this report are listed in **Exhibit B.**

## III.    BACKGROUND REGARDING STUDENT RETENTION

11.     To understand the issues of student retention, persistence, and graduation in the United States, it is worth reviewing some historical details as well as current data.

12.     First, retention and persistence are often interchanged as meaning the same thing. Retention is typically used to define the ability of institutions to keep students enrolled from either one semester to the following semester or from one year to the following year. The National Center for Education Statistics traditionally focuses on fall-to-fall retention rates for institutions, which

000004
Exhibit 50

often do not translate for institutions that have three or more semesters per year or focus on less-than BA degrees (e.g., Associate Degrees or Certificates).

13.     Second, the higher education system in the US is arguably the most expansive and diverse system in the world. There are over 7,000 postsecondary institutions in the United States[1] categorized by type (e.g., less-than two-year; two-year; four-year) and sector (e.g., public; private non-profit; private for profit). In 2010-11, 2,951 (41 percent) of the nation's institutions of higher education were four-year universities, including graduate level; 2,301 (32 percent) were classified as two-year institutions; and 1,926 (27 percent) were less-than-two-year institutions. By sector, 2,043 (28 percent) were publically controlled (i.e., government sponsored); 1,869 (26 percent) private non-profit institutions; and 3,266 (46 percent) private for profit institutions.

14.     Until recently, the focus of congressional and legislative action on higher education has been on expanded access. The Morrill Act of 1862, which created Land Grant Universities; the Second Morrill Act of 1890, which created HBCUs; The GI Bill of 1944, which massified the US system of higher education; the Civil Rights Act of 1964, which created, in partnership with the Higher Education Act of 1965, the TRIO programs, which encourage higher education participation among low-income youth; the Pell Grant from 1972, which have since provided the foundational needs-based grant for low-income students.

---

[1] In academic year 2010-11, there were 7,178 Title IV compliant institutions in the US. "Title IV" institutions as defined from Title IV of the federal Higher Education Act (HEA) which provides structure, policy, and regulations for institutions across the US. Institutions need to be Title IV compliant in order to receive federal funds for operation, most importantly of which are student loan and grant funds. If institutions are not compliant, they are unable to offer federal funds to students, thus, cannot function in reality. Data Source: US Department of Education. https://nces.ed.gov/fastfacts/display.asp?id=84; http://nces.ed.gov/datalab/tableslibrary/viewtable.aspx?tableid=8459.

000005
Exhibit 50

15.     The result of these efforts has been unparalleled growth in higher education. Today, over 20 million students are enrolled in a degree-granting institution in the US.[2] This reflects a 24-percent increase in enrollment in the 20 years from 1992 to 2012.

16.     However, researchers, policymakers, and practitioners have learned that access and enrollment are superseded by the need to graduate students of higher education. While enrollment has shot up since the World War II, graduation rates have not. The gaps in educational attainment of those who manage to matriculate to postsecondary education in the United States are stark at best. Of students who enroll in some type of postsecondary education, 49 percent attain a credential within six years of matriculation, regardless of type or sector of institution.[3] Alternatively, 51 percent—or half—of students who start college in the US do not finish with a degree within six years of beginning their studies. Fifteen percent of students are still enrolled at that time, but only a small percentage of that group end up completing their program.

17.     For students who initiate their programs at a four-year public institution, 60 percent earn a bachelor's degree and an additional five percent earn a lower level credential after six years (See **Exhibit 1**). The graduation rate at private, non-profit four-year institutions is 69 percent and 34 percent at two-year public institutions. At private, for-profit four-year institutions, 16 percent of students graduate with a BA, 3 percent with a certificate, and 15 percent with an Associate's degree. While these rates are somewhat stark, the BA and Associate's degree graduation rates are higher than those for students at public, two-year institutions.

18.     Student success largely depends on the preparedness of students, both academically and socially, for higher education. A 2011 study by Harvard University found that the top reasons

---

[2] http://nces.ed.gov/fastfacts/display.asp?id=98.

[3] Analysis by W. S. Swail using BPS 04/09 data and Powerstats. US Department of Education.

for dropping out of college include (a) the rigors of academic work; (b) an inability to cope with the competing demands of study, family and jobs; and (c) college costs.[4] An institution can have a dramatic impact on the success of current and future students. However, it should be noted that there will always be some students who will not succeed due to individual deficiencies in the areas above, especially on the academic level.

19.     As part of my doctoral studies in the mid 1990s, I created the Geometric Framework for Student Retention (the "Framework") (See **Exhibit 2**). The Framework, based on empirical research, states that student retention and graduation depends on three pivotal factors: (1) the academic background and ability of the student (cognitive factors); (2) the social background and related skill sets and/or attributes of a student (social factors); and (3) what the institution chooses to do to support student success (institution factors). Together, these three areas work together or against each other to impact student success.

20.     The Framework has been used by institutions around the world to guide the way they think and strategize about student retention. Used in conjunction with EPI's Institutional Student Retention Assessment (ISRA), the Framework helps stakeholders focus on the critical issues related to student retention and align student and institutional inputs for a combined and enhanced output.

21.     The Framework is cited in hundreds of journals, dissertations, and reports, a few of which are listed in **Exhibit 3**.

22.     Below I explain each of the three factors of the Geometric Framework in greater detail:

---

[4] http://dash.harvard.edu/bitstream/handle/1/4740480/Pathways_to_Prosperity_Feb2011-1.pdf?sequence=1.

a. Cognitive Factors: Attributes or skill sets include all academic background of the student, including rigor of prior learning, aptitude, knowledge, critical-thinking ability, study skills, and other important elements.

b. Social Factors: These include financial issues, attitudes toward learning, maturity, social coping skills, cultural attitudes, goal commitment, and others.

c. Institution Factors: My work defined institutional factors in five areas: (a) recruitment and admissions; (b) academic services; (c) student services; (d) financial aid; and (e) curriculum and instruction.

    i. Recruitment and Admissions: Institutions have a vast ability to decide who to admit and who to reject at the matriculation stage. At many institutions in the US, especially those serving at-risk student populations (such as Ashford), many students enroll who simply are not prepared for the rigor of college. For those students, orientation and initial courses focusing on study and time management skills are critically important.

    ii. Academic Services: Departments of a university must employ a number of support activities that impact student learning and direction. These include academic advising, supplementary instruction, tutoring/mentoring, research opportunities, pre-college outreach, and bridge programming. These activities are typically supplemental to actual instruction in the classroom (which is under another area).

000008
Exhibit 50

     iii.    Student Services: includes resources that improve campus climate of the university; accessibility to classes and services; student housing; and counseling and health-related support for students.

     iv.    Financial Aid: the availability of highly-trained financial aid advisors, institutional aid, and even work-based study enhance retention of students.

     v.    Curriculum & Instruction: the professional development and pedagogical ability of instructional staff, along with technologically-appropriate instructional classrooms, also impacts student retention.

     vi.    Together and apart, the foregoing five areas showcase what institutions should focus on to improve their student retention and graduation rates.

## IV.    BRIDGEPOINT INITIATIVES

23.    I have been asked to review several of the retention initiatives/strategies implemented and utilized by Ashford University during the time frame 2010 to early 2012. These include the Orientation Course, Minimum Age Requirement, Constellation, Small Class Size, Mobile App, Perfect Attendance Initiative, and Walk-to-Class Webinar.

24.    **Orientation course.** Ashford University provided a Student Success Workshop that was mandatory for all students who had less than 24 transfer credits (Course AUO100). The workshop provided discussion forums on key areas, a self-assessment inventory including ETS assessment tests[5] and the USA Funds "Life Skills"[6] modular learning activity. These items are used

---

[5] ETS is a non-profit organization that provides various measurement tools for use in education. See www.ets.org.

by institutions around the country of all types and sectors. The activities are provided during a two-week period. It is my understanding from review of materials that the first iteration of the orientation course was initiated in fall 2010. Internal Bridgepoint documents show that these materials were restructured in 2011. The information provided to students in the orientation course (as shown in screenshots of the online orientation course, which I reviewed) illustrates a clear, concise, and directed set of information important to navigating not only the online Bridgepoint system, but also the direction for course success. It is my opinion that the orientation course provided useful information for new students. It follows that the orientation course should have an immediate impact, even if small, on students, since it provided immediate information, including orientation to other support structures on campus. Bridgepoint also conducted a randomly-controlled trial to document the impact of the orientation. This is the first I have heard of any institution doing this. Although the findings did not point to a long-term increase in retention, the orientation course did correlate with short-term retention, which could be viewed "as a start." Other important strategies would then have impact on the retention of students who do end up staying for additional courses.

25.  **Minimum Age requirement.** Ashford University implemented an age stipulation that requires students to be 22-years of age or older to enroll. As well, the new enrollees must have a 100 percent attendance record for the early courses EXP 105 and PSYCH 202. It seems clear from Bridgepoint's analysis that they had challenges with regard to retention of traditional-age students (i.e., ages 18-22). The age requirement may increase student retention by removing the most at-risk students, those who are less mature and perhaps less directed. Age has a bifurcated impact on retention. While students may be more mature and directed, they also typically have

---

[6] USA Funds "Life Skills" is a web-based financial literacy and student success program that equips your institution to teach its students to manage their time and money.  See www.usafunds.org.

000010
Exhibit 50

more social and financial responsibilities (e.g., mortgages, jobs, children, etc.). Because the academic research on retention has largely focused on traditional institutions where the majority of students are 18-22 years old, there is not enough information in the literature to understand the overall impact by age due to these factors. However, given Bridgepoint's experience of lower retention rates with young adults, adoption of the minimum age requirement could be seen as a prudent retention policy.

26. **Constellation.** Constellation is a web-based "text book" system developed and used by Bridgepoint. Without opining on the overall efficacy of Constellation, I believe that certainly any program that provides up-to-date and on-time deliverables to students would seem to be prudent. I am very aware that many students in traditional higher education face access challenges with respect to textbooks and other course materials, either due to (a) availability of texts; (b) affordability of texts; and (c) datedness of texts. Certainly, an institution that serves an almost exclusively online student population would benefit from a program like Constellation. The institution and students do not have to worry about Content Rights Management (CRM) issues, and users have the flexibility of accessing their materials on a variety of devices, including desktop, laptop, smart phone, and tablet formats. As well, it is my understanding that students can also print materials, which is not typically allowed under other programs/formats due to CRM issues.

27. **Small Class Size.** Bridgepoint tested a small-class size initiative that yielded some modest increases in student retention. Many higher education practitioners emphasize the importance of small class size, but the research is both limited and equivocal.[7] However, almost all studies on this issue focus on traditional, bricks-and-mortar institutions. Other critical factors, such as the talent of the instructor and the pedagogical methodology utilized, may outweigh the impact

---

[7] http://www.usnews.com/education/best-colleges/the-short-list-college/articles/2014/11/11/10-national-universities-where-most-classes-are-small.

of small class size. In an online system, class size would seem to correlate with the amount of time an instructor can spend on each student, and an increase in the amount of time, on average, spent on students would seem to be of utility.

28. **Mobile app for smart phones/tablets.** Bridgepoint developed a mobile app for smart phones and tablets before the development of Constellation. The app provides students with access to important pieces such as class discussion threads, in which they are to participate and respond. In a social-media world, the app allows students to access this information, and respond, in real time. It would seem that in an online, virtual education arena that access to real-time information would be of great utility. Smart phones, specifically, are ubiquitous for most of society and especially those in their 20s. Email addresses are less utilized by youth compared to smart phones for texting and messaging. It would seem that the app would be an important strategy for connecting students and faculty.

29. **Perfect Attendance initiative.** Bridgepoint implemented a mandatory attendance policy for students in their introductory EXP 105 and PSY 202 programs, which requires students to attend at least once a week for the duration of the course. Bridgepoint's internal research confirms what is understood in the broader research community: attendance matters. How attendance is quantified and enforced is a variable issue. It would seem that attendance in online education, especially for introductory courses where the foundation for student learning and success is cultivated, would be a prudent strategy for student retention. Once students have shown success, it is hoped that they have developed a sense of what success looks like and what strategies are important for them to utilize in order to reach that success. The use of attendance for introductory "gatekeeper" courses could be seen as an important success strategy, especially for at-risk students.

000012
Exhibit 50

30. **Walk to Class Webinar.** Bridgepoint implemented a "Walk to Class" mandatory webinar in 2011 to help orient students to the online classroom. According to information in "Item 14: Student Attrition Action Plans," the webinar "helps students become better prepared to attend school in an online modality by training them in how to use the technology within the online classroom and the tools available to help them succeed within their programs." (BPI010429) My understanding is that this is a synchronous online walk through with a host who can answer questions in real time. In light that a virtual classroom does not have the same opportunity as a residential student's opportunity to walk around campus with a guide, this seems like a unique and interesting manner of making the online system more real and accessible to new students. Such a program could reasonably be expected to assist in retaining students.

31. Each one of these retention efforts works into my Geometric Framework for Student Retention. Increased communication, additional linkages to the institution, better teaching and learning opportunities for students and faculty, and enhanced "college knowledge" by students through better orientation programs all work toward an increased level of student success.

## V. CONCLUSIONS

32. In conclusion, Bridgepoint has implemented a number of strategies to increase the success, therefore retention, of students. Student retention is not a simple, logical, or linear issue. It is as complex as the individuals who choose to attend Ashford or any other postsecondary institution. There are no silver bullets; there are no "one-size-fits-all" solutions. There is hard, difficult work that is made easier by implementing prudent policies and practices that are both intentional and intensive. Every policy and practice should have a very specific reason to be in place, and not just because that is what others suggest is prudent.

-13-

33.     Bridgepoint has done an excellent job of documenting success of its initiatives, and has found that not all strategies work, and those that work do not always have the same impact on all students. Again, this is difficult and imprecise work. It is reasonable to question whether an institution has done everything it can do improve student success. However, it is unreasonable to think that all institutions can do everything possible, due to the sheer complexity of the human condition. Not all students can be served at the level that each demands, and not all students can succeed. In the end, not all students can be successful because of the cognitive and social issues that each brings to the academic table. Not all students can be retained.

34.     The key to understanding student retention lies in the ability to understand an institution's student body. It is important to know the skill sets and attributes—cognitive and social—of students when they enroll so that strategies can be put in place. Bridgepoint has invested in the development of many research-proven strategies to encourage retention and completion, including the development of mobile technologies and web-based course materials, as well as orientation courses and mandatory attendance policies for new students. Student retention is difficult work and must be supported through a myriad of policies and programs in order to effect change in students.

35.     I think it is reasonable to conclude, based on my experience in the field, that Bridgepoint made an effort equal in many ways to those conducted at traditional public and private

000014
Exhibit 50

institutions of higher education. In fact, in some ways it has gone beyond those institutions by doing randomly-controlled trials (RCT) which are rarely conducted at other institutions. Based on my review, I conclude that Bridgepoint implemented those strategies that are largely known in the research literature and are used at hundreds, if not thousands, of other institutions in the United States.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Plaintiffs, that becomes available to me.

Watson Scott Swail, Ed.D.
June 2, 2015

-15-

000015
Exhibit 50

**Exhibit 1. Highest degree attained anywhere by 2009 for all 2003-04 beginning postsecondary students, by first institution attended (Six-year completion rates).[8]**



---

[8] Analysis by W. S. Swail using BPS 04/09 data and Powerstats. US Department of Education.

**Exhibit 2. Swail Geometric Framework for Student Retention.**



The
Student
Experience

Cognitive Factors

Social Factors

Institutional Factors

000017
Exhibit 50

**Exhibit 2 continued. Swail Geometric Framework for Student Retention.**



000018
Exhibit 50

**Exhibit 3. Examples of literature citing the Swail Geometric Framework for Student Retention.**

Hossler, D., and Bontrager, B. (2015). *Handbook of Strategic Enrollment Management.* John Wiley & Sons: San Francisco, CA.

Di Maria, D. L., and Kwai, C.K. (2014, February 16). Developing an International Student Retention Strategy: Theory to Practice. Presentation at the 20144 Annual Conference of the Association of International Education Administrators (AIEA), February 16, 2014, Washington, DC. http://www.aieaworld.org/assets/docs/Conference_Materials/2014/docstoupload2/di%20maria%20kwai%20presentation.pdf.

McCaig, Marilyn M. (2013). *Importance and Effectiveness of Student Health Services at a South Texas University.* A Dissertation submitted to the Texas A&M University – Corpus Christi, TX, April 2013.

Orduna, Aubray (2009). Experiences of African Americans in Nursing Education. A Dissertation submitted to the College of Saint Mary, Omaha, Nebraska.

Sanford, Thomas; Hunter, James M. (2011). "Impact of Performance-funding on Retention and Graduation Rates." *Education Policy Analysis Archives/Archivos Analíticos de Políticas Educativas*, vol. 19, enero, 2011, pp. 1-30 Arizona State University Arizona, Estados Unidos. http://www.redalyc.org/pdf/2750/275019735033.pdf.

Lee, Giljae (2010). *Determinants of Baccalaureate Degree Completion and Time-to-Degree for High School Graduates in 1992.* A dissertation submitted to the University of Minnesota.

Griffin, Kimberly A., Jayakumar, Uma M., Jones, Malana M., and Allen, Walter R. (2010). "Ebony in the Ivory Tower: Examining Trends in the Socioeconomic Status, Achievemtn, and Self-Concept of Black, Male Freshmen." *Equity & Excellence in Education.* Routledge Publishing: London, UK.

De Lourdes Machado-Taylor, Maria, Sarrico, Claudia S., and Brites, Rui (June 26, 2008). *The students' Experience in Higher Education: Findings from a Study in Portugal.* A presentation at the Exploring the Hinterlands: Mapping an Agenda for Institutional Research in the UK Conference, Southampton Solent University, Southampton, United Kingdom, June 25-26, 2008.

National Court Reporters Association (2006). *Reporter Education Commission: Report to the Membership.* National Court Reporters Association, Washington, DC.

Rust College (2013). *Building Communities Academically for Total Student Success.* A report of the Rust College Quality Enhancement Plan, 2014-2019.

Cote, Roger (2008). *Enrolment Management Transformation Project.* Presentation at Laval University, December 3, 2008.

Velez, William (2008). *The Educational Experiences of Latinos in the United States.* Springer: Heidelberg, Germany.

-19-

# EXHIBIT A



# WATSON SCOTT SWAIL, ED.D.

Educational Policy Institute
PO Box 6225
Virginia Beach, VA 23456
757.513.8266
wswail@educationalpolicy.org

**DR. WATSON SCOTT SWAIL** is the Founding President and Senior Research Scientist of the Educational Policy Institute. Founded in 2002, EPI conducts research and policy studies on issues across the education spectrum, from early childhood reading to college preparation and access programs to postsecondary completion and workforce development.



Dr. Swail has been involved in Education for the past 34 years as a middle school teacher, curriculum developer, teacher trainer, graduate school instructor, policy analyst, and program evaluator. He is noted for developing the geometric framework for student retention, which provides a model for institutions of higher education to improve their service to students and increase graduation rates. The model is used at institutions around the world in their strategic planning.

He has conducted research for dozens of organizations, including the Lumina Foundation for Education, Bill & Melinda Gates Foundation, Alfred P. Sloan Foundation, The Ford Foundation, the US Department of Education, and dozens of institutions of higher education and school districts across the US and Canada. He is a frequent keynote speaker at conferences and professional development workshops on issues of educational opportunity, college access and affordability, and future issues in education.

Dr. Swail created and chairs the annual International Student Success Symposium, the EPI Forum on Education & the Economy, as well as the EPI Retention 101 Certification Workshops for higher education leaders and practitioners. He is a prolific writer, with a weekly blog (The Swail Letter on Higher Education), the 2012 Teachers College Press book, *Finding Superman: Debating the Future of American Public Education,* and the Jossey-Bass publication, *Retaining Minority Students in Higher Education.* He is currently working on his next book, *The Higher Education Arms Race,* due in 2016.

Dr. Swail serves on the Research Advisory Board of the National Action Council of Minorities in Engineering (NACME). He is an accomplished singer/songwriter, much less accomplished golfer, and occasional sports writer covering the NHL's Winnipeg Jets on MyToba.ca and itsgameon.ca.

000021
Exhibit 50

## EDUCATION

- **Ed.D., Educational Policy, The George Washington University, Washington DC (December 1995)**
  - o Dissertation: The Development of a Conceptual Framework to Increase Student Retention in Science, Engineering, and Mathematics Programs at Minority Institutions of Higher Education (Winner of the 1996 Phi Delta Kappa Washington Chapter 'Dissertation of the Year')

- **M.Sc., Technology Education, Old Dominion University, Norfolk, VA, August 1991**
  - o Master's Thesis: Assessing the Professional Needs of Canadian Members of the International Technology Education Association

- **Leadership Program, St. Vital School Division, Winnipeg, Manitoba, July 1990**
  - o Six-month leadership course for prospective administrators. Achieved credit for provincial administrator's certificate

- **B.Ed. (Mathematics/Industrial Arts). University of Manitoba, Winnipeg, MB, Summer 1985**


## PROFESSIONAL EXPERIENCE

**President & CEO, Educational Policy Institute, Washington, DC (2002-present)**
The Educational Policy Institute conducts research on educational opportunity in the U.S. and Canada, with a growing interest in international affairs. As President, Dr. Swail's responsibilities include coordination of all Institute research and policy work, fundraising, and professional development activities, including the annual International Conference on Student Success and EPI's National Capitol Summit. A recognized international expert in student retention, minority issues in education, and policy, Dr. Swail serves as a consultant and board member for multiple universities and organizations. The Educational Policy Institute has conducted work for dozens of organizations, including the National Council on Disabilities (NCD), the Library of Congress, Pittsburgh Public Schools, the American Association for the Advancement of Science (AAAS), the National Action Council on Minorities in Engineering (NACME), the Bill & Melinda Gates Foundation, Lumina Foundation for Education and many others.

**Vice President, Council for Opportunity in Education & Founding Director, Pell Institute for the Study of Opportunity in Higher Education, Washington DC (2001-2002)**
The Pell Institute conducts primary and secondary research studies that focus on low-income, first-generation, and disabled students. Responsibilities included planning new initiatives for the Council and establishing The Pell Institute for the Study of Opportunity in Higher Education. Served as the Institute's senior research scientist, oversaw all research projects, and served as the main liaison with partnering and funding organizations.

**Senior Policy Analyst, SRI International, Washington DC (2000-2001)**
Conducted policy research on issues related to educational opportunity and academic preparation, virtual instruction, teacher preparation, and student financial aid. Planned and coordinated project work from the ground up, including fundraising. Provided support in terms of overall planning, statistical and research support, and policy development on key educational issues.

**Associate Director for Policy Analysis, The College Board, Washington DC (1997-2000)**
Chief responsibilities included data analysis on issues relating to three primary areas: academic preparation, access to college, and postsecondary success. Directed and produced The College Board's annual

000022
Exhibit 50

Trends in Student Aid and Trends in College Pricing reports released each fall, providing detailed financial data on the cost of college and available student aid. Other research projects focused on issues relating to the educational opportunity of low-income, disadvantaged students, including distance education and virtual instruction. Provided data and expertise to members of congress and the media. Most recently acted as chair of the ConnectED 2000 National Summit on college preparation and outreach, in San Diego, CA.

**Coordinator of Special Projects, EQUITY 2000, The College Board, Washington DC (1996)**
Responsibilities included strategic planning and implementation for this cutting-edge public school reform program. Other responsibilities included writing reports to funders and stakeholders, writing proposals for funding, coordinating project research, and coordinating web-site development and database system.

**Assistant Professor (Adjunct), The Graduate School of Education and Human Development, The George Washington University, Washington DC (1995-2002)**
Taught graduate courses in educational research methodology and program evaluation. Currently teaching online versions of educational research course work in the masters program.

**Senior Research Associate, Individual Monitoring Systems, Inc., Annapolis, MD (1995-1996)**
Individual Monitoring Systems is an educational psychology firm. Responsibilities included instrument development, data collection, and data analysis for a series of mental health videos for middle and high school students. Sponsored by NIMH.

**Associate, The McKenzie Group, Inc., Washington DC (1993-1995)**
The McKenzie Group is a comprehensive educational consulting firm whose clients include the National Science Foundation, U.S. Navy, RJR Nabisco, Seagram & Sons, and numerous school districts across the nation. Responsibilities included the design of research instrumentation, client communications, needs assessments, project development, strategic planning for large organizations, writing and production of major publications.

**Instructor, Benjamin Syms Middle School, Hampton, VA (1991-1993)**
Responsibilities included the development of an LAP (Learning-Activity-Package) program for middle school technology and course curriculum for computer networking, programming, desktop publishing, computer numeric control (CNC) for robotics, and CADD training. Developed partnerships with NASA/Langley Research Center. Coached several extracurricular activities, including Odyssey of the Mind and the Technology Student Association.

**Adjunct Faculty Member, Department of Occupational and Technical Studies, Old Dominion University, Norfolk, VA (1990-1993)**
Served as the Virginia state curriculum director for the new high school technology curriculum, coordinated and taught graduate-level courses for new high school courses in the technology field, and instructed other core departmental courses.

**Middle School Graphic Communications Instructor, St. Vital School Division, Winnipeg, MB (1985-2000)**
Taught for five years at the junior high level in a magnet school. Instructional areas included architectural drafting, computer-aided design, photography, animation, and design theory. Instruction incorporated individual and group activities, problem-solving and critical-thinking strategies, and multimedia.

000023
Exhibit 50

**CURRENT PROFESSIONAL AND ACADEMIC ASSOCIATION MEMBERSHIP**

- American Educational Research Association (AERA)
- American Evaluation Association (AEA)
- Association of Institutional Research (AIR)
- Association for the Study of Higher Education (ASHE)
- Society for Research on Educational Effectiveness (SREE)

**BOARD ASSIGNMENTS**

- 2010 to present: AVID for Higher Education Advisory Board
- 2005 to present: Research Advisory Board Member, National Action Council for Minorities in Engineering (NACME)
- 2007 to 2012: Old Dominion University Darden College of Education Advisory Board
- 2009 to present: National Advisory Council, Council of State Governments
- 2009, Member, National Advisory Board, National Association of Student Financial Aid Administrators (NASFAA)

**SELECTED RESEARCH PROJECTS (Principal Investigator; selected)**

- 2013-2018, Evaluation, Arizona State University *University PREP* Race to the Top (RTTT) Initiative
- 2012-2017, Evaluation, US Department of Education, OSEP Personnel Development Program Data Collection System: Scholar Data Report and Service Obligations Tracking System
- 2012-2017, Evaluation of St. Vrain School District Academic Excellence through STEM Innovation Race to the Top Grant
- 2012-2013 Evaluation of US Department of Education, International and Foreign Language Education (IFLE) Program
- 2011, Evaluation of the SEED Schools, Washington, DC
- 2011-2015, Evaluation of St. Vrain School District's i3 Grant (Colorado)
- 2010-11, National Study of College Outreach Programs (TG)
- 2010-11, Evaluation of Student Outcomes, Kaplan Higher Education
- 2009, Evaluation of the Old Dominion University Teacher Quality Partnerships Grant (Old Dominion University)
- 2009, Evaluation of Pittsburgh Science & Technology Academy (SciTech; Pittsburgh Public Schools)
- 2009, Evaluation of Osceola Public Schools I-STEP program; a federally-funded program designed to reduce the number of 8th-grade retentions (Osceola Public Schools)
- 2009, Strategic Research Plan for the Texas High School Project, funded by the Texas Education Agency (TEA), the Bill & Melinda Gates Foundation, the Michael and Susan Dell Foundation, and the Community Foundations of Texas (Texas Education Agency)
- 2009, Evaluation of the Lawrence County (Mississippi) Safe Schools/Healthy Students project (Lawrence County Schools)
- 2009, Hampton City Schools GEAR UP program, in association with Old Dominion University (Hampton City Schools)
- 2007, Development of a Web-Based Institutional Audit for Student Retention (Lumina Foundation for Education)

000024
Exhibit 50

- 2007, An Evaluation of the Reading First Program (North Carolina Department of Public Instruction)
- 2007, An Evaluation of the NACME Scholarship Program (NACME, Inc.)
- 2007, A Policy Analysis of No Child Left Behind and its impact on Students with Disabilities (National Council on Disabilities, 2006-07)
- 2007, Development of an Online Database of Best Practices in Student Retention (TG, Texas Guaranty Student Loan Corporation)
- 2006, An Analysis of Student Aid Trends in California (EdFund)
- 2006, Kentucky Postsecondary Education Comprehensive Affordability Analysis (Kentucky Council on Postsecondary Education)
- 2005, An Evaluation of the KIPP Schools Program (KIPP Foundation)
- 2006, An Analysis of the President's FY2007 Budget for Science and Education (American Association for the Advancement of Science)
- 2005, An Analysis of the Impact of Postsecondary Education on the Economic and Social Well-Being of American Society (Bill & Melinda Gates Foundation)
- 2005, A Study of Secondary Counseling in Missouri (MOHELA)
- 2000, A National Survey of Pre-College Outreach Programs (College Board)

## SELECTED PUBLICATIONS

Swail, Watson S. (2015 expected). *The ROI of Higher Education (editor)*. New York, NY: Teachers College Press.

Swail, Watson S. (2015). *Educated Thoughts: Perspectives from one of America's Leading Educators*. Virginia Beach, VA: Education Policy Institute Press.

Swail, Watson S. (2014, June). *"A Different Viewpoint on Student Retention." Higher Learning Research Communications. Volume 4, Number 2.*

Swail, Watson S. (2013). "Roundtable: Finding Superman Editor Responds." *Journal of School Choice* (7:94-97). London, UK: Taylor & Francis Group.

Swail, Watson S. (Ed.) (2012). *Finding Superman: Debating the Future of Public Education in America*. New York, NY: Teachers College Press.

Swail, Watson S. (Ed.) (2012). "Finding Superman." In Watson Scott Swail's (Ed.) *Finding Superman: Debating the Future of Public Education in America*. New York, NY: Teachers College Press.

Swail, Watson S., Quinn, K., Landis, K., and Fung, M. (2012). *2012 Directory of Pre-College Outreach Programs*. Washington, DC: Educational Policy Institute.

Swail, Watson S., Quinn, K., Landis, K., and Fung, M. (2012). *A Blueprint for Success: Case Studies of Successful Pre-College Outreach Programs*. Washington, DC: Educational Policy Institute.

Swail, Watson S. (2011). "In Search of a Better Mousetrap: A Look at Higher Education Ranking Systems." *College & University*. AACRAO: Washington, DC.

000025
Exhibit 50

Swail, Watson S., Dickerson, Shawn, and White, Rachel (2010). *National Disability Policy: A Progress Report.* Washington, DC: National Council on Disability.

Swail, Watson S., Broff, Nancy, and Faubert, Jenny (2010). *Graduating At-Risk Students: A Cross-Sector Analysis.* Washington, DC: Imagine America Foundation.

Swail, Watson S., Broff, Nancy, and Faubert, Jenny (2009, August). "Leveling the Playing Field for All Schools, Including Career Colleges." *Career Education Review.* Oshkosh, WI: Workforce Communications. Pp. 53-58.

Shaffer, Patricia Moore, and Swail, Watson S. (2009, October). Making Decisions about Teacher Professional Development: Practices in 8 Alabama School Districts. Evidence-Based Education Request Desk, Regional Education Laboratory, Southeast SERVE Center.

Swail, Watson S., Jaeschke, Sarah, and Rasmussen, Chris (2009, October). *Measuring Up – A Midwestern Perspective on the National Report Card — 2002 to 2008.* Minneapolis, MN: Midwestern Higher Education Compact.

Swail, Watson S., Mullen, Rebecca, Gardner, Hyniea, and Reed, Jeremy (2008, February). *Engaging Faculty and Staff: An Imperative for Fostering Retention, Advising, and Smart Borrowing.* Round Rock, TX: Texas Guaranteed Student Loan Corporation.

Swail, Watson S., and Usher, Alex (2008, February). *Commentary 2007.* Virginia Beach, VA: Educational Policy Institute.

Swail, Watson S., and Brand, Betsy (2008, January). *The No Child Left Behind Act and the Individuals with Disabilities Act: A Progress Report.* Washington, DC: National Council on Disability.

Swail, Watson S. (2008, January). A Clear and Present Danger to Institutional and Student Success: A training model for embedding student loan default aversion within strategic enrollment management. Round Rock, TX: Texas Guaranteed Student Loan Corporation.

Swail, Watson S., Willis, Ronald C., and Mullen, Rebecca M. (2007, December). *Decision 2008.* Virginia Beach, VA: Educational Policy Institute.

Swail, Watson S. and Hosford, Sarah (2007, November). *Missouri Students and the Pathways to College.* Virginia Beach, VA: Educational Policy Institute.

Baumann, Paul, Cabrera, Alberto, and Swail, Watson S. (2007, October). *An Annotated Bibliography of Latino Educational Research.* Virginia Beach, VA: Educational Policy Institute.

Swail, Watson S., and Usher, Alex (2007, September). *Commentary 2006.* Virginia Beach, VA: Educational Policy Institute.

Swail, Watson S. (2006, September). "The Buy-In Challenge." *Student Success.* Virginia Beach, VA: Educational Policy Institute.

Swail, Watson S. (2006, May). "Strategies to Increase Student Success." *Student Success.* Virginia Beach, VA: Educational Policy Institute.

000026
Exhibit 50

Swail, Watson S. (2006, March). "Barriers to Student Retention and Success on Campuses." *Student Success.* Virginia Beach, VA: Educational Policy Institute.

Swail, Watson S. (2006, January). "Seven Guiding Questions for Student Retention." *Student Success.* Virginia Beach, VA: Educational Policy Institute.

Swail, Watson S. (2006). *California Trends in Student Aid: 1994-95 to 2003-04.* Rancho Cordova, CA: Edfund.

Swail, Watson S., Hosford, Sarah, Chubin, Daryl, Malcom, Shirley, and Pomerance, Laura (2006). "Education and Human Resources in the FY 2007 Budget." *In AAAS Report XXXI: Research and Development FY 2007*: Washington, DC: American Association for the Advancement of Science (AAAS).

Williams, Adriane, and Swail, Watson S. (2005). *Focus on Results: An Academic Impact Analysis of the Knowledge is Power Program (KIPP).* Virginia Beach, VA: Educational Policy Institute.

Swail, Watson S., Chubin, Daryl, Malcom, Shirley, and Grogan, Kathryn (2005). Education and Human Resources in the FY 2006 Budget. In AAAS Report XXX: Research and Development FY 2006: Washington, DC: American Association for the Advancement of Science (AAAS).

Swail, Watson S. and Williams, Adriane (2005, June). "The No Child Left Behind Act of 2001 and the Pathways to College Network Framework: Mutually Supportive Visions and Complementary Goals." *Research Brief.* Honolulu, HI: Pacific Resources for Education and Learning.

Williams, Adriane, and Swail, Watson S. (2005). Is More Better? The Impact of Postsecondary Education on the Economic and Social Well-Being of American Society. Washington, DC: Educational Policy Institute.

Swail, Watson S., Cabrera, Alberto, Lee, Chul, and Williams, Adriane (2005). *Latino Students & the Educational Pipeline.* Washington, DC: Educational Policy Institute.

Swail, Watson S., and Cabrera, Alberto (2004). *Latino Youth and the Pathway to College.* Washington, DC: Pew Hispanic Center.

Swail, Watson S. (2004). "Value Added: The costs and benefits of college preparatory programs in the United States." In Tierney, Corwin, & Colyar (Eds.) *Preparing for College: Nine Elements of Effective Outreach.* Albany, NY: SUNY Press.

Swail, Watson S. (2004). The Affordability of University Education: An Analysis of Higher Education in Canada and the United States. Montreal, QC: Canada Millennium Scholarship Foundation.

Swail, Watson S. (2004). *Changes in Tuition Policy: Natural Policy Experiments in Five Countries.* Montreal, QC: Canada Millennium Scholarship Foundation.

Swail, Watson S. (2004). "Legislation to Improve Graduation Rates Could Have the Opposite Effect." *The Chronicle of Higher Education.* Volume 50, Issue 20, P. B16.

Swail, Watson S., Redd, Kenneth, and Perna, Laura (2003). *Retaining Minority Students In Higher Education.* An ASHE-ERIC Reader. San Francisco. CA: Jossey-Bass.

000027
Exhibit 50

Swail, Watson S. (2003). *Trends in Student Aid and College Pricing FLORIDA, 1997-98 to 2001-02*. Tallahassee, FL: Council on Postsecondary Research and Improvement, The Florida Legislature.

Perna, Laura W., and Swail, Watson S. (2002). "Pre-College Outreach and Early Intervention Programs." In Heller's *Condition of Access*. Westport, CT: Praeger Publishers and the American Council on Education.

Swail, Watson S. (2002, July-August). "Higher Education and the New Demographics." *Change*, v. 34 No. 4, pp. 15-23. A publication of the Helen Dwight Reid Educational Foundation and the American Association for higher Education. Washington, DC: Heldref Publications.

Swail, Watson S., and Perna, Laura W. (2002). "Pre-College Outreach Programs: A National Perspective." In Tierney and Hagedorn's *Increasing Access to College*. Albany, NY: State University of New York Press.

Swail, Watson S., Gladieux, Lawrence E., and Lee, John B. (2001). The California Dream and It's Future: Indicators of Educational and Economic Opportunity in the Golden State. Rancho Cordova, CA: EdFund, Inc.

Swail, Watson S., and Kampits, Eva (2001). "Distance Education & Accreditation—Riding a Tide of Opportunity. In Ratcliff and Lubinescu's (Eds) *Making the Connection Between Accreditation and Learning Outcomes,* a New Directions in Higher Education Sourcebook. San Francisco, CA: Jossey-Bass Publishers.

Swail, Watson S., and Roth, David (2001*). "The Role of Outreach in the Effort to Reform Our Schools." In the ERIC Review themed journal, *Early Intervention for College Programs*, Carol Boston (editor). Washington, DC: ERIC Clearinghouse for Higher Education.

Perna, Laura, Fenske, Robert, and Swail, Watson S. (2001). "Overview of Early Intervention Programs." In the ERIC Review themed journal, *Early Intervention for College Programs*, Carol Boston (editor). Washington, DC: ERIC Clearinghouse for Higher Education.

Swail, Watson S., and Roth, David (2001). *Certification and Teacher Preparation in the United States*. A report prepared for the Pacific Resources for Education and Learning (PREL). Honolulu, HI: PREL.

Swail, Watson S. (2000). "Preparing America's Disadvantaged for College: Programs That Increase College Opportunity." In Cabrera and La Nasa's (Eds) *Understanding the College Choice of Disadvantaged Students*. A New Directions for Institutional Research Publication. San Francisco, CA: Jossey-Bass Publishers.

Swail, Watson S. (2000). "Educational Opportunity and the Role of Pre-College Outreach Programs." In *2001 Outreach Program Handbook*. New York, NY: The College Board, pp. viii-xiii).

Swail, Watson S., and Perna, Laura W. (2000). "A View of the Landscape." In *2001 Outreach Program Handbook*. New York, NY: The College Board, pp. xvii-xxxvi).

Gladieux, Lawrence E., and Swail, Watson S. (May, 2000). "Beyond Access: Increasing the Odds of College Success." *Phi Delta Kappan*. Indianapolis, IN.

000028
Exhibit 50

Swail, Watson S. and Holmes, Dennis (March 2000). "Minority Student Persistence: A Framework for Retention." In Sheila T. Gregory (ed.) *The Academic Achievement of Minority Students: Perspectives, Practices, and Prescriptions*. The University Press of America: Lanham, MD.

Gladieux, Lawrence E., and Swail, Watson Scott (January, 2000). "Is College Affordable? Sorting Perception and Reality." Policy Brief. *The College Board Review*. No. 189/190. New York, NY: The College Board.

Gladieux, Lawrence E., and Swail, Watson Scott (1999). "The Virtual University and Educational Opportunity: Panacea or False Hope?" *Higher Education Management*. Volume 11, No. 2, pp. 43-56.

Galloway, Fred J., and Swail, Watson Scott (November 1999). Institutional Retention Strategies at Historically Black Colleges and Universities and Their Effects on Cohort Default Rates: 1987-1995. Washington, DC: Sallie Mae Education Institute.

Gladieux, Lawrence E., and Swail, Watson S. (1999). "Who Will Have Access to the Virtual University?" *AAHE Bulletin*. Washington, DC: American Association for Higher Education.

College Board, The (1999, October). *Trends in Student Aid 1999*. New York, NY: The College Entrance Examination Board.

College Board, The (1999, October). *Trends in College Pricing 1999*. New York, NY: The College Entrance Examination Board.

Gladieux, Lawrence E., Swail, Watson S., and Carvajal, Ermelinda (August, 1999). *California Trends in Student Aid 1999*. San Jose, CA: EdFund, Inc.

Gladieux, Lawrence E., and Swail, Watson S. (1999). "The Virtual University and Educational Opportunity: Issues of Equity and Access for the Next Generation." *Policy Perspectives*. New York, NY: The College Entrance Examination Board.

Gladieux, Lawrence E., and Swail, Watson S. (1999). "Financial Aid is Not Enough: Improving the Odds of College Success." In Jacqueline King (ed.) *Financing a College Education: How it works, how it's changing*. Washington, DC: ACE/Oryx Press.

Gladieux, Lawrence E., Astor, Bart, and Swail, Watson S. (1998). *Memory, Reason, and Imagination: A Quarter Century of Pell Grants*. New York, NY: The College Entrance Examination Board.

Gladieux, Lawrence E., and Swail, Watson S. (1998*)*. "Postsecondary Education:  Student Success, Not Just Access." In S. Halperin (ed.) *The Forgotten Half Revisited — 1998*. Washington, DC: American Youth Policy Forum.

Swail, W. S. (1995). *A conceptual framework for student retention in science, engineering, and mathematics*. A dissertation conducted at the George Washington University, Washington, D.C.

Ritz, John M., and Swail, Watson S. (1994, Winter/Spring). "Technology Assessment: Integrating Technology, People, and the Environment." *The Journal of Technology Studies*. 20 (1), pp. 51-56.

Swail, Watson S. (1993, Summer). "Year -Round Schools: A Real Possibility in the New Wave of Education." *Journal of the Virginia Technology Education Association*, pp. 2-5, 11.

000029
Exhibit 50

Swail, Watson S. (1992, March). "Forecasting for the Future: The Foundation of a Technology Assessment." *The Technology Teacher*. pp. 23-29.

## SELECTED PRESENTATIONS

Swail, Watson S. (November 2, 2012). What does the future hold? A presentation at the Learning to Earning: Higher Education and the Changing Job Market, sponsored by the Higher Education Quality Council of Ontario (HEQCO) and the Educational Policy Institute, November 1-2, 2012, Toronto, ON.

Swail, Watson S. (May 22, 2012). *Finding Superman... and Other Stories.* A presentation for the Ohio Legislative Caucus, Columbus, Ohio.

Swail, Watson S., and Quinn, Kate (April 16, 2012). *SciTech—Initial Outcomes of a Magnet-School Start-Up.* A presentation at the AERA Conference in Vancouver, BC.

Swail, Watson S., Quinn, Kate, & Kalvesmaki, Andrea (April 16, 2012). *Assessing the Effectiveness of a GEAR UP Program: An Evaluative Case Study.* A presentation at the AERA Conference in Vancouver, BC.

Swail, Watson S., and Quinn, Kate (April 16, 2012). *The Role of College Access Programs in College Completion: Case Studies of Promising Practices.* A presentation at the AERA Conference in Vancouver, BC.

Swail, Watson S. (October 27, 2011). "Critical Reflections and Comparative Policy Perspectives. Presentation at the *Achieving Equity through Innovation: A Canada-United States Colloquium*, Toronto, ON, sponsored by the Canadian Education Association (CEA) and the Stanford Center for Opportunity Policy in Education (SCOPE).

Swail, Watson S. (September 23, 2011). Private higher education: Its place in higher education system and its role in development of mass higher education, enhancement knowledge and innovation. Presentation at the Private Higher Education and Its Contribution to Enhancement of Innovation Potential of Europe in the Global Competitive Environment conference, Warsaw, Poland.

Swail, Watson S. (December 14, 2010). Saving Lives: Strategies that help students prepare, apply, enroll, and succeed in higher education. OCAN/OASFAA Annual Conference, Columbus, OH.

Swail, Watson S., and Collier, Harvest (November 9, 2010). *Road Map to a Campus-Wide Retention Program.* Presentation at the 2010 AACRAO SEM Conference, Nashville, TN.

Swail, Watson S. (November 7, 2010). *In Search of a Better Mousetrap: A Look at Higher Education Ranking Systems.* Presentation at the AACRAO Executive Forum, Nashville, TN.

Swail, Watson S. (October 27, 2010). Closing Keynote at the University of Toronto/Stanford School of Education Conference on Teaching and Learning, Toronto, ON.

Swail, Watson S. (October 20, 2010). *The Fierce Urgency of Now.* A keynote presentation to the NavityMiguel Conference, Washington, DC.

000030
Exhibit 50

Swail, Watson S. (December 9, 2010). *College Readiness and Rigorous Opportunities for All Students*. AVID National Conference, Dallas, TX.

Swail, Watson S. (May 21, 2010). *Seeding the Knowledge Economy: Education and Economic Development*. Presentation at The Council of State Governments' Economic Summit of the States, New York, NY.

Swail, Watson S. (April 23, 2010). *Retaining Students in Higher Education*. A presentation to the faculty and staff of Columbus State Community College, Columbus, OH.

Swail, Watson S. (May 7, 2010). *Defining Student Success at Fanshawe College*. A presentation to the Board of Governors of Fanshawe College, London, ON.

Swail, Watson S. (Various, 2010). *Importance of K-12 and College Readiness Standards in the United States*. Presentations with the Council of State Governments in Miami, FL (April 18-19), Washington, DC (April 28-29), Chicago, IL (May 2-3), and Honolulu, HI (June 21).

Swail, Watson S. (November 12, 2010). *America's Educational System Goes Back to School*. Presentation to The Council of State Governments 2009 Annual Conference, La Quinta, CA.

Swail, Watson S. (September 17-18, 2009). *International Forum on Student Retention,* Bogota, Colombia.

Swail, Watson S. (October 14, 2009). *Educational Access & Success with an EDGE*. A presentation to Traveler's Insurance, Hartford, CT.

Swail, Watson S. (October 5, 2009). *Retaining Students in Private Higher Education in Virginia*. A presentation to the Virginia Foundation for Independent Colleges, Charlottesville, VA.

Swail, Watson S. (August 12, 2009). *A History of College Access & Success*. Ohio College Access Network, Columbus, OH.

Swail, Watson S. (July 21, 2009). *Evaluation Strategies for GEAR UP Programs*. A presentation at the NCCEP National Conference, San Francisco, CA.

Swail, Watson S. (November 7, 2008). *Retention 101: A Primer with a Plan*. A Keynote Presentation to the Staff of El Centro Community College, Dallas, TX.

Swail, Watson S. (October 17, 2008). *Talking Progress: Moving from Challenges to Solutions for Latino Students and American Society*. A presentation at the NASPA Student Affairs Administrators in Higher Education Annual Conference, San Antonio, TX.

Swail, Watson S., Orr, Dominic, Vossensteyn, Hans, and Dobson, Ian (August 27, 2007). *Increasing Student Retention and Persistence in Higher Education: An International Perspective*. A Presentation at the European Association for Institutional Research (EAIR) Conference, Innsbruck, Austria.

Swail, Watson S. (January 29, 2007). *Evaluation Strategies for College Access Programs*. An online presentation for the National Council Higher Educational Loan Programs (NCHELP).

Swail, Watson S. (June 14, 2006). Latino Students and the Educational Pipeline. A presentation to the College Board's Latino Task Force, Washington, DC.

Swail, Watson S. (May 18, 2006). Trends that will Change the Face of Higher Education. Presentation at the North East Loan Authority (NELA) meeting, Seattle, WA.

Swail, Watson S. (April 25, 2006). Seven Guiding Questions for Student Retention. A presentation to the Southwest Regional P-16 Conference, Austin, TX.

Swail, Watson S. (March 31, 2006). Keeping Latino Students in School: A Framework for Understanding Student Persistence. A presentation at the Innovative Educators Conference, San Diego, CA.

Swail, Watson S. (March 28, 2006). Changing Latino Lives: Undertaking the Difficult Work of Institutional and Cultural Change. A presentation at the National Latino Education Summit, San Juan, PR.

Swail, Watson S. (February, 2006). Serving Students: Recommitting Ourselves to What Matters Most. A presentation at Red River College, Winnipeg, MB.

Swail, Watson S. (February, 2006). Trends that will Change the Face of Higher Education. Presentation at the Sallie Mae Annual Meeting, Miami, FL.

Swail, Watson S. (January, 2006). From Here to Eternity: A Love Story or Slasher Flick: You Decide. A presentation at the National Council on Higher Education Loan Programs (NCHELP) conference, Los Angeles, CA.

Swail, Watson S. (November 17, 2005). The Cost of Student Retention. A presentation for the Canada Student Loans Program, Default Management Workshop, Montreal, QC.

Swail, Watson S. (October 2005). Breaking Down Institutional Barriers to Improve Student Success. A presentation to the faculty at Palm Beach Community College, West Palm Beach, FL.

Swail, Watson S. (August 2005). Postsecondary Access and Success in Colorado. A presentation to the Colorado Minority Success Task Force, Denver, CO.

Swail, Watson S. (August 30, 2005). Latino Students and the Educational Pipeline. A presentation to the Western Interstate Council on Higher Education (WICHE), Boulder, CO.

Swail, Watson S. (June 21, 2005). Latino Students and the Educational Pipeline. A presentation to the Texas Higher Education Coordinating Board, Austin, TX.

Swail, Watson S. (May 30, 2005). Changes in Tuition Policy. A presentation at the Association for Institutional Research, San Diego, CA.

Swail, Watson S. (April 2005). Serving Students: The Role of Financial Aid in Student Retention. A presentation at the Ohio Association for Student Financial Aid Association (OASFAA) Annual Conference, Akron, OH.

Swail, Watson S. (January 15, 2005). Access, Cost, and Quality: One Analyst's Weltanschauung. A presentation at the European Association for Institutional Research (EAIR) winter symposium, Miami, FL.

000032
Exhibit 50

Swail, Watson S., and Sean Junor (November 12, 2003). *Changes in Tuition Policy: Natural Policy Experiments in Five Countries.* A presentation at the Association for the Study of Higher Education (ASHE), Portland, OR.

Swail, Watson S., and Patrick Terenzini, Alberto Cabrera, and Andrea Venezia (November 12, 2003). Public Policy to Increase Access to Postsecondary Education. A presentation at the Association for the Study of Higher Education (ASHE), Portland, OR.

Swail, Watson S., and Sean Junor (Monday, October 22, 2003). *The Impact of Tuition Policies on Access and Affordability: An International Comparison.* A Presentation at the Council for Institutional Research and Planning Association (CIRPA), Halifax, NS.

Swail, Watson S., and Sean Junor (October 13, 2003). *The Impact of Tuition Policies on Access and Affordability: An International Comparison.* A Presentation at the Council for Institutional Research and Planning Association (CIRPA), Halifax, NS.

Swail, Watson S. (October 2, 2003). *The Affordability of University Education: An Analysis of Higher Education in Canada and the United States.* A presentation at the annual research conference of the Canada Millennium Scholarship Foundation, Ottawa, ON.

Swail, Watson S., and Lee, John (September 22, 2003). *Retention: Preparing Students for Postsecondary Success.* A presentation at the National College Access Network annual conference. Crystal City, VA.

Swail, Watson S., and Alex I. Usher (August 22, 2003). *The Impact of Tuition Policies on Access and Affordability: An International Comparison.* A Presentation at the European Association for Institutional Research, Limerick, IR.

Swail, Watson S. (June 16, 2003). *University Reform and Accessibility of Higher Education. An Annotation of the U.S. Experience.* A presentation at the Conference on University Reforms and Access to Higher Education, Prague, CZ, June 15-17, 2003.

Swail, Watson S. (May 20, 2003). *Quality Assurance in Higher Education: An International Perspective.* Panel discussion at the Association for Institutional Research Annual Conference, Tampa, FL.

Swail, Watson S. and Pat Dallet (May 22, 2003). *Florida Financial Aid Trends Report.* Project Findings. A presentation at the Florida Assocation for Student Financial Aid Administrators (FASFAA), Orlando, FL.

Swail, Watson S., John B. Lee, and Lana Muraskin (May 15, 2003). *Findings from a National Study of Student Retention.* A presentation at the Student Aid Research Conference, Annapolis, MD.

Swail, Watson S., and Usher, Alex (May 15, 2003). *The Impact of Tuition Policies on Access and Affordability: An International Comparison.* A presentation at the Student Aid Research Conference, Annapolis, MD.

Swail, Watson S. and David Wright (October 30, 2002). *Florida Financial Aid Trends Report.* A presentation at the Florida Assocation for Student Financial Aid Administrators (FASFAA), Destin, FL.

Swail, Watson S. (October 5, 2002). *Closing the Gap: Progress Toward Accessibility.* A presentation at the Coalition of Urban and Metropolitan Universities, Vancouver, BC.

000033
Exhibit 50

Swail, Watson S. (September 24, 2002). *Ten Critical Factors: Pathways to College Opportunity for Our Youth.* A presentation at the National College Access Network Annual Conference, Cleveland, OH.

Swail, Watson S. and Ken Redd (June 4, 2002). *Retaining Minority Students at Four-Year Colleges and Universities.* A presentation at the AIR conference, Toronto, ON.

Swail, Watson S. (April 5, 2002). *Pre-College Programs In America.* A presentation at the Canada Millennium Scholarship Foundation's Annual Conference, Ottawa, ON.

Swail, Watson S. (June 29, 2001). *The Role of Pre-College Programs and College Opportunity in America.* A presentation at the CalSOAP Summit, June 7-9, 2001, Oakland, CA.

Swail, Watson S. (June 4, 2001). *The Role of Higher Education and the New Demographics.* Presented at 2001 Forum of the Association for Institutional Research (AIR), Long Beach, CA.

Swail, Watson S. and others (May 10, 2001). *Higher Education Finance and Economic Opportunity in the Golden State.* A presentation at the NASSGAP/NCHELP Research Conference, Seattle, WA.

Swail, Watson S. and Kampits, Eva (April 4, 2001). *The Role of Accreditation in the Information Age: An American Perspective on an International Affair.* A presentation at the International Council of Distance Education (ICDE) Annual Conference, Dusseldorf, Germany.

Swail, Watson S. and others (November 15, 2000). *Swimming Again the Tide: A discussion of low-income families and college opportunity.* A presentation at the Association for the Study of Higher Education (ASHE) conference, Sacramento, CA.

Swail, Watson S. (2000). Preparing America's Disadvantaged for College: Programs that Increase College Opportunity. In A. F. Cabrera and S. M. La Nasa (Eds.), *New Directions for Institutional Research: No. 107. Understanding the College Choice of Disadvantaged Students* (pp. 85-101). San Francisco, CA: Jossey-Bass.

Swail, Watson S., and David Roth (July 26, 2000). *ConnectED 2000 and implications for the Pacific Island nations.* A presentation at the PREL Conference, Koror, Republic of Palau.

Swail, Watson S. (June 5, 2000). *Cyberlearning and Educational Opportunity,* plus *Early Intervention Programs–A National Perspective.* Two presentations to the National TRIO Directors' Conference, Miami Beach, VA.

Swail, Watson S. (June 5, 2000). *School-to-Work and the SAT*: An Analysis of the 1999 Student Descriptive Questionnaire Data Set with Respect to Students with School-to-Work Type-Experience. Paper prepared for the National School to Work Office.

Swail, Watson S. (April 20, 2000). *Trends in College Pricing, Student Aid, and Virtual Instruction.* Presentation to the Virginia Association of Management Analysis and Planning.

Swail, Watson S. (March 2, 2000). *Pre-College Outreach Programs and the Pacific Islands.* A workshop for educational leaders from the Hawaiian Islands and other pacific islands. Sponsored by the Pacific Resources for Educational Leadership (PREL), Honolulu, HI.

000034
Exhibit 50

Swail, Watson S. (December 9, 1999). *Federal and State Trends in College Pricing and Student Aid*. A presentation to the Ohio Association of Student Financial Aid Administrators (OAFSAA), Columbus, OH.

Swail, Watson S. (December 3, 1999). *Narrowing the Digital Divide — Assessing the Impact on Educational Opportunity and Access for all Students.* A presentation at the 114th Annual Meeting of the New England Association of Schools & Colleges, Inc. Boston, MA.

Swail, Watson S. (November 22, 1999). *A National Perspective on College Outreach.* A keynote presentation at the "Collaboration" conference sponsored by the Minnesota Higher Education Services Office. Metropolitan State University, St. Paul, MN.

Swail, Watson S. (November 16, 1999). *Trends in College Pricing and Student Aid 1999.* A presentation to the Virginia Association of Management Analysis and Reporting. Norfolk, VA.

Swail, Watson S. (November 9, 1999). *Pre-College Programs: A National Perspective.* A presentation for the Consortium of Universities of the Washington Metropolitan Area, Washington, DC.

Swail, Watson S. (October 28, 1999). *Do Pre-College Outreach Programs Really Work?* A Panel Discussion. A presentation at the College Board's National Forum. San Diego, CA.

Gladieux, Lawrence E., and Watson Scott Swail (October 26, 1999*). Virtual University and Educational Opportunity.* A presentation at the EDUCAUSE Convention. Long Beach, CA.

Swail, Watson S. (October 15, 1999). *Access and Opportunity Via the Internet.* A presentation at the New York Academy of Sciences conference, "Virtual Higher Education: Critical Perspectives." October 15, 1999, Hunter College, New York City, NY.

Swail, Watson S. (July 9, 1999). *The Convergence of K-12 and Higher Education in America.* A presentation at the 8th Annual European Access Network Conference, Malta, July 7-10, 1999.

Gladieux, Lawrence E., and Swail, Watson S. (1999). *Financial Aid is Not Enough.* A presentation at the NASSGAP/NCHELP Research Conference, May 6, 1999, Savannah, GA.

Swail, Watson S., and Holmes, Dennis (1999). *Minority Student Persistence: A Model for Colleges and Universities.* A paper presented at the 1999 American Educational Research Association (AERA) Annual Conference, April 21, 1999, Montreal, Quebec.

Perna, Laura, and Swail, Watson S. (1998). *Early Intervention Programs: How Effective are they at Increasing Access to College?* Paper presented at the 1998 ASHE conference, November 7, 1998, Miami, FL.

Gladieux, Lawrence E., and Swail, Watson S. (1998). *The Virtual University and Educational Opportunity: Panacea or False Hope.* A paper presented at the Conference on the Lifelong Learning Challenge: Competition or Co-operation, Programme on Institutional Management in Higher Education Organization for Economic Co-operation and Development (OECD), Paris, France, September 7, 1998.

Swail, Watson S. (1998). *Recruitment and Retention of Minority Students: Best Practices.* A presentation to the Virginia Commission on Access and Diversity in Higher Education, State Legislature, Richmond, Virginia, August 28, 1998.

000035
Exhibit 50

Swail, Watson S. (1998). *Preparation, Access, and Persistence: Three Arease of Focus Toward Equal Opportunities for all Students.* A presentation to the State Council of Higher Education for Virginia, Virginia Beach, VA, June 4, 1998.

Swail, Watson S., Davis, J., and Galloway, F. (1998). *Institutional Retention Strategies at HBCUs and Their Effect on Cohort Default Rates.* Paper presented at the Association for Institutional Research Annual Conference, May 18, 1998, Minneapolis, MN.

Swail, Watson S. (1995). *A Framework for Student Retention at Minority Institutions of Higher Education.* Paper presented at the 1995 National Conference for Higher Education for Black Student Retention, November 12-17, Washington, DC.

Swail, Watson S. (1995). *A Geometric Theory of Persistence and Achievement.* Paper presented at the 1995 National Conference for Higher Education for Black Student Retention, November 12-17, Washington, DC.

Swail, Watson S. (1993). *The Inventor Card: Getting Children Motivated to Learn about Inventors and Inventions.* Paper presented at the 1993 International Technology Education Association International Conference, Charlotte, NC.

Ritz, John M., and Swail, Watson S. (1992*). Technology Assessment: Integrating Technology, People and the Environment.* Paper presented at the 1992 International Technology Education Association International Conference, Minneapolis, MN.

# EXHIBIT B

Conference Call Transcripts:
  March 2, 2010
  May 3, 2010
  November 2, 2010
  March 1, 2011
  May 3, 2011
  November 11, 2011
  December 7, 2011
  March 6, 2012
  May 1, 2012

ITEM No. 1:  A Context for Retention and Graduation at Ashford University
Excerpts from Lead Plaintiffs' Objections and Responses to Defendant Bridgepoint's First Set of
Interrogatories, dated March 26, 2015
Order granting in part Defendants' Motion to Dismiss dated September 13, 2013
WASC Action Letter dated July 3, 2012
WASC Action Letter dated July 10, 2013
Excerpts from the Report of the WASC Pathway B Visit Team, March 11-16, 2012

The following production documents:

BPI011343
BPI013143
BPI013272
BPI020905
BPI028911
BPI028920
BPI034553
BPI034980
BPI051235
BPI053415
BPI053809
BPI055448
BPI055650
BPI074679
BPI074681
BPI088222
BPI092825
BPI095222
BPI095273
BPI096096
BPI096130
BPI095359

1

BPI096573
BPI097346
BPI097472
BPI100537
BPI106831
BPI108568
BPI109835
BPI139976
BPI143357
BPI143358
BPI145661
BPI146111
BPI156733
BPIK000015501
BPIK000017342
BPIK000017910
BPIK000022789
BPIK000063673
BPIK000063679
BPIK000067051
BPIK000076247
BPIK000144280
BPIK000191422
BPIK000418097
BPIK000427021
BPIK000690909
BPIK000703567
BPIK000703607
BPIK000704104
BPIK000706054
BPIK000706056
BPIK000706441
BPIK000706442
BPIK000706448
BPIK000716948
BPIK000716951
BPIK000716954
BPIK000716976
BPIK000716999
BPIK000717001
BPIK000721580
BPIK000721581
BPIK000721592
BPIK000721613
BPIK000737333
BPIK000759675
BPIK000762620
BPIK000825208
BPIK000830034

2

BPIK000910040
BPIK000910041
BPIK000912534
BPIK001013018
BPIK001013019
BPIK001016717
BPIK001016718
BPIK001017197
BPIK001017201
BPIK001017202
BPIK001237977
BPIK001253238
BPIK001285904
BPIK001316190
BPIK001316191
BPIK001316222
BPIK001412905
BPIK001412908
BPIK001412909
BPIK001412910
BPIK001433246
BPIK001433247
BPIK001433248
BPIK001434082
BPIK001440277
BPIK001440280
BPIK001539264
PRTHN00007683
PRTHN00007825
PRTHN00023086
WASC 011593

000039
Exhibit 50

# EXHIBIT 51

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re BRIDGEPOINT EDUCATION, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Civil Action No. 3:12-cv-01737-JM-JLB<br><br>CLASS ACTION |

REPORT ON STUDENT PERSISTENCE

PROFESSOR AMAURY NORA, ED.D.

May 2015

000040
Exhibit 51

# TABLE OF CONTENTS

**Page**

**SCOPE OF PROJECT AND REPORT** ................................................................... 1

**SUMMARY** ............................................................................................................ 1

**CREDENTIALS** ..................................................................................................... 2

**FACTUAL BACKGROUND** .................................................................................. 5

**RELATIONSHIPS BETWEEN INITIATIVES AND STUDENT PERSISTENCE** .............. 5

Overview of Literature on Student Retention .................................................. 6

Retention Improvement Initiatives .................................................................. 7

Student Success Orientation Course ............................................................... 7

Peer Review Process ........................................................................................ 9

Mandatory Walk to Class Webinar ................................................................. 10

Constellation ................................................................................................... 10

Smaller-Class-Size .......................................................................................... 11

Student Advisor Transition ............................................................................. 12

All docs in" Requirement (Financial Aid Plan) ............................................. 13

Mobile Learning Experience (MLE) .............................................................. 14

Writing Reviser ............................................................................................... 15

At Risk" Warning System (REAL Dashboard) .............................................. 15

Admissions Vertical Integration ..................................................................... 16

Waypoint Outcomes Project ............................................................................ 17

Full-Time Faculty Hiring ................................................................................ 17

Key Student Support Services Available to Students ..................................... 18

**EXHIBITS** ........................................................................................................... 23

Exhibit-1 Documents and Other Information Reviewed and Relied Upon ..................... 24

Exhibit-2 Curriculum Vitae ............................................................................ 34

Exhibit-3 Student Engagement Model (Nora, 2003) ...................................... 78

<u>**SCOPE OF PROJECT AND REPORT**</u>

1. I was asked by Wilson, Sonsini, Goodrich & Rosati, counsel for Defendants, to determine whether certain student support initiatives implemented between 2010 and early 2012 could reasonably have been expected to be conducive to improving student persistence.

2. Toward this end, I analyzed the different student support initiatives and the factors that are generally accepted as impacting minority and non-minority student persistence. I examined Company press releases, conference call transcripts, institutional research executive summaries, PowerPoint presentations, Company reports, as well as other pertinent data and documents. Exhibit-1 lists the documents I reviewed and relied upon in the course of this engagement.

3. This report presents my methodology, findings, and conclusions.

4. I reserve, in my sole discretion, the right to make any corrections or additions to my report, and to modify my opinion, should any new or additional evidence become available.

<u>**SUMMARY**</u>

5. In 2011, the Ashford President made it clear that student retention and success were the institution's priorities and instructed that "retention efforts be managed at the Cabinet level, with a strong cross-functional approach based on a foundation of sophisticated and deep data analysis" (BPI034548). Ashford University implemented student support initiatives that were specifically aimed, directly or indirectly, at improving student persistence. Those initiatives included: a) the Student Success Orientation Course, b) Peer Review Process, c) Mandatory Walk to Class Webinar, d) Constellation, e) Smaller-Class-Sizes, f) Student Advisor Transition, g) "All docs in" Requirement (Financial Aid Plan), h) Mobile Learning Experience, i) Writing Reviser, j) At-Risk Warning System (REAL Dashboard), k) Admissions Vertical Integration, l) Waypoint Outcomes Project, and m) Full-time Faculty Hiring. In addition, Ashford University provided a variety of student support services.

6. All of the programmatic objectives and activities incorporated in the initiatives were consistent with strong conceptual- and evidence-based research in the literature. That research establishes links between different cognitive and psychosocial factors

1

represented in different theoretical frameworks and student persistence. Thus, it would be logical to expect that the initiatives developed and implemented at Ashford University would lead to the development of those specific factors that directly and positively impacted student retention (See Exhibit-3).

7. All indications are that the combined initiatives were attempts on the part of Ashford University to focus on the issue of student retention and graduation. The initiatives conceptualized and developed were data- or theory-driven and oftentimes informed by best practices in the field. As discussed below, I conclude that, from the very beginning of the implementation of those initiatives, Ashford University provided a variety of student support- and technology-oriented initiatives that would reasonably be expected to improve student persistence based on the higher education literature.

## <u>CREDENTIALS</u>

8. I am Full Professor of Higher Education, Associate Dean for Research for the College of Education and Human Development, and Executive Director for Research Integrity at the University of Texas at San Antonio.

9. I hold an Ed.D. in Higher Education from the University of Houston, a Master of Science degree in Biology from Texas A&I University, and a Bachelor of Arts degree in Zoology from the University of Texas at Austin.

10. At the University of Texas at San Antonio, the University of Illinois – Chicago, and the University of Southern California I have taught doctoral level courses in Linear Structural Modeling in Educational Research, Multivariate Statistics for Non-Experimental Research in Higher Education, Multiple Regression in Educational Research, Psychological Measurement in the Social Sciences, Inferential Statistics in Education, Research Methods I, Research Methods II, Multivariate Statistics in Education, Residency Seminar, The American Community College, Faculty in Academe, and Impact of College on Students: Studies in Postsecondary Education.

11. At the University of Texas at San Antonio, I have served as the Co-Director of the Center for Research and Policy in Education, a research and education center dedicated to the study of student success in postsecondary institutions.

2

12. Currently I serve as a member of a Technical Review Panel for the U.S. Department of Education, the National Center for Education Statistics (NCES), and the National Science Foundation (NSF) (2009 – present) focused on the *National Educational Longitudinal Study, 2000 – 2012*. I have also served as consultant to the American Council of Education, National Advisory Board member for the evaluation of GEAR UP (1999 – 2003), reviewer for the National Research Council in Washington, DC, and evaluator for two major projects, the National Center for Urban Partnerships (NCUP) and the Houston Annenberg Challenge project (1999-2004).

13. I have served as Content Expert on Higher Education, ERIC Steering Committee, Department of Education, 2004-2006; as a panel member on the National Research Council of the National Academies, Ford Foundation Diversity Fellowships Program, 2005, 2006; a consultant on outcomes assessment for the Title V Project, Houston Community College System, 2004-2009; as consultant for the NPEC Project on Student Success funded by the National Center for Education Statistics, U.S. Department of Education, 2003; advisor to the Task Force on Student Enrollment at California State University-Long Beach, June 2002; advisor on standardized testing and minority college admissions and data analysis, NAACP Legal Defense Fund, New York, February-April, 2000; and have provided testimonial on factors affecting the retention of minority students before a panel for the Southern Education Foundation, State Capital, Austin, Texas, February, 1994.

14. This past summer I was asked to develop a knowledge essay along with Dr. Laura Rendon (UTSA) and Dr. Alicia Dowd (USC) for The Higher Education Subcommittee of President Barack Obama's Advisory Commission on Educational Excellence for Hispanics. The essay titled, *Priced Out: A Closer Look at Postsecondary Affordability for Latinos*, was developed for presentation at the Enriching America through the 21st Century: Increasing Latino Postsecondary Completion symposium sponsored by the White House.

15. I have made numerous research paper presentations at professional conferences including the Association for the Study of Higher Education (ASHE), the American Educational Research Association (AERA), the Association for Institutional Research (AIR), the Annual Meeting of the Noel-Levitz Retention Conference, Hispanic Association of

3

Colleges and Universities (HACU) and invited colloquia to organizational and institutions such as the National Meeting of NASME, the Chicano and Latino Access and Retention and Graduation Symposium, CSU-Long Beach, the Gulf Coast Consortium of Instructional Administrators, Transfer Project, the Ministerio de Cultura y Educacion, Seminario: Indicadores Universiarios, Tendencias y Experiencias Internacionales (Buenos Aires, Argentina), and Tribally-Controlled TRIO Programs, U.S. Department of Education.

16. I have served on the editorial boards of and published in *Research in Higher Education*, *The Review of Higher Education*, *The Journal of Higher Education*, *Journal of Hispanic Higher Education, The Journal of College Student Retention: Research and Theory*, and the *AERJ Review of Educational Research*. Other journals I have published in are listed in my curriculum vita, which is attached as Exhibit-2.

17. My recent works specific to student retention include: *Future research on Hispanic students: What have we yet to learn? And What new and diverse perspectives are needed to examine Latino success in higher education?* (2015), *Undergraduate Latina/o students: A systematic review of research identifying factors contributing to academic success outcomes* (2014), *A Re-Conceptualization of Student Engagement* (2011); *Hispanics and Higher Education: An Overview of Research, Theory and Practice* (2009); *Mentoring Students: Conceptualizing and Validating the Multi-Dimensions of a Support System* (2008); *Examining the Tangible and Psychosocial Benefits of Financial Aid with Student Access, Engagement and Degree Attainment* (2006); *How Minority Students Finance their Higher Education* (2001); *Access to Higher Education for Hispanic Students* (2003); *The Current Status of Undergraduates: Real or illusory? (2003)* and *Latina/os in Four-Year Colleges and Universities* (2005). (See Exhibit-2)

18. I served as the Editor of the *Review of Higher Education*, the journal for the Association for the Study of Higher Education (ASHE) from 2004 to 2014.

19. I am a member of the Association for the Study of Higher Education (ASHE), the American Educational Research Association (AERA), and the American Association for Hispanics in Higher Education (AAHHE). I served on the Board of Directors for the Association for the Study of Higher Education and on several committees for the organization.

4

20. My curriculum vitae is attached as Exhibit-2.

21. Defendants are paying me $600 per hour for my work, and reimbursing me for out-of-pocket expenses. My compensation is not contingent upon my opinions and conclusions.

## FACTUAL BACKGROUND

### About the Company

22. Throughout the Class Period, Bridgepoint was a for-profit educational institution. The Company provides postsecondary educational services through two wholly-owned subsidiary academic institutions, Ashford University ("Ashford") and University of the Rockies ("Rockies") (collectively the "Institutions"). The Institutions offer associate's, bachelor's, master's, and doctoral degree programs primarily through online platforms.

23. As of the start of the Class Period, both Ashford and Rockies were Higher Learning Commission ("HLC") accredited institutions. The HLC accreditation, among other things, allowed the Institutions to be Title IV certified. Under the Higher Education Act, the Title IV certification allowed students attending the Institutions to receive federal student loans and grants. In 2011, 86.8% of Ashford's revenue was derived from the Title IV program. Similarly, in 2011, 85.0% of Rockies' revenue was derived from the aforementioned programs.

24. As of 31 December 2011, the Institutions had 86,642 enrolled students. In 2011, Ashford's online programs accounted for 96.7% of the Company's total enrollment. Traditional campus enrollment accounted for 1.3% of total student enrollment in 2011. Moreover, nearly 50% of Ashford's online student enrollments are minority students (African American, Hispanic, Asian American, and Native Americans).

## RELATIONSHIPS BETWEEN INITIATIVES
## AND STUDENT PERSISTENCE

25. As noted by Ashford University in Item 14: Student Attrition Action Plans, "Ashford University is committed to continuous analysis of student retention and in the creation of interventions, technology-driven solutions, and services that will help students continue through their academic programs to degree completion." BPI010424. Embedded within that statement is the continuous enrollment of the student to reach the attainment of an educational goal. Several operational definitions have been identified by the institution:

5

a) beginning of course to completion of course (or course retention), b) beginning of first course to enrollment in a second course, c) year-to-year persistence, and d) beginning of program of study to graduation. Regardless of the specific measure of student retention, the underlying assumption is that the student will be "retained" or will re-enroll in a future course toward a desired educational goal.

26. The intent of this report is to determine whether the "number of interventions and initiatives …developed …[and] student retention" as stated in Item 14: Student Attrition Action Plans (BPI010423-32), as well as certain other initiatives, would, in the aggregate, reasonably be expected to have a positive impact on student persistence based on the extensive literature in this field. My strategy was to examine four major components of each initiative: a) programmatic objectives, b) programmatic activities associated with the objectives, c) proposed outcomes from interventions, and d) theoretical frameworks used as a basis for the different interventions. Evidence-based research establishes the impact of cognitive and psychosocial factors on student retention, and therefore student support initiatives that would impact those cognitive and psychosocial factors would reasonably be expected to impact student retention as well. I examined whether the activities (or initiatives) would potentially bring about the development and enhancement of cognitive and psychosocial factors that would subsequently impact student retention in order to determine the potential of Ashford's initiatives in addressing student retention (See Exhibit-3).

## Overview of Literature on Student Retention

27. One of the first, and most widely known, researchers in the field of higher education is Dr. Vincent Tinto from Syracuse University. In Alan Seidman's book titled *College Student Retention: Formula for Student Success*, Tinto (2009, p. ix) notes: "Research on student retention is voluminous. It is easily one of the most widely studied topics in higher education over the past [forty] years. Over that time considerable attention has been paid to developing and testing theories of student retention that seek to explain why some students leave and others persist. Although there is still some disagreement over the details of differing theories, the broad dimensions of a theory of student retention have emerged. Among other things, we can say with a good deal of confidence that academic preparation, commitments, and involvement matter." The research has led to the

6

000047
Exhibit 51

development of a wide assortment of retention-related initiatives at two- and four-year public and private institutions.

**Retention Improvement Initiatives**

28. I considered 13 major initiatives developed by Bridgepoint Education, Inc. and/or Ashford University to address the issues of student learning and retention. Those retention improvement initiatives are categorized by the institution as interventions dealing with: (a) student qualifications and (b) student support. All were developed to deal with student success. The qualification initiatives are intended to demonstrate a student's ability to successfully engage in an educational program of study at Ashford University prior to officially enrolling and paying for courses. The second category of initiatives, the student support interventions, are intended to provide assistance to enrolled students, focusing specifically on those that are in the early part of a program of study.

**Student Success Orientation Course**

29. The major objective for the Student Success Orientation Course was to provide students with a non-graded orientation learning environment – "Life of an Ashford University student." The Orientation course was developed in an effort to provide supplementary tools and support for online students with little or no prior college experience. The intent was to have students navigate through an online classroom and experience the life of an Ashford University student.

30. Six different activities comprised the Orientation course. The six activities included: a) meeting other new learners online, b) participating in discussions (discussion forums in which the students interacted in the online classroom and through an activity titled *Reasons for Returning to School*), c) receiving feedback and guidance from the instructor, d) participating in a personal self-assessment through which students evaluated their current level of academic skills and received feedback on their current skills through the use of SmarterMeasure™, e) participating in financial aid orientation activities through the use of USA Funds Life Skills and receiving advice on using time and money wisely while in school and after graduation, and f) participating in an *Ecollege* overview and tutorial (The Library Research Tutorial was specifically designed to meet Standard 3 on critical thinking). A report presented at a meeting of the Student Retention Task Force

000048
Exhibit 51

(February 7, 2012) reported that the introduction of Orientation to EXP105 yielded 15% fewer students out of the course versus the traditional sequence and of those that completed the orientation, they experienced a higher success rate, received higher grades, and had a 50% lower rate of receiving an "F" versus similar cohorts. More specifically, "The results for students enrolling in the orientation course pilot indicate a 6% increase in successful completion of the first course (EXP105), compared to their non-orientation counterparts. Additionally, orientation students' grades in EXP105 are slightly higher, compared to their non-orientation counterparts" (BPIK000144281).

31. The collective activities included in the Student Success Orientation Course initiative potentially lead to the academic and social engagement (involvement) of the student in their online course. This ongoing involvement on the part of the student develops and enhances specific cognitive and psychosocial variables (attributes/facets), all directly found in the literature to impact student retention. These facets included: a) interactions between and among students (Pascarella & Terenzini, 2005; Chaney, Muraskin, Cahalan, & Goodwin, 1998; Nora, Cabrera, Hagedorn, & Pascarella, 1996; Crisp, Taggart, & Nora, 2014), b) a student's sense of belonging or feeling that they are part of an institution (Hurtado & Carter, 1997; Nora & Carales, 2015), c) the integration or full engagement of students in an academic experience (Pascarella & Terenzini, 2005; Grillo & Leist, 2014), d) an active student engagement in the academic and social domains of the institution (Nora, Crisp, & Matthews, 2011; Grillo & Leist, 2014), e) the classroom validation of students by faculty (Rendon, 1994), f) the educational commitments and aspirations of students to earning a college degree (Nora & Cabrera, 1993; Cabrera, Nora, & Castaneda, 1992; Braxton, Duster, & Pascarella, 1988), g) the involvement of the student in a fully developed mentoring experience (Nora & Crisp, 2007), h) faculty/student interactions (Pascarella & Terenzini, 2005; Nora & Cabrera, 1993; Cabrera, Nora, & Castaneda, 1992), i) exposure to a transformative pedagogy (Rendon, 1994, 2009), j) the reduction in the stress and worry associated with meeting the costs of an education (Nora & Cabrera, 1996; Ishitani & DesJardins, 2002-2003; Nora, 1990; Heller 2003; Perna & Steele, 2003), and k) the acquisition of financial literacy (Rendon, Dowd, & Nora, 2012).

32. While no single activity or intervention associated with the Student Success Orientation Course touched on all the facets listed previously, collectively the Orientation course provided students with the varied activities that potentially could have had a positive impact on student retention. All activities were consistent with empirical research findings that found positive direct and indirect effects of those factors (generated by the interventions) on student persistence.

**Peer Review Process**

33. The Peer Review Process initiative provided for a peer review and mentoring support system for faculty. The initiative was intended to serve as an opportunity for the professional development of faculty. Five areas of interest that were observed through an instrument tool included: developing relationships with online students, maintaining high expectations of students, fostering the development of critical thinking, demonstrating instructor expertise in a subject area and in the practice of teaching, and offering constructive feedback to students.

34. The Peer Review Process involved the development and offering of a 5X5 Online Course Observation Instrument. The instrument measured the faculty member's abilities in the five areas previously mentioned. Engagement in the Peer Review Process included course observations of faculty by other faculty as well as the self-evaluations of faculty in the five areas of interests. Scores on each area were derived and follow-up action plans were developed in conjunction with administrators. Students experienced quicker response times to their queries and quick, helpful feedback to their assignment posts. Students expressed that grades were posted in a timely manner. Faculty expressed that they had a responsive point of contact with the institution for their questions or concerns related to the classroom.

35. Several student facets (variables) would likely be developed or enhanced by the Peer Review Process. To the extent faculty improved their teaching practices, there would likely be much more active classroom participation and engagement of faculty with students. Part of a collective mentoring support system for faculty provided faculty a realistic self-assessment of their teaching ability (Tinto, 2005) and the chance for faculty to self-reflect on their pedagogy (Rendon, 1994, 2009). Moreover, the review process could be expected to bring about an increased institutional involvement (Tinto, 2005) and

9

the potential for student validation in the classroom (Rendon, 1994). Several of the areas of interest covered in the instrument focused on the ability of faculty to provide support and encouragement to students (Nora, 1990) and on providing collaborative learning experiences online (Tinto, 1997; Tinto, Goodsell Love, & Russo, 1993).

36. In total, the Peer Review Process would be reasonably likely to provide for the improvement of teaching and the instructional, pedagogical, and retention benefits derived from implementing those practices in the online courses.

## Mandatory Walk to Class Webinar

37. The Mandatory Walk to Class Webinar was designed to ensure that students acclimated to the online format used by Ashford University in their programs of study. The intent of the intervention was to prepare the student to complete and submit course assignments in the online modality required by the institution.

38. The webinar was developed to train students in the use of technology within the online classroom and to provide the tools that were available to help students succeed within their programs. A mock environment was created of what an actual online classroom would look and feel like. The tool walks the student step-by-step through the process of accessing and navigating the classroom environment. Students post assignments and discussions and are able to see postings from other students. Moreover, students can also contact their advisors for assistance on any questions or technical issues (BPI086824).

39. Similar to the Student Success Orientation Initiative, the Mandatory Walk to Class Webinar could reasonably be expected to impact cognitive and psychosocial variables that are linked to student retention, such as a student's sense of belonging or feeling that they are part of an institution (Hurtado & Carter, 1997; Nora & Corales, 2015).

## Constellation

40. Constellation is a suite of highly engaging Web-based materials designed to help students master the instructional goals of Ashford University courses and to support Ashford University curriculum. The reader is a browser-based reader that displays digital materials and allows the students to interact with materials by using highlights, adding bookmarks, and creating notes. Students can access the site directly through the Constellation URL http://content.ashford.edu or through links in the *Student Portal* and the *Online Classroom*.

10

41. Constellation provides materials such as essential readings (chapters), audio and video assets, interactive exercises, and supplements that are organized in a purposeful way. Materials are displayed on the Constellation browser-based reader or on a number of mobile devices. Included in the experience are quizzes with rejoinders, audio and video, simulations and animations, and the ability to make and review annotations.

42. Based on the literature, Constellation could be expected to positively impact student persistence because it provides an engaging learning environment for students through the use of video clips, audio, and interactive components, one that is reliable and hassle free (Tinto, 2005), exposure to a transformative pedagogy (Rendon, 1994, 2009), and an increase in the student's institutional commitment (Nora & Cabrera, 1993; Cabrera, Nora, & Castaneda, 1992).

**Smaller-Class-Size**

43. The institution's policy of reducing the enrollment of students in a class in four undergraduate entry-point courses was based on the vast literature and data analysis by The Parthenon Group indicating that a smaller class size increases the involvement of students in the classroom and increases faculty engagement. The pilot project associated with this intervention also included feedback from Teaching Assistants (TAs) to students on assignments.

44. The pilot project mandated instructor office hours twice a week as well as specific feedback to students on their writing assignments provided by the TA (BPI013274). Student progress was monitored. The report on the pilot project indicated that students did not make use of the office hours even though they were available (BPI095273). Early findings reported that the "smaller groups ha[d] a 9% improvement in retention" (BPI095222; BPIK000703567; BPI074702). Another report indicated that there was an increased engagement and feedback by faculty and students. Moreover, it was found that in the early weeks of a course, the number of minutes that were devoted to students was significantly greater than the time spent when the class size was larger (BPI143358, BPI030368).

45. Preliminary results indicated that reducing the class size from 60 to between 35-40 students slightly increased the retention rate of students enrolled in the first 6 months (BPI034986). The positive effect of the initiative appeared to remain for six months.

11

Although no significant differences in persistence were found for students initially enrolled in smaller classes versus students not enrolled in smaller classes after the 7th month of enrollment, several other positive findings were found. Faculty involved in the pilot classes indicated that there were more opportunities to really know all of their students and be able to provide more individualized guidance and instruction in key areas (BPI095274). Students reported a general sense of community established by the smaller class sizes. (Id.) Increased discussion was also noted. (Id.) Overall, student engagement was improved. (Id.) The institution began the migration of the four courses to smaller class sizes and also engaged in a ramped-up process of recruiting and training new Associate Faculty in the content areas. BPI106844.

46. Literature has shown that a decrease in class size enhances the level of interaction between faculty and students (Nora & Cabrera, 1993; Cabrera, Nora, & Castaneda, 1992; Tinto, 2005; Pascarella & Terenzini, 2005; Upcraft, Gardner, & Barefoot, 2005), increases the level of attention that faculty can provide to students (Tinto, 2005; Seidman, 2005), and the integration or full engagement of students in an academic experience (Pascarella & Terenzini, 2005; Grillo & Leist, 2014) positively impact persistence. Thus, based on the literature, at the time the small class size pilot was conducted, it would have been reasonable to expect that reducing class sizes would ultimately have a positive impact on student persistence.

**Student Advisor Transition**

47. The Student Advisor Transition was an initiative designed to streamline and enhance the student experience by creating a better efficiency within Ashford University's infrastructure. The intervention provided a single point of contact for any academic and financial services needed by the students rather than assigning the student to a separate advisor for each of those areas of expertise. A single student advisor provided information and assistance with academic and financial services (BPIK000030459; BPIK000027486).

48. The intent of the initiative was to reduce the student-to-advisor ratio early in the student's enrollment in a program of study. The student advisor was to provide holistic advising, checking on the financial need and academic progress of the student. "Hybrid" student advisors were responsible for: a) closely monitoring student attendance and grades in the

000053
Exhibit 51

database to ensure student retention and progression in their programs of study, b) counseling students on student finance opportunities and assisting in the application process, document intake, awarding and disbursement of financial aid, and in withdrawing students from courses, c) maintaining a working knowledge of Federal, State and institutional policies governing Title IV, and d) evaluating student requests, identifying issues, and determining any appropriate means for resolution (BPIK000030459).

49. The transition to a "hybrid" student advisor could be expected to foster a deeper working relationship between advisor and students, and engage the student in a fully developed mentoring experience (Nora & Crisp, 2007). Because the financial aid needs of the student were addressed during the advisor/student interactions, one could also expect there was a reduction in the stress and worry related to student finances (Nora & Cabrera, 1996; Ishitani & DesJardins, 2002-2003; Nora, 1990; Heller 2003; Perna & Steele, 2003). Lastly, the intervention could be expected to reduce the level of student frustration and accelerate the resolution of issues (Tinto, 2005). Based on the literature, these factors would be expected to positively impact persistence.

**"All docs in" Requirement (Financial Aid Plan)**

50. The "All docs in" initiative engaged the student in a discussion about resources available to students. The intent of the intervention was to have the financial advisor work together with the student on acquiring the necessary financial aid. In the process the advisor is to motivate the student to succeed at Ashford University. The focus of the intervention is to have the student complete all required financial aid documents prior to the start of a program: a) Institutional Application, b) Student Finance Agreement, c) FAFSA, d) MPN, e) Loan Entrance Interview, plus all related paperwork and documentation further requested by the institution, and to pay all applicable fees. See BPIK001073194. All required financial aid documents in the process were designed to inform Financial Services Advisors, Financial Services Auditors, Student Administrators, Student Services, and Admissions Counselors of the "All Docs in" process, along with activities and expectations for financial aid students.

51. The process involved provided access to all of the required financial aid forms, provided options for electronically signing the application forms, provided links to complete the

000054
Exhibit 51

Free Application for Federal Student Aid (FASFA) and Master Promissory Note, and conducted a loan entrance interview with financial services advisors (FSA) for: payment options, completing and submitting financial documents, financial aid eligibility, alternative sources of funding, financial impact of changes in the student's continuous enrollment, and addressing any other student financial services questions.

52. The completion of all required financial aid forms to receive financial support would reasonably be expected to reduce the stress associated with meeting the costs of an education (Nora & Cabrera, 1993; Perna & Steele, 2003; Tinto, 2005). Moreover, the information received during the process would reasonably be expected to add to the development of financial literacy for the student (Rendon, Dowd, & Nora, 2012). Both of these factors are conducive to improved student persistence.

**Mobile Learning Experience (MLE)**

53. The Mobile Learning Experience was specifically designed to provide a means for students, instructors, and advisors to stay in touch with each other and their classes. It was also intended to provide easy access to due dates and threaded discussions. The MLE combined information from multiple sources that provided a unified mobile experience and enabling students to participate in their courses remotely, to interact with instructors and post to discussions and topic threads using their smart phones. See e.g. BPIK000191422, BPI051235.

54. One of the most important aspects of the initiative was the access to discussion threads among students and between students and faculty. Moreover, the intervention provided more access to course schedules, to course announcements and, for faculty, to faculty email.

55. Certain facets that are linked to improved student persistence would reasonably be expected to be developed or enhanced by the initiative, including: a) interactions between and among students (Pascarella & Terenzini, 2005; Chaney, Muraskin, Cahalan, & Goodwin, 1998; Nora, Cabrera, Hagedorn, & Pascarella, 1996; Crisp, Taggart, & Nora, 2014), b) a student's sense of belonging or feeling that they are part of an institution (Hurtado & Carter,1997; Nora & Carales, 2015), c) the integration or full engagement of students in an academic experience (Pascarella & Terenzini, 2005; Grillo & Leist, 2014), d) the educational commitments and aspirations of students to earning a

14

college degree (Nora & Cabrera, 1993; Cabrera, Nora, & Castaneda, 1992), and e) faculty/student interactions (Pascarella & Terenzini, 2005; Nora & Cabrera, 1993; Cabrera, Nora, & Castaneda, 1992).

## **Writing Reviser**

56. The Writing Reviser Initiative was developed for students in need of additional assistance with writing techniques. Students were encouraged to turn in their papers online and have them evaluated electronically for formatting, spelling, punctuation, and citations. The decision was made based on the premise that the courses offered by Ashford University are writing intensive and that students in need of writing skills would not be able to handle the writing requirements in the courses.

57. The tool was designed to provide feedback across the writing process including thesis development, organization, spelling, and key grammar points. Students are prompted to make corrections to their papers based on the feedback received from the Writing Reviser. No faculty is involved in the process. Concern was noted that a tutorial on the use of the instructional tool that would take an hour would not make the initiative useful to students (BPIK000711089).

58. This initiative could reasonably be expected to improve student persistence because the academic assistance provided to students would involve a proactive pedagogy (Rendon, 2009) and would convey a commitment on the part of the institution to provide support services for students in need of those services (Tinto, 2005). It would also be reasonable to expect that the initiative would help students develop a sense of belonging at the institution (Hurtado & Carter, 1997) and be more likely to also become more active in the learning process.

## **"At Risk" Warning System (REAL Dashboard)**

59. The "At Risk" Warning System was designed to provide real-time feedback on critical student information and provide intervention opportunities for several staff members. Appropriate staff members received training in risk assessment tools. Admissions counselors were provided real-time information on student performance so that they could intervene early enough to make a difference in the academic performance of their

000056
Exhibit 51

students and in their decisions to remain enrolled. Teaching Assistants in the first two introductory courses were provided with a list of all at-risk students and were required to offer support (**BPI164356**).

60. The analytical tool used predicted (within 95% accuracy) which students were at risk of failing an introductory course within a ten-day period of an online course (BPI037177). Student progress was assessed utilizing an assortment of metrics: a) time spent reading course material, b) time spent logged on to the online classroom, c) current course grade based on assignments to date, and d) the number of days since the last attendance was posted (BPI164356). The Student Overview Report generated by the Dashboard was provided to admissions counselors, teaching assistants, and a portion of student advisors.

61. Retention related facets that one would reasonably expect to be enhanced by the intervention included: a) a student's sense of belonging or feeling that they were part of an institution (Hurtado,1999; Nora & Carales, 2015), b) the integration or full engagement of students in an academic experience (Pascarella & Terenzini, 2005; Grillo & Leist, 2014), c) the educational commitments and aspirations of students to earning a college degree (Nora & Cabrera, 1993, 1996), d) the involvement of the student in a fully developed mentoring experience (Nora & Crisp, 2007), and e) exposure to a transformative pedagogy (Rendon, 1994, 2009).

## Admissions Vertical Integration

62. The Admissions Vertical Integration initiative was designed to increase the depth of knowledge about assigned programs for Admissions Counselors by splitting the Admissions staff into verticals, by college, to facilitate a more specialized and thorough knowledge of programs. The goal was to reduce the number of programs that Admissions Counselors were to be familiar with and increase the depth of their knowledge and associated features on those assigned programs to them.

63. The intent of the intervention was to create a better fit between students and program expectations and outcomes (Tinto, 2005). In addition, the initiative would also be expected to help engage the student in a more transformative counseling approach (Rendon, 1994).

16

**Waypoint Outcomes Project**

64. The Waypoint Outcomes project is an electronic rubric and feedback system intended to create in-depth, inclusive rubrics that allow faculty to provide much greater feedback to students in the same time it takes to grade assignments by hand. The approach provided five times as much content feedback and references and four times the amount of extended commentary feedback when the assignments were graded using the rubric in Waypoint to students compared to the level of feedback provided without the project. BPI096123.

65. The approach included the standardization of assignments and the creation of in-depth comprehensive rubrics that allowed faculty to provide much more specific feedback to students within a short time span. Coded assignments linked back to the Institutional/Programmatic Learning Outcome (PLO) targets.

66. While the intent was to impact student performance, one could reasonably expect that student satisfaction with faculty may also be impacted. The initiative would potentially lead to attributes/facets directly found in the literature to impact student retention. These facets included: a) the integration or full engagement of students in an academic experience (Pascarella & Terenzini, 2005; Grillo & Leist, 2014), b) the classroom validation of students by faculty (Rendon, 1994), c) the educational commitments and aspirations of students to earning a college degree (Nora & Cabrera, 1993, 1996), d) faculty/student interactions (Pascarella & Terenzini, 2005; Nora & Cabrera, 1993; Cabrera, Nora, & Castaneda, 1992), and e) exposure to a transformative pedagogy (Rendon, 1994, 2009).

**Full-Time Faculty Hiring**

67. The Full-Time Faculty Hiring initiative was a process to hire full-time online faculty that would support instruction, program review, curriculum revisions, and Associate Faculty within all colleges and programs at Ashford University. The initiative would satisfy accreditation requirements that included the oversight of all programs to be delegated to full-time faculty and a sufficient full-time faculty to student ratio to ensure the integrity and continuity of academic programs (BPI067625).

17

68. Related to this initiative, each college completed one or more program reviews and full-time faculty conducted Faculty Forum meetings with Associate Faculty members. The intent was to also hire part-time remote faculty to support entry-point courses. Some of the faculty that were hired as part of the initiative were assigned to new student acculturation courses, others to full-time positions in particular degree programs, and some to support curricular development and assessment activities (BPIK001464274). As part of the initiative, a Critical Thinking Task Force was formed to redesign the curriculum development model and infuse more critical thinking assignments and activities. Approval was received to hire 21 faculty (on-site in San Diego) whose non-teaching duties would focus on assessment, curriculum, program review, and associate faculty development (BPI067625). Additional full-time faculty were requested to be embedded within the operational teams and as entry point/orientation faculty.

69. It would be reasonable to expect that the Faculty Forum would be instrumental in engaging and supporting existing remote faculty and in building a learning community (Tinto, 1997; Tinto, Goodsell Love, & Russo, 1993) and sense of loyalty and commitment to the institution and to students (Tinto, 2005; Siedman, 2005). The desired outcome was to have available professors who have a proven record of accomplishment of success working with students, have additional training and the expertise necessary for those courses, and available year round to support increasing demand for entry-point instructors. These outcomes would reasonably be expected to improve student persistence.

## Key Student Support Services Available to Students

70. The Ashford University student support system's mission is to ensure that students progress smoothly through processes and milestones necessary to facilitate their degree completion (BPIK000071146). Through a cohesive web of support, students are monitored and communicated with regarding attendance, course scheduling, academic performance, and progression toward degree completion. The focus is on the student experience dedicated to ensuring that students are informed and well-supported throughout their educational journey (BPIK000026805).

18

71. Services are provided through a team approach made up of professional staff members, each dedicated to specific tasks and responsibilities. These staff members include: Admissions Counselors, Educational Loan Specialists, Access and Wellness personnel and Veteran Advisors, Writing Instructional Specialists, Director of Student Affairs, Student Affairs Manager, Student Affairs Specialist, Career Development and Alumni Relations Manager, Associate Director Student Access and Wellness, Student Access and Wellness Manager, Assistive Technology Specialist, Student Support Specialist, and Veteran Specialist. (See BPIK000984231-39 for details on job responsibilities.)

72. Included among the many support services initiatives are: a) implementation of honor societies (Salute and Golden Key), b) honor societies' recognition at graduation, c) Student Alumni Meet and Greets, d) High Tech-High Touch Women's History Month, e) Diversity Month, f) Military and Veteran Specific Activities, g) Solicitation of information from students through focus groups, h) Student Tip Sheet for Student Success, i) Facebook Student Group, j) Charter application for Phi Theta Kappa, k) Students with Disabilities in the Classroom course designed to introduce participants to accommodations and strategies that may help to support students with disabilities and foster their academic success, and l) social media (Twitter, YouTube, Facebook). (See BPIK001432293, BPIK000026959; BPIK000198995; BPI138795; BPI034551.)

73. Those initiatives resulted in several institutional outcomes. The Student Affairs adopted an outcomes-based assessment model and plan and established and maintained a social networking presence. The initiative on Access & Wellness increased its involvement through an orientation video on the website and established an ADA Steering Committee and workgroups to address the institution's compliance with new ADA regulations. It also enhanced the data-tracking capabilities of Ashford University to improve the tracking of student data. The Disability Support Services increased their outreach through a more streamlined referral process and provided a more diversified offering of disability support and accommodations for students. Health & Wellness launched a magazine to address the holistic needs of campus-based and online students as they engaged in their educational pursuits and refocused from *crisis notification* to *critical support*. More importantly, the initiative increased support for students experiencing financial hardship. The Career & Alumni Services initiative provided career development webinars for

19

students on a variety of career-related topics, hosted Student and Alumni Networking across the country, offered personalized career coaching and services to students and alumni, provided discounts on products and services for students and alumni through Beneplace, launched a Hire a Champ campaign, and enhanced the data-tracking capabilities of the institution. Finally, Student Life rolled out the CHAMPS Peer Mentoring Pilot Program, hosted in-person recognition ceremonies for honor society members, planned for a first Ashford Volunteer Day, shifted to a more developmental focus in response to policy violations through language change from "student conduct" to "student community standards," and required sexual misconduct trainings to increase awareness among staff (BPIK000635625).

74. In a series of teleconference focus groups, Ashford University used a protocol designed to capture student perceptions regarding: a) co-curricular opportunities for students so that students could engage with other students and staff out of the classroom environment, b) the types of co-curricular activities that students would be interested in participating, c) the types of engagement (student to student/student with mentors) that they would prefer, d) the use of electronic mediums to communicate academically and socially, and e) the types of engagement opportunities that the students would like to see expanded. The findings indicated that students thought that co-curricular opportunities increased their learning; opened up more doors to them; and created more connections among students. Students also indicated that they would be interested in participating in common-interest groups, mentor-mentee relationships, honor societies, same-major groups, networking opportunities for connecting with professional groups, alumni activities and conversations with their Deans. Student preferences for engaging included having group projects with classmates, video conferencing with faculty, being mentored by industry professionals, and having a student-student mentoring experience past the first course. Finally, the study found that students wanted several engagement opportunities expanded such as: preparation for course expectations, outreach for students who are lost, more course interactions with faculty, course webinars/conference calls, and more faculty engagement (BPIK000053746).

75. The results from the focus group study substantiate the development of the many psychosocial factors that come to impact on student success and retention. Collectively,

20

the student support initiatives/services provided to students would reasonably be expected to help to develop and enhance a student's sense of belonging (Hurtado & Carter, 1994), feeling a sense of support and encouragement (Nora & Cabrera, 1993, 1996), having a reduction in the stress and worry related to educational costs (Nora & Cabrera, 1992), engaging in a mentoring experience (Nora & Crisp, 2003), meeting financial needs (Rendon, Dowd, & Nora, 2012; Heller, 2003;), feeling a sense of being validated by the institution (Rendon, 1994), and involvement in a collaborative learning environment (Tinto, Goodsell Love, & Russo, 1993; Grillo & Leist, 2014), all of which are facets related to student persistence. Examples (or evidence) that these facets are beginning to be seen is found in the report on Social Media and Institutional Outcomes (August, 2012). Remarks like the one noted by a social media user - "*thank you for listening!!!! yay!*" - are found among the many posts by Ashford University students. One post that really captures the guiding mission of the student support services was: "*Random thought: I have to admit at times I want to give up on Ashford University, and attend a technical college. But I read a post yesterday, and [became] encouraged. I will gladly be a class of 2013 graduate. Thanks for the encouraging post and comment.*" Other comments such as "*I feel pretty good about [my paper],*" *I am so excited…I can't describe how proud I am of myself right now,*" and "*I'm so happy right now, and not bad for someone that graduated high school in 1992*" are but a few of the many positive comments posted by students that represent the psychosocial facets developed and enhanced by the student support services (Instances of Social Learning, 2012).

76. In the End of Course surveys conducted by Ashford University, more evidence can be found that all of the student support initiatives collectively provided by the institution are having an impact on student satisfaction and retention decisions. Items that are proxies for a student's commitment to their institution (Nora & Cabrera, 1993, 1996), a student's sense of belonging and that they feel they are living a part of a traditional college experience (Hurtado & Carter, 1997), that students received a solid mentoring experience

000062
Exhibit 51

(Nora & Crisp, 2007), and that students were supported and encouraged during their academic enrollment (Tinto, 2005) were all found to have high scores of agreement, extending from 55% to 94% (BPIK001053373; End of Course Survey for Undergraduates).

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Plaintiffs, that becomes available to me.

_____
Amaury Nora, Ed.D.

May 29, 2015

22

000063
Exhibit 51

# <u>EXHIBITS</u>

000064
Exhibit 51

Exhibit-1

**Documents and Other Information Reviewed and Relied Upon**

## ACADEMIC AND PROFESSIONAL LITERATURE

- Braxton, J.M., ed. (2000). *Reworking the student departure puzzle*. Nashville, TN: Vanderbilt University Press.
- Braxton, J.M., Duster, M., & Pascarella, E.T. (1988). Causal modeling and path analysis: An introduction and an illustration in student attrition research. *Journal of College Student Development, 29*, 263-272,
- Chaney, B., Muraskin, L., Cahalan, M., & Goodwin, D. (1998). Helping the progress of disadvanted students in higher education: The federal Student Support Services program. *Educational Evaluation and Policy Analysis, 20*, 197-215.
- Cabrera, A.F., Nora, A., & Castaneda, M. (1992). The role of finances in the student persistence process: A structural model. *Research in Higher Education, 33*(5), 571-594.
- Crisp, G., Taggart, A., & Nora, A. (2014). Undergraduate Latina/o students: A systematic review of research identifying factors contributing to academic success outcomes. *Review of Educational Research*. DOI:10.3102/0034654314551064.
- Grillo, M.C., & Leist, C.W. (2014). Academic support as a predictor of retention to graduation: New insights on the role of tutoring, learning assistance, and supplemental instruction. *Journal of College Student Retention: Research, Theory & Practice, 15*(3), 387-408.
- Heller, D. (2003). *Informing public policy: Financial aid and student persistence*. Boulder, CO: Western Interstate Commission for Higher Education.
- Hurtado, S., & Carter, D. (1997). Effects of college transition and perceptions of the campus racial climate on Latino college students' sense of belonging, *Sociology of Education, 70*, 324-345.
- Ishitani, T., & DesJardins, S. (2002-2003). A longitudinal investigation of dropout from college in the United States. *Journal of College Student Retention, 4*, 173-201.
- Nora, A., Crisp, G., & Taggart, A. (2015). Future research on Hispanic students: What have we yet to learn? And What new and diverse perspectives are needed to examine Latino success in higher education? *The Journal of Higher Education, 25*.
- Nora, A., Cabrera, A.F., Hagedorn, L. & Pascarella, E.T. (1996). Differential impacts of academics and social experiences on college-related behavioral outcomes across different ethnic and gender groups at four-year institutions. *Research in Higher Education, 37*(4), 427-452.
- Nora, A., & Rendon, L.I. (2015). *The impact of cognitive and psychosocial factors on sense of belonging and academic performance*. Presentation made to the Tomas Rivera Center at the University of Texas at San Antonio, San Antonio, TX.
- Nora, A., Crisp, G., & Matthews, C. (2011). A reconceptualization of CCSSE's benchmarks of student engagement. *The Review of Higher Education, 35*(1), 105-130.
- Nora, A., & Cabrera, A.F. (1993). The construct validity of institutional commitment: A confirmatory factor analysis. *Research in Higher Education, 34*(2), 243-262.

000065
Exhibit 51

- Nora, A., & Cabrera, A.F. (1996). The role of perceptions of prejudice and discrimination on the adjustment of minority students to college. *The Journal of Higher Education, 67*(2), 119-148.
- Nora, A., & Crisp, G. (2007). Mentoring students: Conceptualizing and validating the mlti-dimensions of a support system. *Journal of College Student Retention: Theory and Practice, 9*(3), 337-356. DOI:10.2190/CS:9.3.E.
- Nora, A. (1990). Campus-based aid programs as determinants of retention among Hispanic community college students. *The Journal of Higher Education, 61*(3), 312-331.
- Pascarella, E.T., & Terenzini, P.T., eds. (2005). *How college affects students: A third decade of research*. Jossey-Bass: A Wiley Imprint: San Francisco, CA.
- Pike, G., Kuh, G., & Gonyea, R. (2003). The relationship between institutional mission and students' involvement and educational outcomes. *Research in Higher Education, 44*, 241-261.
- Perna, L., & Steele, P. (2011). The role of context in understanding the contributions of financial aid to college opportunity. *Teachers College Record, 113*, 895-933.
- Rendon, L.I. (1994). Validating culturally diverse students: Toward a new model of learning and student development. *Innovative Higher Education, 19*, 13-52.
- Rendon, L.I. (2009). *Sentipensante (Sensing/Thinking) pedagogy. Education for wholeness, social justice and liberation*. Sterling, VA: Stylus Press.
- Rendon, L.I., Dowd, A., & Nora, A. (2012). *Priced out: A closer look at postsecondary financial aid for Latinos*. White House Symposium, White House Initiative on Excellence for Hispanic Americans, Los Angeles, CA.
- Seidman, A., ed. (2005). *College student retention: Formula for student success*. Praeger Publishers, Westport, CT.
- Tart, K. (1998). *Critical Thinking and the Nursing Care Plan: A Conceptual and Structural Validation of Factors Impacting Cognitive Outcomes*. Presentation at the Annual Meeting of the Association for the Study of Higher Education (ASHE).
- Tinto, V. (2005 a). Foreword. In A. Seidman's (Ed.) *College student retention: Formula for student success* (pps. ix-x). Praeger Publishers, Westport, CT.
- Tinto, V. (2005 b). Epilogue: Moving from Theory to Action. In A. Seidman's (Ed.) *College student retention: Formula for student success* (pps. 317-333). Praeger Publishers, Westport, CT.
- Tinto, V. (1997). Classrooms as communities: Exploring the educational character of student persistence. *Journal of Higher Education, 68*, 599-623.
- Tinto, V., Goodsell Love, A., & Russo, P. (1993). Building learning communities for new college students: A summary of research findings of the Collaborative Learning Project. University Park, PA: National Center on Postsecondary Teaching, Learning, and Assessment.
- Upcraft, L., Gardner, J.N., & Barefoot, B.O., eds. (2005). *Challenging & supporting the first-year student: A handbook for improving the first year of college*. Jossey-Bass: A Wiley Imprint: San Francisco, CA.

000066
Exhibit 51

**CONVERSATIONS WITH THE FOLLOWING:**

- o Dr. Elizabeth Tice
- o Dr. Joseph Hoey
- o Dr. Kristina Powers
- o Alice Parenti

**CONFERENCE CALL TRANSCRIPTS:**

- o March 2, 2010
- o May 3, 2010
- o November 2, 2010
- o March 1, 2011
- o May 3, 2011
- o November 11, 2011
- o December 7, 2011
- o March 6, 2012
- o May 1, 2012

**DOCUMENTS:**

- ITEM No. 1:  A Context for Retention and Graduation at Ashford University
- Excerpts from Lead Plaintiffs' Objections and Responses to Defendant Bridgepoint's First Set of Interrogatories, dated March 26, 2015
- Order granting in part Defendants' Motion to Dismiss dated September 13, 2013
- WASC Action Letter dated July 3, 2012
- WASC Action Letter dated July 10, 2013
- Excerpts from the Report of the WASC Pathway B Visit Team, March 11-16, 2012

- The following production documents:
  - BPI010422
  - BPI010944
  - BPI011308
  - BPI011343
  - BPI013143
  - BPI013272
  - BPI013393
  - BPI018870
  - BPI018881
  - BPI019006
  - BPI020905
  - BPI025957

26

- BPI028911
- BPI028920
- BPI034548
- BPI034553
- BPI034980
- BPI035792
- BPI037177
- BPI051235
- BPI051856
- BPI052768
- BPI053415
- BPI053809
- BPI055448
- BPI055650
- BPI063366
- BPI066516
- BPI067625
- BPI074679
- BPI074681
- BPI086767
- BPI088025
- BPI088222
- BPI091661
- BPI091676
- BPI092825
- BPI095222
- BPI095273
- BPI096096
- BPI096130
- BPI095359
- BPI096573
- BPI097346
- BPI097472
- BPI099584
- BPI100537
- BPI101753
- BPI106831
- BPI108568

27

- BPI109835
- BPI112204
- BPI115957
- BPI118279
- BPI138795
- BPI139976
- BPI143357
- BPI143358
- BPI145661
- BPI146111
- BPI146141
- BPI146211
- BPI156733
- BPI164351
- BPIK000015501
- BPIK000017342
- BPIK000017910
- BPIK000022789
- BPIK000026804
- BPIK000026959
- BPIK000027305
- BPIK000027486
- BPIK000029398
- BPIK000030453
- BPIK000052801
- BPIK000052803
- BPIK000052805
- BPIK000052808
- BPIK000052811
- BPIK000053742
- BPIK000063673
- BPIK000063679
- BPIK000067051
- BPIK000071076
- BPIK000076247
- BPIK000079390
- BPIK000144280
- BPIK000180704

28

- BPIK000183317
- BPIK000190220
- BPIK000191422
- BPIK000198991
- BPIK000198993
- BPIK000201388
- BPIK000201728
- BPIK000201729
- BPIK000307784
- BPIK000316254
- BPIK000375083
- BPIK000399513
- BPIK000418097
- BPIK000427021
- BPIK000436488
- BPIK000436489
- BPIK000436492
- BPIK000436493
- BPIK000436506
- BPIK000441579
- BPIK000445143
- BPIK000480103
- BPIK000484664
- BPIK000540059
- BPIK000571637
- BPIK000624625
- BPIK000628742
- BPIK000635624
- BPIK000690909
- BPIK000701280
- BPIK000703567
- BPIK000703607
- BPIK000704104
- BPIK000706054
- BPIK000706056
- BPIK000706441
- BPIK000706442
- BPIK000706448

000070
Exhibit 51

- BPIK000711089
- BPIK000716948
- BPIK000716951
- BPIK000716954
- BPIK000716976
- BPIK000716999
- BPIK000717001
- BPIK000721580
- BPIK000721581
- BPIK000721592
- BPIK000721613
- BPIK000722890
- BPIK000722891
- BPIK000736393
- BPIK000736629
- BPIK000737333
- BPIK000759675
- BPIK000762620
- BPIK000773654
- BPIK000774789
- BPIK000806584
- BPIK000810223
- BPIK000822185
- BPIK000825208
- BPIK000830034
- BPIK000832335
- BPIK000853538
- BPIK000857213
- BPIK000857356
- BPIK000859874
- BPIK000859882
- BPIK000859938
- BPIK000872654
- BPIK000872793
- BPIK000910040
- BPIK000910041
- BPIK000910074
- BPIK000910302

- BPIK000911235
- BPIK000912247
- BPIK000912534
- BPIK000912682
- BPIK000947821
- BPIK000952845
- BPIK000952849
- BPIK000984231
- BPIK000985109
- BPIK000988482
- BPIK001013018
- BPIK001013019
- BPIK001016717
- BPIK001016718
- BPIK001017197
- BPIK001017201
- BPIK001017202
- BPIK001019222
- BPIK001030283
- BPIK001053352
- BPIK001053353
- BPIK001053365
- BPIK001053385
- BPIK001053386
- BPIK001053387
- BPIK001053388
- BPIK001053393
- BPIK001073192
- BPIK001073194
- BPIK001073196
- BPIK001073199
- BPIK001138249
- BPIK001182861
- BPIK001182862
- BPIK001237977
- BPIK001244803
- BPIK001253238
- BPIK001285904

000072
Exhibit 51

- BPIK001313371
- BPIK001316190
- BPIK001316191
- BPIK001316222
- BPIK001345541
- BPIK001412269
- BPIK001412905
- BPIK001412908
- BPIK001412909
- BPIK001412910
- BPIK001421160
- BPIK001421179
- BPIK001421554
- BPIK001421568
- BPIK001421961
- BPIK001422106
- BPIK001422539
- BPIK001422752
- BPIK001432292
- BPIK001433246
- BPIK001433247
- BPIK001433248
- BPIK001433392
- BPIK001433873
- BPIK001434082
- BPIK001440277
- BPIK001440280
- BPIK001455935
- BPIK001464241
- BPIK001538690
- BPIK001539264
- BPIK001539317
- PRTHN00007683
- PRTHN00007825
- PRTHN00014403
- PRTHN00018046
- PRTHN00023086
- PRTHN00043415

000073
Exhibit 51

- WASC 000216
- WASC 000283
- WASC 005875
- WASC 011593
- WASC 025399

000074
Exhibit 51

**Exhibit-2**

**Curriculum Vitae**

**AMAURY NORA**

Professor of Higher Education and Co-Director, Center for Research and Policy in Education

Associate Dean for Research
College of Education &
Human Development          voice phone:  210.458.4112
MB 3.446                            email: amaury.nora@utsa.edu
University of Texas – San Antonio
San Antonio, Texas   78249-1644

**TABLE OF CONTENTS**

| Section | Page |
|---|---|
| Education | 2 |
| Experience | 2 |
| Publications | 3 |
| Grants | 15 |
| Presentations | 17 |
| Honors and Awards | 31 |
| Service | 32 |
| Professional Memberships | 41 |
| Teaching | 41 |

000075
Exhibit 51

## —EDUCATION—

1985        Doctorate of Education, Higher Education, University of Houston, Houston, Texas.

1973        Master of Science in Biology, Texas A&I University, Kingsville, Texas.

1970        Bachelor of Arts in Zoology, University of Texas at Austin, Austin, Texas.

## —EXPERIENCE—

2012 – Present      Executive Director for Research Integrity, Office of the Vice President for Research, University of Texas at San Antonio

2009 – Present      Professor of Higher Education, Associate Dean for Research, and Co-Director, Center for Research and Policy in Education, College of Education and Human Development

2005-2009      Professor of Educational Psychology (Higher Education) and Director, National Center for Student Success, College of Education, University of Houston

1996-2005      Professor of Educational Leadership (Higher Education) and Associate Dean for Research and Faculty Development, College of Education, University of Houston

1989-1995      Associate Professor of Higher Education, University of Illinois at Chicago and Senior Research Associate, National Center for Teaching, Learning, and Assessment (NCTLA)

1987-1989      Assistant Professor, Higher Education, University of Southern California

1985-1987      Postdoctoral Fellow and Adjunct Professor, Institute for Higher Education Law and Governance, University of Houston.

1983-1984      Research Lab Assistant, Education Research Center, University of Houston

1982-1985      Research Assistant, Institute for Higher Education Law and Governance, University of Houston

1979-1982      Director of Coordinated Bilingual Bicultural Studies Program, a Title III, Strengthening Developing Institutions Program, Laredo Junior College, Laredo, Texas.

000076
Exhibit 51

| 1976-1979 | Master Guidance Mentor for Title III programs (Programmed Instruction for Bilingual Bicultural Studies Program; Coordinated Bilingual Bicultural Studies Program), Laredo Junior College, Laredo, Texas. |
| --- | --- |
| 1973-1976 | Counselor/Instructor for Title III programs, Laredo Junior College. |
| 1972-1973 | Physical science teacher, J.W. Nixon High School, Laredo, Texas. |
| 1971-1972 | Teaching Assistant, Biology Department, genetics course, Texas A&I University, Kingsville, Texas. |

## —PUBLICATIONS (*Refereed Journals/Book Chapters*) —

### Author Impact Analysis

Google Scholar Citation Index

|  | *All* | *Since 2009* |
| --- | --- | --- |
| Citations | 10,727 | 5,829 |
| h-index | 46 | 37 |
| i10-index | 71 | 60 |

Acceptance Rates in Journals with Publications

| American Educational Research Journal: | 7% acceptance rate |
| --- | --- |
| Review of Higher Education: | 5% acceptance rate |
| Research in Higher Education: | 10% acceptance rate |
| Review of Educational Research | 5% acceptance rate |

Impact Factors in Journals with Publications

| Review of Educational Research: | Impact Factor = 5.0 |
| --- | --- |
| American Behavioral Scientist | Impact Factor = .705 |
| Review of Higher Education | Impact Factor = 1.351 |

### Peer-Refereed Journal Articles

Nora, A., Crisp, G., & Taggart, A. (2015). Future research on Hispanic students: What have we yet to learn? And What new and diverse perspectives are needed to examine Latino success in higher education? *The Journal of Higher Education*, 25.

Crisp, G., Taggart, A., & Nora, A. (2014). Undergraduate Latina/o students: A systematic review of research identifying factors contributing to academic success outcomes. *Review of Educational Research.* DOI:10.3102/0034654314551064

Nora, A., Crisp, G., & Reyes, N. (2013). Higher Education. In *Oxford Bibliographies in Latino Studies*. Ed. Ilan Stavans. New York: Oxford University Press.

000077
**Exhibit 51**

Nora, A., Crisp, G., & Matthews, C. (2011). A Reconceptualization of CCSSE's Benchmarks of Student Engagement. *The Review of Higher Education, 35*(1), 105-130. ISSN: 0162-5748

Nora, A., Urick, A., & Quiroz, P. (Summer 2011). Validating students: A conceptualization and overview of its impact on student experiences and outcomes. *Enrollment Management Journal*, *5*(2), 34-52.

Crisp, G., & Nora, A. (2010). Hispanic student success: Factors influencing the persistence and transfer decisions of Latino community college students enrolled in developmental education. *Research in Higher Education, 51*(2), 175-194. DOI: 10.1007/s11162-009-9151-x

Nora, A., & Crisp, G. (2009). Hispanics and higher education: An overview of research, theory and practice. In J.C. Smart's (Ed.), *Handbook of Higher Education: Theory and Research*. New York, NY: Agathon Press.

Crisp, G., Nora, A., & Taggart, A. (2009). Student characteristics, pre-college, college, and environmental factors as predictors of majoring in and earning a STEM degree: An analysis of students attending a Hispanic Serving Institution. *The American Educational Research Journal, 46*, 924-942. DOI: 10.3102/000283120934460

Nora, A., & Snyder, B. (2008). Technology and higher education: The impact of e-learning approaches on student academic achievement, perceptions and persistence. *Journal of College Student Retention: Research, Theory and Practice*.

Sutton, S., & Nora, A. (2008). An exploration of college persistence for students enrolled in web-enhanced courses: A multivariate analytic approach. *Journal of College Student Retention: Research, Theory and Practice*.

Nora, A., & Crisp, G. (2007). Mentoring students: Conceptualizing and validating the multi-dimensions of a support system. *Journal of College Student Retention: Theory and Practice, 9*(3), 337-356. DOI:10.2190/CS.9.3.e

Arbona, C., & Nora, A. (2007). Predicting college attainment of Hispanic students: Individual, institutional, and environmental factors. *The Review of Higher Education, 30*(3), 247-270.

Schreiber, J., Nora, A., Stage, F.K., & Barlow, L. (2006). Structural equation modeling: An introduction and analysis of a decade of research. *The Journal of Educational Research*.

Nora, A., Barlow, L., & Crisp, G. (2006). Examining the tangible and psychosocial benefits of financial aid with student access, engagement and degree attainment. In W.G. Tierney, K. M. Venegas, & M. L. de la Rosa (Eds.), Financial aid and access to college: The public policy challenges. *American Behavioral Scientist, 49*(12), 1-16.

000078
Exhibit 51

Nora, A. (2004). The role of *habitus* and cultural capital in choosing a college, transitioning from high school to higher education, and persisting in college among minority and non-minority students. *Journal of Hispanic Higher Education, 3*(2), 180-208.

Stage, F.K., Nora, A., & Carter, H.C. (2005). Path analysis: An introduction and analysis of a decade of research. *The Journal of Educational Research, 98(1),* 5-12.

Cabrera, A.F., Crissman, J.L., Bernal, E.M., Nora, A., Terenzini, P.T., & Pascarella, E.T. (2002). *Journal of College Student Development, 43* (1), 20-34.

Poyrazli, S., McPherson, R., Nora, A., Arbona, C., & Pisecco, St. (2002). Relation between assertiveness, academic self-efficacy, and psychosocial adjustment among international graduate students. *Journal of College Student Development, 43* (5), 632-641.

Whitt, E.J., Edison, M,I., Pascarella, E.T., Terenzini, P.T., & Nora, A. (2001). Influences on student's openness to diversity and challenge in the second and third year of college. *The Journal of Higher Education, 72*(2), 172-204.

Nora, A. (2001-2002). The depiction of significant others in Tinto's "Rites of Passage:" A reconceptualization of the influence of family and community in the persistence process. *Journal of College Student Retention: Research, Theory & Practice, 3*(1), 41-56.

Nora, A., Rendon, L.I., & Cuadraz, G. (1999). Access, choice, and outcomes: A profile of Hispanic students in higher education. In A. Tashakkori and H.S. Ochoa's (Eds.), *Readings on Equal Education: Education of Hispanics in the U.S.: Policies, policies and outcomes* (Vol. 16). AMS Press, Inc: New York.

Whitt, E.J., Edison, M,I., Pascarella, E.T., Nora, A., & Terenzini, P.T. (1999). Interactions with peers and cognitive outcomes across three years of college. *Journal of College Student Development, 40*, 61-78.

Hagedorn, L.S., Pascarella, E.T., Edison, M.I., Nora, A., & Terenzini, P.T. (1999). Institutional context and the development of critical thinking: A research note. *Review of Higher Education*, *22*(3), 265-285.

Hagedorn, L.S., Siadat, M.V., Fogel, S.F., Nora, A., & Pascarella, E.T. (1999). Success in college mathematics: Comparisons between remedial and non-remedial first year college students. *Research in Higher Education, 40* (3), 261-284.

Cabrera, A.F., Nora, A., Terenzini, P.T., Pascarella, E.T., & Hagedorn, L.S. (1999). Campus racial climates and the adjustment of students to college: A comparison between white students and African American students. *Journal of Higher Education, 70* (2), 134-160.

Pascarella, E.T., Truckenmiller, R., Nora, A., Terenzini, P.T., Edison, M., & Hagedorn, L.S. (1999). Cognitive impacts of intercollegiate athletic participation: Some further evidence. *The Journal of Higher Education, 70* (1), 1-26.

000079
Exhibit 51

Whitt, E.J., Edison, M., Pascarella, E.T., Nora, A., & Terenzini, P.T. (1999). Women's perceptions of a "chilly" climate and cognitive outcomes in college: Additional evidence. *Journal of College Student Development, 40*, 163-177.

Pascarella, E.T., Whitt, E., Edison, M., Nora, A., & Hagedorn, L.S. (1998). Does community college versus four-year college attendance influence students' educational plans? *Journal of College Student Development, 39*(2), 179-193.

Pascarella, E.T., Edison, M.I., Nora, A., Hagedorn, L.S., & Terenzini, P.T. (1998). Does work inhibit cognitive development during college? *Educational Evaluation and Policy Analysis, 20*(2), 75-93.

Pascarella, E.T., Whitt, E., Edison, M., Nora, A., Hagedorn, L.S.,Yaeger, P., & Terenzini, P.T. (1997). Women's perceptions of a "chilly climate" and their cognitive outcomes during the first year of college. *Journal of College Student Development, 38*(2), 109-124.

Hagedorn, L., Nora, A., & Pascarella, E.T. (1997). Pre-occupational segregation among first-year college students: An application of the Duncan Dissimilarity Index. *Journal of College Student Development, 37*(4), 425-437.

Hagedorn, L.S., Siadat, M.V., Nora, A., & Pascarella, E.T. (1997). Factors leading to gains in mathematics during the first year in college: An analysis by gender and ethnicity. *Journal of Women and Minorities in Science and Engineering, 3*(3), 185-202.

Pascarella, E.T., Edison, M., Hagedorn, L.S., Nora, A., & Terenzini, P.T. (1996). Influences on students' internal locus of attribution for academic success in the first year of college. *Research in Higher Education, 37* (6), 731-756.

Hagedorn, L.S., & Nora, A. (1996). Predictors of success: Rethinking admission criteria in graduate and professional programs. In J.G. Haworth (ed.) *New Directions in Institutional Research: Assessing Graduate and Professional Programs 9*(2), 31-44. San Francisco: Jossey-Bass.

Springer, L., Palmer, B., Terezini, P.T., Pascarella, E.T., & Nora, A. (1996). Attitudes toward campus diversity: Participation in a racial or cultural awareness workshop. *The Review of Higher Education, 20*(1), 53-68.

Pascarella, E.T., Edison, M., Nora, A., Hagedorn, L.S., & Terenzini, P.T. (1996). Additional evidence on the cognitive effects of college racial composition: A research note. *Journal of College Student Development, 37*, 494-501.

Pascarella, E.T., Bohr, L., Nora, A., & Terenzini, P.T. (1996). Is differential exposure to college linked to the development of critical thinking? *Research in Higher Education, 37*(2), 159-174.

000080
**Exhibit 51**

Pascarella, E.T., Edison, M., Nora, A., Hagedorn, L.S., & Braxton, J. (1996). Effects of teacher organization/preparation and teacher skill/clarity on general cognitive skills in college. *Journal of College Student Development, 37*(1), 7-19.

Pascarella, E.T., Edison, M., Whitt, E.J., Nora, A., & Hagedorn, L.S. (1996). Cognitive effects of Greek affiliation during the first year of college. *National Association of Student Personnel Administrators Journal,, 33*(4), 242-259.

Terenzini, P.T., Springer, L., Yeager, P., Pascarella, E.T., & Nora, A. (1996). First-generation college students: Characteristics, experiences, and cognitive development. *Research in Higher Education, 37*(1), 1-22.

Pascarella, E.T., Whitt, E.J., Nora, A., Edison, M., Hagedorn, L.S., & Terenzini, P.T. (1996). What have we learned from the first year of the National Study of Student Learning? *Journal of College Student Development, 37*(2), 182-192.

Pascarella, E.T., Edison, M., Nora, A., Hagedorn, L.S. & Terenzini, P.T. (1996). Influences on students' openness to diversity and challenge in the first year of college. *Journal of Higher Education, 67*(2), 174-195.

Nora, A., Cabrera, A.F., Hagedorn, L., & Pascarella, E.T. (1996). Differential impacts of academic and social experiences on college-related behavioral outcomes across different ethnic and gender groups at four-year institutions. *Research in Higher Education, 37*(4), 427-452.

Pascarella, E.T., Edison, M., Nora, A., & Hagedorn, L.S. (1995). Cognitive effects of community colleges and four-year colleges. *Community College Journal, 66*(3), 35-39.

Allen, D.F., & Nora, A. (1995). An empirical examination of the construct validity of goal commitment in the persistence process. *Research in Higher Education, 36*(5), 509-533.

Terenzini, P.T., Springer, L., Pascarella, E.T., & Nora, A. (1995). Influences affecting the development of students' critical thinking skills. *Research in Higher Education, 36*(1), 23-39.

Springer, L., Terenzini, P.T., Pascarella, E.T., & Nora, A. (1995). Influences on college students' orientations toward learning for self-understanding. *Journal of College Student Development, 36*(1), 5-18.

Pascarella, E.T., Bohr, L., Nora, A., & Terenzini, P.T. (1995). Cognitive effects of two-year and four-year colleges: New evidence. *Educational Evaluation and Policy Analysis, 17*(1), 83-96.

Pascarella, E.T., Bohr, L., Nora, A., & Terenzini, P.T. (1995). Intercollegiate athletic participation and freshman year cognitive outcomes. *Journal of Higher Education, 66*, 369-387.

000081
Exhibit 51

Terenzini, P.T., Springer, L., Pascarella, E.T., & Nora, A. (1995). Academic and out-of-class influences affecting the development of students' intellectual orientations. *The Review of Higher Education, 19*, 23-44.

Nora, A., & Cabrera, A.F. (1996). The role of perceptions of prejudice and discrimination on the adjustment of minority students to college. *Journal of Higher Education, 67*(2), 119-148.

Cabrera, A.F., & Nora, A. (1994). College students' perceptions of prejudice and discrimination and their feelings of alienation: A construct validation approach. *The Review of Education/Pedagogy/Cultural Studies, 16*(3-4), pp. 387-409.

Bohr, L., Pascarella, E.T., Nora, A., & Terenzini, P.T. (1994). Do black students learn more at historically black or predominantly white colleges? *Journal of College Student Development, 36*(1), 75-85.

Pascarella, E.T., Bohr, L., Nora, A., Desler, M., & Zusman, B. (1994). Impacts of on-campus and off-campus work on first-year cognitive outcomes. *Journal of College Student Development, 35*, 364-370.

Bohr, L., Pascarella, E.T., Nora, A., Zusman, B., Jacobs, M., Desler, M., & Bulakowski, C. (1994). Cognitive effects of two-year and four-year colleges: A preliminary study. *Community College Review, 22*(1), 4-11.

Pascarella, E.T., Bohr, L., Nora, A., Raganathan, S., Desler, M., & Bulakowski, C. (1994). Impacts of two-year and four-year colleges on learning orientations. *Community College Journal of Research and Practice, 18*(6), 577-589.

Nora, A., & Cabrera, A.F. (1993). The construct validity of institutional commitment: A confirmatory factor analysis. *Research in Higher Education, 34*(2), 243-262.

Nora, A., & Cabrera, A. (1993). Examining graduate education through structural modeling. In P. Terenzini (Ed.) *New Directions for Institutional Researcher*. California: Jossey-Bass.

Nora, A. (1993). Two-year colleges and minority students' educational aspirations: Help or hindrance. In J.C. Smart (Ed.), *Handbook of Higher Education: Theory and Research*, Vol IX. New York, NY: Agathon Press.

Pascarella, E.T., Bohr, L., Nora, A., Zusman, B., Inman, P., & Desler, M. (1993). Cognitive impacts of living on campus versus commuting to college, *Journal of College Student Development, 34*(3), 216-220.

Cabrera, A.F., Nora, A., & Castaneda, M.B. (1993). College persistence: The testing of an integrated model. *Journal of Higher Education, 64*(2), 123-139.

000082
**Exhibit 51**

Cabrera, A.F., Nora, A., & Castaneda, M.B. (1992). The role of finances in the student persistence process: A structural model. *Research in Higher Education, 33*(5), 571-594.

Cabrera, A.F., Castaneda, M.B., Nora, A., & Hengstler, D. (1992). The convergent and discriminant validity between two theories of college persistence. *Journal of Higher Education, 63*(2), 143-164.

Nora, A., & Horvath, F. (1990). Structural pattern differences in course enrollment rates among community college students. *Research in Higher Education, 31*(6), 539-554.

Nora, A., & Rendon, L. (1990). Determinants of predisposition to transfer among community college students: A structural model. *Research in Higher Education, 31*(3), 235-255.

Nora, A., Attinasi, L., & Matonak, A. (1990). Quantification and testing of qualitative measures of precollege factors in Tinto's model of student attrition among a community college student population. *Review of Higher Education, 13*(3), 337-355.

Nora, A. (1990). Campus-based aid programs as determinants of retention among Hispanic community college students. *Journal of Higher Education, 61*(3), 312-331.

Nora, A., & Rendon, L. (1990). Differences in mathematics and science preparation and participation among community college minority and nonminority students. *Community College Review, 18*(2), 29-40.

Nora, A., & Olivas, M.A. (1989). Faculty attitudes towards proprietary research on campus. *Research in Higher Education, 29*(1), 1-23.

Nora, A., & Horvath, F. (1989). The impact of federal financial aid policy on minority student access. *Education and Urban Society, 21*(3), 299-311.

Rendon, L., & Nora, A. (1989). A synthesis and application of research on Hispanic students in community colleges. *Community College Review, 17*(1), 79-85.

Rendon, L., & Nora, A. (1988). Hispanics in the educational pipeline: Addressing the causes and cures of attrition. *Educational Record, 68*(4)/69(1), 79-85.

Nora, A. (1987). Determinants of retention among Chicano college students: A structural model. *Research in Higher Education, 26*(1), 31-59.

## Peer-Refereed Chapters in Books

Rendon, L., Nora, A., & Kanagala, V. (2015). Ventajas/Assests and Conocimientos/Knowledge: Ventajas (Assets) y Conocimientos (Knowledge): Toward An Asset-Based Model To Foster Latin@ Student Success. In *Hispanic Serving Institutions in Higher Education* (p. 35). Sterling, Virginia: Stylus, Inc.

000083
Exhibit 51

Nora, A., & Crisp, G. (2012). Student persistence and subsequent degree attainment beyond the first year in college: Existing knowledge and directions for future research. In A. Seidman (Ed.) *College Student Retention: Formula for Student Success, 2nd Edition* (pp. 229-250). Lanham, Maryland: Rowman & Littlefield Publishers, Inc.

Nora, A. (2009). Researching Hispanic undergraduates: Conceptual and methodological unease. In R. Winkle-Wanker, D. Ortloff and C. Hunter's (Eds.) *Bridging the gap between theory and practice in educational research: Methods at the margins*. Palgrave MacMillan.

Nora, A., Barlow, L., & Crisp, G. (2006). An assessment of Hispanic students in four-year institutions of higher education. In J. Castellanos & A. Gloria's (Eds.), *The Latina/o pathway to the Ph.D*. Stylus Publishing, pp. 55-77.

Nora, A., Barlow, L., & Crisp, G. (2005). Student persistence and degree attainment beyond the first year in college: The need for research. In A. Siedman's (Ed.), *College student retention: Formula for student success*. Praeger Publishers, 129-154.

Nora, A. (April 2003).   Access to higher education for Hispanic students: Real or illusory? In L. Jones and J. Castellanos' (Eds*.), The majority in the minority: Retaining Latina/o faculty, administrators and students*. Sterling, Virginia: Stylus Publishing, LLC.

Nora, A. (2002). A theoretical and practical view of student adjustment and academic achievement. In W. Tierney and L Hagedorn (Eds.), *Increasing access to college: Extending possibilities for all students*. State University of New York Press: Albany.

St. John, E.P., Cabrera, A.F., Nora, A., & Asker, E.H. (2001). Economic perspectives on student persistence. In J. Braxton's (Ed.), *Rethinking the departure puzzle: New theory and research on college student retention*. Vanderbilt University Press: Nashville.

Rendon, L.I., Jalomo, R., & Nora, A. (2001). Minority student persistence. In J. Braxton's (Ed.), *Rethinking the departure puzzle: New theory and research on college student retention*. Vanderbilt University Press: Nashville.

Nora, A. (2000). Balancing research, teaching, and service. In M. Garcia's (Ed.), *Succeeding in an academic career: A guide for faculty of color*. Greenwood Publishing Group.

Rendon, L., & Nora, A. (1994). Improving Transfer Opportunities for Hispanic Students. In M. Justiz, R. Wilson & L. Bjork (Eds.) *Minorities in higher education*. ACE/Macmillan.

Attinasi, L., & Nora, A. (1992). Diverse Students and Complex Issues: A Case for Multiple Methods in College Student Research. In F.K. Stage (Ed.) *A diversity of methods for assessment and research on college students*. ACPA Media.

Rendon, L., & Nora, A. (1991). Hispanic Women in Non-Traditional Careers. In L. Wolfe (Ed.) *Women, work, and school*. Westview Press: Boulder.

000084
Exhibit 51

Nora, A., & Rendon, L. (1988). Hispanic Student Retention in Community Colleges: Reconciling Access with Outcomes. In L.Weis (Ed.) *Class, race and gender in U.S. education.* SUNY Press: Buffalo.

## Chapters in Books (*non-refereed*)

Rendon, L.I., & Nora, A. (1994, Fall). Improving opportunities for minorities to transfer. In M. Justiz (Ed.), *Minorities in higher education*, 120-138. Washington, DC: Oryx/American Council on Education.

## Commissioned Papers/Policy Papers

Nora, A. (October 2008). *Remediation of College Students: A Summary of Empirical Findings on Developmental Education.* Paper commissioned by the Texas Higher Education Coordinating Board, Closing the Gaps Initiative. To be published by THECB for dissemination at the state and national levels (2009).

Nora, A., Lopez, M.A., & Hall, W.D. (Summer 2008). *Hispanic and African American College Students: A Summary of Empirical Findings*. Commissioned Paper for the Southern Education Foundation, Inc.

Rendon, L., Nora, A., Cabrales, J., Ranero, J., & Vasquez, P. (2008). Latino Student Success: A realizable Goal. *Education Policy and Practice Perspectives*. No. 3, Iowa State University, Department of Educational Leadership and Policy Studies.

Rendon, L., Nora, A., Gans, W., & Calleroz, M. (1998). *Student Academic Progress Report, Baseline 1997-1998*. Urban Partnerships Assessment Center, Arizona State University.

Rendon, L.I., Nora, A., London, H., Gans, W.L., & Calleroz, M.D. (1997). *Assessment Guide*. Arizona State University, Tempe, AZ: The Ford Foundation's Urban Partnership Program National Assessment Center.

Rendon, L.I., Nora, A., London, H., Gans, W.L., & Calleroz, M.D. (1997). *Student Academic Progress: Key Data Trends, Baseline 1995-96*. Arizona State University, Tempe, AZ: The Ford Foundation's Urban Partnership Program National Assessment Center.

Rendon, L.I., Nora, A., & London, H. (1997). *Assessment in the Ford Foundation's Urban Partnership Program*. Arizona State University, Tempe, AZ: The Ford Foundation's Urban Partnership Program National Assessment Center.

Rendon, L.I., Nora, A., & London, H. (1996). *Assessment Guide*. Arizona State University, Tempe, AZ: The Ford Foundation's Urban Partnership Program National Assessment Center.

Rendon, L.I., & Nora, A. (1996). *It Takes a Partnership: Student Voices in the Ford Foundation's Urban Partnership Program*. Arizona State University, Tempe, AZ: The Ford Foundation's Urban Partnership Program National Assessment Center.

Rendon, L.I., Nora, A., & London, H. (1994). *Evaluation Manual*. Arizona State University, Tempe, AZ: The Ford Foundation's Urban Partnership Program National Assessment Center.

Rendon, L.I., & Nora, A. (1988, November). *Salvaging transfer students: Toward Alternative Structures to the Baccalaureate*. Commissioned paper for the Carnegie Corporation Quality Education for Minorities Project. Cambridge, MA: M.I.T. (ERIC Document Reproduction No. ED 305 098).

Rendon, L.I., & Nora, A. (1987). *Hispanics in the educational pipeline: Addressing the cuases and cures of attrition*. Commissioned paper for Raza Administrators and Counselors in Higher Education. Irvine, CA.

Nora, A., & Rendon, L.I. (1987). *A discriminate analysis of math and science students in community colleges*. Institute for Higher Education, Law and Governance. Houston, TX: University of Houston.

**White Papers (referred)**

Rendon, L.I., Dowd, A., & Nora, A. (2012). *Priced out: A closer look at postsecondary financial aid for Latinos.* White House Symposium, White House Initiative on Excellence for Hispanic Americans, Los Angeles, CA.

**White Papers**

Nora, A., & Crisp, G. (2012). *Future research on Hispanic students: What have we yet to learn and what new and diverse perspectives are needed to examine Latino success in higher education.* White paper for Hispanic Association for Colleges and Universities (HACU). San Antonio, Texas.

Crisp, G., & Nora, A. (2012). *Hispanic and higher education: An overview of research, theory and practice*. White paper prepared for the Hispanic Association of Colleges and Universities.

Nora, A., & Crisp, G. (2012). *Hispanic student participation and success in developmental education.* White paper for Hispanic Association for Colleges and Universities (HACU). San Antonio, Texas.

Nora, A., & Reyes, N. (2012). Lost among the data: A review of Latino first generation college students. White paper for Hispanic Association for Colleges and Universities (HACU). San Antonio, Texas.

000086
Exhibit 51

Nora, A., & Crisp, G. (2012). *Overview of Hispanics in science, mathematics, engineering and technology (STEM): K-16 representation, preparation, and participation.* White paper for Hispanic Association for Colleges and Universities (HACU). San Antonio, Texas.

Nora, A. (1998). Community colleges in the 21st century: Revising and reexamining their mission. *New Expeditions: Charting the Second Century of Community Colleges.* (http://www.aacc.nche.edu/initiatives/neexpeditions/accesswhite.htm).

## Journal Articles (*non-referred*)

Nora, A. (2007). Unmasking the myth of access. *The Hispanic Outlook in Higher Education, 17*(13), 76.

Nora, A. (2001). How minority students finance their higher education. *ERIC Digest, 171*, ERIC Clearinghouse on Urban Education, Office of Educational Research and Improvement, U.S. Department of Education.

## Single and First-Authored Articles (*under review*)

Nora, A., Crisp, G., & Taggart, A. (*revise and resubmit*). Future research on Hispanic students: What have we yet to learn? and What new and diverse perspectives are needed to examine Latino success in higher education? Manuscript currently under review with *The Journal of Higher Education* (submitted January, 2011).

Nora, A., & Garcia, V. (*under review*). Attitudes related to remediation among developmental students in higher education. Submitted to the *Journal of College Student Development.*

Nora, A., & Garcia, V. (*under review*). An exploration of the influence that perceptions of remediation have on the persistence of developmental students in higher education. Submitted to the *Journal of College Student Retention: Research, Theory and Practice.*

Nora, A., & Lang, D. (*under review*). The impact of psychosocial factors on the achievement, academic and social adjustment, and persistence of college students. Submitted to *Journal of College Student Retention: Research, Theory and Practice.*

## Other Articles, including Bulletins and Technical Reports

Rendon, L., & Nora, A. (1988). Salvaging transfer students toward new policies that facilitate baccalaureate attainment. Commissioned paper for Carnegie Corporation: *Quality Education for Minorities Project.* Massachusetts Institute of Technology (MIT): Cambridge, Mass.

Nora, A. (1987). Causal relationships of factors underlying science and engineering education of Hispanics. In Linda S. Dix (Ed.), *Minorities: Their underrepresentation and career differentials in science and engineering* (Proceeding of a workshop funded by the Office of

Scientific and Engineering Personnel and the National Research Council). National Academic Press: Washington, DC.

## Books and Monographs

Turner, C.S., antonio, a.l., Garcia, M., Laden, B.V., Nora, A., & Presley, C.L. (Eds.) (2002). *Racial and Ethnic Diversity in Higher Education* (2nd Edition). Pearson Custom Publishing: Boston, MA.

Bess, J.L., & Webster, D.S. (Eds.) (1998). Associate Editor for *ASHE Reader on Foundations of American Higher Education*. Simon & Schuster Custom Publishing: Needham Heights, MA.

Turner, C., Garcia, M., Nora, A., & Rendon, L. (Eds.) (1995). *ASHE Reader on Diversity*. Simon & Schuster Custom Publishing: Needham Heights, MA.

Nora, A., & Cabrera, A.F. (1992). *Measuring program outcomes: What impacts are important to assess and what impacts are possible to measure for the Talent Search Program*. U.S. Department of Education: Office of Policy and Planning.

Cabrera, A.F., Nora, A., & Hengstler, D. (1991). *In search of an integrative framework on college persistence*. University of Houston: Institute for Higher Education Law and Governance.

## Book Reviews

Nora, A. (1988). Book review of Renewing the American Community College, W.L. Deegan, D. Tillery & Associates (eds.) for *The Journal of Higher Education, 59*(5), 608-609.

## Research Articles (*in progress*)

Nora, A. (*in progress*). An overview of first generation Hispanic students in higher education.

Nora, A., & Crisp, G. (*in progress*). Remediation of college students: A summary of empirical findings on developmental education.

Nora, A., & Rendon, L. (*in progress*). Community Colleges: Past Failures and Future (Mis)Expectations. *Journal of Hispanics in Higher Education*.

Nora, A., & Wanjagi, L. (*in progress*). Perceptions related to the muticulturalization of a four-year institution.

Nora, A., & Rhoden, B. (*in progress*). Factors impacting the long-term persistence of first-time-in-college students at a research institution.

000088
Exhibit 51

Nora, A., & Anderson, R.G. (*in progress*). The role of religiosity as a determinant of persistence for minority and nontraditional college students: A logistic regression analysis of a theoretical model of student persistence.

Nora, A. (*in progress*). A factor structure model of institutional effectiveness for two- and four-year institutions.

Nora, A., & Rantz, R. (*in progress*). Collaborative learning: differential impacts on self-reported gains versus cognitive outcomes.

## —GRANTS—

Transfer Plus Project, U.S. Department of Education. Funding requested: $3,200,000 over five years. Co-Principal Investigating Institutions: University of Texas at San Antonio and Laredo Community College. Grant award to be announced: July 2015.

The Transfer Experience Project, U.S. Department of Education. Funding requested: $3,700,000 over five years. Co-Principal Investigating Institutions: University of Texas at San Antonio, San Antonio College, and Laredo Community College. Grant award to be announced: July 2014.

NASA Educator Professional Development (EPD), National Aeronautics and Space Administration, NASA Office of Education. Funding requesting: $5,000,000 over five years. Co-Principal Investigating Institutions: University of Texas at San Antonio, Texas Institute of Western Cultures, Smithsonian Institute, NASA, school districts in San Antonio, and tribal colleges. Grant award to be announced: October 2014.

NRT: Discovering, Understanding, Enabling, and Controlling Collective Interactions in Multifunctional Materials, National Science Foundation/NRT. Funding requesting: $7,000,000 over five years. Co-Principal Investigating Institutions: University of Texas at San Antonio, Southwest Research Center, postsecondary institutions in China, Taiwan, and other countries. Grant award to be announced: October 2014.

Gaining Early Awareness and Readiness for Undergraduate Programs (Partnership Grants), Department of Education. Funding requestd: $7,000,000 over five years. Co-Principal Investigating Institutions: University of Texas at San Antonio, Alamo Colleges, Region 20, and 12 Texas rural high schools. Grant award to be announced: October 2014.

Grant Award from the TG Foundation. $250,000 (2012-2013). Co-Principal Investigator.

Grant Award from the Lumina Foundation, collaborative with the San Antonio Education Partnership and the Mayor's Office ($600,000), data analysis and evaluation of database on preparing students for college (2011-2013). Co-Principal Investigator.

Grant Award from the Association for Institutional Research, data analysis of NCES database on Hispanic students ($39,800), AIR/NCES/NSF Grant Project (2008-2009). Co-Principal Investigator.

National Center on College Access and Technology, Institute of Education Sciences National Center Program (CFDA 84.305), U.S. Department of Education. Funding requested: $10 million over five years. Co-Principal Investigating Institutions: University of Houston, University of Southern California, The Pennsylvania State University, University of Pennsylvania, and University of Florida. Grant award to be announced: March, 2006. Co-Principal Investigator.

Grant Award from the Association for Institutional Research, data analysis of NCES database on Hispanic students ($30,000), AIR/NCES Grant Project (2004-2005). Co-Principal Investigator.

Quantitative Outcomes Assessment of Houston Annenberg Challenge, subcontract from University of Texas at Austin ($386,000), Houston, TX (1999-2004).

Building a Community of Differences at Bloomfield College, ($12,000). NASPA/Ford Diversity Project (1998).

Conceptual problems affecting the progress of Latinos in our education system, ($5,000). Inter-University Programs for Latino Research/Social Science Research Council (IUP/SSRC). Committee for Public Policy Research on Contemporary Hispanic Issues (1990).

Co-principal investigator and Senior Research Associate for National Study of Student Learning, National Center on Postsecondary Teaching, Learning, and Assessment (NCTLA was a research and development center funded by OERI from 1990-1995 at approximately $5.9 million).

Research on Graduate Students at UIC ($60,000). Graduate Office, University of Illinois at Chicago (1990-1991).

## —PRESENTATIONS—

### Refereed Papers Presented at Professional Meetings

Nora, A., & Rendon, L. (2015). *Debunking deficit perspectives about Latin@ students: An asset-based framework to foster success*. Paper presented at the annual meeting of the American Association for Hispanics in Higher Education, Frisco, TX.

Kanagala, V., Nora, A., & Rendon, L. (2014). *Understanding the Latina/o college student journey at a Hispanic serving institution: An asset-based paradigm*. Presentation at the annual meeting of the American Educational Research Association.

000090
Exhibit 51

Rendon, L., & Nora, A. (2014). *Understanding college completion trajectory of Latino students at a Hispanic serving institution*. Paper presented at the annual meeting of the American Association for Hispanics in Higher Education, Cosa Mesa, CA.

Kanagala, V., Nora, A., & Rendon, L. (2013). *Latino/a college experiences and completion at a Hispanic serving institution*. Presentation at the annual meeting of the Association for the Study of Higher Education, St. Louis, MO.

Nora, A., Crisp, G., & Taggart, A. (2012). *Research on Hispanic students: What do we know? What have we yet to learn? And What new and diverse perspectives are needed to examine Latino/a success in higher education.* Paper presented at the annual meeting of the Association for the Study of Higher Education, Las Vegas, NV.

Crisp, G., & Nora, A. (2009). *Hispanic Student Success: Factors Influencing the Persistence and Transfer Decisions of Latino Community College Students Enrolled in Developmental Education*. Paper presented at the annual Association for Institutional Research (AIR) Forum, Jacksonville, FL.

Nora, A. (2009). *Hispanic and African American College Students: A Summary of Empirical Findings*. Presentation at the annual meeting of the Educational Policy Institute, New Orleans, Louisiana.

Nora, A., & Snyder, B.P. (2007, April). *Structural differences in scholarly engagement among full- and part-time doctoral students.* Paper presented at the annual meeting of the American Educational Research Association, Chicago, IL.

Nora, A., & Snyder, B.P. (2006, November). *An examination of the influence of self-efficacy and financial factors on graduate student professional and scholarly engagement*. Paper presented at the annual meeting of the Association for the Study of Higher Education, Anaheim, CA.

Nora, A. *Student persistence in higher education: An overview of minorities' college adjustment, academic performance and degree attainment*. Presentation to be made at the 19th Annual National Conference on Race & Ethnicity in American Higher Education (NCORE 2006), (June, 2006)

Nora, A., & Yeh, K. *The impact of social psychological factors on Taiwanese adult learner's second language achievement and performance*. Presentation to be made at the Annual Meeting of the American Educational Research Association (March, 2006).

Nora, A., & Crisp, G. *Mentoring students: Conceptualizing and validating the multi-dimensions of a support system*. Presentation at the Annual Meeting of the Association for the Study of Higher Education (November, 2005).

50

Nora, A. *Hispanic students in two- and four-year institutions of higher education: An overview of college adjustment, academic performance and graduation*. Presentation made at the Annual Meeting of the Noel-Levitz Retention Conference (June, 2005).

Arbona, C., & Nora, A. *Predicting college attainment of Hispanic students: Individual, institutional, and environmental factors*. Paper presentation at the Annual Meeting of the Association for Institutional Research (May, 2005).

Nora, A. *The impact of perceived support systems on college choice among undergraduates*. Presentation at the Annual Conference of the American Educational Research Association (April, 2004).

Nora, A. *A reconceptualization of persistence theory*. Symposium presentation at the Annual Meeting of the Association for the Study of Higher Education (November, 2003).

Nora, A. *Universal access in higher education: Myth or reality*. Symposium presentation at the Annual Meeting of the Association for the Study of Higher Education (November, 2003).

Nora, A., & Anderson, R.G. *The role of religiosity as a determinant of persistence for minority and nontraditional college students: A logistic regression analysis of a theoretical model of student persistence*. Paper to be presented at the annual meeting of the American Educational Research Association (April, 2003).

Nora, A. *The impact of mentoring experiences on withdrawal behavior among first-year college students at a two-year institution*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 2002).

Ruban, L., & Nora, A. *Differences among high achieving and low achieving students using self-regulated learning and compensatory strategies*. Paper presented at the annual meeting of the American Educational Research Association (April, 2002).

Ruban, L., & Nora, A. *The impact of self-regulated learning on the academic achievement of undergraduates with and without learning disabilities*. Paper presented at the annual meeting of the Southwestern Educational Research Association (February, 2002).

Nora, A., & Garcia, V. *The role of perceptions of remediation on the persistence of developmental students in higher education*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 2001).

Nora, A., & Lang, D. *Precollege psychosocial factors related to persistence*. Paper presented at the annual meeting of the Association for Institutional Research (June, 2001).

Nora, A., & Rantz, R. *Collaborative learning: Differential impacts on self-reported gains versus cognitive outcomes*. Paper presented at the annual meeting of the American Educational Research Association (April, 2001).

000092
Exhibit 51

Nora, A., & Lang, D. *The impact of psychosocial factors on the achievement, academic and social adjustment, and persistence of college students*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1999).

Nora, A., & Garcia, V. *Attitudes related to remediation among developmental students in higher education*. Paper presented at the annual meeting of the American Educational Research Association (April, 1999).

Pascarella, E.T., Imes, K., Nora, A., Terenzini, P.T., Edison, M., & Hagedorn, L. *Cognitive impacts of intercollegiate athletic participation: Some further evidence*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1998).

Cabrera, A.F., Nora, A., Bernal, E.M., Terenzini, P.T., & Pascarella, E.T. *Collaborative learning: Preferences, gains in cognitive and affective outcomes, and openness to diversity among college students*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1998).

Pascarella, E.T., Edison, M.I., Nora, A., Hagedorn, L.S., & Terenzini, P.T. *Does work inhibit cognitive development during the first year of college?* Paper presented at the annual meeting of the American Educational Research Association (April, 1998).

Whitt, E.J., Pascarella, E.T., Edison, M.I. Nora, A., & Terenzini, P.T. *Women's perceptions of a "chilly climate" and cognitive outcomes during college*. Paper presented at the annual meeting of the American Educational Research Association (April, 1998).

Hagedorn, L.S., Pascarella, E.T., Edison, M., Braxton, J., Nora, A., Terenzini, P.T., & Knight, W. *Does institutional context influence the development of critical thinking?* Paper to be presented at the annual meeting of The Association for Institutional Research (May, 1998).

Springer, L., Palmer, B., Terenzini, P., Pascarella, E., & Nora, A. *The impact of ethnic and women's studies courses on students' attitudes toward diversity on campus*. Paper presented at the meeting of the American Educational Research Association (March, 1997).

Nora, A., & Cabrera, A.F. *Factors affecting the involvement of graduate students in scholarly behavior: A logistic regression analysis*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1997).

Nora, A., Kraemer, B., & Itzen, R. *Factors affecting the persistence of Hispanic college students*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1997).

Whitt, E., Edison, M., Pascarella, E.T, Nora, A., & Terenzini, P.T. *Interactions with peers and cognitive outcomes during college*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1997).

000093
Exhibit 51

Hagedorn, L.S., Fogel, S., Nora, A., & Pascarella, E.T. *Coming apart: An analysis of pre-occupational segregation and inequality in the third year of college*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1997).

Terenzini, P.T., Yaeger, P., Bohr, L., Pascarella, E.T., & Nora, A. *African American college students: Experiences in HBCUs and PWIs and learning outcomes*. Paper presented at the annual meeting of the Association for Institutional Research (May, 1997).

Hagedorn, L.S., Siadat, M.V., Fogel, S.F., Nora, A., & Pascarella, E.T. *Success in college mathematics: Comparisons between remedial and non-remedial first year college students*. Paper presented at the annual meeting of the American Educational Research Association (March, 1997).

Cabrera, A.F., Nora, A., Hagedorn, LS., & Pascarella, E.T. *Campus racial climate and the adjustment of students to college : A comparison between white students and African American students*. Paper presented at the annual meting of the Association for the Study of Higher Education (November, 1996).

Springer, L., Terenzini, P.T., Pascarella, E.T., & Nora, A. *Changes in degree aspirations of African American college students at predominately black and predominately white institutions*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1996).

Pascarella, E.T., Whitt, E.J., Edison, M.I., Nora, A., Hagedorn, L.S., Yaeger, P., & Terenzini, P.T. *The 'chilly climate' for women and cognitive outcomes during the first year of college*. Paper presented at the annual meting of the Association for the Study of Higher Education (November, 1996).

Terenzini, P., Yaeger P., Pascarella, E., & Nora, A. *Work-study program infuences on college students' cognitive development*. Paper presented at the meeting of the Association for Institutional Research (May, 1996).

Nora, A., & Grant, J.M. *Structural differences in scholarly engagement among full- and part-time doctoral students*. Paper presented at the annual meeting of the American Educational Research Association (April, 1996).

Nora, A., Cabrera, A.F., Hagedorn, L., & Pascarella, E.T. *Gender differences in underlying structural patterns among behavioral, cognitive, and attitudinal outcomes among four-year college students*. Paper presented at the annual meeting of the American Educational Research Association (April, 1996).

Hagedorn, L.S., Siadat, M., Nora, A., & Pascarella, E.T. *Factors leading to gains in mathematics during the first year of college*. Paper presented at the annual meeting of the American Educational Research Association (April, 1996).

000094
Exhibit 51

Pascarella, E.T., Nora, A., Edison, M., Hagedorn, L.S., & Terenzini, E.T. *Influences of students' openness to diversity and challenge in the first year of college.* Paper presented at the annual meeting of the American Educational Research Association (April, 1996).

Pascarella, E.T., Nora, A., Edison, M., Hagedorn, L.S., & Terenzini, E.T. *Influences on students' internal locus of attributions for academic success in the first year of college.* Paper presented at the annual meeting of the American Educational Research Association (April, 1996).

Springer, L., Terenzini, P., Pascarella, E., & Nora, A. *Do white students perceive racism toward minority groups on campus?* Paper presented at the meeting of the American Educational Research Association (April, 1995).

Pascarella, E., Edison, M., Whitt, E., Nora, A., Hagedorn, L.S., & Terenzini, P.T. *Cognitive effects of Greek affiliation during the first year of college.* Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1995).

Yaeger, P. Terenzini, P.T., Nora, A., & Terenizini, P.T. *Perceptions of gender discrimination and the effect on degree aspirations.* Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1995).

Springer, L., Palmer-Crampton, B., Terenzini, P.T., Pascarella, E.T., & Nora, A. *Participation in a racial or cultural awareness workshop and attitudes toward diversity on campus.* Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1995).

Hagedorn, L.S., Nora, A., & Pascarella, E.T. *Pre-occupational segregation among freshman students: An application of the Duncan Dissimilarity Index to declared college majors.* Paper presented at the annual meeting of the American Educational Research Association (April, 1995).

Pascarella, E.T., Hagedorn, L.S., Nora, A., & Edison, M. *Effects of teacher organization/preparation and teacher skill/clarity on general cognitive skills in college.* Paper presented at the annual meeting of the American Educational Research Association (April, 1995).

Terenzini, P.T., Springer, L., Pascarella, E.T., & Nora, A. *First-generation college students: Their characteristics and experiences, and the effects on their critical thinking skills.* Paper presented at the annual meeting of the American Educational Research Association (April, 1995).

Nora, A., & Cabrera, A.F. *The role of significant others in the adjustment and persistence of minorities and non-minorities in higher education.* Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1994).

54

Cabrera, A.F., & Nora, A. *The role of perceptions of prejudice in the collegiate experiences of minorities and nonminorities*. Paper presented at the annual meeting of the American Educational Research Association (April, 1994).

Hagedorn, L.S., & Nora, A. *The effects of gender-based wage differentials on job satisfaction and commitment among female faculty*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1994).

Terenzini, P.T. Springer, L., Pascarella, E.T., & Nora, A. *The multiple influences on college students' critical thinking skills*. Paper presented at the annual meeting of the Association for the Study of Higher Education (November, 1994).

Nora, A., Cabrera, A.F., Hagedorn, L.S., & Pascarella, E.T. *Differential impacts of academic and social experiences on college-related behavioral outcomes across different ethnic and gender groups at four-year institutions*. Paper presented at the annual conference of the American Educational Research Association (April, 1994).

Terenzini, P.T., Springer, L., Pascarella, E.T., & Nora, A. *Influences on college students' orientation toward learning for self-understanding*. Paper presented at the annual meeting of the American Educational Research Association (April, 1994).

Terenzini, P.T., Springer, L., Pascarella, E.T., & Nora, A. *In- and out-of-class influences affecting the development of students' intellectual orientations*. Paper presented at the meeting of the Association for the Study of Higher Education (November, 1993).

Cabrera, A.F., & Nora, A. *The underlying dimensionality of perceptions of prejudice among ethnically diverse college students*. Paper presented at the meeting of the Association for the Study of Higher Education (November, 1993).

Nora, A., Castaneda, M.B., & Cabrera, A.F. *Student persistence: The testing of a comprehensive structural model of retention*. Paper presented at the annual conference of the Association for the Study of Higher Education (November, 1992).

Nora, A., & Cabrera, A.F. *Graduate student involvement in scholarly behavior: A structural model*. Paper presented at the annual conference of the American Educational Research Association (April, 1992).

Cabrera, A.F., Nora, A., & Castaneda, M.B. *The role of finances in the persistence process: A structural model*. Paper presented at the annual conference of the American Educational Research Association (April,1992).

Nora, A., & Cabrera, A.F. *An exploratory examination of the impact of institutional factors on outcomes of graduate education*. Paper presented at the annual conference of the Association for the Study of Higher Education (November, 1991).

55

Nora, A., & Wedham, E. Off-campus experiences: *The pull factors affecting freshman-year attrition on a commuter campus*. Paper presented at the annual conference of the American Educational Research Association (April, 1991).

Nora, A., & Cabrera, A.F. *The construct validity of institutional commitment: A confirmatory factor analysis*. Paper presented at the annual conference of the Association for the Study of Higher Education (November, 1991).

Cabrera, A.F., Nora, A., & Castaneda, M.B. *College persistence: The testing of an integrated model*. Paper presented at the annual conference of the Association for the Study of Higher Education (November, 1991).

Cabrera, A.F., Nora, A., Castaneda, M.B., & Hengstler, D. *Determinants of persistence: The inclusion and testing of ability to pay factors in Tinto's model of student attrition*. Presented to the Association for the Study of Higher Education (November, 1990).

Cabrera, A.F., Castaneda, M.B., Nora, A., & Hengstler, D. *The convergence between two theories of college persistence*. Paper presented to the Association for the Study of Higher Education (November, 1990).

Nora, A., & Attinasi, L. *Testing qualitative indicators of precollege factors in a recursive model of student persistence among a community college student population*. Paper presented to the Association for Institutional Research (May, 1990).

Nora, A., & Rendon, L. *A non-recursive model of community college faculty transfer commitments*. Presented to the Association for the Study of Higher Education (November, 1989).

Nora, A., & Rendon, L. *Structural pattern differences in course enrollment rates among community college students*. Presented to the American Educational Research Association (March, 1989).

Nora, A,. & Rendon, L. *Determinants of pre-disposition to transfer among community college students: A structural model*. Presented to the Association for the Study of Higher Education (November, 1988).

Nora, A., & Attinasi, L. *Quantification and testing of qualitative measures of precollege factors in Tinto's model of student attrition among a community college student population*. Presented to the Association for the Study of Higher Education (November, 1988).

Nora, A., & Attinasi, L. *A second-generation theoretical model of the persistence of transfer students*. Presented to the American Educational Research Association (March, 1988).

Nora, A., & Olivas, M.A. *Faculty attitudes towards proprietary research on campus: A state case study*. Presented to the Association for the Study of Higher Education (April, 1987).

000097
Exhibit 51

Nora, A. *Campus-based aid programs as determinants of retention among Chicano community college students: A structural model.* Paper presented to American Educational Research Association (April, 1987).

Nora, A., & Rendon, L. *A discriminant analysis of math and science students in Southwest community colleges.* Presented to American Educational Research Association (February, 1987).

Nora, A., & Attinasi, L. *The use of naturalistic research to improve quantitative conceptualizations of student persistence in college.* Presented to the Association for the Study of Higher Education (November, 1987).

Nora, A. *Determinants of retention among Chicano college students: A structural model.* Paper presented to American Educational Research Association (April, 1985).

## Invited Papers

Rendon, L., & Nora, A. (October, 1987). *Hispanics in the educational pipeline: Addressing the causes and cures of attrition.* Paper presented to annual conference of the Raza Advocates for California Higher Education.

## Invited Colloquia

Nora, A., & Rendon, L. (2015). The impact of cognitive and psychosocial factors on sense of belonging and academic performance. Presentation made to the Tomas Rivera Center at the University of Texas at San Antonio, San Antonio, TX.

Nora, A., & Rendon, L. (2014). A retrospective case study of Hispanic college students at UTSA: An exploratory profile. Colloquia presented to the Office of Student Affairs, University of Texas at San Antonio, San Antonio, TX.

Nora, A., Rendon, L., McMilllin, S., Serrata,W., L'Orange, H., & Swail, S.(Moderator), EPI Forum on Education and the Economy, "The present and future of college access and affordability," Education Policy Institute, San Antonio, TX. (October 2014).

Nora, A. (2014). Retention 2014 Student Success Symposium, "Factors impacting student success," Education Policy Institute, San Antonio, TX. (October 2014)

Nora, A., & Rendon, L. (2014). UTSA undergraduate student survey 2014: Latent constructs in the conceptual framework. Colloquia presented to the Office of Student Affairs, University of Texas at San Antonio, San Antonio, TX.

Rendon, L., & Nora, A. (2014). A contemporary analysis of Latino's college experiences and completion (Part 1). Presentation to the San Antonio Diplomas Project staff, Lumina Foundation Grant, San Antonio, TX.

000098
Exhibit 51

Rendon, L., & Nora, A. (2014). The Latino/a college experience at UTSA: Identifying pathways towards degree completion. Colloquia presented to the Faculty Senate at the University of Texas at San Antonio, San Antonio, TX.

Rendon, L., & Nora, A. (2013). A contemporary analysis of Latino's college experiences and completion (Part 1). Presentation to the San Antonio Diplomas Project staff, Lumina Foundation Grant, San Antonio, TX.

Nora, A. (September, 2007). Presentation made at the Texas Higher Education Coordinating Board's Governing Conference. Houston, TX.

Nora, A., & Rendon, L. (September, 2006). *Evaluating retention efforts and outcomes in higher education*. Presentation to be made at a conference of administrators and practitioners from four-year institutions in Mexico.

Nora, A. (August, 2005). *Student persistence: Incorporating a holistic view in research on undergraduates and retention efforts*. Presentation to the faculty and administration of the University of Monterrey, Mexico.

Nora, A. (August, 2003). *Identifying factors specific to learning communities: Using research to inform practice*. Presentation to the Freshman Programs Conference, California State University, Sacramento.

Nora, A. (August, 2003). *Establishing communities of learners: A framework for practice*. Colloquia presented to tribal colleges as part of a federal grant awarded to Salish Kootenai College, Missoula, Minnesota.

Nora, A. (November, 2002). *Financial aid as a factor in the persistence process: Research, practice, and policy*. Presentation to the Graduate Student Policy Seminar, Association for the Study of Higher Education.

Nora, A. (April, 2002). *An overview of the academic and social adjustment to college of undergraduates*. National Meeting of NASME, St. Louis, Missouri.

Nora, A. (February, 2002). *Access, retention and graduation patterns of Chicano and Latino students at the national, state and local levels*. Spring 2002 Chicano and Latino Access and Retention and Graduation Symposium, California State University-Long Beach.

Nora, A. (April, 2001). *Factors affecting the academic and social adjustment and persistence of minority students*, Tribally-Controlled TRIO Programs, U.S. Department of Education.

Nora, A. (March, 2001). *Factors affecting the academic and social adjustment and persistence of minority students at two-year institutions*. Colloquia presented to tribal colleges as part of a federal grant awarded to Salish Kootenai College, Minneapolis, Minnesota.

Nora, A. (May, 2001). *Retaining undergraduate students*. Colloquia presented to faculty and administrators at Canada College, Redwood, CA.

Nora, A., & Rendon, L. (May, 2001). Keynote address before the Student Retention Summit at Cal State Fullerton.

Nora, A. (January, 2000). *Predictors of achievement and adjustment of two- and four-year college students*. Colloquia presented to the Gulf Coast Consortium of Instructional Administrators, Transfer Project. Houston, TX.

Nora, A. (August 1999). *College student persistence: An overview of the academic and social adjustment to college of undergraduates*. Colloquia presented at the University of Detroit Mercy President's Convocation, University of Detroit Mercy. Detroit, MI.

Nora, A. (September, 1999). *Performance indicators of student academic and social adjustment to college*. Colloquia presented to the Ministerio de Cultura y Educacion, Seminario: Indicadores Universiarios, Tendencias y Experiencias Internacionales. Buenos Aires, Argentina.

Nora, A. (December, 1998). *Factors affecting the persistence of Hispanic college students*. Arizona State University.

Nora, A. (May, 1995). *Student, institutional, and environmental factors impacting the persistence process among minority and non-minority college students*. Colloquia presented to Deans' Council, Columbia College.

Nora, A. (February 1995). *Conceptual models of student persistence: From theory to intervention*. Colloquia presented to the Texas Association for Institutional Research, San Antonio,.

Nora, A. (March, 1995). *Factors affecting minority students' attitudes, achievement, and persistence*. Colloquia presented to faculty and administrators, Penn State University.

Nora, A. (June, 1994). *Institutional factors related to student persistence*. Colloquia presented to Freshman Year Experience Symposium, University of Arizona.

Nora, A. (March, 1994). *Theoretical frameworks of persistence: Factors influencing dropout behavior*. Colloquia presented to the Retention Task Force, University of Illinois at Chicago.

Nora, A., (May, 1993). *Retention of Latino students in higher education*. Colloquia presented to the Latino Eligibility Study Task Force, Spring Symposium.

Nora, A. (November, 1992). *The relationships between Hispanics' academic and social adjustment in college and persistence*. Colloquia presented to the Pennsylvania Governor's Commission on Latino Affairs.

000100
Exhibit 51

Nora, A. (April, 1992). *A Theoretical Framework for the Study of Minority Undergraduate Student Persistence*. Colloquia presented to the Hispanic Association for College and Universities' (HACU) "National Conference on the Retention of Hispanic College Students".

Nora, A. (September, 1990). *Factors Related to Persistence*. Colloquia presented to Office of Planning and Resource Management (OPRM), University of Illinois at Chicago.

Nora, A. (March, 1990). *Factors found to be related to student persistence: A review of theoretically-based studies*. Colloquia presented to Triton Community College, College of the Sequoias, and Rio Hondo Community College.

Nora, A. (May, 1990). *Factors related to persistence*. Colloquia presented to the College of Education Higher Education Conference, Chicago.

Nora, A. (June, 1990). *Retention, achievement, and financial aid factors: A review of the literatur*e. Colloquia presented to the School of Education, Program in Higher and Adult Continuing Education, University of Michigan.

Nora, A. (Spring, 1988). *Determinants of retention among a Hispanic community college student population*. Colloquia presented to the College of Education, University of Illinois at Chicago.

Nora, A. (1988). *Hispanics in higher education*. Colloquia presented to School of Education, University of Southern California.
Nora, A. (1987). *Retention of minorities in higher education*. Colloquia presented to Retention Committee, University of Houston.

Nora, A. (May, 1987). *Issues impacting black and Hispanic populations.* Presentation on access and retention, Symposium on the Future of Higher Education for San Antonio. San Antonio, Texas: Our Lady of the Lake University of San Antonio.

Nora, A. (Spring, 1986). *Analyzing a causal model of retention among a minority college student population*. Colloquia presented at Phi Delta Kappa Spring Seminar.

Nora, A. (Fall, 1984). *The Use of causal modeling in bilingual education research*. Texas Association of Bilingual Education Conference, Houston.

## Symposium Presentations and Conference Discussant

Stanley, C., Bensimon, E., Bonner, F., Chang, M., Nora, A., Patitu, C., & Turner, C. (2013). *Preparing for full professor: Critical dialogues among senior higher education scholars on gender and racial equity in research, scholarship and teaching*. Symposium at the annual meeting of the Association for the Study of Higher Education, St. Louis, Missouri.

000101
Exhibit 51

Keup, J., Floyd, D., Thomas, S., Braxton, J., Nora, A., Toutkoushian, R., Valimaa, J., & Wawrzynski, M. (2013). *Journal editors insights into the publishing process.* Symposium at the annual meeting of the Association for the Study of Higher Education, St. Louis, Missouri.

Nora, A., Kanagala, V., & Rendon, L. (fall, 2013). *Hispanic students at an HSI institution*. Roundtable presentation at the annual meeting of the Association for the Study of Higher Education.

Nora, A., Braxton, J., Gore, P., Morris, L., Thomas, S., Toutkoushian, R., Valimaa, J., & Wawrzynski, M. (fall, 2013). *Journal editors reflect on the publishing process.* Symposium at the annual meeting of the Association for the Study of Higher Education, St. Louis, Missouri.

Nora, A., Braxton, J., Gore, P., Morris, L., Thomas, S., Toutkoushian, R., Valimaa, J., & Wawrzynski, M. (fall, 2012). *Journal editors reflect on the publishing process.* Symposium at the annual meeting of the Association for the Study of Higher Education, Las Vegas, NV.

Bensimon, E., Bonner, F., Nora, A., Chang, M., Turner, C., & Stanley, C. (fall, 2011). *Preparing for Full Professor, Does Race Matter? Senior Higher Education Scholars Reflect on Research and Practice*. Symposium at the annual meeting of the Association for the Study of Higher Education.

Bensimon, E., Hurtado, S., Nora, A., Heller, D., & Luca, S. (fall, 2009). *Findings from the ASHE/Ford Foundation grant Higher Education Equity Institute on Publishing and Scholarship*. Presidential session at the annual meeting of the Association for the Study of Higher Education. Ontario, Canada.

Nora, A., Smart, J., Braxton, J., & Rhoads, G. (November, 2008). *Editors of major higher education journals in the field.* Presidential session at the annual meeting of the Association for the Study of Higher Education. Jacksonville, FL.

Nora, A., Smart, J., Baird, J., & Levine, J. (March, 2006). *Editors of major higher education journals in the field*. Special session at the annual meeting of the American Educational Research Association, Division J (Postsecondary Education).

Nora, A., Smart, J., Baird, J., Levine, J., Rhoads, G., & Hamrick, F. (November, 2004). *Editors of major higher education journals in the field*. Special session at the annual meeting of the Association for the Study of Higher Education.

antonio, a., Anthony, J., Turner, C., Garcia, M., Laden, B., Foster, L., Nora, A.,& Presley, C. (November, 2004). *Meet the editors: A conversation about using the ASHE reader, racial and ethnic diversity in higher education*. Symposium at the annual meeting of the Association for the Study of Higher Education.

Cheslock, J., Smart, J., Nora, A., Lee, J., & Perna, L. (November, 2004). *Challenges and opportunities in quantitative methods*. Symposium at the annual meeting of the Association for the Study of Higher Education.

000102
Exhibit 51

Hagedorn, L.S., Adelman, C., Nora, A., Perna, L., Knight, M., Oesterreich, H., & Colyar, J. (November, 2002). *College preparation programs and college access: Relationships real and imagined*. Symposium at the annual meeting of the Association for the Study of Higher Education.

Bensimon, E., Nora, A., & Patriquin, L. (April, 2000). *Mixed methods in educational research*. Symposium at the annual meeting of the American Educational Research Association.

Bensimon, E., Nora, A., Patriquin, L., & LaBare, M. (November, 1999). *A comparison of qualitative and quantitative findings among college students*. Symposium at the annual meeting of the Association for the Study of Higher Education.

Bensimon, E., Nora, A., LaBare, M., & Patriquin, L. (April, 1999). *Multicultural perspectives among college students*. Symposium at the annual meeting of the American Educational Research Association.

Nora, A. (November, 1996). *College effects on students*. Discussant, research papers for the Association for the Study of Higher Education, Memphis.

Rendon, L., Jalomo, R., Nora, A., Hagedorn, L., & Cuadraz, G.H. (November, 1996). *Improving the educational pathway: Addressing the issues and understanding experiences of at-risk students, K-12 to graduate school*. Symposium at the annual meeting of the Association for the Study of Higher Education, Memphis.

Hagedorn, L., & Nora, A. (November, 1996). *Predictors of success: Rethinking admissions criteria in graduate and professional programs*. Roundtable at the annual meeting of the Association for the Study of Higher Education, Memphis.

Nora, A., Bensimon, E., Rhoads, R., & Tierney, W.G. (April, 1995). *Organizational frameworks and strategies for multicultural campuses*. Symposium at the annual meeting of the American Educational Research Association, San Francisco.

Nora, A. (April, 1992). *Responding to diverse student needs in the two-year college: Contemporary trends and issues*. Discussant, symposium for the American Educational Research Association.

Nora, A. (March, 1988). *Workshop exploring the factors that underlie underrepresentation and differential career development of minorities in science and engineering*. Discussant, workshop sponsored by the National Research Council, funded by the National Science Foundation .

Nora, A. (November, 1987). *The effects of gender, race, and environment on academic and degree attainment*. Discussant, panel presentation for the Association for the Study of Higher Education.

Selected by Special Commission Committee as one of three authors to produce a white (knowledge) paper on student financial aid for national policy considerations, President Barack Obama's White House Initiative for Excellence in Hispanic Student Success, 2012.

Research Excellence Award at a Teaching Institution, American Association of Hispanics in Higher Education (AAHHE), 2012.

Named to High School Longitudinal Study of 2009, Fourth Technical Review Panel, National Center for Education Statistics (NCES), National Science Foundation, and Department of Education, 2010 – 2012.

Selected as an AERA Fellow (Class of 2010) by the American Educational Research Association, 2010.

Appointed as Senior Research Scholar to the University of Texas at Austin Educational Research Center, 2009 – Present.

Appointed as Senior Research Associate for the Educational Policy Institute (EPI), 2009 – Present.

Named to Texas Higher Education Coordinating Board Think Tank on Developmental Education, advisory committee to Higher Education Commissioner, Texas Higher Education Coordinating Board, 2008-2009.

Named to AERA/NCES Think Tank to improve national databases produced by the National Center for Education Statistics, 2007.

Named to Texas Higher Education Task Force on Latino(a) Students, advisory committee to Higher Education Commissioner, Texas Higher Education Coordinating Board, 2007-2008.

Named as Senior Scholar, American College Personnel Association (ACPA), 2005.

Award of Appreciation, Member of the Association for the Study of Higher Education (ASHE)/Lumina Foundation for Education Dissertation Fellowship Program Committee, 2005.

Nominated for the position of Vice-Chair of the Scientific Committee for Europe and North America, Scientific Committees of the UNESCO Forum on Higher Education, Research and Knowledge, 2004.

Certificate of Appreciation for Presentation on Research on Students, Arizona State University West, Learner-Centered Summer Institute 2001.

000104
Exhibit 51

Named to Hall of Honor, College of Education, University of Houston, 2000

Research Excellence Award, College of Education, University of Houston, 1999-2000

Award of Appreciation, Program Chair for 1999 ASHE Conference, The Association for the Study of Higher Education, 1999

Research Award, Assessment for Student Development, Commission IX, American College Personnel Association, 1997

Honorable Mention-Mertes Award for Research Excellence, ACCCA, 1997

Award of Appreciation, The Association for the Study of Higher Education, 1996

AIR Forum Best Paper Award, Association for Institutional Research (AIR), 1995

Early Career Scholar Award, Association for the Study of Higher Education (ASHE), 1992

Visiting Scholar, Pennsylvania State University, Summer 1991

Visiting Scholar, University of Michigan, Summer 1990

First runner-up, 1985 Dissertation of the Year Award, Association for the Study of Higher Education (ASHE) , 1986

Selected to the NIE Graduate Student Seminar in Higher Education, sponsored by the American Educational Research Association (AERA), Division J and the National Institute of Education, 1985

Member, Graduate Student Committee, AERA/ASHE Joint Conference, 1984

Dissertation of the Year, Texas Association of Chicanos in Higher Education, 1985
Dissertation approved with distinction, Educational Leadership and Cultural Studies, College of Education, University of Houston, University Park

## —SERVICE—

### University Service – University of Texas at San Antonio

Committee Member, Limited Submission Review Committee, University of Texas at San Antonio -2013 – Present

Committee Member, VPR Executive Directors Committee, University of Texas at San Antonio – 2013 - Present

64

Task Force Member, Research Excellence Cluster Committee (Social and Educational Transformation), University of Texas at San Antonio -2014

Member, Task Force on the Transition of *Bilingual Review Journal* from Arizona State University to the University of Texas at San Antonio – 2013 – 2014.

Attendee, Meeting, Academic Analytics Task Force, University of Texas at San Antonio

Committee Member, Council of Associate Deans for Research, University of Texas at San Antonio, 2010 - Present

Member, Task Force on F&A Distribution, 2009 – 2012 (appointed by Provost).

Member, Faculty Senate Subcommittee on IRB Policies and Practices, 2010 – 2012 (appointed by Faculty Senate).

Member, Collaborative Committee on Inter-Institutional Grant Partnerships, 2010-present (appointed by Vice President for Research).

Member, Adrum Committee, Vice President for Research, UTSA, 2010.

Member, Task Force on Student Retention, Provost Office, UTSA, 2010.

## University Service – University of Houston

Member, Data Team, Provost Committee on Achieving the Dream, 2007-2009.

Member, Core Team, Provost Committee on Achieving the Dream, 2007-2009.

Member, University Promotion and Tenure Committee, University of Houston. Appointed to serve on the committee by the Provost, 2006-2009.

Member, University Research Council, 1999-2005.

Member, Review Committee for Internal Grants, 2002-2003.

Member, Review Committee for Institutes and Centers, 1999-2001, 2002-2003, and 2004-2005.

Member, Pilot Committee, Faculty Executive Committee on Human Subjects, 1997.

Member, Assessment Committee, Scholars' Community, 1997-1998. Invited to serve on university team to provide advice on the assessment of the Scholars' Community Program,.

## University Service – University of Illinois at Chicago

Member, Search Committee, Director of Computer Services, 1994. Invited to serve on the committee by the Vice-Chancellor for Academic Affairs.

Member, EAP/LARES Evaluation Task Force, 1992-1993. Invited to serve on the committee by Louise A. Kerr, Associate Vice-Chancellor for Academic Affairs with Mary Desler as committee chair. Engaged in assessment of the two programs and prepared a final report.

Member of Vice Chancellor for Academic Affairs' Cultural Diversity Task Force Committee, 1990.

## College Service – College of Education, University of Houston

Member, Faculty Executive Committee, 2008-2009

Member, Research Core Subcommittee, Doctoral Program Task Force, 2008-2009.

Chair, Faculty Development Committee, 2006-2007.

Member, Faculty Development Committee, 2006-2009.

Member, COE Scholarship Committee, 2006-2008.

Co-Chair, Committee on Assessment and Institutional Effectiveness, 2004-2005.

Chair, Institutional Effectiveness Committee, 2002-2003.

Member, Technology Committee, 2002-2003.

Member, Constitution Committee, 2002-2003.

Ex-officio Member, Research Committee, 1999-2005.

Member, Dean's Faculty Support Team, 1999-2003.

Member, Dean's Administrative Cabinet, 1999-2003.

Member, Alumni Faculty Service Award, Selections Committee, 1999-2000.

Chair, Graduate Studies Committee, 1999.

Member, Vice-Chair, Graduate Studies Committee, 1996-1998.

Member, Research Task Force, 1996-1997.

Chair, (appointed by Dean), Educational Technology Committee, 1994-1996.

Member (appointed by Dean), Student Development Committee, 1994-1995.

Member (appointed by Dean), Faculty Recruitment and Retention Committee, 1994-1995.

000107
Exhibit 51

*Member, EPPC Committee, 1994-1995.

Member, Search Committee, Educational Psychology faculty position, 1994-1995.

Chair, Search Committee, Recruitment and Admissions Counselor, 1995.

Member, Search Committee, Higher Education faculty position, 1994.

*Co-chair and Member, Honors Committee, 1990-1991.

*Member, Institutional Review Board, 1990-1991.

Member, PPA Steering Committee, 1992-1995.

*elected position

## College Service – College of Education and Policy Studies, University of Texas at San Antonio

Ex-Officio Member, College Faculty Awards Committee, 2010 – present.

## Department Service –Department of Educational Psychology, College of Education, University of Houston

Member, Academic Affairs Committee, 2007-2009 .

Member, Committee for the preparation of proposal for Ph.D. program in higher education, to be proposed to the Texas Higher Education Coordinating Board, 2009.

## Department of Educational Leadership and Cultural Studies, College of Education University of Houston

Member, Search Committee for Department Chair, 2004-2005, 2005-2006.

Member, Faculty Search Committee, 2002-2003, 2003-2004.

Acting Program Coordinator, Higher Education Program Area, 1999-2000.

Acting Chair, Fall, 2000.

Chair, Committee on Residency Requirements, 1998-2000.

Chair, Committee on Extension Program, 1998-2000.

Member, Committee on Comprehensive Exams, 1998-2000.

## Department of Educational Leadership and Policy Studies, College of Education and Human Development, University of Texas at San Antonio

Member, Faculty Merit Review Committee, 2013 – 2014.

000108
Exhibit 51

Member, Search Committee, Department Chair for Educational Leadership and Policy Studies, 2011-2012.

Member, Promotion and Tenure Committee at Department Level, 2009 – present.

Member, Third- and Fourth-Year Review Committee, 2009 – present.

Committee on Outreach Activities, 2009 – present.

Member, Departmental Admissions Committee, 2009 – present.

Member, Departmental Committee on Graduate Programs, 2009 – present.

## Non-University Professional Activities

### Editorial Work

Editor, *The Review of Higher Education*, Journal for the Association for the Study of Higher Education (ASHE), January 2004-Present.

Co-Editor, Special Issue on the Impact of Technology on Student Persistence, *Journal of College Student Retention: Research, Theory and Practice*, 2008.

Co-Editor, Special Issue on Hispanic Students in Higher Education, *Journal of Hispanic Higher Education*, 2006.

### Membership on Editorial Review Boards:

Editorial Board, *Journal of Hispanic Higher Education*, 2002-2006

Editorial Board, *Journal of College Student Retention: Research, Theory and Practice*, 1998-2009

Editorial Board, *The Journal of Higher Education*, 1997-2003

Associate Editor on Equity Issues, *Higher Education: Handbook of Theory and Research*, 1994-1996.

Editorial Board, *Research in Higher Education*, 1990-2000.

Consulting editor and manuscript reviewer for *The Journal of Higher Education*, 1989-1995.

Editorial Board*, The Review of Higher Education*, 1988-1991.

000109
Exhibit 51

**Ad Hoc Reviewing:**

Dissertation Reviewer, *American Association of Hispanics in Higher Education*, 2008-2010.

Manuscript Reviewer, *American Educational Research Journal*, 2002-2003.

Proposal Reviewer, Research Grants, Association for Institutional Research, 1999-2000.

Proposal Reviewer, Research Grants, Association for Institutional Research, 1997.

Manuscript Reviewer, Research Briefs, American Council on Education, Division of Policy Analysis and Research, 1993-1995.

**Service to Professional Organizations**

Mentor, ASHE/Lumina Fellowship Program, 2007-2008

Member, Association for the Study of Higher Education Scholarship Committee (ASHE), 2002-2006

Program Chair, Association for the Study of Higher Education (ASHE), 1998-1999

Member, Association for the Study of Higher Education (ASHE) Awards Committee, 1998-1999

Vice-Chair, Measurement, Assessment, and Evaluation, American Educational Research Association (AERA) Division J, 1997-1998

Board Member, Association for the Study of Higher Education (ASHE), 1995-1997

Member of American Educational Research Association (AERA) J Program Committee, 1997-1998

Member of ASHE Task Force for the Study of Higher Education in 21st Century, 1990-1992.

Member, Affirmative Action Committee, American Educational Research Association (AERA), 1991-1992.

Chair, American Educational Research Association (AERA) Division J (Postsecondary Education) Research Proposals on Students, 1991-1992.

69

Co-chair, Research Paper Program, Association for the Study of Higher Education (ASHE), 1991

Member of Association for Institutional Research (AIR) Forum Publications Committee, 1990-1992.

Member of Association for the Study of Higher Education (ASHE) Readers' Advisory Board, 1990-1996.

## Membership on Advisory Boards

Member of the NCCEP Advisory Board, Washington, DC., 2008-2012.

Member of Advisory Board for Educational Leadership Department, Iowa State University, Ames, IA, 2006-2009.

Member of National Advisory Board for the Evaluation of GEARUP, WESTAT, U.S. Department of Education, 1999-2003.

Member of Minority-Serving Institutions Scholars Advisory Committee, The Institute for Higher Education Policy, 2003.

Member of ASHE Readers' Advisory Board, 1990-1996.

Member of American Council on Education (ACE) Advisory Committee for the Cooperative Institutional Research Program, 1989-1992.

## Reviewing Conference Presentation Proposals

AIR/NCES/NSF Improving Institutional Research in Postsecondary Education Grant and Scholarship Program, 1997

Association for the Study of Higher Education, 1987-2007

American Educational Research Association, Division J, 1987-2007

## Staff development of Personnel of External Agencies

Columbia College, Chicago, Illinois, 1995.

## Consultant/Evaluator

Panel Expert on Higher Education Finance, Institute for Higher Education Law and Governance – Higher Education Finance Seminar, 2009 – Present

000111
Exhibit 51

Florida International University, Consultant and evaluator on STEM Project funded by National Science Foundation, 2013-2014

ABT Consulting Group. Provided consultation in the area of factors related to student persistence and program evaluation. A grant provided to NCCEP organization to assess the influence of Children's Savings Plans on student outcome measures, 2013 - 2014

## Community Advisory Committees and Services

Member, Advisory Council, Department of Educational Leadership and Policy Studies, College of Education, Iowa State University, 2007-2009.

Member, Advisory Board, National Center for Collaborative Urban Partnerships, 2009 - Present.

Content Expert on Higher Education, ERIC Steering Committee, Department of Education, 2004-2008.

Panel member, The National Research Council of the National Academies, Ford Foundation Diversity Fellowships Program, 2005, 2007, 2008.

Consultant on Outcomes Assessment, Title V Project, Houston Community College System, 2004-2009.

Consultant, NPEC Project on Student Success, funded by the National Center for Education Statistics, U.S. Department of Education, 2003.

Advisor to Task Force on Student Enrollment, California State University-Long Beach, June 2002.

Advisor, Expertise on Standardized Testing and Minority College Admissions, Data Analysis, NAACP Legal Defense Fund, New York, February-April, 2000.

Advisory Board, U.S. Department of Education, Outcomes Assessment of National GEAR UP Program, Washington, DC, 1999-2003.

Served as member of a panel to identify promising areas for research on topics of concern to community colleges, Conference on Community Colleges: Issues and Research, The Spencer Foundation, March 1998.

Provided testimonial on factors affecting the retention of minority students before a panel for the Southern Education Foundation, State Capital, Austin, Texas, February, 1994.

Member, Advisory Board, St. Augustine College Extension Campus, Aurora, Illinois, 1993.

Member, Hispanic Advisory Board, McHenry County College, Crystal Lake, Illinois, 1993, 1995.

## Other Miscellaneous Community Service

*Assistance provided in statistical analysis/research design to:*

Shell Interdisciplinary Grant, University of Houston, Houston, TX,
Outcomes assessment for interdisciplinary project between Engineering Department and English Department, 2001-2002.

Chicano Family Center, Designing a data tracking system necessary for outcomes assessment, 2001.

Healthy Family Initiatives, TDPRS, Outcomes Assessment for Report to the Texas Legislature, provided standards for all programs in the State of Texas, 1998-1999.

Council on Alcohol and Drugs, Outcomes Assessment and Grant Proposal Development, Houston, 1999-2000.

Rebecca Krepper, College of Nursing, Texas Women's University, Houston, TX, 1999-2000.

Nursing Department, Ben Taub, Outcomes Assessment, Houston, TX, 1999-2000.

Charles Cook, Vice Chancellor for Educational Development, Houston Community College System, Transfer Study of HCC Students to the University of Houston System, 1999-2000.
Laura Rendon, California State University-Long Beach, Long Beach, California.

College of Dentistry, University of Illinois at Chicago.

Estela Bensimon, Penn State University, State College, Pennsylvania.

North Harris Community College, Houston, Texas (1998).

Hawaii Community College System, Hawaii (1998-1999).

Healthy Families Initiatives, University of Houston, Houston, Texas.

Methodologist, Ford Foundation, Urban Partnership Evaluation Project, 1992-1998.

000113
Exhibit 51

## —PROFESSIONAL MEMBERSHIPS—

American Educational Research Association, Division J

American Educational Research Association, Hispanic Special Interest Group

Association for the Study of Higher Education

Association for Institutional Research

American College Personnel Association

American Association of Hispanics in Higher Education

## —TEACHING—

### Courses Taught

Linear Structural Modeling in Educational Research
Multivariate Statistics for Non-Experimental Research in Higher Education
Multiple Regression in Educational Research
Psychological Measurement in the Social Sciences
Inferential Statistics in Education
Research Methods I
Research Methods II
Multivariate Statistics in Education
Residency Seminar
The American Community College
Faculty in Academe
Impact of College on Students: Studies in Postsecondary Education

### Dissertations Chaired

**1996 – 2008 (University of Houston)**

Blanca Plazas Synder, *The Role of Pre-college Factors and the Texas Top 10% Law on College Attendance.* University of Houston.

Gloria Crisp, *Mentoring students: Conceptualizing and Validating the Multi-Dimensions of a Support System.* Accepted for presentation at the Annual Meeting of the Association for the Study of Higher Education. Accepted for publication in *The Review of Higher Education*. University of Houston.

Brenda Findley, *The Impact of Specific Factors on the Retention of Human Resources Personnel.* University of Houston.

000114
Exhibit 51

Libby Barlow, *Undergraduate Success in College: The Impact of the Boarding School Experience.* University of Houston.

Viola Garcia, *The Role of Remedial Attitudes on the Persistence of Developmental Students in Higher Education.* <u>Accepted for presentation at the Annual Meeting of the Association for the Study of Higher Education (ASHE).</u> University of Houston.

Donna Lang, *Pre-College Psychosocial Factors: Determinants of Student College Adjustment, Academic Achievement, and Persistence,* <u>Accepted for presentation at the Annual Meeting of the Association for the Study of Higher Education (ASHE).</u> University of Houston.

Cheryl Matherly, *"More Valuable than Two Panama Canals": Higher Education in Pro-Growth Houston, 1900-1990.* <u>Accepted for publication.</u> University of Houston.

Robert G. Anderson, Jr., *The Role of Religiosity as a Determinant of Persistence for Minority and Nontraditional College Students: A Logistic Regression Analysis of a Theoretical Model of Student Persistence.* <u>Accepted for presentation at the Annual Meeting of the Association for the Study of Higher Education (ASHE).</u> University of Houston.

Carolyn A. Lightfoot, *The Impact of Academic, Social and Mentoring Experiences on the Persistence of Minority and Non-Minority College Students.* University of Houston.

Steve Sutton, *An Exploration of College Persistence for Students Enrolled in Web-Enhanced Courses: A Multivariate Analytic Approach.* <u>Accepted for publication in *The Journal of College Student Retention: Research, Theory, and Practice*</u>. University of Houston.

Kathryn Tart, *Critical Thinking and the Nursing Care Plan: A Conceptual and Structural Validation of Factors Impacting Cognitive Outcomes,* <u>Accepted for presentation at the Annual Meeting of the Association for the Study of Higher Education (ASHE).</u> University of Houston.

Noel Clarke, *Roles of management Strategy and Decision-making Process on Nine measures of Institutional Effectiveness Perceived by Administrators and Faculty at a Public Four-Year Institution of Higher Education.* University of Houston.

Jean Swartz, *Team Effectiveness at a Community College.* University of Houston.

Beth Dennard, *Psychosocial Factors of College Choice and Their Influence on Measures of Student Satisfaction.* University of Houston.

Jane Thieleman, *The Role of Resilience as a Determinant of Persistence for Minority College Students: A Logistic Regression Analysis of a Theoretical Model of Student Persistence.* University of Houston.

Rita Poimbeauf, *Administration Students' Perceptions of their Experience in a Leadership Cohort.* University of Houston.

000115
Exhibit 51

Cher Brock, *Factors Influencing the Success of Students in Freshman English: A Logistic Regression Analysis of a Modified Theoretical Model.*

Anita L. Carroll, *Academic and Social Experiences Affecting Nursing Students.* University of Houston.

Marcell Smith, *The Role of Mentoring in Relation to Principal Development.* University of Houston.

## 1987-1995 (University of Illinois at Chicago *and* University of Southern California)

Barbara Kraemer, *Factors Affecting Hispanic Student Transfer Behavior,* Accepted for presentation at the Annual Meeting of the American Educational Research Association (AERA). Published in *Research in Higher Education.* University of Illinois at Chicago.

Linda Hagedorn, *Wage Equity and Female Faculty Job-Satisfaction: The Role of Wage Differentials in a Job Satisfaction Causal Model,* Accepted for presentation at the Annual Meeting of the American Educational Research Association (AERA). Published in *Research in Higher Education.* University of Illinois at Chicago.

Kathleen Collins, *The Validation of an Integrated Model of Student Persistence for African American College Students.* Accepted for presentation at the Annual Meeting of the American Educational Research Association (AERA). University of Illinois at Chicago.

Richard Itzen, *The Dimensionality of Learning Structures in the Reid Perceptual Learning Style Preference Questionnaire.* University of Illinois at Chicago.

Rose Frances Horvath, *Factors Affecting the Retention of Transfer Students.* University of Southern California.

## Dissertations: Committee Member/Co-Chair

## 2009-2014 (University of Texas at San Antonio)

Nicole Reyes. *An Exploration of Native College Graduates' Goals to "Give Back,"* College of Education and Human Development.

Roopa Prasad. *Classroom Experiences that Predict Sense of Belonging and Academic Performance within the Community College Math Classroom.* College of Education and Human Development.

Angela Urick. *To What Extend do Typologies of School Leaders Across the U.S. Predict Teacher Attrition? A Multilevel Latent Class Analysis of Principals and Teachers*, College of Education and Human Development.

Laura Pantano. College of Education and Human Development.

000116
Exhibit 51

Anna Lopez. *Exploring the Experiences of Spouses of Mexican Deportees: A Grounded Theory of Adjustment*. College of Education and Human Development.

William dela Cruz. *The relationship of faculty perceptions of UTSA's management strategies, decision-making processes, and organizational culture to its organizational/institutional effectiveness*. College of Education and Human Development. (Co-Chair)

Hamsa Aburumuh. *Enrolling Arabic Heritage Language Learners in Texas Community-Based Schools: Examining the Impact of Attitudinal and Motivational Factors on Parental Choices*. College of Education and Human Development. (Co-Chair)

Ching, Wan. *Taiwanese students' beliefs about learning English and their relations to the students' self-reported language learning behaviors*. College of Education and Human Development. Successfully defended, Spring 2011.

## 1996 – 2008 (University of Houston)

I-Ching (Karen) Yeh, *The Impact of Social Psychological Factors on Taiwanese Adult Learner's Second Language Achievement and Performance*. <u>Accepted for presentation at the Annual Meeting of the American Educational Research Association (AERA)</u>. Department: Curriculum and Instruction.

John C. Wolfskill, *Visual Synchronous Motion: A Pedagogic Reinforcement for Musical Acuity in the Collegiate Classroom*. Department: Moore's School of Music.

Diane Almgren Rhorer, *A Hidden Curriculum of Racism for Welfare Women in a GED Preparation Program: A Critical Ethnography*. Department: Educational Leadership and Cultural Studies.

Loree R. Burton, *Factors Associated with Special Education Teachers' Intent to Stay in Teaching: The Testing of a Causal Model*. Department: Educational Leadership and Cultural Studies.

Bruce M. Maclean, *The Relation among Principled Moral Reasoning, Employment, Campus Residency, and Informal Academic and Social Experiences*. Department: Educational Psychology.
Julie Y. Love, *Faculty/University Collaboration: Differential Perceptions of Shared Governance, Presidential Leadership Style and Decision-Making at a Research University*. Department: Educational Leadership and Cultural Studies.

R. Ruth Cutting, *Stereotype Threat: An Examination of Domain Identification and Stereotype Endorsement*, Department: Educational Psychology.

000117
Exhibit 51

Chih-Hsum Huang, *Impact of Socially Desirable Instrumentality and Socially Desirable Expressiveness on Female Pre-Service Teachers' Computer Attitudes*. Department: Curriculum and Instruction.

Sofia Cano, *Acculturation, Marianismo, and Satisfaction with Marianismo: An Analysis of Depression in Mexican American College Women*. Department: Educational Psychology.

S. Poyrazli, *Relation between Assertiveness, Academic Self-Efficacy, and Psychosocial Adjustment among International Graduate Students*. Department: Educational Psychology. Published in the *Journal of College Student Development*.

David Sablatura, *A Comparison of Job Satisfaction among Urban, Suburban, and Rural School Principals*.

**1987-1995 (University of Houston, University of Illinois at Chicago *and* University of Southern California)**

Andrew J. Matonak, *The Application of Tinto's Theoretical Model of Persistence to Academically Underprepared Students in the Community College*. Accepted for presentation at the Annual Meeting of the Association for the Study of Higher Education.

Scott Allen Key, *The Origins of American Land Grant Universities: An Historical Policy Study*.

Rita Bode, *Using Methodological Advances in the Modeling of the Effect of Ability Grouping on Student Achievement*. Accept for presentation at the Annual Meeting of the American Educational Research Association.

Ranfen Li, *Home Environment and Chinese Children's Reading Achievement*.

000118
Exhibit 51

## Exhibit-3

## <u>Student Engagement Model (Nora, 2003)</u>

**As students are engaged in initiatives**

Orientation Course
Walk the Class Webinar
Small-Class-Sizes
"All docs in"
Student Advisor Transition
Minimum Age Policy
Peer Review Process
Mobile Learning Exp.
Interactive Classroom
Student Support Services
Constellation Course
Etc.

**Cognitive and psychosocial factors developed and enhanced**

Academic Integration and Engagement
Faculty/Student Interactions
Sense of Belonging
Mentoring Experience (Realistic self-assessment)
Transformative Learning
Acquisition of Financial Literacy
Validation by faculty
Support and Encouragement, etc.
Institutional Commitment
Educational Commitment to Degree
Etc.

**Impacting on:**

Academic Performance

Student Satisfaction

Student Retention

# EXHIBIT 52

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE BRIDGEPOINT EDUCATION, INC. SECURITIES LITIGATION | CASE NO. 12-cv-01737-JM (JLB) |

# EXPERT REPORT OF DAVID I. TABAK, PH.D.

## I.  BACKGROUND AND SCOPE OF ANALYSIS

1.   This is a "class action for violations of the federal securities laws on behalf of all purchasers or acquirers of Bridgepoint Education, Inc. ('Bridgepoint' or the 'Company') securities from *May 3, 2011 through July 13, 2012* (the 'Class Period'), and who were damaged thereby (the 'Class')."[1]  Plaintiffs made numerous allegations relating to Bridgepoint and to Ashford University ("Ashford"), an institution run by Bridgepoint, with a focus on Ashford's application for accreditation from the Western Association of Schools and Colleges ("WASC").

2.   On September 13, 2013, an Order Granting in Part and Denying in Part Defendant's Motion to Dismiss ("MTD Order") held that allegations related to "Ashford's student persistence initiatives" would remain in the case, while those related to "Ashford's application for WASC accreditation, … Ashford's quality of education, and … Bridgepoint's financial projections" were dismissed.[2]

3.   On January 15, 2015, the Court certified a class in this matter ("Class Cert Order") based on Plaintiffs' motion "to certify a class consisting of all persons who purchased

---

[1] Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint") filed December 21, 2012, ¶2.  Emphasis in original.

[2] MTD Order, p. 26.  Following p. 26 of the MTD Order, I use the phrase "persistence initiatives" to refer to the remaining allegations.  In some material in this case, the initiatives are referred to as "quality initiatives."

Bridgepoint common stock between May 3, 2011, and July 13, 2012 ….”[3]  The Class Cert Order noted that because Plaintiffs did not file an amended complaint, “at this point, the consolidated complaint remains the operative complaint, and the only remaining claims are for securities fraud under § 10(b) and Rule 10b-5 and control-person liability under § 20(a), both related to the alleged misrepresentations regarding student-persistence and tracking.”[4]

4.  Counsel for defendants in this matter has asked me to address the following issues:

   a.  What did the investing public understand about “persistence” and how did it respond to statements about Bridgepoint’s persistence initiatives?

   b.  What damages, if any, were suffered by investors as a result of the one remaining allegation in this matter and how, if at all, are damages affected by the dismissal of three of the allegations via the MTD Order?

5.  My opinions are summarized as follows:

   a.  As seen in analyst reports and the depositions of analysts, the market understood the term “persistence” and was able to calculate historical persistence based on unchallenged data provided by Bridgepoint.  These figures were not restated by analysts after the July 2012 announcements, indicating that analysts believed them to be accurate.  Further, in their quantitative long-term forecasts of persistence, analysts gave no or virtually no credit to any statements by Bridgepoint of any effects or anticipated benefits from persistence initiatives.  Because the value of Bridgepoint’s stock depended on expected future results, themselves based in part on forecasts of future persistence, the failure of Bridgepoint statements to artificially inflate projections of future persistence means that statements about persistence or

---

[3] Class Cert Order, p. 7.
[4] Class Cert Order, p. 5.

000121
Exhibit 52

persistence initiatives did not artificially inflate the price of Bridgepoint's stock.

b. The dismissal of three of the four sets of allegations in the MTD Order requires one to disaggregate any potential damages that would be due to the full set of originally pled allegations, which requires a careful review of the MTD Order. Because statements related to the persistence initiatives, the one remaining set of allegations, had no or virtually no effect on Bridgepoint's stock price, no damages remain after the MTD Order.

c. Assuming, solely for the sake of argument, that there is any liability, investors who purchased shares after July 9, 2012 should not be entitled to any damages, as they purchased after there was no additional information that Bridgepoint could have potentially disclosed to the market relevant to the remaining allegation in this matter. For the same reason, the stock price decline following the July 13, 2012 news should not be included in any calculation of damages.

d. Even if we ignore the lack of impact from the remaining alleged false or misleading statements on Bridgepoint's stock price, as discussed in ¶5(a) above, several methods for determining damages, based on the assumption that these statements did affect Bridgepoint's stock price, yield an inflation of Bridgepoint's stock price at most between $0.59 and $3.00 per share. These figures would need to be further reduced to account for how the July 9, 2012 news contained more negative information than could have been disclosed earlier.

## II.  QUALIFICATIONS AND REMUNERATION

6.  I received Bachelors degrees in Physics and in Economics from the Massachusetts Institute of Technology and a Masters degree and a Ph.D. in Economics from Harvard

000122
Exhibit 52

University.  I have published in my fields of expertise on subjects such as valuation, market efficiency, loss causation, statistics, and the analysis of stock price movements.

7.  I have appeared as an expert in fields including valuation in United States federal district courts; state trial courts; bankruptcy court; and in arbitration forums, including the National Association of Securities Dealers, the International Chamber of Commerce International Court of Arbitration, and the American Arbitration Association.  I have submitted reports and provided testimony for both plaintiffs and defendants in securities class actions.

8.  National Economic Research Associates ("NERA") was established in 1961 and now employs approximately 500 people in over twenty offices worldwide.  NERA provides consulting for economic matters to parties for their internal use, to parties in litigation, and to governmental and regulatory authorities.  I have worked at NERA for over fifteen years and am a Senior Vice President in NERA's Securities and Finance practice.  My work entails providing analyses for parties in litigation and consulting for parties in non-litigation settings.

9.  I have published peer-reviewed articles in *Litigation Economics Review* and the *Journal of Forensic Economics* and served as a referee for those journals.  I have been an invited presenter at the United States Securities and Exchange Commission and have served as a speaker at events providing continuing legal education and continuing professional education credits for attorneys and professional appraisers.

10. My curriculum vitae, which sets forth in further detail my publications and prior testimony experience, is attached to this report as Exhibit 1.

11. NERA is being compensated on a non-contingent basis for out-of-pocket costs and for our usual rates for time.  My billing rate is $750 per hour.  I have been assisted by a number of individuals at NERA working at my direction who are billing at their standard rates.

000123
Exhibit 52

## III.   MATERIALS RELIED UPON

12. Materials relied upon for the purposes of this report are cited in the report and are also listed in Exhibit 2.

## IV.   ANALYSTS UNDERSTOOD "PERSISTENCE" AND WERE NOT MATERIALLY INFLUENCED BY BRIDGEPOINT'S STATEMENTS ABOUT ITS PERSISTENCE INITIATIVES

13. Persistence is a measure of how many students enrolled at a university at the beginning of one time period continued to be enrolled (i.e., persisted) at the beginning of the next period. For example, if 1,000 students are enrolled in one quarter of a year and 900 of those are still enrolled in the following quarter, there is a 90% persistence rate from the first to second quarter.

14. The market pays attention to persistence because it is an input in forecasting future enrollment and, hence, future revenues. Future enrollment is determined by the number of current students who continue to enroll, or persist, plus the number of newly enrolled students. Persistence rates can be important because they reflect how long current and new students remain enrolled and generating revenues. Changes in persistence rates are also important because if persistence rates are expected to increase and remain above current levels, then total enrollment will be higher.[5] Because future revenue is typically an input into expected future cash flows, and because future cash flows are normally the key driver in the valuation of a stock, expected future persistence rates would be an important measure for Bridgepoint analysts to consider.

---

[5] This assumes that the university is not limited by physical space. In addition, a higher persistence rate means a lower need to recruit new students, and, thus, lower costs of recruitment for the university.

15. To examine whether the market understood and could quantify persistence, I examine analyst reports about Bridgepoint.[6] Exhibit 3a shows analyst calculations and projections of persistence in analyst reports published from after the 1Q10 earnings announcement through those published after the 1Q12 earnings announcement. The data used are from analyst reports that had an exhibit or other display of a time series of persistence forecasts. In Exhibit 3a, historical figures are shown in black and projected figures are shown in red. A few points can be seen in this exhibit.

16. First, as seen in Exhibit 3a, analysts agreed on historical persistence figures.[7] This is particularly notable because Bridgepoint did not actually present persistence figures, but did provide the market with the information necessary to calculate those figures. Analysts disclosed how they calculate persistence based on the data provided by management. The agreement between analysts on the values of those figures (putting aside later-corrected errors) demonstrates that there was a general agreement on how those calculations were performed.[8] These calculations were confirmed in analyst depositions as well.[9] Thus,

---

[6] In Plaintiffs' April 22, 2013 Opposition to Defendants' Motion to Dismiss ("Opposition to MTD"), they state in footnote 3 that "Plaintiffs cite to analysts' comments throughout the Class Period to illustrate that Defendants actually misled the market." I agree that as a general matter, analysts can demonstrate either that the market was misled or that the market correctly understood certain points or issues.

[7] Sometimes there were initial disagreements due to errors, such as in Signal Hill's May 4, 2010 analyst report, which had several incorrect historical persistence figures that were replaced in a later Signal Hill report with figures that matched those from Wedbush and Piper Jaffray. Notably, analysts repeated the same historical figures after the July 2012 news announcements, indicating that those announcements did not affect analysts' views of the accuracy of the actual persistence figures they calculated and used in their analyses.

[8] See, for example, Barclays Capital March 19, 2012 report ("BPI's quarterly persistence (which we measure as the number of students currently enrolled, minus current starts, divided by the prior period's enrollment) has been historically below that of many peers.") and BMO Capital Markets May 3, 2010 and other reports ("While management does not disclose this, we have calculated a sequential retention rate using beginning enrollment, adding new starts in the quarter and then subtracting ending enrollment. As the net result includes both drop-outs and graduates, it is tough to create a true retention rate. Additionally, there is some seasonality in this metric.")

-6-

even if analysts projected different levels of persistence in the future, they did not have any substantive disagreement about the actual levels of persistence.

17. Second, in their forecasts made in 2010 and 2011, there is no evidence that analysts gave any quantitative credit to any statements by Bridgepoint about the impact of its initiatives on historical persistence or the anticipated impact of its initiatives on future persistence.[10]  For example, looking at Exhibit 3a, we see that following Bridgepoint's 1Q10 earnings announcement, Signal Hill's forecast for 1Q11 persistence (i.e., the same quarter the following year) of 77.3% was the same as the 1Q10 actual figure of 77.3%.  In other words, Signal Hill was forecasting no change in persistence rates over the next year.

---

[9] See, for example, the deposition of William Blair analyst Brandon Dobell ("Dobell Depo."), 23:7-14 ("Q. What is your understanding of the meaning of persistence, as you use it here?  A. In this instance, I believe it was a calculation that started with prior period ending enrollments.  You would add new student starts and then you would look at end-of-period enrollments and then compare the implied subtracted number versus where you finished the prior quarter.")  This answer describes the inputs to the calculation of persistence.  Mr. Dobell confirmed that the formula using those inputs was "EOP [end-of-period] enrollment minus new enrollment over BOP [beginning-of-period] enrollment." (Dobell Depo., 24:6-14.)  Mr. Dobell further confirmed that this was a general formula "used across the universe by both sell-side analysts as well as institutional investors, and I would say for Bridgepoint as well as other companies in the group."  (Dobell Depo., 25:21-24.)  Mr. Dobell's formula was, in substance, the same one agreed to by Andrew Steinerman in his deposition ("Steinerman Depo.") ("Q. And so the ratio or the formula [f]or student persistence would be continuing student enrollment over total student enrollment in the prior quarter?  A. Yes.") (Steinerman Depo., 33:13-18. See also 34:6-14.)

[10] This does not mean that analysts were not concerned with persistence initiatives. Rather, it means that analysts' forecasts reveal that they did not credit favorable statements by the Company about potential future effects of any initiatives to any material extent.  In fact, we can see explicit analyst repudiation of Bridgepoint statements on persistence.  (E.g., "BPI reiterated its focus on initiatives designed to establish student preparedness (e.g., orientation, raised age requirements) and increase student retention. While we appreciate BPI's focus, we note that 2Q11 student persistence declined ~70 bps y/y and 2H11 guidance implies further persistence pressure.") (J.P.Morgan September 19, 2011 analyst report.)  See also the August 3, 2011 Credit Suisse analyst report ("We believe management's guidance assumes 2H11 YoY persistence declines.")

000126
Exhibit 52

Similarly, Signal Hill's forecasted persistence rates for each additional quarter in 2011 matched its forecasts for the same quarter in 2010. This directly shows that the analyst did not credit statements made by Bridgepoint about the anticipated impact of its initiatives on future persistence rates. Moreover, because some of the initiatives discussed by Bridgepoint were new, any positive effect on persistence rates due to these initiatives would likely increase persistence rates even more in future periods. The analysts' decision not to forecast increases in future persistence rates therefore implies that they were not giving those initiatives any observable quantitative credit in terms of an effect on either present or future persistence rates.

18. Continuing through Exhibit 3a, we see the same pattern consistently repeat itself in forecasts made in 2010 and 2011. For example, following Bridgepoint's 2Q10 earnings announcement, Signal Hill's forecasted persistence levels for the first two quarters of 2011 equaled the actual figures for the respective quarters in 2010, and Signal Hill's forecasted persistence figures for the last two quarters of 2011 equaled their forecasted figures for the two remaining quarters of 2010.[11] In this quarter, we also have reports from Piper Jaffray. In contrast to Signal Hill, Piper Jaffray's forecast *decreases* in persistence in each quarter in 2011 from the corresponding quarter's actual or forecast figure in 2010. In 3Q2010, we have Piper Jaffray and Signal Hill both forecast *decreases* in the same-quarter (e.g., comparing 1Q11 to 1Q10) persistence rate for each quarter of 2011.

19. Exhibit 3b shows the year-over-year (e.g., 2Q12 over 2Q11) changes in forecast persistence rate by analyst, with increases shown in green, unchanged figures in black, and decreases in red. As can be seen, the forecasted persistence rates were nearly uniformly at or below the prior same-quarter actual or forecast until after the 4Q11 actual

---

[11] Signal Hill does have one increase in forecast persistence on a year-over-year basis, for 4Q10. However, this data point is problematic as Signal Hill had previously miscalculated 4Q09 persistence and may have previously created a 4Q10 forecast based on its miscalculation.

000127
Exhibit 52

financials were reported.[12]  For example, while the Complaint alleges that "[a]nalysts responded to defendants' statements contained in the 1Q11 press release and the importance of Bridgepoint's initiatives to future success …,"[13] as seen in Exhibit 3b, RBC and Piper Jaffray forecast solely decreasing year-over-year persistence rates immediately following that March 1, 2011 press release.  Similarly, while ¶103 of the Complaint says that in "response [to the 2Q11 earnings press release on August 2, 2011], analysts expressed interest in Bridgepoint's highly touted quality initiatives," year-over-year persistence rate forecasts were again flat or negative.

20. Again, the first increases in forecasted year-over-year persistence followed the 4Q11 earnings announcement.  That announcement revealed information showing that the 4Q11 actual persistence figure exceeded prior analyst forecasts by one-and-a-half to two percentage points.  Analysts could have rationally incorporated this increase into their analyses, providing a possible explanation for why there was an increase in forecasted persistence at this point.  Moreover, in both 1Q12 and 2Q12, the two remaining quarters wholly or partly in the Class Period, the actual persistence figures *exceeded* these revised forecasts, with actual persistence coming in at 81.5% for 1Q12 and 77.3% for 2Q12.  Thus, the one time that analysts began to forecast persistence figures in excess of historical same-quarter numbers, they actually underestimated actual persistence for those quarters wholly or partly in the Class Period.[14]

21. In summary, putting aside one forecast that may have been affected by a prior calculation error, until after the 4Q11 earnings announcement, analysts were forecasting year-over-year persistence to either be flat or to decrease.  This means that analysts gave

---

[12] The exception relates to a forecast that was originally made when Signal Hill miscalculated actual persistence.  It is not clear whether in updating its actual figures Signal Hill recognized that its forecast may have been based on incorrect figures and needed to be adjusted to reflect the correction.

[13] Complaint, ¶85.

[14] In fact, analysts' forecasts of the next quarter's persistence rate were nearly always too low over the entire Class Period.

000128
Exhibit 52

Bridgepoint quantitative credit only for demonstrated changes to persistence, as analysts understood and calculated that metric (and, even then, often still forecasting decreases in persistence rates), and not for any claims that persistence initiatives would raise future persistence levels.  It is unlikely that analysts gave Bridgepoint's then-current initiatives meaningful credit for any demonstrated increases in persistence levels, because, had they done so, analysts would have likely raised their estimates of future persistence levels to account for expansion of those initiatives.  Because it is future cash flows, dependent in part on future persistence levels, that drive the stock price, and because analyst forecasts of future persistence levels were generally flat or declining on a year-over-year basis, statements about the actual or anticipated effects of Bridgepoint's persistence initiatives did not serve to inflate the Company's stock price.

## V.  THERE IS NO INFLATION IN BRIDGEPOINT'S STOCK PRICE, AND HENCE NO DAMAGES, DUE TO THE ALLEGATIONS ABOUT PERSISTENCE INITIATIVES

22. Based on the analysis in Section IV of this report, there is no evidence that analysts increased their forecasts of persistence in response to the alleged misrepresentations relating to persistence initiatives.  In fact, the only time that analysts tended to increase persistence forecasts above same-quarter actual persistence (i.e., after 4Q11 was reported) was one where they failed to increase their forecasts sufficiently to anticipate an actual gain in persistence levels.  Thus, if anything, rather than putting too much weight on persistence initiatives, the market may have been putting too little weight on those initiatives by focusing heavily on the historical data.

23. Analysts also did not change their historical persistence figures after the July 9, 2012 or July 13, 2012 announcements.  Later analyst reports still showed the same

historical figures and analysts testified that the news did not cause them to question the prior figures.[15]

24. Consequently, the market price of Bridgepoint shares was not artificially inflated by the remaining alleged misrepresentations related to persistence and investors who purchased Bridgepoint shares therefore suffered no damages based on the remaining allegation in this matter.

## VI.  INVESTORS WHO PURCHASED AFTER JULY 9, 2012 SHOULD NOT BE ENTITLED TO ANY DAMAGES

25. On July 9, 2012, Bridgepoint disclosed that Ashford was denied accreditation by WASC due in part to questions about student persistence.  On July 12, 2012, Ashford received a letter from the Higher Learning Commission of the North Central Association of Schools and Colleges ("HLC"), Ashford's then-current accreditor.  The letter stated the denial of accreditation by WASC raised issues that Bridgepoint would have to address if it wished to continue to be accredited by HLC, including whether Ashford's "resource allocations are sufficiently aligned with educational purposes and objectives in the areas of student completion and retention…."  This quote was contained in an 8-K publicly filed by Bridgepoint on July 13, 2012.

26. Plaintiffs allege that the HLC letter is a form of curative disclosure.  But, that raises the question: curative of what?

---

[15] See, for example, Dobell Depo. 63:4-21(Including: "Q. So nothing in the HLC announcement caused you to want to revise or change any of those persistence calculations; is that fair?  A. Correct.") and the deposition of Trace Urdan ("Urdan Depo.") 46:7-10 ("Q. Did you learn anything upon HLC's announcement that caused you to question any of the persistence rates you had previously reported in your reports?  A. No.")

000130
Exhibit 52

27. There is nothing in the HLC letter that reveals any new information about persistence or persistence initiatives at Ashford. To the contrary, in ¶9 of the Complaint, Plaintiffs allege that the "disclosures on *July 9, 2012* revealed the truth concealed by defendants' false statements and omissions made during the Class Period, and eliminated the stock price inflation caused thereby" (emphasis added.) With the truth already revealed on July 9, 2012, even the Complaint does not allege that the Company was still withholding any information from the market after that date. Thus, there should be no damages from the information in the HLC letter made public on July 13, 2012.

28. Though this should end the inquiry related to July 13, 2012, I address what some might attempt to argue is some alternative form of disclosure alleged in the Complaint. Specifically, ¶11 of the Complaint claims that the July 13, 2012 "disclosure further revealed the true risks concealed by defendants' false statements and omissions and further eliminated the artificial inflation in Bridgepoint's stock." This statement is incorrect. Even if one accepts that a disclosure of risks is relevant, the market already knew that HLC could respond to new information including the results of WASC's decision on accreditation. For example, a July 11, 2012 report by Wells Fargo states:

> We believe there is a heightened risk of a Higher Learning Commission (HLC) program review following a conversation with a source knowledgeable with both the processes and politics of HLC accreditation. We are persuaded that the findings in the Western Association of Schools and Colleges (WASC) team report published Monday could trigger an HLC review every bit as comprehensive as that undertaken by WASC.

29. That is, though the market may not have known exactly how HLC would react to WASC's decision, HLC's reaction was the realization of a publicly known risk that, even if the market were not aware of as of July 9, 2012, it would have been aware of following the July 11, 2012 Wells Fargo Report.[16,17] The prior knowledge of the risk of HLC action

---

[16] In his deposition, Mr. Urdan, the Wells Fargo analyst, had the following exchange: "Q. Prior to speaking with that individual [the 'source knowledgeable with both the processes and politics of HLC accreditation'], were you aware that HLC would be performing – or could likely be performing a heightened review? A. I certainly considered it a
(continued)

000131
Exhibit 52

was also confirmed on July 13, 2012 in a BMO analyst report that stated, "Given the WASC denial, we are not completely surprised by the HLC's heightened scrutiny, though we expect this may put further pressure on the stock." The analysts' lack of surprise at some action by HLC is not surprising given 34 CFR 602.28(d) of the Code of Federal Regulations relating to accrediting agencies for educational institutions: "If the agency

---

possibility, but this conversation made it more like a foregone conclusion." (Urdan Depo., 51:7-12.)

[17] For a similar analysis of how an investigation alone will typically not be considered corrective, see *Meyer v. Greene*, 2013 WL 656500 (11th Cir. Feb. 25, 2013) at 22-23. ("In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that—an investigation—and nothing more. *See In re Almost Family, Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL443461, at *13 (W.D. Ky. Feb. 10, 2012) ('Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure.'); … To be sure, stock prices may fall upon the announcement of an SEC investigation; but that is because the investigation can be seen to portend an added *risk* of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent.") (Emphasis in original.)

See also *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir.2014) ("We agree with the Eleventh Circuit's reasoning [in *Meyer*]. The announcement of an investigation does not 'reveal' fraudulent practices to the market. Indeed, at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal. While the disclosure of an investigation is certainly an ominous event, it simply puts investors on notice of a *potential* future disclosure of fraudulent conduct. Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred. This type of speculation cannot form the basis of a viable loss causation theory. Accordingly, we hold that the announcement of an investigation, without more, is insufficient to establish loss causation.") (Closing footnote omitted; emphasis in original.) Notably, there was no ultimate disclosure of any additional problems at Bridgepoint or Ashford as a result of the HLC program review. Instead, Ashford received accreditation from WASC in July 2013 and the HLC review was therefore dropped in August 2013. See "Ashford University Approved for Accreditation by Western Association of Schools and Colleges," July 10, 2013 (http://www.ashford.edu/community/news/ashford-approved-by-wasc.htm) and "Higher Learning Commission Removes Ashford from Notice Sanction), September 5, 2013 (http://www.ashford.edu/community/news/hlc-removes-ashford-notice.htm).

-13-

learns that an institution it accredits or preaccredits, or an institution that offers a program it accredits or preaccredits, is the subject of an adverse action by another recognized accrediting agency or has been placed on probation or an equivalent status by another recognized agency, the agency must promptly review its accreditation or preaccreditation of the institution or program to determine if it should also take adverse action or place the institution or program on probation or show cause."[18]

30. Thus, the Complaint errs when it states that the July 13, 2012 "disclosure further revealed the true risks concealed by defendants' false statements and omissions and further eliminated the artificial inflation in Bridgepoint's stock."[19] Those risks, and specifically the risk that the issues that caused WASC to deny accreditation to Ashford could similarly jeopardize Ashford's HLC accreditation, were known as of July 9 and explicitly presented to the market in the July 11 Wells Fargo Report; July 13 was merely the realization of what was by then a *publicly known* risk.

31. At best, the magnitude of HLC's response may have been unexpected, but not the risk that there would be some response. See, for example, the following quote from a July 13, 2012 analyst report by Wells Fargo (emphases added):

> *As expected*, items raised in Monday's Western Association of Schools and Colleges (WASC) team report have prompted Ashford University's current accreditor, the Higher Learning Commission (HLC), to seek assurances that the university is in compliance with HLC standards. *We believe the primary issue relates to independence of Ashford's Board*. The issue should be easily resolved, though the school will be hard-pressed to explain the previous oversight.

---

[18] Part of Title 34 – Education, with Original Date of 2012-07-01, available at http://www.gpo.gov/fdsys/pkg/CFR-2012-title34-vol3/xml/CFR-2012-title34-vol3-sec602-28.xml. This regulation was in fact cited in a July 16, 2012 analyst report by Height Analytics.

[19] Complaint, ¶11.

> HLC has announced that it will have a team on the ground in 60 days. *This is faster than we had presumed* and could suggest a less thorough review than that performed by WASC for its report. Nevertheless, a site visit in September could allow for a report prior to the November meeting of HLC Governing Board. *This could allow for sanctions earlier than we had anticipated.*

32. Because damages are calculated based on how the market would have reacted had the allegedly misrepresented information been made known to the market, the proper measure of inflation and damages must be based solely on the market's reaction to the July 9, 2012 news (and, then, only to whatever portion, if any, of that news is related to the remaining allegation in this case). Damages should not be based on any reaction to the July 13, 2012 news, which was a particularly negative outcome to a publicly known risk.


## VII.   AT MOST, DAMAGES ARE BETWEEN $0.59 AND $3.00 PER SHARE

33. Although the analysis in Section IV of this report shows that analysts were not quantitatively influenced by Bridgepoint's statements regarding its persistence initiatives, in this section, I put aside that issue. Instead, I ask what damages would be assuming that Defendants are nonetheless responsible for the market not anticipating that issues with persistence would be among the reasons that WASC denied Ashford accreditation. In doing this, I am cognizant of the fact that the Court has already dismissed allegations related to "Ashford's application for WASC accreditation…." Still, based on my understanding of Plaintiffs' pleadings to date, they appear to be basing their damages in part on the market's reaction to the announcement of WASC's decision not to grant accreditation to Ashford. See, for example, ¶9 of the Complaint ("The disclosures on July 9, 2012 revealed the truth concealed by defendants' false statements and omissions made during the Class Period, and eliminated the stock price inflation caused thereby. Bridgepoint's stock price dropped $7.25 per share, declining to less than half of its Class Period high of $30.50 per share.")

34. Assuming that damages are to be calculated based on the stock price drop in response to the news provided to the market on July 9, 2012, Plaintiffs and/or their expert

-15-

would have to take the following steps to even potentially create a reliable measure of damages:

    a.   The stock-price movement must be adjusted to remove the effects of market and/or industry effects over the period over which the price decline is measured;

    b.   The resultant stock-price movement must then be parsed to isolate the portion due to the persistence-initiative allegations as opposed to the portions due to claims that have been dismissed or due to factors that were never claimed to be the result of misrepresentations or omissions.

    c.   The degree of alleged inflation in Bridgepoint's stock price must be adjusted at earlier points in time to reflect the information that the Company could have disclosed at any point and the risk that would have been revealed to the market as a result of that information.

35. I discuss these three considerations in the following subsections.

### A. The Stock-Price Movement Must Be Adjusted to Remove the Effects of Market and/or Industry Effects

36. The removal of market and/or industry effects from a measured price movement is a standard practice in financial economics. I note that as part of the class-certification phase of this litigation, Plaintiffs have provided an analysis that performs this step in the Report on Market Efficiency from Professor Steven P. Feinstein ("Feinstein Class Cert Report").[20]

37. While I could challenge some of the specific choices made by Prof. Feinstein for his calculations, I find that they are within the range of what one finds in the field. Thus, for purposes of this report, to reduce the number of differences between my analyses and those of Plaintiffs, I use the calculations in the Feinstein Class Cert Report to determine

---

[20] See the discussion on event studies beginning in ¶87 of the Feinstein Class Cert Report discussing the analysis and relevant academic literature.

000135
Exhibit 52

the dollar amount of Bridgepoint's stock-price movement over July 9 and 10, 2012, as the stock movement on both dates was statistically significant at the standard 5% significance level.  Should Plaintiffs shift to use different calculations in the damages analysis, I will review those to see if they are reasonable.

### B. The Stock-Price Movement Must Be Parsed to Isolate the Portion Due to the Persistence-Initiative Allegations

38. It is well-accepted in securities litigation that damages are based on stock-price declines due solely to the allegations that remain in a case and not on other causes.[21] Here, to the extent that Plaintiffs base their damages calculations on the WASC denial of accreditation, we would expect their analysis to be consistent with their prior pleadings. For example, Plaintiffs have pled the following in ¶54 of the Complaint:

> In acting on Ashford's application for initial accreditation, the Commission had the option to defer action with another site visit. According to WASC's "Handbook of Accreditation," deferral allows the Commission to indicate to an institution "the need for additional information or progress in one or more specified areas before a positive decision can be made." A deferral is "interlocutory in nature and designed to provide time for the institution to correct specified deficiencies." The Commission found deferral inappropriate for Ashford "[b]ecause the areas in which substantial compliance was not demonstrated spanned across several key aspects of the Standards." The decision by WASC not to defer Ashford's application demonstrates the multiple and significant deficiencies at Ashford and thereby, that defendants knew or recklessly

---

[21] See, for example, *In re Omnicom Group, Inc. Sec. Litig.*, 2008 WL 243788 (S.D.N.Y. Jan. 29, 2008), ("Because the law requires the disaggregation of confounding factors, disaggregating only some of them cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss.") and *In re Imperial Credit Industries, Inc. Securities Litigation*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal 2003) *aff'd sub nom. Mortensen v. Snavely, 145 Fed. Appx. 218 (9th Cir. 2005).* ("Because of the need 'to distinguish between the fraud-related and non-fraud related influences on the stock's price behavior,' In re Oracle Sec. Litig., 829 F.Supp. 1176, 1181 (N.D.Cal.1993), a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar.")

000136
Exhibit 52

disregarded since the beginning of the Class Period, that Ashford's WASC application for accreditation would very likely be denied.[22]

39. This quotation points out two factors that must be considered in any damages analysis for that analysis to be consistent with Plaintiffs' prior pleadings. First, as Plaintiffs have pled that deferral was found "inappropriate … 'because the areas in which substantial compliance was not demonstrated *spanned across several key aspects of the Standards*,'" (emphasis added) a damages analysis based on solely the persistence-initiative allegations, and not on numerous areas that span across several key aspects of the Standards, could not be based on the market's reaction to the actual announcement of a lack of deferral without proper adjustments. Of particular note, WASC's July 3, 2012 letter ("WASC Letter") discusses "WASC's four Standards" and places the persistence allegations ("Student retention and completion, methods of tracking student progress, and support for student success"[23]) within Standard 2, while other issues deal with aspects of Standards 1, 3, 4, as well as with overlapping aspects of Standard 2.

40. Second, the quotation also states "that defendants knew or recklessly disregarded since the beginning of the Class Period, that Ashford's WASC application for accreditation *would very likely* be denied." (Emphasis added.) The Complaint therefore concedes that Defendants could not have disclosed the certainty that the application for accreditation would be denied, but solely alleges that it "would very likely be denied." Thus, even ignoring that some allegations have already been dismissed, the actual announcement revealed more than Defendants could have previously disclosed and thus is an example of an "overdisclosure," or a "curative disclosure" that provides more

[22] Plaintiffs repeat and emphasize this point in the Opposition to MTD, stating on pp. 3-4: "Tellingly, WASC declined to grant Ashford a deferral to give Defendants time to try to remedy the accreditation deficiencies '[b]ecause the areas in which *substantial compliance was not demonstrated* spanned across several *key aspects* of the Standards." (Emphasis in Opposition to MTD.) See also p. 8 of the Opposition to MTD again citing the same quotation.

[23] This grouping may actually overstate the persistence-related allegations as "support for student success" may encompass additional issues.

-18-

information than Defendants could have disclosed earlier.[24] I discuss this in the following subsection.

41. Below, I address ways to parse the stock-price movement to determine the portion due to persistence issues, under the assumption that those issues did contribute to a denial of accreditation. The per-share inflation immediately before the July 9, 2012 disclosure of the WASC Letter, assuming that Defendants are responsible for all of the stock-price decline due to issues related to persistence, are shown in Exhibit 4. Exhibit 4 is ordered from low to high damages, while the analyses in the discussion below are grouped by type of analysis.

### 1. Damages Based on the Costs of Addressing Persistence Issues

42. The first approach to damages that I undertake relies on the analyst report I have identified that provides the clearest quantitative forecast of the potential costs needed to obtain accreditation by WASC. This is a July 10, 2012 report by Wells Fargo that contains the following paragraph:

> To satisfy WASC, we expect that Ashford will have to significantly increase its full-time faculty, expanding its cost of services significantly and genuinely give the university some autonomy. Simply matching instructional expenses to marketing expenses would require an incremental $50 million. It will likely also have to make a much larger gesture to screen would-be drop-outs before they are officially enrolled. Anything short of Kaplan's first-two-courses-free approach might be viewed as too incremental. Foregone revenue associated with reduced churn – at least in the near term, through a transition period could cost another $50 million.

---

[24] See, for example, Cornell, Bradford, and R. Gregory Morgan, "Using finance theory to measure damages in fraud on the market cases," *UCLA L. Rev.* 37 (1990): 883 and Tabak, David, "Risk Disclosures and Damages Measurement in Securities Fraud Cases," 21 Sec. Reform Act Litig. Rep. 6 (2006). Plaintiffs do, at other points, make contradictory statements, claiming that a denial of accreditation was inevitable. (E.g., Opposition to MTD, p. 2.) I discuss this in the following subsection.

43. This analyst report identifies the "cost" of increasing persistence, here called "reduc[ing] churn," as $50 million in lost revenue.  To be conservative, we assume absolutely no cost savings, such as reduced instructional or administrative expenses, associated with this reduced revenue.  Dividing this $50 million by Bridgepoint's shares outstanding and removing taxes results in a tax-adjusted figure of $0.59 per share.  See Exhibit 5 for the details of the calculation.  This $0.59 is shown as Scenario I in Exhibit 4.

44. An alternative approach based on the July 10, 2012 Wells Fargo Report is to consider the "costs" (including the $50 million in lost revenue) attributable to persistence issues among the costs identified by Wells Fargo.  Specifically, besides the $50 million in lost revenue, Wells Fargo stated that "[s]imply matching instructional expenses to marketing expenses would require an incremental $50 million."  From a June 19, 2012 report by Wells Fargo, which contained more detailed financial projections than the July 10 report, we see that for FY2012, Wells Fargo projected Instructional Costs and Services to be $294.2 million, while projecting Marketing and Promotional Expenses of $344.1 million.  The difference between the two of $49.9 million is the "incremental $50 million" necessary to "match[] instructional expenses to marketing expenses" as discussed in the July 10 Wells Fargo Report.  This gap of $49.9 million was projected to decline by $5.7 million to $44.1 million in FY2013 and by a further $5.9 million to $38.2 million in FY2014.  We project that the difference would continue to decline by $5.8 million (the average of the two prior figures) until it would reach zero in FY2021.  We can then compare the one-time $50 million in lost revenue in the near term through a transition period to the present value of the additional costs of matching instructional costs to marketing costs through FY2020.

45. Two versions of this analysis are shown in Exhibit 6.  In each case, the additional costs are the same, but the discount rate used is based on discount rates of 24.8% in one analysis and 28.8% in the other.  These discount rates are determined by applying a perpetual growth formula to multiples of the S&P 500 and Bridgepoint's projected Fiscal Year 2013 net income multiple, respectively, using information provided in a June 19, 2012 Wells Fargo analyst report.  Details of the calculations are provided in Exhibits 7a

000139
**Exhibit 52**

and 7b. The resulting calculations, again shown in Exhibit 6, are that 24.9% and 25.9% of the loss in value is attributable to the lost revenue from reducing churn or increasing persistence, with the remainder due to the costs of increasing instructional costs.[25]

46. The results of these two calculations are shown in Scenarios IV and VII in Exhibit 4, with the former showing a maximum effect of the persistence-related issues of $1.99 per share and the latter showing a maximum effect of the persistence-related issues of $2.07 per share as of immediately before the WASC Letter.

### 2. Damages Based on "Content Analysis" of Analyst Reports

47. The second category of analysis is based on what is known as "content analysis" applied to analyst reports following the WASC Letter. Content analysis is an academic tool that, in its simplest form, recognizes that the amount of attention given to a particular topic is often a rough indicator of the relative importance of or interest in the topic. For example, newspapers may devote a relatively large amount of space to election polls shortly before an election, when interest is high and the polls are more likely to accurately predict the results of the election, than far from an election when interest is lower and the accuracy of the polls is more doubtful. Content analysis is a well-established academic methodology was endorsed by the First Circuit in an opinion on a securities fraud matter as a means to help disaggregate the effects of different potential causes of a stock-price decline.[26]

---

[25] Again, we conservatively assume that there are no cost savings associated with the lost revenue. In these analyses, the tax rate does not matter, as both the foregone revenues and incremental costs are measured before taxes, leaving the ratio between these two categories unaffected by the tax rate on earnings.

[26] *Bricklayers and Trowel Trades v. Credit Suisse LLC*, 752 F.3d 82 (1st Cir. 2014). (The expert "could also have used content analysis. See, e.g., David Tabak, Making Assessments About Materiality Less Subjective Through the Use of Content Analysis (2007), available at http://www.nera.com/67_5197. htm; Esther Bruegger & Frederick C. Dunbar, Estimating Financial Fraud Damages with Response Coefficients, 35 J. Corp. L. 11, 25 (2009) ("'[C]ontent analysis' is now part of the tool kit for determining which among a number of simultaneous news events had effects on the stock price.').")

48. To apply content analysis to the analyst reports, we examined the prevalence of terms related to persistence versus the other five areas considered in the WASC Letter.[27] Specifically, Exhibit 8a shows the search terms related to each area of concern and how often each appeared in the five analyst reports issued on July 9 or 10, 2012 and that discussed the WASC Letter. There were a total of 52 terms related to the descriptions of the six different areas. To be conservative, we included the word "success," part of "support for student success" as being related to persistence, even though this could relate to other issues. Under this categorization, 13 of the 52 instances in which a term appeared, or 25.0% of the total, related to persistence. Using Prof. Feinstein's calculation of the stock-price decline following the July 9, 2012 news, this means that at most $2.00 is attributable to persistence issues under this analysis.

49. This result, a measure of how analysts responded to the July 9, 2012 news, is shown in Scenario V in Exhibit 4. The similarity of the results to those of Scenarios IV and VII discussed above (i.e., the $2.00 here compared to the $1.99 and $2.07 from the prior two analyses) adds to the confidence that one should have in these results.

### 3. Damages Based on "Content Analysis" of the WASC Letter

50. In addition to analyzing how analysts responded to the WASC Letter, we can apply content analysis to the WASC Letter itself. The first scenario we consider here is based on the WASC Letter's description of four Standards of Accreditation. The category of "Student retention and completion, methods of tracking student progress, and support for student success" only touched on Standard 2. However, there were also two other categories of issues that WASC found at Ashford that also touched on Standard 2. Thus,

---

[27] The concept that each category is preliminary thought of as of equal weight is a baseline assumption in content analysis. That is, the "*frequency* with which a symbol, idea, reference, or topic occurs in a stream of messages is taken to indicate the *importance of, attention to, or emphasis* on that symbol, idea, reference, or topic in the messages." (Klaus Krippendorff, Content Analysis: An Introduction to Its Methodology, 2nd edition, 2004, p. 59. Emphases in original.)

000141
Exhibit 52

the category that included persistence was one of three categories that touched on one of the four Standards of Accreditation. Under the simple assumption that 25% of any price decline is associated with each Standard of Accreditation, then only one-third of that, or 8.3% of the price decline is associated with the category that includes persistence issues.[28] Again using Prof. Feinstein's calculation of the stock-price decline, this means that at most $0.67 is attributable to persistence issues under this analysis. This is shown as Scenario II in Exhibit 4.

51. The second scenario we consider is based on the six numbered areas of interest in the WASC Letter. Again, persistence is included solely in the first of these six points, so it would account for at most one-sixth of the total price decline, or $1.33 per share. This is shown as Scenario III in Exhibit 4.

52. The third scenario we consider assumes that even though there are other issues that also touch on Standard 2, we conservatively assume that a full 25% of the price reaction, or $2.00 per share is attributable to persistence issues by treating persistence issues as if they were wholly responsible for the failures in Standard 2. This is shown as Scenario VI in Exhibit 4.

53. The fourth scenario we consider is that there were 16 Criteria For Review ("CFR") listed in the WASC Letter and six of them were related to the category that included persistence issues. Thus 6/16, or 37.5% of the price reaction, or $3.00 per share, would be attributable to persistence issues. This is shown as Scenario IX in Exhibit 4.

---

[28] This is a very simplified form of content analysis, in which each entry in a list is considered to be a single reference to a category. Of course, additional examination may yield reasons to believe that any category is of greater or lesser weight than average. For this reason, I do not rely on this analysis as the sole scenario but include it among others to provide a greater set of potential parsing figures that can be compared to see if they tend to fall in a similar range.

54. The final scenario we consider in this category is based on the prevalence of terms related to persistence versus the other five areas considered in the WASC Letter.[29] Exhibit 8b shows the search terms related to each area of concern and how often each appeared in the WASC Letter. There were a total of 88 terms related to the descriptions of the six different areas. To be conservative, we included the word "success," part of "support for student success" as being related to persistence, even though this could relate to other issues. Under this categorization, 25 of the 88 terms, or 28.4% of the total, related to persistence. This corresponds to $2.27 per share, shown as Scenario VIII in Exhibit 4.

### 4. Summary

55. The different inflation or damages scenarios are based on different assumptions about how to measure the impact of the persistence allegations as a portion of the total July 9, 2012 market-adjusted stock-price decline. The results range from $0.59 to $3.00 per share out of a total market-adjusted stock-price decline of $8.00 per share, with a mean estimate of $1.77 per share.

56. While, like any approach, the analyses discussed above have their individual advantages and disadvantages, they all point toward the same conclusion: the portion of the stock-price reaction for which the persistence allegations are responsible is, at most, under half and typically only approximately a quarter of the total. As a whole, these analyses show that the market processed the cost and revenue impacts of different reasons for the denial of accreditation and spent time discussing those different reasons in proportions roughly equal to the amount of importance indicated by the WASC Letter and the financial analyses of those costs. Given the general convergence of the results from three different methodologies, it would be improper to treat the WASC denial of

---

[29] This scenario is a more obvious fit with the Krippendorff quote in footnote 27 about examining the frequency with which a term appears. While a measure of one out of four or one out of six is consistent with the description in that quote, an examination of a larger amount of text allows for finer measurements.

-24-

accreditation, which itself was based on how the failures "spanned across several key aspects of the Standards" as if the persistence allegations, wholly contained in Standard 2, could be responsible for the entirety of the market-adjusted stock-price reaction to the WASC Letter.

### C. The Degree of Inflation in Bridgepoint's Stock Price Must Be Adjusted at Earlier Points in Time to Reflect the Information That the Company Could Have Disclosed

57. As previously noted, in ¶54 of the Complaint, Plaintiffs have pled that Defendants knew or should have known that WASC accreditation "would very likely be denied." While Plaintiffs have also at other points claimed that such a denial was a certainty, it is rare that a future outcome that depends on the actions of a third party can be known with certainty. I do not opine on the legal issues involved with apparently contradictory pleadings by Plaintiffs on this issue, but proceed on the basis that, at a minimum, to establish a reliable damages analysis, Plaintiffs must provide evidence and analysis to demonstrate what the probability of a denial of accreditation was at any point in time, whether that is 100% or some other figure.

58. Furthermore, Plaintiffs repeatedly cited the WASC Letter as denying accreditation because there was a lack of compliance in areas within each of WASC's four Standards while the persistence-initiative aspects all fall within Standard 2. Taken at face value, if the reason for the denial of accreditation was due to a factor that is not relevant for purposes of this litigation (i.e., the failure to demonstrate compliance across several aspects of the Standards of Accreditation), then a disclosure of solely the persistence issues would not have affected the publicly perceived probability of non-accreditation. Assuming, however, that Plaintiffs are not bound by this direct reading of the WASC Letter and by at least some of their pleadings, then, as the party that bears the burden of proof, if they wish to provide an accurate measure of any damages that may exist, they must provide evidence and analysis to demonstrate what the perceived probability of a denial of accreditation would be at any point in time, whether that is 100% or some other

000144
Exhibit 52

figure, based on both what was actually publicly known and based on a disclosure of the persistence issues. [30]

59. As Plaintiffs bear the burden of proof on this point, I do not develop a complete model to measure the change in the publicly perceived probability of accreditation if the persistence issues had been made public, but reserve my right to comment on any model that is put forth by Plaintiffs' damages or other expert. I do note, however, two features that should be incorporated into such a model:

1. The WASC Letter states, "Given that there were multiple areas in which substantial compliance could not be demonstrated and that these areas fell into several aspects of the Standards of Accreditation, the Commission determined that a denial of initial accreditation of Ashford was the appropriate action." However, the WASC Letter describes the persistence-initiative allegations as falling solely within one of the four Standards of Accreditation.

2. Plaintiffs have already pled that accreditation only "would very likely be denied" based on the allegations initially pled in the Complaint.

60. Once we know the difference between (a) the probability of accreditation as perceived by the market and (b) the probability that would have been perceived by the market had Defendants disclosed the alleged "truth," it is a straightforward task to calculate inflation at any point in time. Suppose, for example, that before this analysis that the stock-price decline associated with the persistence-initiative issues was $1.00 per share. Further suppose that one calculates or otherwise demonstrates that the market

---

[30] Statistically estimated models for accreditation in various fields have been published in the academic literature. See, for example, Gohmann, Stephan F., "Factors Influencing NCQA Accreditation Decisions of HMOs," *Atlantic Economic Journal* 34.2 (2006): 209-217 and Sarkar, Sumit and Deb Ghosh, "Contractor accreditation: A probabilistic model," *Decision Sciences* 28.2 (1997): 235-259. If they developed such a model, Plaintiffs could determine the effect, if any, of meeting the CFRs relating to measuring persistence on the probability of receiving accreditation as a means of limiting inflation to the allegation remaining in the case (again assuming that accreditation risk is a viable measure of inflation given the MTD Order).

perceived that there was a 90% probability of accreditation in or around July 2012 but that based on what allegedly should have been disclosed about the persistence initiatives, the market would have perceived that the probability of accreditation was only 60%. When the market learned of the accreditation failure, the stock price fell by $1.00 corresponding to a decline of 90 percentage points in the probability of accreditation (i.e., from a 90% chance of accreditation to a 0% chance of accreditation in or around July 2012). However, had the alleged truth been revealed earlier (i.e., had the market assessed only a 60% probability of accreditation had it known the alleged "truth" about persistence initiatives), the drop would have only been one of 30 percentage points (from 90% to 60%). Then, only 30/90, or one-third of the $1.00 per share decline would be included in the inflation that was due to what Defendants allegedly could have disclosed, while the remainder would represent the surprise effect of the denial of accreditation on both the market and on Defendants.

61. In determining what the market should have initially expected the probability of accreditation to be had Defendants made some disclosure, one should consider the following factors. First, Ashford was reaccredited in 2006 including "a comprehensive evaluation...." Per p. 26 of the Company's 2009 10-K:

> The Higher Learning Commission renewed Ashford University's accreditation in 2006 for the maximum period of ten years. The renewal followed a review process, including a change in ownership review resulting from our acquisition of the university in 2005, as well as a comprehensive evaluation in connection with the regularly scheduled renewal process following the university's previous ten-year grant of accreditation in 1995.

62. Second, a then-current study of accreditation standards found that "[o]ne overriding impression emerged from the study: Although there are seven quasi-independent regional organizations in the accreditation system, their policies and approaches to student learning outcomes assessment tend to be more alike than different. The seven regional accreditation organizations appear to share similar expectations for

-27-

student learning outcomes assessment."[31]  This information should be considered in evaluating what the market's perceived probability of accreditation by WASC was or would have been had the alleged "truth" been known, given Ashford's prior accreditation by HLC and that the different accreditors' approaches "tend to be more alike than different."  However, to the extent that standards for accreditation had tightened since Ashford's last accreditation, as noted in the report, that information would have been public knowledge and therefore been incorporated into the market perception of the probability of WASC accreditation as well as in evaluating the market's perceived probability of WASC accreditation, in both cases potentially affecting the level of measured inflation in Bridgepoint's stock price.

63. For Plaintiffs' analysis to be reasonable, it should consider whether other universities were able to achieve accreditation or even deferral while failing to meet certain WASC areas of review.  Any damages analysis that fails to address this and merely assumes that based solely on the persistence-initiative allegations the market would have known with complete certainty that Ashford would be denied accreditation by WASC would be entirely unfounded.  This is particularly important because to the extent that Plaintiffs wish to assert that as of the start of the Class Period, Defendants should have had the foresight to understand that Ashford could not achieve either accreditation or deferral in July 2012 due to persistence issues, Plaintiffs would also have to address why Defendants could not have also foreseen that Ashford would in fact receive accreditation from WASC in July 2013 despite, in WASC's opinion, still having an unacceptable retention rate and a failure of some of its attempts to positively affect persistence.[32]

---

[31] Provezis, Staci, "Regional Accreditation and Student Outcomes: Mapping the Territory," *National Institute of Learning Outcomes Assessment*, October 2010, p. 7.

[32] See the July 10, 2013 letter from WASC granting accreditation stating that "the Commission still considers the current retention rate unacceptable….  The Commission wishes to emphasize that significant improvement in both first year retention and degree completion rates is still needed. … The University will need to continue to study the impact of its changes and develop corrective measures as needed, since it already appears (continued)

000147
Exhibit 52

64. Again, as Plaintiffs have the burden of proof on this matter, I do not perform this type of analysis here but reserve my right to respond to the analysis performed by one or more of Plaintiffs' experts.

### D. Summary

65. The subsections above describe three steps that Plaintiffs would need to undertake to even potentially have a reliable damages analysis. Plaintiffs have already undertaken the first step (removing market and industry influences on the stock price) previously, so I expect that they will employ the same or a similar analysis in their damages calculation.[33]

66. The second step (isolating the effects of the persistence-initiative allegations on the July 9, 2012 stock-price movement) is one that Plaintiffs have not yet undertaken, but one that needs to be performed so as to not make the MTD Order meaningless, as a failure to undertake such an analysis would essentially be equivalent to a claim that the particular allegations in this matter are irrelevant to a damages analysis. I expect to review Plaintiffs' expert's analysis in this regard to determine whether it is reasonable.

67. The third step (adjusting the level of inflation for what the Company could have disclosed at any point in time) is necessary to obtain a measure of inflation, and thus damages, that is consistent with the securities laws, which allow for damages only for what Defendants could have disclosed, not what they could not have even known. Again, I expect to review Plaintiffs' expert's analysis in this regard to determine whether it is reasonable.

---

that not all changes are having a significant positive effect on persistence and completion..."

[33] Plaintiffs' expert and I are exchanging reports simultaneously, so I do not know what he or she has done in his or her damages report.

000148
Exhibit 52

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Plaintiffs, that becomes available to me.

David I. Tabak
June 1, 2015

-30-



**David I. Tabak**
Senior Vice President

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
Direct dial: +1 212 345 2176
david.tabak@nera.com
www.nera.com

# EXHIBIT 1
# DAVID I. TABAK
## SENIOR VICE PRESIDENT

Dr. Tabak earned his Ph.D. and M.A. degrees in Economics from Harvard University and his B.S. in Economics and B.S. in Physics from the Massachusetts Institute of Technology.  While at Harvard, Dr. Tabak participated in teaching courses in micro- and macroeconomics and American economic policy at the undergraduate and graduate levels and in the creation of an undergraduate textbook and accompanying software package.

Dr. Tabak has appeared as an expert in state, federal, and bankruptcy court, and before arbitration panels, including the National Association of Securities Dealers, the American Arbitration Association, the International Dispute Resolution Centre, and the International Chamber of Commerce International Court of Arbitration.  He has published in his areas of expertise in forums such as *St. John's Law Review* and *Shannon Pratt's Business Valuation Update*, and has published peer-reviewed articles in *Litigation Economics Review* and the *Journal of Forensic Economics*.  Dr. Tabak is also the author of book chapters and has served as a member of *BV Q&A Update's* expert author panel and as a referee for peer-reviewed journals. His publications have covered topics such as commercial disputes, economic analysis of market efficiency, valuation discounts for lack of marketability, and the application of statistics in litigation analyses.  Dr. Tabak has been an invited presenter at the Securities and Exchange Commission and has spoken at forums that provide continuing legal education credits or continuing professional education credits for accountants and valuation professionals.

Dr. Tabak has been retained as an expert to address issues including allegations of valuations, contract disputes, commercial damages, and disputes between brokers and customers. His non-litigation work has included developing a risk-scoring model for a reinsurance company, assisting financial institutions in new product development, analysis of potential insider trading for a financial institution, and interpretation of statistical analyses of treatment effectiveness for a program for at-risk youth.

# Education

### Harvard University
Ph.D., Economics, 1996
M.A., Economics, 1992

### Massachusetts Institute of Technology
B.S., Economics, 1990
B.S., Physics, 1990

# Professional Experience

### NERA Economic Consulting

2005- *Senior Vice President*
Provide written and oral testimony. Conduct and supervise economic analyses, with a focus on securities litigation and valuation cases.

2001-2005 *Vice President*

1998-2001 *Senior Consultant*

1996-1998 *Senior Analyst*

### Harvard University

1991-1996 *Teaching Fellow in Economics*
Participated in teaching various courses from introductory principles of economics to graduate macroeconomics. Ran coursewide tutorial program for the largest class at Harvard for two academic years, with a staff of over fifty part-time employees.

### Worth Publishers

1991, 1993 *Research Assistant/Independent Contractor*
Worked on data collection, software analysis, and creation of a problem bank for an educational economics software package.

### National Bureau of Economic Research

1991 *Research Assistant*
Performed data collection and econometric analysis for a project on comparisons of international growth rates.

# Honors and Professional Activities

Member, American Economic Association, 1993-present

Referee, *Journal of Forensic Economics*, 2005, 2006, 2008, 2009, 2011, 2012

Referee, *Litigation Economics Review*, 2002, 2003, 2004

William M. Mercer Securities Corporation, Registered Representative, Series 7 and 63, 2000 - 2002

Marsh & McLennan Securities Corporation, Registered Representative, Series 7 and 63, 1998 - 2000

Adjunct Member, Committee on International Trade, Association of the Bar of the City of New York, 1998 – 2001

Harvard University Scholarship, 1990-1992

Derek Bok Teaching Award, 1993, 1994, 1995, and 1996

Allyn Young Teaching Award, 1996

## Expert Reports and Testimony

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 30, 2015.

Declaration of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *George Byrun et al. v. Salix Pharmaceuticals et al.*, 30 January 2015.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, 13 January 2015.

Expert Report of David Tabak before the Securities and Exchange Commission in the matter of *Airtouch Communications, Inc., Hideyuki Kanakubo, and Jerome Kaiser, CPA*, December 16, 2014.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Puda Coal Securities et al. Litigation*, November 13, 2014.

Deposition Testimony before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, July 2, 2014.

Testimony before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 16, 2014.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, June 11, 2014.

Supplemental Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 3, 2014.

Deposition before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 31, 2014.

Cross Examination in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation et al. before the Ontario Superior Court of Justice (Commercial List), March 19, 2014.

Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. *against AriZona Beverages USA LLC et al.*, March 11, 2014.

Report of David I. Tabak in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation *et al.* before the Ontario Superior Court of Justice (Commercial List), February 28, 2014.

000153
Exhibit 52

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, September 4, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2013.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, June 27, 2013.

Deposition Testimony before the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, May 10, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, April 11, 2013.

Declaration of David I. Tabak, Ph.D. in the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, March 21, 2013.

Reply Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, November 8, 2012.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, November 6, 2012.

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2012.

Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, May 3, 2012.

Written Direct Testimony of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, April 17, 2012.

Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, April 10, 2012.

Rebuttal Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, January 30, 2012.

Expert Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, December 5, 2011. (Affidavits testifying to the report executed on December 9, 2011 and December 20, 2011.)

000154
Exhibit 52

Deposition Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, August 1, 2011.

Expert Report of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, July 8, 2011.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, February 3, 2011.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, January 11, 2011.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Securities and Exchange Commission v. Alfred S. Teo, et al.*, November 4, 2010.

Declaration of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 29, 2010.

Deposition Testimony before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 7, 2010.

Expert Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, September 16, 2010.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, August 30, 2010.

Rebuttal Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., April 25, 2010.

Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., March 12, 2010.

Testimony before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, November 6, 2009.

Expert Rebuttal Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, October 19, 2009.

Expert Report of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, September 17, 2009.

Expert Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, September 10, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, July 16, 2009.

Declaration of David Tabak before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, July 13, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, June 26, 2009.

Deposition Testimony before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, June 16, 2009.

Declaration and Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, May 29, 2009.

Deposition Testimony before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, May 6, 2009.

Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, April 15, 2009.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, February 17, 2009.

Declaration of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, January 5, 2009.

Expert Report of David Tabak, Ph.D., before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, December 15, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, November 7, 2008.

Deposition Testimony before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* October 31, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* September 23, 2008.

Cross-Examination before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, June 23, 2008.

Surrebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, January 11, 2008.

Affidavit of David I. Tabak before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, December 19, 2007.

Rebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 19, 2007.

Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 3, 2007.

Deposition Testimony before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund, et al. vs. The Coca-Cola Company*, August 23, 2007.

Deposition Testimony before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, June 13, 2007.

Expert Report of David Tabak before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund, et al. vs. The Coca-Cola Company*, May 30, 2007.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, April 27, 2007.

Expert Report of David Tabak before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, April 4, 2007. (Amended report, June 25, 2007.)

Rebuttal Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, January 18, 2007.

Expert Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, December 18, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, November 9, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 13, 2006.

Affidavit of David I. Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, October 11, 2006.

Rebuttal Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 4, 2006.

Expert Report before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, October 4, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, September 15, 2006.

Expert Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, August 25, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, July 20, 2006.

Deposition Testimony before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, May 25, 2006.

Affidavit before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, April 14, 2006.

Deposition Testimony before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 24, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, March 17, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 9, 2006.

Expert Report of David Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, February 13, 2006.

Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, February 1, 2006.

Rebuttal Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 30, 2005.

Deposition Testimony before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 9, 2005.

Expert Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, October 3, 2005.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Pennsylvania in *Sean Fitzpatrick v. Michael Queen, Thomas McGreal, Joseph W. Luter, IV, Michael H. Cole, Smithfield Foods, Inc., Showcase Foods, Inc., and Pennexx Foods, Inc.*, March 25, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 24, 2005.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 18, 2005.

Affidavit of David Tabak, Ph.D. and Stephanie Plancich, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Doug Sutton and Prescott Nottingham v. Robert F. Bernard, Robert T. Clarkson, and Bert B. Young*, January 11, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, January 5, 2005.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Phoenician Trading Partners, L.P. v. Blue Water Fund Ltd., et al.*, January 3, 2005.

Affidavit of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, December 14, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, December 10, 2004.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, October 4, 2004.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, September 22, 2004.

Deposition Testimony before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, September 9, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, August 20, 2004.

Further Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, July 30, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, June 30, 2004.

000159
Exhibit 52

Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 7, 2004.

Deposition Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 2, 2004.

Expert Report of David Tabak before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, March 31, 2004.

Statement of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *United States of America v. Morris Weissman*, February 10, 2004.

Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, December 17, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of Ohio Eastern District (at Columbus) in *Barry F. Bovee, et al. v. Coopers & Lybrand, et al.*, December 16, 2003.

Deposition Testimony before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation* and in *In Re Safety-Kleen Rollins Shareholders Litigation*, October 23, 2003.

Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, October 1, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation*, August 28, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Rollins Shareholders Litigation*, August 28, 2003.

Testimony before the NASD in *Ralph Rubenstein, JANT Foundation, et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* June 19, 2003.

Affidavit of David Tabak, Ph.D. and Ramzi Zein, Ph.D. in Support of Norwegian Cruise Line's Opposition to Proposed Rule before the Federal Maritime Commission, May 30, 2003.

Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, March 11 and 12, 2003.

Declaration of David I. Tabak in Support of Defendant's Motion in Opposition to Appointment of Additional Lead Plaintiffs and Class Certification before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, June 21, 2002.

Affidavit before the United States District Court for the District of Rhode Island in *George Kinney et al. v. Metro Global Media, Inc., et al.* May 15, 2002.

000160
Exhibit 52

Testimony before the American Arbitration Association in *Beth Kaplan v. Rite Aid Corporation; Rite Aid Corporation v. Beth Kaplan and Bruce Sholk*, May 2-3, 2002.

Expert Report of David I. Tabak before the United States District Court for the District of Idaho in *Pippin v. ICF Kaiser International, et. Al, Wood v. Edwards et al.*, February 11, 2002.

Deposition Testimony before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, February 7, 2002.

Deposition Testimony before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Securities, Inc. Litigation*, January 17, 2002.

Affidavit before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, January 10, 2002.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Inc. Securities Litigation*, December 28, 2001.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Castle Creek Technology Partners LLC against Cellpoint Inc.*, December 13, 2001.

Deposition Testimony before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, October 11, 2001.

Deposition Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, September 6, 2001.

Testimony before the United States District Court for the Eastern District of New York in *United States of America against Harry Shuster*, July 30, 2001.

Declaration before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, July 23, 2001.

Testimony before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, May 29, 2001.

Opinion Letter before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, May 24, 2001.

000161
Exhibit 52

Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, May 22, 2001.

Testimony before the Supreme Court of the State of New York, County of New York in *Robert Klein against 5B Technologies Corporation f/k/a Paramount Financial Corporation and Deltaforce Personnel Services, Inc.*, May 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, April 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Central District of California in *In Re Imperial Credit Industries, Inc. Securities Litigation*, April 5, 2001.

Affidavit before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, February 8, 2001.

Deposition Testimony before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 19, 2001.

Expert Report of David I. Tabak before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 11, 2001.

Supplemental Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, September 13, 2000.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Martin R. Lautman v. The Loewen Group Inc., et al.*, September 6, 2000.

Supplemental Affidavit of David I. Tabak before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 25, 2000.

Affidavit of David I. Tabak and Christoph Muelbert before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 23, 2000.

Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, April 28, 2000.

Testimony before the American Arbitration Association in *Roderick Covlin against C.S. Block New York, LLC, Dr. Sharaif Amanat, Omar Amanat*, March 30, 2000.

Expert Report of David I. Tabak before the National Association of Securities Dealers Office of Dispute Resolution in *Brooks, Houghton & Company, Inc. Private Corporate Advisors, Inc., and Brooks, Houghton Securities, Inc. against BIG Entertainment, Inc.*, March 17, 2000.

Declaration of David I. Tabak before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* February 21, 2000.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *The Klass Report LLC and Christopher M. Klass against Telemation, Inc.*, December 15, 1999.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* November 26, 1999.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *A.R. DiGima, Inc. vs. A.G. Edwards & Sons, Inc. and Eugene Damico*, November 5, 1999.

Deposition Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, October 22, 1999.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, September 16, 1999.

Expert Report of Frederick C. Dunbar and David I. Tabak before the United States District Court for the Northern District of Alabama, Southern Division in *MedPartners, Inc. v. Dun & Bradstreet, Inc*, July 28, 1999.

Testimony before the International Chamber of Commerce International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, April 13, 1998.

Expert Witness Statement of David I. Tabak before the International Chamber of Commerce, International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, March 13, 1998.

## Publications

"Implications for Market Efficiency and Damages Analysis of Plaintiff Interpretations of *Halliburton II's* Statement that 'market efficiency is a matter of degree,'" *Loyola University Chicago Law Journal*, Spring 2015.

"The Solvency Two-Step," Guest Post on the Weil Bankruptcy Blog. March 2013.

"Do Courts Count *Cammer* Factors?" NERA Working Paper, republished in the Harvard Law School Forum on Corporate Governance and Financial Regulation. Also published in modified form as "Counting Cammer Factors – A Review of Case Law" at Law360.com, August 2012.

"Settlement reasonableness from negotiations to coverage disputes," *Litigation and Dispute Resolution 2012 Global Reference* Guide. A prior version of this was published as a NERA Working Paper, February 2012.

"Guesstimating Loss for Sentencing," published in Law360.com, February 2012. (Originally published with the title "Estimating Loss For Sentencing Purposes." Retitled by Law360.com after initial publication on its website.)

"Economic Analysis of Loss in the United States Sentencing Commission's Proposed Methodologies," NERA Working Paper, February 2012.

"Guideline Companies in Valuation: A Careful View of the Market Approach," *Journal of Business Valuation*, 2011 Volume 1. (A previous version appeared as a NERA working paper entitled "Guideline Companies in Valuation: The Economist's View of the Market Approach" in October 2008.)

"The Matrixx of Materiality and Statistical Significance in Securities Fraud Cases," (co-authored with Frederick Lee of Boies, Schiller & Flexner) NERA Working Paper, December 2010.

"Materiality and Statistical Significance Explained" (co-authored with Frederick Lee of Boies, Schiller & Flexner), published in Law360.com, December 2010.

"Satisfying Fiduciary Duty Under ERISA," *Employment Law Strategist*, June 2010.

"Use and Misuse of Event Studies to Examine Market Efficiency," NERA Working Paper, April 2010. (A previous version appeared in September 2009, and a condensed version appeared as a Guest Column, "On the Misuse of Event Studies to Examine Market Efficiency," in May 2010 on www.securitiesdocket.com.)

"Comment: 'A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," *Journal of Forensic Economics*, December 2009.

Book Review of *Business Valuation: In Integrated Theory (Second Edition)* in *Valuation Strategies,* November/December 2008.

000164
Exhibit 52

Guest Author/Respondent, *BVUpdate*, published by Business Valuation Resources, LLC, *Special Report:* What Will the Wall Street Meltdown Mean to the BV Profession? (with Raymund Wong), November 2008.

"Inflation and Damages in a Post-*Dura* World," NERA Working Paper, September 2007.

"Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics,*" Volume XIX, Number 2, published March 2007.

"Making Assessments About Materiality Less Subjective Through The Use of Content Analysis," NERA Working Paper, March 2007.

"Risk Disclosures and Damages Measurement in Securities Fraud Cases," published in the *Securities Reform Act Litigation Reporter*, April 2006. (Previously published as a NERA Working Paper.)

Guest Author/Respondent, *BV Q&A Update*, published by Business Valuation Resources, LLC., January, March, June, and July 2004; February, May, August, and September 2005.

"Loss Causation and Damages in Shareholder Class Actions: When it Takes Two Steps to Tango," in *Securities Litigation & Enforcement Institute 2004,* published by the Practising Law Institute. (Previously published as a NERA Working Paper.)

"The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-On-The-Market Cases" (with Paul A. Ferrillo and Frederick C. Dunbar), *St. John's Law Review,* Winter 2004. (Previously published as a working paper by NERA and Weil, Gotshal & Manges, LLP.)

"Determination of the Appropriate Event Window Length in Individual Stock Event Studies" (with Dmitry Krivin, Robert Patton, and Erica Rose), NERA Working Paper, November 4, 2003.

"Inflation Methodologies in Securities Fraud Cases: Theory and Practice" (with Chudozie Okongwu), published in *Securities Litigation & Enforcement Institute 2003,* by the Practising Law Institute. (Previously published as a NERA Working Paper.)

"Hedging and the Estimation of Marketability Discounts," in *Shannon Pratt's Business Valuation Update*, published by Business Valuation Resources, LLC, August 2003. (Also reprinted in *BVR's Guide to Discounts for Lack of Marketability*, 2007.)

"Shareholders' Suit against Corporation," in *Litigation Support Report Writing: Accounting, Finance, and Economic Issues*, edited by Jack P. Friedman and Roman L. Weil, published by John Wiley & Sons, Inc., 2003.

"A CAPM-Based Approach to Calculating Illiquidity Discounts," NERA Working Paper, November 2002.

"A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud" (with Svetlana Starykh and Marc Shotland), *Litigation Economics Review*, Vol. 5, No. 2, Winter 2001 (printed July 2002).

"Intraday Trading Rates in Shareholder Class Actions," *NERA Securities and Finance Insights*, June 2002.

"Materiality and Magnitude: Event Studies in the Courtroom" (with Frederick C. Dunbar), *Litigation Services Handbook: The Role of the Financial Expert, Third Edition, 2001*, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank, published by John Wiley & Sons, Inc. (Previous versions appeared in the 2000 Supplement to the *Litigation Services Handbook* and as a NERA Working Paper.)

"Are Investors Signalling You About Your Y2K Risk?" (with Vinita M. Juneja and Denise N. Martin), *Y2K Marketwatch*, December 1999.

"What Does the Market Think About Your Y2K Exposure?" (with Vinita M. Juneja and Denise N. Martin), *Viewpoint*, Issue No. 2, November 1999.

"Economic Analysis and Identification of Class Conflicts in Securities Fraud Litigation," NERA Working Paper, June 1998.

000166
Exhibit 52

## Selected Presentations

Presenter, "Multiple Comparisons and the Known or Potential Error Rate," National Association of Forensic Economics session at the Eastern Economics Association, New York, NY, 27 February 2015.

Panelist, Annual Institute for Investor Protection Conference at Loyola University Chicago Law School, 24 October 2014.

Panelist, 2014 Business Law Section Annual Meeting, American Bar Association, Chicago, 11 September 2014.

Moderator, New York University Ross Roundtable, April 7, 2014.

Commentator, Institute for Law and Economic Policy Conference: "Business Litigation and Regulatory Agency Review in the Era of the Roberts Court," April 4, 2014.

Panelist, "The Supreme Court's Decision in Amgen and Other Recent Cases," Securitiesdocket.com; July 24, 2013.

Panelist, "Securities Law: Fraud-on-the-Market Theory Demystified," The Knowledge Congress; July 23, 2013.

Moderator, New York University Ross Roundtable, April 15, 2013.

Panelist, 1st Annual Securities Litigation & Enforcement Institute; New York City Bar; New York, NY; December 11, 2012.

Panelist, The Litigation Summit and Exposition; Washington DC; November 12, 2012.

Panelist, The Society of Corporate Secretaries on materiality issues in determining corporate disclosures, October 18, 2012; New York, NY.

Panelist, Symposium in honor of Nobel Prize Winner Daniel Kahneman at Loyola University, Chicago, IL; October 5, 2102.

Panelist, Practising Law Institute, "Taking and Defending Expert Depositions"; New York, NY June 27, 2012.

Discussant, National Association of Forensics Economics; Chicago IL; January 7, 2012.

Panelist, Advanced eDiscovery Institute (session: Statistics and Sampling for Lawyers: How to Apply a Well-Accepted Methodology in the World of eDiscovery); Washington DC; November 17, 2011.

Presenter, Securities Regulation Committee of the New York State Bar Association; New York, New York; July 20, 2011.

000167
Exhibit 52

Panelist, 2nd Annual Law Firm Marketing U& Business Development Leadership Forum, sponsored by *The American Lawyer* (session: Macro Economic Industry-by-Industry Overview – a power-packed session exploring the sectors that will shape 2011 and beyond); New York, NY; May 24, 2011.

Presenter in webinar on "Fair Value Measurement Consideration for 2010 and Beyond," The Knowledge Congress, July 13, 2010.

Panelist, Forum for Institutional Investors, sponsored by Bernstein Litowitz Berger & Grossman LLP; New York, NY; October 24, 2008.

Presenter, Office of Litigation Support, Securities and Exchange Commission; Washington, DC; May 20, 2008.

Presenter, IQPC Subprime Litigation Conference; New York, New York; February 27, 2008.

Presenter, IQPC Securities Litigation Conference; New York, New York; May 18, 2007.

Presenter, "Everything You Were Afraid To Know About Experts," Fordham University; January 19, 2006.

Presenter, *Eugene P. and Delia S. Murphy Conference on Corporate Law,* Fordham University; November 4, 2005.

Panel Member, *Directors & Officers Under Fire: Protecting Your Interests in this Hostile Environment*, a Directors Roundtable seminar; Washington, D.C.; June 8, 2004.

Guest Lecturer, Fordham University; New York, New York; March 8, 2004.

Panel Member, Business Valuation Resources audio conference on discounts for lack of marketability; May 14, 2003.

Presenter, *Third Annual Law and Business Conference*, Vanderbilt University Law School, ("Inflation Methodologies in Securities Fraud Cases: Theory and Practice"); March 28, 2003.

Guest Lecturer, Middlebury College; Middlebury, Vermont; January 28, 2003.

Panel Member, *Second Annual Grant & Eisenhofer Institutional Investor Conference;* New York, New York; December 9, 2002.

Guest Speaker, Deutsche Bank institutional investor conference call; November 22, 2002.

Panel Member, *Key Issues Facing Board Members: The Coming Tide in Securities Class Actions,* a Directors Roundtable seminar; Chicago, Illinois; February 22, 2001.

Panel Member, *Securities Litigation: Risk Management and Avoidance, Emerging Challenges for CXOs*, a seminar sponsored by Jones, Day, Reavis and Pogue and PriceWaterhouseCoopers; Reston, Virginia; September 20, 2000.

"When the Litigation Comes In and the Money Goes Out: What Determines Settlement Values?" presented at *Balancing Disclosure and Litigation Risks for Public Companies (or Soon-to-Be Public Companies)*, a seminar sponsored by Alston & Bird and RR Donnelley Financial; Raleigh, North Carolina; November 10, 1999.

May 2015

**Exhibit 2**
**Bridgepoint Education, Inc.**
**Materials Relied Upon**

*Academic Literature*

Cornell, Bradford, and Morgan, R. Gregory, "Using finance theory to measure damages in fraud on the market cases," *UCLA L. Rev.* 37 (1990).

Tabak, David, "Risk Disclosures and Damages Measurement in Securities Fraud Cases," 21 *Sec. Reform Act Litig. Rep.* 6 (2006).

Krippendorff, Klaus, "Content Analysis: An Introduction to Its Methodology," 2nd edition, *SAGE,* 2004.

Gohmann, Stephan F., "Factors Influencing NCQA Accreditation Decisions of HMOs," *Atlantic Economic Journal* 34.2 (2006).

Sarkar, Sumit and Ghosh, Deb, "Contractor accreditation: A probabilistic model," *Decision Sciences* 28.2 (1997).

Provezis, Staci, "Regional Accreditation and Student Outcomes: Mapping the Territory," *National Institute of Learning Outcomes Assessment* (2010).

*Data*

Bridgepoint Education, Inc. and industry analyst reports.

Bridgepoint Education, Inc.'s 2009 Form 10-K, Form 10-Q for the period ended June 30, 2012, Form 10-Q for the period ended March 31, 2012, and Form 8-K dated July 13, 2012 obtained from the SEC.

Bridgepoint Education, Inc. stock price data obtained from FactSet Research Systems Inc.

*Depositions*

Deposition of Brandon Dobell, dated April 16, 2015.

Deposition of Andrew Steinerman, dated April 15, 2015.

Deposition of Trace Urdan, dated April 24, 2015.

*Case Documents*

Consolidated Complaint for Violation of the Federal Securities Laws, filed December 21, 2012.

Page 1 of 3

**Exhibit 2**
**Bridgepoint Education, Inc.**
**Materials Relied Upon**

### Case Documents (continued)

Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, filed September 13, 2013.

Order Granting Motion for Class Certification, filed January 15, 2015.

Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Complaint for Violation of the Federal Securities Laws, filed April 22, 2013.

Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA dated August 6, 2014.

### Case Law

*Meyer v. Greene,* 2013 WL 656500 (11th Cir. Feb. 25, 2013).

*Loos v. Immersion Corp*., 762 F.3d 880 (9th Cir.2014).

*In re Omnicom Group, Inc. Sec. Litig.*, 2008 WL 243788 (S.D.N.Y. Jan. 29, 2008).

*In re Imperial Credit Industries, Inc. Securities Litigation,* 252 F. Supp. 2d 1005, 1014 (C.D. Cal 2003) *aff'd sub nom. Mortensen v. Snavely, 145 Fed. Appx. 218 (9th Cir. 2005).*

*Bricklayers and Trowel Trades v. Credit Suisse LLC*, 752 F.3d 82 (1st Cir. 2014).

### News Articles

"Bridgepoint Plunges as Ashford's Accreditation Turned Down," *Bloomberg*, July 9, 2012, updated 2:17 PM.

"Ashford University Approved for Accreditation by Western Association of Schools and Colleges," *Ashford University*, July 10, 2013 (http://www.ashford.edu/community/news/ashford-approved-by-wasc.htm).

"Higher Learning Commission Removes Ashford University from Notice Sanction," *Ashford University*, September 5, 2013 (http://www.ashford.edu/community/news/hlc-removes-ashford-notice.htm).

000171
Exhibit 52

**Exhibit 2**
**Bridgepoint Education, Inc.**
**Materials Relied Upon**

*Other Documents*

Letter from Western Association of Schools and Colleges to Ashford University President & CEO Elizabeth Tice, dated July 3, 2012.

Letter from Western Association of Schools and Colleges to Ashford University President & CEO Richard Pattenaude, dated July 10, 2013.

Code of Federal Regulations Title 34 – Education, available at http://www.gpo.gov/fdsys/pkg/CFR-2012-title34-vol3/xml/CFR-2012-title34-vol3-sec602-28.xml.

**Exhibit 3a**
**Bridgepoint Education, Inc.**
**Historical and Analyst Projections of Quarterly Persistence Rates**
**1Q 2009 through 4Q 2012**

| Analyst | Report Date | Persistence Rate for the Fiscal Quarter | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1Q 2009 | 2Q 2009 | 3Q 2009 | 4Q 2009 | 1Q 2010 | 2Q 2010 | 3Q 2010 | 4Q 2010 | 1Q 2011 | 2Q 2011 | 3Q 2011 | 4Q 2011 | 1Q 2012 | 2Q 2012 | 3Q 2012 | 4Q 2012 |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) | (15) | (16) | (17) | (18) |
| Signal Hill | 5/4/2010 [1] | 79.9 % | 97.2 % | 84.2 % | 94.7 % | 77.3 % | 77.3 % | 77.0 % | 87.0 % | 77.3 % | 77.3 % | 77.0 % | 87.0 % | | | | |
| Wedbush | 5/4/2010 | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 71.0 | 74.5 | 78.0 | 76.0 | 69.0 | 73.0 | 77.0 | | | | |
| Average | | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 71.0 | 74.5 | 78.0 | 76.0 | 69.0 | 73.0 | 77.0 | | | | |
| Piper Jaffray | 8/3/2010 | 79.9 % | 73.5 % | 77.8 % | 78.5 % | 77.3 % | 74.9 % | 75.8 % | 76.5 % | 76.8 % | 74.4 % | 75.3 % | 76.0 % | | | | |
| Signal Hill | 8/5/2010 | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 74.9 | 77.5 | 84.0 | 77.3 | 74.9 | 77.5 | 84.0 | | | | |
| Piper Jaffray | 9/8/2010 | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 74.9 | 75.8 | 76.5 | 76.3 | 73.9 | 74.8 | 75.5 | | | | |
| Average | | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 74.9 | 76.4 | 79.0 | 76.8 | 74.4 | 75.9 | 78.5 | | | | |
| Piper Jaffray | 11/3/2010 [2] | 79.9 % | 73.5 % | 77.8 % | 78.5 % | 77.3 % | 74.9 % | 78.5 % | 78.0 % | 76.3 % | 73.9 % | 77.5 % | 77.0 % | | | | |
| Signal Hill | 11/4/2010 | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 74.9 | 78.5 | 78.5 | 77.1 | 74.7 | 78.3 | 78.3 | | | | |
| Average | | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 74.9 | 78.5 | 78.3 | 76.7 | 74.3 | 77.9 | 77.7 | | | | |
| RBC | 3/1/2011 | | | | | 77.3 % | 74.9 % | 78.5 % | 80.7 % | 72.8 % | 70.4 % | 77.5 % | 78.7 % | | | | |
| Piper Jaffray | 3/2/2011 | 79.9 % | 73.5 % | 77.8 % | 78.5 % | 77.3 | 74.9 | 78.5 | 80.7 | 75.3 | 72.9 | 77.0 | 79.2 | | | | |
| Signal Hill | 3/9/2011 | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 74.9 | 78.5 | 80.7 | 75.3 | 72.9 | 76.5 | 78.7 | | | | |
| Average | | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 74.9 | 78.5 | 80.7 | 74.5 | 72.1 | 77.0 | 78.9 | | | | |
| RBC | 5/4/2011 | | | | | | | | | 77.9 % | 74.2 % | 77.7 % | 79.5 % | 76.9 % | 73.2 % | 77.6 % | 79.5 % |
| Piper Jaffray | 5/13/2011 [3] | 79.9 % | 73.5 % | 77.8 % | 78.5 % | 77.3 % | 74.9 % | 78.5 % | 80.7 % | 77.9 | 72.9 | 77.0 | 79.2 | | | | |
| Average | | 79.9 | 73.5 | 77.8 | 78.5 | 77.3 | 74.9 | 78.5 | 80.7 | 77.9 | 73.6 | 77.4 | 79.4 | 76.9 | 73.2 | 77.6 | 79.5 |
| Piper Jaffray | 8/3/2011 [4] | | | | | 77.3 % | 74.9 % | 78.5 % | 80.7 % | 77.9 % | 74.2 % | 77.0 % | 79.2 % | 76.9 % | 74.2 % | 77.0 % | 79.2 % |
| RBC | 8/3/2011 | | | | | | | | | 77.9 | 74.2 | 77.0 | 78.7 | 76.9 | 73.2 | 76.9 | 78.7 |
| Wunderlich | 8/12/2011 [5] | | | | | 77.3 | 74.9 | 78.5 | 80.7 | 77.9 | 84.1 | 76.5 | 78.7 | 77.9 | 84.1 | 76.5 | 78.7 |
| Average | | | | | | 77.3 | 74.9 | 78.5 | 80.7 | 77.9 | 77.5 | 76.8 | 78.9 | 77.2 | 77.2 | 76.8 | 78.9 |
| Piper Jaffray | 11/2/2011 [6] | | | | | 77.3 % | 74.9 % | 78.5 % | 80.7 % | 77.9 % | 74.2 % | 81.1 % | 79.2 % | 76.9 % | 74.2 % | 81.1 % | 79.2 % |
| Wunderlich | 11/2/2011 [7] | | | | | 77.3 | 74.9 | 78.5 | 80.7 | 77.9 | 74.2 | 81.1 | 78.7 | 75.9 | 72.2 | 81.1 | 78.7 |
| Average | | | | | | 77.3 | 74.9 | 78.5 | 80.7 | 77.9 | 74.2 | 81.1 | 79.0 | 76.4 | 73.2 | 81.1 | 79.0 |
| Piper Jaffray | 3/6/2012 [8] | | | | | 77.3 % | 74.9 % | 78.5 % | 80.7 % | 77.9 % | 74.2 % | 81.1 % | 80.7 % | 78.4 % | 74.7 % | 81.6 % | 81.2 % |
| Wunderlich | 3/7/2012 | | | | | 77.3 | 74.9 | 78.5 | 80.7 | 77.9 | 74.2 | 81.1 | 80.7 | 77.9 | 74.2 | 81.1 | 80.7 |
| Deutsche Bank | 4/2/2012 | | | | | | | | | 77.9 | 74.2 | 81.1 | 80.7 | 78.7 | 75.3 | 81.1 | 81.9 |
| Average | | | | | | 77.3 | 74.9 | 78.5 | 80.7 | 77.9 | 74.2 | 81.1 | 80.7 | 78.3 | 74.7 | 81.3 | 81.3 |

Exhibit 52

000173

**Bridgepoint Education, Inc.**
**Historical and Analyst Projections of Quarterly Persistence Rates**
**1Q 2009 through 4Q 2012**

| | | Persistence Rate for the Fiscal Quarter | | | | | | | | | | | | | | | |
| Analyst | Report Date | 1Q 2009 | 2Q 2009 | 3Q 2009 | 4Q 2009 | 1Q 2010 | 2Q 2010 | 3Q 2010 | 4Q 2010 | 1Q 2011 | 2Q 2011 | 3Q 2011 | 4Q 2011 | 1Q 2012 | 2Q 2012 | 3Q 2012 | 4Q 2012 |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) | (15) | (16) | (17) | (18) |
| Deutsche Bank | 5/1/2012 | | | | | | | | | 77.9 % | 74.2 % | 81.1 % | 80.7 % | 81.5 % | 76.4 % | 81.9 % | 82.3 % |
| Piper Jaffray | 5/2/2012 | | | | | | | | | 77.9 | 74.2 | 81.1 | 80.7 | 81.5 | 75.2 | 81.6 | 81.2 |
| Wells Fargo | 6/19/2012 | | | | | | | | | 77.9 | 74.2 | 81.1 | 80.7 | 81.5 | 74.2 | 81.1 | 80.7 |
| Average | | | | | | | | | | 77.9 | 74.2 | 81.1 | 80.7 | 81.5 | 75.3 | 81.5 | 81.4 |
| **Actual Persistence Rates:**[9] | | 79.9 % | 73.5 % | 77.8 % | 78.5 % | 77.3 % | 74.9 % | 78.5 % | 80.7 % | 77.9 % | 74.2 % | 81.1 % | 80.7 % | 81.5 % | 77.3 % | | |

**Notes and Sources:**

Analyst and Industry reports obtained from Counsel. Does not include persistence rates from analyst reports that only projected persistence rates for one quarter or did not provide persistence rate projections. Does not include analyst reports released after the first alleged disclosure on July 9, 2012.

Figures in BLACK represent actual persistence rates. Figures in RED represent projected persistence rates.

[1] On May 25, 2010 and May 26, 2010, Signal Hill released additional reports on Bridgepoint Education, Inc. detailing the same actual and projected persistence rates as reported in its May 4, 2010 report. Certain actual rates in these three reports were reported incorrectly and were updated without mention in the Signal Hill report released on August 5, 2010. Incorrect figures have been listed in italics.

[2] On November 23, 2010 Piper Jaffray released an Industry Note that included Bridgepoint Education, Inc.'s actual and projected persistence rates. These rates were the same as those in Piper Jaffray's November 3, 2010 report.

[3] On May 25, 2011, Piper Jaffray released another report on Bridgepoint Education Inc. detailing the same actual and projected persistence rates.

[4] On September 26, 2011, Piper Jaffray released another report on Bridgepoint Education Inc. detailing the same actual and projected persistence rates.

[5] In this report, Wunderlich incorrectly reported the 2Q 2011 actual persistence rate as 84.1%. This error was corrected in its November 2, 2011 report. The incorrect rate has been listed in italics.

[6] In January, 2012 Piper Jaffray released a publication entitled "Education Stocks in 2012 Risk/Reward Increasingly Attractive," which included Bridgepoint Education, Inc.'s actual and projected persistence rates. These figures were the same as those in Piper Jaffray's November 2, 2011 report.

[7] On March 5, 2012 Wunderlich released another report on Bridgepoint Education Inc. detailing the same actual and projected persistence rates.

[8] In March 2012, Piper Jaffray released a publication entitled "Education Industry Benchmark Analysis" detailing the same actual and projected persistence rates. Additionally, on April 12, 2012, Piper Jaffray released another report on Bridgepoint Education Inc. detailing the same actual and projected persistence rates.

[9] Actual persistence rates for 2Q 2012 and 3Q 2012 are obtained from Piper Jaffray's November 6, 2012 report. All other actual persistence rates are taken from the report that most recently reported the actual persistence rate.

Exhibit 52
000174

| Analyst | Report Date | Year-Over-Year Changes in Forecasted Persistence Rate | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2Q 2010 | 3Q 2010 | 4Q 2010 | 1Q 2011 | 2Q 2011 | 3Q 2011 | 4Q 2011 | 1Q 2012 | 2Q 2012 | 3Q 2012 | 4Q 2012 |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| Signal Hill | 5/4/2010 [1] | *-19.9* % | *-7.2* % | *-7.7* % | 0.0 % | 0.0 % | 0.0 % | 0.0 % | | | | |
| Wedbush | 5/4/2010 | | -2.5 | -3.3 | -0.5 | -1.3 | -2.0 | -1.5 | -1.0 | | | |
| Average | | | -2.5 | -3.3 | -0.5 | -1.3 | -2.0 | -1.5 | -1.0 | | | |
| | | | | | | | | | | | | |
| Piper Jaffray | 8/3/2010 | | -2.0 % | -2.0 % | -0.5 % | -0.5 % | -0.5 % | -0.5 % | | | | |
| Signal Hill | 8/5/2010 | | -0.3 | 5.5 | 0.0 | 0.0 | 0.0 | 0.0 | | | | |
| Piper Jaffray | 9/8/2010 | | -2.0 | -2.0 | -1.0 | -1.0 | -1.0 | -1.0 | | | | |
| Average | | | -1.4 | 0.5 | -0.5 | -0.5 | -0.5 | -0.5 | | | | |
| | | | | | | | | | | | | |
| Piper Jaffray | 11/3/2010 [2] | | | -0.5 % | -1.0 % | -1.0 % | -1.0 % | -1.0 % | | | | |
| Signal Hill | 11/4/2010 | | | 0.0 | -0.2 | -0.2 | -0.2 | -0.2 | | | | |
| Average | | | | -0.3 | -0.6 | -0.6 | -0.6 | -0.6 | | | | |
| | | | | | | | | | | | | |
| RBC | 3/1/2011 | | | | -4.5 % | -4.5 % | -1.0 % | -2.0 % | | | | |
| Piper Jaffray | 3/2/2011 | | | | -2.0 | -2.0 | -1.5 | -1.5 | | | | |
| Signal Hill | 3/9/2011 | | | | -2.0 | -2.0 | -2.0 | -2.0 | | | | |
| Average | | | | | -2.8 | -2.8 | -1.5 | -1.8 | | | | |
| | | | | | | | | | | | | |
| RBC | 5/4/2011 [3] | | | | | -0.7 %[3] | -0.8 %[3] | -1.2 %[3] | -1.0 % | -1.0 % | -0.1 % | 0.0 % |
| Piper Jaffray | 5/13/2011 [4] | | | | | -2.0 | -1.5 | -1.5 | | | | |
| Average | | | | | | -1.4 | -1.2 | -1.4 | -1.0 | -1.0 | -0.1 | 0.0 |

Exhibit 52
000175

**Exhibit 3b**
**Bridgepoint Education, Inc.**
**Analyst Projections of Year-Over-Year Changes in Quarterly Persistence Rates**
**2Q 2010 through 4Q 2012**

| Analyst | Report Date | Year-Over-Year Changes in Forecasted Persistence Rate | | | | | | | | | | |
| | | 2Q 2010 | 3Q 2010 | 4Q 2010 | 1Q 2011 | 2Q 2011 | 3Q 2011 | 4Q 2011 | 1Q 2012 | 2Q 2012 | 3Q 2012 | 4Q 2012 |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Piper Jaffray | 8/3/2011 [5] | | | | | | -1.5 % | -1.5 % | -1.0 % | 0.0 % | 0.0 % | 0.0 % |
| RBC | 8/3/2011 | | | | | | -1.5 [3] | -2.0 [3] | -1.0 [3] | -1.0 | -0.1 | 0.0 |
| Wunderlich | 8/12/2011 [6] | | | | | | -2.0 | -2.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Average | | | | | | | -1.7 | -1.8 | -0.7 | -0.3 | 0.0 | 0.0 |
| Piper Jaffray | 11/2/2011 [7] | | | | | | | -1.5 % | -1.0 % | 0.0 % | 0.0 % | 0.0 % |
| Wunderlich | 11/2/2011 [8] | | | | | | | -2.0 | -2.0 | -2.0 | 0.0 | 0.0 |
| Average | | | | | | | | -1.8 | -1.5 | -1.0 | 0.0 | 0.0 |
| Piper Jaffray | 3/6/2012 [9] | | | | | | | | 0.5 % | 0.5 % | 0.5 % | 0.5 % |
| Wunderlich | 3/7/2012 | | | | | | | | 0.0 | 0.0 | 0.0 | 0.0 |
| Deutsche Bank | 4/2/2012 | | | | | | | | 0.8 | 1.1 | 0.0 | 1.2 |
| Average | | | | | | | | | 0.4 | 0.5 | 0.2 | 0.6 |
| Deutsche Bank | 5/1/2012 | | | | | | | | | 2.2 % | 0.8 % | 1.6 % |
| Piper Jaffray | 5/2/2012 | | | | | | | | | 1.0 | 0.5 | 0.5 |
| Wells Fargo | 6/19/2012 | | | | | | | | | 0.0 | 0.0 | 0.0 |
| Average | | | | | | | | | | 1.1 | 0.4 | 0.7 |
| **Actual Change in Persistence:** | | **1.4 %** | **0.7 %** | **2.2 %** | **0.6 %** | **-0.7 %** | **2.6 %** | **0.0 %** | **3.6 %** | **3.1 %** | | |

Exhibit 52
000176

# Bridgepoint Education, Inc.
## Analyst Projections of Year-Over-Year Changes in Quarterly Persistence Rates
## 2Q 2010 through 4Q 2012

| | | Year-Over-Year Changes in Forecasted Persistence Rate | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Analyst | Report Date | 2Q 2010 | 3Q 2010 | 4Q 2010 | 1Q 2011 | 2Q 2011 | 3Q 2011 | 4Q 2011 | 1Q 2012 | 2Q 2012 | 3Q 2012 | 4Q 2012 |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |

**Notes and Sources:**

Analyst and Industry reports obtained from Counsel. Does not include persistence rates from analyst reports that only projected persistence rates for one quarter or did not provide any persistence rate projections. Does not include analyst reports released after the first alleged disclosure on July 9, 2012.

Increases in year-over-year persistence rate are listed in GREEN, decreases in RED, and no change in BLACK.

[1] On May 25, 2010 and May 26, 2010, Signal Hill released additional reports on Bridgepoint Education, Inc. detailing the same actual and projected persistence rates. Actual rates in these three reports were reported incorrectly, and were updated without mention in the Signal Hill report released on August 5, 2010. Calculations using incorrect rates have been listed in italics.

[2] On November 23, 2010 Piper Jaffray released an Industry Note that included Bridgepoint Education, Inc.'s actual and projected persistence rates. These rates were the same as those in Piper Jaffray's November 3, 2010 report.

[3] RBC did not report actual persistence rates for 1Q 2010 through 4Q 2010 in this report. RBC did provide actual persistence rates for those quarters in their March 1, 2011 analyst report. Where indicated we have calculated year-over-year change in the forecasted persistence rate from the actual persistence rate reported in RBC's March 1, 2011 report.

[4] On May 25, 2011, Piper Jaffray released another report on Bridgepoint Education Inc. detailing the same actual and projected persistence rates.

[5] On September 26, 2011, Piper Jaffray released another report on Bridgepoint Education Inc. detailing the same actual and projected persistence rates.

[6] In this report, Wunderlich incorrectly reported the 2Q 2011 actual persistence rate as 84.1%. This error was corrected in its November 2, 2011 report. The calculation of the 2Q 2012 projected change in the persistence rate uses the incorrect rate of 84.1% and has been listed in italics.

[7] In January, 2012 Piper Jaffray released a publication entitled "Education Stocks in 2012 Risk/Reward Increasingly Attractive," which included Bridgepoint Education, Inc.'s actual and projected rates for persistence. These rates were the same as those in Piper Jaffray's November 2, 2011 report.

[8] On March 5, 2012 Wunderlich released another report on Bridgepoint Education Inc. detailing the same actual and projected persistence rates.

[9] In March 2012, Piper Jaffray released a publication entitled "Education Industry Benchmark Analysis" detailing the same actual and projected persistence rates. Additionally, on April 12, 2012, Piper Jaffray released another report on Bridgepoint Education, Inc. detailing the same actual and projected persistence rates.

Exhibit 52
000177

| Alleged Inflation Scenario | Inflation Per Share |
|---|---|
| (1) | (2) |
| **Scenario I: 7.4% Effective Attribution (Analysis Based on Wells Fargo Report):** The July 10, 2012 Wells Fargo Report indicated that to satisfy WASC, it would cost Ashford $50 million in foregone revenue to reduce "churn." This fee corresponds to approximately $0.59 per basic share in alleged damages, an effective attribution of 7.4% of BPI's price reaction following the July 9, 2012 news announcement.[1] | $0.59 |
| **Scenario II: 8.3% Attribution (Analysis of Standards Cited in WASC Letter):** The July 3, 2012 WASC letter denying initial accreditation to Ashford discussed WASC's four Standards of Accreditation. Retention was one of three issues mentioned in Standard 2, so one-third of one-fourth (one out of twelve or 8.3%) of BPI's price reaction is attributed to persistence issues. | $0.67 |
| **Scenario III: 16.7% Attribution (Content Analysis of WASC Letter):** The July 3, 2012 WASC letter denying initial accreditation to Ashford discussed six categories that Ashford needed to address. Retention fell under one of these categories, so one-sixth (16.7%) of BPI's price reaction is attributed to persistence issues. | $1.33 |
| **Scenario IV: 24.9% Attribution (Analysis Based on Wells Fargo Report):** A DCF analysis of the cost of increasing instructional costs to match marketing costs, as discussed in the Wells Fargo July 10, 2012 Equity Report, plus a one-time $50 million churning fee implies that approximately 24.9% of BPI's price reaction was attributable to persistence issues.[2] | $1.99 |
| **Scenario V: 25.0% Attribution (Content Analysis of Analyst Reports):** Content analysis of the analyst reports on and around July 9, 2012 suggests that approximately 25.0% of BPI's price reaction is attributable to persistence issues.[3] | $2.00 |
| **Scenario VI: 25.0% Attribution (Analysis of Standards Cited in WASC Letter):** Of the four Standards of Accreditation not met, Standard 2 is related to retention issues. Therefore, 25% of BPI's price reaction is attributed to persistence issues. In the WASC Letter, retention is only mentioned in regard to Standard 2.[4] | $2.00 |
| **Scenario VII: 25.9% Attribution (Analysis Based on Wells Fargo Report):** A DCF analysis of the cost of increasing instructional costs to match marketing costs, as discussed in the Wells Fargo July 10, 2012 Equity Report, plus a one-time $50 million churning fee implies that approximately 25.9% of BPI's price reaction was attributable to persistence issues.[5] | $2.07 |
| **Scenario VIII: 28.4% Attribution (Content Analysis of WASC Letter):** Content analysis of the WASC letter showed that words relating to retention/persistence suggested that approximately 28.4% of BPI's price reaction is attributable to persistence issues.[6] | $2.27 |
| **Scenario IX: 37.5% Attribution (Analysis of Standards Cited in WASC Letter):** Of the CFR's listed in the July 2012 WASC letter, six out of sixteen were related to retention, and retention was only mentioned with regard to those CFRs. Therefore, 37.5% of BPI's price reaction is attributed to persistence issues.[7] | $3.00 |

**Notes and Sources:**

Inflation is calculated using a market model with Dr. Feinstein's CRSP Market Index and Peers Index. Data obtained from "Report on Market Efficiency Professor Steven P. Feinstein, Ph.D., CFA" dated August 6, 2014. The control period is the same as Dr. Feinstein's, May 3, 2011 through July 13, 2012.

[1] Wells Fargo Equity Research Report on Bridgepoint Education, Inc. dated July 10, 2012 states that "[f]oregone revenue associated with reduced churn - at least in the near term through a transitional period could cost another $50 million." Based on this we assume that the resolution of persistence issues would cost Bridgepoint $50 million. This corresponds to approximately $0.59 in losses per basic share outstanding, or approximately 2.7% of BPI's closing stock price of $21.50 the last trading day before the alleged disclosure. For more information on this calculation, see Exhibit 5 "Alleged Damages Per Share Attributable to an Estimated $50 Million in Lost Revenue Due to Persistence Issues." $0.59 is approximately 7.4% of the total market-adjusted price reaction of approximately

$8.00 from July 9 through July 10, 2012.

[2] 24.9% was calculated using a DCF model based on the Wells Fargo July 10, 2012 Equity Report on Bridgepoint Education, Inc. The DCF analysis used the estimated 2013 S&P 500 earnings multiple and determined that approximately 24.9% of the price reaction was attributable to persistence issues. See Exhibit 6 "Estimated Share of WASC Compliance Costs Attributable to Student Persistence."

[3] A review of five analyst reports issued on July 9, 2012 and July 10, 2012 that discussed the WASC letter contained at most 13 words directly related to retention issues as described in the WASC letter. In total, there were 52 words that directly corresponded to the issues described in that letter. Therefore, at most thirteen out of fifty-two, or 25.0%, of the price reaction was determined to be associated with persistence issues. For more information, see Exhibit 8a "Number of Times an Area of Concern was Mentioned in Analyst Reports Issued after the Release of the July 3, 2012 WASC Letter."

[4] Of WASC's four Standards of Accreditation, student retention and completion fall under Standard 2, according to the July 3, 2012 WASC letter. Based on this, at most 25% of the price reaction was determined to be related to issues of persistence, as Standard 2 was one of four Standards failed.

[5] 25.9% was calculated using a DCF model based on the Wells Fargo July 10, 2012 Equity Report on Bridgepoint Education, Inc. The DCF analysis used Bridgepoint's Projected Fiscal Year 2013 Net Income Multiple and determined that approximately 25.9% of the price reaction is attributable to persistence issues. For more information on this calculation, see Exhibit 6 "Estimated Share of WASC Compliance Costs Attributable to Student Persistence."

[6] A review of the July 2012 WASC letter showed that at most 25 words in the letter were directly related to retention issues. In total, 88 words were determined to have been directly related to all categories of issues mentioned in the WASC letter. Therefore, at most twenty-five out of eighty-eight, or 28.4% of the price reaction was determined to be associated with persistence issues. For more information see Exhibit 8b "Number of Times an Area of Concern was Mentioned in the July 3, 2012 WASC Letter."

[7] In the July 2012 WASC letter, retention is mentioned as relating to at most six Criteria for Review ("CFR") (2.6, 2.10, 2.11, 2.12, 2.13, and 2.14). The other issues mentioned to the letter relate to 10 additional CFR's, (1.6, 2.1, 2.2, 2.7, 3.2, 3.5, 3.9, 3.10, 3.11, and 4.4). Issues with CFR 2.6 are related to both retention and "an effective system for assessing and monitoring student learning and assuring academic rigor." If we attribute CFR 2.6 solely to retention, then six out of sixteen CFR's are related to retention issues, or 37.5% of the price reaction.

**000179**
**Exhibit 52**

**Exhibit 5**
**Bridgepoint Education, Inc.**
**Alleged Damages Per Share Attributable to an Estimated $50 Million in**
**Lost Revenue Due to Persistence Issues[1]**

| | | | |
|---|---|---|---|
| **A.** | Estimated Foregone Revenue Due to Persistence Issues[1] | | $50,000,000 |
| **B.** | Bridgepoint Education, Inc. Three-Month Effective Tax Rate as of 6/30/2012[2] | | 37.9 % |
| **C.** | Bridgepoint Education, Inc. Basic Shares Outstanding as of 6/30/2012[3] | | 52,741,000 |
| **D.** | Tax-Adjusted Loss | **A * (1 - B)** | $31,050,000 |
| **E.** | Tax-Adjusted Loss Per Share | **D / C** | $0.59 |

**Notes and Sources:**

[1] Information obtained from the Wells Fargo Equity Research Report on Bridgepoint Education, Inc. dated July 10, 2012. On page 2, Wells Fargo states, "Foregone revenue associated with reduced churn – at least in the near term, through a transition period could cost another $50 million."

[2] Obtained from Bridgepoint Education, Inc. Form 10-Q for the period ended June 30, 2012: "We recognized income tax expense for the three months ended June 30, 2012 and 2011, of $28.9 million and $31.1 million, respectively, at effective tax rates of 37.9% and 37.3%, respectively."

[3] Obtained from page 3 of Bridgepoint Education, Inc. Form 10-Q for the period ended June 30, 2012.

**Exhibit 6**
**Bridgepoint Education, Inc.**
**Estimated Share of WASC Compliance Costs Attributable to Student Persistence**

**Using the Estimated Fiscal Year 2013 S&P 500 Earnings Multiple**          *Amounts in thousands*

| | | | |
|---|---|---|---|
| **A.** | Present Value of Costs Due to Failure to be Accredited by WASC[1] | | $150,694 |
| **B.** | Estimated Lost Revenue Due to Addressing Persistence Issues[2] | | $50,000 |
| **C.** | Present Value of Total Losses | **A + B** | $200,694 |
| **D.** | Ratio of Effects of Persistence Versus All Items on Earnings | **B / C** | 24.9% |

**Using Bridgepoint's Projected Fiscal Year 2013 Net Income Multiple**

| | | | |
|---|---|---|---|
| **E.** | Present Value of Costs Due to Failure to be Accredited by WASC[1] | | $143,163 |
| **F.** | Estimated Lost Revenue Due to Addressing Persistence Issues[2] | | $50,000 |
| **G.** | Present Value of Total Losses | **E + F** | $193,163 |
| **H.** | Ratio of Effects of Persistence Versus All Items on Earnings | **F / G** | 25.9% |

**Notes and Sources:**

[1] Total Discounted Costs obtained from Exhibit 7c "Present Value of the Cost of Matching Instructional Expenses to Marketing Expenses."

[2] Information taken from Wells Fargo Equity Research Report on Bridgepoint Education, Inc. dated July 10, 2012. On page 2 of this report, Wells Fargo states, "Foregone revenue associated with reduced churn – at least in the near term, through a transition period could cost another $50 million."

**Exhibit 7a**
**Bridgepoint Education, Inc.**
**Calculation of Discount Rate for Discounted Cash Flow Analysis**
**Using the Estimated Fiscal Year 2013 S&P 500 Earnings Multiple[1]**

| | | | |
|---|---|---|---|
| **A.** | Calendar Year 2013 S&P 500 Earnings Multiple[1] | | 12.00 |
| **B.** | Low Discount to Multiple[1] | | 20% |
| **C.** | High Discount to Multiple[1] | | 10% |
| **D.** | Average Discount to Multiple | **(B + C)/2** | 15% |
| **E.** | S&P 500 Discounted Multiple | **D * A** | 10.20 |
| **F.** | Wells Fargo 3-5 Year Estimated Earnings Growth Rate[1] | | 15% |
| **G.** | Discount Rate | **(1 + E*F) / E** | 24.8% |

**Notes and Sources:**

[1] Information obtained from Wells Fargo Equity Research Report on Bridgepoint Education, Inc. entitled "BPI: Initiating Coverage With An Outperform Rating Credit Where Credit Is Due" dated June 19, 2012.

**Exhibit 52**
**000182**

**Exhibit 7b**
**Bridgepoint Education, Inc.**
**Calculation of Discount Rate for Discounted Cash Flow Analysis**
**Using Bridgepoint's Projected Fiscal Year 2013 Net Income Multiple**

| | | | |
|---|---|---|---|
| **A.** | Wells Fargo Estimated 2013 Total Net Income[1] | | $166,347,000 |
| **B.** | Diluted Shares Outstanding as of March 31, 2012[2] | | 56,203,000 |
| **C.** | Projected Income Per Diluted Share | **A / B** | $2.96 |
| **D.** | Stock Price Before Alleged Disclosure on 7/9/2012[3] | | $21.50 |
| **E.** | Price / Estimated Earnings Ratio | **D / C** | 7.26 |
| **F.** | Wells Fargo 3-5 Year Estimated Earnings Growth Rate[1] | | 15% |
| **G.** | Discount Rate | **(1 + E*F) / E** | 28.8% |

**Notes and Sources:**

[1] Information obtained from Wells Fargo Equity Research Report on Bridgepoint Education, Inc. entitled "BPI: Initiating Coverage With An Outperform Rating Credit Where Credit Is Due" dated June 19, 2012.

[2] Diluted shares obtained from Bridgepoint Education, Inc. form 10-Q for the quarterly period ended March 31, 2012.

[3] Price data obtained from FactSet Research Systems, Inc.

**Exhibit 52**
**000183**

**Exhibit 7c**
**Bridgepoint Education, Inc.**
**Present Value of the Cost of Matching Instructional Expenses to Marketing Expenses[1]**
**Fiscal Years 2012 through 2020**

| | | | Projections for the Fiscal Year Ending December 31[1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 |
| | | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | | | ----------------------------------in thousands---------------------------- | | | | | | | | |
| **A.** | Instructional Costs and Services[2] | | $294,242 | $326,484 | $361,138 | - | - | - | - | - | - |
| **B.** | Marketing and Promotional[2] | | $344,102 | $370,606 | $399,361 | - | - | - | - | - | - |
| **C.** | Difference[1] | **B - A** | $49,860 | $44,122 | $38,223 | *$32,405* | *$26,586* | *$20,768* | *$14,949* | *$9,131* | *$3,312* |
| **D.** | Years from 2012 | | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| **Present Value of Difference** | | | | | | | | | | | |
| **E.** | Using the Estimated Fiscal Year 2013 S&P 500 Earnings Multiple[3] | **C / (1 + .248)$^D$** | $49,860 | $35,353 | $24,540 | *$16,669* | *$10,958* | *$6,859* | *$3,956* | *$1,936* | *$563* |
| **F.** | Using Bridgepoint's Projected Fiscal Year 2013 Net Income Multiple[4] | **C / (1 + .288)$^D$** | $49,860 | $34,265 | $23,052 | *$15,177* | *$9,670* | *$5,866* | *$3,279* | *$1,555* | *$438* |

| Total Valuation of Projected Cash Flows | |
|---|---|
| Using the Estimated Fiscal Year 2013 S&P 500 Earnings Multiple: | $150,694 |
| Using Bridgepoint's Projected Fiscal Year 2013 Net Income Multiple: | $143,163 |

**Notes and Sources:**

Projections obtained from Wells Fargo Equity Research Report on Bridgepoint Education, Inc. entitled "BPI: Initiating Coverage With An Outperform Rating Credit Where Credit Is Due" dated June 19, 2012.

[1] The Wells Fargo July 10, 2012 Equity Report indicated that, to satisfy WASC, Ashford would have to expend an incremental $50 million to match marketing and instructional costs, along with other initiatives. This approximately matches the difference between Wells Fargo's projected 2012 instructional and marketing costs, which it calculates to be $49.86 million according to a June 19, 2012 report. Wells Fargo projects that this difference will drop to $44.122 million in 2013 and $38.223 million in 2014 (an average change of $5.819 million per year). Using that average yearly change, we have extrapolated the additional instructional costs out to 2020. The extrapolated figures are italicized. The difference, which would become negative after 2020, is assumed to be zero starting in 2021.

[2] Information taken from page 7 of the Wells Fargo Equity Research Report on Bridgepoint Education, Inc. dated June 19, 2012.

[3] Assumes a discount rate of 24.8%. For more information on the calculation of this discount rate, see Exhibit 7a "Calculation of Discount Rate Using the Estimated Fiscal Year 2013 S&P 500 Earnings Multiple."

[4] Assumes a discount rate of 28.8%. For more information on the calculation of this discount rate, see Exhibit 7b "Calculation of Discount Rate Using Bridgepoint's Projected Fiscal Year 2013 Net Income Multiple."

**Exhibit 52**
000184

**Exhibit 8a**
**Bridgepoint Education, Inc.**
**Number of Times an Area of Concern was Mentioned in Analyst Reports**
**Issued after the Release of the July 3, 2012 WASC Letter**

| WASC Areas of Concern[1] | Search Term(s) | Count[2] |
|---|---|---|
| (1) | (2) | (3) |
| 1. Student retention and completion, methods of tracking student progress, and support for student success | reten* | 7 |
|  | completion | 4 |
|  | persist* | 2 |
|  | success | 0 |
| 2. Alignment of resource allocations with educational purposes and objectives | resource | 3 |
| 3. A sufficient core of full-time faculty members, and a faculty model that provides for faculty development and oversight of academic policies and ensures the integrity and continuity of academic programs | faculty | 19 |
|  | oversight | 2 |
|  | academic p* | 2 |
| 4. An effective system of program review | program review | 4 |
| 5. An effective system for assessing and monitoring student learning and assuring academic rigor | student learning | 2 |
|  | rigor | 2 |
| 6. An empowered and independent governing board and a clear and acceptable relationship with the parent company | independ* | 5 |

| | |
|---|---|
| **Total Count:** | **52** |
| **Total Count Related to #1:** | **13** |
| **Percent Related to #1:** | **25.0%** |

**Notes and Sources:**

Analyst reports were considered for the analysis if they were issued on July 9, 2012 or July 10, 2012 and had a discussion of the WASC letter. This included the following analyst reports:

"Ashford University's WASC rejection shifts focus to HLC," Deutsche Bank, July 9, 2012.

"A University Between Two Regions - ALERT," JPMorgan, July 9, 2012.

"Flying Too Close to the Sun; Downgrading to Market Perform," William Blair, July 9, 2012.

"Downgrading to Neutral on Heightened Regulatory Uncertainty," Piper Jaffray, July 10, 2012.

"BPI: Accreditation Stakes Raised, Bold Action Required Maintaining Outperform Rating," Wells Fargo, July 10, 2012.

[1] From the "Summary of Action" section on page 1 of the July 3, 2012 WASC letter denying Bridgepoint's Ashford University initial accreditation.

[2] Mentions are only considered if the search term is included in the body of the analyst report (mentions in valuation tables or in disclosure segments are not included).

**Exhibit 8b**

**Bridgepoint Education, Inc.**

**Number of Times an Area of Concern was Mentioned in the**

**July 3, 2012 WASC Letter[1]**

| WASC Areas of Concern[2] | Search Term(s) | Count |
|---|---|---|
| **(1)** | **(2)** | **(3)** |
| 1. Student retention and completion, methods of tracking student progress, and support for student success | reten* | 9 |
| | completion | 6 |
| | persist* | 4 |
| | success | 6 |
| 2. Alignment of resource allocations with educational purposes and objectives | resource | 6 |
| 3. A sufficient core of full-time faculty members, and a faculty model that provides for faculty development and oversight of academic policies and ensures the integrity and continuity of academic programs | faculty | 29 |
| | oversight | 3 |
| | academic p* | 6 |
| 4. An effective system of program review | program review | 7 |
| 5. An effective system for assessing and monitoring student learning and assuring academic rigor | student learning | 4 |
| | rigor | 3 |
| 6. An empowered and independent governing board and a clear and acceptable relationship with the parent company | independ* | 5 |

|  |  |
|---|---|
| **Total Count:** | **88** |
| **Total Count Related to #1:** | **25** |
| **Percent Related to #1:** | **28.4%** |

**Notes and Sources:**

[1] WASC's letter denying Bridgepoint's Ashford University initial accreditation was released on its website on July 9, 2012. The letter was obtained from http://www.wascsenior.org/institutions/ashford-university.

[2] From the "Summary of Action" section on page 1 of the July 3, 2012 WASC letter denying Bridgepoint's Ashford University initial accreditation.

# EXHIBIT 53

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE BRIDGEPOINT EDUCATION, INC. SECURITIES LITIGATION | CASE NO. 12-cv-01737-JM (JLB) |

# REBUTTAL EXPERT REPORT OF DAVID I. TABAK, PH.D.

## I.     BACKGROUND AND SCOPE OF ANALYSIS

1.    This is a "class action for violations of the federal securities laws on behalf of all purchasers or acquirers of Bridgepoint Education, Inc. ('Bridgepoint' or the 'Company') securities from *May 3, 2011 through July 13, 2012* (the 'Class Period'), and who were damaged thereby (the 'Class')."[1]  Plaintiffs made numerous allegations relating to Bridgepoint and to Ashford University ("Ashford"), an institution run by Bridgepoint, with a focus on Ashford's application for accreditation from the Western Association of Schools and Colleges ("WASC").

2.    On September 13, 2013, an Order Granting in Part and Denying in Part Defendant's Motion to Dismiss ("MTD Order") held that allegations related to "Ashford's student persistence initiatives" would remain in the case, while those related to "Ashford's application for WASC accreditation, … Ashford's quality of education, and … Bridgepoint's financial projections" were dismissed.[2]

3.    On January 15, 2015, the Court certified a class in this matter ("Class Cert Order") based on Plaintiffs' motion "to certify a class consisting of all persons who purchased

---

[1] Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint") filed December 21, 2012, ¶2.  Emphasis in original.

[2] MTD Order, p. 26.  Following p. 26 of the MTD Order, I use the phrase "persistence initiatives" to refer to the remaining allegations.  In some material in this case, the initiatives are referred to as "quality initiatives."

Bridgepoint common stock between May 3, 2011, and July 13, 2012 ….”[3]  The Class Cert Order noted that because Plaintiffs did not file an amended complaint, “at this point, the consolidated complaint remains the operative complaint, and the only remaining claims are for securities fraud under § 10(b) and Rule 10b-5 and control-person liability under § 20(a), both related to the alleged misrepresentations regarding student-persistence and tracking.”[4]

4.  It is my understanding that on June 2, 2015 the parties exchanged expert reports (referred to as the “Tabak Report” and the “Feinstein Report”).  The Feinstein Report claims to show loss causation and calculate damages based on two alleged disclosure dates: July 9, 2012 (when Ashford was denied WASC accreditation) and July 13, 2012 (when Ashford’s accreditor, the Higher Learning Commission (“HLC”), placed Ashford on special monitoring status).  Counsel for defendants in this matter has asked me to review the Feinstein Report and provide my opinions on the conclusions reached in that report.

5.  My opinions are summarized as follows:

a.  The July 13, 2012 announcement provided no new disclosure regarding the persistence allegations remaining in this case.  Moreover, the Feinstein Report’s analysis of the July 13, 2012 news event actually proves *Defendants’* argument that the risk of an HLC action was already known by the market.  Because this was merely the realization of a *publicly known* risk and because there was no new disclosure about persistence, there is no loss causation and no damages related to the July 13, 2012 news announcement.

b.  The Feinstein Report’s analysis of the July 9, 2012 news event fails to account for numerous important issues discussed in the Tabak Report, including the requirement that Prof. Feinstein disaggregate the various potential causes for

---

[3] Class Cert Order, p. 7.
[4] Class Cert Order, p. 5.

000188
Exhibit 53

Bridgepoint's stock-price decline. The Feinstein Report does not account for the difference between the actual disclosure (i.e., that WASC denied Ashford accreditation) and the remaining allegation in this case ("Ashford's student persistence initiatives"). Instead, the Feinstein Report incorrectly claims that they are effectively the same thing. That approach is deficient because it avoids the necessary task of disaggregating the effects of news related to the remaining allegation in this case from the effects of other news. The Feinstein Report further fails to adjust the results for what Bridgepoint could have disclosed at earlier points in time. Consequently, its conclusions about inflation and damages are incorrect. The Feinstein Report fails to include any analysis at all in these areas, and instead either explicitly or implicitly presents conclusions that maximize its assessment of damages.

## II. QUALIFICATIONS AND REMUNERATION

6. My qualifications and remuneration are discussed in the Tabak Report.

## III. MATERIALS RELIED UPON

7. Materials relied upon for the purposes of this report are cited in the report and include those that are listed in Exhibit 2 of the Tabak Report. Any new materials are listed in Exhibit 1 of this report.

## IV. THE FEINSTEIN REPORT'S ANALYSIS OF THE JULY 13, 2012 NEWS EVENT ACTUALLY PROVES *DEFENDANTS'* ARGUMENT THAT THE RISK OF AN HLC ACTION WAS ALREADY KNOWN BY THE MARKET

8. In the class-certification phase of this litigation, Defendants argued that the class period should end on July 9, 2012 because the July 13 news event did not disclose any new information regarding persistence and the July 9 news event fully revealed the truth

regarding student persistence.[5]   In the Class Cert Order, the Court ruled that Defendants' argument was not appropriate at the class-certification stage.  Still, in the briefing leading up to that order, that defense was discussed and Plaintiffs alleged that "the stock price drop on July 13, 2012, was due to the disclosure of the previously unknown but concealed risk that Ashford's failed retention and persistence initiatives could jeopardize HLC accreditation."[6]

9.   Rather than support Plaintiffs' position on this point, the Feinstein Report (like the Tabak Report) disproves it.  For example, the full original (i.e., excluding quotations by analysts) text of ¶79 of the Feinstein Report is as follows: "Given the deficiencies highlighted by WASC, analysts were concerned that the Institution's accreditation with HLC could be placed under review."

10. Feinstein ¶79 directly contradicts the argument that Plaintiffs make in favor of a finding of loss causation or damages for the July 13, 2012 news event.  Moreover, Feinstein ¶79 does not merely provide an empty contradiction of Plaintiffs' stated position, but quotes five separate analyst reports after the July 9, 2012 WASC decision, including one from Wells Fargo on July 11, 2012 titled "BPI: WASC Report Likely Affects HLC Status[.]  Review Could be Triggered Irrespective of Substantial Presence[.]"[7]

---

[5] Because the Monday July 9, 2012 news announcement occurred before the market open, Defendants actually should have argued for the class period to end on Friday July 6, 2012.

[6] Plaintiffs' Reply in Support of Amended Motion for Class Certification, dated November 19, 2014, Section Header II(B). (Capitalization altered.)

[7] The Feinstein Report uses bold italics to add emphasis to the words or phrases "could be," "may now," and "could" in four of the five quotes describing the risks of action by HLC.  It is not clear what the purpose of these emphases is, as it is not clear that Plaintiffs are still arguing that Defendants concealed a certainty about an HLC action.  Rather, Plaintiffs argued at the class certification stage that "the stock price drop on July 13, 2012, was due to the disclosure of the previously *unknown but concealed risk* that Ashford's failed retention and persistence initiatives could jeopardize HLC accreditation." (Emphasis added.)    The bold italics used in ¶79 of the Feinstein Report
(continued)

-4-

11. The Tabak Report quoted from that same analyst report for the same proposition: that the market was not only informed but actually demonstrated knowledge no later than July 11, 2012 that the WASC announcement could jeopardize HLC accreditation, the exact concern that Plaintiffs argue was a "concealed risk" before July 13, 2012.[8]

12. The Feinstein Report further confirms that the risk of a loss of HLC accreditation was known before July 13, 2012 when it says that in "response to Ashford being placed on special monitoring status by HLC following WASC's denial of accreditation, analyst commentary attributed Bridgepoint's negative stock price reaction to the *increased* risk that Ashford could lose its HLC accreditation."[9]

13. Prof. Feinstein and I are apparently in agreement on one key point: following the July 9, 2012 WASC action and before the July 13, 2012 news about HLC, the market was aware of and "concerned that [Ashford]'s accreditation with HLC could be placed under review."[10] Thus, both damages / loss causation expert analyses in this case have refuted Plaintiffs' claim that "the stock price drop on July 13, 2012, was due to the disclosure of the *previously unknown but concealed risk* that Ashford's failed retention and persistence initiatives could jeopardize HLC accreditation."[11]

---

serve to highlight that the market knew that HLC "could" or "may" take action, conclusively disproving Plaintiffs' claim that the risk of HLC action was unknown or concealed.

[8] Adding to the evidence presented in the Feinstein Report on this issue, the Tabak Report also quoted from an analyst deposition and from two July 13, 2012 post-disclosure analyst reports stating that the risk that HLC would take some action was not a surprise. (See ¶¶ 28-31 of the Tabak Report.) The Tabak Report also noted that a federal regulation republished on July 7, 2012 required that if an educational institution was the subject on an adverse action by one accrediting agency, any other agency that was still accrediting the educational institution would have to review that accreditation. Thus, following WASC's denial of accreditation of Ashford, HLC should have been expected to review its accreditation of Ashford.

[9] Feinstein Report, ¶81. (Emphasis added.)

[10] Feinstein Report, ¶79.

[11] Plaintiffs' Reply in Support of Amended Motion for Class Certification, dated November 19, 2014, Section Header II(B). (Capitalization altered and emphasis added.)

000191
Exhibit 53

14. Moreover, both the Feinstein and Tabak Reports quote from the same section from a July 13, 2012 Wells Fargo analyst report including: "HLC has announced that it will have a team on the ground in 60 days. This is faster than we had presumed … This could allow for sanctions earlier than we anticipated."[12]  Both the Feinstein and Tabak Reports therefore provide evidence that Bridgepoint's negative stock-price movement on July 13, 2012 was due to the perceived severity of HLC's reaction, not to a realization of an undisclosed risk that HLC would react to the WASC denial.  Plaintiffs nowhere allege that Defendants were in a better position than the market to foresee HLC's specific reaction to the WASC denial.  Thus, there was nothing that Defendants even allegedly could have disclosed after the July 9, 2012 news until they received news from HLC on July 12, 2012, news that Bridgepoint disclosed to the market the very next morning.

15. It is also important to note that Plaintiffs allege that the July 13, 2012 news was "that Ashford's failed retention and persistence initiatives could jeopardize HLC accreditation," not that there was any new disclosure about persistence or persistence initiatives.  In fact, the Complaint alleges that the "disclosures on *July 9, 2012* revealed the truth concealed by defendants' false statements and omissions made during the Class Period" and that the July 13, 2012 disclosure only "further revealed the true risks concealed by defendants' false statements and omissions…."[13]  The Feinstein Report alleges no new disclosure of information about persistence or persistence initiatives on July 13, 2012.  My own review finds that there was no new disclosure about persistence or persistence initiatives on July 13, 2012.  Furthermore, analysts did not revise any of their historic figures for persistence after either the July 9 or July 13, 2012 news events.  Thus, there is complete agreement that no new information about persistence or persistence initiatives was revealed on July 13, 2012.  The only possible question is whether the risks related to HLC accreditation were disclosed on July 13, 2012 or if those risks were revealed earlier and merely realized on July 13, 2012.

---

[12] Quoted in ¶81 of the Feinstein Report and ¶31 of the Tabak Report.

[13] Complaint, ¶9 and ¶11, respectively, for the two quotes.  Emphasis added in first quote.

16. On that point, as discussed above, the Feinstein Report agrees with and supports the conclusion in the Tabak Report that, contrary to Plaintiffs' claims, the risk of an HLC action was known to the market as of the July 9, 2012 WASC announcement.  Thus, both the Tabak and Feinstein Reports prove that there is no loss causation and no damages for the particular realization of the fully disclosed risk of an HLC action.  The Tabak and Feinstein reports thus demonstrate that no damages should flow from the decline in Bridgepoint's stock following the July 13, 2012 news event and that there should be no claim for purchasers of Bridgepoint stock on or after July 9, 2012.

## V.  THE FEINSTEIN REPORT'S ANALYSIS OF THE JULY 9, 2012 NEWS EVENT IS SPECULATIVE AND FAILS TO DISAGGREGATE THE CAUSES OF THE STOCK PRICE DECLINE

### A.  *The Scope of Analysis of the Feinstein Report is Misstated and Potentially Inapplicable to the Case as it Now Stands*

17. I begin my review of the Feinstein Report's analysis of the July 9, 2012 news event with an attempt at understanding the difference between the assignment Prof. Feinstein was given and what his report actually does.  According to ¶2 of the Feinstein Report, Prof. Feinstein was asked "to determine whether investors suffered losses as a result of Defendants' alleged misdeeds described in the Consolidated Complaint for Violation of the Securities Laws ('Complaint') dated 21 December 2012.  [Prof. Feinstein] was also asked to quantify damages sustained, if any, on a per share basis."  If followed, this assignment would be irrelevant to this matter as it now stands, because the MTD Order dismissed three of the four categories of "alleged misdeeds" in the Complaint.

18. The Feinstein Report neither mentions the MTD Order nor cites it in its Exhibit-1, "Documents and Other Information Reviewed and Relied Upon In Addition to Those listed in my August Report."[14]  In ¶5(b) of the Tabak Report, I stated that the "dismissal of

_____

[14] The August 2014 Feinstein report on class certification issues also neither mentions the MTD Order nor lists it as a document relied upon.

000193
Exhibit 53

three of the four sets of allegations in the MTD Order requires one to disaggregate any potential damages that would be due to the full set of originally pled allegations, which requires a careful review of the MTD Order." I stand by that opinion and cannot understand how Prof. Feinstein could have developed loss-causation and damages analyses consistent with the MTD Order without relying upon it. If Prof. Feinstein did in fact rely on the MTD Order, then I cannot understand how he could do so in a meaningful way without citing it in his materials relied upon or ever referencing it in his report.

19. Despite apparently not relying on the MTD Order, the Feinstein Report carefully avoids attributing any damages to the three sets of allegations dismissed by that order. The Feinstein Report even goes so far as to argue, without any valid support, that the "reasons for [WASC] denying accreditation were inseparably linked to the Company's systematic failures to understand and improve student retention and persistence."[15] I disagree with this claim, and discuss it in a later subsection, but it strongly hints that Prof. Feinstein somehow knew, at least in substance, that the MTD Order dismissed allegations related to "Ashford's application for WASC accreditation" but left in allegations related to "Ashford's student persistence initiatives."

20. To the extent that Prof. Feinstein was actually relying on the MTD Order and not the allegations as stated in the Complaint, then the scope of analysis as described in the Feinstein Report and the list of materials relied upon are both incomplete and misleading. To the extent that Prof. Feinstein was relying on some assumptions provided by counsel related to the MTD Order, then, again, both the scope of analysis for the Feinstein Report and the list of materials relied upon are incorrect, and, in addition, we have no current way to verify whether the assumptions provided by counsel accurately describe the MTD Order.

---

[15] Feinstein Report, ¶109.

000194
Exhibit 53

### B. The Feinstein Report Bases Its Damages for Persistence Initiatives on Flawed Analyses of the WASC Denial of Accreditation for Ashford

21. The only potential disclosure of persistence-initiative issues in this matter would be as a part of the news related to WASC's denial of accreditation. As previously noted, the MTD Order dismissed the claims related to "Ashford's application for WASC accreditation." Thus, any analysis of damages due to Bridgepoint's stock-price decline following that announcement would have to be limited to the share of that stock-price decline, if any, due to actual news about the persistence initiatives.

22. As shown in the Tabak Report, there was no evidence that analysts were imputing any quantitative significance to the persistence initiatives in forecasting future persistence. Analysts also did not restate their historical figures for persistence following the July 9, 2012 WASC announcement. Therefore, even if the July 9, 2012 news suggested to analysts that Ashford could not measure the effects of its persistence initiatives, that news did not affect analysts' views of Bridgepoint's actual historical or expected future persistence levels. This means that Bridgepoint's stock price was not inflated by any claims the Company made about persistence initiatives and, thus, there is no loss causation or damages due to any direct effects of those statements on the valuation of Bridgepoint's stock.

23. For the sake of argument,[16] we can also analyze any effects that the alleged misrepresentations related to persistence initiatives had on the perceived probability of

_____

[16] Claims stemming from "material misrepresentations or omissions regarding … Ashford's application for WASC accreditation" were dismissed in the MTD Order. The MTD Order notes at 32-33 that Plaintiff "claims that the WASC's May and June 2011 letters constituted early notice regarding inadequate student retention, completion, methods of tracking students, and student support. ... By failing to take the steps necessary to address the deficiencies identified by the WASC while making statements that Bridgepoint would be transparent about the approval process and that Bridgepoint was very pleased with how the accreditation process was going, Plaintiff contends that Defendants made material misrepresentations about the accreditation process." As the MTD Order dismissed these claims, I see no basis for the Feinstein Report to claim damages for any effects of Bridgepoint's purported undisclosed failure to take the steps
(continued)

000195
Exhibit 53

accreditation.  Again putting aside whether this is even allowable following the MTD Order, the claims made about this pathway in the Feinstein Report are inconsistent both with Plaintiffs' prior pleadings as well as with much evidence in the case, as discussed below.

### 1. The Reasons for Denying Accreditation Were Not "Inseparably Linked" to Persistence Issues

24. The Feinstein Report claims that the "reasons for denying accreditation were inseparably linked to the Company's systematic failures to understand and improve student retention and persistence."  It is through this claim that the Feinstein Report attempts to incorporate the full decline in Bridgepoint's stock price (net of market and industry effects) into its damages claim without having to consider the other reasons why Ashford was denied accreditation or to disaggregate the effects that these various reasons had on WASC's accreditation decision.  Yet, this claim of an inseparable link between the reasons cited by WASC is untenable.

25. For example, one of the six reasons WASC's letter gave for the denial of accreditation was that Ashford had not demonstrated that it had an "empowered and independent governing board and a clear and acceptable relationship with the parent company."[17]  Having an empowered and independent board is by no means "inseparably linked" to alleged "systematic failures to understand and improve student retention and persistence."  It takes only a moment's thought to recognize that a university might be able to understand and improve student retention under governance structures in which the

_____

necessary to address the deficiencies identified by the WASC.  Moreover, the Feinstein Report has not provided any basis (and the evidence points otherwise) to imply that persistence was effectively the sole determinant of WASC accreditation.  For the purposes of this report, however, I assume that some potential for recovery due to losses via a pathway from persistence through the WASC accreditation process exists if, contrary to what is done in the Feinstein Report, such a pathway is properly shown and losses due to that pathway are properly quantified.

[17] July 3, 2012 letter from WASC to Elizabeth Tice of Ashford ("WASC Letter").

board is independent or in which the board is tied to a parent company. A university can similarly fail to understand and improve student retention with either type of board. Tellingly, the Feinstein Report never even mentions this reason other than within analyst quotes. This failure to analyze the six reasons and associated CFRs (Criteria For Review) in any manner whatsoever speaks to the superficial and insufficient nature of the "inseparably linked" argument in the Feinstein Report.

26. Ashford was ultimately granted accreditation by WASC in 2013. At that time, WASC found that "[i]n sum, the Ashford Board appears to be operating effectively and, engaging in appropriate oversight of the University's operations," but that "the Commission still considers the current retention rate unacceptable…. The Commission wishes to emphasize that significant improvement in both first year retention and degree completion rates is still needed. … The University will need to continue to study the impact of its changes and develop corrective measures as needed, since it already appears that not all changes are having a significant positive effect on persistence and completion..."[18] The substantial change in the status of Ashford's board without a similar change in WASC's view of persistence also demonstrates that these issues were by no means "inseparably linked."

27. The purported "inseparable link" also turned out to be quite capable of separation over the course of the Class Period. As shown in Exhibit 2A, there were 16 CFRs cited in the "Summary of Action" section of the July 2012 WASC Letter denying accreditation to Ashford.[19] Three of these were not cited in WASC's June 3, 2011 letter to Ashford.

_____

[18] July 10, 2013 letter from WASC granting accreditation to Ashford. I note that the letter said that there were still some additional goals for the Board even though it was operating effectively.

[19] The July 2012 WASC Letter actually has two slightly different lists of CFRs, one in the "Summary of Action" section and one in the "Commission Action" section. For simplicity, I analyze only the list in the Summary of Action and refer to that list as the list in the July 2012 WASC Letter. The analysis would not be qualitatively different if all of the CFRs cited in the July 2012 WASC Letter were used.

Thus, rather than being "inseparably linked," the set of 16 CFRs ultimately cited by WASC in July 2012 was one that had changed.[20]

28. This review can also be performed starting with WASC's June 3, 2011 letter to Ashford, which cited 32 CFRs. Of those, only 13 were cited in the July 2012 WASC Letter denying accreditation to Ashford, including the six that WASC mentioned in relation to "[s]tudent retention and completion…" (hereinafter, "persistence-and-denial CFRs"). As only 13 of the 32 CFRs from the June 2011 letter were repeated in the July 2012 WASC Letter, then the remaining 19 out of 32, or a majority, of the CFRs cited by WASC in June 2011 were indeed "separated" from the others over the course of approximately one year. This clear majority strongly suggests that the persistence-and-denial CFRs were not "inseparably linked" to other CFRs. Given how three CFRs were added and 19 CFRs were removed between the June 2011 and July 2012 WASC letters, one cannot merely assert that the seven CFRs that were not persistence-and-denial CFRs and were found in both the June 2011 and July 2012 WASC letters were "inseparably linked" to the persistence-and-denial CFRs.[21] Instead, they may have represented issues that existed both in 2011 and 2012 even though they had no strong relationship, much less an "inseparable link," to the persistence initiatives.

29. The issue here is that the Feinstein Report asserts that persistence was "inseparably linked" to other issues, but does not perform any analysis to support this assertion. The set of CFRs cited in letters from WASC to Ashford changed over time, which is not what one would expect if the issues covered by those CFRs were "inseparably linked." By failing to examine which, if any, CFRs were linked to the persistence-and-denial CFRs,

---

[20] By using the "inseparably linked" claim to lump all the CFRs together rather than disaggregate their effects, the Feinstein Report avoids even addressing the question of how it can find loss causation or damages for the three CFRs that Ashford was not made aware of in June 2011 and therefore could not have known to disclose at that time even assuming that some form of disclosure was necessary.

[21] These seven CFRs are the 13 CFRs cited in both the June 3, 2011 and July 2012 WASC letters less the six persistence-and-denial CFRs, which are all part of that set of 13.

the Feinstein Report avoids the necessary task of disaggregating the reasons for WASC's denial of accreditation to Ashford between those that were linked to persistence from those that cannot be so linked.

### 2. Persistence Issues Were Not Solely Responsible for the 2012 Denial of Accreditation to Ashford by WASC and Plaintiffs Have Pled the Opposite

30. In his deposition, Ralph Wolff, the president of WASC in 2012, agreed that it would "be fair to say that not one single factor drove the decision of the commission to deny accreditation [to Ashford in 2012] but rather all of the factors collectively."[22] The Feinstein Report provides no counter-evidence of anyone other than Prof. Feinstein claiming that Ashford's failure to receive accreditation can be tied exclusively to persistence issues.

31. The Complaint, in fact, disagrees with Prof. Feinstein on this exact point, pleading, "The Commission found deferral inappropriate for Ashford '[b]ecause the areas in which substantial compliance was not demonstrated spanned across several key aspects of the Standards.' The decision by WASC not to defer Ashford's application demonstrates the multiple and significant deficiencies at Ashford and thereby, that defendants knew or recklessly disregarded, since the beginning of the Class Period, that Ashford's WASC application for accreditation would very likely be denied."[23]

32. Plaintiffs repeat and emphasize this point in their Opposition to MTD, stating on pp. 3-4: "Tellingly, WASC declined to grant Ashford a deferral to give Defendants time to try to remedy the accreditation deficiencies '[b]ecause the areas in which substantial compliance was not demonstrated *spanned across several key aspects* of the Standards."[24] Despite being asked "to determine whether investors suffered losses as a result of

---

[22] Deposition of Ralph Wolff, 228:5-9.

[23] Complaint, ¶54.

[24] Emphasis altered. See also p. 8 of the Opposition to MTD again citing the same quotation.

Defendants' alleged misdeeds described in the Consolidated Complaint for Violation of the Securities Laws…," Dr. Feinstein never addresses how his opinions contradict those of the Complaint and Plaintiffs' Opposition to MTD.

33. It is also noteworthy that none of the analysts cited in the Feinstein Report suggest that the reasons for WASC's denial of accreditation to Ashford boil down to persistence. Among the analyst materials that the Feinstein Report quotes in its ¶76, presumably among those quotes it found most favorable to its position, is that William Blair would not revisit its new, lower rating unless it was comfortable that it saw, among other things, "significant increases in retention *and* evidence of Ashford addressing some of the go/no-go issues from the WASC report (full-time faculty, board independence)…."[25] The same paragraph in the Feinstein Report quotes JPMorgan as "find[ing] WASC's list of non-compliant items to be long. In particular, we are concerned about Ashford's failure to meet WASC's standards with regard to full-time faculty, an item that we view as ideological in nature." Moreover, one analyst report not cited by the Feinstein Report says that "many of the questions raised [by WASC] may require meaningful changes to Ashford's operating model or cost structure in order to satisfy the visiting team's concerns. *We don't view any one of the issues as a show-stopper*, but given that retaining accreditation is critical to the company's viability, we presume Bridgepoint won't want to take chances or skirt close to the edge in ensuring WASC's demands are met."[26] Prof. Feinstein's failure to find a single quote in support of the proposition that all of the issues are "inseparably linked" to persistence and instead having to rely on quotes that specifically reference other issues in the list shows how Prof. Feinstein stands alone in his speculation about that supposedly inseparable link.

---

[25] Emphasis added. Notably, in pp. 28-31, the MTD Order dismissed statements related to Ashford's quality of education, including that "Plaintiff also asserted that Defendants' representations regarding the number of faculty on staff at Ashford were similarly misleading," citing, among others, the statement that "[W]e have invested last year and we will continue to invest this year in more full-time faculty more terminally degreed faculty."

[26] First Analysis report dated July 10, 2012, pp. 2-3. Emphasis added.

-14-

### 3. The Feinstein Report's Claim that "Persistence and Retention Was the Ultimate Indicator … [of] the Quality of Ashford's Educational Effectiveness and Performance" Is Flawed

34. In another attempt to force all of the actual reasons for the denial of accreditation to Ashford into the rubric of persistence, in ¶109, the Feinstein Report states, "As explained above, persistence and retention was the ultimate indicator by which regulators, accreditors, analysts, and the Company itself measured the quality of Ashford's educational effectiveness and performance."

35. This claim has numerous flaws.  For example, investors and analysts care about persistence because it affects the total number of students enrolled, not because it affects the quality of education (other than through factors such as its ability to attract students and to keep them paying tuition rather than leaving).  In fact, if a for-profit school could increase persistence by lowering academic standards and thereby cause fewer tuition-paying students to flunk out, that would be viewed as a positive result for investors.  But that same action should not elicit a similar positive response from regulators or accreditors.

36. It is in this light that we should consider the following quote from ¶107(i) of the Feinstein Report:

> Andrew Clark, Bridgepoint's CEO, acknowledged that persistence and persistence trends were the "ultimate metric in our industry. *If I was an investor*, the thing that I'd want to know most about with any public education company is, what does persistence look like, can I measure it, could it give me all that information, and can I look at that trend over a year-over-year-over-year-over-year basis."  (Emphasis added.)

37. Mr. Clark made it clear that he understood that there was a distinction between how investors view persistence and how those involved in assessing education view it and made a point of explaining the viewpoint from which persistence was the thing that he, if he were an investor, would "want to know most about…."  In this same conference, Mr. Clark, speaking as an educator, also said, "Most importantly, we are focused in on the student experience.  Students have given us feedback with regards to Constellation.  78%

-15-

of those say it improved – they felt that it improved their learning experience.  They were actually learning more as a result of it, which is really our ultimate outcome."[27]

38. Other quotations and descriptions provided in ¶¶107 and 108 of the Feinstein Report do not claim that persistence is the ultimate indicator of educational effectiveness and performance.  The Feinstein Report itself states in ¶108 that "improving retention and persistence was *a* fundamental key to accreditation …," and not *the* fundamental key.[28]  Similarly, the Feinstein Report states that "Wunderlich analysts noted that student persistence was *an important factor* for accreditation" rather than the most important or only factor.[29]

39. The Feinstein Report also attempts to rely on HLC president Sylvia Manning for the proposition that persistence encompasses all other factors in accreditation decisions.  Specifically, Feinstein ¶108(ii) states the following:

> In response to Senator Harkin, HLC's president stated, "There will be much greater emphasis on student persistence and completion. Frankly, that was *one of the things* that, from the traditional context that we came from, we had assumed. We need to place much more emphasis on that and to require our institutions, above all, to place much more emphasis on that. We will be doing that."  (Emphasis added.)

40. This quote is at best ambiguous as to the relative importance of persistence, but certainly does not serve as reasonable support for the Feinstein Report's position that persistence was a factor that dominated all others.  Not only does HLC President Manning describe persistence and completion as "one of the things" she was discussing at that point, but she said that they "need to place much more emphasis on that," suggesting that as of her March 10, 2011 testimony, there was some low or insufficient emphasis on

---

[27] Bridgepoint Education, Inc. at William Blair & Company, LLC Global Services Growth Stock Conference, December 7, 2011.

[28] Emphasis added in the quotation.

[29] Feinstein Report, ¶108(v).  Emphasis added.

persistence and retention. It is not clear how much new emphasis would be placed on persistence and retention, as analyzing persistence and retention data was number 7 on a list of 10 "Changes We Are Making" in Dr. Manning's prepared testimony before Congress.[30] It is quite a leap to go from a statement that persistence and retention have been underemphasized to the claim in Feinstein ¶109 that "persistence and retention was the ultimate indicator by which regulators, accreditors, analysts, and the Company itself measured the quality of Ashford's educational effectiveness and performance."

41. I would not deny that persistence was "an important factor," just as the Feinstein Report stated when describing the views of Wunderlich analysts. But, even if something is "an important factor," that does not "explain[] [how] persistence and retention was the ultimate indicator by which regulators, accreditors, analysts, and the Company itself measured the quality of Ashford's educational effectiveness and performance."

42. Finally, even if persistence were the most important indicator, that would still not make it the sole indicator or the sole metric that determined whether Ashford would get accreditation. If that were true, then it would be impossible to see how Ashford was accredited by WASC in 2013 despite still having an "unacceptable" retention rate according to WASC.[31] WASC's 2013 letter approving accreditation stated: "<u>Attrition, support for student achievement, and adequate levels of degree completion.</u> The Commission found in 2012 that Ashford was not in substantial compliance with Standard 2, especially Criteria for Review (CFRs) 2.10-2.14." The same section of that 2013 letter found that Ashford would still need to focus on CFRs 2.10-2.14.

43. Furthermore, as shown in Exhibit 3, Ashford's average quarterly persistence rate over the four quarters leading up to the July 2013 accreditation was lower than its average

---

[30] Transcript of Hearing of the Committee on Health, Education, Labor, and Pensions of the United States Senate entitled "Bridgepoint Education, Inc.: A Case Study In For-Profit Education And Oversight," March 10, 2011.

[31] Again, as noted in the July 2013 letter from WASC, "the Commission still considers the current retention rate unacceptable…."

000203
Exhibit 53

quarterly persistence rate over the four quarters leading up to July 2012 denial.[32]  Given WASC's citing the same persistence-related CFRs in 2013 as it did in 2012 and given the actual decline in Ashford's persistence rate, it is unreasonable for the Feinstein Report to conclude that "persistence and retention was the ultimate indicator" that subsumes all the other reasons for WASC's denial of accreditation.

### 4. By Sweeping All the Reasons for the Denial of Accreditation Under "Persistence," the Feinstein Report Attempts to Reintroduce Claims for Statements Dismissed in the MTD Order

44. Because it does not cite or rely on the MTD Order, the Feinstein Report seems oblivious to the fact that that order did indeed separate out the "inseparably linked" factors of "persistence initiatives, … Ashford's application for WASC accreditation, … [and] Ashford's quality of education."  The Feinstein Report attempts to overturn the MTD Order by claiming that the denial of Ashford's application for WASC accreditation can effectively be tied solely to persistence initiatives, ignoring or unaware that the MTD Order dismissed claims related to Ashford's quality of education.

45. In fact, in dismissing the claims related to statements about quality of education, the MTD Order at 29 specifically referenced a portion of ¶179 of the Complaint ("[O]ur efforts to instill quality in all that we do are producing …. outcomes that prove we are serving the academic needs of our students…").  The Feinstein Report makes no attempt to reconcile the dismissal of a statement about outcomes, with the fact that it bases damages on "the quality of Ashford's educational effectiveness and performance,"[33] which is simply another way of describing "outcomes."

46. Similarly, in dismissing the quality-of-education statements, the MTD Order at 29 specifically referenced "the number of faculty on staff at Ashford."  For comparison, a

---

[32] This is true whether one compares the four quarters leading up to 1Q12 and 1Q13 (i.e., the latest reported quarters) or the four quarters leading up to 2Q12 and 2Q13 (i.e., the latest completed quarters).

[33] Feinstein Report, ¶109.

"sufficient core of full-time faculty members" was one of the reasons in the 2012 WASC Letter for the denial of accreditation that the Feinstein Report now wishes to reinsert into the case by claiming that they are "inseparably linked" to persistence.

47. The MTD Order at 30-31 specifically referenced claims that Bridgepoint "falsely highlighted its ability to analyze data and to meaningfully assess student learning" and that "[s]erious concerns also exist about the rigor of the coursework…" as among the statements that it dismissed. These explicitly mirrored one of the six reasons for the denial of accreditation in the WASC Letter that the Feinstein Report attempts to link to persistence: "An effective system for assessing and monitoring student learning and assuring academic rigor."

48. Because he does not rely on the MTD Order, Prof. Feinstein presumably did not undertake the task of seeing if statements regarding the reasons stated in the WASC Letter were among those already dismissed from the case by the MTD Order. As a result, the Feinstein Report presents an analysis that argues that *all* of the reasons for denial of accreditation cited in the WASC Letter are "inseparably linked" to persistence based on a faulty reading of some analyst reports and other statements. The Feinstein Report does not even consider, as just one example, that a university can implement systems that track (or fail to track) persistence initiatives under an independent board or under a board tied to a parent company. Nor does the Feinstein Report attempt to reconcile its speculation about an inseparable link with how the cited CFRs changed over time. It further does not address how Ashford achieved accreditation from WASC in 2013 while showing strong improvements in some areas (such as board independence) but still having an unacceptable persistence rate. It is not that that Feinstein Report has performed problematic analyses to disentangle these effects; rather, the problem is that the Feinstein Report has not made any attempt to disaggregate the effects of the persistence initiatives from everything else cited by WASC. Instead, the Feinstein Report merely speculates that the reasons for the WASC denial are all "inseparably linked."

49. The Feinstein Report would thus make Defendants liable for every reason for Ashford's failure to obtain accreditation even though statements related to some of the

000205
Exhibit 53

reasons for the denial have already been dismissed from the case.  The Feinstein Report does this via its unsupported view that any statements that mentioned persistence are "inseparably linked" to every other reason for Ashford's failure to obtain accreditation, ignoring or unaware of how the MTD Order distinguished between the subject matter of different categories of statements.

50. The collective result of these issues is fatally flawed loss causation and damages analyses in the Feinstein Report that can serve no useful purpose in this matter.

## VI. THE FEINSTEIN REPORT FAILS TO CONSIDER THE DIFFERENCE BETWEEN WHAT WAS ULTIMATELY DISCLOSED IN THE WASC LETTER AND WHAT DEFENDANTS ALLEGEDLY COULD HAVE DISCLOSED EARLIER

51. Even if the Feinstein Report accurately characterized and measured the stock-price effects of the persistence initiatives in the July 9, 2012 news event, that does not mean that inflation at earlier points in the Class Period is equal to the Feinstein-measured effects as of July 9, 2012.

52. On July 9, 2012, the market learned that WASC denied accreditation to Ashford. But it was not clear that a denial of accreditation, as opposed to deferral (or even potentially approval), was a foregone conclusion.[34]  For example, following the WASC team visit to Ashford, the team report dated May 15, 2012 recommended deferral for one year, not denial of accreditation.[35]  It is not at all clear how Defendants could have known that WASC would come up with a harsher decision (i.e., denial) than the recommendation of the WASC visiting team and staff (i.e., deferral) or why Defendants should be assessed damages for not seeing that WASC would fail to follow the recommendation of its own

---

[34] See p. 41 of the MTD Order: "Although Defendants were aware of the areas that needed attention, on these allegations and the current record, it does not appear that denial was a foregone conclusion."
[35] Wolff Depo., 46:2-12 and 210:1-211:2.

visiting team and staff.[36]  A deferral of accreditation would have caused a smaller decline in Bridgepoint's stock price, as it would have signaled that the issues at Ashford were less severe than what was signaled by the denial of accreditation.  A deferral would also not have been the type of adverse action that would have required a reevaluation of Ashford by HLC, as a deferral is not an ultimate final action by WASC, but merely a decision to postpone action.  Because the market recognized the risk of an HLC action, a part of Bridgepoint's stock price decline following the July 9, 2012 news included the increased risk of action by HLC, a risk that may still have existed but would have been of lesser magnitude had WASC simply deferred Ashford's application.

53. When asked in deposition "why the commission decided to deny [accreditation to Ashford] rather than adopt the [one-year deferral] recommendation of the visiting team," Dr. Wolff testified, "Number one, the commission found that the institution was not in substantial compliance with standards.  The visiting team itself said that it felt that it would take at least two to three, perhaps even five years for the institution to document – demonstrate and document that it was in substantial compliance."[37]  In actuality, in a letter dated July 10, 2013, WASC said that it "judges that [Ashford] is now in substantial compliance with Commission standards.  As a result, the Commission has acted to grant Initial Accreditation."  To find Bridgepoint liable for the full stock-price effects of WASC's denial decision would mean finding that Bridgepoint and/or the market should have foreseen that in July 2012 WASC would reject the one-year deferral suggested by its visiting team (which turned out to be an accurate estimate of how long it would take Ashford to come into substantial compliance with WASC's standards) because it believed that Ashford would take "at least two to three [and] perhaps even five years" to achieve

---

[36] I am not aware that Ashford was informed of the WASC visiting team's actual recommendation.  Still, the Feinstein Report requires Defendants to have come up with a harsher conclusion than that of the visiting team with whom they interacted.  In her deposition (189:10-17), Therese Cannon of WASC confirmed that the WASC staff also recommended deferral.

[37] Wolff Depo., 155:5-7 and 155:12-18.

and document substantial compliance (which turned out to be an inaccurate overestimate). That is, for Bridgepoint and/or the market to foresee the WASC denial, they would have had to foresee that WASC would overestimate how long it would take Ashford to be in substantial compliance with WASC's standards. The Feinstein Report does not explain why it bases damages on the effects of WASC's overestimate of the time that it would take Ashford to achieve and document substantial compliance with WASC's standards.

54. The Feinstein Report also documents important developments due to a June 10, 2011 publication of a presentation by Dr. Wolff to the Board of the National Advisory Committee on Institutional Quality and Integrity ("NACIQI").[38] The Feinstein Report states in ¶41 that in "response to the NACIQI meeting, a First Analysis analyst noted the shift in direction for WASC accreditation." Yet, the Feinstein Report never considers whether this shift toward tougher standards would have affected the market impact on Bridgepoint's stock of any disclosure that Bridgepoint allegedly should have made between May 3, 2011 (the start of the Class Period) and June 10, 2011. In its ¶43, the Feinstein Report points out that "Signal Hill analysts noted that WASC's new direction could pose problems for Ashford, as its retention and graduation rates 'could be found wanting by WASC.'" This implies that the risk of non-accreditation was lower before WASC's new direction (and the inflationary effect of any misrepresentation on Bridgepoint's stock price may have been similarly lower before June 10, 2011). It also implies that the risk that Ashford's retention and graduation rates posed for accreditation were not concealed risks, but were publicly disclosed and publicly discussed risks. Nowhere does the Feinstein Report take any of this into account.

---

[38] Feinstein Report, ¶40.

## VII. USE OF THE MEASUREMENT OF THE DECLINE IN BRIDGEPOINT'S STOCK AS DETERMINED IN THE FEINSTEIN REPORT LOWERS MY DAMAGES ESTIMATES

55. In the Tabak Report, I presented figures for potential per-share inflation estimates, while still recognizing that any such figures ignore that the persistence-initiative statements did not have a quantitative effect on analysts' estimates of persistence. I also noted that the figures were overestimates because they did not account for various factors, such as treating the actual denial of accreditation by WASC as a certainty rather than a particularly bad outcome of a potential risk.

56. To limit disagreements between me and Plaintiffs' expert, the quantification of the inflation figures in the Tabak Report was based in part on work performed by Prof. Feinstein in the class-certification stage of this litigation. In the Tabak Report, I interpreted Prof. Feinstein's event study of the July 9, 2012 news announcement to yield a stock-price effect of $8.00 per share, based on the assumption that it would include two days of stock-price movement following the news event.[39]

57. The Feinstein Report calculates the stock-price movement net of market and industry effects following the July 9, 2012 news as only $7.13 per share, based on including only one day in the analysis. Because there are merits to both procedures, I present in Exhibit 4 the (overstated) inflation figures from my original report side-by-side with the (overstated) inflation figures calculated using the $7.13 figure for the overall stock-price movement net of market and industry effects from the Feinstein Report.

---

[39] The decision itself was not to use two days but to follow a procedure of including each consecutive day where the daily stock-price movement net of market and industry effects was statistically significant. This happened to result in the use of two days in this particular instance.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Plaintiffs, that becomes available to me.

David I. Tabak
June 15, 2015

-24-

**Exhibit 1**
**Bridgepoint Education, Inc.**
**Additional Materials Relied Upon**

*Depositions*

Deposition of Ralph Wolff, dated May 20, 2015.

Deposition of Therese Cannon, dated March 26, 2015.

*Case Documents*

Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., CFA dated June 2, 2015.

Expert Report of David I. Tabak, Ph.D. dated June 1, 2015.

Plaintiffs' Reply in Support of Amended Motion for Class Certification, filed November 19, 2014.

*Analyst Reports*

"BPI: Q2 Results -- Management Confident In Growth Absence Of Guidance Likely To Keep Sell-side Conservative," Wells Fargo, August 7, 2013.

"Downgrade to equal-weight; valuation probably attractive, but too many unknowns," First Analysis, July 10, 2012.

*Other Documents*

Letter from Western Association of Schools and Colleges to Ashford University President Elizabeth Tice, dated June 3, 2011.

Bridgepoint Education, Inc. at William Blair & Company, LLC Global Services Growth Stock Conference, December 7, 2011.

Transcript of Hearing of the Committee on Health, Education, Labor, and Pensions of the United States Senate entitled "Bridgepoint Education, Inc.: A Case Study In For-Profit Education And Oversight," March 10, 2011.

**Exhibit 2A**
**Bridgepoint Education, Inc.**
**Analysis of Criteria for Review (CFR) Mentioned**
**in the WASC Letters to Bridgepoint Education, Inc.[1]**

| | | WASC Letter Dated | |
|---|---|---|---|
| | | 6/3/2011[2] | 7/3/2012[3] |
| | | (1) | (2) |
| A. Total Number of CFRs Mentioned | | 32 | 16 |
| B. Number of CFRs Mentioned in the July 3, 2012 Letter that were also Mentioned in the June 3, 2011 Letter | | | 13 |
| C. Number of CFRs that were First Mentioned in the July 3, 2012 Letter and Not Mentioned in the June 3, 2011 Letter | **A - B** | | 3 |
| D. Number of Persistence-and-Denial CFRs Mentioned in the Letter Dated July 3, 2012[4] | | 6 | 6 |
| E. Number of CFRs in the Letter other than Persistence-and-Denial CFRs | **A - D** | 26 | 10 |
| F. Number of CFRs that were Carried Over from the June 3, 2011 Letter Minus Persistence-and-Denial CFRs | **B - D** | | 7 |
| G. Percentage of CFRs from the June 3, 2011 Letter that were Mentioned in the July 3, 2012 Letter[5] | | | 40.6 % |

**Notes and Sources:**

Data obtained from letters from the Western Association of Schools and Colleges dated June 3, 2011 and the Summary of Action section from the July 3, 2012 letter.

[1] For information on which specific CFRs were mentioned in a given letter, see Exhibit 2B.

[2] Letter from Western Association of Schools and Colleges to Ashford University President Elizabeth Tice, dated June 3, 2011.

[3] The "Summary of Action" section from the Letter from Western Association of Schools and Colleges to Ashford University President & CEO Elizabeth Tice, dated July 3, 2012.

[4] The letter dated July 3, 2012 stated "Student retention and completion, methods of tracking student progress, and support for student success (Criteria for Review (CFR) 2.6, 2.10-2.14)" were included as areas related to persistence and denial.

[5] Calculated as 13 / 32 or the Number of CFRs Mentioned in the July 3, 2012 Letter that were also Mentioned in the June 3, 2011 Letter (row B) divided by the Total Number of CFRs Mentioned in the June 3, 2011 Letter (row A).

**Exhibit 2B**
**Bridgepoint Education, Inc.**
**Criteria for Review (CFR) Mentioned in WASC**
**Letters to Bridgepoint Education, Inc.[1]**

| CFR[2] | CFR Cited as an Area of Concern in WASC Letter Dated | |
|---|---|---|
| | 6/3/2011[3] | 7/3/2012[4] |
| (1) | (2) | (3) |
| 1.1 | Yes | |
| 1.3 | Yes | |
| 1.6 | | Yes |
| 1.7 | Yes | |
| 1.8 | Yes | |
| 1.9 | Yes | |
| 2.1 | Yes | Yes |
| 2.2 | Yes | Yes |
| 2.3 | Yes | |
| 2.4 | Yes | |
| 2.6 | Yes | Yes |
| 2.7 | Yes | Yes |
| 2.10 | Yes | Yes |
| 2.11 | Yes | Yes |
| 2.12 | Yes | Yes |
| 2.13 | Yes | Yes |
| 2.14 | Yes | Yes |
| 3.1 | Yes | |
| 3.2 | Yes | Yes |
| 3.3 | Yes | |
| 3.4 | Yes | |
| 3.5 | Yes | Yes |
| 3.6 | Yes | |
| 3.8 | Yes | |
| 3.9 | | Yes |
| 3.10 | | Yes |
| 3.11 | Yes | Yes |
| 4.1 | Yes | |
| 4.2 | Yes | |
| 4.3 | Yes | |
| 4.4 | Yes | Yes |
| 4.5 | Yes | |
| 4.6 | Yes | |
| 4.7 | Yes | |
| 4.8 | Yes | |

**Notes and Sources:**

[1] A code of "Yes" means that the CFR was mentioned in the June 3, 2011 letter or in the "Summary of Action" section of the July 3, 2012 letter as an area to focus on as of the date of the document.

[2] Only CFRs that were mentioned in the June 3, 2011 letter or the "Summary of Action" section of the July 3, 2012 letter were included in column (1).

[3] Letter from Western Association of Schools and Colleges to Ashford University President Elizabeth Tice, dated June 3, 2011.

[4] The "Summary of Action" section from the Letter from Western Association of Schools and Colleges to Ashford University President & CEO Elizabeth Tice, dated July 3, 2012.

**Exhibit 3**
**Bridgepoint Education, Inc.**
**Actual Quarterly Persistence Figures, Rolling Arithmetic, and Rolling Geometric Mean**
**2Q11 - 2Q13**

| | Actual, Rolling Arithmetic, and Rolling Geometric Mean Quarterly Persistence Figures | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2Q11** | **3Q11** | **4Q11** | **1Q12** | **2Q12** | **3Q12** | **4Q12** | **1Q13** | **2Q13** |
| | **(1)** | **(2)** | **(3)** | **(4)** | **(5)** | **(6)** | **(7)** | **(8)** | **(9)** |
| A. Actual Persistence Figures | 74.2 % | 81.1 % | 80.7 % | 81.5 % | 77.3 % | 76.5 % | 79.4 % | 80.0 % | 77.5 % |
| B. Four-Quarter Rolling Arithmetic Mean[1] | | | | 79.4 | 80.2 | 79.0 | 78.7 | 78.3 | 78.4 |
| C. Four-Quarter Rolling Geometric Mean[2] | | | | 79.3 | 80.1 | 79.0 | 78.7 | 78.3 | 78.3 |

**Notes and Sources:**

Data obtainted from August 7, 2013 Wells Fargo Analyst Report entitled "BPI: Q2 Results -- Management Confident In Growth Absence Of Guidance Likely To Keep Sell-side Conservative."

[1] Calculated as the average of the current quarter's persistence figure and the prior three quarters' persistence figures.

[2] Calculated as the product of the current quarter's persistence figure and the prior three quarters' persistence figures raised to the power of 1/4.

**Exhibit 53**
**000214**

**Exhibit 4**
**Bridgepoint Education, Inc.**
**Maximum Per-Share Inflation in BPI Stock**
**Assuming Liability for Persistence Issues**

| Alleged Inflation Scenario | Inflation Per Share Using Market-Adjusted Price Reaction of: | |
|---|---|---|
| | $8.00 | $7.13 |
| (1) | (2) | (3) |
| **Scenario I: 7.4% Effective Attribution (Analysis Based on Wells Fargo Report):** The July 10, 2012 Wells Fargo Report indicated that to satisfy WASC, it would cost Ashford $50 million in foregone revenue to reduce "churn." This fee corresponds to approximately $0.59 per basic share in alleged damages, as discussed in the Wells Fargo July 10, 2012 Equity Report, an effective attribution of 7.4% or 8.3% of BPI's measured price reactions following the July 9, 2012 news announcement, respectively.[1] | $0.59 | $0.59 |
| **Scenario II: 8.3% Attribution (Analysis of Standards Cited in WASC Letter):** The July 3, 2012 WASC letter denying initial accreditation to Ashford discussed WASC's four Standards of Accreditation. Retention was one of three issues mentioned in Standard 2, so one-third of one-fourth (one out of twelve or 8.3%) of BPI's price reaction is attributed to persistence issues. | $0.67 | $0.59 |
| **Scenario III: 16.7% Attribution (Content Analysis of WASC Letter):** The July 3, 2012 WASC letter denying initial accreditation to Ashford discussed six categories that Ashford needed to address. Retention fell under one of these categories, so one-sixth (16.7%) of BPI's price reaction is attributed to persistence issues. | $1.33 | $1.19 |
| **Scenario IV: 24.9% Attribution (Analysis Based on Wells Fargo Report):** A DCF analysis of the cost of increasing instructional costs to match marketing costs, as discussed in the Wells Fargo July 10, 2012 Equity Report, plus a one-time $50 million churning fee implies that approximately 24.9% of BPI's price reaction was attributable to persistence issues.[2] | $1.99 | $1.78 |
| **Scenario V: 25.0% Attribution (Content Analysis of Analyst Reports):** Content analysis of the analyst reports on and around July 9, 2012 suggests that approximately 25.0% of BPI's price reaction is attributable to persistence issues.[3] | $2.00 | $1.78 |
| **Scenario VI: 25.0% Attribution (Analysis of Standards Cited in WASC Letter):** Of the four Standards of Accreditation not met, Standard 2 is related to retention issues. Therefore, 25% of BPI's price reaction is attributed to persistence issues. In the WASC Letter, retention is only mentioned in regard to Standard 2.[4] | $2.00 | $1.78 |
| **Scenario VII: 25.9% Attribution (Analysis Based on Wells Fargo Report):** A DCF analysis of the cost of increasing instructional costs to match marketing costs, as discussed in the Wells Fargo July 10, 2012 Equity Report, plus a one-time $50 million churning fee implies that approximately 25.9% of BPI's price reaction was attributable to persistence issues.[5] | $2.07 | $1.85 |
| **Scenario VIII: 28.4% Attribution (Content Analysis of WASC Letter):** Content analysis of the WASC letter showed that words relating to retention/persistence suggested that approximately 28.4% of BPI's price reaction is attributable to persistence issues.[6] | $2.27 | $2.03 |
| **Scenario IX: 37.5% Attribution (Analysis of Standards Cited in WASC Letter):** Of the CFRs listed in the July 2012 WASC letter, six out of sixteen were related to retention, and retention was only mentioned with regard to those CFRs. Therefore, 37.5% of BPI's price reaction is attributed to persistence issues.[7] | $3.00 | $2.67 |

**Notes and Sources:**

Inflation is calculated using a market model with Dr. Feinstein's CRSP Market Index and Peers Index. Data obtained from "Report on Market Efficiency Professor Steven P. Feinstein, Ph.D., CFA" dated August 6, 2014. The control period is the same as Dr. Feinstein's, May 3, 2011 through July 13, 2012.

[1] Wells Fargo Equity Research Report on Bridgepoint Education, Inc. dated July 10, 2012 states that "[f]oregone revenue associated with reduced churn - at least in the near term through a transitional period could cost another $50 million." Based on this we assume that the resolution of persistence issues would cost Bridgepoint $50 million. This corresponds to approximately $0.59 in losses per basic share outstanding, or approximately 2.7% of BPI's closing stock price of $21.50 the last trading day before the alleged disclosure. For more information on this calculation, see Exhibit 5 of the Tabak Report "Alleged Damages Per Share Attributable to an Estimated $50 Million in Lost Revenue Due to Persistence Issues." $0.59 is approximately 7.4% of the total market-adjusted price reaction of approximately $8.00 from July 9 through July 10, 2012. $0.59 is approximately 8.3% of the total market-adjusted price reaction of approximately $7.13 on July 9, 2012.

[2] 24.9% was calculated using a DCF model based on the Wells Fargo July 10, 2012 Equity Report on Bridgepoint Education, Inc. The DCF analysis used the estimated 2013 S&P 500 earnings multiple and determined that approximately 24.9% of the price reaction was attributable to persistence issues. See Exhibit 6 of the Tabak Report "Estimated Share of WASC Compliance Costs Attributable to Student Persistence."

[3] A review of five analyst reports issued on July 9, 2012 and July 10, 2012 that discussed the WASC letter contained at most 13 words directly related to retention issues as described in the WASC letter. In total, there were 52 words that directly corresponded to the issues described in that letter. Therefore, at most thirteen out of fifty-two, or 25.0%, of the price reaction was determined to be associated with persistence issues. For more information, see Exhibit 8a of the Tabak Report "Number of Times an Area of Concern was Mentioned in Analyst Reports Issued after the Release of the July 3, 2012 WASC Letter."

[4] Of WASC's four Standards of Accreditation, student retention and completion fall under Standard 2, according to the July 3, 2012 WASC letter. Based on this, at most 25% of the price reaction was determined to be related to issues of persistence, as Standard 2 was one of four Standards failed.

[5] 25.9% was calculated using a DCF model based on the Wells Fargo July 10, 2012 Equity Report on Bridgepoint Education, Inc. The DCF analysis used Bridgepoint's Projected Fiscal Year 2013 Net Income Multiple and determined that approximately 25.9% of the price reaction is attributable to persistence issues. For more information on this calculation, see Exhibit 6 of the Tabak Report "Estimated Share of WASC Compliance Costs Attributable to Student Persistence."

[6] A review of the July 2012 WASC letter showed that at most 25 words in the letter were directly related to retention issues. In total, 88 words were determined to have been directly related to all categories of issues mentioned in the WASC letter. Therefore, at most twenty-five out of eighty-eight, or 28.4% of the price reaction was determined to be associated with persistence issues. For more information see Exhibit 8b of the Tabak Report "Number of Times an Area of Concern was Mentioned in the July 3, 2012 WASC Letter."

000215
Exhibit 53

**Exhibit 4**
**Bridgepoint Education, Inc.**
**Maximum Per-Share Inflation in BPI Stock**
**Assuming Liability for Persistence Issues**

[7] In the July 2012 WASC letter, retention is mentioned as relating to at most six Criteria for Review ("CFR") (2.6, 2.10, 2.11, 2.12, 2.13, and 2.14). The other issues mentioned to the letter relate to 10 additional CFR's, (1.6, 2.1, 2.2, 2.7, 3.2, 3.5, 3.9, 3.10, 3.11, and 4.4). Issues with CFR 2.6 are related to both retention and "an effective system for assessing and monitoring student learning and assuring academic rigor." If we attribute CFR 2.6 solely to retention, then six out of sixteen CFR's are related to retention issues, or 37.5% of the price reaction.

000216
Exhibit 53

# EXHIBIT 54

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re BRIDGEPOINT EDUCATION, INC. SECURITIES LITIGATION | Civil Action No. 3:12-cv-01737-JM-JLB |
| | CLASS ACTION |
| This Document Relates To: | |
| ALL ACTIONS. | |

REPORT ON LOSS CAUSATION AND DAMAGES

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

JUNE 2, 2015

# TABLE OF CONTENTS

I.    SCOPE OF PROJECT AND REPORT ........................................................................1

II.   CONCLUSIONS.................................................................................................2

III.  FACTUAL BACKGROUND .................................................................................3

      A.    About the Company ................................................................................3

            1.    Ashford's Candidacy for WASC Accreditation .........................................4

      B.    Summary of Plaintiffs' Allegations ........................................................7

      C.    Timeline of Events...................................................................................8

            1.    2010 Initiatives to Improve Persistence and Retention...............................8

            2.    10 March 2011: Senate Hearing on Examining Bridgepoint and
                  For-Profit Education and Oversight...........................................................10

            3.    3 May 2011: Bridgepoint Announces 1Q 2011 Financial Results ............13

            4.    10 June 2011: Report of WASC President Ralph Wolff's
                  Presentation to NACIQI Board .................................................................15

            5.    2 August 2011: Bridgepoint Announces 2Q 2011 Financial Results ........18

            6.    15 September 2011: Bridgepoint Presents at BMO Education
                  Conference ...............................................................................................21

            7.    1 November 2011: Bridgepoint Announces 3Q 2011 Financial
                  Results......................................................................................................22

            8.    7 December 2011: Bridgepoint Presents at the William Blair
                  Global Services Growth Stock Conference ................................................25

            9.    4 March 2012: Ashford Responds to the WASC Visiting Team's
                  Request for Additional Information Concerning Persistence and
                  Graduation Rates......................................................................................27

            10.   6 March 2012: Bridgepoint Announces 4Q and FY 2011 Financial
                  Results......................................................................................................28

            11.   13 March 2012: Bridgepoint Presents at the Credit Suisse Global
                  Services Conference...................................................................................31

            12.   1 May 2012: Bridgepoint Announces 1Q 2012 Financial Results ............32

            13.   9 July 2012: Ashford Was Denied WASC Accreditation..........................34

            14.   13 July 2012: HLC Places Ashford on Special Monitoring Status............39

IV.   LOSS CAUSATION...........................................................................................42

      A.    The Company Deemed Information about Retention and Persistence
            Material ...................................................................................................42

      B.    Analysts Deemed Information about Persistence and Retention Material ............46

V.      EMPIRICAL CONFIRMATION OF LOSS CAUSATION ................................................49

        A.      Event Study ................................................................................................50

                1.      Disclosure Events ....................................................................................51

                2.      Isolating the Impact of Company-Specific Information ...........................51

                3.      *t*-test ........................................................................................................52

        B.      Event Study Results and Analysis: 9 July 2012 ...............................................53

                1.      Significant Stock Price Decline ................................................................53

                2.      Accounting for Potentially Confounding Information ...............................54

        C.      Event Study Results and Analysis: 13 July 2012 .............................................58

                1.      Significant Stock Price Decline ................................................................58

                2.      Accounting for Potentially Confounding Information ...............................59

        D.      Event Study Summary .................................................................................59

VI.     ARTIFICIAL INFLATION RIBBON ...........................................................................59

        A.      Dollar-Based Inflation Ribbons Versus Percent-Based Inflation Ribbons ............61

                1.      Computation of the Percent-Based Inflation Ribbon ...............................62

VII.    PER SHARE DAMAGE FORMULA ............................................................................63

VIII.   LIMITING FACTORS AND OTHER ASSUMPTIONS ................................................66

# I.    SCOPE OF PROJECT AND REPORT

1. In my expert report dated 6 August 2014 ("August Report" or "Feinstein August Report"), I concluded that Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") common stock traded in an efficient market over the course of the Class Period, 3 May 2011 to 13 July 2012. I showed that each of the *Cammer* and *Krogman* factors supports a finding that Bridgepoint common stock traded in an efficient market, and I further demonstrated – through an event study – that Bridgepoint common stock reacted promptly to new material information as it entered the market, which is the hallmark of an efficient market.

2. Subsequently, I was asked by Robbins Geller Rudman & Dowd LLP, counsel for the Plaintiffs, to determine whether investors suffered losses as a result of Defendants' alleged misdeeds described in the Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint") dated 21 December 2012. I was also asked to quantify damages sustained, if any, on a per share basis.

3. This report presents my methodology, findings, and conclusions relating to loss causation and the quantification of per share damages.

4. The documents I reviewed and relied upon in the course of this engagement in addition to those cited in my August Report are listed in Exhibit-1. My credentials and compensation are presented in my August Report, as is a list of testimony within the four years preceding that report. Testimony I have provided since the submission of my August Report is identified in Exhibit-2.

5. I understand that discovery is ongoing in this case. I reserve the right to make any corrections or additions to my report, and to modify my opinion, should any new or additional information become available.

1

## II.   CONCLUSIONS

6.   The alleged misrepresentations and omissions caused the price of Bridgepoint's common stock to be artificially inflated over the course of the Class Period. Corrective disclosures near and at the end of the Class Period dissipated the artificial inflation, which in turn caused the stock price to decline, thereby causing investor losses.

7.   These conclusions are based on fundamental principles of finance and valuation, an analysis of Company statements, news articles and analyst reports, and event study analysis.

8.   In particular, the event study analysis, which considered and accounted for potentially confounding information, proves that the alleged misrepresentations and omissions caused the price of Bridgepoint stock to be artificially inflated, and that the corrective disclosures caused stock price declines and investor losses.

9.   On account of Defendants' misrepresentations and omissions, the observed market price of the Company's stock was artificially inflated by 50.1% at the start of the Class Period. Investors suffered losses upon the disclosure of the previously concealed facts and the ramifications associated therewith that "Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition,"[1] and "that Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion."[2] The previous concealment of this information during the Class Period by the alleged misrepresentation and omissions caused investor losses.

10.   Any investor who purchased Bridgepoint stock when the price was artificially inflated and held that stock beyond a corrective disclosure suffered a loss that was caused by the alleged misrepresentations and omissions. Artificial inflation ranged up to $15.28 per share.[3] No detectable artificial inflation remained after 13 July 2012.

---

[1] Complaint, ¶96.

[2] *Id.*

[3] On account of a cap on recoverable damages pursuant to the *Dura Pharmaceuticals* decision, while artificial inflation ranged up to $15.28 per share, recoverable damages range up to $10.41 per share.

### III. FACTUAL BACKGROUND

#### A. About the Company

11.  Throughout the Class Period, Bridgepoint was a for-profit educational institution. The Company provides postsecondary educational services through two wholly-owned subsidiary academic institutions, Ashford University ("Ashford" or the "Institution") and University of the Rockies ("Rockies") (collectively the "Institutions").[4] The Institutions offer associate's, bachelor's, master's, and doctoral degree programs primarily through online platforms.[5]

12.  As of the start of the Class Period, both Ashford and Rockies were Higher Learning Commission ("HLC") accredited institutions.[6] HLC accreditation, among other things, allowed the Institutions to be eligible for Title IV funds.[7] Under the Higher Education Act, the Title IV program allowed students attending the Institutions to receive federal student loans and grants.[8] In 2011, 86.8% of Ashford's revenue was derived from the Title IV program.[9] Similarly, in 2011, 85.0% of Rockies' revenue was derived from the aforementioned programs.[10]

13.  As of 31 December 2011, the Institutions had 86,642 enrolled students.[11] In 2011, Ashford's online programs accounted for 96.7% of the Company's total enrollment.[12]

14.  For 2011, the Company reported revenue and earnings of $933.35 million and $172.76 million, respectively.[13]

---

[4] Bridgepoint Education Inc. Form 10-K for the Fiscal Year Ended 31 December 2012, filed 12 March 2013, p. 1 and p. 78.

[5] *Id.*, p. 1 and p. 4.

[6] Bridgepoint Education Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 7 March 2012, p. 2.

[7] Bridgepoint Education Inc. Form 10-K for the Fiscal Year Ended 31 December 2012, filed 12 March 2013, p. 19.

[8] *Id.*, p. 5.

[9] *Id.*, p. 19.

[10] *Id.*

[11] *Id.*, p. 4.

[12] *Id.*

[13] *Id.*, p. 74.

000222
Exhibit 54

15.	Throughout the Class Period, Bridgepoint common stock was listed and traded on the New York Stock Exchange ("NYSE") under the symbol BPI.

16.	At the close of trading on 2 May 2011, the last trading day prior to the Class Period, Bridgepoint's common stock price was $18.39 per share, according to share price data obtained from the Center for Research in Security Prices ("CRSP"). The peak share closing price during the Class Period was $30.50 per share on 22 July 2011. By 13 July 2012, the final day of the Class Period, the stock price had fallen to $9.77 per share, representing a decline of 67.97% from the Class Period high and a decline of 46.87% from the start of the Class Period.

17.	During the Class Period, Bridgepoint's market capitalization (the aggregate value of all outstanding common shares) peaked at $1.61 billion on 22 July 2011.[14] By the close of trading on 13 July 2012, the final day of the Class Period, the Company's market capitalization had fallen to $512.14 million. This represents a decline in market capitalization of $1.10 billion,[15] a decline of 68.23% from the Company's peak equity value.

1.	Ashford's Candidacy for WASC Accreditation

18.	In September 2010, prior to the start of the Class Period, Ashford announced that it had initiated the process to gain regional accreditation from the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("WASC").[16] Ashford determined that it was appropriate for the Institution to "operate under the auspices of WASC, which is the regional accrediting body having jurisdiction over California institutions."[17]

19.	WASC considers four Standards of Accreditation ("WASC Standards") in evaluating an institution's eligibility for accreditation: Standard 1) define institutional purposes and ensure educational objectives; Standard 2) achieve educational objectives through

---

[14] Shares outstanding data obtained from Company SEC filings.

[15] Apparent mathematical discrepancy due to rounding.

[16] Bridgepoint Education Inc. Form 10-K for the Fiscal Year Ended 31 December 2010, filed 2 March 2011, p. 25.

[17] *Id.*

4

core functions; Standard 3) develop and apply resources and organizational structures to ensure sustainability; and Standard 4) create an organization committed to learning and improvement.[18]

20.   Standard 1 requires, among other things, that the institution have a system to measure student achievement, in terms of retention, completion, and student learning.[19] In order to demonstrate compliance with Standard 2, "all programs offered by the institution are subject to systematic program review,"[20] which includes an analysis of "the program's learning objectives and outcomes,"[21] and "retention and completion."[22]

21.   While Standards 1 and 2 specifically mention retention, Standards 3 and 4 are designed to ensure that the institution is systematically designed to achieve the educational outcomes, as articulated in Standards 1 and 2. As stated in the WASC Handbook of Accreditation:

> "By design, elements of educational effectiveness are incorporated into all four Commission Standards, so that institutions explore the relationships between capacity and educational quality and effectiveness. Each of the four Accreditation Standards describes key elements of educational effectiveness."
> **WASC Handbook of Accreditation, 2008, p. 8.**

---

[18] WASC Handbook of Accreditation, 2008, p. 7.

[19] *Id.*, p. 11.

[20] *Id.*, p. 15.

[21] *Id.*

[22] *Id.*

22.    WASC's accreditation process is divided into multiple stages:[23]

    i.    "to begin the accreditation process, [the institution] must first submit an application to enable WASC to verify that the institution meets all of WASC's eligibility criteria."[24] Ashford's application was submitted to WASC in January 2011.[25]

    ii.    If eligible, the "institution must next submit an application for accreditation, together with supporting narrative and documentation."[26] Ashford submitted this information and data in December of 2011.[27]

    iii.    "Upon receipt of the application for accreditation and related materials, WASC will appoint a site visit team and schedule one or more visits, the purpose of which is to validate the information provided in the institution's application, particularly its compliance with WASC standards."[28] A WASC site visit team visited the Institution in March 2012.[29]

    iv.    Before the team's report is finalized, Ashford is allowed to "review the report for correction of errors of fact and to prepare a written response to the final team report, which will be provided to WASC for consideration along with the report."[30] On 1 May 2012, Ashford sent a letter to WASC with subject heading, "request for changes to errors of fact."[31] The team's final report was submitted on

---

[23] Bridgepoint Education, Inc. Form 10-K for the Fiscal Year Ended 31 December 2010, filed 2 March 2011, p. 25.

[24] *Id*.

[25] *Id*.

[26] *Id*.

[27] "BPI - Q3 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents*, 1 November 2011, p. 4; and "BPI - Q4 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents*, 6 March 2012, p. 6.

[28] Bridgepoint Education, Inc. Form 10-K for the Fiscal Year Ended 31 December 2010, filed 2 March 2011, p. 25.

[29] "BPI - Q1 2012 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents*, 1 May 2012, p. 4.

[30] Bridgepoint Education, Inc. Form 10-K for the Fiscal Year Ended 31 December 2010, filed 2 March 2011, p. 25.

[31] Letter from Elizabeth Tice to Dr. Stanley O. Ikenberry, 1 May 2012, [BPIK000711203].

000225
Exhibit 54

15 May 2012.[32] Ashford submitted a formal response to the visiting team's report on 23 May 2012.[33]

    v.    If Ashford would be deemed to be in "substantial compliance with all of WASC's standards," based on WASC's review of all the documents, WASC would be expected to grant accreditation.[34] WASC's decision was expected by mid-2012.[35]

### B. Summary of Plaintiffs' Allegations

23.    Plaintiffs allege that Defendants made false and misleading statements and omissions that failed to disclose the true facts about the Company's student persistence, a critical factor considered by accreditors, which reflects whether or not the Institution is achieving its educational function and purpose. Specifically, Plaintiffs allege that Defendants failed to disclose, among other key facts, that Ashford had:

> "failed to develop and implement reforms to address the WASC concerns communicated to defendants in the spring of 2011, which would be required for WASC accreditation, including that:
>
> (i) Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition;
>
> (ii) Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion."
> **Complaint, ¶96.**

---

[32] "Fw: AshU_WASC Visit Final Team Report S12," internal Company Email and attachment, forwarded by Diane Thompson to Andrew Clark and Dan Devine on 15 May 2012, [BPI047243-308].

[33] Western Association of Schools & Colleges Letter to Elizabeth Tice, President and CEO of Ashford University, dated 3 July 2012.

[34] Bridgepoint Education, Inc. Form 10-K for the Fiscal Year Ended 31 December 2010, filed 2 March 2011, p. 25. In order for an institution to be in "substantial compliance" with the WASC standard, that "institution must demonstrate that it meets all, or nearly all, of the Standards of Accreditation at a minimum level and has a clear plan in place to meet the Standards at a substantial level of compliance for accreditation." (WASC Handbook of Accreditation, 2008, p. 41.)

[35] "BPI - Q1 2012 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents*, 1 May 2012, p. 4.

000226
Exhibit 54

## C. Timeline of Events

24. The following review of events provides background and context for understanding the Company's condition and experience during the Class Period. As set forth below, the Company, analysts, accreditors, and regulators stressed improvement in retention and persistence as the fundamental factor relevant to Bridgepoint's continued accreditation and financial viability.

### 1. 2010 Initiatives to Improve Persistence and Retention

25. Beginning in the second-half of 2010, in an effort to improve student retention and persistence rates, the Company told investors that it instituted new initiatives aimed at attracting, and/or selecting, the most qualified candidates, which could improve student persistence and retention rates.[36]

> "[Andrew Clark, Bridgepoint CEO]: During the third quarter, we will plan to introduce a two-week orientation course and an assessment test for students who have not taken an equivalent entry level college English and math course. When coupled with our 2.0 minimum GPA requirement, the changes we are making will allow us to continue to attract the most qualified students."
> **"BPI - Q4 2009 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **2 March 2010, p. 5.**

> "[Andrew Clark, Bridgepoint CEO]: In an effort to attract the highest quality students and to aid in managing our institution cohort default rate, we are also planning to implement some new admissions criteria in the second and third quarters of 2010. In the second quarter, we plan to increase the minimum age requirement to 22 in our AAB program to mirror the requirements of our bachelor's degree students. In addition, all associate and bachelor's degree students in their first course will be required to attend all five weeks. We found that a large percentage of students who missed one week of attendance do not successfully complete their first course, drop out after their first course, and are more likely to not complete their second course."
> *Id.*

---

[36] "BPI - Q4 2009 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents,* 2 March 2010, p. 13.

"[Andrew Clark, Bridgepoint CEO]: As many of you already know, in the second quarter we have implemented new admissions policies that raise the minimum age to 22 for all online students at Ashford University. Previously the minimum age for associate degree candidates was 18. By focusing our admissions efforts on more mature students, we expect to attract students with a greater commitment to completing their degrees."
**"BPI - Q1 2010 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **3 May 2010, p. 2.**

26. The Company explained that a potential student would only influence the Institution's enrollment metrics after that student had completed their orientation and enrolled in their first course.[37] Andrew Clark, Bridgepoint's CEO, noted that increasing the selectivity of new enrollments could have a positive impact on the Company.

"[Brandon Dobell, William Blair Analyst]: A couple of quick ones for you. As you think about the impact of the orientation program and let's call it some more selectivity upfront, how does that – or how could it impact bad debt in 2010? I know you guys gave some guidance on that number but have you modeled some kind of impact or what that could be for you?

[Andrew Clark, Bridgepoint CEO]: Well, you know, directionally I think that it could positively impact bad debt as we look at some of the students that would be affected by the change in our admissions policy. It should positively impact bad debt and even potentially over the longer-term positively impact our CDR."
**"BPI - Q4 2009 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **2 March 2010, p. 13.**

27. Later in 2010, the Company told investors that it implemented a new software system, called Constellation, to improve the quality of education at the Institution.

"[Andrew Clark, Bridgepoint CEO]: We are very excited about the launch of Constellation. It's a new, innovative suite of highly engaging web-based course materials that includes both text and multimedia aspects. Constellation's content and our proprietary browser were developed in cooperation with subject matter experts from across the country and our

---

[37] *Id.,* p. 12.

own faculty and are owned 100% by Bridgepoint. This new suite of products reinforces Ashford University's commitment to affordability, quality, and acceptability for its students."

**"BPI - Q1 2010 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **3 May 2010, p. 3.**

28.     In the beginning of 2011, the Company told investors that it expanded the initiatives focused on academic quality and student retention.

"[Dan Devine, Bridgepoint CFO]: In fact, I believe our admissions counselors for 2011 will be flat to what it was in the previous year in 2010. What you really see there is a continued, as I mentioned I think in the first quarter call or 2010, I said Ashford University would have a strong focus on branding and developing a branding strategy throughout the year which we did in 2010. We initiated some of that at the very end of 2010, and we'll continue to do that for 2011. I think one of the messages that I would want you to take away certainly from us on every call and certainly this call, Peter, is we are very much focused on the long term. We're focused on building a long term sustainable organization that has institutions that are very successful around academic quality, around retention of our students, and ultimately graduation."

**"BPI - Q4 2010 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents***, 1 March 2011, p. 12.**

        **2.      10 March 2011: Senate Hearing on Examining Bridgepoint and
                  For-Profit Education and Oversight**

29.     In March 2011, the Senate Health Education Labors and Pension Committee (the "HELP Committee") held a hearing to discuss the educational failures of Ashford to retain students and keep them in school to work towards and complete their degree, all while Bridgepoint made over $120 million in profit.[38]

30.     Prior to the HELP Committee hearing on 10 March 2011, Mr. Daniel Smith, the Staff Director of the HELP Committee, sent a letter to Bridgepoint's CEO. In the letter Mr. Smith was critical of the Company for being unwilling to testify before the HELP Committee.

---

[38] "Hearing Sees Financial Success and Education Failures of For-Profit College," by Tamar Lewin, *New York Times*, 10 March 2011; and Bridgepoint Education Inc. Form 10-K for the Fiscal Year Ended 31 December 2010, filed 2 March 2011, p. 68.

000229
Exhibit 54

"You should be aware that it would be made clear at the hearing that your failure to appear is based on nothing other than your own apparent unwillingness to testify regarding how a company that receives over 86 percent of its revenue from the Federal Government saw a 1-year increase in profit from $81 million to $216 million, but also has student withdrawal rates of at least 65 to 75 percent."

**"Letter to Bridgepoint CEO Andrew Clark," by Daniel E. Smith (Staff Director of the Senate Committee on Health, Education, Labor and Pensions), 1 March 2011.**

31. During the hearing, Senator Harkin was critical of Ashford's first year dropout rates in its bachelor's and associate's programs, which were 63.4% and 84%, respectively.

"[Senator Harkin]: The statement that I read from the analysis says, basically, everything is fine, except parking and the cafeteria and computer access. Yet the data that we have from Ashford shows that in the bachelor's program 63.4 percent, in the associate's program 84 percent dropped out within a year. How can you reconcile that data with the fact that the quality of instruction and instructional support services are growing and sufficient faculty and support resources are provided to deliver a quality learning experience?"

**"Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight," Hearing of the Committee on Health, Education, and Pensions United States Senate One Hundred Twelfth Congress, 10 March 2011, p. 33.**

32. Given that the accreditation standards of HLC (the Institutions' then current accreditor) were based on quality and support services, Senator Harkin was critical of HLC, and its President Sylvia Manning, for the fact that the Institution was able to maintain accreditation with retention rates that were below 50%. Senator Harkin stated that the standards and Ashford's poor retention could not be reconciled.

"[Senator Harkin]: Now, Dr. Manning, I have here again a document from Ashford, which we requested. They gave us the documentation. And they claimed this is data that was provided to HLC. Is that it right there? Yes. Yes, data provided to HLC, and you will see that full-time entering undergraduates, up on top, the retention rate. If I am not mistaken – full-time entering undergraduates, on the bottom. First-time entering undergraduates, retention rate – white, 46 percent; black/nonHispanic, 35 percent; Hispanic, 39 percent; Asian or Pacific Islander, etc, etc.

11

All these retention rates are below 50 percent. They tell me that they provided this document to HLC. So your reviewers would have had this document. So, again, I am wondering how you can reconcile accreditation based upon quality and support services when you have less than 50 percent retention rates for first-time entering undergraduates?"

**"Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight," Hearing of the Committee on Health, Education, and Labor United States Senate One Hundred Twelfth Congress, 10 March 2011, p. 34.**

33.     In response, Sylvia Manning testified that the Institution's low retention was "the greatest problem" facing HLC and that "above all" they were going to require institutions like Ashford to place a "much greater emphasis on persistence and completion."

"[Sylvia Manning, HLC President]: That is a huge problem, and it is a problem across higher education. It is a problem that is more acute in the online environment. It is a problem that is more acute with nontraditional students. But it is, I think, the greatest problem that is facing us."

**"Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight," Hearing of the Committee on Health, Education, and Labor United States Senate One Hundred Twelfth Congress, 10 March 2011, p. 34.**

"[Sylvia Manning, HLC President]: ***There will be much greater emphasis on student persistence and completion.*** Frankly, that was one of the things that, from the traditional context that we came from, we had assumed. We need to place much more emphasis on that and to require our institutions, above all, to place much more emphasis on that. We will be doing that."

***Id.*** **(emphasis added).**

34.     Sylvia Manning told Senator Harkin that HLC would be implementing new accreditation and monitoring criteria which would focus on student retention and persistence.

"[Sylvia Manning, HLC President]: That said, with a better understanding of today's transformations in higher education, in 2008 we began to develop policies and procedures to respond to them, allowing us to address such situations thoroughly and effectively. Let me explain the changes that we have made … the new criteria bring new focus on keeping and graduating students. We will require institutions to pay greater attention and report on

what they are doing. *We will also analyze the data we collect annually from institutions to determine when it is time to look more closely at their persistence and graduation rates*."
**"Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight," Hearing of the Committee on Health, Education, and Pensions United States Senate One Hundred Twelfth Congress, 10 March 2011, pp. 27-28 (emphasis added).**

      3.       3 May 2011: Bridgepoint Announces 1Q 2011 Financial Results

35.    On 3 May 2011, Bridgepoint announced financial results for 1Q 2011 (quarter ended 31 March 2011), raised guidance for FY 2011, and held a conference call with investors.[39] The Company reported quarterly revenue of $229 million, EPS of $0.92 per share, and raised guidance to a range of $2.47 to $2.57 for FY 2011.[40] Analysts' consensus 1Q and FY 2011 EPS estimates were $0.61 per share and $2.26 per share, respectively.[41]

36.    The Company attributed the better than expected revenue to increased persistence. According to the Company's CEO, Andrew Clark, student support initiatives implemented in 2010 were responsible for the improvement in student persistence.

> "[Andrew Clark, Bridgepoint CEO]: We are pleased with the results we achieved in the first quarter as our new enrollments were in-line with our expectations, and I am particularly pleased that our year over year student persistence increased for the fourth consecutive quarter. The increased persistence not only resulted in better than anticipated revenue for the quarter, but it more importantly reinforces that the student support initiatives we made in 2010 to enhance student persistence are working as we planned."
> **"Bridgepoint Education Reports First Quarter 2011 Results; Announces Additional $75 Million Share Repurchase Authorization," *PR Newswire*, Company press release, 3 May 2011, 7:00 AM.**

---

[39] "Bridgepoint Education Reports First Quarter 2011 Results; Announces Additional $75 Million Share Repurchase Authorization," *PR Newswire*, Company press release, 3 May 2011, 7:00 AM; "BPI - Q1 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents,* 3 May 2011.

[40] "Bridgepoint Education Reports First Quarter 2011 Results; Announces Additional $75 Million Share Repurchase Authorization," *PR Newswire*, Company press release, 3 May 2011, 7:00 AM.

[41] "Bridgepoint Education, Inc. (BPI) Tops Q1 EPS Views; New Enrollments Up 13%; Guides FY11; Announces $75M Buyback," *StreetInsider.com*, 3 May 2011.

000232
Exhibit 54

37. On the conference call, the Company updated investors on its WASC accreditation application process. According to the Company, based on a review of Ashford's initial eligibility application, WASC determined that Ashford was eligible to proceed with its "application for candidacy for accreditation."[42]

38. Further, the Company highlighted that its 2010 quality initiatives would continue to focus on improving student persistence and retention.

> "[Andrew Clark, Bridgepoint CEO]: We instituted a lot of quality initiatives back in 2010. We saw what we thought were some positive changes from that as early as the second quarter last year. And we continue to realize the positive outcomes from that in the third quarter and fourth quarter, and now again in the first quarter. So everything that we implemented last year has really done what we thought it would do, which is improve our persistence. We continue though to focus on that. It's going to be, as I mentioned, more challenging in the quarters going forward just because the year-over-year comparison, but we will continue to focus on that relentlessly."
> **"BPI - Q1 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents,* 3 May 2011, p. 8.**

> "[Andrew Clark, Bridgepoint CEO]: Well, in terms of orientation, Kelly, we believe that – we haven't given out specific timing, but it will be in the second half of the year that we will roll out the orientation. As we mentioned I think last quarter, contemplated in our guidance and in our internal models is any impact positively or negatively in terms of the orientation. The negative part would just be a delay of the student effectively beginning their first course. That delay that would be by a couple of weeks. The positive impact, of course, would be increased persistence. So I would say that generally our plans are for this to fall in the second half of the year."
> ***Id.,* p. 14.**

> "[Andrew Clark, Bridgepoint CEO]: Right now we are very focused on our initiatives for 2011 on student persistence, student graduation – anything we can do to improve the student experience in the classroom or administratively."
> ***Id.,* p. 18.**

---

[42] "BPI - Q1 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents,* 3 May 2011, p. 4.

39.     Contemporaneous analyst commentary highlighted Ashford's strategy to improve

persistence and student graduation.

> "[M]anagement is implementing changes to its admissions criteria and
> related policies that are intended to attract and enroll higher quality students
> and maintain or improve metrics such as bad debt, cohort default rates,
> retention, repayment rates and graduation rates."
> **"Bridgepoint Education: Q1 Follow-up: Downside Risks Linger," by Kelly Flynn,
> Credit Suisse, analyst report, 4 May 2011, p. 6.**

> "Combined new student enrollment in the first quarter increased 13.4%, to
> 27,550, compared to 24,300 last year, and was also better than the
> *StreetAccount* consensus which called for a 8.1% increase to 26,350 (four
> estimates), despite the implementation of quality initiatives during 2010,
> which reduces enrollment growth in the near term but has a positive effect
> on retention and, ultimately, graduation rates."
> **"Bridgepoint Education, Inc.:Q1 Results; Another Strong Quarter," by Alexander
> Paris Jr., Barrington Research, analyst report, 4 May 2011, p. 3.**

> "The company continues to make extensive changes to its admissions
> process to improve student quality and outcomes, as well as operational
> transparency. Ashford has completed the pilot of its orientation course for
> students with fewer than 24 transfer credits, and is now in the process of
> redesigning a formal program to be rolled out in 2H11. The final orientation
> will include a personal assessment for online learning readiness with
> customized feedback, an introduction to Ashford's student resources and a
> virtual tour of the online classroom environment. Management believes that
> the free, mandatory course will help improve student persistence, with the
> only downside coming from the two-week delay to student starts."
> **"Q1:11 Healthy Model," by Trace Urdan and Alexandra Chan, Signal Hill, analyst
> report, 4 May 2011, p. 4 [BPIK000253046 at 49].**

    4.       <ins>10 June 2011: Report of WASC President Ralph Wolff's
             Presentation to NACIQI Board</ins>

40.     On 10 June 2011, the United States Department of Education published a report on the

meeting of the National Advisory Committee on Institutional Quality and Integrity

("NACIQI").[43] In his presentation to the NACIQI Board, WASC President Ralph

Wolff highlighted the changes that WASC was implementing to address the public's

---

[43] "Report of the Meeting of the National Advisory Committee on Institutional Quality and Integrity," NACIQI,
U.S. Department of Education, 8-10 June 2011.

concern, including that focused on by Senator Harkin during the Senate HELP Committee hearings, that for-profit schools, like Ashford, had failed to retain students and keep them in school to persist towards graduating, and that accreditors grant accreditation despite these fundamental failures.[44]

> "[Ralph Wolff, WASC President]: We think this is what our responsibility should be, to meet the changes that are already occurring. So I want to highlight seven major changes that we're undertaking, and we think each and every one of them is significant, substantial, and addresses these public accountability concerns. One. ***First, external validation of retention and graduation rates. For the last three years, we have made graduation rates central to our process we've made a part of every accrediting review. Our internal studies have shown that as institutions address retention and graduation, that there already is a considerable amount of data that institutions have, well beyond IPEDS, but that what institutions need is better application of that data, benchmarking of that data, and bringing the research that is available, how to bring or how to improve graduation, into the actual infrastructure of the institution***."
> **"Report of the Meeting of the National Advisory Committee on Institutional Quality and Integrity," NACIQI, U.S. Department of Education, Appendix-F, 8-10 June 2011, pp. 281-282 (emphasis added).**

41.    In response to the NACIQI meeting, a First Analysis analyst noted the shift in direction for WASC accreditation.

> "***One of the speakers was Ralph Wolff, president of the Western Association of Schools and Colleges (WASC), one of six regional accrediting bodies. He outlined several changes his association had already made or was in the process of making in response to a call for greater public accountability. These changes include: 1) employing independent audits to verify graduation and retention rates***; 2) considering whether graduation rates are acceptable in light of an institution's mission; 3) assessing learning outcomes in areas like writing and critical thinking, and whether those outcomes are acceptable in light of an institution's mission; 4) increasing transparency of the accreditation process and results, and developing post-review quality indicators that would be made public; 5) exploring multiple levels of accreditation (as discussed above); and 6) establishing special, more in-depth protocols for proprietary institutions and using outside auditing firms to examine those institutions' finances. We

---

[44] "Report of the Meeting of the National Advisory Committee on Institutional Quality and Integrity," NACIQI, U.S. Department of Education, Appendix-F, 8-10 June 2011, p. 281.

000235
Exhibit 54

suspect all regional accrediting bodies will ultimately implement changes along the lines of those in process at WASC."

**"NACIQI Meeting Portends Shift Toward More Accountability," by Corey Greendale, First Analysis, analyst report, 12 June 2011, p. 2 [BPI059475 at 76] (emphasis added).**

42. The Company's head of investor relations, Paul Goodson, emailed senior executives at Bridgepoint, including Andrew Clark, to highlight the First Analysis analyst's comments and Mr. Wolff's comments on "WASC's new direction in accreditation."[45]

43. Further, Signal Hill analysts noted that WASC's new direction could pose problems for Ashford, as its retention and graduation rates "could be found wanting by WASC."

> "***WASC also intends to measure and benchmark more quantitative measures of student success, including retention and graduation rates.*** Accreditation review could result in a 'target' graduation rate – or several based on subgroups – that the institution could be working toward with a specific plan. ***Ashford's rates could be found wanting by WASC but measures already in place to address these outcomes measures should be viewed favorably***."
> **"WASC Accreditation Changes: Transparency Replaces Clubbiness," by Trace Urdan and Alexandra Chan, Signal Hill, analyst report, 21 June 2011, p. 2 [BPIK000223599, at 600] (emphasis added).**

44. Following Mr. Wolff's presentation at the NACIQI meeting, which highlighted WASC's commitment to focus on keeping students in school and working towards a degree, the Company internally acknowledged that others at the NACIQI meeting stated "that WASC will focus specifically on grad rates and retention in their new requirements," and that given Senator "Harkin['s] focus on churn and putting BPI at the top of the 'Bad Actors' list," Jarrell Price, an analyst at Height Analytics, a firm "whose value-add is their monitoring of legislative and regulatory activity for the impact on stocks,"[46] told the Company that he "believes investors are worrying that

---

[45] "APEI, APOL, CECO, CPLA, DV, EDMC, ESI, STRA, UTI: NACIQI meeting portends shift toward more Accountability," Internal Company Email, forwarded by Paul Goodson to Andrew Clark on 13 June 2011, [BPI059473].

[46] "Re: The Ah Ha moment for today's stock price activity in BPI," Internal Company email, from Jane McAuliffe to Andrew Clark, 10 June 2011, [BPI097843, at 43-44].

this could turn into a problem for BPI specifically."[47] In light of this development the Company considered how to handle the uncertainty overhanging its stock price.

> "Let me pass along a comment from Trace Urdan of a month ago – that WASC migration is 90% of the reason our stock is lower than sector multiples. So here's our problem with the impact of this issue on the stock price: the Street hates uncertainty, and will sell, short, or avoid anything where significant uncertainty exists. And Wolfe's [sic] comments today introduce major new uncertainty in the price outlook for BPI. There might not be a lot we can do, but we should do whatever we can to remove uncertainty. For example, we may be in a position to encourage Wolfe [sic] to publish a document as soon as his plans solidify. This will at least mitigate a major uncertainty overhanging BPI, and could be an upward catalyst like the publication of GE was."
> **"Re: The Ah Ha Moment for Today's Stock Price Activity In BPI," Internal Company email, from Jane McAuliffe to Andrew Clark, 10 June 2011, [BPI097843, at 44].**

> 5.      2 August 2011: Bridgepoint Announces 2Q 2011 Financial Results

45. On 2 August 2011, Bridgepoint announced financial results for 2Q 2011 (quarter ended 30 June 2011), raised guidance for FY 2011, and held a conference call with investors.[48] The Company reported quarterly revenue of $239.9 million, EPS of $0.90 per share, and raised guidance to a range of $2.56 to $2.68 for FY 2011.[49] For 2Q 2011, analysts expected revenue and EPS of $229.7 million and $0.69 per share, respectively.[50]

---

[47] *Id.*, [BPI097843, at 44].

[48] "Bridgepoint Education Reports Second Quarter 2011 Results," *PR Newswire*, Company press release, 2 August 2011, 7:00 AM; "BPI - Q2 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents*, 2 August 2011.

[49] "Bridgepoint Education Reports Second Quarter 2011 Results," *PR Newswire*, Company press release, 2 August 2011, 7:00 AM.

[50] "Bridgepoint Education (BPI) Reports Better-Than-Expected Q2 Results," *StreetInsider.com*, 2 August 2011.

000237
Exhibit 54

46. On the conference call with investors, Jane McAuliffe, Bridgepoint's Chief Academic Officer, disclosed that Ashford was approved to pursue accreditation through the more expedited Pathway B in the WASC Accreditation manual.[51] Andrew Clark reiterated the Institution's focus on enrolling more qualified candidates to increase student persistence.

> "[Andrew Clark, Bridgepoint CEO]: We have said previously that we expect a slowing of our growth rate as the size of our Company increases, as well as from the quality of preparedness initiatives we have put in place and regulatory changes and unprecedented media and legislative focus on our industry. Our performance this quarter is in line with those expectations and our previous guidance for 2011. We do not believe that slower growth rate is a result of declining demand for our degree offerings. We believe we remain well positioned competitively by offering students a compelling value proposition based on quality and affordability.
>
> Persistence in the second quarter was relatively flat compared to last year's strong second quarter level. We continue to believe that maintaining a high level – high persistence level is an important goal for both of our institutions and demonstrates that our institutions are successfully engaging students and delivering a quality education experience that enhances student's lives. We will continue to focus on improving persistence despite tougher year-over-year comparisons in this quarter and for the remainder of the year."
> **"BPI - Q2 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **2 August 2011, p. 3.**

47. The Company added that its new software (*e.g.* Constellation), would contribute to the initiative to improve student retention and persistence.

> "[Zach Batum, Barclays Analyst]: You said that Constellation was rolled out at about 50% at Ashford. Will you provide us with some color on what specifically you're doing with the student usage data and how much you think the data can help student quality and retention going forward?
>
> [Andrew Clark, Bridgepoint CEO]: Yes sure. It's a great question. I mean, I would say that we're at the early stages in terms of student data that comes from Constellation and what we can do with it. We think the potential is very strong and we think that potential will relate to student persistence,

---

[51] "BPI - Q2 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents*, 2 August 2011, p. 5.

student behavior, enabling students to get even further help from the faculty because the data that were able to collect and just create an overall better student experience as a result of that data."

**"BPI - Q2 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **2 August 2011, p. 15.**

48. In their reports following the Company's 2Q 2011 earnings announcement, analysts noted concerns about the Institution's student persistence.

"Student persistence remains a concern. BPI reiterated its focus on initiatives designed to establish student preparedness (e.g., orientation program) and increase student retention. While we appreciate BPI's efforts, we note that 2Q11 student persistence declined ~70 bps y/y and 2H11 guidance implies further persistence pressure. In addition, BPI is facing enrollment headwinds from larger graduating classes, which will further pressure student persistence."

**"Solid 2Q11 Results for BPI, But Growth Challenges Are Looming Ahead," by Andrew Steinerman,** *et al.*, **JPMorgan, analyst report, 3 August 2011, p. 1.**

"With the quarter's outperformance on enrollments, it appears management is expecting tougher retention (could be graduations or just structural declines in persistence) or much lower starts in the back half of 2011. Commentary on the call regarding third quarter starts and retention trends pointed to negative starts in the back half of the year (putting starts flat for the year) and tough retention as larger graduating classes continue (more graduates this year than in the past four years)."

**"Raising Estimates; Valuation Attractive; Catalyst Will Be Third- Quarter Starts," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 2 August 2011, p. 3.**

49. Similarly, Wunderlich analysts noted that the decline in the Company's growth rate was the result of a strategic shift to improve persistence, purportedly implemented in order to allay the concerns of the WASC evaluators.

"Shift in enrollment growth is strategic, not environmental. Ashford's value proposition, we believe, is resonating well in the current market environment. The dramatic slowdown in starts we rather view as a function of the company's additional orientation process as well as greater selectivity in its admissions process. ***The contemplated expense increase we believe***

20

*is for the benefit of WASC evaluators. These changes are intended to neutralize concerns WASC may have regarding Ashford's ability to provide quality service and instruction*."
**"Initiating Coverage With a Buy – Misunderstood and Misvalued," by Trace Urdan and Jeff Lee, Wunderlich Securities, analyst report, 12 August 2011, p. 1 (emphasis added).**

<u>6.</u>     <u>15 September 2011: Bridgepoint Presents at BMO Education Conference</u>

50.     On 15 September 2011, Andrew Clark and Daniel Devine, Bridgepoint's CEO and CFO, respectively, presented at the BMO Capital Markets Back to School Education Conference.[52] During his portion of the presentation, Andrew Clark described a number of enhancements to the student experience that he expressed would lead to better persistence.[53]

> "[Andrew Clark, Bridgepoint CEO]: We want to make sure that we're continuously improving on quality, on the student experience, and we believe that enhanced performance leads to better persistence."
> **"BMO Capital Markets Back to School Education Conference,"** *Bloomberg***, Investor Conference, 15 September 2011, p. 3.**

51.     Between the BMO Education Conference and Bridgepoint's 3Q 2011 earnings announcement, analysts' commentary noted the importance of student persistence and that it would be an important factor considered by WASC. In fact, JPMorgan analysts referred to persistence as the "*holy grail of higher education.*"

> "*Student persistence is a holy grail of higher education. BPI reiterated its focus on initiatives designed to establish student preparedness (e.g., orientation program, raised age requirements) and increase student retention.*"
> **"BPI's Low Price Supports Its Relative Start Strength, But Regulatory Items Remain – Alert," by Andrew C. Steinerman,** *et al.***, JPMorgan, analyst report, 19 September 2011, p. 1 (emphasis added).**

---

[52] "BMO Capital Markets Back to School Education Conference," *Bloomberg*, Investor Conference, 15 September 2011.

[53] *Id.*, p. 3.

"We continue to believe that *the primary driver of the softness in starts is the company's own effort to raise the quality of its student outcomes and to anticipate the sensibilities of WASC inspectors*."
**"Reducing Estimates to Better Match Guidance," by Trace Urdan and Jeff Lee, Wunderlich Securities, analyst report, 5 October 2011, p. 1 (emphasis added).**

7.    1 November 2011: Bridgepoint Announces 3Q 2011 Financial Results

52.    On 1 November 2011, Bridgepoint announced financial results for 3Q 2011 (quarter ended 30 September 2011), increased earnings guidance for fiscal year 2011, and held a conference call with investors.[54] For the quarter, the Company reported revenue of $242.8 million, EPS of $0.78 per share, and raised FY 2011 guidance to a range of $2.95-$2.98 per share.[55] Both revenue and EPS beat consensus estimates of $230.5 million and $0.57 per share, respectively.[56]

53.    During the conference call, the Company updated investors on its accreditation process with WASC, noting that it had begun a self-study that it would submit in December 2011, and that WASC's on-site visit of Ashford would be hosted in March 2012.[57]

54.    Furthermore, Jane McAuliffe noted the positive impact that the new quality initiatives were having on student persistence.

"[Jane McAuliffe, Bridgepoint CAO]: We are pleased to report that we are continuing to see improving student persistence levels. Newly implemented programs and procedures are improving the academic readiness and persistence of our student body, enhancing the quality and value of our academic programs, and driving favorable performance outcomes we track. … Our success with persistence and graduation is also due in part to our long-standing practice of seeking the highest quality prospective students,

---

[54] "Bridgepoint Education Reports Third Quarter 2011 Results," *PR Newswire*, Company press release, 1 November 2011, 7:00 AM; "BPI - Q3 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents,* 1 November 2011.

[55] "Bridgepoint Education Reports Third Quarter 2011 Results," *PR Newswire*, Company press release, 1 November 2011, 7:00 AM.

[56] "Bridgepoint Education (BPI) Tops Q3 EPS by 21c, Posts FY11 Guidance," *StreetInsider.com*, 1 November 2011.

[57] "BPI – Q3 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents,* 1 November 2011, p. 4.

22

which is a practice that remains central to our recruitment focus. Having well-prepared students and maintaining high persistence levels are important goals for both of our institutions."
**"Q3 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **1 November 2011, p. 4.**

55.     On the conference call, Brandon Dobell, a William Blair analyst asked the Company for more information about the factors affecting persistence.[58] The Company attributed the increase in student persistence to the quality initiatives and tremendous investment in data analytics and predictive modeling.

> "[Jane McAuliffe, Bridgepoint, CAO]: Hi, Brandon. I think we are starting to see the effects of all the work that we are doing upfront. If you think about the quality initiatives we put into place with the orientation; with required attendance in the beginning courses; how we walk our students to class and make sure they are prepared and are comfortable in that learning environment. So by the time they get there, all that upfront preparation has really given them a sense of confidence that they can succeed and they can achieve and they know what to expect. So we think that is having a good impact for us.
>
> [Andrew Clark, Bridgepoint CEO]: Yes, and I would just emphasize, Brandon, that as I said in my opening remarks, we made a tremendous investment into data analytics and into that group internally within the organization, and predictive modeling, and really understanding the characteristics and the behaviors of students that ultimately are successful academically and end up graduating from our institutions. … So I think that even with increased students graduating, even with difficult comps, all the quality initiatives, predictive modeling we are doing are going to lead to an opportunity to see improved persistence in 2012."
> **"Q3 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **1 November 2011, p. 10.**

56.     Analyst commentary following the Company's earnings announcement discussed the trends in the Company's persistence.

---

[58] *Id.*, p. 9.

23

"Sequential retention rates were 81.1% in 3Q11 – the highest since 1Q08. Management said persistence was up y/y, attributed to student quality initiatives, despite an increasing number of graduates in 2011."
**"More on 3Q11; Raising Ests. And Target," by Jeffrey M. Silber, BMO Capital Markets, analyst report, 1 November 2011, p. 3.**


"We recognize the switch from Higher Learning Commission (HLC) to Western Association of Schools & Colleges (WASC) accreditation stands as a huge issue for many investors, but we remain confident Bridgepoint will be successful in this regard, particularly with its 'new' growth profile (in line with the group's growth, improving retention, etc.) as a backdrop for how WASC will view the risk of Bridgepoint becoming one of its institutions. … Expect retention improvement from the predictive modeling investments, attendance policy changes, and generally higher-quality incoming student cohorts."
**"Still Talking the Talk and Walk the Walk; Raising Estimates; Next Catalyst Will Be Fiscal 2012 Guidance," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 1 November 2011, p. 1 and p. 3.**


"Better persistence suggests quality control is proving effective. Stronger y/y persistence in an environment where most schools are reporting persistence declines suggests satisfied students, but also points to the company's efforts around improving lead quality and orientation are having a beneficial effect."
**"Conservative Guidance, Better Performance," by Trace Urdan and Jeff Lee, Wunderlich Securities, analyst report, 2 November 2011, p. 1.**


"As a result of the new regulatory environment and the implication of quality initiates, BPI's growth has slowed in recent quarters (in fact, Q3/11 was the first quarter of negative starts growth) and we expect Q4/11 and Q1/12 new student starts to be negative YOY, almost entirely due to changes in admissions counselors' compensation and the associated impact on productivity as well as tough comps. These declines, however are being offset by improvements in student persistence and, despite higher graduation rates, total student enrollment has surprised (yet again) on the upside."
**"Q3 Results Top Expectations; Guidance Raised; Stock Cheap," by Alexander Paris Jr. and Joe Janssen, Barrington Research, analyst report, 1 November 2011, p. 4.**


57.     Later in November 2011, Corey Greendale, a First Analysis analyst, commented on WASC's accreditation redesign. Given Ashford's persistence rates Mr. Greendale noted that this redesign could present challenges for the Institution. Mr. Greendale went on to note, however, that he was reassured by the purported trends in student

persistence and retention, and that the initiatives designed to further improve these metrics would demonstrate to WASC that the Institution was committed to improving student outcomes.

> "We think it is noteworthy WASC makes specific mention of proprietary schools in its announcement of accreditation redesign, demonstrating WASC's sensitivity to the scrutiny these schools and their accreditors are currently facing. We believe WASC is acutely aware it could be under the microscope of critics as it conducts its review of Ashford early next year, adding to the rigor with which Ashford will need to demonstrate the quality of its programs. ***We also think the fact WASC makes mention of graduation and retention rates is significant, given Ashford likely has room for improvement in those areas. That said, we believe WASC will be more concerned about the trend in Ashford's graduation and retention rates than where they stand currently.*** We think Ashford will be able to demonstrate current progress, and a commitment to making additional progress, toward improving student outcomes, which we believe will be more important to WASC than simply examining past outcomes. ***More broadly, we believe Ashford can present WASC with data and curricula that exhibit a strong focus on measuring and improving student outcomes, which we expect will be WASC's primary concern***."
> **"View Changes in WASC Processes as Manageable," by Corey Greendale, First Analysis, analyst report, 15 November 2011, p. 1 [BPI064597] (emphasis added).**

### 8. 7 December 2011: Bridgepoint Presents at the William Blair Global Services Growth Stock Conference

58. Speaking at the William Blair Global Services Growth Stock Conference, Andrew Clark affirmed that persistence is the "ultimate metric" in the public education industry. Further, Andrew Clark stated that persistence and trends in persistence are what he would want to know most about as an investor.

> "[Andrew Clark, Bridgepoint CEO]: So, I think that's one real bright shining spot and ***it's the ultimate metric in our industry. If I was an investor, the thing that I'd want to know most about with any public education company is, what does persistence look like, can I measure it, could it give me all that information, and can I look at that trend over a year-over-year-over-year-over-year basis.*** We even give out cohort persistence as you know on our fourth quarter earnings call and we give that historically over four years to really try and provide that transparency."
> **"William Blair & Company Global Services Growth Stock Conference," *Bloomberg*, Investor conference, 7 December 2011, pp. 3-4 (emphasis added).**

25

59.     When asked by Brandon Dobell, a William Blair analyst, about the current trends in

student persistence, Andrew Clark touted the Company's improvement over the last

six quarters and attributed the increase to its quality initiatives.

> "[Brandon B. Dobell, William Blair Analyst]: Okay. Some of the schools
> in the group and I think to a certain extent you guys included given the rapid
> growth '08, '09, and '10 have the opposite effect of happening in '11, '12,
> '13, '14. A lot of students going out of the institution as they graduate, how
> do we think about that the impact on the population of the higher
> graduations? And then excluding that, how has persistence trended? Have
> you seen any changes there in recent quarters?
>
> [Andrew Clark, Bridgepoint CEO]: Well, I mean, starting with persistence
> we've seen great results over the last – we've had better year-over-year
> persistence five of our last six quarters. We did a lot back in 2010 and
> throughout 2011 around quality initiatives for our students and student
> preparedness and that has impacted our persistence in a very positive way.
> We think some of the other things that we're doing in terms of data
> analytics, in terms of Constellation are going to actually provide for
> improved persistence in 2012."
> **"William Blair & Company Global Services Growth Stock Conference,"** *Bloomberg*,
> **Investor conference, 7 December 2011, p. 3.**

> "[Andrew Clark, Bridgepoint CEO]: Now where you will see it and again a
> reason why I think our persistence is going to be greater in 2012 is because
> of orientation, because of the predictive analytics and because of
> Constellation, all of those things are going to, I think, come together to
> create some pretty positive momentum."
> *Id.*, **p. 9.**

60.     During the conference, Andrew Clark was asked to provide an update on WASC

accreditation process and whether there was any way for investors to get more

information about how the process was going.[59] Andrew Clark reassured investors that

the process was "very straightforward" and that there was a lot of dialogue between

the Institution and WASC, which was "very positive."

---

[59] "William Blair & Company Global Services Growth Stock Conference," *Bloomberg*, Investor conference, 7
December 2011, p. 4.

000245
Exhibit 54

"[Andrew Clark, Bridgepoint CEO]: Yeah, I mean, it's a very straightforward process. We submit our self-study in December, the visit's in March. We expect a decision kind of mid-year next year. It's not, you're not isolated in the process, it's not like you submit the self-study and walk away. There's a lot of dialogue back and forth, back when we put our application in throughout the entire process. And so that's very positive and we have a deep, deep bench academically."
**"William Blair & Company Global Services Growth Stock Conference,"** *Bloomberg*, **Investor conference, 7 December 2011, p. 5.**

9.     4 March 2012: Ashford Responds to the WASC Visiting Team's Request for Additional Information Concerning Persistence and Graduation Rates

61.     In a 4 March 2012 email to Elizabeth Tice, President and CEO of Ashford University, the WASC visiting team highlighted their heightened concern about the Institution's retention and graduation rates and wanted an explanation or contextualization of these rates. In particular, the visiting team requested that Ashford provide "plans for improving unsatisfactory rates, including targets and timelines."[60]

"As you know from previous communications, WASC has had concerns about Ashford's retention and graduation rates, especially in view of the large numbers of new students enrolling at Ashford each year and the rapid enrollment growth that Ashford has experienced. These concerns have been heightened by the data that you have provided. I wanted to let you know that this area of inquiry will be an important one, and to give you the chance, if you choose, to prepare a narrative that might explain or contextualize the data."
**"WASC Visit – An Issue," Internal email from Teri Cannon to Elizabeth Tice, 4 March 2012 [BPI099993].**

62.     In response, Ashford stressed that "*across American higher education, very few issues garner as much attention at the moment as persistence and completion rates.*"[61]

---

[60] Internal email titled "WASC Visit – An Issue," from Teri Cannon to Elizabeth Tice, 4 March 2012 [BPI099993].

[61] "Item 1: A Context for Retention and Graduation at Ashford University," Ashford University, March 2012, p. 3 [BPI010172 at 74] (emphasis added).

10. **6 March 2012: Bridgepoint Announces 4Q and FY 2011 Financial Results**

63.    On 6 March 2012, Bridgepoint reported full year and 4Q 2011 (quarter ended 31 December 2011) financial results and held a conference call with investors.[62] The Company also announced guidance for fiscal year 2012.[63] For the fourth quarter, the Company reported revenue of $221.3 million and EPS of $0.41 per share beating consensus estimates of $216.8 million and $0.38 per share, respectively.[64,65] For fiscal year 2012, the Company provided EPS guidance in the range of $2.45 to $2.55 per share, below consensus expectations of $2.84 per share.[66,67]

64.    On the conference call with investors, the Company highlighted that its quality initiatives had improved student retention and persistence in FY 2011 and that these initiatives were expected to continue to improve these metrics in FY 2012.

> "[Andrew Clark, Bridgepoint CEO]: Data analytics investments in 2011 have provided us with a tremendous amount of information to predict student behavior prior to and while attending our institutions. Throughout 2012, we will continue to increase our investment in data analytics to foster continued improvements in the student experience and persistence. Our analysis has shown that increased investment in 2012 in the areas of smaller class sizes, increased monitoring of faculty and student interaction, and addressing students who may be facing challenges earlier in their program will likely lead to increased student persistence and graduation rates over the longer term."
> **"BPI - Q4 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **6 March 2012, p. 9.**

---

[62] "Bridgepoint Education Reports Full Year and Fourth Quarter 2011 Results," *PR Newswire*, Company press release, 6 March 2012, 7:00 AM; "BPI - Q4 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents,* 6 March 2012.

[63] "Bridgepoint Education Reports Full Year and Fourth Quarter 2011 Results," *PR Newswire*, Company press release, 6 March 2012, 7:00 AM.

[64] *Id.*

[65] "UPDATE 1-Bridgepoint 2012 Profit Outlook Disappoints," *Reuters*, 6 March 2012.

[66] "Bridgepoint Education Reports Full Year and Fourth Quarter 2011 Results," *PR Newswire*, Company press release, 6 March 2012, 7:00 AM.

[67] "UPDATE 1-Bridgepoint 2012 Profit Outlook Disappoints," *Reuters*, 6 March 2012.

000247
Exhibit 54

"[Andrew Clark, Bridgepoint CEO]: I would just say a lot of the investments that we outlined earlier in the call are all directionally towards – having a better, more highly qualified student enter our institutions and persist and that should lead to better metrics not just from a persistence standpoint but from a bad debt perspective, too. And that will come towards the latter part of the year."
*Id.*, p. 13.

"[Andrew Clark, Bridgepoint CEO]: Our institutions are constantly looking to improve on metrics like persistence and graduation and our guidance does have an improvement in persistence this year over last year, which is meaningful because our persistence increased pretty well last year because of the initiatives that we had done previously. Graduation, as you have seen, also those rates have trended nicely. I think all of the investments we are making here, the increased investment in student recruitment in terms of trying to attract prospective students that we know from our data analytics that the cost of that, the increased cost of that is offset by better persistence over the long-term, which we piloted that this past year towards the end of the year. And we have data that supports that thesis. We know that all of these initiatives, the class size, all of these things will lead to us improving our metrics, so when we have our fourth-quarter earnings call next year, I would anticipate that again when we lay out these quality metrics as we have done today, that you will see improvement on a year-over-year basis."
*Id.*, p. 14.

65.     Subsequently, Andrew Clark was asked how much of the increased investment and changes in technology went toward improving student persistence.

"[Zach Fadem, Barclays Analyst]: You've done a nice job notching up your retention rates a little bit at 61% this year. How much of that would you credit to the recent investments and changes in technology or predictive analytics and what not? How much room do you think there is for this number to rise going forward? Thanks.

[Andrew Clark, Bridgepoint CEO]: I would credit most of it, Gary, with quality initiatives that we started in 2010 and then that we continued throughout 2011, although our investment in data analytics and predictive modeling and some of the results of that definitely helped towards the latter half of 2011. So I think from a trend perspective, my view, like I said in our guidance, we have considered an increase in persistence on a year-over-year basis and if persistence increased by 50 basis points each year, that's quite

29

meaningful to our institutions and ultimately to the Company. So I don't have a specific number for you but I will tell you that all the investments we have made and that we're going to make throughout 2012 we think will improve our persistence this year and will continue to improve it in 2013."
**"BPI - Q4 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, 6 March 2012, p. 19.

66.   In addition, in order to improve student persistence, the Company stated that it was making investments in faculty, reducing class sizes, increasing student monitoring, increasing faculty and student interaction, and implementing a new student dashboard.

"[Jane McAuliffe, Bridgepoint CAO]: We are making several investments in curriculum and faculty beginning at the time of enrollment that should lead to better outcomes for the students. Once a student starts, our analysis has shown that smaller initial class sizes benefit students in terms of their first-class completion rates and longer-term persistence at Ashford. In support of this, Ashford University has been hiring faculty in all colleges, many who will be specifically focused on the beginning classes."
**"BPI - Q4 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, 6 March 2012, p. 4.

"[Jane McAuliffe, Bridgepoint CAO]: Additionally, we have developed a student dashboard that allows staff to predict with a high degree of accuracy a student's ultimate level of success very early in a class. Such information positions us to extend focused assistance to specific students and we will be able to inform students where to concentrate their academic efforts early on, ultimately improving their likelihood of academic success."
*Id.*, p. 6.

"[Andrew Clark, Bridgepoint CEO]: Our analysis has shown that increased investment in 2012 in the areas of smaller class sizes, increased monitoring of faculty and student interaction, and addressing students who may be facing challenges earlier in their program will likely lead to increased student persistence and graduation rates over the longer term."
*Id.*, p. 9.

67.   Analysts commented on the Company's quality enhancement initiatives to improve persistence.

"If the company is able to recover from the current enrollment drag without adversely affecting academic quality, Bridgepoint's revenue growth could be better than we modeled,"

**"Strong 4Q11; 2012 Outlook Suggests Healthy Enrollment Dynamics Coupled with Much More Investments," by Andrew C. Steinerman, JPMorgan, analyst report, 6 March 2012, p. 5.**

"Student persistence: Management's guidance assumes improved persistence versus 2011, due in part, to the impact of quality enhancement initiatives and increased focus on selecting students with a strong probability of succeeding."

**"Q411 Starts Bottoming, But Investments Weighing on Margins," by Kelly Flynn, Credit Suisse, analyst report, 7 March 2012, p. 2.**

11.     13 March 2012: Bridgepoint Presents at the Credit Suisse Global Services Conference

68.   In an investor presentation at the Credit Suisse Global Services Conference, Andrew Clark, Bridgepoint's CEO, described how the Company had spent a "tremendous amount of money" over the last year to increase student persistence.

"[Andrew Clark, Bridgepoint CEO]: We've spent a tremendous amount of money in resources last year on data analytics, producing a student dashboard that allowed us to identify students that were perhaps running into difficulty, and be able to help them in a proactive way. Ashford University has a micro site just based around what we do in the area of assessment, and that's available to anybody in this room to be able to go out and see how the institution performs against various measures of student learning and assessment.

From a learning standpoint, this year – we've invested last year and we will continue to invest this year in more full-time faculty, more terminally degreed faculty. We have made a decision to have smaller class sizes in our initial courses to help students succeed at a better rate, and we actually have seen positive results already from that in terms of increased persistence from those students."

**"Credit Suisse Global Services Conference," *Bloomberg*, Investor conference, 13 March 2012, p. 3.**

"[Andrew Clark, Bridgepoint CEO]: We are working on making sure that we target prospective students that perform and persist at the best rate possible, based on characteristics that we've identified that lead to more success at our institutions.

31

That does mean we have a higher initial recruitment cost, but that is – we have found from our pilot that that's offset by the students' success, that they have – they actually end up with a higher GPA and persisting for a longer period of time. We also determined from our data analytics that smaller class sizes and increased monitoring of student and faculty interaction actually also helps students perform better in the classroom and persist at a longer rate.

And I should say why I'm talking about persistence that – we provide and you'll see it here in a minute, cohort persistence data each year at the end of the year. But on a quarterly basis, I believe our persistence has improved year-over-year seven out of the last eight quarters."
**"Credit Suisse Global Services Conference,"** *Bloomberg*, **Investor conference, 13 March 2012, p. 4.**

12.     <u>1 May 2012: Bridgepoint Announces 1Q 2012 Financial Results</u>

69.    On 1 May 2012, Bridgepoint reported financial results for 1Q 2012 (quarter ended 31 March 2012), lowered EPS guidance for fiscal year 2012, and held a conference call with investors.[68] The Company reported quarterly revenue of $250.4 million, EPS of $0.59 per share, and reiterated FY 2012 EPS guidance of $2.33 to $2.43 per share.[69] Both revenue and EPS were below consensus estimates of $252.1 million and $0.76 per share, respectively.

70.    On the conference call, a Barrington Research analyst, Joe Jansen, asked if there were any "pending issues" or if the Company had any comments following WASC's site visit in March 2012.[70]

> "[Jane McAuliffe, Bridgepoint CAO]: I don't think we're going to comment on the informal processes along the way. I think our intent really is to wait until we're through the whole process and then we'll be sure to give you an update at that time."
> **"BPI - Q1 2012 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **1 May 2012, p. 9.**

---

[68] "Bridgepoint Education Reports First Quarter 2012 Results," *PR Newswire*, Company press release, 1 May 2012, 7:01 AM.

[69] "Bridgepoint Education Reports First Quarter 2012 Results," *PR Newswire*, Company press release, 1 May 2012, 7:01 AM, "Bridgepoint Education 1st Quarter Profit Sinks 38 Pct, Instructional And Marketing Costs Rise," *Associated Press*, 1 May 2012.

[70] "BPI - Q1 2012 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents*, 1 May 2012, p. 9.

71. The Company continued to emphasize the positive impact that the student support initiatives were having on student persistence.

> "[Andrew Clark, Bridgepoint CEO]: Well, student persistence was strong across the board for us, and it's always been strong with graduate students, but we're really focusing on our students in their first three to four courses because that's typically where a student will choose to drop out of college. And so we focus strongly in that area. We've obviously done a lot of various things, including just the types of prospective students that we identify at the very beginning. And so it's paid off nicely across all parts of the enrollment base."
> **"BPI - Q1 2012 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **1 May 2012, p. 9.**

72. On the conference call, Gary Brisbee, a Barclays analyst, asked which initiatives in particular were responsible for improving student persistence. Jane McAuliffe responded that a combination of all the initiatives were responsible for improvements in persistence.

> "[Gary Brisbee, Barclays Analyst]: Wondering if you could give us some more color on which of the initiatives that you've talked about over the last few quarters were the most helpful in contributing to the persistence? And some of the things that I remember were smaller class sizes on the initial class, more of the fulltime faculty early in the course trying to drive more interaction with the students, and I think there were several other things you've talked about, but what's helping the most, what's not, any color on that would be great?
>
> [Jane McAuliffe, Bridgepoint CAO]: Hi, Gary. I think it's all of them. It's the focus on the orientation, it's the class size, it's putting doctorally prepared faculty in the classes, it is implementing faculty mentoring and peer review process to ensure quality in the classroom. It's really I think a combination of all those things. It's our focus on quality. It's our focus on increasing the value of that student experience that's so important to us. So it's all that combined, and then looking at our data analytics and making sure that we're tracking all the initiatives and we know what's having an impact. So I would say it's a multitude of things that we're looking at."
> **"BPI - Q1 2012 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **1 May 2012, pp. 16-17.**

000252
Exhibit 54

73. Analyst commentary related the Company's message about the positive impact that the initiatives were having on persistence.

> "Management attributed the improvement [in persistence] to the various student support and quality initiatives being implemented, despite a YoY increase in the number of graduating students."
> **"Q1 Review: Starts Growth to Resume in Q2, But Margin Pressure Persists," by Kelly Flynn, Credit Suisse, analyst report, 2 May 2012, p. 4.**

### 13. 9 July 2012: Ashford Was Denied WASC Accreditation

74. On 9 July 2012, prior to the start of trading, Bridgepoint announced that Ashford's application for initial accreditation was denied. According to the Company, "WASC found that Ashford had not yet demonstrated substantial compliance with certain of the WASC Standards for Accreditation."

> "Bridgepoint Education's Ashford University received notice on July 5, 2012 that the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges (WASC) acted to deny Ashford University's application for initial accreditation."
> **"Ashford University to Run Parallel Process of Appeal and Re-application for WASC Accreditation," *PR Newswire*, Company press release, 9 July 2012.**

> "WASC found that Ashford University had not yet demonstrated substantial compliance with certain of the WASC Standards for Accreditation, as would be required for initial accreditation. Ashford University intends to appeal this decision and simultaneously to undertake the process for reapplying for initial accreditation. Under WASC rules, if Ashford University decides to reapply for accreditation, the institution will be required to demonstrate that it has satisfactorily addressed the report's conclusions and has come into compliance with the WASC Standards of Accreditation."
> **Bridgepoint Education, Inc. Form 8-K, Item 8.01, filed on 9 July 2012.**

000253
Exhibit 54

75.     During trading that day, WASC published the letter and team report detailing the reasons for denial on its website.[71] WASC cited Ashford's failure to show compliance with its accreditation standards relating to student retention, persistence, and completion, and related factors.

> "Ashford has experienced dramatic growth in a short time – moving from 10,000 students in 2007 (the year following Ashford's last reaccreditation by HLC) to nearly 100,000 students in 2012, with new students entering 50 times a year. The challenges that this rapid growth and enrollment model present to management, quality, and student success cannot be overstated. Although the team found that Ashford has sought to keep pace by building its infrastructure to support this large number of online students, many of its most promising initiatives are recent, some only undertaken within the last year. The Commission acknowledges Ashford's efforts, many of which are important in addressing identified areas of needed improvement, but finds that the impact of these new and important undertakings cannot yet be measured and assessed."
> **Western Association of Schools & Colleges Letter to Elizabeth Tice, President and CEO of Ashford University, dated 3 July 2012, p. 4.**

> "As detailed in the team report, a large proportion of students who enter the degree programs at Ashford withdraw, most within a short period of time – nearly 128,000 students have withdrawn in the last five years, during which time 240,000 new students were enrolled. This level of attrition is, on its face, not acceptable. … As found by the team, Ashford has not yet developed a method to collect and display data on retention, persistence, and completion in a manner that can be easily understood, that lends itself to analysis, and that accounts for each student who is recruited and enrolled in a degree program. Ashford has only recently sought to understand and examine its high levels of attrition and to develop programs to support students to succeed in meeting their educational goals. The team found that in the months before the visit Ashford had initiated 11 action steps to improve retention and that some of them were only being piloted. … The Commission acknowledges recent efforts to better understand the data on student success, to make changes in support programs, and to adopt policies that are designed to improve retention; for example, the new student orientation program and the class-size reductions that were being piloted at the time of the visit. However, concerted and systematic approaches to

---

[71] According to reports, the letter and team report were made available at 1:00 PM EST that day. "The WASC denial letter as well as the field report should be posted at www.wascsenior.org at 10AM PDT." ("BPI: Update Following Conversation With Management," Trace Urdan, Wells Fargo, analyst report, 9 July 2012, p. 1.)

000254
Exhibit 54

improve retention, persistence, and completion, with evidence-based plans, targets, and timelines, are not in place and the impact of recent changes cannot yet be measured."
*Id.*, p. 4.

76.     Analyst commentary following the Company's announcement was decidedly negative. In fact, analysts from Credit Suisse considered WASC's denial a "significant negative surprise."[72]

> "To revisit our new rating, we would need to be comfortable that 1) HLC's substantial presence compliance process would be rather lengthy (i.e., beyond the deadline for the WASC decision on Ashford's reapplication); 2) significant increases in retention and evidence of Ashford addressing some of the go/no-go issues from the WASC report (full-time faculty, board independence); and 3) evidence that 'progress' rather than 'completion' would matter to WASC in the reapplication process (see our discussion about the quirks of the application process timing below)."
> **"Flying Too Close to the Sun; Downgrading to Market Perform," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 9 July 2012, p. 1.**

> "And language like '[addressing attrition levels will] require reconsideration of current student acquisition strategies,' 'improving persistence will be a challenge for the institution,' and 'for the online program it is not evident that the faculty is providing the range of academic service to the institution that will be essential to long-term sustainability' indicate to us that WASC sees a large gap between acceptable academic practices and those in effect at Bridgepoint.

> While concrete remedies are given in some instances, and the report notes many examples of strong practices at Bridgepoint, on the whole, it leads us to believe that Bridgepoint is not close to being accredited by WASC."
> *Id.*, p. 2.

> "Specifically, WASC cited six areas of deficiency. We view the shortcomings as more than just procedural and as fundamental issues that will take considerable effort to remediate. The deficiencies include: 1) high attrition and lack of robust methods to collect and analyze retention, persistence and completion data; 2) high spending levels on recruitment compared to instruction; 3) inadequate number of full time faculty with untested practices to unbundle faculty responsibilities among staff; 4)

---

[72] "WASC Denial a Negative Surprise," by Kelly Flynn and Patrick Elgrably, Credit Suisse, analyst report, 9 July 2012, p. 1.

relatively new program review that is not yet broadly adopted; 5) relatively new system of student assessment and concerns over rigor of coursework; and 6) lack of independence of Ashford's board from Bridgepoint."
**"Downgrading to Neutral on Heightened Regulatory Uncertainty," by Peter Appert and George Tong, Piper Jaffray, analyst report, 10 July 2012, p. 2.**

"BPI now faces uncertain process of addressing non-compliant items identified by WASC. In their action letter, WASC identified six areas of its accreditation standards under which Ashford had not yet demonstrated substantial compliance. While we have long viewed BPI's plan to switch its accrediting agency as a risk, we find WASC's list of non-compliant items to be long. In particular, we are concerned about Ashford's failure to meet WASC's standards with regard to full-time faculty, an item that we view as ideological in nature. We also note that WASC cited Ashford's relatively shorter operating history under its current model (in place since 2005) as an obstacle to some of the analysis required in the accreditation process, including student retention rates."
**"A University Between Two Regions – Alert," by Andrew Steinerman, *et al.*, JPMorgan, analyst report, 9 July 2012, p. 1.**

77.     Analysts noted the higher expected costs and spending required to meet WASC requirements, or alternatively, comply with HLC's "substantial presence" requirement.

"To reflect higher costs associated with spending to meet WASC requirements (but ignoring one-time relocation costs) and more conservative enrollment growth assumptions, we are trimming our 2012/2013 EPS estimates to $2.49/$2.25 from $2.45/$2.80. Our price target moves to $18 based on 8x 2013E EPS of $2.25. We lower our multiple to 8x from 12x to capture the increased regulatory uncertainty."
**"Downgrading to Neutral on Heighted Regulatory Uncertainty," by Peter Appert and George Tong, Piper Jaffray, analyst report, 10 July 2012, p. 1.**

"In our opinion, Bridgepoint must commit itself to either HLC or WASC and then put forth a plan that gives the respective Commission the ability to state that the institution is now reformed. Both of these actions are likely to be expensive."
**"BPI: Accreditation Stakes Raised, Bold Action Required Maintaining Outperform Rating," by Trace Urdan and Jeffrey Lee, Wells Fargo, analyst report, 10 July 2012, p. 2.**

78.     That Ashford was denied accreditation from WASC caused many analysts to question the credibility of management and further adjust downward their valuations of the Company.

37

"Based on conversations we have had today, we believe management has lost a significant amount of credibility with investors, which we expect will be a long-term headwind to valuation even as business fundamentals and the student value proposition (debt to income, costs, etc.) are currently better than most companies in the group."

**"Flying Too Close to the Sun; Downgrading to Market Perform," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 9 July 2012, p. 2.**

"Leading up to the WASC decision, BPI has expressed cautious optimism relating to the likelihood of meeting WASC's accreditation standards, and seems very surprised by the negative decision. WASC plans to publicly release a copy of its visiting team report and WASC action letter this afternoon, which should provide further clarity into its decision making process and rationale."

**"Ashford Denied WASC Accreditation," by Gary Bisbee and Zachary Fadem, Barclays, analyst report, 9 July 2012, p. 3.**

79.   Given the deficiencies highlighted by WASC, analysts were concerned that the Institution's accreditation with HLC could be placed under review.

"In addition, the report *could be* viewed as a road map for future accreditation decisions not just by WASC, but by HLC, Bridgepoint's current accreditor. … We would not be surprised to see 2012 guidance pulled or revised downward on the second-quarter call in light of the transition period the institution will likely be entering to ensure accreditation compliance (with either WASC or HLC, or both, if the company chooses to walk that tightrope)."

**"Flying Too Close to the Sun; Downgrading to Market Perform," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 9 July 2012, p. 2 (emphasis added).**

"In light of the numerous, significant deficiencies (in our view) highlighted in WASC's report, we are concerned that Ashford's HLC accreditation *may now* also be called into question. Ashford remains accredited by HLC through 2014-15, but future reviews by HLC may be contentious. The HLC has been publicly rebuked for being too lenient on For Profits in the past, which puts even more pressure on HLC to be tough in any future review of BPI."

**"Ashford University's WASC Rejection Shifts Focus to HLC," by Paul Ginocchio and Adrienne Colby, Deutsche Bank, analyst report, 9 July 2012, p. 1 (emphasis added).**

38

"WASC's accreditation denial *could* potentially serve as a negative precedent when HLC reviews Ashford's accreditation in 2014. Each of the potential options available to BPI create potentially meaningful near- and long-term costs. In the worse-case scenario, which we view as very unlikely, Ashford could lose regional accreditation, thereby potentially losing access to Title IV funding for students."
**"Downgrading to Neutral on Heightened Regulatory Uncertainty," by Peter Appert and George Tong, Piper Jaffray, analyst report, 10 July 2012, p. 2 (emphasis added).**

"In our view, [Bridgepoint] has become an embarrassment and a liability to HLC, which has been criticized for allowing it to grow so rapidly, and it represents a hot potato to WASC to which it has applied for accreditation. Both accreditors themselves are feeling the heat of criticism from members of Congress and the Department of Education for historically lax oversight of the sector."
**"BPI: Accreditation Stakes Raised, Bold Action Required Maintaining Outperform Rating," by Trace Urdan and Jeffrey Lee, Wells Fargo, analyst report, 10 July 2012, p. 2.**

"We believe there is a heightened risk of a Higher Learning Commission (HLC) program review following a conversation with a source knowledgeable with both the processes and politics of HLC accreditation. We are persuaded that the findings in the Western Association of Schools and Colleges (WASC) team report published Monday *could* trigger an HLC review every bit as comprehensive as that undertaken by WASC."
**"BPI: WASC Report Likely Affects HLC Status Review Could be Triggered Irrespective of Substantial Presence," by Trace Urdan and Jeffrey Lee, Wells Fargo, analyst report, 11 July 2012, p. 1 (emphasis added).**

14.     13 July 2012: HLC Places Ashford on Special Monitoring Status

80.     On 13 July 2012, Bridgepoint announced that HLC had placed Ashford University on special monitoring status. HLC required the Institution to submit a report no later than 10 August 2012 demonstrating that it was in compliance with the HLC's Criteria for Accreditation, including "in the areas of student completion and retention."[73]

"The Board of Trustees of the Higher Learning Commission of the North Central Association of Schools and Colleges (HLC) met on July 11, 2012 to consider the recent action by the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges (WASC) concerning Bridgepoint Education's Ashford University.

---

[73] Bridgepoint Education, Inc. Form 8-K, Item 8.01, filed on 13 July 2012.

On July 12, 2012, Ashford University received a letter from the HLC communicating its Special Monitoring status to confirm compliance with the Commission's Criteria for Accreditation, including the Minimum Expectations. In an effort to ensure that the University continues to satisfy HLC's accreditation requirements, the HLC Board of Trustees is requiring Ashford University to provide a report by August 10, 2012."

**"Ashford University Receives Notification from HLC,"** *PR Newswire*, **Company press release, 13 July 2012.**

"The University's report must demonstrate that the University remains in compliance with the HLC's Criteria for Accreditation and include: (i) evidence that Ashford University meets the HLC Criteria for Accreditation relating to the role and autonomy of the University's governing board and its relationship with Bridgepoint Education, including the role of faculty in overseeing academic policies and the integrity and continuity of academic programs, (ii) evidence that Ashford University's resource allocations are sufficiently aligned with educational purposes and objectives in the areas of student completion and retention, the sufficiency of full-time faculty and model for faculty development, and plans for increasing enrollments, and (iii) evidence demonstrating that Ashford University has an effective system for assessing and monitoring student learning and assuring academic vigor."

**Bridgepoint Education, Inc. Form 8-K, Item 8.01, filed on 13 July 2012.**

81. In response to Ashford being placed on special monitoring status by HLC following WASC's denial of accreditation, analyst commentary attributed Bridgepoint's negative stock price reaction to the increased risk that Ashford could lose its HLC accreditation.

"BPI's regulatory challenges are mounting, with the risk of losing accreditation having driven further significant downside in the stock. … The worst-case scenario for BPI is a determination by HLC that Ashford is in violation of accreditation standards, resulting in a withdrawal of the university's accreditation. This would deny students access to Title IV funding and effectively put the company out of business. Alternatively, HLC could impose less severe sanctions that might require ongoing monitoring of operations and compliance. The best-case scenario is continued full accreditation. This range of outcomes obviously creates meaningful near-term regulatory uncertainty that we are unable to reliably handicap at this point."

**"Regulatory Uncertainty Mounts," by Peter Appert and George Tong, Piper Jaffray, analyst report, 13 July 2012, p. 1.**

000259
Exhibit 54

"Reduce Target to $10. This target change relates more to WASC report details than to today's news. Since taking our target to $15, we have reviewed the WASC report and considered the potential outcomes; we now think the issues Ashford must address with HLC relate to academic quality, not geographic presence."

**"HLC News No Big Surprise, But Reduce Target," by Kelly Flynn and Patrick Elgrably, Credit Suisse, analyst report, 13 July 2012, p. 1.**


"HLC has announced that it will have a team on the ground in 60 days. This is faster than we had presumed and could suggest a less thorough review than that performed by WASC for its report. Nevertheless, a site visit in September could allow for a report prior to the November meeting of HLC Governing Board. This could allow for sanctions earlier than we had anticipated. The sanctions could include Show Cause or Probation, which would start a 12-month clock during which the University would have to satisfy any identified issues. In the latter case, the University would be prevented from accessing Title IV. While this seems excessively punitive given the generally strong quality of Ashford's service to students, it cannot be ruled out as a possibility."

**"BPI: Second Shoe Drops; HLC Announces Review," by Trace Urdan, Wells Fargo, analyst report, 13 July 2012, p. 1.**


"HLC will review this report at its February 2013 meeting, where it will decide whether to continue accreditation, with or without further monitoring, continue accreditation under sanction or 'show cause' order, or withdraw accreditation. Management noted it is cooperating with HLC's request. Given the WASC denial, we are not completely surprised by the HLC's heightened scrutiny, though we expect this may put further pressure on the stock."

**"Faces Further Accreditation Scrutiny," by Jeffrey Silber and Paul Condra, BMO, analyst report, 13 July 2012, p. 1.**


"We have reviewed our valuation of Bridgepoint in light of the recently increased risks to Ashford University's HLC accreditation following the WASC rejection of BPI's application for transfer of accreditation. … Our target is based on our scenario analysis and reflects 3.8x our 2012E EPS and 1.0x 2012E EBITDA, a deep discount to online peers due to BPI's accreditation risk. Downside risks include: loss of accreditation; lower-than-expected enrollment growth due to competition, accreditation issues, or self-imposed changes; higher operating costs to comply with accreditor standards; and higher sales & marketing costs to increase brand awareness.

**"Lowering Price Target Based On Five Potential Scenarios," by Paul Ginocchio and Adrienne Colby, Deutsche Bank, analyst report, 26 July 2012, p. 1.**

41

# IV.    LOSS CAUSATION

82.    Over the course of the Class Period, the alleged misrepresentations and omissions about the Company's systematic failure to address issues related to student retention and persistence caused the price of Bridgepoint stock to be artificially inflated. The disclosures on 9 July 2012 and 13 July 2012 revealed that "Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition,"[74] and "that Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion."[75] The disclosure of the ramifications of these failures caused the artificial inflation in the price of Bridgepoint stock to dissipate, causing the stock price to fall, and thereby causing investor losses.

83.    These conclusions are based on generally accepted principles of finance and valuation, Company statements, analyst reports, analysts' valuation models, and an event study focusing on the empirical reaction of the stock price to the corrective disclosures.

###    A.    The Company Deemed Information about Retention and Persistence Material

84.    The Company itself frequently acknowledged the importance of persistence and retention.

> "[Jeff Silber, BMO Capital Markets Analyst]: Okay, great. That helped. I just wanted to double-check on that. You mentioned a few times in your remarks about the improvement in persistence. I am wondering if we can just get a little bit more color on exactly what you guys are doing? Thank you so much.
>
> [Andrew Clark, Bridgepoint CEO]: Sure Jeff. Well as you know, we instituted a lot of quality initiatives back in 2010. We saw what we thought were some positive changes from that as early as the second quarter last year. And we continue to realize the positive outcomes from that in the third quarter and fourth quarter, and now again in the first quarter. So everything

---

[74] Complaint, ¶96.

[75] Id.

that we implemented last year has really done what we thought it would do, which is improve our persistence. We continue though to focus on that. It's going to be, as I mentioned, more challenging in the quarters going forward just because the year-over-year comparison, but we will continue to focus on that relentlessly."

**"BPI – Q1 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **3 May 2011, p. 8.**

"[Brandon Dobell, William Blair Analyst]: A couple of questions for you. You talked about improving persistence, I wondered if you could give us a little more color on that? In particular are you seeing, I guess, more improvement or more progress with students who are in their second, third, fourth, fifth course kind of timeframe or ones that are have been there for a year and they are staying longer? I think it is kind of implied within that the sustainability of the increases. Do you think they are or do you think it's more of a short-term bump that is kind of a knock-on effect from the orientation program?

[Andrew Clark, Bridgepoint CEO]: I think it's not a short-term impact, as evidenced by the full-year that we have seen and an increase in persistence. So, I think we will continue to see the level going forward that we have seen over the last year. On a year-over-year comparison it is going to be – become more difficult in that regard, but we should be, I think, close to the same level. So we are pleased overall with our initiatives, Brandon. We are not going to just stop and kind of say that we're happy and we are not going to do anything more. I think we all believe that there is increased opportunities and we will continue to pursue those throughout the year."

*Id.*, **p. 10.**

"[Andrew Clark, Bridgepoint CEO]: Persistence in the second quarter was relatively flat compared to last year's strong second quarter level. We continue to believe that maintaining a high level – high persistence level is an important goal for both of our institutions and demonstrates that our institutions are successfully engaging students and delivering a quality education experience that enhances student's lives. We will continue to focus on improving persistence despite tougher year-over-year comparisons in this quarter and for the remainder of the year."

**"BPI - Q2 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **2 August 2011, p. 3.**

"[Andrew Clark, Bridgepoint CEO]: Yes, and I would just emphasize, Brandon, that as I said in my opening remarks, we made a tremendous investment into data analytics and into that group internally within the organization, and predictive modeling, and really understanding the characteristics and the behaviors of students that ultimately are successful academically and end up graduating from our institutions. … So I think that

even with increased students graduating, even with difficult comps, all the quality initiatives and data analytics, predictive modeling we are doing are going to lead to an opportunity to see improved persistence in 2012."
**"BPI - Q3 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **1 November 2011, p. 10.**

"[Andrew Clark, Bridgepoint CEO]: And that's saying a lot because we're coming off difficult comps in that regard. So, I think that's one real bright shining spot and it's the ultimate metric in our industry. If I was an investor, the thing that I'd want to know most about with any public education company is, what does persistence look like, can I measure it, could it give me all that information, and can I look at that trend over a year-over-year-over-year-year-over-year basis. We even give out cohort persistence as you know on our fourth quarter earnings call and we give that historically over four years to really try and provide that transparency."
**"William Blair & Company Global Services Growth Stock Conference,"** *Bloomberg*, **Investor conference, 7 December 2011, pp. 3-4.**

"[Andrew Clark, Bridgepoint CEO]: Our analysis has shown that increased investment in 2012 in the areas of smaller class sizes, increased monitoring of faculty and student interaction, and addressing students who may be facing challenges earlier in their program will likely lead to increased student persistence and graduation rates over the longer term."
**"BPI - Q4 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **6 March 2012, p. 9.**

"[Andrew Clark, Bridgepoint CEO]: So I think from a trend perspective, my view, like I said in our guidance, we have considered an increase in persistence on a year-over-year basis and if persistence increased by 50 basis points each year, that's quite meaningful to our institutions and ultimately to the Company. So I don't have a specific number for you but I will tell you that all the investments we have made and that we're going to make throughout 2012 we think will improve our persistence this year and will continue to improve it in 2013."
*Id.*, **p. 19.**

"[Andrew Clark, Bridgepoint CEO]: Our institutions are constantly looking to improve on metrics like persistence and graduation and our guidance does have an improvement in persistence this year over last year, which is meaningful because our persistence increased pretty well last year because of the initiatives that we had done previously. Graduation, as you have seen, also those rates have trended nicely. I think all of the investments we are making here, the increased investment in student recruitment in terms of trying to attract prospective students that we know from our data analytics that the cost of that, the increased cost of that is offset by better persistence

44

over the long-term, which we piloted that this past year towards the end of the year. And we have data that supports that thesis. We know that all of these initiatives, the class size, all of these things will lead to us improving our metrics, so when we have our fourth-quarter earnings call next year, I would anticipate that again when we lay out these quality metrics as we have done today, that you will see improvement on a year-over-year basis."
***Id.*, p. 14.**

"[Andrew Clark, Bridgepoint CEO]: Well, student persistence was strong across the board for us, and it's always been strong with graduate students, but we're really focusing on our students in their first three to four courses because that's typically where a student will choose to drop out of college. And so we focus strongly in that area. We've obviously done a lot of various things, including just the types of prospective students that we identify at the very beginning. And so it's paid off nicely across all parts of the enrollment base."
**"BPI - Q1 2012 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **1 May 2012, p. 9.**

"[Andrew Clark, Bridgepoint CEO]: I think probably it's, you know, we do think it will persist through the year. It's primarily probably conservatism on our part, but as I said, Gary, last fall in the last earnings call even on very difficult comparisons on a year-over-year basis we expect our retention to continue to improve throughout 2012."
***Id.*, p. 17.**

"[Andrew Clark, Bridgepoint CEO]: Consistent with the measures that underlie accreditation, our most intense focus will be on those key areas that validate the strength of Ashford's education model. Retention, persistence, learning outcomes, graduation rates, and all of the factors that contribute to success in these areas. In every instance, the goal continues to be to improve those aspects of our operating model that demonstrate its educational effectiveness and its ability to deliver value and opportunity through the educational success of our students. Ashford's investment in student initiatives, together with the potential effect of recent regulatory actions on new students and student retention, reduces our financial and operating visibility. As a result, we have elected to suspend the full year 2012 financial guidance that we customarily provide on these quarterly calls."
**"BPI – Q2 2012 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **7 August 2012, p. 3.**

### B. Analysts Deemed Information about Persistence and Retention Material

85. As evident in the following analyst conference call questions and comments, and excerpts from analyst reports published during the Class Period, the Company's persistence and retention, and the impact of those factors on accreditation, were important to Bridgepoint's business and valuation.

> "[Brandon Dobell, William Blair Analyst]: A couple of questions for you. You talked about improving persistence, I wondered if you could give us a little more color on that? In particular are you seeing, I guess, more improvement or more progress with students who are in their second, third, fourth, fifth course kind of timeframe or ones that are have been there for a year and they are staying longer? I think it is kind of implied within that the sustainability of the increases. Do you think they are or do you think it's more of a short-term bump that is kind of a knock-on effect from the orientation program?"
>
> **"BPI - Q1 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents,* 3 May 2011, p. 10.**

> "To that end, management noted that student persistence increased for the fourth consecutive quarter in Q1/11, resulting in better-than-expected revenue but also reinforcing that the student support initiatives BPI made in 2010 to enhance student persistence are working."
>
> **"Bridgepoint Education, Inc.:Q1 Results; Another Strong Quarter," by Alexander Paris Jr., Barrington Research, analyst report, 4 May 2011, p. 1.**

> "With the quarter's outperformance on enrollments, it appears management is expecting tougher retention (could be graduations or just structural declines in persistence) or much lower starts in the back half of 2011."
>
> **"Raising Estimates; Valuation Attractive; Catalyst Will Be Third-Quarter Starts," by Brandon Dobell, William Blair, analyst report, 2 August 2011, p. 3**

> "In recent quarters, BPI reiterated its focus on initiatives designed to establish student preparedness (e.g., orientation programs) and increase student retention. Also, in 4Q10, the company began rolling out its new admissions counselor evaluation policy in compliance with the new regulations that took effect July 1. We would be interested in mgmt's comments about the impact of these initiatives on new enrollments and student retention."
>
> **"Beat-and-Raise in 2Q11 for BPI, But Growth Challenges in 2H11 – Alert," by Andrew Steinerman, *et al.*, JPMorgan, analyst report, 2 August 2011, p. 1.**

46

"Student persistence remains a concern. BPI reiterated its focus on initiatives designed to establish student preparedness (e.g., orientation program) and increase student retention. While we appreciate BPI's efforts, we note that 2Q11 student persistence declined ~70 bps y/y and 2H11 guidance implies further persistence pressure. In addition, BPI is facing enrollment headwinds from larger graduating classes, which will further pressure student persistence."

**"Solid 2Q11 Results for BPI, But Growth Challenges Are Looming Ahead," by Andrew Steinerman, *et al.*, JPMorgan, analyst report, 3 August 2011, p. 1.**

"Student persistence is a holy grail of higher education. BPI reiterated its focus on initiatives designed to establish student preparedness (e.g., orientation program, raised age requirements) and increase student retention. While we appreciate BPI's focus, we note that 2Q11 student persistence declined ~70 bps y/y and 2H11 guidance implies further persistence pressure. In addition, BPI is facing enrollment headwinds from larger graduating classes (more graduates in 2011 than in the previous four years combined)."

**"BPI's Low Price Supports Its Relative Start Strength, But Regulatory Items Remain – Alert," by Andrew Steinerman, *et al.*, JPMorgan, analyst report, 19 September 2011, p. 1.**

"Commentary on the call regarding fourth quarter starts and retention trends will be the key for the stock, in our view, even with the continuing margin upside Bridgepoint is posting."

**"Solid Third-Quarter Performance; Maintain Outperform," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 1 November 2011, p. 1.**

"In addition, while management is focused on student retention, increased graduating classes over the next few quarters should further impact student persistence (in our calculations). If BPI management is not able to return positive start growth by 3Q12, actual results may be worse than our estimates."

**"Another Beat-and-Raise in 3Q11 Despite Growth Challenges – Follow-up," by Andrew Steinerman, *et al.*, JPMorgan, analyst report, 1 November 2011, p. 4.**

"Sequential retention rate up y/y. While management does not disclose this, we have calculated a sequential retention rate using beginning enrollment, adding new starts in the quarter and then subtracting ending enrollment. As the net result includes both drop-outs and graduates, it is tough to create a true retention rate. In addition, there is some seasonality in this metric.

47

Nevertheless, we believe the trend analysis is useful. As shown in Exhibit 3, sequential retention rates were 81.1% in 3Q11 – the highest since 1Q08. Management said persistence was up y/y, attributed to student quality initiatives, despite an increasing number of graduates in 2011."
**"More on 3Q11; Raising Ests. and Target," by Jeffrey M. Silber and Paul Condra, BMO, analyst report, 1 November 2011, p. 4.**


"[Brandon B. Dobell, William Blair Analyst]: Okay. Some of the schools in the group and I think to a certain extent you guys included given the rapid growth '08, '09, and '10 have the opposite effect of happening in '11, '12, '13, '14. A lot of students going out of the institution as they graduate, how do we think about that the impact on the population of the higher graduations? And then excluding that, how has persistence trended? Have you seen any changes there in recent quarters?"
**"William Blair & Company Global Services Growth Stock Conference," *Bloomberg*, Investor conference, 7 December 2011, pp. 3-4.**


"Management cited a number of things including technology, learning outcomes, marketing, and improving class sizes as areas for investment. The class size initiative stuck out for us in part because the company's gross margins have been a source of contention among investors since the IPO and in part because we expect the accreditors are sensitive to it in the context of student retention and learning outcomes."
**"Kicking the Hornet's Nest: Thoughts on the HLC/WASC Process," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 27 March 2012, p. 4.**


"To revisit our new rating, we would need to be comfortable that 1) HLC's substantial presence compliance process would be rather lengthy (i.e., beyond the deadline for the WASC decision on Ashford's reapplication); 2) significant increases in retention and evidence of Ashford addressing some of the go/no-go issues from the WASC report (full-time faculty, board independence); and 3) evidence that 'progress' rather than 'completion' would matter to WASC in the reapplication process (see our discussion about the quirks of the application process timing below)."
**"Flying Too Close to the Sun; Downgrading to Market Perform," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 9 July 2012, p. 1.**


"And language like '[addressing attrition levels will] require reconsideration of current student acquisition strategies,' 'improving persistence will be a challenge for the institution,' and 'for the online program it is not evident that the faculty is providing the range of academic service to the institution that will be essential to long-term sustainability' indicate to us that WASC sees a large gap between acceptable academic

practices and those in effect at Bridgepoint. While concrete remedies are given in some instances, and the report notes many examples of strong practices at Bridgepoint, on the whole, it leads us to believe that Bridgepoint is not close to being accredited by WASC."
*Id.*, **p. 2.**

## V.     EMPIRICAL CONFIRMATION OF LOSS CAUSATION

86.     Over the course of the Class Period, the alleged misrepresentations and omissions caused the price of Bridgepoint stock to be artificially inflated. Ultimately, the Company publicly disclosed that WASC denied Ashford's accreditation because the Institution had failed to demonstrate substantial compliance with WASC Standards of Accreditation. The Company also ultimately revealed that Ashford was being put on special monitoring by HLC because of WASC's denial of accreditation. These disclosures informed the public that contrary to Defendants prior statements, "Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition,"[76] and "that Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion."[77] The disclosed information and its direct ramifications caused the artificial inflation to dissipate, which in turn caused the stock price to decline and investors to suffer losses.

87.     These conclusions, compelled by financial valuation principles, Company statements, and analyst commentary and valuation models, as described above, are also proved empirically by event study analysis focusing on the reaction of the Bridgepoint stock price to the corrective disclosures.

---

[76] Complaint, ¶96.

[77] *Id.*

### A.    Event Study

88.    In order to determine whether corrective information related to the alleged misstatements and omissions caused losses to investors, I conducted an event study. An event study examines whether a security price reacts to the release of new information. A statistically significant stock price reaction in response to the release of new information indicates that the new information caused the price change.

89.    Event study analysis is one of the most commonly used analytic methodologies employed by finance researchers. MacKinlay [1997] presents a description and examples of the methodology and writes about how it is generally accepted and widely used in academic research.[78] Crew, *et al.*, [2007] write about how the methodology is generally accepted and widely used in forensic applications.[79]

90.    An event study measures how much a stock price rises or falls in response to new information. It first determines how much of a stock price change cannot be explained by market and sector peer group factors. The portion of a stock price change that cannot be attributable to market and sector factors is called the residual stock price movement or "residual return." The event study isolates the residual return and also tests whether the residual return can reasonably be explained as merely a random fluctuation.

91.    If the stock's residual return is deemed statistically significant, it indicates that the stock price movement cannot be attributed to market and sector factors, or to random volatility, but rather was caused by new company-specific information.

---

[78] "Event Studies in Economics and Finance," A. Craig MacKinlay, *Journal of Economic Literature*, March 1997.

[79] "Federal Securities Acts and Areas of Expert Analysis," by Nicholas I. Crew, *et al.*, in Chapter 18 of the *Litigation Services Handbook*; *The Role of the Financial Expert*, 4th edition, edited by Roman L. Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, John Wiley & Sons, Inc., 2007.

000269
Exhibit 54

<u>1.</u>    <u>Disclosure Events</u>

92.    I reviewed a wide variety of information sources, including news articles, press releases, equity analyst reports, and SEC filings, to determine when corrective information related to the alleged misrepresentations and omissions was disseminated. The following two partially corrective events were identified:

    i.    **9 July 2012** – prior to the start of trading, Bridgepoint announced that WASC found that Ashford "had not yet demonstrated substantial compliance with certain of the WASC Standards of Accreditation,"[80] and as a result denied Ashford accreditation. During trading that day, WASC cited Ashford's failure to show "substantial compliance with its accreditation standards related to student retention and graduation," among other things.[81]

    ii.    **13 July 2012** – prior to the start of trading, Bridgepoint announced that HLC placed Ashford on "Special Monitoring status to confirm compliance with the Commission's Criteria for Accreditation."[82] HLC's action was due to WASC's findings and accreditation denial. HLC required the Institution to submit a report no later than 10 August 2012, demonstrating that it was in compliance with the HLC's Criteria for Accreditation, including "in the areas of student completion and retention."[83]

<u>2.</u>    <u>Isolating the Impact of Company-Specific Information</u>

93.    One component of an event study is to determine how much of a company's stock returns are attributable to market and sector effects, so that these factors can be isolated and removed.

---

[80] "Ashford University to Run Parallel Process of Appeal and Re-application for WASC Accreditation," *PR Newswire*, Company press release, 9 July 2012.

[81] "Shares of Bridgepoint Education Tumble 30 Percent On Accreditation Denial," *Associated Press*, 9 July 2012.

[82] "Ashford University Receives Notification from HLC," *PR Newswire*, Company press release, 9 July 2012.

[83] Bridgepoint Education, Inc. Form 8-K, Item 8.01, filed on 13 July 2012.

000270
**Exhibit 54**

94.     The method, which is generally accepted and widely used in econometric modeling, first involves running a regression to determine how the Company's stock price typically behaves in relation to the overall stock market and its industry sector. Then, the regression model is used to determine how much of each event day's actual return is explained by the market and sector factors (the "explained return"). The actual return minus the explained return is the residual return, which measures the stock return after removing both the market and industry effects.

95.     In this case, the regression analysis removed from the returns of Bridgepoint stock that portion explained by the overall stock market and the Peer Index, thereby isolating Bridgepoint residual returns. I used the same regression as presented and described in my August Report. The data, Market Index, Peer Index, dummy variables, and estimation period were the same as the regression presented in that report. I computed the explained portion of Bridgepoint's stock return on the event date by adding: 1) the estimated regression intercept term, 2) the day's Market Index return multiplied by the Market Index coefficient estimated by the regression, and 3) the day's Peer Index return multiplied by the regression's Peer Index coefficient.

96.     I then computed the residual return for the event date by subtracting that day's explained return from the actual return.

97.     I ran the regression on daily returns covering the entire Class Period, using dummy variables to control for potentially abnormal returns on the earnings and guidance announcement dates, and the disclosure dates tested in my August Report.

> ### 3.      *t*-test

98.     For each event, a statistical test called a *t*-test was conducted to determine whether the residual return of Bridgepoint's stock can be explained by random volatility, or alternatively must have been caused by Company-specific information. A *t*-test compares the residual return on an event date to the typical residual return exhibited over the estimation (control) period. If the event date residual return is far greater (positively or negatively) than the typical residual return, the *t*-test indicates that the

residual return in question cannot have been caused by random volatility alone – *i.e.*, it is statistically significant.[84]

99. The event study results are presented below and summarized in Exhibit-3. As shown in Exhibit-3, Bridgepoint's stock price experienced statistically significant declines at the 95% confidence level on the disclosure event dates: 9 July 2012 and 13 July 2012. The statistical significance of these declines indicates, to a high degree of statistical certainty, that Company-specific information caused the residual declines in the price of Bridgepoint's stock on those days.

100. Exhibit-4 presents event study metrics for all dates in the Class Period.

## B. Event Study Results and Analysis: 9 July 2012

### 1. Significant Stock Price Decline

101. On 9 July 2012, Bridgepoint stock fell 41.13% (on a logarithmic return basis). The Market Index return was -0.23%, and the Peer Index return was -1.46%. According to the regression results, the explained portion of Bridgepoint's stock return on that day was -0.81% and the residual return was -40.32%, or $7.13 per share. The residual return is the estimate of the return Bridgepoint stock would have experienced absent any market and peer group effects.

102. A residual return of -40.32% is an unusually large negative one-day return for Bridgepoint common stock. That residual return is associated with a *t*-statistic value of -16.45, which indicates that the residual return was too severe to have been a random fluctuation. The likelihood of obtaining a residual return of this magnitude and associated *t*-statistic given that particular explanation is virtually nil. Therefore, the stock return is deemed statistically significant.

---

[84] The test is called the *t*-test because it involves the computation of a *t*-statistic, which is the event date residual return divided by the standard deviation of residual returns from the estimation period. If the absolute value of the *t*-statistic is greater than the critical *t*-statistic value (1.97 for large samples), the likelihood that the residual return could have been caused by random volatility alone is less than 5%, which is generally accepted to be so unlikely that the random volatility explanation can be rejected.

103. The magnitude of the residual return on 9 July 2012 and its statistical significance indicate that, to a high degree of statistical certainty, the price of Bridgepoint stock decreased in response to the negative Company news that day. In fact, such a large *t*-statistic enables one to state with more than 99.99% confidence that the Bridgepoint stock decline that day did not occur by random chance alone, but instead was caused by the negative Company news.

2. Accounting for Potentially Confounding Information

104. I examined all of the Company-related news that emerged on 9 July 2012 and assessed the valuation impact, if any, of potentially confounding information. Prior to the start of trading on 9 July 2012, the Company disclosed that WASC had denied Ashford accreditation for not being in "substantial compliance with certain of the WASC Standards for Accreditation" required for initial accreditation.[85]

105. During trading that day, the WASC's denial letter and team report were made publicly available.[86] The WASC's denial letter described six areas in which Ashford failed to demonstrate a substantial level of compliance with WASC Standards.[87] However, as detailed below, the items cited by WASC as reasons for denying Ashford's accreditation are inseparably linked to the Company's inability to systematically and concertedly address its deficiencies in student retention and persistence.

106. While at least two of the standards explicitly list retention and persistence as core components, all of WASC's Accreditation Standards address elements that contribute to or reflect education effectiveness.

---

[85] Bridgepoint Education, Inc. Form 8-K, Item 8.01, filed on 9 July 2012. According to EDGAR, the Company's filing was accepted at 7:04 AM on 9 July 2012.

[86] "The WASC denial letter as well as the field report should be posted at www.wascsenior.org at 10AM PDT." ("BPI: Update Following Conversation With Management," Trace Urdan, Wells Fargo, analyst report, 9 July 2012, p. 1.)

[87] Western Association of Schools & Colleges Letter to Elizabeth Tice, President and CEO of Ashford University, dated 3 July 2012, p. 4.

000273
Exhibit 54

"By design, elements of educational effectiveness are incorporated into all four Commission Standards, so that institutions explore the relationships between capacity and educational quality and effectiveness. Each of the four Accreditation Standards describes key elements of educational effectiveness."
**WASC Handbook of Accreditation, 2008, p. 8.**

107.   Throughout the Class Period, the Company, analysts, accreditors, and regulators stressed the fundamental link between retention and persistence improvement and the Company's continued accreditation. The Company itself acknowledged that:

    i.   Andrew Clark, Bridgepoint's CEO, acknowledged that persistence and persistence trends were the "ultimate metric in our industry. If I was an investor, the thing that I'd want to know most about with any public education company is, what does persistence look like, can I measure it, could it give me all that information, and can I look at that trend over a year-over-year-over-year-over-year basis."[88]

    ii.   "Across American higher education, very few issues garner as much attention at the moment as persistence and completion rates." [89]

    iii.   During the 3 May 2011 conference call with investors during which the Company spoke about WASC accreditation, Andrew Clark confirmed that "right now we are very focused on our initiatives for 2011 on student persistence, student graduation – anything we can do to improve the student experience in the classroom or administratively."[90]

108.   The market was also aware that improving retention and persistence was a fundamental key to accreditation based on statements made during the Senate HELP Committee hearings and by WASC, and as demonstrated by statements made by analysts throughout the Class Period:

---

[88] "William Blair & Company Global Services Growth Stock Conference," *Bloomberg*, Investor conference, 7 December 2011, p. 3.

[89] "Item 1: A Context for Retention and Graduation at Ashford University," Ashford University, March 2012, p. 3. [BPI010172 at 74].

[90] "BPI - Q1 2011 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents*, 3 May 2011, p. 18.

000274
Exhibit 54

i. During the public testimony of HLC's president at the Senate HELP Committee hearings, Senator Harkin emphasized the important connection between accreditation and retention, stating "So, again, I am wondering how you can reconcile accreditation based upon quality and support services when you have less than 50 percent retention rates for first-time entering undergraduates?"[91]

ii. In response to Senator Harkin, HLC's president stated, "There will be much greater emphasis on student persistence and completion. Frankly, that was one of the things that, from the traditional context that we came from, we had assumed. We need to place much more emphasis on that and to require our institutions, above all, to place much more emphasis on that. We will be doing that."[92]

iii. During a national presentation, WASC's president emphasized the importance of retention improvement for its accredited institutions, stating, "First, external validation of retention and graduation rates. For the last three years, we have made graduation rates central to our process we've made a part of every accrediting review. Our internal studies have shown that as institutions address retention and graduation, that there already is a considerable amount of data that institutions have, well beyond IPEDS, but that what institutions need is better application of that data, benchmarking of that data, and bringing the research that is available, how to bring or how to improve graduation, into the actual infrastructure of the institution."[93]

iv. Analysts understood the importance of retention improvement to accreditation. Commenting on WASC's accreditation process, analyst s at Signal Hill noted, "WASC also intends to measure and benchmark more

---

[91] "Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight," Hearing of the Committee on Health, Education, and Pensions United States Senate One Hundred Twelfth Congress, 10 March 2011, p. 33.

[92] *Id.*, p. 34.

[93] "Report of the Meeting of the National Advisory Committee on Institutional Quality and Integrity," NACIQI, U.S. Department of Education, Appendix-F, 8-10 June 2011, p. 282.

quantitative measures of student success, including retention and graduation rates. Accreditation review could result in a 'target' graduation rate – or several based on subgroups – that the institution could be working toward with a specific plan. Ashford's rates could be found wanting by WASC but measures already in place to address these outcomes measures should be viewed favorably."[94]

v. JPMorgan analysts referred to persistence as the "holy grail of higher education."[95] Wunderlich analysts noted that student persistence was an important factor for accreditation, stating that they "continue to believe that the primary driver of the softness in starts is the company's own effort to raise the quality of its student outcomes and to anticipate the sensibilities of WASC inspectors."[96]

vi. Recognizing the importance of retention improvement to WASC accreditation, analysts at William Blair stated, "We recognize the switch from Higher Learning Commission (HLC) to Western Association of Schools & Colleges (WASC) accreditation stands as a huge issue for many investors, but we remain confident Bridgepoint will be successful in this regard, particularly with its 'new' growth profile (in line with the group's growth, improving retention, etc.) as a backdrop for how WASC will view the risk of Bridgepoint becoming one of its institutions."[97]

vii. A First Analysis analyst also commented on WASC's accreditation redesign, stating, "We also think the fact WASC makes mention of graduation and retention rates is significant, given Ashford likely has room for improvement in those areas. That said, we believe WASC will be more concerned about the trend in Ashford's graduation and retention

[94] "WASC Accreditation Changes: Transparency Replaces Clubbiness," by Trace Urdan and Alexandra Chan, Signal Hill, analyst report, 21 June 2011, p. 2 [BPIK000223599, at 600].

[95] "BPI's Low Price Supports Its Relative Start Strength, But Regulatory Items Remain – Alert," by Andrew Steinerman, et al., JPMorgan, analyst report, 19 September 2011, p. 1.

[96] "Reducing Estimates to Better Match Guidance," by Trace Urdan and Jeff Lee, Wunderlich Securities, analyst report, 5 October 2011, p. 1.

[97] "Still Talking the Talk and Walk the Walk; Raising Estimates; Next Catalyst Will Be Fiscal 2012 Guidance," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 1 November 2011, p. 1.

000276
Exhibit 54

rates than where they stand currently. We think Ashford will be able to demonstrate current progress, and a commitment to making additional progress, toward improving student outcomes, which we believe will be more important to WASC than simply examining past outcomes. More broadly, we believe Ashford can present WASC with data and curricula that exhibit a strong focus on measuring and improving student outcomes, which we expect will be WASC's primary concern."[98]

109. As explained above, persistence and retention was the ultimate indicator by which regulators, accreditors, analysts, and the Company itself measured the quality of Ashford's educational effectiveness and performance. The Company failed to satisfy the key criteria that WASC was assessing: retention and persistence improvement. The reasons for denying accreditation were inseparably linked to the Company's systematic failures to understand and improve student retention and persistence. When the Company announced that WASC denied Ashford accreditation, the market understood that the Company had failed to meet the essential standards.

110. The observed -40.32% residual decline ($7.13 per share) was caused by the Company-specific corrective disclosures that day. A -40.32% logarithmic return translates to a -33.2% price decline, which was caused by the corrective disclosure.

### C.    Event Study Results and Analysis: 13 July 2012

#### 1.    Significant Stock Price Decline

111. On 13 July 2012, Bridgepoint stock fell 28.33% (on a logarithmic return basis). The Market Index return was 1.54%, and the Peer Index return was -0.42%. According to the regression model, on 13 July 2012 the explained return for Bridgepoint stock was 0.80% and the residual return was -29.13%, or -$3.28 per share.

---

[98] "View Changes in WASC Processes as Manageable," by Corey Greendale, First Analysis, analyst report, 15 November 2011, p. 1 [BPI064597].

112. A residual return of -29.13% is an unusually large negative one-day return for Bridgepoint common stock. That residual return is associated with a *t*-statistic value of -11.89, which indicates that the residual return was too severe to have been merely a random fluctuation. The likelihood of obtaining a residual return of this magnitude and associated *t*-statistic given that particular explanation is virtually nil.

113. The magnitude of the residual return on 13 July 2012 and its statistical significance indicate that, to a high degree of statistical certainty, Company-specific information caused the residual decline in Bridgepoint's stock price.

<div align="center">

2.     Accounting for Potentially Confounding Information

</div>

114. I found no other news on 13 July 2012 that would reasonably affect Bridgepoint's stock price. I therefore attributed the observed -29.13% residual decline ($3.28 per share) to the news in the Company's press release that day. A -29.13% logarithmic return translates to a -25.3% price decline, which was caused by the corrective disclosure.

**D.     Event Study Summary**

115. The statistical significance of the residual declines in the Bridgepoint share price on 9 July 2012 and 13 July 2012, following the corrective disclosures, coupled with analysis of potentially confounding information, prove that the corrective disclosures caused the stock price to decline on those days. It follows that the alleged misrepresentations and omissions, which were cured by the disclosures, had previously caused the Bridgepoint stock price to be artificially inflated, and thus were responsible for investor losses.

# VI.     ARTIFICIAL INFLATION RIBBON

116. Artificial inflation is the difference between what the stock price actually was at a point in time, and what the price would have been absent the alleged fraud. An inflation ribbon is a time series indicating how much artificial inflation caused by the alleged fraud was in the stock price on each day of the Class Period. When the stock

<div align="center">

59

</div>

price falls on account of a corrective disclosure, inflation dissipates. Inflation after such a corrective disclosure and significant price decline must be less than the inflation prior to the disclosure.

117. The record of significant residual stock price reactions to the corrective disclosures allows one to observe how much total artificial inflation had been in the stock price during the Class Period. The sum of these residual returns measures how much artificial inflation in total exited the stock price, and therefore also measures how much artificial inflation had previously existed in the stock price.

118. The inflation ribbon is constructed by working chronologically backwards from the final corrective disclosure on 13 July 2012, and cumulating the two fraud-related residual price declines as they occurred. Using the fraud-related price declines on and after a corrective disclosure date to measure the amount of inflation that was in the stock price prior to that date is a widely used and generally accepted methodology.[99] The inflation just prior to a partially corrective disclosure must be the inflation remaining afterward plus the inflation the disclosure dissipated.

119. According to the Complaint, and detailed above, Defendants misrepresented or failed to disclose that Ashford could not effectively collect and analyze data on retention, persistence, and completion, and failed to implement concerted and systematic approaches to improve retention and persistence. Had analysts and investors been informed at the start of the Class Period, and throughout, of the Company's systematic failures in the fundamental areas of persistence and retention, rather than learning of this information through the corrective disclosures on 9 July 2012 and 13 July 2012, the stock price would have fallen at the start of the Class Period to reflect these adverse facts.

120. Assuming Plaintiffs' allegations and based on an analysis of case facts and documents, I have determined that Bridgepoint's stock price was artificially inflated by 50.1% at the start of the Class Period, measured by the percentage declines that occurred when the corrective disclosures were made. I estimate that had analysts and investors been

---

[99] See, for example, "Constructing the But-for Value Line," by Nicholas I. Crew, Kevin L. Gold, and Marnie A. Moore, chapter 18 in *Litigation Services Handbook: The Role of the Financial Expert*, 4th edition, edited by Roman L. Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, John Wiley & Sons, 2007, pp. 18.12-15.

informed at the start of the Class Period about the Company's systematic failure to understand and improve its persistence and retention, the stock price would have fallen 50.1% at the start of the Class Period to reflect these adverse facts. The computation of this percentage inflation is described below.

### A. Dollar-Based Inflation Ribbons Versus Percent-Based Inflation Ribbons

121. Two types of inflation ribbons are commonly used to compute damages in securities cases, dollar-based and percent-based. The level of the dollar-based inflation ribbon on any particular date is the sum of all subsequent fraud-related residual dollar returns. The underlying assumption is that the dollar value of the information provided on a disclosure date is the same on all previous dates as it was observed to be on the disclosure date.

122. The level of the percent-based inflation ribbon is the aggregate of the subsequent fraud-related residual percent returns. The assumption underlying the use of the percent-based inflation ribbon is that the impact of the misrepresentations and omissions on the stock price is the same percentage of the stock price over the course of the Class Period as it was observed to be on the disclosure date. The percent-based inflation ribbon can be expressed in percentage terms or translated into dollar values corresponding to the constant percentages.

123. The appropriate inflation ribbon depends on the type of information allegedly misrepresented. For example, a dollar-based ribbon may be appropriate if the information at issue pertains to a fixed value of a particular asset or a fixed amount of non-recurring income. If, on the other hand, the information pertains to a stated fraction of all future earnings, or to impairment of an asset whose value fluctuates in proportion with the value of the company, then a percent-based ribbon may be called for.

124. In this particular case the alleged fraud involved concealment of systematic and concerted defects in the Company's business model. As such, the alleged fraud impacted the market's assessment of the Company's profitability, growth, and risk, rather than the constant value of any one particular asset. According to financial

principles, these factors underlie the valuation multiple that market participants typically use to value a stock. Consequently, given the facts and circumstances of this particular case, the alleged misrepresentations and omissions would have inflated Bridgepoint's stock price by a multiplicative factor, and therefore a percentage-based inflation ribbon is the more appropriate model of artificial inflation. The percentage inflation would generally remain constant, changing only when there were new material misrepresentations, omissions, or corrective disclosures.

125.    Because a stock price changes from day to day for a variety of reasons, including non-fraud related factors such as the overall stock market, the peer group, or other company developments, the dollar value of a constant percent inflation will also change from day to day.

###    1.    Computation of the Percent-Based Inflation Ribbon

126.    No artificial inflation remained in the stock price after 13 July 2012, the date of the final corrective disclosure. On 13 July 2012, the stock price fell 25.3% on account of disclosures related to the alleged fraud. This percentage price decline indicates that, prior to this disclosure, 25.3% of the observed stock price represented artificial inflation caused by the alleged misrepresentations and omissions. Just prior to that date the percentage-based inflation ribbon stood at 25.3% of Bridgepoint's stock price, and that 25.3% was the level of artificial inflation on each date since the prior corrective disclosure.

127.    On 9 July 2012, the fraud-related residual stock price decline was 33.2%, meaning that the stock price fell 33.2% due to the corrective disclosure. Artificial inflation equal to 33.2% of the stock price dissipated in response to that day's corrective disclosure. The level of the percent-based inflation ribbon just prior to that date must have been 50.1% of the observed stock price, which is a function of the 33.2% inflation that dissipated on 9 July 2012 and the 25.3% inflation that remained and dissipated later (13 July 2012).

128.    The formula for arriving at the 50.1% total percentage inflation prior to both the 33.2% inflation dissipation and the later 25.3% inflation dissipation is:

$$1 - (1 - 33.2\%) * (1 - 25.3\%) = 50.1\%$$

62

129. For example, if the stock were trading for $100 per share, and later shed 33.2% of its value due to artificial inflation dissipation, and then shed another 25.3% of its value due to another dissipation of artificial inflation, the stock would fall first from $100 to $66.80 per share, and then from $66.80 per share to $49.90 per share. The total decline due to dissipation of artificial inflation would be $50.10 per share, indicating that the total percentage inflation had been 50.1%.

130. As described above and as shown in Exhibit-5, the artificial inflation in the Bridgepoint stock price caused by the alleged fraud ranged up to 50.1% of the Company's stock price over course of the Class Period.

131. Also presented in Exhibit-5 is the dollar value corresponding to the percent inflation on each day over the course of the Class Period. The dollar value of the artificial inflation in the Bridgepoint stock price caused by the alleged fraud ranged up to $15.28 per share over the Class Period. That is, on 7 May 2012, when Bridgepoint stock traded at $20.34 per share and the percent inflation was 50.1%, the dollar inflation was $10.19 per share (equal to the $20.34 per share stock price multiplied by 50.1% inflation).

## VII. PER SHARE DAMAGE FORMULA

132. The measure of per share damages traditionally applied in Rule 10b-5 cases is the difference between the actual purchase price of the security and what would have been the purchase price of the security had there been no fraud or misrepresentation.

> "[M]any courts have adopted the out-of-pocket rule as the traditional measure of damages in Rule 10b-5 cases. The out-of-pocket measure rule defines damages as 'the difference between the contract price, or the price paid, and the real or actual value at the date of the sale, together with such outlays as are attributable to the defendant's conduct. Or, in other words, the difference between the amount parted with and the value of the thing received.' Typically, courts measure this as the plaintiff's purchase price less the true value at the time of the transaction. The true value is the price of the security in the absence of fraud or misrepresentation."
> **"Federal Securities Acts and Areas of Expert Analysis," by Nicholas I. Crew, Kevin L. Gold, and Marnie A. Moore, chapter 18 in *Litigation Services Handbook: The Role of the Financial Expert*, 4th edition, edited by Roman Weil, Peter Frank, Christian Hughes, and Michael J. Wagner, John Wiley & Sons, 2007, p. 18.6 (citations omitted).**

000282
Exhibit 54

133. However, the *Dura Pharmaceuticals* ("*Dura*") case decision clarified that recoverable damages are not the entire amount by which an investor overpaid for a security on account of fraud, but how much of that artificial inflation was actually lost by the investor on account of corrective disclosures that occurred during the investor's holding period. Therefore, recoverable damages are the amount by which fraud-induced inflation decreased between the time the investor purchased and sold the security, but are no more than the dollar values of the corrective disclosures that occurred during the investor's holding period. That is, the *Dura* decision imposes a cap on per share damages equal to the dollar declines sustained as a result of the corrective disclosures.

134. For shares sold after the final corrective disclosure, the Private Securities Litigation Reform Act of 1995 ("PSLRA 1995") limits the recoverable damages to be no greater than the difference between the price paid for the security and the average trading price over the 90 days subsequent to the disclosure (the "bounce-back period").

> "[T]he award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."
> **15 U.S.C. §78u-4(e) (1).**

135. Damage on any share purchased during the Class Period and held 90 days or more beyond the final corrective disclosure equals the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the stock price (the investment loss), where the terminal stock price is deemed to be the average price over the 90 days following the final corrective disclosure, but no more than the sum of dollar declines sustained as a result of the corrective disclosures (the "*Dura* cap").

000283
Exhibit 54

136. Because the final disclosure in this case took place after the close of trading on 13 July 2012, the 90-day bounce-back period stretches from 13 July 2012 through 10 October 2012 (90 calendar days following the disclosure). The average price for Bridgepoint stock over this period of 90 calendar days, based on closing prices, was $10.12 per share. Exhibit-6 presents Bridgepoint's stock prices from 13 July 2012 through 10 October 2012.

137. According to the PSLRA 1995, the investment loss cap for a share sold *within* the 90-day bounce-back period is a function of the average trading price from the date of final disclosure to the date of actual sale.

> "[I]f the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security."
> **15 U.S.C. §78u-4(e) (2).**

138. Thus, damage on any share purchased during the Class Period and sold up to 90 days after the final corrective disclosure is the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss), as limited by the *Dura* cap, or the decline in the stock price (the investment loss), where the sale price is computed to be the average trading price from the final corrective disclosure date to the sale date. That is, the damage is capped by the investment loss where the actual sale price is replaced by the average price within the 90-day bounce-back period up to the date of actual sale.

139. To provide a conservative measure of damages, I applied the PSLRA investment loss cap to shares sold *during* the Class Period as well as to shares sold afterward. For any particular holding period, I computed damages as the lesser of the decline in the inflation ribbon (based on the out-of-pocket measure as limited by the *Dura* decision) and the decline in the share price over the holding period (based on the PSLRA investment loss cap).

65

140. As an example of how per share damages are computed for a particular investor, consider an investor who purchased Bridgepoint stock on 7 May 2012 for $20.34 per share and sold those shares at the close of trading on 13 July 2012 for $9.77 per share. The inflation on 7 May 2012 was 50.1%, equal to $10.19 per share. By the close of trading on 13 July 2012 there was no artificial inflation in the stock price. Based on the change in inflation, this investor's economic/inflation loss is $10.19 per share, equal to the decline in inflation over his/her holding period ($10.19 minus $0.00). The investment loss is $10.57 per share, equal to the $20.34 per share purchase price minus the $9.77 per share sale price. The *Dura* cap is the sum of the dollar values of the two corrective disclosures that transpired during this investor's holding period (9 July 2012 and 13 July 2012) which amounts to $10.41 per share ($3.28 plus $7.13). The per share damages are the lesser of the $10.19 economic/inflation loss (which in this example is below the $10.41 *Dura* cap) and the $10.57 investment loss. The recoverable damage is therefore $10.19 per share.

141. Based on the foregoing analysis and statutory formulas, Rule 10b-5 damages per share range from $0 to $10.41 per share, excluding prejudgment interest. A particular investor's per share damage depends on when during the Class Period each share was purchased and if and when each respective share was subsequently sold.

## VIII.   LIMITING FACTORS AND OTHER ASSUMPTIONS

142. This report is furnished solely for the purpose of court proceedings in the above referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report, including in the event additional information becomes available.

Steven P. Feinstein, Ph.D., CFA

000285
Exhibit 54

Exhibit-1

**Documents and Other Information Reviewed and Relied Upon
In Addition to Those Listed in my August Report**


## CASE DOCUMENTS

- Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA, dated 6 August 2014.


## NEWS ARTICLES/PRESS RELEASES

- "Hearing Sees Financial Success and Education Failures of For-Profit College," by Tamar Lewin, *New York Times*, 10 March 2011.
- "Bridgepoint Education, Inc. (BPI) Tops Q1 EPS Views; New Enrollments Up 13%; Guides FY11; Announces $75M Buyback," *StreetInsider.com*, 3 May 2011.
- "Bridgepoint Education (BPI) Reports Better-Than-Expected Q2 Results," *StreetInsider.com*, 2 August 2011.
- "Bridgepoint Education (BPI) Tops Q3 EPS by 21c, Posts FY11 Guidance," *StreetInsider.com*, 1 November 2011.
- "UPDATE 1-Bridgepoint 2012 profit outlook disappoints," *Reuters*, 6 March 2012.


## ANALYST REPORTS

- RBC Capital, 4 May 2011 [RBC000001].
- Signal Hill, 4 May 2011 [BPIK000253046].
- First Analysis, 12 June 2011 [BPI059475].
- Height Analytics, 13 June 2011 [BPIK000217687].
- Signal Hill, 21 June 2011 [BPIK000223599].
- RBC Capital, 3 August 2011 [RBC000008].
- Height Analytics, 13 September 2011 [BPIK000224832].
- Barclays Capital, 17 October 2011 [BARC_000241].
- Barclays Capital, 17 October 2011 [BARC_000405].
- First Analysis, November 2011 [BPIK000220008].
- First Analysis, 9 November 2011 [BPIK001439188].
- First Analysis, 15 November 2011 [BPI064597].
- Barclays Capital, 4 January 2012 [BARC_000001].
- Barclays Capital, 4 January 2012 [BARC_000286].
- Barclays Capital, 4 January 2012 [BARC_000314].
- First Analysis, 6 March 2012 [BPIK000210956].
- Height Analytics, 7 March 2012 [BPIK000250301].

000286
Exhibit 54

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**
**In Addition to Those Listed in my August Report**

- Barclays Capital, 19 March 2012 [BARC_000028].
- Barclays Capital, 19 March 2012 [BARC_000293].
- Barclays Capital, 19 March 2012 [BARC_000335].
- Barclays Capital, 2 May 2012 [BARC_000072].
- Barclays Capital, 2 May 2012 [BARC_000165].
- Barclays Capital, 2 May 2012 [BARC_000300].
- Barclays Capital, 2 May 2012 [BARC_000202].
- First Analysis, 6 May 2012 [BPIK000044884].
- First Analysis, 27 June 2012 [BPI084057].
- Height Analytics, 10 July 2012 [BPIK000047826].
- Barclays Capital, 7 August 2012 [BARC_000216].
- Barclays Capital, 7 August 2012 [BARC_000232].
- Citi Group, 7 August 2012 [CGMI000001].

## ACADEMIC AND PROFESSIONAL LITERATURE

- Crew, Nicholas I., Kevin L. Gold, and Marnie A. Moore, *Litigation Services Handbook: The Role of the Financial Expert*, chapter 18, 4th edition, edited by Roman L. Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, John Wiley & Sons, 2007.
- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, March 1997.

## CONFERENCE CALL TRANSCRIPTS

- "BMO Capital Markets Back to School Education Conference," *Bloomberg*, Investor conference, 15 September 2011.
- "William Blair & Company Global Services Growth Stock Conference," *Bloomberg*, Investor conference, 7 December 2011.
- "Credit Suisse Global Services Conference," *Bloomberg*, Investor conference, 13 March 2012.

## INTERNAL COMPANY DOCUMENTS AND EMAILS

- "News: What's 'Good Enough'?- Inside Higher Ed," Internal Company Email, from Jane McAuliffe to Andrew Clark and Diane Thompson, 13 Arpil 2011 [BPI049613].
- "Re: The Ah Ha Moment for Today's Stock Price Activity In BPI," Internal Company email, from Jane McAuliffe to Andrew Clark, 10 June 2011 [BPI097843].

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon
In Addition to Those Listed in my August Report**

- "RE: Height Analytics --For-Profit Ed: Sector Specific Accreditation & WASC's Plan for Bridgepoint," Internal Company Email, from Joseph Hoey to Jane McAuliffe, 13 June 2011 [BPIK000287456].
- "APEI, APOL, CECO, CPLA, DV, EDMC, ESI, STRA, UTI: NACIQI meeting portends shift toward more Accountability," Internal Company Email, forwarded by Paul Goodson to Andrew Clark on 13 June 2011 [BPI059472].
- "FW: Signal Hill - BPI: WASC Accreditation Changes: Transparency Replaces Clubbiness," Internal Company Email, from Paul Goodson to Andrew Clark and Dan Devine, 21 June 2011 [BPI059288].
- "FW: Education/ knowledge services: School as a Service: The next big thing in the higher education industry (APEI, APOL, BPI, CECO, COCO, CPLA, DV, EDMC, ESI, LOPE, STRA, UTI) (Feb 26, 2012)," Internal Company Email, from Paul Goodson to Kaji Niraj, 27 February 2012 [BPIK000823138].
- "FW: WASC Visit – An Issue," Internal Company Email, from Teri Cannon to Elizabeth Tice, 4 March 2012 [BPI099993].
- "Item 1: A Context for Retention and Graduation at Ashford University," Ashford University, March 2012 [BPI010172].
- Letter from Elizabeth Tice to Dr. Stanley O. Ikenberry, 1 May 2012 [BPIK000711203].
- "Fw: AshU_WASC Visit Final Team Report S12," Internal Company Email, forwarded by Diane Thompson to Andrew Clark and Dan Devine on 15 May 2012 [BPI047243].
- Letter from Ashford University to Ralph Wolff, dated 23 May 2012 [WASC 026727].
- "BPI: Good relative fundamentals & focus on improving outcomes merit a higher multiple (June 27, 2012)," internal Company email, from Paul Goodson to Andrew Clark, 28 June 2012 [BPIK000017246].

**DATA AND DATABASES**

- Bloomberg
- CRSP (Center for Research in Security Prices)
- EDGAR
- Factiva
- Thomson Research

**OTHER**

- *Dura Pharmaceuticals, et al., v. Broudo, et al*., 544 U.S. 336, 125.
- Private Securities Litigation Reform Act of 1995.
- WASC Handbook of Accreditation, 2008.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**
**In Addition to Those Listed in my August Report**

- "Letter to Bridgepoint CEO Andrew Clark," by Daniel E. Smith (Staff Director of the Senate Committee on Health, Education, Labor and Pensions), 1 March 2011.
- "Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight," Hearing of the Committee on Health, Education, and Pensions United States Senate One Hundred Twelfth Congress, 10 March 2011.
- "Report of the Meeting of the National Advisory Committee on Institutional Quality and Integrity," NACIQI, U.S. Department of Education, 8-10 June 2011.
- Western Association of Schools & Colleges Letter to Elizabeth Tice, President and CEO of Ashford University, dated 3 July 2012.
- Any other documents and data cited in the report.

000289
Exhibit 54

In Re Groupon, Inc. Securities Litigation
Civil Action No. 12-cv-2450
United States District Court
Northern District of Illinois
Deposition Testimony
February 2014
Testimony at Evidentiary Hearing
September 2014

Mary K. Jones, *et al*., vs. Pfizer Inc., *et al.*
United States District Court
Southern District of New York
Civil Action no. 10-cv-03864-AKH
Deposition Testimony
January 2012 and October 2014

In Re Questcor Pharmaceuticals, Inc. Securities Litigation
Civil Action No. 12-cv-01623-DMG
United States District Court
Central District of California
Deposition Testimony
October 2014

In Re Longtop Financial Technologies, Ltd. Securities Litigation
Civil Action No. 11-cv-3658-SAS
United States District Court
Southern District of New York
Trial Testimony
November 2014

In Re Delcath Systems, Inc. Securities Litigation
Civil Action No. 13 Civ. 3116 (LGS)
United States District Court
Southern District of New York
Deposition Testimony
December 2014

In Re Prudential Financial, Inc. Securities Litigation
Civil Action No. 2:12-cv-05275-SDW-MCA
United States District Court
District of New Jersey
Deposition Testimony
January 2015

000290
Exhibit 54

In Re Walter Energy, Inc. Securities Litigation
Civil Action No. 2:12-cv-00281-VEH
United States District Court
Northern District of Alabama
Deposition Testimony
January 2014 and March 2015

In Re CVS Caremark Corporation Securities Litigation
Civil Action No. 1:09-cv-00554-S-DLM
United States District Court
District of Rhode Island
Deposition Testimony
March 2015

In Re Las Vegas Sands Corp. Securities Litigation
Civil Action No. 2:10-cv-00765-KJD-LRL
United States District Court
District of Nevada
Deposition Testimony
March 2015

In Re JPMorgan Chase & Co. Securities Litigation
Civil Action No. 1:12-cv-03852-GBD
United States District Court
Southern District of New York
Deposition Testimony
March 2015

In Re Baxter International Inc., Securities Litigation
Civil Action No. 1:10-cv-06016
United States District Court
Northern District of Illinois
Eastern Division
Deposition Testimony
November 2014 and May 2015

000291
Exhibit 54

**Exhibit-3**

**Bridgepoint Education, Inc. Event Study Results**

| Date | BPI Closing Price | BPI Prior Day Closing Price | BPI Logarithmic Return | Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t*-statistic | Residual Dollar Return |
|------|------|------|------|------|------|------|------|------|------|
| 9 July 2012 | $14.25 | $21.50 | -41.13% | -0.23% | -1.46% | -0.81% | -40.32% | -16.45 | ($7.13) |
| 13 July 2012 | $9.77 | $12.97 | -28.33% | 1.54% | -0.42% | 0.80% | -29.13% | -11.89 | ($3.28) |

Exhibit 54

000292

# Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t-* Statistic[1] |
|---|---|---|---|---|---|---|---|
| 5/3/2011 | $19.87 | 7.74% | -0.65% | 0.52% | -0.12% | 7.86% | 3.21 * |
| 5/4/2011 | $19.00 | -4.48% | -0.79% | -0.68% | -0.79% | -3.69% | -1.51 |
| 5/5/2011 | $19.14 | 0.73% | -0.93% | -0.83% | -0.95% | 1.68% | 0.69 |
| 5/6/2011 | $19.22 | 0.42% | 0.46% | -1.24% | -0.28% | 0.70% | 0.28 |
| 5/9/2011 | $19.94 | 3.68% | 0.61% | 0.70% | 0.76% | 2.92% | 1.19 |
| 5/10/2011 | $20.21 | 1.34% | 0.85% | 2.13% | 1.61% | -0.27% | -0.11 |
| 5/11/2011 | $20.80 | 2.88% | -1.22% | -0.68% | -1.06% | 3.93% | 1.61 |
| 5/12/2011 | $21.17 | 1.76% | 0.41% | 1.47% | 1.02% | 0.75% | 0.30 |
| 5/13/2011 | $21.15 | -0.09% | -0.90% | -0.01% | -0.53% | 0.43% | 0.18 |
| 5/16/2011 | $20.51 | -3.07% | -0.71% | -1.84% | -1.30% | -1.77% | -0.72 |
| 5/17/2011 | $20.12 | -1.92% | -0.07% | -0.99% | -0.49% | -1.43% | -0.58 |
| 5/18/2011 | $21.00 | 4.28% | 1.08% | -0.31% | 0.56% | 3.72% | 1.52 |
| 5/19/2011 | $21.26 | 1.23% | 0.24% | -0.78% | -0.19% | 1.42% | 0.58 |
| 5/20/2011 | $20.08 | -5.71% | -0.69% | -1.88% | -1.31% | -4.40% | -1.79 |
| 5/23/2011 | $19.88 | -1.00% | -1.31% | -0.94% | -1.24% | 0.24% | 0.10 |
| 5/24/2011 | $20.47 | 2.92% | -0.06% | 1.90% | 0.93% | 2.00% | 0.81 |
| 5/25/2011 | $22.89 | 11.17% | 0.51% | 1.45% | 1.07% | 10.11% | 4.12 * |
| 5/26/2011 | $22.02 | -3.87% | 0.53% | -0.49% | 0.13% | -4.01% | -1.64 |
| 5/27/2011 | $22.43 | 1.84% | 0.51% | 0.70% | 0.70% | 1.15% | 0.47 |
| 5/31/2011 | $23.49 | 4.62% | 1.03% | -0.49% | 0.44% | 4.17% | 1.70 |
| 6/1/2011 | $23.68 | 0.81% | -2.37% | 0.18% | -1.36% | 2.16% | 0.88 |
| 6/2/2011 | $24.48 | 3.32% | -0.07% | 9.83% | 4.80% | -1.48% | -0.60 |
| 6/3/2011 | $25.22 | 2.98% | -0.96% | -0.39% | -0.75% | 3.73% | 1.52 |
| 6/6/2011 | $24.78 | -1.76% | -1.27% | -3.11% | -2.28% | 0.52% | 0.21 |

Exhibit 54

000293

Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | t- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 6/7/2011 | $24.94 | 0.64% | 0.01% | -1.28% | -0.58% | 1.22% | 0.50 |
| 6/8/2011 | $24.84 | -0.40% | -0.60% | -2.60% | -1.61% | 1.21% | 0.49 |
| 6/9/2011 | $25.01 | 0.68% | 0.75% | 0.32% | 0.67% | 0.02% | 0.01 |
| 6/10/2011 | $23.48 | -6.31% | -1.42% | -2.28% | -1.96% | -4.35% | -1.78 |
| 6/13/2011 | $23.31 | -0.73% | -0.08% | -1.40% | -0.69% | -0.03% | -0.01 |
| 6/14/2011 | $24.16 | 3.58% | 1.39% | 0.20% | 1.01% | 2.58% | 1.05 |
| 6/15/2011 | $23.98 | -0.75% | -1.76% | -1.36% | -1.73% | 0.98% | 0.40 |
| 6/16/2011 | $22.47 | -6.50% | 0.00% | -1.02% | -0.46% | -6.05% | -2.47 * |
| 6/17/2011 | $22.64 | 0.75% | 0.21% | -0.21% | 0.07% | 0.68% | 0.28 |
| 6/20/2011 | $23.05 | 1.79% | 0.55% | 0.39% | 0.57% | 1.22% | 0.50 |
| 6/21/2011 | $23.75 | 2.99% | 1.59% | 2.09% | 2.06% | 0.93% | 0.38 |
| 6/22/2011 | $23.46 | -1.23% | -0.55% | -1.03% | -0.81% | -0.42% | -0.17 |
| 6/23/2011 | $23.61 | 0.64% | -0.25% | 1.65% | 0.69% | -0.05% | -0.02 |
| 6/24/2011 | $23.69 | 0.34% | -1.08% | -1.13% | -1.19% | 1.53% | 0.62 |
| 6/27/2011 | $23.74 | 0.21% | 0.82% | 0.03% | 0.57% | -0.36% | -0.15 |
| 6/28/2011 | $23.97 | 0.96% | 1.38% | 2.37% | 2.06% | -1.10% | -0.45 |
| 6/29/2011 | $23.75 | -0.92% | 0.87% | -1.26% | -0.03% | -0.89% | -0.36 |
| 6/30/2011 | $25.00 | 5.13% | 0.98% | 1.25% | 1.27% | 3.86% | 1.58 |
| 7/1/2011 | $25.57 | 2.25% | 1.37% | 2.51% | 2.12% | 0.14% | 0.06 |
| 7/5/2011 | $26.93 | 5.18% | -0.01% | 0.35% | 0.21% | 4.98% | 2.03 * |
| 7/6/2011 | $27.00 | 0.26% | 0.12% | 0.14% | 0.18% | 0.08% | 0.03 |
| 7/7/2011 | $27.45 | 1.65% | 1.07% | 4.40% | 2.86% | -1.21% | -0.49 |
| 7/8/2011 | $27.25 | -0.73% | -0.64% | -0.45% | -0.58% | -0.15% | -0.06 |
| 7/11/2011 | $26.38 | -3.24% | -1.97% | -2.69% | -2.51% | -0.74% | -0.30 |

Exhibit 54

000294

# Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t*- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 7/12/2011 | $27.42 | 3.87% | -0.39% | 2.03% | 0.79% | 3.08% | 1.26 |
| 7/13/2011 | $28.05 | 2.27% | 0.48% | 1.37% | 1.01% | 1.26% | 0.51 |
| 7/14/2011 | $28.33 | 0.99% | -0.82% | -1.39% | -1.15% | 2.14% | 0.87 |
| 7/15/2011 | $28.25 | -0.28% | 0.62% | 1.15% | 0.99% | -1.27% | -0.52 |
| 7/18/2011 | $27.86 | -1.39% | -0.97% | -0.45% | -0.79% | -0.60% | -0.25 |
| 7/19/2011 | $28.31 | 1.60% | 1.64% | 2.22% | 2.15% | -0.54% | -0.22 |
| 7/20/2011 | $29.57 | 4.35% | -0.01% | 0.32% | 0.19% | 4.16% | 1.70 |
| 7/21/2011 | $30.06 | 1.64% | 1.24% | 0.08% | 0.85% | 0.79% | 0.32 |
| 7/22/2011 | $30.50 | 1.45% | 0.14% | 1.63% | 0.93% | 0.53% | 0.22 |
| 7/25/2011 | $27.01 | -12.15% | -0.64% | -0.43% | -0.57% | -11.58% | -4.73 * |
| 7/26/2011 | $26.69 | -1.19% | -0.48% | 0.31% | -0.11% | -1.08% | -0.44 |
| 7/27/2011 | $25.35 | -5.15% | -2.22% | -1.73% | -2.20% | -2.95% | -1.21 |
| 7/28/2011 | $24.68 | -2.68% | -0.30% | -8.32% | -4.21% | 1.53% | 0.63 |
| 7/29/2011 | $24.76 | 0.32% | -0.59% | -0.23% | -0.44% | 0.77% | 0.31 |
| 8/1/2011 | $25.04 | 1.12% | -0.36% | -1.73% | -1.03% | 2.16% | 0.88 |
| 8/2/2011 | $21.77 | -13.99% | -2.65% | -1.64% | -2.42% | -11.57% | -4.72 * |
| 8/3/2011 | $21.61 | -0.74% | 0.51% | 1.35% | 1.02% | -1.76% | -0.72 |
| 8/4/2011 | $21.17 | -2.06% | -5.22% | -3.73% | -5.05% | 3.00% | 1.22 |
| 8/5/2011 | $20.23 | -4.54% | -0.49% | 0.08% | -0.23% | -4.31% | -1.76 |
| 8/8/2011 | $19.87 | -1.80% | -7.24% | -7.16% | -7.99% | 6.20% | 2.53 * |
| 8/9/2011 | $21.37 | 7.28% | 5.08% | 3.56% | 4.95% | 2.32% | 0.95 |
| 8/10/2011 | $21.28 | -0.42% | -4.02% | -3.47% | -4.17% | 3.75% | 1.53 |
| 8/11/2011 | $22.48 | 5.49% | 4.52% | 1.93% | 3.81% | 1.67% | 0.68 |
| 8/12/2011 | $22.80 | 1.41% | 0.48% | -0.92% | -0.11% | 1.52% | 0.62 |

Exhibit 54

000295

**Exhibit-4**

**Event Study Daily Results**

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t*- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 8/15/2011 | $22.79 | -0.04% | 2.29% | -1.98% | 0.50% | -0.54% | -0.22 |
| 8/16/2011 | $22.25 | -2.40% | -1.12% | -0.69% | -1.00% | -1.40% | -0.57 |
| 8/17/2011 | $22.47 | 0.98% | 0.07% | -1.24% | -0.52% | 1.50% | 0.61 |
| 8/18/2011 | $21.15 | -6.05% | -4.74% | -6.95% | -6.32% | 0.27% | 0.11 |
| 8/19/2011 | $21.02 | -0.62% | -1.60% | -2.25% | -2.06% | 1.44% | 0.59 |
| 8/22/2011 | $21.39 | 1.74% | -0.02% | -1.45% | -0.68% | 2.43% | 0.99 |
| 8/23/2011 | $21.59 | 0.93% | 3.42% | 4.42% | 4.34% | -3.41% | -1.39 |
| 8/24/2011 | $21.50 | -0.42% | 1.22% | 3.16% | 2.35% | -2.77% | -1.13 |
| 8/25/2011 | $21.04 | -2.16% | -1.64% | -2.36% | -2.14% | -0.02% | -0.01 |
| 8/26/2011 | $21.51 | 2.21% | 1.64% | 1.67% | 1.89% | 0.32% | 0.13 |
| 8/29/2011 | $22.58 | 4.85% | 2.99% | 3.90% | 3.81% | 1.04% | 0.43 |
| 8/30/2011 | $22.67 | 0.40% | 0.37% | 1.11% | 0.81% | -0.41% | -0.17 |
| 8/31/2011 | $22.08 | -2.64% | 0.50% | -2.01% | -0.63% | -2.01% | -0.82 |
| 9/1/2011 | $20.86 | -5.68% | -1.25% | -3.55% | -2.48% | -3.21% | -1.31 |
| 9/2/2011 | $20.40 | -2.23% | -2.56% | -1.97% | -2.53% | 0.30% | 0.12 |
| 9/6/2011 | $20.48 | 0.39% | -0.82% | -0.89% | -0.90% | 1.30% | 0.53 |
| 9/7/2011 | $21.49 | 4.81% | 2.95% | 4.11% | 3.89% | 0.92% | 0.38 |
| 9/8/2011 | $21.38 | -0.51% | -1.12% | -2.42% | -1.84% | 1.33% | 0.54 |
| 9/9/2011 | $20.52 | -4.11% | -2.73% | -1.12% | -2.22% | -1.89% | -0.77 |
| 9/12/2011 | $20.91 | 1.88% | 0.45% | 0.69% | 0.66% | 1.22% | 0.50 |
| 9/13/2011 | $21.29 | 1.80% | 1.10% | 1.40% | 1.41% | 0.39% | 0.16 |
| 9/14/2011 | $20.96 | -1.56% | 1.31% | 2.14% | 1.91% | -3.47% | -1.42 |
| 9/15/2011 | $21.67 | 3.33% | 1.57% | 0.93% | 1.48% | 1.85% | 0.75 |
| 9/16/2011 | $21.44 | -1.07% | 0.36% | -1.20% | -0.32% | -0.74% | -0.30 |

Exhibit 54
000296

# Exhibit-4

## Event Study Daily Results

### 3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t*- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 9/19/2011 | $21.17 | -1.27% | -1.08% | -2.46% | -1.84% | 0.57% | 0.23 |
| 9/20/2011 | $21.05 | -0.57% | -0.43% | -2.47% | -1.44% | 0.87% | 0.35 |
| 9/21/2011 | $20.92 | -0.62% | -3.02% | -3.25% | -3.44% | 2.82% | 1.15 |
| 9/22/2011 | $20.04 | -4.30% | -3.51% | -4.62% | -4.42% | 0.12% | 0.05 |
| 9/23/2011 | $19.46 | -2.94% | 0.62% | 2.70% | 1.75% | -4.69% | -1.91 |
| 9/26/2011 | $20.02 | 2.84% | 2.19% | 2.39% | 2.58% | 0.25% | 0.10 |
| 9/27/2011 | $20.38 | 1.78% | 1.27% | 2.69% | 2.15% | -0.36% | -0.15 |
| 9/28/2011 | $19.60 | -3.90% | -2.41% | -4.70% | -3.77% | -0.13% | -0.05 |
| 9/29/2011 | $18.94 | -3.43% | 0.82% | 0.68% | 0.88% | -4.31% | -1.76 |
| 9/30/2011 | $17.44 | -8.25% | -2.51% | -2.15% | -2.58% | -5.67% | -2.31 * |
| 10/3/2011 | $16.52 | -5.42% | -3.33% | -6.48% | -5.21% | -0.21% | -0.09 |
| 10/4/2011 | $16.92 | 2.39% | 2.41% | 6.61% | 4.77% | -2.38% | -0.97 |
| 10/5/2011 | $18.65 | 9.73% | 1.98% | 3.36% | 2.92% | 6.82% | 2.78 * |
| 10/6/2011 | $19.44 | 4.15% | 2.05% | 3.05% | 2.82% | 1.33% | 0.54 |
| 10/7/2011 | $19.08 | -1.87% | -1.12% | -1.68% | -1.48% | -0.39% | -0.16 |
| 10/10/2011 | $20.00 | 4.71% | 3.41% | 0.48% | 2.41% | 2.30% | 0.94 |
| 10/11/2011 | $19.73 | -1.36% | 0.11% | 0.92% | 0.56% | -1.92% | -0.78 |
| 10/12/2011 | $20.74 | 4.99% | 1.18% | 3.27% | 2.37% | 2.62% | 1.07 |
| 10/13/2011 | $20.33 | -2.00% | -0.30% | 0.08% | -0.11% | -1.89% | -0.77 |
| 10/14/2011 | $21.00 | 3.24% | 1.79% | -1.04% | 0.65% | 2.59% | 1.06 |
| 10/17/2011 | $20.14 | -4.18% | -2.13% | -3.58% | -3.04% | -1.14% | -0.46 |
| 10/18/2011 | $19.54 | -3.02% | 2.10% | -2.45% | 0.15% | -3.18% | -1.30 |
| 10/19/2011 | $19.48 | -0.31% | -1.44% | 1.26% | -0.25% | -0.06% | -0.02 |
| 10/20/2011 | $19.90 | 2.13% | 0.42% | -2.24% | -0.79% | 2.93% | 1.19 |

Exhibit 54

000297

# Exhibit-4

## Event Study Daily Results

### 3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t*- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 10/21/2011 | $20.91 | 4.95% | 1.92% | 3.31% | 2.86% | 2.09% | 0.85 |
| 10/24/2011 | $22.00 | 5.08% | 1.66% | 4.06% | 3.07% | 2.02% | 0.82 |
| 10/25/2011 | $21.41 | -2.72% | -2.06% | 0.13% | -1.19% | -1.53% | -0.62 |
| 10/26/2011 | $21.27 | -0.66% | 1.15% | -0.64% | 0.45% | -1.11% | -0.45 |
| 10/27/2011 | $21.82 | 2.55% | 3.58% | 4.06% | 4.26% | -1.71% | -0.70 |
| 10/28/2011 | $21.83 | 0.05% | 0.03% | -0.64% | -0.25% | 0.30% | 0.12 |
| 10/31/2011 | $21.67 | -0.74% | -2.51% | -3.33% | -3.16% | 2.42% | 0.99 |
| 11/1/2011 | $22.99 | 5.91% | -2.96% | -2.83% | -3.19% | 9.11% | 3.72 * |
| 11/2/2011 | $23.59 | 2.58% | 1.71% | -2.57% | -0.15% | 2.72% | 1.11 |
| 11/3/2011 | $23.74 | 0.63% | 1.93% | 6.64% | 4.49% | -3.86% | -1.58 |
| 11/4/2011 | $22.95 | -3.38% | -0.57% | -0.15% | -0.39% | -3.00% | -1.22 |
| 11/7/2011 | $23.65 | 3.00% | 0.48% | -0.12% | 0.28% | 2.72% | 1.11 |
| 11/8/2011 | $23.22 | -1.83% | 1.14% | 3.25% | 2.34% | -4.18% | -1.71 |
| 11/9/2011 | $22.91 | -1.34% | -3.90% | -4.08% | -4.39% | 3.05% | 1.24 |
| 11/10/2011 | $21.40 | -6.82% | 0.76% | 2.41% | 1.69% | -8.51% | -3.47 * |
| 11/11/2011 | $22.02 | 2.86% | 1.98% | 3.15% | 2.82% | 0.04% | 0.02 |
| 11/14/2011 | $22.06 | 0.18% | -0.94% | -1.60% | -1.33% | 1.52% | 0.62 |
| 11/15/2011 | $22.38 | 1.44% | 0.46% | 1.32% | 0.97% | 0.47% | 0.19 |
| 11/16/2011 | $22.22 | -0.72% | -1.53% | -1.10% | -1.46% | 0.74% | 0.30 |
| 11/17/2011 | $22.94 | 3.19% | -1.74% | -0.83% | -1.46% | 4.65% | 1.90 |
| 11/18/2011 | $22.59 | -1.54% | -0.04% | -0.90% | -0.42% | -1.12% | -0.46 |
| 11/21/2011 | $21.26 | -6.07% | -1.89% | -0.73% | -1.50% | -4.57% | -1.86 |
| 11/22/2011 | $21.64 | 1.77% | -0.41% | -0.82% | -0.62% | 2.39% | 0.98 |
| 11/23/2011 | $21.20 | -2.05% | -2.38% | -1.13% | -2.00% | -0.05% | -0.02 |

Exhibit 54

000298

# Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t*- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 11/25/2011 | $20.59 | -2.92% | -0.36% | -2.30% | -1.31% | -1.61% | -0.66 |
| 11/28/2011 | $21.03 | 2.11% | 3.04% | 2.21% | 3.02% | -0.90% | -0.37 |
| 11/29/2011 | $20.66 | -1.78% | 0.23% | 0.44% | 0.40% | -2.18% | -0.89 |
| 11/30/2011 | $22.00 | 6.28% | 4.35% | 4.87% | 5.14% | 1.14% | 0.47 |
| 12/1/2011 | $21.20 | -3.70% | -0.23% | -1.15% | -0.67% | -3.04% | -1.24 |
| 12/2/2011 | $22.14 | 4.34% | 0.01% | 0.70% | 0.39% | 3.95% | 1.61 |
| 12/5/2011 | $23.15 | 4.46% | 1.05% | 0.52% | 0.95% | 3.51% | 1.43 |
| 12/6/2011 | $22.69 | -2.01% | 0.05% | -0.20% | -0.03% | -1.98% | -0.81 |
| 12/7/2011 | $22.58 | -0.49% | 0.19% | -0.27% | 0.03% | -0.51% | -0.21 |
| 12/8/2011 | $21.55 | -4.67% | -2.33% | -3.31% | -3.04% | -1.63% | -0.67 |
| 12/9/2011 | $22.19 | 2.93% | 1.78% | 2.74% | 2.50% | 0.43% | 0.18 |
| 12/12/2011 | $21.81 | -1.73% | -1.56% | 0.16% | -0.86% | -0.87% | -0.36 |
| 12/13/2011 | $21.15 | -3.07% | -1.14% | -3.09% | -2.18% | -0.89% | -0.36 |
| 12/14/2011 | $20.73 | -2.01% | -1.28% | -1.13% | -1.31% | -0.69% | -0.28 |
| 12/15/2011 | $20.69 | -0.19% | 0.38% | 2.31% | 1.41% | -1.60% | -0.65 |
| 12/16/2011 | $21.62 | 4.40% | 0.50% | 2.08% | 1.37% | 3.03% | 1.24 |
| 12/19/2011 | $21.74 | 0.55% | -1.29% | -0.73% | -1.12% | 1.67% | 0.68 |
| 12/20/2011 | $22.15 | 1.87% | 2.99% | 1.98% | 2.88% | -1.01% | -0.41 |
| 12/21/2011 | $22.15 | 0.00% | 0.21% | 1.27% | 0.79% | -0.79% | -0.32 |
| 12/22/2011 | $22.41 | 1.17% | 0.91% | 1.09% | 1.14% | 0.03% | 0.01 |
| 12/23/2011 | $22.64 | 1.02% | 0.80% | 1.47% | 1.26% | -0.24% | -0.10 |
| 12/27/2011 | $23.77 | 4.87% | 0.01% | 1.23% | 0.65% | 4.22% | 1.72 |
| 12/28/2011 | $23.06 | -3.03% | -1.38% | -1.81% | -1.70% | -1.33% | -0.54 |
| 12/29/2011 | $23.38 | 1.38% | 1.09% | 0.68% | 1.05% | 0.32% | 0.13 |

Exhibit 54

000299

# Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | t- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 12/30/2011 | $23.00 | -1.64% | -0.27% | -0.04% | -0.15% | -1.49% | -0.61 |
| 1/3/2012 | $21.87 | -5.04% | 1.60% | -1.04% | 0.54% | -5.57% | -2.27 * |
| 1/4/2012 | $22.14 | 1.23% | -0.04% | 0.36% | 0.19% | 1.04% | 0.42 |
| 1/5/2012 | $22.38 | 1.08% | 0.31% | -0.45% | 0.01% | 1.07% | 0.43 |
| 1/6/2012 | $22.95 | 2.52% | -0.28% | 1.45% | 0.57% | 1.94% | 0.79 |
| 1/9/2012 | $23.37 | 1.81% | 0.28% | 1.80% | 1.10% | 0.72% | 0.29 |
| 1/10/2012 | $23.39 | 0.09% | 1.04% | 4.64% | 2.95% | -2.87% | -1.17 |
| 1/11/2012 | $24.02 | 2.66% | 0.10% | 3.04% | 1.59% | 1.07% | 0.44 |
| 1/12/2012 | $26.21 | 8.73% | 0.31% | 0.49% | 0.47% | 8.25% | 3.37 * |
| 1/13/2012 | $25.41 | -3.10% | -0.54% | 1.21% | 0.30% | -3.40% | -1.39 |
| 1/17/2012 | $26.11 | 2.72% | 0.38% | 0.67% | 0.61% | 2.11% | 0.86 |
| 1/18/2012 | $24.80 | -5.15% | 1.23% | -3.62% | -0.96% | -4.19% | -1.71 |
| 1/19/2012 | $24.93 | 0.52% | 0.57% | -0.48% | 0.16% | 0.36% | 0.15 |
| 1/20/2012 | $24.59 | -1.37% | 0.08% | 0.56% | 0.37% | -1.74% | -0.71 |
| 1/23/2012 | $24.44 | -0.61% | 0.15% | 0.11% | 0.19% | -0.80% | -0.33 |
| 1/24/2012 | $25.21 | 3.10% | -0.08% | 2.02% | 0.98% | 2.12% | 0.87 |
| 1/25/2012 | $25.86 | 2.55% | 0.98% | 1.32% | 1.30% | 1.25% | 0.51 |
| 1/26/2012 | $25.65 | -0.82% | -0.51% | -3.50% | -1.99% | 1.17% | 0.48 |
| 1/27/2012 | $25.70 | 0.19% | 0.06% | -0.50% | -0.17% | 0.37% | 0.15 |
| 1/30/2012 | $25.15 | -2.16% | -0.36% | -0.84% | -0.60% | -1.57% | -0.64 |
| 1/31/2012 | $24.59 | -2.25% | -0.02% | -0.89% | -0.41% | -1.84% | -0.75 |
| 2/1/2012 | $25.95 | 5.38% | 1.12% | 5.87% | 3.61% | 1.77% | 0.72 |
| 2/2/2012 | $26.60 | 2.47% | 0.18% | -1.74% | -0.70% | 3.18% | 1.30 |
| 2/3/2012 | $26.94 | 1.27% | 1.50% | 1.38% | 1.65% | -0.38% | -0.16 |

Exhibit 54

000300

# Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | t- Statistic[1] |
|------|------|------|------|------|------|------|------|
| 2/6/2012 | $26.52 | -1.57% | -0.09% | -0.59% | -0.31% | -1.27% | -0.52 |
| 2/7/2012 | $26.40 | -0.45% | 0.13% | -0.86% | -0.30% | -0.16% | -0.06 |
| 2/8/2012 | $26.16 | -0.91% | 0.22% | 0.54% | 0.44% | -1.36% | -0.55 |
| 2/9/2012 | $26.54 | 1.44% | 0.11% | 1.43% | 0.81% | 0.64% | 0.26 |
| 2/10/2012 | $26.53 | -0.04% | -0.84% | -1.62% | -1.27% | 1.24% | 0.50 |
| 2/13/2012 | $26.80 | 1.01% | 0.74% | 1.61% | 1.29% | -0.28% | -0.11 |
| 2/14/2012 | $26.45 | -1.31% | -0.15% | -3.24% | -1.63% | 0.32% | 0.13 |
| 2/15/2012 | $26.09 | -1.37% | -0.44% | -0.06% | -0.26% | -1.11% | -0.45 |
| 2/16/2012 | $26.32 | 0.88% | 1.26% | -1.31% | 0.19% | 0.69% | 0.28 |
| 2/17/2012 | $26.37 | 0.19% | 0.14% | 1.48% | 0.85% | -0.66% | -0.27 |
| 2/21/2012 | $26.34 | -0.11% | 0.01% | 0.33% | 0.21% | -0.32% | -0.13 |
| 2/22/2012 | $26.53 | 0.72% | -0.33% | -0.67% | -0.50% | 1.22% | 0.50 |
| 2/23/2012 | $26.74 | 0.79% | 0.58% | 1.24% | 1.01% | -0.22% | -0.09 |
| 2/24/2012 | $26.63 | -0.41% | 0.15% | 0.64% | 0.44% | -0.85% | -0.35 |
| 2/27/2012 | $26.62 | -0.04% | 0.10% | -1.31% | -0.54% | 0.50% | 0.21 |
| 2/28/2012 | $24.54 | -8.14% | 0.28% | -4.80% | -2.13% | -6.01% | -2.45 * |
| 2/29/2012 | $24.36 | -0.74% | -0.55% | -1.70% | -1.13% | 0.40% | 0.16 |
| 3/1/2012 | $24.04 | -1.32% | 0.68% | -0.18% | 0.38% | -1.70% | -0.69 |
| 3/2/2012 | $23.84 | -0.84% | -0.50% | -2.28% | -1.39% | 0.55% | 0.23 |
| 3/5/2012 | $23.49 | -1.48% | -0.45% | -0.19% | -0.33% | -1.14% | -0.47 |
| 3/6/2012 | $23.39 | -0.43% | -1.75% | -1.56% | -1.82% | 1.39% | 0.57 |
| 3/7/2012 | $24.02 | 2.66% | 0.80% | 0.51% | 0.79% | 1.87% | 0.76 |
| 3/8/2012 | $24.64 | 2.55% | 1.08% | 0.83% | 1.12% | 1.42% | 0.58 |
| 3/9/2012 | $24.40 | -0.98% | 0.46% | 1.27% | 0.95% | -1.93% | -0.79 |

Exhibit 54

000301

# Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | t- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 3/12/2012 | $23.85 | -2.28% | -0.13% | -0.35% | -0.21% | -2.07% | -0.84 |
| 3/13/2012 | $24.68 | 3.42% | 1.78% | 1.59% | 1.93% | 1.49% | 0.61 |
| 3/14/2012 | $24.10 | -2.38% | -0.37% | -1.55% | -0.95% | -1.43% | -0.58 |
| 3/15/2012 | $24.40 | 1.24% | 0.66% | 1.29% | 1.08% | 0.16% | 0.06 |
| 3/16/2012 | $24.47 | 0.29% | 0.13% | 0.16% | 0.20% | 0.08% | 0.03 |
| 3/19/2012 | $24.88 | 1.66% | 0.41% | 0.47% | 0.53% | 1.13% | 0.46 |
| 3/20/2012 | $24.81 | -0.28% | -0.44% | -0.44% | -0.45% | 0.17% | 0.07 |
| 3/21/2012 | $24.79 | -0.08% | -0.11% | -0.12% | -0.09% | 0.01% | 0.00 |
| 3/22/2012 | $24.58 | -0.85% | -0.82% | -1.37% | -1.14% | 0.29% | 0.12 |
| 3/23/2012 | $24.28 | -1.23% | 0.44% | -0.14% | 0.25% | -1.48% | -0.60 |
| 3/26/2012 | $25.47 | 4.78% | 1.40% | 2.15% | 1.97% | 2.82% | 1.15 |
| 3/27/2012 | $25.26 | -0.83% | -0.37% | -3.42% | -1.86% | 1.03% | 0.42 |
| 3/28/2012 | $25.28 | 0.08% | -0.55% | -0.74% | -0.66% | 0.74% | 0.30 |
| 3/29/2012 | $24.78 | -2.00% | -0.19% | 0.50% | 0.16% | -2.16% | -0.88 |
| 3/30/2012 | $24.75 | -0.12% | 0.33% | -0.64% | -0.07% | -0.06% | -0.02 |
| 4/2/2012 | $25.44 | 2.75% | 0.81% | 0.50% | 0.79% | 1.96% | 0.80 |
| 4/3/2012 | $25.38 | -0.24% | -0.43% | -1.44% | -0.93% | 0.70% | 0.29 |
| 4/4/2012 | $23.98 | -5.67% | -1.19% | -2.55% | -1.95% | -3.73% | -1.52 |
| 4/5/2012 | $23.37 | -2.58% | -0.09% | 0.22% | 0.09% | -2.67% | -1.09 |
| 4/9/2012 | $21.18 | -9.84% | -1.17% | -2.02% | -1.68% | -8.16% | -3.33 * |
| 4/10/2012 | $20.50 | -3.26% | -1.85% | -1.28% | -1.75% | -1.52% | -0.62 |
| 4/11/2012 | $21.33 | 3.97% | 0.86% | 1.47% | 1.29% | 2.67% | 1.09 |
| 4/12/2012 | $21.60 | 1.26% | 1.51% | 1.62% | 1.78% | -0.52% | -0.21 |
| 4/13/2012 | $21.50 | -0.46% | -1.26% | -1.86% | -1.66% | 1.19% | 0.49 |

Exhibit 54

000302

# Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t*- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 4/16/2012 | $21.36 | -0.65% | -0.06% | -1.53% | -0.75% | 0.09% | 0.04 |
| 4/17/2012 | $21.62 | 1.21% | 1.51% | 0.54% | 1.25% | -0.04% | -0.02 |
| 4/18/2012 | $21.41 | -0.98% | -0.40% | -0.61% | -0.51% | -0.46% | -0.19 |
| 4/19/2012 | $21.29 | -0.56% | -0.48% | -0.31% | -0.41% | -0.15% | -0.06 |
| 4/20/2012 | $21.30 | 0.05% | 0.16% | -0.07% | 0.10% | -0.05% | -0.02 |
| 4/23/2012 | $21.16 | -0.66% | -0.96% | -0.56% | -0.84% | 0.18% | 0.07 |
| 4/24/2012 | $20.88 | -1.33% | 0.33% | -1.72% | -0.60% | -0.73% | -0.30 |
| 4/25/2012 | $21.16 | 1.33% | 1.40% | 1.11% | 1.46% | -0.13% | -0.05 |
| 4/26/2012 | $21.59 | 2.01% | 0.69% | 5.79% | 3.30% | -1.29% | -0.52 |
| 4/27/2012 | $21.75 | 0.74% | 0.40% | 1.57% | 1.05% | -0.32% | -0.13 |
| 4/30/2012 | $21.56 | -0.88% | -0.44% | -1.04% | -0.75% | -0.13% | -0.05 |
| 5/1/2012 | $20.15 | -6.76% | 0.49% | -2.98% | -1.11% | -5.66% | -2.31 * |
| 5/2/2012 | $20.74 | 2.89% | -0.20% | -0.23% | -0.20% | 3.09% | 1.26 |
| 5/3/2012 | $20.52 | -1.07% | -1.01% | -3.30% | -2.21% | 1.14% | 0.47 |
| 5/4/2012 | $20.46 | -0.29% | -1.61% | -1.50% | -1.70% | 1.41% | 0.57 |
| 5/7/2012 | $20.34 | -0.59% | 0.05% | -0.34% | -0.09% | -0.49% | -0.20 |
| 5/8/2012 | $20.29 | -0.25% | -0.53% | 3.58% | 1.46% | -1.71% | -0.70 |
| 5/9/2012 | $20.23 | -0.30% | -0.60% | 1.25% | 0.27% | -0.57% | -0.23 |
| 5/10/2012 | $20.43 | 0.98% | 0.29% | -0.29% | 0.08% | 0.90% | 0.37 |
| 5/11/2012 | $19.74 | -3.44% | -0.27% | -3.74% | -1.96% | -1.48% | -0.60 |
| 5/14/2012 | $19.21 | -2.72% | -1.23% | -0.38% | -0.91% | -1.81% | -0.74 |
| 5/15/2012 | $19.10 | -0.57% | -0.60% | 0.98% | 0.14% | -0.71% | -0.29 |
| 5/16/2012 | $19.47 | 1.92% | -0.49% | 0.78% | 0.11% | 1.81% | 0.74 |
| 5/17/2012 | $19.37 | -0.51% | -1.64% | -0.97% | -1.46% | 0.94% | 0.39 |

Exhibit 54

000303

# Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t*- Statistic[1] |
|------|------|------|------|------|------|------|------|
| 5/18/2012 | $19.75 | 1.94% | -0.84% | -0.09% | -0.53% | 2.47% | 1.01 |
| 5/21/2012 | $20.00 | 1.26% | 1.78% | 1.09% | 1.69% | -0.43% | -0.18 |
| 5/22/2012 | $19.41 | -2.99% | -0.03% | -2.94% | -1.42% | -1.58% | -0.64 |
| 5/23/2012 | $20.24 | 4.19% | 0.30% | 0.79% | 0.62% | 3.57% | 1.46 |
| 5/24/2012 | $19.46 | -3.93% | 0.11% | -0.55% | -0.16% | -3.77% | -1.54 |
| 5/25/2012 | $19.60 | 0.72% | -0.16% | 2.79% | 1.30% | -0.58% | -0.24 |
| 5/29/2012 | $20.18 | 2.92% | 1.13% | 2.34% | 1.89% | 1.03% | 0.42 |
| 5/30/2012 | $19.49 | -3.48% | -1.59% | -3.30% | -2.56% | -0.91% | -0.37 |
| 5/31/2012 | $19.59 | 0.51% | -0.21% | 0.14% | -0.02% | 0.53% | 0.22 |
| 6/1/2012 | $18.54 | -5.51% | -2.55% | -1.52% | -2.30% | -3.21% | -1.31 |
| 6/4/2012 | $18.22 | -1.74% | -0.11% | 3.48% | 1.67% | -3.41% | -1.39 |
| 6/5/2012 | $18.25 | 0.16% | 0.80% | 0.22% | 0.65% | -0.48% | -0.20 |
| 6/6/2012 | $19.06 | 4.34% | 2.28% | 1.58% | 2.24% | 2.10% | 0.86 |
| 6/7/2012 | $18.55 | -2.71% | -0.14% | -0.46% | -0.27% | -2.44% | -1.00 |
| 6/8/2012 | $18.48 | -0.38% | 0.74% | 1.16% | 1.07% | -1.45% | -0.59 |
| 6/11/2012 | $18.62 | 0.75% | -1.43% | -2.23% | -1.95% | 2.70% | 1.10 |
| 6/12/2012 | $19.07 | 2.39% | 1.17% | -2.03% | -0.22% | 2.61% | 1.06 |
| 6/13/2012 | $18.54 | -2.82% | -0.71% | -1.05% | -0.92% | -1.90% | -0.78 |
| 6/14/2012 | $18.53 | -0.05% | 0.96% | 1.84% | 1.54% | -1.59% | -0.65 |
| 6/15/2012 | $18.77 | 1.29% | 1.02% | 1.03% | 1.18% | 0.11% | 0.04 |
| 6/18/2012 | $18.95 | 0.95% | 0.22% | -0.42% | -0.03% | 0.98% | 0.40 |
| 6/19/2012 | $20.30 | 6.88% | 1.18% | 3.78% | 2.62% | 4.26% | 1.74 |
| 6/20/2012 | $20.42 | 0.59% | -0.14% | 0.08% | -0.01% | 0.60% | 0.25 |
| 6/21/2012 | $20.45 | 0.15% | -2.39% | -1.04% | -1.97% | 2.11% | 0.86 |

Exhibit 54

000304

# Exhibit-4

## Event Study Daily Results

3 May 2011 through 13 July 2012

| Date | BPI Closing Price | BPI Logarithmic Return | CRSP Market Index Logarithmic Return | Peer Index Logarithmic Return | BPI Explained Return | BPI Residual Return | *t*- Statistic[1] |
|---|---|---|---|---|---|---|---|
| 6/22/2012 | $20.46 | 0.05% | 0.74% | 0.91% | 0.95% | -0.90% | -0.37 |
| 6/25/2012 | $20.16 | -1.48% | -1.59% | 0.24% | -0.84% | -0.64% | -0.26 |
| 6/26/2012 | $20.64 | 2.35% | 0.50% | 4.61% | 2.60% | -0.25% | -0.10 |
| 6/27/2012 | $21.00 | 1.73% | 0.91% | 0.87% | 1.04% | 0.69% | 0.28 |
| 6/28/2012 | $21.07 | 0.33% | -0.21% | 1.15% | 0.47% | -0.13% | -0.06 |
| 6/29/2012 | $21.80 | 3.41% | 2.54% | 3.40% | 3.30% | 0.11% | 0.05 |
| 7/2/2012 | $21.89 | 0.41% | 0.39% | 0.75% | 0.65% | -0.24% | -0.10 |
| 7/3/2012 | $21.97 | 0.36% | 0.89% | 1.08% | 1.12% | -0.76% | -0.31 |
| 7/5/2012 | $21.81 | -0.73% | -0.41% | -0.64% | -0.53% | -0.20% | -0.08 |
| 7/6/2012 | $21.50 | -1.43% | -1.01% | -0.13% | -0.65% | -0.78% | -0.32 |
| 7/9/2012 | $14.25 | -41.13% | -0.23% | -1.46% | -0.81% | -40.32% | -16.45 * |
| 7/10/2012 | $13.07 | -8.64% | -0.89% | -3.85% | -2.40% | -6.24% | -2.55 * |
| 7/11/2012 | $13.01 | -0.46% | -0.04% | -0.86% | -0.41% | -0.05% | -0.02 |
| 7/12/2012 | $12.97 | -0.31% | -0.49% | -0.58% | -0.55% | 0.24% | 0.10 |
| 7/13/2012 | $9.77 | -28.33% | 1.54% | -0.42% | 0.80% | -29.13% | -11.89 * |

**Source:** CRSP.

**Note:**

[1] Residual returns that are statistically significant at the 95% confidence level are marked with "*".

Exhibit 54

000305

Exhibit-5

# Artificial Inflation Ribbon

3 May 2011 to 13 July 2012

| Date | Bridgepoint Stock Price | Percent Inflation | Dollar Inflation Based On Percent Ribbon | Maximum Recoverable Damage Per Share Based On *Dura* Cap |
|------|------|------|------|------|
| 5/3/2011 | $19.87 | 50.1% | $9.95 | $9.95 |
| 5/4/2011 | $19.00 | 50.1% | $9.52 | $9.52 |
| 5/5/2011 | $19.14 | 50.1% | $9.59 | $9.59 |
| 5/6/2011 | $19.22 | 50.1% | $9.63 | $9.63 |
| 5/9/2011 | $19.94 | 50.1% | $9.99 | $9.99 |
| 5/10/2011 | $20.21 | 50.1% | $10.13 | $10.13 |
| 5/11/2011 | $20.80 | 50.1% | $10.42 | $10.41 |
| 5/12/2011 | $21.17 | 50.1% | $10.61 | $10.41 |
| 5/13/2011 | $21.15 | 50.1% | $10.60 | $10.41 |
| 5/16/2011 | $20.51 | 50.1% | $10.28 | $10.28 |
| 5/17/2011 | $20.12 | 50.1% | $10.08 | $10.08 |
| 5/18/2011 | $21.00 | 50.1% | $10.52 | $10.41 |
| 5/19/2011 | $21.26 | 50.1% | $10.65 | $10.41 |
| 5/20/2011 | $20.08 | 50.1% | $10.06 | $10.06 |
| 5/23/2011 | $19.88 | 50.1% | $9.96 | $9.96 |
| 5/24/2011 | $20.47 | 50.1% | $10.26 | $10.26 |
| 5/25/2011 | $22.89 | 50.1% | $11.47 | $10.41 |
| 5/26/2011 | $22.02 | 50.1% | $11.03 | $10.41 |
| 5/27/2011 | $22.43 | 50.1% | $11.24 | $10.41 |
| 5/31/2011 | $23.49 | 50.1% | $11.77 | $10.41 |
| 6/1/2011 | $23.68 | 50.1% | $11.86 | $10.41 |
| 6/2/2011 | $24.48 | 50.1% | $12.26 | $10.41 |
| 6/3/2011 | $25.22 | 50.1% | $12.64 | $10.41 |
| 6/6/2011 | $24.78 | 50.1% | $12.41 | $10.41 |
| 6/7/2011 | $24.94 | 50.1% | $12.50 | $10.41 |
| 6/8/2011 | $24.84 | 50.1% | $12.44 | $10.41 |
| 6/9/2011 | $25.01 | 50.1% | $12.53 | $10.41 |
| 6/10/2011 | $23.48 | 50.1% | $11.76 | $10.41 |
| 6/13/2011 | $23.31 | 50.1% | $11.68 | $10.41 |
| 6/14/2011 | $24.16 | 50.1% | $12.10 | $10.41 |
| 6/15/2011 | $23.98 | 50.1% | $12.01 | $10.41 |
| 6/16/2011 | $22.47 | 50.1% | $11.26 | $10.41 |
| 6/17/2011 | $22.64 | 50.1% | $11.34 | $10.41 |
| 6/20/2011 | $23.05 | 50.1% | $11.55 | $10.41 |
| 6/21/2011 | $23.75 | 50.1% | $11.90 | $10.41 |
| 6/22/2011 | $23.46 | 50.1% | $11.75 | $10.41 |
| 6/23/2011 | $23.61 | 50.1% | $11.83 | $10.41 |
| 6/24/2011 | $23.69 | 50.1% | $11.87 | $10.41 |
| 6/27/2011 | $23.74 | 50.1% | $11.89 | $10.41 |
| 6/28/2011 | $23.97 | 50.1% | $12.01 | $10.41 |

000306
Exhibit 54

# Exhibit-5

## Artificial Inflation Ribbon

3 May 2011 to 13 July 2012

| Date | Bridgepoint Stock Price | Percent Inflation | Dollar Inflation Based On Percent Ribbon | Maximum Recoverable Damage Per Share Based On *Dura* Cap |
|------|------------------------|-------------------|------------------------------------------|----------------------------------------------------------|
| 6/29/2011 | $23.75 | 50.1% | $11.90 | $10.41 |
| 6/30/2011 | $25.00 | 50.1% | $12.53 | $10.41 |
| 7/1/2011 | $25.57 | 50.1% | $12.81 | $10.41 |
| 7/5/2011 | $26.93 | 50.1% | $13.49 | $10.41 |
| 7/6/2011 | $27.00 | 50.1% | $13.53 | $10.41 |
| 7/7/2011 | $27.45 | 50.1% | $13.75 | $10.41 |
| 7/8/2011 | $27.25 | 50.1% | $13.65 | $10.41 |
| 7/11/2011 | $26.38 | 50.1% | $13.22 | $10.41 |
| 7/12/2011 | $27.42 | 50.1% | $13.74 | $10.41 |
| 7/13/2011 | $28.05 | 50.1% | $14.05 | $10.41 |
| 7/14/2011 | $28.33 | 50.1% | $14.19 | $10.41 |
| 7/15/2011 | $28.25 | 50.1% | $14.15 | $10.41 |
| 7/18/2011 | $27.86 | 50.1% | $13.96 | $10.41 |
| 7/19/2011 | $28.31 | 50.1% | $14.18 | $10.41 |
| 7/20/2011 | $29.57 | 50.1% | $14.81 | $10.41 |
| 7/21/2011 | $30.06 | 50.1% | $15.06 | $10.41 |
| 7/22/2011 | $30.50 | 50.1% | $15.28 | $10.41 |
| 7/25/2011 | $27.01 | 50.1% | $13.53 | $10.41 |
| 7/26/2011 | $26.69 | 50.1% | $13.37 | $10.41 |
| 7/27/2011 | $25.35 | 50.1% | $12.70 | $10.41 |
| 7/28/2011 | $24.68 | 50.1% | $12.36 | $10.41 |
| 7/29/2011 | $24.76 | 50.1% | $12.40 | $10.41 |
| 8/1/2011 | $25.04 | 50.1% | $12.55 | $10.41 |
| 8/2/2011 | $21.77 | 50.1% | $10.91 | $10.41 |
| 8/3/2011 | $21.61 | 50.1% | $10.83 | $10.41 |
| 8/4/2011 | $21.17 | 50.1% | $10.61 | $10.41 |
| 8/5/2011 | $20.23 | 50.1% | $10.14 | $10.14 |
| 8/8/2011 | $19.87 | 50.1% | $9.95 | $9.95 |
| 8/9/2011 | $21.37 | 50.1% | $10.71 | $10.41 |
| 8/10/2011 | $21.28 | 50.1% | $10.66 | $10.41 |
| 8/11/2011 | $22.48 | 50.1% | $11.26 | $10.41 |
| 8/12/2011 | $22.80 | 50.1% | $11.42 | $10.41 |
| 8/15/2011 | $22.79 | 50.1% | $11.42 | $10.41 |
| 8/16/2011 | $22.25 | 50.1% | $11.15 | $10.41 |
| 8/17/2011 | $22.47 | 50.1% | $11.26 | $10.41 |
| 8/18/2011 | $21.15 | 50.1% | $10.60 | $10.41 |
| 8/19/2011 | $21.02 | 50.1% | $10.53 | $10.41 |
| 8/22/2011 | $21.39 | 50.1% | $10.72 | $10.41 |
| 8/23/2011 | $21.59 | 50.1% | $10.82 | $10.41 |
| 8/24/2011 | $21.50 | 50.1% | $10.77 | $10.41 |

000307
Exhibit 54

**Exhibit-5**

**Artificial Inflation Ribbon**

3 May 2011 to 13 July 2012

| Date | Bridgepoint Stock Price | Percent Inflation | Dollar Inflation Based On Percent Ribbon | Maximum Recoverable Damage Per Share Based On *Dura* Cap |
|---|---|---|---|---|
| 8/25/2011 | $21.04 | 50.1% | $10.54 | $10.41 |
| 8/26/2011 | $21.51 | 50.1% | $10.78 | $10.41 |
| 8/29/2011 | $22.58 | 50.1% | $11.31 | $10.41 |
| 8/30/2011 | $22.67 | 50.1% | $11.36 | $10.41 |
| 8/31/2011 | $22.08 | 50.1% | $11.06 | $10.41 |
| 9/1/2011 | $20.86 | 50.1% | $10.45 | $10.41 |
| 9/2/2011 | $20.40 | 50.1% | $10.22 | $10.22 |
| 9/6/2011 | $20.48 | 50.1% | $10.26 | $10.26 |
| 9/7/2011 | $21.49 | 50.1% | $10.77 | $10.41 |
| 9/8/2011 | $21.38 | 50.1% | $10.71 | $10.41 |
| 9/9/2011 | $20.52 | 50.1% | $10.28 | $10.28 |
| 9/12/2011 | $20.91 | 50.1% | $10.48 | $10.41 |
| 9/13/2011 | $21.29 | 50.1% | $10.67 | $10.41 |
| 9/14/2011 | $20.96 | 50.1% | $10.50 | $10.41 |
| 9/15/2011 | $21.67 | 50.1% | $10.86 | $10.41 |
| 9/16/2011 | $21.44 | 50.1% | $10.74 | $10.41 |
| 9/19/2011 | $21.17 | 50.1% | $10.61 | $10.41 |
| 9/20/2011 | $21.05 | 50.1% | $10.55 | $10.41 |
| 9/21/2011 | $20.92 | 50.1% | $10.48 | $10.41 |
| 9/22/2011 | $20.04 | 50.1% | $10.04 | $10.04 |
| 9/23/2011 | $19.46 | 50.1% | $9.75 | $9.75 |
| 9/26/2011 | $20.02 | 50.1% | $10.03 | $10.03 |
| 9/27/2011 | $20.38 | 50.1% | $10.21 | $10.21 |
| 9/28/2011 | $19.60 | 50.1% | $9.82 | $9.82 |
| 9/29/2011 | $18.94 | 50.1% | $9.49 | $9.49 |
| 9/30/2011 | $17.44 | 50.1% | $8.74 | $8.74 |
| 10/3/2011 | $16.52 | 50.1% | $8.28 | $8.28 |
| 10/4/2011 | $16.92 | 50.1% | $8.48 | $8.48 |
| 10/5/2011 | $18.65 | 50.1% | $9.34 | $9.34 |
| 10/6/2011 | $19.44 | 50.1% | $9.74 | $9.74 |
| 10/7/2011 | $19.08 | 50.1% | $9.56 | $9.56 |
| 10/10/2011 | $20.00 | 50.1% | $10.02 | $10.02 |
| 10/11/2011 | $19.73 | 50.1% | $9.88 | $9.88 |
| 10/12/2011 | $20.74 | 50.1% | $10.39 | $10.39 |
| 10/13/2011 | $20.33 | 50.1% | $10.19 | $10.19 |
| 10/14/2011 | $21.00 | 50.1% | $10.52 | $10.41 |
| 10/17/2011 | $20.14 | 50.1% | $10.09 | $10.09 |
| 10/18/2011 | $19.54 | 50.1% | $9.79 | $9.79 |
| 10/19/2011 | $19.48 | 50.1% | $9.76 | $9.76 |
| 10/20/2011 | $19.90 | 50.1% | $9.97 | $9.97 |

000308
**Exhibit 54**

## Exhibit-5

## Artificial Inflation Ribbon

### 3 May 2011 to 13 July 2012

| Date | Bridgepoint Stock Price | Percent Inflation | Dollar Inflation Based On Percent Ribbon | Maximum Recoverable Damage Per Share Based On *Dura* Cap |
|---|---|---|---|---|
| 10/21/2011 | $20.91 | 50.1% | $10.48 | $10.41 |
| 10/24/2011 | $22.00 | 50.1% | $11.02 | $10.41 |
| 10/25/2011 | $21.41 | 50.1% | $10.73 | $10.41 |
| 10/26/2011 | $21.27 | 50.1% | $10.66 | $10.41 |
| 10/27/2011 | $21.82 | 50.1% | $10.93 | $10.41 |
| 10/28/2011 | $21.83 | 50.1% | $10.94 | $10.41 |
| 10/31/2011 | $21.67 | 50.1% | $10.86 | $10.41 |
| 11/1/2011 | $22.99 | 50.1% | $11.52 | $10.41 |
| 11/2/2011 | $23.59 | 50.1% | $11.82 | $10.41 |
| 11/3/2011 | $23.74 | 50.1% | $11.89 | $10.41 |
| 11/4/2011 | $22.95 | 50.1% | $11.50 | $10.41 |
| 11/7/2011 | $23.65 | 50.1% | $11.85 | $10.41 |
| 11/8/2011 | $23.22 | 50.1% | $11.63 | $10.41 |
| 11/9/2011 | $22.91 | 50.1% | $11.48 | $10.41 |
| 11/10/2011 | $21.40 | 50.1% | $10.72 | $10.41 |
| 11/11/2011 | $22.02 | 50.1% | $11.03 | $10.41 |
| 11/14/2011 | $22.06 | 50.1% | $11.05 | $10.41 |
| 11/15/2011 | $22.38 | 50.1% | $11.21 | $10.41 |
| 11/16/2011 | $22.22 | 50.1% | $11.13 | $10.41 |
| 11/17/2011 | $22.94 | 50.1% | $11.49 | $10.41 |
| 11/18/2011 | $22.59 | 50.1% | $11.32 | $10.41 |
| 11/21/2011 | $21.26 | 50.1% | $10.65 | $10.41 |
| 11/22/2011 | $21.64 | 50.1% | $10.84 | $10.41 |
| 11/23/2011 | $21.20 | 50.1% | $10.62 | $10.41 |
| 11/25/2011 | $20.59 | 50.1% | $10.32 | $10.32 |
| 11/28/2011 | $21.03 | 50.1% | $10.54 | $10.41 |
| 11/29/2011 | $20.66 | 50.1% | $10.35 | $10.35 |
| 11/30/2011 | $22.00 | 50.1% | $11.02 | $10.41 |
| 12/1/2011 | $21.20 | 50.1% | $10.62 | $10.41 |
| 12/2/2011 | $22.14 | 50.1% | $11.09 | $10.41 |
| 12/5/2011 | $23.15 | 50.1% | $11.60 | $10.41 |
| 12/6/2011 | $22.69 | 50.1% | $11.37 | $10.41 |
| 12/7/2011 | $22.58 | 50.1% | $11.31 | $10.41 |
| 12/8/2011 | $21.55 | 50.1% | $10.80 | $10.41 |
| 12/9/2011 | $22.19 | 50.1% | $11.12 | $10.41 |
| 12/12/2011 | $21.81 | 50.1% | $10.93 | $10.41 |
| 12/13/2011 | $21.15 | 50.1% | $10.60 | $10.41 |
| 12/14/2011 | $20.73 | 50.1% | $10.39 | $10.39 |
| 12/15/2011 | $20.69 | 50.1% | $10.37 | $10.37 |
| 12/16/2011 | $21.62 | 50.1% | $10.83 | $10.41 |

90

Exhibit-5

## Artificial Inflation Ribbon

3 May 2011 to 13 July 2012

| Date | Bridgepoint Stock Price | Percent Inflation | Dollar Inflation Based On Percent Ribbon | Maximum Recoverable Damage Per Share Based On *Dura* Cap |
|---|---|---|---|---|
| 12/19/2011 | $21.74 | 50.1% | $10.89 | $10.41 |
| 12/20/2011 | $22.15 | 50.1% | $11.10 | $10.41 |
| 12/21/2011 | $22.15 | 50.1% | $11.10 | $10.41 |
| 12/22/2011 | $22.41 | 50.1% | $11.23 | $10.41 |
| 12/23/2011 | $22.64 | 50.1% | $11.34 | $10.41 |
| 12/27/2011 | $23.77 | 50.1% | $11.91 | $10.41 |
| 12/28/2011 | $23.06 | 50.1% | $11.55 | $10.41 |
| 12/29/2011 | $23.38 | 50.1% | $11.71 | $10.41 |
| 12/30/2011 | $23.00 | 50.1% | $11.52 | $10.41 |
| 1/3/2012 | $21.87 | 50.1% | $10.96 | $10.41 |
| 1/4/2012 | $22.14 | 50.1% | $11.09 | $10.41 |
| 1/5/2012 | $22.38 | 50.1% | $11.21 | $10.41 |
| 1/6/2012 | $22.95 | 50.1% | $11.50 | $10.41 |
| 1/9/2012 | $23.37 | 50.1% | $11.71 | $10.41 |
| 1/10/2012 | $23.39 | 50.1% | $11.72 | $10.41 |
| 1/11/2012 | $24.02 | 50.1% | $12.03 | $10.41 |
| 1/12/2012 | $26.21 | 50.1% | $13.13 | $10.41 |
| 1/13/2012 | $25.41 | 50.1% | $12.73 | $10.41 |
| 1/17/2012 | $26.11 | 50.1% | $13.08 | $10.41 |
| 1/18/2012 | $24.80 | 50.1% | $12.42 | $10.41 |
| 1/19/2012 | $24.93 | 50.1% | $12.49 | $10.41 |
| 1/20/2012 | $24.59 | 50.1% | $12.32 | $10.41 |
| 1/23/2012 | $24.44 | 50.1% | $12.24 | $10.41 |
| 1/24/2012 | $25.21 | 50.1% | $12.63 | $10.41 |
| 1/25/2012 | $25.86 | 50.1% | $12.96 | $10.41 |
| 1/26/2012 | $25.65 | 50.1% | $12.85 | $10.41 |
| 1/27/2012 | $25.70 | 50.1% | $12.88 | $10.41 |
| 1/30/2012 | $25.15 | 50.1% | $12.60 | $10.41 |
| 1/31/2012 | $24.59 | 50.1% | $12.32 | $10.41 |
| 2/1/2012 | $25.95 | 50.1% | $13.00 | $10.41 |
| 2/2/2012 | $26.60 | 50.1% | $13.33 | $10.41 |
| 2/3/2012 | $26.94 | 50.1% | $13.50 | $10.41 |
| 2/6/2012 | $26.52 | 50.1% | $13.29 | $10.41 |
| 2/7/2012 | $26.40 | 50.1% | $13.23 | $10.41 |
| 2/8/2012 | $26.16 | 50.1% | $13.11 | $10.41 |
| 2/9/2012 | $26.54 | 50.1% | $13.30 | $10.41 |
| 2/10/2012 | $26.53 | 50.1% | $13.29 | $10.41 |
| 2/13/2012 | $26.80 | 50.1% | $13.43 | $10.41 |
| 2/14/2012 | $26.45 | 50.1% | $13.25 | $10.41 |
| 2/15/2012 | $26.09 | 50.1% | $13.07 | $10.41 |

91

# Exhibit-5

## Artificial Inflation Ribbon

### 3 May 2011 to 13 July 2012

| Date | Bridgepoint Stock Price | Percent Inflation | Dollar Inflation Based On Percent Ribbon | Maximum Recoverable Damage Per Share Based On *Dura* Cap |
|---|---|---|---|---|
| 2/16/2012 | $26.32 | 50.1% | $13.19 | $10.41 |
| 2/17/2012 | $26.37 | 50.1% | $13.21 | $10.41 |
| 2/21/2012 | $26.34 | 50.1% | $13.20 | $10.41 |
| 2/22/2012 | $26.53 | 50.1% | $13.29 | $10.41 |
| 2/23/2012 | $26.74 | 50.1% | $13.40 | $10.41 |
| 2/24/2012 | $26.63 | 50.1% | $13.34 | $10.41 |
| 2/27/2012 | $26.62 | 50.1% | $13.34 | $10.41 |
| 2/28/2012 | $24.54 | 50.1% | $12.29 | $10.41 |
| 2/29/2012 | $24.36 | 50.1% | $12.20 | $10.41 |
| 3/1/2012 | $24.04 | 50.1% | $12.04 | $10.41 |
| 3/2/2012 | $23.84 | 50.1% | $11.94 | $10.41 |
| 3/5/2012 | $23.49 | 50.1% | $11.77 | $10.41 |
| 3/6/2012 | $23.39 | 50.1% | $11.72 | $10.41 |
| 3/7/2012 | $24.02 | 50.1% | $12.03 | $10.41 |
| 3/8/2012 | $24.64 | 50.1% | $12.34 | $10.41 |
| 3/9/2012 | $24.40 | 50.1% | $12.22 | $10.41 |
| 3/12/2012 | $23.85 | 50.1% | $11.95 | $10.41 |
| 3/13/2012 | $24.68 | 50.1% | $12.36 | $10.41 |
| 3/14/2012 | $24.10 | 50.1% | $12.07 | $10.41 |
| 3/15/2012 | $24.40 | 50.1% | $12.22 | $10.41 |
| 3/16/2012 | $24.47 | 50.1% | $12.26 | $10.41 |
| 3/19/2012 | $24.88 | 50.1% | $12.46 | $10.41 |
| 3/20/2012 | $24.81 | 50.1% | $12.43 | $10.41 |
| 3/21/2012 | $24.79 | 50.1% | $12.42 | $10.41 |
| 3/22/2012 | $24.58 | 50.1% | $12.31 | $10.41 |
| 3/23/2012 | $24.28 | 50.1% | $12.16 | $10.41 |
| 3/26/2012 | $25.47 | 50.1% | $12.76 | $10.41 |
| 3/27/2012 | $25.26 | 50.1% | $12.66 | $10.41 |
| 3/28/2012 | $25.28 | 50.1% | $12.67 | $10.41 |
| 3/29/2012 | $24.78 | 50.1% | $12.41 | $10.41 |
| 3/30/2012 | $24.75 | 50.1% | $12.40 | $10.41 |
| 4/2/2012 | $25.44 | 50.1% | $12.75 | $10.41 |
| 4/3/2012 | $25.38 | 50.1% | $12.72 | $10.41 |
| 4/4/2012 | $23.98 | 50.1% | $12.01 | $10.41 |
| 4/5/2012 | $23.37 | 50.1% | $11.71 | $10.41 |
| 4/9/2012 | $21.18 | 50.1% | $10.61 | $10.41 |
| 4/10/2012 | $20.50 | 50.1% | $10.27 | $10.27 |
| 4/11/2012 | $21.33 | 50.1% | $10.69 | $10.41 |
| 4/12/2012 | $21.60 | 50.1% | $10.82 | $10.41 |
| 4/13/2012 | $21.50 | 50.1% | $10.77 | $10.41 |

000311
**Exhibit 54**

# Exhibit-5

## Artificial Inflation Ribbon

### 3 May 2011 to 13 July 2012

| Date | Bridgepoint Stock Price | Percent Inflation | Dollar Inflation Based On Percent Ribbon | Maximum Recoverable Damage Per Share Based On *Dura* Cap |
|------|------|------|------|------|
| 4/16/2012 | $21.36 | 50.1% | $10.70 | $10.41 |
| 4/17/2012 | $21.62 | 50.1% | $10.83 | $10.41 |
| 4/18/2012 | $21.41 | 50.1% | $10.73 | $10.41 |
| 4/19/2012 | $21.29 | 50.1% | $10.67 | $10.41 |
| 4/20/2012 | $21.30 | 50.1% | $10.67 | $10.41 |
| 4/23/2012 | $21.16 | 50.1% | $10.60 | $10.41 |
| 4/24/2012 | $20.88 | 50.1% | $10.46 | $10.41 |
| 4/25/2012 | $21.16 | 50.1% | $10.60 | $10.41 |
| 4/26/2012 | $21.59 | 50.1% | $10.82 | $10.41 |
| 4/27/2012 | $21.75 | 50.1% | $10.90 | $10.41 |
| 4/30/2012 | $21.56 | 50.1% | $10.80 | $10.41 |
| 5/1/2012 | $20.15 | 50.1% | $10.10 | $10.10 |
| 5/2/2012 | $20.74 | 50.1% | $10.39 | $10.39 |
| 5/3/2012 | $20.52 | 50.1% | $10.28 | $10.28 |
| 5/4/2012 | $20.46 | 50.1% | $10.25 | $10.25 |
| 5/7/2012 | $20.34 | 50.1% | $10.19 | $10.19 |
| 5/8/2012 | $20.29 | 50.1% | $10.17 | $10.17 |
| 5/9/2012 | $20.23 | 50.1% | $10.14 | $10.14 |
| 5/10/2012 | $20.43 | 50.1% | $10.24 | $10.24 |
| 5/11/2012 | $19.74 | 50.1% | $9.89 | $9.89 |
| 5/14/2012 | $19.21 | 50.1% | $9.62 | $9.62 |
| 5/15/2012 | $19.10 | 50.1% | $9.57 | $9.57 |
| 5/16/2012 | $19.47 | 50.1% | $9.75 | $9.75 |
| 5/17/2012 | $19.37 | 50.1% | $9.70 | $9.70 |
| 5/18/2012 | $19.75 | 50.1% | $9.89 | $9.89 |
| 5/21/2012 | $20.00 | 50.1% | $10.02 | $10.02 |
| 5/22/2012 | $19.41 | 50.1% | $9.72 | $9.72 |
| 5/23/2012 | $20.24 | 50.1% | $10.14 | $10.14 |
| 5/24/2012 | $19.46 | 50.1% | $9.75 | $9.75 |
| 5/25/2012 | $19.60 | 50.1% | $9.82 | $9.82 |
| 5/29/2012 | $20.18 | 50.1% | $10.11 | $10.11 |
| 5/30/2012 | $19.49 | 50.1% | $9.76 | $9.76 |
| 5/31/2012 | $19.59 | 50.1% | $9.81 | $9.81 |
| 6/1/2012 | $18.54 | 50.1% | $9.29 | $9.29 |
| 6/4/2012 | $18.22 | 50.1% | $9.13 | $9.13 |
| 6/5/2012 | $18.25 | 50.1% | $9.14 | $9.14 |
| 6/6/2012 | $19.06 | 50.1% | $9.55 | $9.55 |
| 6/7/2012 | $18.55 | 50.1% | $9.29 | $9.29 |
| 6/8/2012 | $18.48 | 50.1% | $9.26 | $9.26 |
| 6/11/2012 | $18.62 | 50.1% | $9.33 | $9.33 |

93

000312
**Exhibit 54**

Exhibit-5

## Artificial Inflation Ribbon

3 May 2011 to 13 July 2012

| Date | Bridgepoint Stock Price | Percent Inflation | Dollar Inflation Based On Percent Ribbon | Maximum Recoverable Damage Per Share Based On *Dura* Cap |
|---|---|---|---|---|
| 6/12/2012 | $19.07 | 50.1% | $9.55 | $9.55 |
| 6/13/2012 | $18.54 | 50.1% | $9.29 | $9.29 |
| 6/14/2012 | $18.53 | 50.1% | $9.28 | $9.28 |
| 6/15/2012 | $18.77 | 50.1% | $9.40 | $9.40 |
| 6/18/2012 | $18.95 | 50.1% | $9.49 | $9.49 |
| 6/19/2012 | $20.30 | 50.1% | $10.17 | $10.17 |
| 6/20/2012 | $20.42 | 50.1% | $10.23 | $10.23 |
| 6/21/2012 | $20.45 | 50.1% | $10.25 | $10.25 |
| 6/22/2012 | $20.46 | 50.1% | $10.25 | $10.25 |
| 6/25/2012 | $20.16 | 50.1% | $10.10 | $10.10 |
| 6/26/2012 | $20.64 | 50.1% | $10.34 | $10.34 |
| 6/27/2012 | $21.00 | 50.1% | $10.52 | $10.41 |
| 6/28/2012 | $21.07 | 50.1% | $10.56 | $10.41 |
| 6/29/2012 | $21.80 | 50.1% | $10.92 | $10.41 |
| 7/2/2012 | $21.89 | 50.1% | $10.97 | $10.41 |
| 7/3/2012 | $21.97 | 50.1% | $11.01 | $10.41 |
| 7/5/2012 | $21.81 | 50.1% | $10.93 | $10.41 |
| 7/6/2012 | $21.50 | 50.1% | $10.77 | $10.41 |
| 7/9/2012 | $14.25 | 25.3% | $3.61 | $3.28 |
| 7/10/2012 | $13.07 | 25.3% | $3.31 | $3.28 |
| 7/11/2012 | $13.01 | 25.3% | $3.29 | $3.28 |
| 7/12/2012 | $12.97 | 25.3% | $3.28 | $3.28 |
| 7/13/2012 - thereafter | $9.77 | – | – | – |

000313
Exhibit 54

# Exhibit-6

## Bridgepoint Stock Prices

13 July 2012 through 10 October 2012

| Date | BPI Closing Price |
|------|------------------|
| 7/13/2012 | $9.77 |
| 7/16/2012 | $9.84 |
| 7/17/2012 | $9.65 |
| 7/18/2012 | $9.47 |
| 7/19/2012 | $9.23 |
| 7/20/2012 | $9.01 |
| 7/23/2012 | $8.93 |
| 7/24/2012 | $8.66 |
| 7/25/2012 | $8.58 |
| 7/26/2012 | $8.40 |
| 7/27/2012 | $8.41 |
| 7/30/2012 | $8.43 |
| 7/31/2012 | $9.10 |
| 8/1/2012 | $9.35 |
| 8/2/2012 | $9.42 |
| 8/3/2012 | $9.44 |
| 8/6/2012 | $10.01 |
| 8/7/2012 | $10.58 |
| 8/8/2012 | $10.98 |
| 8/9/2012 | $10.91 |
| 8/10/2012 | $10.77 |
| 8/13/2012 | $10.07 |
| 8/14/2012 | $9.80 |
| 8/15/2012 | $10.07 |
| 8/16/2012 | $10.36 |
| 8/17/2012 | $10.45 |
| 8/20/2012 | $10.29 |
| 8/21/2012 | $10.40 |
| 8/22/2012 | $10.10 |
| 8/23/2012 | $10.46 |
| 8/24/2012 | $9.99 |
| 8/27/2012 | $9.78 |
| 8/28/2012 | $9.72 |
| 8/29/2012 | $9.74 |
| 8/30/2012 | $9.77 |
| 8/31/2012 | $9.86 |

000314
Exhibit 54

# Exhibit-6

## Bridgepoint Stock Prices

13 July 2012 through 10 October 2012

| Date | BPI Closing Price |
|---|---|
| 9/4/2012 | $9.56 |
| 9/5/2012 | $10.32 |
| 9/6/2012 | $10.81 |
| 9/7/2012 | $10.89 |
| 9/10/2012 | $10.93 |
| 9/11/2012 | $11.38 |
| 9/12/2012 | $11.00 |
| 9/13/2012 | $10.72 |
| 9/14/2012 | $11.26 |
| 9/17/2012 | $11.22 |
| 9/18/2012 | $11.64 |
| 9/19/2012 | $11.78 |
| 9/20/2012 | $11.04 |
| 9/21/2012 | $10.96 |
| 9/24/2012 | $10.72 |
| 9/25/2012 | $10.06 |
| 9/26/2012 | $10.24 |
| 9/27/2012 | $10.20 |
| 9/28/2012 | $10.15 |
| 10/1/2012 | $10.20 |
| 10/2/2012 | $10.20 |
| 10/3/2012 | $9.80 |
| 10/4/2012 | $10.21 |
| 10/5/2012 | $10.33 |
| 10/8/2012 | $10.57 |
| 10/9/2012 | $10.57 |
| 10/10/2012 | $10.72 |

**Source:** CRSP.

000315
Exhibit 54

# EXHIBIT 55

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re BRIDGEPOINT EDUCATION, INC.<br>SECURITIES LITIGATION | Civil Action No. 3:12-cv-01737-JM-JLB |
| | <u>CLASS ACTION</u> |
| This Document Relates To: | |
| ALL ACTIONS. | |

REBUTTAL REPORT ON LOSS CAUSATION AND DAMAGES

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

JUNE 15, 2015

# TABLE OF CONTENTS

I.     SCOPE OF PROJECT AND REPORT ...........................................................1

II.    CONCLUSIONS.........................................................................................2

III.   MY DAMAGES COMPUTATION WAS EXECUTED IN ACCORDANCE WITH DR. TABAK'S THREE REQUISITE STEPS ........................................3

    A.    Review of My Loss Causation and Damage Methodology .....................3

    B.    Dr. Tabak's Stated Requisite Steps.........................................................5

    C.    My Damages Methodology Appropriately Removed Market and Industry Effects from Bridgepoint's Stock Price on the Corrective Disclosures..................6

    D.    My Damages Methodology Appropriately Considered All of the Information Disclosed in Both Corrective Disclosures .........................................7

        1.    Dr. Tabak Fails to Appreciate the Importance and Role of Persistence.................................................................................................8

            a.    Persistence, Retention, and Completion All Measured Educational Effectiveness and Therefore are All Related to Business Viability ......................................................................10

            b.    Dr. Tabak Incorrectly Concludes That a Lack of Statistically Significant Stock Price Changes Implies No Inflation.........................................................................................13

        2.    The 13 July 2012 Corrective Disclosure Informed the Market of the Severity and Magnitude of the Company's Systematic Failures .........16

    E.    My Constant Percentage Inflation Ribbon Is Appropriate and Endorsed by Dr. Tabak ...........................................................................................................21

        1.    Percentage Inflation Ribbon ................................................................21

        2.    Constant Percentage Inflation Ribbon .................................................22

IV.   DR. TABAK'S DAMAGES MODELS ARE FLAWED.................................23

    A.    Flaws in Scenarios I, IV, and VII ............................................................24

    B.    Flaws in Scenarios II, III, V, VI, VIII, and IX.......................................26

V.    LIMITING FACTORS AND OTHER ASSUMPTIONS................................27

# I. SCOPE OF PROJECT AND REPORT

1. In my expert report dated 6 August 2014 ("August Report" or "Feinstein August Report"), I concluded that Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") common stock traded in an efficient market over the course of the Class Period, 3 May 2011 to 13 July 2012. I showed that each of the *Cammer* and *Krogman* factors supports a finding that Bridgepoint common stock traded in an efficient market, and I further demonstrated – through an event study – that Bridgepoint common stock reacted promptly to new material information as it entered the market, which is the hallmark of an efficient market.

2. Following my August Report, I submitted a report dated 2 June 2015 ("Damages Report" or "Feinstein Damages Report"), in which I determined that the alleged misrepresentations and omissions caused the price of Bridgepoint stock to be artificially inflated over the course of the Class Period and caused investors to suffer losses when corrective disclosures dissipated artificial inflation.[1] I also quantified the per share damages caused by the alleged misdeeds.

3. The Company's announcements on 9 July 2012 and 13 July 2012 were both corrective disclosures, which together caused the dissipation of artificial inflation totaling 50.1% of the Company's stock price.[2] Any investor who purchased Bridgepoint stock when the price was artificially inflated and held that stock beyond a corrective disclosure suffered a loss that was caused by the alleged misrepresentations and omissions. Artificial inflation ranged up to $15.28 per share.[3]

4. Subsequently, I was asked by Robbins Geller Rudman & Dowd LLP, counsel for the Plaintiffs, to consider, evaluate, and respond to the arguments and conclusions in the Expert Report of David I. Tabak, Ph.D. ("Tabak Report") dated 1 June 2015,

---

[1] Feinstein Damages Report, ¶6.

[2] *Id.*, ¶9.

[3] On account of a cap on recoverable damages pursuant to the *Dura Pharmaceuticals* decision, while artificial inflation ranged up to $15.28 per share, recoverable damages range up to $10.41 per share.

1

submitted by Defendants in this matter. The Tabak Report presents Dr. Tabak's opinions on loss causation and damages concerning Bridgepoint's common stock.

5. This report presents my methodology, findings, and conclusions relating to the Tabak Report.

6. The documents I reviewed and relied upon in the course of this engagement, in addition to those cited in my earlier reports, are listed in Exhibit-1. My credentials and compensation are presented in my August Report, as is a list of testimony within the four years preceding that report. Testimony I have provided since the submission of my Damages Report is identified in Exhibit-2.

7. I understand that discovery is ongoing in this case. I reserve the right to make any corrections or additions to my report, and to modify my opinion, should any new or additional information become available.

## II. <u>CONCLUSIONS</u>

8. The Tabak Report provides no basis for revising my findings and conclusions on loss causation and damages. My analysis is based on widely used and generally accepted methodologies, grounded in fundamental principles of finance. Dr. Tabak largely agrees with the methodologies I applied. Where Dr. Tabak disagrees, his divergent opinions stem from his misreading or misunderstanding of case facts or his faulty application of the very methodological principles he articulates.

9. My loss causation and attribution analysis, in which I accounted for and controlled for the effects of market and industry factors on Bridgepoint's stock price following the two corrective disclosures, is accurate, appropriate, and grounded in the academic literature. Dr. Tabak agrees that my event study analysis controlled for the effects of the market and industry factors.

10. Dr. Tabak agrees that my use of a constant percentage inflation ribbon is one of the most common methodologies used to compute damages in securities litigations. Further, his report supports my choice of taking a constant percentage level of artificial inflation back from the first corrective disclosure date to the beginning of the Class Period.

2

11. The damage scenarios presented in the Tabak Report are flawed and uninformative, generally.

12. Nonetheless, I agree with the underlying assumption in Dr. Tabak's first two damage models that accreditation required fixing the persistence problem, and that the Company's failure to receive WASC accreditation signaled to the marketplace what had been previously concealed by the alleged fraud. However, in his first two damage models, Dr. Tabak limits his estimate of artificial inflation (and thus damages) to the amount of money the Company would have had to spend in order to fix the persistence problem. This limitation is incorrect as it is pure speculation that the Company would have coupled an earlier corrective disclosure with a commitment to spend the necessary funds to fix the problem, that the amount committed would have been sufficient, or that it would even have been possible to correct the problems in a reasonable timeframe. Similar statements that were made are specifically alleged to be among the false and misleading statements in this case. The economic consequences of the false and misleading statements are not the purported costs to address the persistence problem, as Dr. Tabak posits, but rather the economic consequences of not having done so. The artificial inflation and damages are correctly measured by the residual declines that occurred upon the corrective disclosures.

## III.  MY DAMAGES COMPUTATION WAS EXECUTED IN ACCORDANCE WITH DR. TABAK'S THREE REQUISITE STEPS

### A.    Review of My Loss Causation and Damage Methodology

13. As explained in my Damages Report, I computed the amount of artificial inflation in Bridgepoint's stock price using an event study that measured how much artificial inflation exited the stock price following the corrective disclosures. The event study appropriately determined how much of the Company's stock decline following each corrective disclosure date was attributable to market and sector effects so that these factors could be isolated and removed.[4]

---

[4] Feinstein Damages Report, ¶93.

14. On 9 July 2012 and 13 July 2012 the market was informed of developments that resulted from Company conditions that were previously concealed according to Plaintiffs' allegations on account of the alleged false and misleading statements and omissions. These corrective disclosure events conveyed to the marketplace the information that was previously concealed by the alleged misrepresentations and omissions. When the two corrective disclosure events revealed to the marketplace the previously concealed truth, the stock price fell 33.2% and 25.3%, respectively.[5, 6] Across the two dates, the aggregate percentage price decline caused by the disclosures amounted to 50.1% of the stock's value.[7]

15. Based on a review of all Company-specific news that emerged on the corrective disclosure dates, I attributed the entirety of the residual price declines on July 9th and July 13th to the corrective disclosures.[8] It therefore follows that, just prior to the first corrective disclosure, Bridgepoint stock was artificially inflated by 50.1%. As there were no identifiable inflationary or deflationary events between the start of the Class Period and the first corrective disclosure, and as the nature of the concealed information would have caused the Company to be overvalued by a percentage of its market value rather than by a constant dollar amount, I concluded that the 50.1% of artificial inflation was in the Bridgepoint stock price from the start of the Class Period until the first corrective disclosure on 9 July 2012.

16. The alleged misrepresentations and omissions caused the Bridgepoint stock price to be inflated. Disclosure events that revealed to investors what was previously concealed caused the artificial inflation to dissipate, causing the stock price to fall, and, in turn, caused investors to suffer losses. In particular, investors suffered losses upon the disclosure of the previously concealed facts and the ramifications associated therewith that "Ashford had not developed a method for tracking, collecting and displaying data

---

[5] *Id.*, ¶110 and ¶114.

[6] These declines are presented on a percentage price decline basis. On a logarithmic return basis, the stock price returns were -40.3% and -29.1%, respectively.

[7] Feinstein Damages Report, ¶120.

[8] *Id.*, ¶103 and ¶113.

on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition,"[9] and that "Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion."[10] By causing artificial inflation, which dissipated upon disclosure, the previous concealment of this information during the Class Period by the alleged misrepresentation and omissions caused investor losses.

17. As explained in my Damages Report, I am able to measure damages for any particular investor as a function of the change in stock price and change in artificial inflation over the course of the investor's holding period, subject to certain statutory provisions and limits.

**B.      Dr. Tabak's Stated Requisite Steps**

18. In his report, Dr. Tabak describes the three requisite steps for a reliable damages analysis:[11] 1) Bridgepoint's stock price movements "must be adjusted to remove the effects of market and/or industry effects over the period over which the price decline is measured;"[12] 2) the effects of allegation-related information on the disclosure dates must be isolated;[13] and, 3) one must construct an inflation ribbon consistent with Plaintiffs' allegations and other case specific issues.[14]

19. The methodology by which I measured damages accords with all of the requisite steps stated by Dr. Tabak. First, he explicitly accepts my event study analysis, inclusive of the manner in which I controlled for market and industry effects.[15] Second, I determined that there was no confounding non-fraud related information that was released on each corrective disclosure date. Third and finally, my constant percentage

---

[9] Complaint, ¶96.

[10] *Id.*

[11] Tabak Report, ¶34.

[12] *Id.*, ¶34(a).

[13] *Id.*, ¶34(b).

[14] *Id.*, ¶34(c).

[15] *Id.*, ¶36 and ¶37.

5

inflation ribbon is not only appropriate, but is also a methodology that Dr. Tabak has endorsed in his published work as appropriate for the conditions present in the current case.[16]

20. Consequently, while Dr. Tabak and I may disagree on various details, he cannot dispute that my damages methodology comprises what he asserts in his report as the necessary elements for a reliable damages computation.

**C.     My Damages Methodology Appropriately Removed Market and Industry Effects from Bridgepoint's Stock Price on the Corrective Disclosures**

21. In my August Report, I performed a regression analysis that removed the effects of the overall market and that of Bridgepoint's peer group from the Company's stock price.[17] For my Damages Report, I used the same regression analysis as presented and described in my August Report.[18]

22. Dr. Tabak agrees that I performed the regression analysis correctly and he accepts the statistical results of my event study.

> "The removal of market and/or industry effects from a measured price movement is a standard practice in financial economics. I note that as part of the class-certification phase of this litigation, Plaintiffs have provided an analysis that performs this step in the Report on Market Efficiency from Professor Steven P. Feinstein ('Feinstein Class Cert Report').
>
> While I could challenge some of the specific choices made by Prof. Feinstein for his calculations, I find that they are within the range of what one finds in the field. Thus, for purposes of this report, to reduce the number of differences between my analyses and those of Plaintiffs, I use the calculations in the Feinstein Class Cert Report to determine the dollar

---

[16] "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," by David Tabak and Chudozie Okongwu, *NERA Economic Consulting*, July 2002.

[17] Feinstein August Report, ¶¶101-102.

[18] Feinstein Damages Report, ¶95.

amount of Bridgepoint's stock-price movement over July 9 and 10, 2012, as the stock movement on both dates was statistically significant at the standard 5% significance level."
**Tabak Report, ¶¶36-37.**

23. Dr. Tabak accepts that my statistical analysis appropriately removed market and peer effects from Bridgepoint's stock price movements on both of the corrective disclosure dates.

24. Dr. Tabak contends that the artificial inflation caused by alleged false statements that were dismissed by the Court must be identified, isolated, and removed from the artificial inflation caused by the remaining alleged false statements. My understanding is that there has been no proof that the dismissed factors were false and misleading, which appears to be consistent with the court's dismissal of these factors. Consequently, these factors caused no artificial inflation. There is no identifiable artificial inflation related to the dismissed factors that needs to be isolated and removed.

### D. My Damages Methodology Appropriately Considered All of the Information Disclosed in Both Corrective Disclosures

25. Dr. Tabak states that a reliable damages estimate requires one to analyze the impact, if any, of confounding non-allegation related information.[19] As explained in my Damages Report, I did so.

26. I examined all of the Company-specific news that emerged on both corrective disclosure dates (9 July 2012 and 13 July 2012) and assessed the valuation impact, if any, of potentially confounding information released on these dates.[20] Based on careful analysis of the news that emerged on each disclosure date, I attributed the entire residual price declines on both disclosure dates to the Plaintiffs' allegations.[21]

---

[19] Tabak Report, ¶38.

[20] Feinstein Damages Report, ¶¶104-109 and 114.

[21] *Id.*, ¶¶110 and 114.

27. Incorporated in my analysis is the fundamental link between retention and persistence improvement and the Company's accreditation, as was explicated by the Company, analysts, accreditors, and regulators.[22]

28. As explained in my Damages Report:

> " … persistence and retention was the ultimate indicator by which regulators, accreditors, analysts, and the Company itself measured the quality of Ashford's educational effectiveness and performance. The Company failed to satisfy the key criteria that WASC was assessing: retention and persistence improvement. The reasons for denying accreditation were inseparably linked to the Company's systematic failures to understand and improve student retention and persistence. When the Company announced that WASC denied Ashford accreditation, the market understood that the Company had failed to meet the essential standards." **Feinstein Damages Report, ¶109.**

### 1.　Dr. Tabak Fails to Appreciate the Importance and Role of Persistence

29. Because Dr. Tabak adopts a too narrow definition of persistence, his attribution analysis, and thus his damages estimates, are fatally flawed. Inconsistent with the Company, accreditors, regulators, analysts, and common sense, Dr. Tabak interprets "persistence" as an isolated metric that is independent of the quality of Bridgepoint's programs, the condition of its operations, the ability to successfully achieve its stated mission, and ultimately, its accreditation. As such, Dr. Tabak inappropriately views all information other than persistence metrics as unrelated to both persistence and false and misleading statements that mentioned persistence. This mistake underlies Dr. Tabak's errors in his opinions regarding confounding information.

30. Dr. Tabak narrowly interprets persistence to mean no more, and have no more significance, than a mathematical performance metric (*i.e.* the persistence rate) while disregarding the broader meaning of persistence and the implications of persistence and related initiatives on the quality of the Company's programs and the viability of its business model.[23] Based on this flawed understanding, Dr. Tabak incorrectly

---

[22] *Id.*, ¶107.

[23] Tabak Report, ¶14.

concludes that there was no artificial inflation due to Defendants' misrepresentations and omissions about persistence and retention, or the initiatives aimed at improving persistence and retention.

> "There is no evidence that analysts gave any quantitative credit to any statements by Bridgepoint about the impact of its initiatives on historical persistence or the anticipated impact of its initiatives on future persistence. For example, looking at Exhibit 3a, we see that following Bridgepoint's 1Q10 earnings announcement, Signal Hill's forecast for 1Q11 persistence (i.e., the same quarter the following year) of 77.3% was the same as the 1Q10 actual figure of 77.3%. In other words, Signal Hill was forecasting no change in persistence rates over the next year. … The analysts' decision not to forecast increases in future persistence rates therefore implies that they were not giving those initiatives any observable quantitative credit in terms of an effect on either present or future persistence rates."
> **Tabak Report, ¶17.**

> "Because it is future cash flows, dependent in part on future persistence levels, that drive the stock price, and because analyst forecasts of future persistence levels were generally flat or declining on a year-over-year basis, statements about the actual or anticipated effects of Bridgepoint's persistence initiatives did not serve to inflate the Company's stock price."
> **Id., ¶21.**

> "This does not mean that analysts were not concerned with persistence initiatives. Rather, it means that analysts' forecasts reveal that they did not credit favorable statements by the Company about potential future effects of any initiatives to any material extent."
> **Id., ¶17, FN10.**

31. Dr. Tabak's conclusion that the Company's initiatives to improve student persistence, retention, and graduation were not material information to investors is erroneous. First, contrary to Dr. Tabak's assertion, persistence represented much more than just an independent mathematical performance metric. Second, Dr. Tabak conflates the lack of a statistically significant price increase, or change in analysts' estimates of persistence, with no inflation. I address each of these flaws in more detail below.

9

a. *Persistence, Retention, and Completion All Measured Educational Effectiveness and Therefore are All Related to Business Viability*

32. The term "persistence" was used by Defendants and understood by the market throughout the Class Period to represent more than just a historical mathematical metric. In fact, persistence, retention, and completion were used interchangeably by Defendants and represented the worthwhileness of the Company's programs as reflected in their ability to keep students in school and persisting towards graduation and a degree. Because persistence and retention was the ultimate indicator by which regulators, analysts, accreditors, and the Company measured the quality of Ashford's educational effectiveness, and thus assessed accreditation eligibility, it was undeniably material. This fact is further evidenced by the significant stock price declines on July 9th and July 13th when the previously concealed facts and ramifications regarding Bridgepoint's systematic failures in persistence and retention were finally disclosed.

33. For example, Bridgepoint's CEO Andrew Clark explained that persistence represented more than just a mathematical performance metric:

> "[Andrew Clark, Bridgepoint CEO]: Right now we are very focused on our initiatives for 2011 on student persistence, student graduation – anything we can do to improve the student experience in the classroom or administratively."
> **"BPI - Q1 2011 Bridgepoint Education Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **3 May 2011, p. 18.**

> "Q. And what does that mean to you, persist towards a degree, as the CEO of Bridgepoint?
> A. That means that they remain enrolled and engaged and they're pursuing their academic and educational goals."
> **Deposition of Andrew Clark, dated 29 April 2015, pp. 18-19.**

> "Q. Okay. And what does that mean to you, to retain students?
> A. It – it means effectively the same thing as persistence. There's a variety of different definitions of retaining students."
> *Id.*, **pp. 19-20.**

10

"Q. All right. So persistence could mean – have a general meaning as well as a specific mathematical calculation; correct?

A. Yes."

*Id.*, pp. 100-101.

"Q. Okay. So just – and I believe earlier – we'll leave it at that. What you just gave me was a mathematical calculation of persistence, and what I –

A. Correct.

Q. – asked was whether or not you had a general understanding of persistence outside of that mathematical calculation.

A. My general understanding is that graduates are left in that calculation of persistence.

Q. So other than – other than – other than taking out a certain metric of the calculation, the word 'persistence' means nothing more to you?

MR. SALCEDA: Object to the form.

A. Persistence is another term for retention."

*Id.*, pp. 101-102.

"Q. All right. And you say, 'Increasing persistence is a critical metric that validates our delivery of a higher – of a quality educational experience'; correct?

A. Correct."

*Id.*, p. 276.

"Q. You say, 'For example, on the Ashford transparency site, we list numerous charts highlighting the persistence of our students based on various demographic criteria.' Do you see that?

A. Yes

Q. Okay. In that sentence, you're not referring just simply to the street calculation for persistence?

A. No. No, because that transparency site went well beyond what we provided to the street. Of course it was available to the street, because I'm telling the street about it here. And in fact, I know from talking to investors and analysts that many of them went and visited that website.

Q. And I appreciate that. I'm not accusing you of hiding that from the street. What I'm trying to understand is that in the same conference call where you used persistence to refer to the street metric, you also are using persistence in a more general way; correct, sir?

A. As I qualified here, where I say we go beyond.

Q. I understand. But when – let me just make this very clear. In the second paragraph, you say student persistence improved; right?

A. Uh-huh. Yes.

Q. And you're referring to the street persistence metric utilized by analysts; correct?

11

A. Correct.

Q. And then approximately three paragraphs down, you use the word 'persistence' in a different way; correct?

A. I do."

**Id., pp. 278-280.**

34. Analysts also used persistence, retention, graduation, and completion synonymously.

"[Brandon Dobell]: I think the market tended to use persistence and retention almost – interchangeably is the wrong word, because they're calculated differently. But when you're talking about efforts to improve the academic progress of students, an investor, an analyst, you could have three of us sitting around the table and one person says, what are you doing to improve retention? The next person says, what are you doing to improve persistence? And the third person says, what are you doing to improve the rate at which students stay? And the point of the question and the answer to those three questions is going to be the same. I think the investment community used persistence and retention in the same way, partly because intuitively it's how many people are staying? How many people are progressing? So if an investor asked me how do you calculate persistence, I would have given him the formula in one of the earlier exhibits. If they asked how do you calculation retention, I would say here's the same formula recognizing that neither formula has graduations data. So I think consistently the discussions, the qualitative discussions around that metric and the answers from management and the questions from people like me would reference persistence and retention interchangeably, recognizing that the management team was not going to say it was X point X percent. These are qualitative discussions around how the team was improving, the progress of students, what they were doing to make sure the right students got in, to make sure that if they couldn't make it through, they did so before they figured out it was too late. ***But persistence versus retention, I think the investment community – again, you could use those almost interchangeably because there was a qualitative discussion about student progress as opposed to a specific metric.***"

**Deposition of Brandon Dobell, dated 16 April 2015, pp. 103-105 (emphasis added).**

"Q. Okay. Do you recall whether during that ongoing discussion about persistence, you understood that management was using the term 'persistence' to mean the same thing that you just described for us?

MR. WORLEY: Objection as to form.

A. I would refer to the statement that I made earlier, which is that 'persistence' is a very broad term that is used in a variety of different contexts. So while here in this note I'm referring to this very specific calculation that we've discussed, management would often discuss

persistence based on the data that they have, which is nonpublic, meaning that they would often be talking about persistence exclusive of graduations. So it's not uncommon – although I can't recall a specific instance, but it would not be uncommon for an analyst to ask management about a persistence rate based on this calculation that we've discussed. And management would contradict the conclusion by referring to the data that they would have that would be different from this specific calculation, meaning that they can see things that we can't see.

BY MR. KETROSER:

Q. Okay.

A. *And they would often answer a question about persistence, which, broadly speaking, represents the same phenomenon of students continuing in school, and they would have a different perspective on it. So I can't say that when management discusses persistence they were always referring to this specific calculation. In fact, I would say more often they were not referring to this specific calculation.*"

**Deposition of Trace Urdan, dated 24 April 2015, pp. 33-35 (emphasis added).**

35. The above quotes demonstrate that Dr. Tabak's understanding of persistence as nothing more than a mathematical metric is erroneous. In fact, persistence, retention, and completion are all used interchangeably to represent the quality of the education, and therefore the viability of Bridgepoint's business model – which were undeniably material to the Company, accreditors, regulators, analysts, and investors.

   *b.    Dr. Tabak Incorrectly Concludes That a Lack of Statistically Significant Stock Price Changes Implies No Inflation*

36. Second, Dr. Tabak incorrectly concludes that the lack of a statistically significant price increase, or change in analysts' estimates of the Company's persistence rate and thus future cash flows, implies that misrepresentations about persistence caused no inflation. Specifically, Dr. Tabak concludes that because analysts did not give the Company any quantitative credit for its persistence initiatives, these initiatives did not inflate the Company's stock price.

   "It is unlikely that analysts gave Bridgepoint's then-current initiatives meaningful credit for any demonstrated increases in persistence levels, because, had they done so, analysts would have likely raised their estimates of future persistence levels to account for expansion of those initiatives. Because it is future cash flows, dependent in part on future persistence

13

levels, that drive the stock price, and because analyst forecasts of future persistence levels were generally flat or declining on a year-over-year basis, statements about the actual or anticipated effects of Bridgepoint's persistence initiatives did not serve to inflate the Company's stock price." **Tabak Report, ¶21.**

37. Dr. Tabak is only speculating about what "likely" may have prompted analysts to maintain their model parameters, and what they "unlikely" did or did not believe despite the Company's representations. Dr. Tabak inappropriately dismisses the possibility that analysts presented conservative valuation models, based on conservative assumptions, which they chose to base on observable historical results rather than on improved projections. Analysts could certainly have opted for this conservatism in the quantitative model parameters they presented while simultaneously accepting the Company's representations that improvement initiatives were underway and the future business model was consequently viable and strong.

38. Moreover, Dr. Tabak overlooks the fact that all of the forward valuation models necessarily depended on the Company's representations that quality improvement initiatives were underway that would satisfy WASC sufficiently to make accreditation achievable. Had analysts not accepted the Company's representations that requisite improvements were underway, analysts' cash flow forecasts would have reflected the negative repercussions of the Company's failing to receive accreditation.

39. Material misrepresentations and omissions need not cause a statistically significant stock price increase, or increases in analysts' projections, because misrepresentations and omissions may introduce artificial inflation by preventing a security price from falling rather than by causing the price to increase. Therefore, the absence of a statistically significant stock price increase is not inconsistent with there having been a new material misrepresentation or omission that caused Bridgepoint's stock to be artificially inflated.

40. This important principle, apparently overlooked or misunderstood by Dr. Tabak, is presented in the generally accepted forensic finance literature:

"Statements that allegedly inflated the share price often do not result in an observed price increase when they were made. For example, one might not expect large increases in share prices for a firm that inflated its stock price by falsely reporting high earnings, if it consistently met market expectations."

**"Federal Securities Acts and Areas of Expert Analysis," by Nicholas I. Crew, *et al.*, in Chapter 18 of the *Litigation Services Handbook*; *The Role of the Financial Expert*, 4th ed., edited by Roman L. Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, John Wiley & Sons, Inc., 2007, pp. 18.14-15.**

41. Indeed, Plaintiffs allege that had analysts and investors been informed throughout the Class Period of Bridgepoint's systematic failures to improve retention and persistence, the stock price (and analysts' models of persistence and future cash flows) would have fallen. That analysts' projections and the stock price did not rise by statistically significant amounts when defendants omitted this material information does not prove the statements were immaterial and failed to cause investors' losses.

42. In paragraphs 57-64 of Dr. Tabak's report, he contends that the artificial inflation prior to the corrective disclosures would be proportional to the amount by which the false and misleading statements caused investors to overestimate the probability of WASC accreditation. With no empirical or logical support, Dr. Tabak assumes that, even with full disclosure, investors may have nonetheless anticipated successful accreditation. According to this section of Dr. Tabak's report (contradicted by the premises in his damage modeling section), the WASC denial may still have been a surprise, even if there had been full disclosure.

43. Dr. Tabak's conjectures about market participants' assessments of accreditation probability are erroneous. As described in my Damages Report, unbeknownst to investors was the fact the Company failed to satisfy the key criteria that WASC was assessing: retention and persistence improvement. The reasons for denying accreditation were inseparably linked to the Company's systematic failures to understand and improve student retention and persistence, which is what the Defendants allegedly concealed. When the Company announced that WASC had denied Ashford accreditation, the market understood that the Company had failed to meet the essential standards.

15

44. Based on the fundamental principles of market efficiency and rational expectations, because investors generally do not make systematic errors in forecasting when they are equipped with full truthful information, one can estimate that investors would have correctly anticipated the ramifications of the Company's failures to adequately address the persistence problem. Therefore, Dr. Tabak's suggested probability modeling is not necessary, if not misguided.

2.  The 13 July 2012 Corrective Disclosure Informed the Market of the Severity and Magnitude of the Company's Systematic Failures

45. As explained in paragraph 114 of my Damages Report, I attributed the entire residual price decline of -25.3% on 13 July 2012 to the news in the Company's press release that day. This conclusion is justified as the disclosure that HLC was considering withdrawing its accreditation more fully informed the marketplace of the severity and magnitude of Ashford's systematic failures.

46. Dr. Tabak incorrectly contends that the news that day was nothing more than a realization of a publicly known risk, and that there are no additional damages from this disclosure.

> "There is nothing in the HLC letter that reveals any new information about persistence or persistence initiatives at Ashford. … With the truth already revealed on July 9, 2012, even the Complaint does not allege that the Company was still withholding any information from the market after that date. Thus, there should be no damages from the information in the HLC letter made public on July 13, 2012."
> **Tabak Report, ¶27.**

> "July 13 was merely the realization of what was by then a *publicly known risk*."
> *Id.*, **¶30 (emphasis in original).**

47. In my Damages Report I noted that, given the deficiencies highlighted in WASC's denial letter, analysts were concerned that the Institution's accreditation with HLC *could be* placed under review.[24]

---

[24] Feinstein Damages Report, ¶79.

16

"In addition, the report *could be* viewed as a road map for future accreditation decisions not just by WASC, but by HLC, Bridgepoint's current accreditor. … We would not be surprised to see 2012 guidance pulled or revised downward on the second-quarter call in light of the transition period the institution will likely be entering to ensure accreditation compliance (with either WASC or HLC, or both, if the company chooses to walk that tightrope)."

**"Flying Too Close to the Sun; Downgrading to Market Perform," by Brandon Dobell and Thomas Dillon, William Blair, analyst report, 9 July 2012, pp. 2-3 (emphasis added).**

"In light of the numerous, significant deficiencies (in our view) highlighted in WASC's report, we are concerned that Ashford's HLC accreditation *may now* also be called into question. Ashford remains accredited by HLC through 2014-15, but future reviews by HLC may be contentious. The HLC has been publicly rebuked for being too lenient on For Profits in the past, which puts even more pressure on HLC to be tough in any future review of BPI."

**"Ashford University's WASC Rejection Shifts Focus to HLC," by Paul Ginocchio and Adrienne Colby, Deutsche Bank, analyst report, 9 July 2012, p. 1 (emphasis added).**

"WASC's accreditation denial *could* potentially serve as a negative precedent when HLC reviews Ashford's accreditation in 2014. Each of the potential options available to BPI create potentially meaningful near- and long-term costs. In the worse-case scenario, which we view as very unlikely, Ashford could lose regional accreditation, thereby potentially losing access to Title IV funding for students."

**"Downgrading to Neutral on Heightened Regulatory Uncertainty," by Peter Appert and George Tong, Piper Jaffray, analyst report, 10 July 2012, p. 2 (emphasis added).**

"In our view, [Bridgepoint] has become an embarrassment and a liability to HLC, which has been criticized for allowing it to grow so rapidly, and it represents a hot potato to WASC to which it has applied for accreditation. Both accreditors themselves are feeling the heat of criticism from members of Congress and the Department of Education for historically lax oversight of the sector."

**"BPI: Accreditation Stakes Raised, Bold Action Required Maintaining Outperform Rating," by Trace Urdan and Jeffrey Lee, Wells Fargo, analyst report, 10 July 2012, p. 2.**

"We believe there is a heightened risk of a Higher Learning Commission (HLC) program review following a conversation with a source knowledgeable with both the processes and politics of HLC accreditation. We are persuaded that the findings in the Western Association of Schools

and Colleges (WASC) team report published Monday *could* trigger an HLC
review every bit as comprehensive as that undertaken by WASC."
**"BPI: WASC Report Likely Affects HLC Status Review Could be Triggered
Irrespective of Substantial Presence," by Trace Urdan and Jeffrey Lee, Wells Fargo,
analyst report, 11 July 2012, p. 1 (emphasis added).**

48. HLC's accreditation review, announced by the Company on 13 July 2012 and coming
on the heels of the WASC decision, provided analysts and investors with a more
complete understanding of the true condition of the Company's programs. HLC's
decision to review its accreditation of Bridgepoint informed the marketplace that a
party that was in a position to know deemed WASC's concerns to be legitimate.
HLC's decision conveyed to investors a better understanding of the scope and
seriousness of the previously undisclosed condition. According to Plaintiffs, the true
but previously concealed condition of Bridgepoint included the facts that "Ashford had
not developed a method for tracking, collecting and displaying data on retention,
persistence, and completion in a manner that could be understood and analyzed to
improve student outcomes, which resulted in high levels of attrition,"[25] and "that
Ashford had not implemented concerted and systematic approaches to improve
retention, persistence, and completion."[26]

49. Further, Dr. Tabak cannot dispute that analysts' comments following the 13 July 2012
disclosure were decidedly negative and linked the Company's negative stock price
reaction to the understanding that Ashford could lose its HLC accreditation based on
the systematic failures which resulted in the WASC denial of accreditation.

> "BPI's regulatory challenges are mounting, with the risk of losing
> accreditation having driven further significant downside in the stock. …
> The worst-case scenario for BPI is a determination by HLC that Ashford is
> in violation of accreditation standards, resulting in a withdrawal of the
> university's accreditation. This would deny students access to Title IV
> funding and effectively put the company out of business. Alternatively,
> HLC could impose less severe sanctions that might require ongoing
> monitoring of operations and compliance. The best-case scenario is
> continued full accreditation. This range of outcomes obviously creates

---

[25] Complaint, ¶96.

[26] *Id.*

meaningful near-term regulatory uncertainty that we are unable to reliably handicap at this point."
**"Regulatory Uncertainty Mounts," by Peter Appert and George Tong, Piper Jaffray, analyst report, 13 July 2012, p. 1.**


"Reduce Target to $10. This target change relates more to WASC report details than to today's news. Since taking our target to $15, we have reviewed the WASC report and considered the potential outcomes; we now think the issues Ashford must address with HLC relate to academic quality, not geographic presence."
**"HLC News No Big Surprise, But Reduce Target," by Kelly Flynn and Patrick Elgrably, Credit Suisse, analyst report, 13 July 2012, p. 1.**


"HLC has announced that it will have a team on the ground in 60 days. This is faster than we had presumed and could suggest a less thorough review than that performed by WASC for its report. Nevertheless, a site visit in September could allow for a report prior to the November meeting of HLC Governing Board. This could allow for sanctions earlier than we had anticipated. The sanctions could include Show Cause or Probation, which would start a 12-month clock during which the University would have to satisfy any identified issues. In the latter case, the University would be prevented from accessing Title IV. While this seems excessively punitive given the generally strong quality of Ashford's service to students, it cannot be ruled out as a possibility."
**"BPI: Second Shoe Drops; HLC Announces Review," by Trace Urdan, Wells Fargo, analyst report, 13 July 2012, p. 1.**


"HLC will review this report at its February 2013 meeting, where it will decide whether to continue accreditation, with or without further monitoring, continue accreditation under sanction or 'show cause' order, or withdraw accreditation. Management noted it is cooperating with HLC's request. Given the WASC denial, we are not completely surprised by the HLC's heightened scrutiny, though we expect this may put further pressure on the stock."
**"Faces Further Accreditation Scrutiny," by Jeffrey Silber and Paul Condra, BMO, analyst report, 13 July 2012, p. 1.**


"We have reviewed our valuation of Bridgepoint in light of the recently increased risks to Ashford University's HLC accreditation following the WASC rejection of BPI's application for transfer of accreditation. … Our target is based on our scenario analysis and reflects 3.8x our 2012E EPS and 1.0x 2012E EBITDA, a deep discount to online peers due to BPI's accreditation risk. Downside risks include: loss of accreditation; lower-than expected enrollment growth due to competition, accreditation issues, or

19

self-imposed changes; higher operating costs to comply with accreditor standards; and higher sales & marketing costs to increase brand awareness."
**"Lowering Price Target Based On Five Potential Scenarios," by Paul Ginocchio and Adrienne Colby, Deutsche Bank, analyst report, 26 July 2012, p. 1.**

50. In fact, Andrew Clark testified that the decline on 13 July 2012 was in response to the information in the Company's 8-K, which included that HLC was requiring Ashford to submit a report demonstrating that it was in compliance with the HLC's Criteria for Accreditation, including "in the areas of student completion and retention."[27]

> "Q. The decline that occurred on July 13th of nearly 25 percent on my calculations on a volume of 6.7 million shares, in your view, understanding that you believe that you have some – some reasoning into what cause – has caused stock price declines at Bridgepoint, in your view, did – that stock price decline on that day, was it caused in any way by the fact that Warburg Pincus held a significant block?
> A. No.
> Q. What was it in your view that caused the stock price to decline on this day?
> MR. SALCEDA: Object to the form.
> THE WITNESS: This 8-K.
> BY MR. GOLDSTEIN:
> Q. The 8-K in which it was announced that the HLC was requiring Bridgepoint to show substantial compliance?
> A. Yes."
> **Deposition of Andrew Clark, dated 29 April 2015, p. 334.**

51. HLC's decision to put Ashford on special monitoring status was a ramification of Ashford's systematic deficiencies concerning persistence. In fact, a Credit Suisse analyst even noted that they "now think the issues Ashford must address with HLC relate to academic quality, not geographic presence."[28]

52. Based on a review of all the Company-specific news that emerged on 13 July 2012, I see no reason to revise my attribution analysis.

---

[27] Bridgepoint Education, Inc. Form 8-K, Item 8.01, filed on 13 July 2012.

[28] "HLC News No Big Surprise, But Reduce Target," by Kelly Flynn and Patrick Elgrably, Credit Suisse, analyst report, 13 July 2012, p. 1.

### E. My Constant Percentage Inflation Ribbon Is Appropriate and Endorsed by Dr. Tabak

#### 1. Percentage Inflation Ribbon

53. In my Damages Report, I calculated the percentage inflation in Bridgepoint's stock price during the Class Period to be 50.1% by cumulating the two fraud-related residual price declines on 9 July 2012 and 13 July 2012.[29] I found that, given the facts of the case and the allegations, including that "Ashford had not developed a method for tracking, collecting and displaying data on retention, persistence, and completion in a manner that could be understood and analyzed to improve student outcomes, which resulted in high levels of attrition,"[30] and "that Ashford had not implemented concerted and systematic approaches to improve retention, persistence, and completion,"[31] a percentage inflation ribbon is appropriate in this matter.

> "Defendants misrepresented or failed to disclose that Ashford could not effectively collect and analyze data on retention, persistence, and completion, and failed to implement concerted and systematic approaches to improve retention and persistence. Had analysts and investors been informed at the start of the Class Period, and throughout, of the Company's systematic failures in the fundamental areas of persistence and retention, rather than learning of this information through the corrective disclosures on 9 July 2012 and 13 July 2012, the stock price would have fallen at the start of the Class Period to reflect these adverse facts."
> **Feinstein Damages Report, ¶119.**

54. Dr. Tabak considers the percentage inflation ribbon to be one of the most common methodologies for computing damages in securities litigation.[32] Further, if Dr. Tabak chose to argue that my use of a constant percentage based ribbon is wrong, it should be noted that he explicitly states that "it is not always clear whether a certain disclosure is

---

[29] Feinstein Damages Report, ¶118.

[30] Complaint, ¶96.

[31] *Id.*, ¶96.

[32] "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," by David Tabak and Chudozie Okongwu, *NERA Economic Consulting*, July 2002, p. 1.

better modeled as a constant percentage or constant dollar inflation."[33] The type of disclosures in this case (*i.e.*, the Company's systematic failures in the fundamental areas of persistence and retention) raised concerns about the Company's business model viability and profitability, rather than the dollar value of any particular assets, accords with the types of disclosures that Dr. Tabak identifies as appropriate for applying a percentage inflation ribbon.

### 2.   Constant Percentage Inflation Ribbon

55. The final step of a reliable damages model, according to Dr. Tabak, is to determine whether the level of inflation should be adjusted over time.[34]

56. The Tabak Report provides support for my choice of maintaining inflation at a constant level from the start of the Class Period to the first partially corrective disclosure. Specifically, Dr. Tabak identified no inflationary or deflationary events over that timeframe, as a result of which there was no measurable change in inflation. Consequently, the level of percentage inflation must have remained constant.

57. The statistically significant stock price declines that occurred when the market learned of Bridgepoint's systematic failures amounted to 50.1% of the stock price value. It follows that Bridgepoint's stock price was artificially inflated by 50.1% since the beginning of the Class Period.

58. These conclusions accord with opinions expressed by Dr. Tabak in his report and published work, and are specifically compelled by the facts and circumstances of this case.

---

[33] "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," by David Tabak and Chudozie Okongwu, *NERA Economic Consulting*, July 2002, p. 6.

[34] Tabak Report, ¶67.

## IV.    DR. TABAK'S DAMAGES MODELS ARE FLAWED

59. In his report, Dr. Tabak presents nine different models to compute per share damages attributable to persistence.[35] According to Exhibit 4 of his report, per share damages range between $0.59 and $3.00 per share.

60. Importantly, Dr. Tabak admits in the first two models that it would have been necessary for the Company to effectively address the persistence problem in order to receive WASC accreditation, and that the Company's failure to receive accreditation signaled to the marketplace what had been previously concealed by the alleged fraud. In his first two damage models Dr. Tabak argues that the artificial inflation in the stock price during the Class Period equaled the amount of money the Company would have had to spend in order to fix the persistence problem.

61. While I agree with Dr. Tabak that, consistent with Plaintiffs' allegations, full corrective disclosure at any time during the Class Period would have informed investors that persistence was not adequately being addressed, I disagree with his model that limits artificial inflation to the amount of money the Company would have had to commit to address the persistence problem. Rather, artificial inflation must include the costs of all consequences of the concealed condition of the Company, which is measurable as the residual declines that did occur upon the corrective disclosures.

62. Dr. Tabak's damage models are also flawed on account of his overly narrow definition of persistence, which is even at odds with how Defendants have used and explained the term and how the market understood the term. Because he interprets the term as being an independent and isolated mathematical metric, that is unrelated to other measures and descriptors of the Company's condition, his "content analysis" understates how the alleged false and misleading statements shaped investors' view of the Company and the role persistence played in the corrective disclosures. As a result, while Dr. Tabak's models are a step in the right direction, because they do recognize

---

[35] *Id.*, Exhibit 4.

23

some role of statements and disclosures about persistence being responsible for inflation and damages, they nonetheless vastly understate inflation and damages.

## A.    Flaws in Scenarios I, IV, and VII

63. Three of Dr. Tabak's nine damage computations are based on one Wells Fargo analyst report published on 10 July 2012, the trading day following the corrective disclosure.[36] Specifically, Dr. Tabak's Scenarios I, IV, and VII apportion the losses based on the following 10 July 2012 Wells Fargo analyst report.[37]

> "To satisfy WASC, we expect that Ashford will have to significantly increase its full-time faculty, expanding its cost of services significantly and genuinely give the university some autonomy. Simply matching instructional expenses to marketing expenses would require an incremental $50 million. It will likely also have to make a much larger gesture to screen would-be drop-outs before they are officially enrolled. Anything short of Kaplan's first-two-courses-free approach might be viewed as too incremental. Foregone revenue associated with reduced churn – at least in the near term, through a transition period could cost another $50 million."
> **"BPI: Accreditation Stakes Raised, Bold Action Required Maintaining Outperform Rating," by Trace Urdan, Wells Fargo, analyst report, 10 July 2012, p. 2.**

64. In his Scenario I, Dr. Tabak estimates the amount of per share inflation attributable to the alleged fraud by dividing $31.05 million, the after tax cost of the $50 million in lost revenue to reduce churn, by 52.74 million (the number of shares outstanding) which results in $0.59 per share.[38] This $0.59 per share represents only 7.4% of the $7.99 per share residual decline in Bridgepoint's stock price over 9-10 July 2012.[39] That is, according to Dr. Tabak, to rectify Ashford's systematic failures and deficiencies with respect to persistence, the only negative effect would have been a one-time expense of $0.59 per share, equal to only 7.4% of the residual stock price decline actually experienced over the timeframe he identifies. A major problem with

---

[36] "BPI: Accreditation Stakes Raised, Bold Action Required Maintaining Outperform Rating," by Trace Urdan, Wells Fargo, analyst report, 10 July 2012.

[37] Tabak Report, Exhibit 4.

[38] *Id.*, Exhibit 5.

[39] *Id.*, Exhibit 4, FN1.

Dr. Tabak's damage model is that it attributes only a small fraction of the observed residual price decline that was caused by the disclosure to the persistence factor, which the Company, accreditors, regulators, and analysts deemed to be "the ultimate metric." Moreover, his model fails to account for the majority of the price decline.

65. Scenarios IV and VII are flawed similarly in that they attribute only a small portion of the observed residual decline elicited by the Company disclosure without explaining what caused the majority of the price decline. For each scenario, Dr. Tabak performs a Discounted Cash Flow Analysis ("DCF") to estimate the incremental cost of increasing spending on teachers. For Scenario VII, based on the ratio of the $50 million (the amount of revenue lost to reduce churn) to $193.2 million (equal to the $50 million plus $143.2 million, the present value of the incremental teaching costs), he attributes only 25.9% of the 9 July 2012 residual decline to persistence.[40]

66. Notwithstanding the fact that Dr. Tabak still assumes that the cost of improving persistence would be a one-time item of $50 million, a major flaw in his analysis is that his purported valuation impact amounts to $193.2 million, which is 51.3% of the total $376.2 million decline in the Company's market capitalization that occurred on 9 July 2012. However, Dr. Tabak never disputes that the residual price decline on 9 July 2012 measures an economic consequence of Bridgepoint failing to receive WASC accreditation, which he acknowledges depended on addressing the persistence problem. He never accounts for the rest of the price decline that day.

67. Dr. Tabak's damage model is inadequate because it incorporates only an estimate of the cost to fix the persistence problem, not the economic consequences of having not done so.

68. Dr. Tabak models the wrong thing. Plaintiffs' allegation is not that the Company concealed the cost of fixing the persistence problem. Rather, Plaintiffs allege that the Company concealed that the problem was not being adequately addressed.

---

[40] *Id.*, Exhibits 7a, 7b, and 7c. The only difference between Scenario VII and Scenario IV is the different discount rate.

000342
Exhibit 55

## B.    Flaws in Scenarios II, III, V, VI, VIII, and IX

69. The remaining six damage computations presented in the Tabak Report are based on a "content analysis" that is neither objective nor replicable, and suffers from a fundamental flaw. Content analysis is a methodology by which one can sometimes allocate a price effect among various factors that are separate, distinct, and represented by unique vocabulary. The approach involves counting how many times a particular factor is mentioned by analysts, accreditors, or regulators, for example, and assigning relative importance on the basis of word count.

70. For each of Dr. Tabak's content analyses, he identifies search terms to determine the appropriate attribution of the stock price decline to persistence, as opposed to other factors that Dr. Tabak incorrectly assumes to be completely independent and separate.[41] However, nowhere in his report does Dr. Tabak provide any explanation for how he determined these search terms. Nor does he consider how the factors he considers are interrelated, such that multiple search terms refer to factors that reflect persistence, are in fact the very factor he wishes to isolate. Nor does Dr. Tabak offer any explanation for why his search terms are assigned equal-weights.

71. For example, in Exhibit 8a of his report, he inexplicably assigned the same weight to the term "persist*" as he did to the term "resource." Based on his flawed weighting scheme the term "resource" is allocated 5.8% of the residual stock price decline on 9 July 2012, while "persist*" is allocated 3.8% of the decline. That is, despite the facts that the Company considered persistence the "ultimate metric,"[42] and that JPMorgan analysts considered it the "holy grail of higher education,"[43] in Dr. Tabak's analysis, the word "resource" is somehow given a larger attribution and responsibility for the price decline. This example of an absurd result stemming from Dr. Tabak's content analysis highlights the fundamental flaws of his analyses.

---

[41] *Id.*, ¶¶50-54.

[42] "William Blair & Company Global Services Growth Stock Conference," Bloomberg, Investor conference, 7 December 2011, pp. 3-4.

[43] "BPI's Low Price Supports Its Relative Start Strength, But Regulatory Items Remain – Alert," by Andrew Steinerman, *et al.*, JPMorgan, analyst report, 19 September 2011, p. 1.

72. On account of his flawed assumptions, adopted without any analysis or support, that competing search terms represented distinct individual components of Bridgepoint's condition, with no overlap, and each with equal weight, Dr. Tabak's purported content analysis is unscientific and unreliable.

## V.     LIMITING FACTORS AND OTHER ASSUMPTIONS

73. This report is furnished solely for the purpose of court proceedings in the above referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report, including in the event additional information becomes available.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**
**Documents and Other Information Reviewed and Relied Upon**
**In Addition to those Listed in my August Report and Damages Report**

**CASE DOCUMENTS**

- Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, by Judge Jeffrey Miller, dated 13 September 2013.
- Deposition of Andrew Steinerman, dated 15 April 2015.
- Deposition of Brandon Dobell, dated 16 April 2015.
- Deposition of Trace Urdan, dated 24 April 2015.
- Deposition of Andrew Clark, dated 29 April 2015.
- Expert Report of David I. Tabak, Ph.D., dated 1 June 2015.
- Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., CFA, dated 2 June 2015.

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Tabak, David, and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practices," *NERA Economic Consulting,* July 2002.

**CONFERENCE CALL TRANSCRIPTS**

- "BPI – Q4 2009 Bridgepoint Education Inc. Earnings Conference Call," *Thomson StreetEvents,* 2 March 2010.

**OTHER**

- Any other documents and data cited in the report.

000345
Exhibit 55

In Re Goldman, Sachs & Co., et al. Securities Litigation
Civil Action No. 10 Civ. 4429 (MGC)
United States District Court
Southern District of New York
Deposition Testimony
June 2015

In Re Dana Corporation, et al. Securities Litigation
Civil Action No. 3:05-cv-07393-JGC
United States District Court
Northern District of Ohio
Deposition Testimony
June 2015

000346
Exhibit 55

# EXHIBIT 56

Jonah H. Goldstein
JonahG@rgrdlaw.com

June 19, 2014

<u>VIA EMAIL</u>

The Honorable Jill L. Burkhardt
Magistrate Judge of the U.S. District Court
Southern District of California
221 West Broadway, Suite 5140
San Diego, CA  92101

      Re:    *In re Bridgepoint Education Inc., Securities Litigation*
               No. 3:12-cv-01737-JM-JLB

Dear Judge Burkhardt:

Lead Plaintiffs City of Atlanta General Employees Pension Fund and Teamsters Local 677 Health Services & Insurance Plan ("Plaintiffs") respectfully request the Court to compel Defendants Bridgepoint Education, Inc. ("Bridgepoint"), Andrew S. Clark, Daniel J. Devine, and Jane McAuliffe (the "Individual Defendants") (collectively, "Defendants") to (1) produce documents related to Bridgepoint's attempts to obtain accreditation from the Western Association of Schools and Colleges ("WASC"); (2) expand their search for responsive documents to include November 1, 2012 to July 31, 2013; (3) produce all documents related to the Individual Defendants' transactions in Bridgepoint stock; and (4) include the Individual Defendants' documents in the parties' negotiated predictive coding protocol.  Plaintiffs seek to resolve these issues with the Court during the telephonic conference set for June 27, 2014 at 2:30 p.m. PDT.  Dkt. No. 55.

## I.    Background

This dispute arises in an action against Bridgepoint for making false and misleading statements during its pursuit of WASC accreditation for its Ashford University ("Ashford").  On September 13, 2013, District Court Judge Jeffrey T. Miller sustained Plaintiffs' claims that Defendants made false statements related to Ashford's student persistence, retention, and graduation rates as well as initiatives to improve those rates.  Dkt. No. 39 at 26-29.  Although Judge Miller dismissed the claim that Defendants made false statements about Ashford's pursuit of accreditation, Judge Miller noted that:

> Plaintiff may eventually be able to demonstrate that Defendants were aware that WASC would not accredit Ashford well before the WASC denied accreditation in July 2012.  ***If discovery reveals that Defendants knew that denial of accreditation would be denied***, then Plaintiff may be permitted to amend its complaint to reassert this claim based on prior misleading statements made during conference calls or other disclosures to investors.

950939_2

000347
Exhibit 56

The Honorable Jill L. Burkhardt
June 19, 2014
Page 2

Dkt. No. 39 at 33. But, despite Judge Miller's explicit recognition, Defendants refuse to produce accreditation documents.[1]

## II. Defendants Should Be Compelled to Produce Accreditation Documents

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. of Civ. P. 26(b)(1). Discovery is relevant "'unless it is clear that the information sought can have no possible bearing on the subject matter of the action.'" *In re Toyota Motor Corp. Sec. Litig.*, 2012 U.S. Dist. LEXIS 124438, at *18-*19 (C.D. Cal. Mar. 9, 2012) (citations omitted). "[R]elevancy is to be interpreted very broadly." *Id.* at *19. Indeed, in securities cases, like here, "the Actionable Statements do not bound the limits of relevant or potentially relevant information." *Id.* at *45.

The significance and interrelatedness of student persistence, retention, and graduation rates to Ashford's failed WASC accreditation is indisputable, as WASC in fact denied accreditation largely because Bridgepoint failed to improve persistence, retention, and graduation rates. Judge Miller recognized that "the facts pled by Plaintiff indicate that acceptable ***levels of persistence were crucial to obtaining accreditation***, thereby rendering any statements about persistence potentially material." Dkt. No. 39 at 29 (emphasis added). Thus, Judge Miller explicitly reasoned, that discovery related to accreditation should be produced as relevant to the persistence claims. Dkt. No. 39 at 33 ("***if discovery reveals*** that Defendants knew that denial of accreditation would be denied then Plaintiff may be permitted to amend").

That Bridgepoint's failed accreditation attempt and the critical factors of persistence and student retention are inextricably intertwined is further shown by the fact that WASC explicitly stated that "[r]etention of students, their persistence toward a degree, and completion of their desired degree within a reasonable amount of time are of critical importance" to receiving accreditation. WASC019640. Additionally, in its letters to Bridgepoint identifying areas of needed focus to gain accreditation, WASC noted "the importance of retention and completion rates," (BPI034538) and that "[d]etailed information will be needed on retention, persistence and graduation" (BPI034533).

Defendants recognize the relevance of accreditation to Plaintiffs' claims regarding persistence, and have agreed to produce documents related to accreditation to the extent those documents expressly relate to persistence. Defendants take the position that unless a document specifically refers to accreditation ***and*** persistence, student retention and/or completion, it is irrelevant, because Judge Miller dismissed Plaintiffs' accreditation claims. Defendants' position

---

[1] The parties have conferred on this issue and three others that are discussed in detail herein.

ignores the fact that persistence and accreditation are so inextricably intertwined that documents addressing accreditation likely necessarily concern persistence, even though they may not explicitly state so. For example, an email discussing Bridgepoint's need to improve in critical areas of accreditation or admitted inability to meet WASC accreditation standards that did not use the magic words "persistence," "retention" or "student completion," would still be relevant and discoverable to show the falsity of Defendants' statements regarding student persistence and retention because these were the critical areas upon which WASC accreditation was based and ultimately denied.

Indeed, the Ninth Circuit endorses Judge Miller's allowance for discovery of accreditation documents. *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011). In *WPP*, the Ninth Circuit held that "where some claims survive a motion to dismiss, the district court, in its discretion, has power to allow an amended complaint even with regard to claims that it earlier dismissed . . . should ***discovery reveal evidence indicating that previously dismissed Defendants were in fact involved in the alleged fraudulent conduct***." *Id.* at 1059 (citing *Nunes v. Ashcroft*, 375 F.3d 805, 807-08 (9th Cir. 2004)); *see also In re Allstate Life Ins. Co. Litig.*, 2012 U.S. Dist. LEXIS 7678, at *21 (D. Ariz. Jan. 23, 2012) (PSLRA does not bar "plaintiffs' use of evidence obtained during subsequent good-faith discovery on other claims" to amend pleadings); *McIntire v. China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d 105, 129 (S.D.N.Y. 2013) (plaintiff could replead dismissed claims if "during the course of discovery Plaintiffs come upon sufficient evidence that could reasonably support a finding of knowledge or conscious recklessness on the part of [defendants]"); *Benbow v. Aspen Tech., Inc.*, 2003 U.S. Dist. LEXIS 15356, at *11 (E.D. La. Aug. 25, 2003) ("the fact that the subject matter of this request overlaps and subsumes all of the facts relevant to the plaintiffs' recently dismissed Federal securities claims pursuant to Rule 10b-5 is of no moment"); *In re Constellation Energy Grp., Inc.*, 2012 U.S. Dist. LEXIS 44036, at *13 (D. Md. Mar. 28, 2012).[2] Accordingly, Defendants should be required to produce documents related to accreditation.

## III.    Documents from November 1, 2012 to July 31, 2013 Are Relevant

After being denied accreditation on July 3, 2012, Defendants submitted another application on October 11, 2012 that was granted in July 2013. Plaintiffs seek documents from November 1, 2012 to July 31, 2013 to discover discussions of Bridgepoint's efforts and failures regarding the student persistence, retention, and graduation rates which resulted in the denial of its first accreditation attempt. Notwithstanding, Defendants refuse to produce documents beyond the time

---

[2]    Defendants' reliance in correspondence on *SG Cowen Sec. Corp. v. United States Dist. Court*, 189 F.3d 909 (9th Cir. 1999) is misplaced. There, the district court allowed discovery on all claims that had been dismissed. *Id.* at 911. Here, Plaintiffs seek discovery on a subject relevant to pending claims that survived dismissal.

frame January 1, 2010 to October 31, 2012. Courts in this circuit have repeatedly held that pre- and post-class period discovery can lead to admissible evidence, particularly admissions relating to prior conduct.[3] *See, e.g., In re Applied Micro Circuits Corp. Sec. Litig.*, 2002 U.S. Dist. LEXIS 22403, at *29 (S.D. Cal. Oct. 4, 2002); *Toyota*, 2012 U.S. Dist. LEXIS 124438, at *20-*21; *Zamora v. D'Arrigo Bros. Co.*, 2007 U.S. Dist. LEXIS 21418, at *1 (N.D. Cal. Mar. 15, 2007). Indeed, WASC's document production demonstrates the existence of relevant documents in this timeframe. For example, WASC000068 is "A Reflection by Ashford University" prepared for Ashford's second attempt at accreditation, where Ashford describes its efforts related to persistence in its first accreditation attempt. This reflection is dated February 15, 2013, outside of Defendants' time period. Similarly, WASC's Special Visit Team evaluated Ashford in April 2013 regarding its second accreditation attempt. Like in its initial attempt, Bridgepoint provided extensive materials in support of the reapplication. To the extent these documents discuss Bridgepoint's first accreditation attempt they are relevant, yet would not be produced using Defendants' narrow timeframe.

## IV.     Defendants Should Produce All Documents Related to Insider Trading

The Individual Defendants sold over 1.3 million shares of Bridgepoint stock for over $30 million during the Class Period. Although Judge Miller dismissed Plaintiffs' stand-alone insider trading claims, the Individual Defendants' stock transactions remain relevant to scienter (*i.e.*, knowledge of or recklessness regarding the fraudulent conduct) – an element of Plaintiffs' upheld claims. Currently, Defendants agree to produce the Individual Defendants' Rule 10b5-1 insider trading plans, any amendments to those plans, and emails regarding transactions that also discuss persistence. They refuse to produce any other emails discussing their transactions in Bridgepoint stock. But, the timing of a discussion to sell Bridgepoint stock is relevant to show Defendants' upheld statements were made with scienter if that email coincided with Defendants' possession of negative internal information related to persistence that does not appear in the email. *See, e.g., Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (insider sales are evidence of the scienter element); *Toyota*, 2012 U.S. Dist. LEXIS 124438, at *37-*38 (ordering discovery related to scienter element); *In re Sunpower Sec. Litig.*, 2012 U.S. Dist. LEXIS 134947, at *10 (N.D. Cal. Sep. 20, 2012) (same).

## V.      The Individual Defendants' Documents Should Be Predictively Coded

For months, the parties discussed Defendants' proposal to use predictive coding, in lieu of search terms, to identify responsive documents.[4] But, on May 28, 2014, Defendants revealed their

---

[3]    The Class Period in this case is May 3, 2011 to July 13, 2012.

[4]    Predictive coding involves software that learns to identify the characteristics of a responsive document by tracking the coding decisions of attorneys on a subset of documents and then, uses

intent to preclude from predictive coding the Individual Defendants' documents.  Before Plaintiffs even propounded their discovery requests, Defendants ran a list of unilaterally-selected search terms over the Individual Defendants' documents and reviewed them for their own internal factual assessment of the case.[5]  But now, Defendants refuse to include in the predictive coding system ***any*** of the Individual Defendants' documents, and assert that Plaintiffs must accept the documents Defendants collected.  Defendants' attempt to unilaterally dictate discovery, despite Plaintiffs' good faith negotiations, should not be countenanced.

Notwithstanding, Plaintiffs have proposed a solution that will avoid any re-review by Defendants and ensure that Plaintiffs get all responsive documents: Defendants produce the responsive Individual Defendants' documents that have been reviewed, while loading only the documents that have not already been reviewed into the predictive coding system.  This would collect any responsive documents missed by the search terms and avoid repetitive review.  But Defendants propose only to discuss additional search terms, which will lead to further delay and additional burden for both sides.  Instead, predictive coding that will be used for all other custodians should also be used for the Individual Defendants.

**VI.    Conclusion**

For the foregoing reasons, Plaintiffs should be granted the relief requested in this letter.

Respectfully submitted,

JONAH H. GOLDSTEIN

JHG:tlc

---

sophisticated algorithms to predict the responsiveness of the documents in the remaining review set. In their negotiations, the parties agreed that in this case this method is the most appropriate and cost-effective way to retrieve responsive documents.

[5]    Despite Plaintiffs' requests, Defendants have not provided important information, such as how many of the 81,912 documents they reviewed will be produced as responsive.

950939_2

# EXHIBIT 57

1   NINA F. LOCKER, State Bar No. 123838
    IGNACIO E. SALCEDA, State Bar No. 164017
2   JONI OSTLER, State Bar No. 230009
    WILSON SONSINI GOODRICH & ROSATI
3   Professional Corporation
    650 Page Mill Road
4   Palo Alto, CA 94304-1050
    Telephone: (650) 493-9300
5   Facsimile:  (650) 565-5100
    nlocker@wsgr.com
6   isalceda@wsgr.com
    jostler@wsgr.com
7
    Attorneys for Defendants
8   Bridgepoint Education, Inc., Andrew S.
    Clark, Daniel J. Devine, and Jane McAuliffe
9

10              UNITED STATES DISTRICT COURT

11            SOUTHERN DISTRICT OF CALIFORNIA

12                  SAN DIEGO DIVISION

13  In re BRIDGEPOINT EDUCATION,      )  Case No.:  12-CV-1737 JM WMC
    INC., SECURITIES LITIGATION       )
14                                    )  **BRIDGEPOINT EDUCATION
                                      )  INC.'S FIRST SET OF
15                                    )  INTERROGATORIES TO
    _____    )  LEAD PLAINTIFFS**
16                                    )
    This Document Relates To:         )
17                                    )
            ALL ACTIONS.              )
18                                    )
19                                    )
                                      )
20                                    )
                                      )
21                                    )
                                      )
22  _____    )
23
24
25
26
27
28

## BRIDGEPOINT'S FIRST SET OF INTERROGATORIES
## TO LEAD PLAINTIFFS

Pursuant to Federal Rules of Civil Procedure 26 and 33, defendant Bridgepoint Education, Inc., hereby requests that Lead Plaintiffs provide written responses under oath to the following Interrogatories within thirty (30) days of service.

## DEFINITIONS

As used herein, the following terms have the meanings indicated below:

1.      The terms "You" and "Your" refer to lead plaintiff the City of Atlanta General Employees Pension Fund and Teamsters Local 677 Health Services & Insurance Plan, and any person acting or purporting to act on their behalf, including, but not limited to, its Board of Trustees, employees, directors, officers, and agents.

2.      The term "Bridgepoint" means Bridgepoint Education, Inc.

3.      The words "and" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these interrogatories any information that might otherwise be construed to be outside their scope.

4.      All references to the singular include the plural, and all references to the plural include the singular.

## INSTRUCTIONS

1.      Each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objections shall be stated in lieu of an answer.  The answers are to be signed by the Lead Plaintiffs making them, and the objections signed by the attorney making them.

2.      The response to each interrogatory shall, pursuant to Federal Rule of Civil Procedure 33(b)(1)(B), include all information available to the Lead Plaintiffs, including but not limited to knowledge in the possession, custody, or control of Lead Plaintiffs' investigators, consultants, attorneys, or other agents.

3.     In the event Your answer to any interrogatory is "not applicable" or any similar phrase or response, please explain in detail why that interrogatory is not applicable.  In the event that Your answer to any interrogatory is "unknown" or a similar response, explain in detail who, if anyone, would know the answer to the interrogatory or where the answer to the interrogatory may be found.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**

Identify specifically the new information about Bridgepoint's student persistence that You contend was revealed in Bridgepoint's announcement filed on Form 8-K on July 13, 2012 (referenced at ¶ 81 of Your complaint).

**INTERROGATORY NO. 2:**

Identify the specific statement(s) You assert was (or were) revealed to be false by the new information You identify in Your response to Interrogatory No. 1 above.

**INTERROGATORY NO. 3:**

Identify specifically the new information about Bridgepoint's student retention that You contend was revealed in Bridgepoint's announcement filed on Form 8-K on July 13, 2012 (referenced at ¶ 81 of Your complaint).

**INTERROGATORY NO. 4:**

Identify the specific statement(s) You assert was (or were) revealed to be false by the new information You identify in Your response to Interrogatory No. 3 above.

**INTERROGATORY NO. 5:**

Identify specifically the new information about Bridgepoint's initiatives that You contend was revealed in Bridgepoint's announcement filed on Form 8-K on July 13, 2012 (referenced at ¶ 81 of Your complaint).

**INTERROGATORY NO. 6:**

Identify the specific statement(s) You assert was (or were) revealed to be false by the new information You identify in Your response to Interrogatory No. 5 above.

**INTERROGATORY NO. 7:**

Identify which allegedly false or misleading statement(s) You contend was (or were) made by Defendant Daniel Devine.

Dated: February 24, 2015

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

Nina F. Locker
Ignacio E. Salceda
Joni Ostler

By:     s/ Joni Ostler
            JONI OSTLER

650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:   650-493-9300
Facsimile:   650-565-5100
nlocker@wsgr.com
isalceda@wsgr.com
jostler@wsgr.com

*Attorneys for Defendants*
*Bridgepoint Education, Inc., Andrew S. Clark,*
*Daniel J. Devine, and Jane McAuliffe*

DECLARATION OF SERVICE BY EMAIL

2        I, Joni Ostler, not a party to the within action, hereby declare that on February 24, 2015 I
served the attached BRIDGEPOINT EDUCATION, INC.'S FIRST SET OF
3   INTERROGATORIES TO LEAD PLAINTIFFS on the following parties by e-mail as follows:

4   Austin P. Brane
    ROBBINS GELLER RUDMAN & DOWD LLP
5   655 West Broadway, Suite 1900
    San Diego, CA 92101
6   abrane@rgrdlaw.com

7
    Frank J. Johnson, Jr.
8   JOHNSON & WEAVER, LLP
    110 West "A" Street, Suite 750
9   San Diego, CA 92101
10  frankj@johnsonandweaver.com

11       I declare under penalty of perjury that the foregoing is true and correct.

12       Executed on February 24, 2015, at Palo Alto, California.

13
                                    s/ Joni Ostler
14                                  Joni Ostler

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIDGEPOINT EDUC. INC.'S FIRST SET OF                    -5-
INTERROGATORIES TO LEAD PLAINTIFFS

# EXHIBIT 58

1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  JONAH H. GOLDSTEIN (193777)
   LAURIE L. LARGENT (153493)
3  REGIS C. WORLEY, JR. (234401)
   AUSTIN P. BRANE (286227)
4  655 West Broadway, Suite 1900
   San Diego, CA 92101
5  Telephone: 619/231-1058
   619/231-7423 (fax)
6  jonahg@rgrdlaw.com
   llargent@rgrdlaw.com
7  rworley@rgrdlaw.com
   abrane@rgrdlaw.com
8
   Lead Counsel for Plaintiffs
9
   [Additional counsel appear on signature page.]
10
                 UNITED STATES DISTRICT COURT
11
                SOUTHERN DISTRICT OF CALIFORNIA
12
   In re BRIDGEPOINT EDUCATION,      )  No. 3:12-cv-01737-JM-JLB
13 INC. SECURITIES LITIGATION        )
   ─────────────────────────────────  )  CLASS ACTION
14                                    )
   This Document Relates To:          )  CITY OF ATLANTA GENERAL
15                                    )  EMPLOYEES PENSION FUND'S
        ALL ACTIONS.                  )  OBJECTIONS AND RESPONSES TO
16                                    )  DEFENDANT BRIDGEPOINT
   ─────────────────────────────────  )  EDUCATION INC.'S FIRST SET OF
17                                       INTERROGATORIES
18
19
20
21
22
23
24
25
26
27
28

1015242_1

1    Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and
2  applicable Local Rules for the United States District Court for the Southern District of
3  California and the rules and orders of this Court, Lead Plaintiff City of Atlanta
4  General Employees Pension Fund ("Lead Plaintiff") hereby responds and objects to
5  Defendant Bridgepoint Education, Inc.'s ("Defendant" or "Bridgepoint") First Set of
6  Interrogatories (the "Interrogatories") as follows:

7  **I.        PRELIMINARY STATEMENT**

8         Lead Plaintiff's responses to the Interrogatories are based upon a reasonable
9  investigation of the evidence currently available and reflect current knowledge,
10 understanding and belief, based upon information known at this time.

11        Lead Plaintiff has not completed discovery, including expert discovery,
12 depositions or reviewed all potential evidence for use at trial. Additional contentions,
13 facts, witnesses, documents, testimony or other evidence may arise during the
14 discovery process and during the review of discovery in preparation for trial. Lead
15 Plaintiff is providing responses based upon review of evidence received to date and
16 expressly reserves the right to modify its position based upon further discovery.

17        As this action proceeds, and as further investigation and discovery are
18 conducted, additional or different facts and information may be revealed to Lead
19 Plaintiff. Therefore, these objections and responses are made without prejudice to,
20 and are not a waiver of, Lead Plaintiff's rights to rely upon and use, at trial or
21 otherwise, any other facts and information subsequently identified. Lead Plaintiff
22 further reserves the right to supplement, clarify, revise or correct any or all of the
23 objections and responses herein, and to assert additional objections or privileges, in
24 subsequent supplemental responses.

25        By making the accompanying objections and responses to Defendant's
26 Interrogatories, Lead Plaintiff does not waive, and hereby expressly reserves, its right
27 to assert any and all objections as to the admissibility of such responses into evidence
28 in this action, on any and all grounds, including, but not limited to, relevancy,

1 materiality and admissibility, and on any ground that would require exclusion of any

2 response herein if it were introduced in Court. All objections and grounds, including

3 relevance, are expressly reserved and may be interposed at the time of trial. Further,

4 each of the General Objections contained herein is incorporated by reference as

5 though fully set forth in each response.

6 **II.    GENERAL OBJECTIONS**

7      Lead Plaintiff makes the following General Objections, whether or not

8 separately set forth in response to each Interrogatory, to each and every instruction,

9 definition and request set forth in the Interrogatories:

10      1.    Lead Plaintiff objects to the Interrogatories to the extent they purport to

11 impose any obligation(s) on Lead Plaintiff that is not imposed by law, or are otherwise

12 inconsistent with Rules 26 and 33 of the Federal Rules of Civil Procedure and/or the

13 Local Rules for the United States District Court for the Southern District of California.

14      2.    Lead Plaintiff objects to the Interrogatories to the extent that they seek

15 information or documents that are beyond the scope of permissible discovery.

16      3.    Lead Plaintiff objects to the Interrogatories to the extent that they seek or

17 require disclosure of information that is protected from discovery by the attorney-

18 client privilege, the attorney work-product doctrine, the joint prosecution or common

19 interest privilege, the right to privacy or any other applicable privilege or immunity.

20 Such disclosure as may hereafter occur pursuant to the Interrogatories shall not

21 include any information protected by such privileges or doctrines. Inadvertent

22 disclosure of any such information shall not constitute a waiver of any applicable

23 privilege, protection or immunity, in whole or in part.

24      4.    Lead Plaintiff objects to the Interrogatories to the extent that they seek

25 information or documents that is not within Lead Plaintiff's possession, custody or

26 control.

27

28

000359
Exhibit 58

5.     Lead Plaintiff objects to the Interrogatories to the extent they seek information or documents that are publicly available, or otherwise can be found in the pleadings and/or equally available to Defendant.

6.     Lead Plaintiff objects to the Interrogatories insofar as they are vague, ambiguous, harassing, overly broad or unduly burdensome, and to the extent that the discovery sought is unreasonably cumulative, duplicative or disproportionate.

7.     Lead Plaintiff objects to the Interrogatories to the extent they prematurely seek information related to expert(s), expert testimony or opinion at a time when no experts have been designated.

8.     Lead Plaintiff objects to the Interrogatories insofar as they seek information or documents neither relevant to any claim, defense or subject matter of the litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

9.     Lead Plaintiff objects to the Interrogatories to the extent they are unlimited in time frame or seek information or documents from an unnecessarily lengthy period of time.

10.     Lead Plaintiff objects to each of the "Definitions" and "Instructions" in the Interrogatories to the extent said Definitions and Instructions purport to enlarge, expand or alter in any way the plain meaning and scope of any specific word or request on the ground that such enlargement, expansion or alteration renders such request vague, ambiguous, unintelligible, unduly broad and uncertain.

11.     Lead Plaintiff objects to Definition No. 1 purporting to describe "You" or "Your" and the Interrogatories incorporating these terms, to the extent that the Definition construes "You" and "Your" to include Lead Plaintiff's attorneys and thereby calls for the disclosure of information that is protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the right to privacy, or any other applicable privilege or immunity.  Lead Plaintiff also objects to this

Definition to the extent it purports to require Lead Plaintiff to provide information not within its custody or control.

12.     Lead Plaintiff objects to Instruction No. 2 to the extent that the Instruction calls for information from Lead Plaintiff's attorneys and thereby calls for information that is protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the right to privacy, or any other applicable privilege or immunity.  Lead Plaintiff also objects to this Instruction to the extent it purports to require Lead Plaintiff to provide information not within its custody or control.

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, Lead Plaintiff responds to the specific Interrogatories as follows:

**III.     RESPONSES AND OBJECTIONS**

INTERROGATORY NO. 1:

Identify specifically the new information about Bridgepoint's student persistence that You contend was revealed in Bridgepoint's announcement filed on Form 8-K on July 13, 2012 (referenced at ¶ 81 of Your complaint).

RESPONSE TO INTERROGATORY NO. 1:

Lead Plaintiff objects to this Interrogatory as prematurely seeking expert opinion before the expert disclosure dates provided for in the amended scheduling order entered August 6, 2014 ("Scheduling Order") (Dkt. No. 68).  Subject to and without waiving the foregoing General Objections and Specific Objections, and reserving the right to amend this response following the expert disclosure dates ordered in this case, Lead Plaintiff states as follows:

As alleged in paragraph 81 of the Consolidated Complaint for Violations of the Federal Securities Laws ("Complaint") (Dkt. No. 26), incorporated herein by reference, Bridgepoint's July 13, 2012 disclosure revealed that Ashford University's poor student completion and retention, which resulted in the denial of WASC accreditation, also jeopardized its accreditation with HLC.  Specifically, Bridgepoint's

000361
Exhibit 58

July 13, 2012 disclosure revealed that HLC was concerned that Ashford's resource allocations were not "sufficiently aligned with educational purposes and objectives in the area of student completion and retention." Lead Plaintiff alleges that the information contained in Bridgepoint's July 13, 2012 disclosure was omitted from Defendants' false and misleading statements throughout the Class Period and was not revealed in the July 9, 2012 disclosure, when Bridgepoint announced WASC's findings, but made no mention that its deficiencies in the areas of student retention and completion could jeopardize its HLC accreditation.

INTERROGATORY NO. 2:

Identify the specific statement(s) You assert was (or were) revealed to be false by the new information You identify in Your response to Interrogatory No. 1 above.

RESPONSE TO INTERROGATORY NO. 2:

Lead Plaintiff objects to this Interrogatory on the grounds that the information is equally available to Defendants as the alleged false and misleading statements are set forth in the Complaint. Subject to and without waiving the foregoing General Objections and Specific Objections, Lead Plaintiff states as follows: Defendants' false and misleading statements responsive to this Interrogatory are contained in paragraphs 84, 90, 91, 92, 102, 104, 129, 131, 133, 134, 152, 161, 162, 163, 164, 178, and 183 of the Complaint and state as follows:

- "We are pleased with the results we achieved in the first quarter as our new enrollments were in-line with our expectations, and I am particularly pleased that our year over year student persistence increased for the fourth consecutive quarter. The increased persistence not only resulted in better than anticipated revenue for the quarter, but it more importantly reinforces that the student support initiatives we made in 2010 to enhance student persistence are working as we planned. Our focus will remain on continuing to improve the programs we have in place to further enhance the academic readiness of the students who attend our institutions, and to provide students with an innovative, high quality learning experience that enriches their lives." (May 3, 2011) (¶84);

- "We saw . . . positive changes" from the initiatives "as early as the second quarter" in 2010 and "we continue to realize the positive outcomes from [the initiatives] in the third quarter and fourth quarter [of 2010], and now again in the first quarter" of 2011 (May 3, 2011) (¶90);

000362
Exhibit 58

| | |
|---|---|
| 1 | • "[E]verything that we implemented last year has really done what we thought it would do, which is improve our persistence" (May 3, 2011) |
| 2 | (¶90); |
| 3 | • "[T]he increase in persistence was fairly similar across students. Students in their first and second course, those are the folks that are |
| 4 | [always], as you know, most likely to drop and not persist. And so we're doing quite a bit inside our organization to try and focus in on those |
| 5 | students and try and help them through those first couple of courses. |
| 6 | These adults haven't been to school in a while, and it's a completely kind of new experience for them in many cases. So anything |
| 7 | that we can do to better assist them in those first few courses, we are working on that internally on various initiatives and ways in which we |
| 8 | can increase that persistence. |
| 9 | *   *   * |
| 10 | So we are pleased overall with our initiatives . . . ." (May 3, 2011) (¶91); |
| 11 | |
| 12 | • "[W]e are very focused on doing everything we can at our institutions to improving persistence and improving our graduation rates, and setting |
| 13 | students to be as successful as they can possibly be." Further that "right now we are very focused on our initiatives for 2011 on student |
| 14 | persistence, student graduation – anything we can do to improve the student experience in the classroom or administratively." (May 3, 2011) |
| 15 | (¶92); |
| 16 | • "During the first half of 2011, our institutions continued to make progress on key initiatives to improve the academic readiness of students |
| 17 | and to provide students with an innovative, high quality learning experience." (August 2, 2011) (¶102); |
| 18 | • "We continue to believe that maintaining a high level – high level of persistence level is an important goal for both of our institutions and |
| 19 | demonstrates that our institutions are successfully engaging students and delivering a quality education experience that enhances student's lives. |
| 20 | We will continue to focus on improving persistence . . . ." (August 2, 2011) (¶104); |
| 21 | |
| 22 | • "We are pleased with our progress in the first half of 2011. We have achieved significant key initiatives, strengthened our support for |
| 23 | students and faculty through developing new technologies and enhanced transparency for prospective students." (August 2, 2011) (¶104); |
| 24 | • "Taking a broader viewer of our accomplishments to date in 2011, our institutions have successfully managed through a major transition in |
| 25 | how our industry operates. We have made significant progress on key initiatives. We have strengthened our support for students and faculty |
| 26 | through innovative technologies. And we have enhanced transparency for prospective students." (November 1, 2011) (¶129); |
| 27 | |
| 28 | • "Our success with persistence and graduation is also due in part to our long-standing practice of seeking the highest quality prospective |

3:12-cv-01737-JM-JLB

students, which is a practice that remains central to our recruitment focus. Having well-prepared students and maintaining high persistence levels are important goals for both of our institutions." (November 1, 2011) (¶131);

- "I think we are starting to see the effects of all the work that we are doing upfront. If you think about the quality initiatives we put into place with the orientation; with required attendance in the beginning courses; how we walk our students to class and make sure they are prepared and are comfortable in that learning environment.

  So by the time they get there, all that upfront preparation has really given them a sense of confidence that they can succeed and they can achieve and they know what to expect. So we think that is having a good impact for us." (November 1, 2011) (¶133);

- "It is new. We are excited to be looking at some of that initial data, and the teams are really going to use that to make some quality decisions within the classroom, within their instructional practices, within the day-to-day support for students from an academic perspective, and where we might be able to jump in and coach them as far as what we are seeing and what behaviors we can tend to see across-the-board with all students, and how those trends can help better inform how that student can be successful himself in the classroom.

  So it is new for us, and we are just excited to get it rolling and to start using some of that data." (November 1, 2011) (¶134);

- "Yes, I mean I would just add to [McAuliffe's] comments that there is a tremendous amount of insight that we have gained from that investment, and we are just at the beginning. So we expect that we are going to have even further insight that is going to lead to even more improvements, as Jane mentioned.

  It's very exciting for us as an organization and for our institutions to be able to have that predictive capability and to proactively reach a student before they start having some significant type of issues that might lead them to dropping out of the institution." (November 1, 2011) (¶134);

- "We did a lot back in 2010 and throughout 2011 around quality initiatives for our students and student preparedness. That has impacted our persistence in a very positive way. . . ." (December 7, 2011) (¶152);

- "In 2011, I am very pleased to report that both our institutions improved the quality of the student learning experience through the increased use of innovative technologies. To this end, we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experience at our institutions. In 2011, we believe these investments in the student learning experience were responsible for improved student persistence and graduation rates, and we expect that our focus on these investments will continue to produce similar results in the future . . . ." (March 6, 2012) (¶161);

1015242_1                                                    3:12-cv-01737-JM-JLB

- • "We recognize that Bridgepoint's success depends on providing students a high-quality education at our institutions. To this end, we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experiences at our institutions.

  . . . [W]e will continue to invest in innovations to improve the student learning experience and we anticipate that these investments will provide continued improved persistence and graduation rates over the long term." (March 6, 2012) (¶162);

- • "We will be investing more in identifying prospective students in 2012 to ensure that the students we acquire will have the right attributes to be successful at our institutions. . . .

  We are making several investments in curriculum and faculty beginning at the time of enrollment that should lead to better outcomes for the students." (March 6, 2012) (¶163);

- • "We are consciously and deliberately increasing our investment in prospective students, allowing us to target a student that has a profile that performs and persists better and we have – as we have mentioned, we made a tremendous investment in data analytics throughout 2011 and so we have data that supports that thesis and we expect and have included in our guidance increased persistence as a result of being able to attract those students." (March 6, 2012) (¶164);

- • "We are pleased that our operating and financial results were in-line with our internal expectations for the quarter, and we are particularly pleased by the strong increase in student persistence at our universities," said Andrew Clark, Chief Executive Officer of Bridgepoint Education. "Increasing persistence reflects our success with the student support and quality initiatives we are implementing, which help assure the academic readiness of students and help provide students with an innovative, high quality learning experience that enriches their lives." (May 1, 2012) (¶178); and

- • "It's our focus on quality. It's our focus on increasing the value of that student experience that's so important to us." (May 1, 2012) (¶183).

INTERROGATORY NO. 3:

Identify specifically the new information about Bridgepoint's student retention that You contend was revealed in Bridgepoint's announcement filed on Form 8-K on July 13, 2012 (referenced at ¶ 81 of Your complaint).

RESPONSE TO INTERROGATORY NO. 3:

Lead Plaintiff objects to this Interrogatory as prematurely seeking expert opinion before the expert disclosure dates provided for in the Scheduling Order entered August 6, 2014. Subject to and without waiving the foregoing General

000365
Exhibit 58

Objections and Specific Objections, and reserving the right to amend this response following the expert disclosure dates ordered in this case, Lead Plaintiff states as follows:

As alleged in paragraph 81 of the Complaint, incorporated herein by reference, Bridgepoint's July 13, 2012 disclosure revealed that Ashford University's poor student completion and retention, which resulted in the denial of WASC accreditation, also jeopardized its accreditation with HLC. Specifically, Bridgepoint's July 13, 2012 disclosure revealed that HLC was concerned that Ashford's resource allocations were not "sufficiently aligned with educational purposes and objectives in the area of student completion and retention." Lead Plaintiff alleges that the information contained in Bridgepoint's July 13, 2012 disclosure was omitted from Defendants' false and misleading statements throughout the Class Period and was not revealed in the July 9, 2012 disclosure, when Bridgepoint announced WASC's findings, but made no mention that its deficiencies in the areas of student retention and completion could jeopardize its HLC accreditation.

INTERROGATORY NO. 4:

Identify the specific statement(s) You assert was (or were) revealed to be false by the new information You identify in Your response to Interrogatory No. 3 above.

RESPONSE TO INTERROGATORY NO. 4:

Lead Plaintiff objects to this Interrogatory on the grounds that the information is equally available to Defendants as the alleged false and misleading statements are set forth in the Complaint. Subject to and without waiving the foregoing General Objections and Specific Objections, Lead Plaintiff states as follows: Defendants' false and misleading statements responsive to this Interrogatory are contained in paragraphs 84, 90, 91, 92, 102, 104, 129, 131, 133, 134, 152, 161, 162, 163, 164, 178, and 183 of the Complaint and state as follows:

- "We are pleased with the results we achieved in the first quarter as our new enrollments were in-line with our expectations, and I am particularly pleased that our year over year student persistence increased

for the fourth consecutive quarter. The increased persistence not only resulted in better than anticipated revenue for the quarter, but it more importantly reinforces that the student support initiatives we made in 2010 to enhance student persistence are working as we planned. Our focus will remain on continuing to improve the programs we have in place to further enhance the academic readiness of the students who attend our institutions, and to provide students with an innovative, high quality learning experience that enriches their lives." (May 3, 2011) (¶84);

- "We saw . . . positive changes" from the initiatives "as early as the second quarter" in 2010 and "we continue to realize the positive outcomes from [the initiatives] in the third quarter and fourth quarter [of 2010], and now again in the first quarter" of 2011 (May 3, 2011) (¶90);

- "[E]verything that we implemented last year has really done what we thought it would do, which is improve our persistence" (May 3, 2011) (¶90);

- "[T]he increase in persistence was fairly similar across students. Students in their first and second course, those are the folks that are [always], as you know, most likely to drop and not persist. And so we're doing quite a bit inside our organization to try and focus in on those students and try and help them through those first couple of courses.

    These adults haven't been to school in a while, and it's a completely kind of new experience for them in many cases. So anything that we can do to better assist them in those first few courses, we are working on that internally on various initiatives and ways in which we can increase that persistence.

    *    *    *

    So we are pleased overall with our initiatives . . . ." (May 3, 2011) (¶91);

- "[W]e are very focused on doing everything we can at our institutions to improving persistence and improving our graduation rates, and setting students to be as successful as they can possibly be." Further that "right now we are very focused on our initiatives for 2011 on student persistence, student graduation – anything we can do to improve the student experience in the classroom or administratively." (May 3, 2011) (¶92);

- "During the first half of 2011, our institutions continued to make progress on key initiatives to improve the academic readiness of students and to provide students with an innovative, high quality learning experience." (August 2, 2011) (¶102);

- "We continue to believe that maintaining a high level – high level of persistence level is an important goal for both of our institutions and demonstrates that our institutions are successfully engaging students and delivering a quality education experience that enhances student's lives. We will continue to focus on improving persistence . . . ." (August 2, 2011) (¶104);

000367
Exhibit 58

- • "We are pleased with our progress in the first half of 2011. We have achieved significant key initiatives, strengthened our support for students and faculty through developing new technologies and enhanced transparency for prospective students." (August 2, 2011) (¶104);

- • "Taking a broader viewer of our accomplishments to date in 2011, our institutions have successfully managed through a major transition in how our industry operates. We have made significant progress on key initiatives. We have strengthened our support for students and faculty through innovative technologies. And we have enhanced transparency for prospective students." (November 1, 2011) (¶129);

- • "Our success with persistence and graduation is also due in part to our long-standing practice of seeking the highest quality prospective students, which is a practice that remains central to our recruitment focus. Having well-prepared students and maintaining high persistence levels are important goals for both of our institutions." (November 1, 2011) (¶131);

- • "I think we are starting to see the effects of all the work that we are doing upfront. If you think about the quality initiatives we put into place with the orientation; with required attendance in the beginning courses; how we walk our students to class and make sure they are prepared and are comfortable in that learning environment.

   So by the time they get there, all that upfront preparation has really given them a sense of confidence that they can succeed and they can achieve and they know what to expect. So we think that is having a good impact for us." (November 1, 2011) (¶133);

- • "It is new. We are excited to be looking at some of that initial data, and the teams are really going to use that to make some quality decisions within the classroom, within their instructional practices, within the day-to-day support for students from an academic perspective, and where we might be able to jump in and coach them as far as what we are seeing and what behaviors we can tend to see across-the-board with all students, and how those trends can help better inform how that student can be successful himself in the classroom.

   So it is new for us, and we are just excited to get it rolling and to start using some of that data." (November 1, 2011) (¶134);

- • "Yes, I mean I would just add to [McAuliffe's] comments that there is a tremendous amount of insight that we have gained from that investment, and we are just at the beginning. So we expect that we are going to have even further insight that is going to lead to even more improvements, as Jane mentioned.

   It's very exciting for us as an organization and for our institutions to be able to have that predictive capability and to proactively reach a student before they start having some significant type of issues that might lead them to dropping out of the institution." (November 1, 2011) (¶134);

- "We did a lot back in 2010 and throughout 2011 around quality initiatives for our students and student preparedness. That has impacted our persistence in a very positive way. . . ." (December 7, 2011) (¶152);

- "In 2011, I am very pleased to report that both our institutions improved the quality of the student learning experience through the increased use of innovative technologies. To this end, we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experience at our institutions. In 2011, we believe these investments in the student learning experience were responsible for improved student persistence and graduation rates, and we expect that our focus on these investments will continue to produce similar results in the future . . . ." (March 6, 2012) (¶161);

- "We recognize that Bridgepoint's success depends on providing students a high-quality education at our institutions. To this end, we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experiences at our institutions.

  . . . [W]e will continue to invest in innovations to improve the student learning experience and we anticipate that these investments will provide continued improved persistence and graduation rates over the long term." (March 6, 2012) (¶162);

- "We will be investing more in identifying prospective students in 2012 to ensure that the students we acquire will have the right attributes to be successful at our institutions. . . .

  We are making several investments in curriculum and faculty beginning at the time of enrollment that should lead to better outcomes for the students." (March 6, 2012) (¶163);

- "We are consciously and deliberately increasing our investment in prospective students, allowing us to target a student that has a profile that performs and persists better and we have – as we have mentioned, we made a tremendous investment in data analytics throughout 2011 and so we have data that supports that thesis and we expect and have included in our guidance increased persistence as a result of being able to attract those students." (March 6, 2012) (¶164);

- "We are pleased that our operating and financial results were in-line with our internal expectations for the quarter, and we are particularly pleased by the strong increase in student persistence at our universities," said Andrew Clark, Chief Executive Officer of Bridgepoint Education. "Increasing persistence reflects our success with the student support and quality initiatives we are implementing, which help assure the academic readiness of students and help provide students with an innovative, high quality learning experience that enriches their lives." (May 1, 2012) (¶178); and

- "It's our focus on quality. It's our focus on increasing the value of that student experience that's so important to us." (May 1, 2012) (¶183).

1015242_1

INTERROGATORY NO. 5:

Identify specifically the new information about Bridgepoint's initiatives that You contend was revealed in Bridgepoint's announcement filed on Form 8-K on July 13, 2012 (referenced at ¶ 81 of Your complaint).

RESPONSE TO INTERROGATORY NO. 5:

Lead Plaintiff objects to this Interrogatory as prematurely seeking expert opinion before the expert disclosure dates provided for in the Scheduling Order entered August 6, 2014. Subject to and without waiving the foregoing General Objections and Specific Objections, and reserving the right to amend this response following the expert disclosure dates ordered in this case, Lead Plaintiff states as follows:

As alleged in paragraph 81 of the Complaint, incorporated herein by reference, Bridgepoint's July 13, 2012 disclosure revealed that Ashford University's poor student completion and retention, including the lack of any positive impact from concerted and systematic efforts to improve student completion and retention, which resulted in the denial of WASC accreditation, also jeopardized its accreditation with HLC. Specifically, Bridgepoint's July 13, 2012 disclosure revealed that HLC was concerned that Ashford's resource allocations were not "sufficiently aligned with educational purposes and objectives in the area of student completion and retention." Lead Plaintiff alleges that the information contained in Bridgepoint's July 13, 2012 disclosure was omitted from Defendants' false and misleading statements throughout the Class Period and was not revealed in the July 9, 2012 disclosure, when Bridgepoint announced WASC's findings, but made no mention that its deficiencies in the areas of student retention and completion could jeopardize its HLC accreditation.

INTERROGATORY NO. 6:

Identify the specific statement(s) You assert was (or were) revealed to be false by the new information You identify in Your response to Interrogatory No. 5 above.

000370
Exhibit 58

RESPONSE TO INTERROGATORY NO. 6:

Lead Plaintiff objects to this Interrogatory on the grounds that the information is equally available to Defendants as the alleged false and misleading statements are set forth in the Complaint. Subject to and without waiving the foregoing General Objections and Specific Objections, Lead Plaintiff states as follows: Defendants' false and misleading statements responsive to this Interrogatory are contained in paragraphs 84, 90, 91, 92, 102, 104, 129, 131, 133, 134, 152, 161, 162, 163, 164, 178, and 183 of the Complaint and state as follows:

- "We are pleased with the results we achieved in the first quarter as our new enrollments were in-line with our expectations, and I am particularly pleased that our year over year student persistence increased for the fourth consecutive quarter. The increased persistence not only resulted in better than anticipated revenue for the quarter, but it more importantly reinforces that the student support initiatives we made in 2010 to enhance student persistence are working as we planned. Our focus will remain on continuing to improve the programs we have in place to further enhance the academic readiness of the students who attend our institutions, and to provide students with an innovative, high quality learning experience that enriches their lives." (May 3, 2011) (¶84);

- "We saw . . . positive changes" from the initiatives "as early as the second quarter" in 2010 and "we continue to realize the positive outcomes from [the initiatives] in the third quarter and fourth quarter [of 2010], and now again in the first quarter" of 2011 (May 3, 2011) (¶90);

- "[E]verything that we implemented last year has really done what we thought it would do, which is improve our persistence" (May 3, 2011) (¶90);

- "[T]he increase in persistence was fairly similar across students. Students in their first and second course, those are the folks that are [always], as you know, most likely to drop and not persist. And so we're doing quite a bit inside our organization to try and focus in on those students and try and help them through those first couple of courses.

These adults haven't been to school in a while, and it's a completely kind of new experience for them in many cases. So anything that we can do to better assist them in those first few courses, we are working on that internally on various initiatives and ways in which we can increase that persistence.

\* \* \*

So we are pleased overall with our initiatives . . . ." (May 3, 2011) (¶91);

- 14 -                    3:12-cv-01737-JM-JLB

000371
Exhibit 58

- • "[W]e are very focused on doing everything we can at our institutions to improving persistence and improving our graduation rates, and setting students to be as successful as they can possibly be." Further that "right now we are very focused on our initiatives for 2011 on student persistence, student graduation – anything we can do to improve the student experience in the classroom or administratively." (May 3, 2011) (¶92);

- • "During the first half of 2011, our institutions continued to make progress on key initiatives to improve the academic readiness of students and to provide students with an innovative, high quality learning experience." (August 2, 2011) (¶102);

- • "We continue to believe that maintaining a high level – high level of persistence level is an important goal for both of our institutions and demonstrates that our institutions are successfully engaging students and delivering a quality education experience that enhances student's lives. We will continue to focus on improving persistence . . . ." (August 2, 2011) (¶104);

- • "We are pleased with our progress in the first half of 2011. We have achieved significant key initiatives, strengthened our support for students and faculty through developing new technologies and enhanced transparency for prospective students." (August 2, 2011) (¶104);

- • "Taking a broader viewer of our accomplishments to date in 2011, our institutions have successfully managed through a major transition in how our industry operates. We have made significant progress on key initiatives. We have strengthened our support for students and faculty through innovative technologies. And we have enhanced transparency for prospective students." (November 1, 2011) (¶129);

- • "Our success with persistence and graduation is also due in part to our long-standing practice of seeking the highest quality prospective students, which is a practice that remains central to our recruitment focus. Having well-prepared students and maintaining high persistence levels are important goals for both of our institutions." (November 1, 2011) (¶131);

- • "I think we are starting to see the effects of all the work that we are doing upfront. If you think about the quality initiatives we put into place with the orientation; with required attendance in the beginning courses; how we walk our students to class and make sure they are prepared and are comfortable in that learning environment.

  So by the time they get there, all that upfront preparation has really given them a sense of confidence that they can succeed and they can achieve and they know what to expect. So we think that is having a good impact for us." (November 1, 2011) (¶133);

- • "It is new. We are excited to be looking at some of that initial data, and the teams are really going to use that to make some quality decisions within the classroom, within their instructional practices, within the day-to-day support for students from an academic perspective, and where we might be able to jump in and coach them as far as what we

are seeing and what behaviors we can tend to see across-the-board with all students, and how those trends can help better inform how that student can be successful himself in the classroom.

So it is new for us, and we are just excited to get it rolling and to start using some of that data." (November 1, 2011) (¶134);

- "Yes, I mean I would just add to [McAuliffe's] comments that there is a tremendous amount of insight that we have gained from that investment, and we are just at the beginning. So we expect that we are going to have even further insight that is going to lead to even more improvements, as Jane mentioned.

It's very exciting for us as an organization and for our institutions to be able to have that predictive capability and to proactively reach a student before they start having some significant type of issues that might lead them to dropping out of the institution." (November 1, 2011) (¶134);

- "We did a lot back in 2010 and throughout 2011 around quality initiatives for our students and student preparedness. That has impacted our persistence in a very positive way. . . ." (December 7, 2011) (¶152);

- "In 2011, I am very pleased to report that both our institutions improved the quality of the student learning experience through the increased use of innovative technologies. To this end, we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experience at our institutions. In 2011, we believe these investments in the student learning experience were responsible for improved student persistence and graduation rates, and we expect that our focus on these investments will continue to produce similar results in the future . . . ." (March 6, 2012) (¶161);

- "We recognize that Bridgepoint's success depends on providing students a high-quality education at our institutions. To this end, we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experiences at our institutions.

[W]e will continue to invest in innovations to improve the student learning experience and we anticipate that these investments will provide continued improved persistence and graduation rates over the long term." (March 6, 2012) (¶162);

- "We will be investing more in identifying prospective students in 2012 to ensure that the students we acquire will have the right attributes to be successful at our institutions. . . .

We are making several investments in curriculum and faculty beginning at the time of enrollment that should lead to better outcomes for the students." (March 6, 2012) (¶163);

- "We are consciously and deliberately increasing our investment in prospective students, allowing us to target a student that has a profile that performs and persists better and we have – as we have mentioned, we

000373
Exhibit 58

1  made a tremendous investment in data analytics throughout 2011 and so
2  we have data that supports that thesis and we expect and have included
   in our guidance increased persistence as a result of being able to attract
   those students." (March 6, 2012) (¶164);

3  •      "We are pleased that our operating and financial results were in-
4  line with our internal expectations for the quarter, and we are particularly
   pleased by the strong increase in student persistence at our universities,"
5  said Andrew Clark, Chief Executive Officer of Bridgepoint Education.
   "Increasing persistence reflects our success with the student support and
6  quality initiatives we are implementing, which help assure the academic
   readiness of students and help provide students with an innovative, high
7  quality learning experience that enriches their lives." (May 1, 2012)
   (¶178); and

8  •      "It's our focus on quality. It's our focus on increasing the value of that
9  student experience that's so important to us." (May 1, 2012) (¶183).

10 INTERROGATORY NO. 7:

11      Identify which allegedly false or misleading statement(s) You contend was (or

12 were) made by Defendant Daniel Devine.

13 RESPONSE TO INTERROGATORY NO. 7:

14      Lead Plaintiff objects to this Interrogatory on the grounds that the information is

15 equally available to Defendants as the alleged false and misleading statements are set

16 forth in the Complaint.   Subject to and without waiving the foregoing General

17 Objections and Specific Objections, Lead Plaintiff states as follows:

18      As alleged in the Complaint, throughout the Class Period, defendant Daniel J.

19 Devine ("Devine") made false and misleading statements and omissions regarding

20 Ashford's failed pursuit of WASC accreditation as well as Bridgepoint's financial

21 projections.  The previously alleged statements were dismissed in  the Court's 2013

22 Order on Defendants' motion to dismiss the Complaint (Dkt. No. 39).  However, as

23 alleged      in      the      Complaint,      defendant      Devine      remains      liable

24

25

26

27

28

000374
Exhibit 58

1  under §20(a) of the Securities Exchange Act of 1934 as a control person of

2  Bridgepoint.  ¶¶244-247.  Lead Plaintiff is willing to meet and confer on this issue.

3  DATED: March 26, 2015                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
4                                          JONAH H. GOLDSTEIN
                                           LAURIE L. LARGENT
5                                          REGIS C. WORLEY. JR.

6

7                                          _____
                                                    AUSTIN P. BRANE
8
                                           655 West Broadway, Suite 1900
9                                          San Diego, CA  92101
                                           Telephone:  619/231-1058
10                                         619/231-7423 (fax)

11                                         Lead Counsel for Plaintiffs

12                                         ROBERT M. CHEVERIE &
                                               ASSOCIATES
13                                         GREGORY S. CAMPORA
                                           Commerce Center One
14                                         333 E. River Drive, Suite 101
                                           East Hartford, CT  06108
15                                         Telephone:  860/290-9610
                                           860/290-9611 (fax)
16
                                           JOHNSON & WEAVER, LLP
17                                         FRANK J. JOHNSON
                                           600 West Broadway, Suite 1540
18                                         San Diego, CA  92101
                                           Telephone:  619/230-0063
19                                         619/255-1856 (fax)

20                                         Additional Counsel for Plaintiff

21

22

23

24

25

26

27

28

000375
Exhibit 58

# DECLARATION OF SERVICE BY EMAIL

I, Lisa M. Mix, not a party to the within action, hereby declare that on March 26, 2015, I served the attached CITY OF ATLANTA GENERAL EMPLOYEES PENSION FUND'S OBJECTIONS AND RESPONSES TO DEFENDANT BRIDGEPOINT EDUCATION INC.'S FIRST SET OF INTERROGATORIES on the parties in the within action by e-mail addressed as follows:

## COUNSEL FOR PLAINTIFFS:

| NAME | FIRM | EMAIL |
|---|---|---|
| Jonah H. Goldstein<br>Laurie Largent<br>Regis Worley<br>Austin P. Brane | ROBBINS GELLER<br>RUDMAN & DOWD LLP<br>655 West Broadway<br>Suite 1900<br>San Diego, CA 92101<br>Tel: 619/231-1058<br>Fax: 619/231-7423 | jonahg@rgrdlaw.com<br>llargent@rgrdlaw.com<br>rworley@rgrdlaw.com<br>abrane@rgrdlaw.com |
| Frank J. Johnson, Jr. | JOHNSON & WEAVER, LLP<br>110 West "A" Street<br>Suite 750<br>San Diego, CA 92101<br>Tel: 619/230-0063<br>Fax: 619/255-1856 | frankj@johnsonandweaver.com |

## COUNSEL FOR DEFENDANTS:

| NAME | FIRM | EMAIL |
|---|---|---|
| Ignacio E. Salceda<br>Joni L. Ostler<br>Nina F. Locker | WILSON SONSINI<br>GOODRICH & ROSATI<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>Tel: 650/493-9300<br>Fax: 650/565-5100 | isalceda@wsgr.com<br>jostler@wsgr.com<br>nlocker@wsgr.com |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 26, 2015, at San Diego, California.

_____
LISA M. MIX

3:12-cv-01737-JM-JLB

# EXHIBIT 59

ROBBINS GELLER RUDMAN
   & DOWD LLP
JONAH H. GOLDSTEIN (193777)
LAURIE L. LARGENT (153493)
REGIS C. WORLEY, JR. (234401)
AUSTIN P. BRANE (286227)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com
llargent@rgrdlaw.com
rworley@rgrdlaw.com
abrane@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re BRIDGEPOINT EDUCATION, INC. SECURITIES LITIGATION | No. 3:12-cv-01737-JM-JLB |
| | CLASS ACTION |
| This Document Relates To: | LEAD PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF REQUEST FOR ADMISSIONS |
| ALL ACTIONS. | |

1028777_1

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and applicable Local Rules for the United States District Court for the Southern District of California and the rules and orders of this Court, Lead Plaintiffs Teamsters Local 677 Health Services & Insurance Plan and City of Atlanta General Employees' Pension Fund (collectively, "Plaintiffs") hereby respond and object to Defendants' First Set of Request for Admission (the "Requests") as follows:

## I. PRELIMINARY STATEMENT

Plaintiffs' responses and objections to the Requests are set forth below. By asserting the specific responses and objections stated below, Plaintiffs do not waive their right to challenge the relevance, materiality, or admissibility of the Requests or the use of the Requests and/or their responses thereto in any subsequent proceeding or trial in this action.

The responses and objections stated below are based on the information presently available and known to Plaintiffs. Plaintiffs' factual investigation of this action is continuing, and that investigation may disclose additional information and/or documents that could lead to additions to, changes in, and variations from these responses and objections. Plaintiffs therefore reserve their rights to amend, modify, or supplement the responses and objections below should such amendments, modifications, or supplements become appropriate.

The Requests are in large part unintelligible due to the use of vague and ambiguous language as set forth below. Nonetheless, Plaintiffs have made a good faith attempt to respond to the Requests to the extent they understood the Requests and subject to the general and specific objections set forth below.

## II. GENERAL OBJECTIONS

These General Objections are incorporated into the specific objections to each numbered Request. The assertion of the same or additional objections to any particular individual Request does not waive other General Objections, as set forth below, that are not specifically repeated in the specific objections. Plaintiffs reserve

the right to supplement or amend these objections based on information presently available. Further, Plaintiffs reserve the right to supplement or amend these objections based on information later obtained through investigation, discovery, or otherwise.

1. Plaintiffs object to the Requests to the extent they seek information that is protected by any applicable privilege, doctrine or right, including without limitation the attorney-client privilege, the work-product doctrine, and/or all other rights and privileges recognized under the constitutional, statutory, or decisional law of the United States and all relevant jurisdictions. Nothing done in relation to the Requests is intended to or shall operate as a waiver by Plaintiffs, intentionally or otherwise, of the attorney-client privilege, work-product doctrine protection, or any other applicable privilege, doctrine, or immunity protecting its communications, transactions, or records from disclosure.

2. Plaintiffs object to the Requests on the grounds and to the extent that they prematurely seek expert opinion before the expert disclosure dates provided for in the Scheduling Order entered August 6, 2014.

3. Plaintiffs object to the Requests to the extent they are not relevant to the subject matter of this litigation and/or are not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs' response to any Request shall not be deemed an admission or acknowledgement that such Request calls for information that is relevant to the subject matter of this action, and such response is without prejudice to Plaintiffs' right to contend at any other stage of the proceeding that the requested information is irrelevant, immaterial, or otherwise objectionable.

4. Plaintiffs object to the Requests to the extent they are compound and each matter is not separately stated, as required by Federal Rule of Civil Procedure 36(a)(2).

5. Plaintiffs object to the Requests to the extent they are overly broad, oppressive, vague, ambiguous, and, therefore, unduly burdensome.

000379
Exhibit 59

6.     Plaintiffs object to the Requests, including any Definition or Instruction therein, to the extent they seek to impose on Plaintiffs obligations different from or greater than those imposed by federal statute, the Federal Rules of Civil Procedure, or the Local Rules of the Court.

7.     Plaintiffs object to the Requests to the extent they call for, or can be interpreted as calling for, legal conclusions.

8.     No incidental or implied admissions are intended by the objections herein.  Nor shall the fact that Plaintiffs have objected to any Request be taken as an admission that Plaintiffs accept or admit the existence of any fact set forth or assumed by such request.

9.     Plaintiffs reserve the right to make all appropriate objections on any ground at any depositions, hearings, or trial on this matter that may occur.

10.     Plaintiffs failure to object to the Requests on a particular ground shall not be construed as a waiver of its right to object on that ground or any additional ground at any time.

11.     Plaintiffs object to the use of any denial, or any non-qualified admission, to any particular request as impeachment evidence either at the time of trial, or in any proceeding before trial, including without limitation summary judgment proceedings.

**III.     OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.     Plaintiffs generally object to the Definitions and Instructions set forth in the Requests to the extent they attempt to define words beyond their ordinary meaning.

2.     Plaintiffs generally object to the Definitions and Instructions on the grounds and to the extent they cause the specific Requests to be overly broad, unduly burdensome, or oppressive.  Plaintiffs also object to the Definitions to the extent they cause the Requests to call for information that is privileged, not relevant to the subject matter involved in this action, not admissible in evidence, or not reasonably calculated to lead to the discovery of admissible evidence.

000380
Exhibit 59

3.      Plaintiffs generally object to the Definitions and Instructions to the extent they purport to place upon Plaintiffs obligations different from or greater than those imposed by federal statute, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, or the Local Rules of the Court.  Whenever the Definitions and Instructions conflict with the Federal Rules of Civil Procedure, Plaintiffs will comply with the Federal Rules of Civil Procedure and not Defendants' Definitions and Instructions.

4.      Plaintiffs object to the Instructions in total, and to each specific instruction contained therein, insofar as they make the Requests unintelligible, impossible or impractical to respond to if complied with.

5.      Plaintiffs object to Definition No. 6 purporting to describe "You" or "Your" and the Requests incorporating these terms, to the extent that the Definition construes "You" and "Your" to include Plaintiffs' attorneys and thereby calls for the disclosure of information that is protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the right to privacy, or any other applicable privilege or immunity.  Plaintiffs also object to this Definition to the extent it purports to require Plaintiffs to provide information not within its custody or control.

6.      Plaintiffs object to Definition No. 7 as inapplicable to the Requests due to the fact that Definition No. 7 purports to modify the scope of interrogatories not at issue here.

**IV.    REQUESTS FOR ADMISSION**

REQUEST FOR ADMISSION NO. 1:

Admit that, the term "persistence," as used in Defendants' calls with market analysts and investors during the Class Period, referred to a metric equal to the number of students enrolled at the end of a quarter minus the number of new students enrolled in the quarter, divided by the number of students enrolled at the end of the prior quarter.

RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the phrases "as used in Defendants' calls with market analysts and investors," "referred to a metric," "students," and "students enrolled;" (ii) to the extent it calls for speculation; and (iii) that the Request is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: deny.

REQUEST FOR ADMISSION NO. 2:

Admit that, each calendar quarter during the Class Period, Bridgepoint publicly disclosed total enrollment and new student enrollment.

RESPONSE TO REQUEST FOR ADMISSION NO. 2:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the phrase "each calendar quarter during the Class Period" and the terms "student" and "enrollment;" and (ii) that the Request is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiffs admit that during the Class Period, Bridgepoint publicly provided numbers referred to by Bridgepoint as "total enrollment" and "new student enrollment." Plaintiffs' admission does not extend to the accuracy or completeness of the numbers provided by Bridgepoint or to the data they purported to represent.

REQUEST FOR ADMISSION NO. 3:

Admit that, during the Class Period, market analysts were able to calculate, did calculate, and published their calculations of "persistence" as used in Defendants' calls with market analysts and investors.

<u>RESPONSE TO REQUEST FOR ADMISSION NO. 3</u>:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the phrase "as used in Defendants' calls with market analysts and investors," and the term "market analysts"; (ii) to the extent it calls for speculation as to documents not originated, authored or maintained by Plaintiffs and to the mental state of those that authored or contributed to such documents; and (iii) that the Request is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiffs admit that at various times during the Class Period, third parties published documents containing numbers referred to as "persistence," and deny the remainder of the Request.

<u>REQUEST FOR ADMISSION NO. 4</u>:

Admit that "persistence," as used in Defendants' calls with market analysts and investors during the Class Period, was calculated by Barclays as the "number of students currently enrolled minus current starts, divided by the prior period's enrollment."

<u>RESPONSE TO REQUEST FOR ADMISSION NO. 4</u>:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the phrases "as used in Defendants' calls with market analysts and investors" and "was calculated," and the term "Barclays;" (ii) to the extent it calls for speculation as to documents not originated, authored or maintained within or by Plaintiffs and to the mental state of those that authored or contributed to such documents; and (iii) that the Request is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiffs admit that the phrase "number of students currently enrolled minus current starts, divided by the

000383
Exhibit 59

prior period's enrollment" appears in a document issued by Barclays Capital, *e.g.*, BARC_000335, and deny the remainder of the Request.

REQUEST FOR ADMISSION NO. 5:

Admit that "persistence," as used in Defendants' calls with market analysts and investors during the Class Period, was calculated by JP Morgan as the "ratio of continuing student enrollment (total enrollment less new enrollment) in the current quarter and total student enrollment in the prior quarter."

RESPONSE TO REQUEST FOR ADMISSION NO. 5:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the phrases "as used in Defendants' calls with market analysts and investors" and "was calculated," and the term "JP Morgan;" (ii) to the extent it calls for speculation as to documents not originated, authored or maintained within or by Plaintiffs and to the mental state of those that authored or contributed to such documents; and (iii) that the Request is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiffs admit that the phrase "ratio of continuing student enrollment (total enrollment less new enrollment) in the current quarter and total student enrollment in the prior quarter" appears in a document issued by J.P. Morgan Securities LLC, *e.g.*, BPI045492, and deny the remainder of the Request.

REQUEST FOR ADMISSION NO. 6:

Admit that, during the Class Period, the following analysts calculated and published the same persistence values for Bridgepoint: BMO Capital, Credit Suisse, JP Morgan, Piper Jaffray, RBC, WM Smith, Wunderlich, Barclays, Deutsche Bank, Barrington, William Blair, Citi, and Wells Fargo.

000384
Exhibit 59

RESPONSE TO REQUEST FOR ADMISSION NO. 6:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object (i) that the Request is vague and ambiguous, including in its use of the phrase "the same persistence values," and the term "the following analysts" without identifying any individuals; (ii) to the extent it calls for speculation as to documents not originated, authored or maintained within or by Plaintiffs and to the mental state of those that authored or contributed to such documents; and (iii) that the Request is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiffs admit that at various times during the Class Period, third parties, including those listed in the Request, published documents containing numbers referred to as "persistence" for Bridgepoint Education, Inc., and that in certain instances the numbers were the same, *e.g.*, BPI067652, BPIK000253210, BPIK000827305, BPI067669, BPI067312, BPI08672, BARC_000335, BPI044830, BPI063424. Plaintiffs deny the remainder of the Request.

REQUEST FOR ADMISSION NO. 7:

Admit that WASC's action letter to Ashford dated July 3, 2012, did not refer to the terms "persistence" or "retention" to mean the same metrics as used in Defendants' calls with market analysts and investors during the Class Period.

RESPONSE TO REQUEST FOR ADMISSION NO. 7:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the phrase "as used in Defendants' calls with market analysts and investors" and the term "metrics;" (ii) to the extent it calls for speculation as to documents not originated, authored or maintained within or by Plaintiffs and to the mental state of those that authored or contributed to such documents; (iii) that the document referenced in the Request

speaks for itself; (iv) to the extent it misstates the requirements of Rule 901 of the Federal Rules of Evidence; and (v) to the extent it misstates the requirements of Rules 1001 and 1002 of the Federal Rules of Evidence.

Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: deny.

REQUEST FOR ADMISSION NO. 8:

Admit that WASC did not reach the decision to deny accreditation to Ashford until June 13, 2012.

RESPONSE TO REQUEST FOR ADMISSION NO. 8:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the phrase "reach the decision;" and (ii) to the extent it calls for speculation as to documents not originated, authored or maintained within or by Plaintiffs and to the mental state of those that authored or contributed to such documents.

Subject to and without waiving the foregoing objections, Plaintiffs admit that the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges ("Commission") met June 13-15, 2012. Plaintiffs also admit that the Commission acted to deny Ashford University's application for initial accreditation. Plaintiffs deny the remainder of the Request.

REQUEST FOR ADMISSION NO. 9:

Admit that, in 2010, Ashford implemented, at a minimum, the following initiatives as identified at Bates BPI157880-881: (a) a new student orientation course; (b) a live, web-based "walk-to-class" program; (c) an increase in the minimum age of attendance for online associate's degrees programs from 18 to 22; and (d) a requirement that all undergraduate students have perfect attendance for all five weeks of the first class.

000386
Exhibit 59

<u>RESPONSE TO REQUEST FOR ADMISSION NO. 9</u>:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the terms "implemented," "initiatives," and "new;" (ii) that the document referenced in the Request speaks for itself; (iii) to the extent it misstates the requirements of Rule 901 of the Federal Rules of Evidence; (iv) to the extent it misstates the requirements of Rules 1001 and 1002 of the Federal Rules of Evidence; and (v) that the Request is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiffs admit that BPI157880-881 states, in part: "We increased the minimum age of attendance for our online associate's degree programs from 18 to 22;" "we now require that all undergraduate students have perfect attendance for all five weeks of their first class at Ashford;" "Ashford University provided randomly selected first time online students with fewer than 24 hours of transfer credit with a free, two-week online Student Success Workshop;" and "we piloted a live, web-based 'walk to class.'" Plaintiffs deny the remainder of the Request.

<u>REQUEST FOR ADMISSION NO. 10</u>:

Admit that, in 2011 and 2012, Ashford implemented the following initiatives as identified at BPIK000745750: (a) a student orientation course; (b) a program to reduce class size; (c) a program to improved lead quality; (d) the REAL dashboard.

<u>RESPONSE TO REQUEST FOR ADMISSION NO. 10</u>:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the terms "implemented" and "initiatives;" (ii) the document referenced in the Request speaks for itself; (iii) to the extent it misstates the requirements of Rule 901 of the Federal Rules of Evidence; (iv)

to the extent it misstates the requirements of Rules 1001 and 1002 of the Federal Rules of Evidence; and (v) that the Request is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiffs admit that BPIK000745750 contains a table titled "Improvement Initiatives Underway," and that table states, in part: "Orientation Court – PILOT;" "Small Early Class Size – PILOT;" "Improve Prospective Student Lead Quality Mix;" and "REAL Dashboard – PILOT." Plaintiffs deny the remainder of the Request.

REQUEST FOR ADMISSION NO. 11:

Admit that Defendants did not know that Ashford would be denied accreditation by WASC until after WASC reached that decision.

RESPONSE TO REQUEST FOR ADMISSION NO. 11:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the term "reached;" and (ii) to the extent it calls for a legal conclusion.

Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: deny.

REQUEST FOR ADMISSION NO. 12:

Admit that each of the Defendants had a good faith and reasonable basis for making the statements You allege to be false and misleading.

RESPONSE TO REQUEST FOR ADMISSION NO. 12:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the terms "good faith," "reasonable basis," and "making;" and (ii) to the extent it calls for a legal conclusion.

Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: deny.

1  REQUEST FOR ADMISSION NO. 13:

2      Admit that each of the Defendants had a good faith and reasonable basis for

3  stating that persistence (as used in Defendants' calls with market analysts and

4  investors during the Class Period) had been improving year-over-year, for four

5  consecutive quarters, as of May 2011.

6  RESPONSE TO REQUEST FOR ADMISSION NO. 13:

7      Plaintiffs incorporate by reference the General Objections and Objections to

8  Definitions and Instructions, set forth above.  Plaintiffs further object: (i) that the

9  Request is vague and ambiguous, including in its use of the terms "good faith,"

10 "reasonable basis," and "stating," and the phrase "as used in Defendants' calls with

11 market analysts and investors" and "as of May 2011;" and (ii) to the extent it calls for

12 a legal conclusion.

13     Subject to and without waiving the foregoing objections, Plaintiffs respond as

14 follows: deny.

15 REQUEST FOR ADMISSION NO. 14:

16     Admit that each of the Defendants had a good faith and reasonable basis for

17 stating, during the Class period, that persistence (as used in Defendants' calls with

18 market analysts and investors during the Class Period) was improving due to

19 initiatives implemented by Bridgepoint and/or Ashford.

20 RESPONSE TO REQUEST FOR ADMISSION NO. 14:

21     Plaintiffs incorporate by reference the General Objections and Objections to

22 Definitions and Instructions, set forth above.  Plaintiffs further object: (i) that the

23 Request is vague and ambiguous, including in its use of the terms "good faith,"

24 "reasonable basis," "initiatives," and "stating," and the phrase "as used in Defendants'

25 calls with market analysts and investors;" and (ii) to the extent it calls for a legal

26 conclusion.

27     Subject to and without waiving the foregoing objections, Plaintiffs respond as

28 follows: deny.

REQUEST FOR ADMISSION NO. 15:

Admit that WASC's action letter to Ashford dated July 3, 2012, identified six reasons for its denial of accreditation to Ashford, only one of which was related to persistence, retention, or graduation rates.

RESPONSE TO REQUEST FOR ADMISSION NO. 15:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the terms "identified," "reasons," and "related to;" (ii) the document referenced in the Request speaks for itself; (iii) to the extent it calls for a legal conclusion; (iv) to the extent it misstates the requirements of Rule 901 of the Federal Rules of Evidence; and (v) to the extent it misstates the requirements of Rules 1001 and 1002 of the Federal Rules of Evidence.

Subject to and without waiving the foregoing objections, Plaintiffs admit that a letter dated July 3, 2012, from Ralph A. Wolff, President of WASC, to Elizabeth Tice, President and CEO of Ashford University, identified six "areas," and that one of the six "areas" identified was: "Student retention and completion, methods of tracking student progress, and support for student success (Criteria for Review (CFR) 2.6, 2.10-2.14)." WASC 019637. Plaintiffs deny the remainder of the Request.

REQUEST FOR ADMISSION NO. 16:

Admit that Bridgepoint's Form 8-K of July 9, 2012, did not reveal any new information regarding persistence, retention, or graduation rates.

RESPONSE TO REQUEST FOR ADMISSION NO. 16:

Plaintiffs incorporate by reference the General Objections and Objections to Definitions and Instructions, set forth above. Plaintiffs further object: (i) that the Request is vague and ambiguous, including in its use of the terms "reveal" and "new;" (ii) the document referenced in the Request speaks for itself; (iii) to the extent it calls for a legal conclusion; (iv) to the extent it misstates the requirements of Rule 901 of the Federal Rules of Evidence; (v) to the extent it misstates the requirements of Rules

000390
Exhibit 59

1001 and 1002 of the Federal Rules of Evidence; (vi) to the extent it prematurely seeks expert opinion before the expert disclosure dates provided for in the Scheduling Order entered August 6, 2014.

Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: deny.

DATED: May 11, 2015

ROBBINS GELLER RUDMAN
& DOWD LLP
JONAH H. GOLDSTEIN
LAURIE L. LARGENT
REGIS C. WORLEY, JR.
AUSTIN P. BRANE

_____
JONAH H. GOLDSTEIN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

ROBERT M. CHEVERIE &
ASSOCIATES
GREGORY S. CAMPORA
Commerce Center One
333 E. River Drive, Suite 101
East Hartford, CT 06108
Telephone: 860/290-9610
860/290-9611 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: 619/230-0063
619/255-1856 (fax)

Additional Counsel for Plaintiff

000391
Exhibit 59

## DECLARATION OF SERVICE BY E-MAIL

I, Karen Cook, not a party to the within action, hereby declare that on May 11, 2015, I served the attached LEAD PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF REQUEST FOR ADMISSIONS on the parties in the within action by e-mail addressed as follows:

### COUNSEL FOR PLAINTIFFS:

| NAME | FIRM | EMAIL |
|------|------|-------|
| Jonah H. Goldstein<br>Laurie Largent<br>Regis Worley<br>Austin P. Brane | ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Tel: 619/231-1058<br>Fax: 619/231-7423 | jonahg@rgrdlaw.com<br>llargent@rgrdlaw.com<br>rworley@rgrdlaw.com<br>abrane@rgrdlaw.com |
| Frank J. Johnson, Jr. | JOHNSON & WEAVER, LLP<br>110 West "A" Street, Suite 750<br>San Diego, CA 92101<br>Tel: 619-230-0063<br>Fax: 619/255-1856 | frankj@johnsonandweaver.com |

### COUNSEL FOR DEFENDANTS:

| NAME | FIRM | EMAIL |
|------|------|-------|
| Ignacio E. Salceda<br>Joni L. Ostler<br>Nina F. Locker | WILSON SONSINI GOODRICH & ROSATI<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>Tel: 650/493-9300<br>Fax: 650/565-5100 | isalceda@wsgr.com<br>jostler@wsgr.com<br>nlocker@wsgr.com |
| Bahram Seyedin-Noor<br>Bryan Ketroser | ALTO LITIGATION<br>4 Embarcadero Center, Suite 1400<br>San Francisco, CA 94111<br>Tel: 415/868-5602<br>Fax: 866/654-7207 | bahram@altolit.com<br>bryan@altolit.com |

1    I declare under penalty of perjury that the foregoing is true and correct.
2  Executed on May 11, 2015, at San Diego, California.

3

4    _____
5                    KAREN COOK

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 60

ROBBINS GELLER RUDMAN
  & DOWD LLP
JONAH H. GOLDSTEIN (193777)
LAURIE L. LARGENT (153493)
REGIS C. WORLEY, JR. (234401)
AUSTIN P. BRANE (286227)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com
llargent@rgrdlaw.com
rworley@rgrdlaw.com
abrane@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re BRIDGEPOINT EDUCATION, INC. SECURITIES LITIGATION | No. 3:12-cv-01737-JM-JLB |
| | CLASS ACTION |
| This Document Relates To: | LEAD PLAINTIFF CITY OF ATLANTA GENERAL EMPLOYEES PENSION FUND'S OBJECTIONS AND RESPONSES TO DEFENDANT ANDREW S. CLARK'S FIRST SET OF INTERROGATORIES |
|     ALL ACTIONS. | |

1030731_1

1    Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and
2  applicable Local Rules for the United States District Court for the Southern District of
3  California and the rules and orders of this Court, Lead Plaintiff City of Atlanta
4  General Employees Pension Fund ("Lead Plaintiff") hereby objects and responds to
5  Defendant Andrew S. Clark's ("Defendant") First Set of Interrogatories (the
6  "Interrogatories") as follows:

7  **I.    PRELIMINARY STATEMENT**

8    Lead Plaintiff's responses to the Interrogatories are based upon a reasonable
9  investigation of the evidence currently available and reflect current knowledge,
10 understanding and belief, based upon information known at this time.

11   Lead Plaintiff has not completed discovery, including expert discovery,
12 depositions or reviewed all potential evidence for use at trial. Additional contentions,
13 facts, witnesses, documents, testimony or other evidence may arise during the
14 discovery process and during the review of discovery in preparation for trial. Lead
15 Plaintiff is providing responses based upon review of evidence received to date and
16 expressly reserves the right to modify its position based upon further discovery and
17 review.

18   As this action proceeds, and as further investigation and discovery are
19 conducted, additional or different facts and information may be revealed to Lead
20 Plaintiff. Therefore, these objections and responses are made without prejudice to,
21 and are not a waiver of, Lead Plaintiff's rights to rely upon and use, at trial or
22 otherwise, any other facts and information subsequently identified. Lead Plaintiff
23 further reserves the right to supplement, clarify, revise or correct any or all of the
24 objections and responses herein, and to assert additional objections or privileges, in
25 subsequent supplemental responses.

26   By making the accompanying objections and responses to Defendant's
27 Interrogatories, Lead Plaintiff does not waive, and hereby expressly reserves, its right
28 to assert any and all objections as to the admissibility of such responses into evidence

in this action, on any and all grounds, including, but not limited to, relevancy, materiality and admissibility, and on any ground that would require exclusion of any response herein if it were introduced in Court. All objections and grounds, including relevance, are expressly reserved and may be interposed at the time of trial. Further, each of the General Objections contained herein is incorporated by reference as though fully set forth in each response.

## II. GENERAL OBJECTIONS

Lead Plaintiff makes the following General Objections, whether or not separately set forth in response to each Interrogatory, to each and every instruction, definition and request set forth in the Interrogatories:

1. Lead Plaintiff objects to the Interrogatories to the extent they purport to impose any obligation(s) on Lead Plaintiff that is not imposed by law, or are otherwise inconsistent with Rules 26 and 33 of the Federal Rules of Civil Procedure and/or the Local Rules for the United States District Court for the Southern District of California.

2. Lead Plaintiff objects to the Interrogatories to the extent that they seek information or documents that are beyond the scope of permissible discovery.

3. Lead Plaintiff objects to the Interrogatories to the extent that they seek or require disclosure of information that is protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the joint prosecution or common interest privilege, the right to privacy or any other applicable privilege or immunity. Such disclosure as may hereafter occur pursuant to the Interrogatories shall not include any information protected by such privileges or doctrines. Inadvertent disclosure of any such information shall not constitute a waiver of any applicable privilege, protection or immunity, in whole or in part.

4. Lead Plaintiff objects to the Interrogatories to the extent that they seek information or documents that is not within Lead Plaintiff's possession, custody or control.

000396
Exhibit 60

5.     Lead Plaintiff objects to the Interrogatories insofar as they are vague, ambiguous, harassing, overly broad or unduly burdensome, and to the extent that the discovery sought is unreasonably cumulative, duplicative or disproportionate.

6.     Lead Plaintiff objects to the Interrogatories to the extent they prematurely seek information related to expert(s), expert testimony or opinion at a time when no experts have been designated.

7.     Lead Plaintiff objects to the Interrogatories insofar as they seek information or documents neither relevant to any claim, defense or subject matter of the litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

8.     Lead Plaintiff objects to the Interrogatories to the extent they are unlimited in time frame or seek information or documents from an unnecessarily lengthy period of time.

9.     Lead Plaintiff objects to each of the "Definitions" and "Instructions" in the Interrogatories to the extent said Definitions and Instructions purport to enlarge, expand or alter in any way the plain meaning and scope of any specific word or request on the ground that such enlargement, expansion or alteration renders such request vague, ambiguous, unintelligible, unduly broad and uncertain.

10.     Lead Plaintiff objects to the Interrogatories to the extent they exceed the number of interrogatories, including subparts, permitted by Rule 33(a)(1).

11.     Lead Plaintiff objects to Definition No. 1 purporting to describe "You" or "Your" and the Interrogatories incorporating these terms, to the extent that the Definition construes "You" and "Your" to include Lead Plaintiff's attorneys and thereby calls for the disclosure of information that is protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the right to privacy, or any other applicable privilege or immunity.  Lead Plaintiff also objects to this Definition to the extent it purports to require Lead Plaintiff to provide information not within its custody or control.

000397
Exhibit 60

12.     Lead Plaintiff objects to Instruction No. 2 to the extent that the Instruction calls for information from Lead Plaintiff's attorneys and thereby calls for information that is protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the right to privacy, or any other applicable privilege or immunity.  Lead Plaintiff also objects to this Instruction to the extent it purports to require Lead Plaintiff to provide information not within its custody or control.

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into the following response, Lead Plaintiff responds to the specific Interrogatory as follows:

## III.     RESPONSES AND OBJECTIONS

<u>INTERROGATORY NO. 1</u>:

If Your response to any Request for Admission in Defendants' First Set of Requests for Admissions was anything other than an unqualified admission, state the number of that Request and all facts upon which You base Your response to that Request.

<u>RESPONSE TO INTERROGATORY NO. 1</u>:

Lead Plaintiff incorporates by reference the General Objections set forth above. Lead Plaintiff also incorporates by reference each and every General and Specific Objection in Lead Plaintiffs' Objections and Responses to Defendants' First Set of Request for Admissions.  Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, overly broad, unduly burdensome and oppressive as it seeks "all facts" upon which Lead Plaintiff's response to an unidentified Request(s) for Admission is made.   Subject to and without waiving the foregoing objections, Lead Plaintiff responds as follows:

### **RESPONSE CONCERNING REQUEST NO. 1**:

During the Class Period, one or more of the Individual Defendants participated in one-on-one or follow-up calls with analysts.  Lead Plaintiff cannot attest to the meaning of any use of the term "persistence" in those calls, or any other "calls with

000398
Exhibit 60

market analysts and investors during the Class Period" that may have occurred, but for which no transcript of the call is available to Lead Plaintiff. The use of the term "persistence" during Bridgepoint's earnings calls and investor conferences and/or roadshows alleged in the Complaint did not communicate the same thing in every instance. Defendants, analysts, and investors used the term "persistence." At times, Defendants used "persistence" interchangeably with "retention." At times, the term "persistence" communicated the broader concept of students generally persisting towards graduation.

Documents and testimony at: BPI045537; BPI046053; BPI047899; BPI049278; BPI065284; BPI066423; BPI067776; BPI071709; BPI083908; BPI102423; BPI109102; BPI154076; BPIK000006503; BPIK000042683; BPIK000073362; BPIK000210969; BPIK000215727; BPIK000246803; BPIK000247716; BPIK000251275; BPIK000682209; BPIK000682211; BPIK001010612; Deposition of Andrew Clark at 18:22-19:6, 19:24-20:3, 102:6-7, 279:11-280:2, 281:14-282:2; PRTHN00062900; PRTHN00062901; Deposition of Jonathan Shapiro at 52:5-53:6, 61:19-62:6; Deposition of Brandon Dobell at 103:4-105:10, 135:10-136:13; Deposition of Jeffrey Silber at 76:4-7; and Deposition of Trace Urdan at 33:13-35:7.

**<u>RESPONSE CONCERNING REQUEST NO. 2</u>:**

The definition of "student" and whether or not a "student" at Bridgepoint's institutions was counted in the "total enrollment" and "new student enrollment" appear to have changed during the Class Period. Student enrollment figures also changed in association with data warehouse changes. Based on Lead Plaintiff's understanding of how Bridgepoint defined the "total enrollment" and "new student enrollment" figures disclosed in quarterly press releases and earnings calls, not all persons admitted or otherwise attending courses at Bridgepoint were counted in the disclosed figures. And, the "new student enrollment" figure was an estimate.

Documents at: BPI066423; BPI068934; BPI071728; BPIK000006503; BPIK000073362; BPIK000078960; BPIK001010612; and BPIK001298007.

000399
Exhibit 60

**RESPONSE CONCERNING REQUEST NO. 3**:

Lead Plaintiff incorporates by reference its Response Concerning Request No. 1.

Lead Plaintiff does not know if, in each instance a "market analyst," as Lead Plaintiff understands the term, published a figure labeled "persistence," the analyst who authored the document calculated the "persistence" figure, or if the analyst sourced it from somewhere else. Also, analysts published similar numbers to those labeled "persistence" by other "market analysts," but did not refer to the number as "persistence." And, Lead Plaintiff does not know if one or more "market analyst" attempted, but was unable to calculate a "persistence" figure, or calculated a "persistence" figure, but did not publish it.

Documents at: BPI045537; BPI046053; BPI047899; BPI067163; and BPI083908.

**RESPONSE CONCERNING REQUEST NO. 4**:

Lead Plaintiff incorporates by reference its Response Concerning Request No. 1.

A Barclays Capital document containing the quoted definition is dated March 19, 2012. Barclays Capital did not provide analyst coverage of Bridgepoint until March 19, 2012 and, to Lead Plaintiff's knowledge, issued only the single document regarding that coverage during the Class Period. The March 19, 2012 document is attributed to Gary E. Bisbee and Zachary Fadem. Lead Plaintiff does not know if any other employees or agents of Barclays Capital calculated a "persistence" figure for Bridgepoint in a manner different from that specified in Request No. 4.

Document at: BARC_000335.

**RESPONSE CONCERNING REQUEST NO. 5**:

Lead Plaintiff incorporates by reference its Response Concerning Request No. 1.

J.P. Morgan Securities LLC issued three documents during the Class Period that contained the language quoted in Request No. 5. All three documents are attributed to Andrew Steinerman, Jeffrey Volshteyn, and Molly McGarrett. Lead Plaintiff does not know if any other employees or agents of J.P. Morgan Securities LLC calculated a "persistence" figure for Bridgepoint in a manner different from that specified in Request No. 5. Also, J.P. Morgan Securities LLC published documents during the Class Period concerning Bridgepoint that did not include the quoted language.

Documents at: BPI037640; BPI045492; BPI048767; and BPI066802.

**RESPONSE CONCERNING REQUEST NO. 6**:

The entities listed in Request No. 6 provided coverage of Bridgepoint for different, overlapping periods of time. Not all instances of a "persistence" number published by the listed entities provided the exact same number. No entity listed published a number labeled "persistence values." At least one entity listed did not publish a "persistence" figure. For those entities that published a "persistence" figure pertaining to multiple time periods, the figures were not the same over time.

Documents at: BARC_000335; BPI044830; BPI045537; BPI063424; BPI067163; BPI067312; BPI067669; BPI108672; BPIK000253210; and BPIK000827305.

**RESPONSE CONCERNING REQUEST NO. 7**:

Lead Plaintiff incorporates by reference its Response Concerning Request No. 1.

WASC reviewed extensive submissions from Ashford regarding persistence and retention, as expressed in multiple formats, as well as submissions regarding past, present, and future action plans or initiatives to improve persistence, retention and graduation. The Action Letter was based on that review. The Action Letter referenced "persistence," "retention," "graduation," "attrition," and "completion." The Action Letter's comments on these topics concerned Ashford's inability to keep its students enrolled generally, the specific ways in which Ashford measured (or

000401
Exhibit 60

attempted to measure) that same inability, and Ashford's efforts (or lack thereof) to keep its students persisting towards graduation. BPI168926.

Documents at: BPI034530; BPI098144; BPI098146; BPI099618; BPI099619; BPI109020; BPI109102; BPI112374; BPIK000247716; and BPIK000282179.

**RESPONSE CONCERNING REQUEST NO. 8**:

The findings underlying the Commission's decision to deny initial accreditation to Ashford were made in March 2012 based on documents submitted to WASC by Ashford, and communications between WASC and Bridgepoint and/or Ashford, between December 2011 and March 2012, as well as information presented during a site visit by WASC to Ashford's Clinton, IA, and San Diego, CA, locations on March 11-16, 2012. The Commission's decision to deny initial accreditation to Ashford appears to have been formalized on June 15, 2012.

Documents and testimony at: BPI047236; BPI168926; and Deposition of Therese Cannon at 206:18-25.

**RESPONSE CONCERNING REQUEST NO. 9**:

Documents purporting to list retention or persistence initiatives implemented in 2010 do not include the initiatives identified in Request No. 9. The initiatives identified in Request No. 9 had various qualifications, exceptions, or limitations, including only applying to sub-populations within Bridgepoint's student body. The "orientation course" was a pilot in 2010. In a submission to WASC in February 2012, Defendants stated that a "Mandatory Walk to Class Webinar" was "Implemented in June 2011," not 2010. BPI028926.

Documents at: BPI028920; BPI053654; BPI053809; BPI066689; BPI066689; BPI067037; BPI084998; BPI090034; BPI095379; BPI145630; BPI145631; BPI145642; BPIK000125888; BPIK000706054; BPIK000706056; BPIK000830862; BPIK000866284; BPIK000868753; BPIK000985891; BPIK001316222; PRTHN00014623; and WASC000293.

000402
Exhibit 60

**RESPONSE CONCERNING REQUEST NO. 10**:

The initiatives identified in Request No. 10 had various qualifications, exceptions, or limitations, including only applying to sub-populations within Bridgepoint's student body. The "orientation" and "program to reduce class size" were pilots in 2011. The orientation pilot was scaled back in 2011 and was not scheduled to move beyond a pilot until late 2012. The "REAL dashboard" was a pilot in 2012 with full implementation not scheduled until late 2012. Changes in lead buying strategy did not largely occur until 2012.

Documents at: BPI043843; BPI059164; BPI065389; BPI066689; BPI066689; BPI066921; BPI067036; BPI067037; BPI084998; BPI095379; BPI106373; BPI118291; BPIK000125888; BPIK000269027; BPIK000300108; BPIK000303275; BPIK000678847; BPIK000684176; BPIK000706054; BPIK000706056; BPIK000830862; BPIK000866284; BPIK000868753; BPIK000868755; BPIK000907467; BPIK001169080; BPIK001175645; BPIK001175646; PRTHN00014623; PRTHN00023449; PRTHN00108292; and WASC000293.

**RESPONSE CONCERNING REQUEST NO. 11**:

Defendants paid close attention to Ashford's persistence, retention, and graduation rates. As Bridgepoint executives, the Individual Defendants had access to and reviewed – often at their request – information detailing Ashford's persistence, retention, and graduation rates, as well as the details of any initiatives to improve those rates. The Individual Defendants reviewed and participated in the drafting and/or revision of submissions to WASC regarding these areas. Defendants were engaged in the accreditation process, which was interactive.

Defendants knew the WASC Standards of Accreditation. "The WASC Standards of Accreditation place great emphasis on student achievement and success. Retention of students, their persistence toward a degree, and completion of their desired degree within a reasonable time are of critical importance." BPI168929. Defendants met with WASC officials before and during Ashford's WASC application

review process in 2010-2012. Defendants had constant communications with WASC during the review process and were provided clarification and answers to questions regarding the WASC standards and Ashford's application on numerous occasions. Defendants knew WASC required detailed information on Ashford's persistence, retention, and graduation rates, and Ashford's efforts to improve those rates, and that WASC would pay "close attention" to these "concerns." BPI109343; BPI047236. Defendants knew that WASC's "concerns" regarding these areas were heightened during the application review process. Defendants received multiple requests both prior to and during the March 2012 site visit for additional documentation to support Ashford's application in the areas of persistence, retention, and graduation. Defendants received feedback from the WASC visit team members during and immediately following the March 2012 site visit. Defendants were provided a draft copy of the Visit Team Report in April 2012, and the final Team Report in May 2012.

Documents and testimony at: BPI034530; BPI034980; BPI038778; BPI046185; BPI047236; BPI048280; BPI048934; BPI049278; BPI059809; BPI064174; BPI064176; BPI067871; BPI083493; BPI099618; BPI099619; BPI101497; BPI101498; BPI101536; BPI102328; BPI102352; BPI103954; BPI109326; BPI109667; BPI111178; BPI112358; BPI112374; BPI118267; BPI118291; BPI99993; BPIK000232283; BPIK000269027; BPIK000430267; BPIK000682211; BPIK000684176; BPIK000724185; BPIK000830861; BPIK000830862; BPIK000836762; BPIK001021085; and Deposition of Jane McAuliffe at 47:25-48:10, 50:21-51:18, 85:25-86:14, 104:20-105:3, 114:2-6.

Lead Plaintiff incorporates by reference its Response Concerning Request No. 12.

**RESPONSE CONCERNING REQUEST NO. 12**:

Coming into the Class Period, the rate at which students were leaving Ashford prior to degree completion had been on a multi-year decline. At the time of Ashford's submission to WASC in 2011, by multiple measures, student retention was the worst

000404
Exhibit 60

it had ever been at Ashford.  Multiple measures of persistence and retention showed a decline.  Within Bridgepoint, there was disagreement and confusion on how to calculate and display persistence, retention, and graduation data.  WASC found that during the Class Period, Ashford had "not yet developed a method to collect and display data on retention, persistence, and completion in a manner that can be easily understood, that lends itself to analysis, and that accounts for each student who is recruited and enrolled in a degree program."  BPI168929.

At the time of Defendants' Class Period misstatements, no action plan or initiative put in place by Bridgepoint or Ashford in 2010-2012 had been determined to have improved persistence or retention across Bridgepoint's student body.  In a submission to WASC listing Ashford's "improvement initiatives" by year, the only initiative listed for 2010 is "Ashford Student Withdrawal Survey."  BPI010181-82.  Neither Parthenon Group nor WASC found any evidence that student surveys had improved persistence or retention at Bridgepoint.  Administration of the "Withdrawal Survey," without more, could not improve retention.  The initiatives – mostly pilots – submitted to WASC for 2011 and the first half of 2012 did not produce a measured improvement in persistence or retention during the Class Period.

The minimum age, or "under 22" change in admissions criteria was a screening process for students under the age of 22.  The policy was only for Ashford online associate's degree programs with fewer than 24 transfer credits.  The policy had multiple exceptions and an appeals process.  Ashford continued to admit students under the age of 22.  The change in admissions criteria did not significantly impact persistence or retention at Bridgepoint.

The pilot orientation program in 2010 did not improve persistence or retention at Bridgepoint.  The 2010 orientation was a pilot study that included only a small sample of Bridgepoint's student body and many aspects of the program were optional.  The President of Ashford described the program as having no "teeth."  Because of its

000405
Exhibit 60

failure, Defendants made significant changes when piloting a later orientation program.

An orientation program was piloted in late 2011 for students with fewer than 24 credits enrolled in Ashford's College of Health, Human Services and Science. As of May 2012, more information was needed to determine any potential retention impact, but preliminary studies showed that there was no such indication. Full implementation of the orientation was not planned to begin until late 2012. Bridgepoint did not have adequate faculty during the Class Period to expand the orientation beyond a pilot.

A pilot program to "reduce enrollment in the first four Ashford University undergraduate entry-point courses" was put in place in late 2011. BPI028921. The pilot was only for a sample of the four courses. Two of the entry-point courses were only required for students entering Ashford with fewer than 24 transfer credits. Full implementation of reduced class sizes across the four courses was not planned until late 2012. During the Class Period, Defendants did not have adequate faculty to implement the program across all of the four entry-point courses. As of February 2012, overall impact on student retention in the pilot had yet to be determined. There was internal debate around whether a reduction in class size impacted retention and at no point was there a clear indication that reduction in class size had resulted in improved retention rates.

Although changes in lead buying strategies occurred in March 2012, no impact had been quantified as of August 2012. Throughout the Class Period, Bridgepoint had experienced a continued decline in student quality.

During the Class Period, Defendants did not have the ability to effectively measure the impact of its persistence or retention initiatives. In late 2011, the Parthenon Group was working with Bridgepoint to develop impact analysis tools at Bridgepoint. As late as August 2012, Defendants were still developing a uniform method to measure the impact of initiatives on persistence or retention. In addition,

000406
Exhibit 60

the impact on retention of many programs labeled "initiatives" by Defendants was not capable of being measured, regardless of whether Bridgepoint had the systems in place to do so generally.

Ashford submitted information to WASC regarding initiatives dating back to at least 2009. If Ashford had information regarding persistence and retention initiatives, the most critical area of WASC's Standards for Accreditation, it submitted that information to WASC. WASC considered all information Ashford submitted, including in response to multiple requests for information on retention initiatives. WASC found that during the Class Period "concerted and systematic approaches to improve retention, persistence, and completion, with evidence-based plans, targets and timelines, are not in place and the impact of recent changes cannot yet be measured." BPI168930. A Review Committee found the evidence supporting WASC's denial of initial accreditation was substantial and that the evidence was not materially in error.

Throughout the Class Period, the Individual Defendants had access to and sought out, and reviewed, information on the state of Bridgepoint's persistence, retention and graduation rates, as well as any Bridgepoint or Ashford initiatives to improve those rates. These areas were the constant topic of internal communications, meetings, and presentations, as well as consulting agreements costing Bridgepoint over $1 million. Defendants repeatedly professed their knowledge on the topics in communications with analysts and investors. The Individual Defendants were personally involved in drafting and/or revising Ashford's submissions to WASC on these areas.

Documents and testimony at: BPI010172; BPI028920; BPI034530; BPI034980; BPI038778; BPI040634; BPI045749; BPI046415; BPI047234; BPI047236; BPI048280; BPI048934; BPI052061; BPI059809; BPI064174; BPI064176; BPI066689; BPI067036; BPI067037; BPI067871; BPI095379; BPI099427; BPI099618; BPI099619; BPI099993; BPI101497; BPI101498; BPI101535; BPI101536; BPI106373; BPI109343; BPI109667; BPI112374; BPI116866;

BPI118267; BPI118291; BPIK000269027; BPIK000270182; BPIK000270183; BPIK000282179; BPIK000300108; BPIK000327448; BPIK000678847; BPIK000682209; BPIK000682211; BPIK000684031; BPIK000684176; BPIK000689708; BPIK000706054; BPIK000706056; BPIK000721729; BPIK000721730; BPIK000724185; BPIK000830862; BPIK000834557; BPIK001193888; Deposition of Andrew Clark at 148:4-149:1, 243:10-12, 256:24-25, 266:14-267:13, 274:14-22; Deposition of Amber Eckert at 113:22-115:3; Deposition of Jane McAuliffe at 124:13-22, 186:8-12, 190:19-191:1; PRTHN00023449; PRTHN00024182; PRTHN00108292; WASC000293; and WASC027838.

**RESPONSE CONCERNING REQUEST NO. 13**:

Plaintiff incorporates by reference its Response Concerning Requests Nos. 1 and 12.

**RESPONSE CONCERNING REQUEST NO. 14**:

Plaintiff incorporates by reference its Responses Concerning Requests Nos. 1 and 12.

**RESPONSE CONCERNING REQUEST NO. 15**:

The Action Letter detailed "multiple aspects of the Standards of Accreditation" that Ashford had not demonstrated it complied with at a substantial level. The Action Letter listed six "areas" of noncompliance. Within the six "areas," the Action Letter discussed multiple reasons for Ashford's non-compliance, several of which "related to persistence, retention, or graduation rates." BPI168926.

000408
Exhibit 60

<u>**RESPONSE CONCERNING REQUEST NO. 16**</u>:

Bridgepoint's Form 8-K filed July 9, 2012, revealed that WASC denied initial accreditation to Ashford because Ashford could not demonstrate substantial compliance with WASC's Standards for Accreditation – which included the most critical standard concerning persistence, retention and graduation.

DATED: May 15, 2015

ROBBINS GELLER RUDMAN
  & DOWD LLP
JONAH H. GOLDSTEIN
LAURIE L. LARGENT
REGIS C. WORLEY, JR.
AUSTIN P. BRANE

_____
JONAH H. GOLDSTEIN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

ROBERT M. CHEVERIE &
  ASSOCIATES
GREGORY S. CAMPORA
Commerce Center One
333 E. River Drive, Suite 101
East Hartford, CT 06108
Telephone: 860/290-9610
860/290-9611 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: 619/230-0063
619/255-1856 (fax)

Additional Counsel for Plaintiff

000409
Exhibit 60

# DECLARATION OF SERVICE BY E-MAIL

I, Lisa M. Mix, not a party to the within action, hereby declare that on May 15, 2015, I served the attached LEAD PLAINTIFF CITY OF ATLANTA GENERAL EMPLOYEES PENSION FUND'S OBJECTIONS AND RESPONSES TO DEFENDANT ANDREW S. CLARK'S FIRST SET OF INTERROGATORIES on the parties in the within action by e-mail addressed as follows:

## COUNSEL FOR PLAINTIFFS:

| NAME | FIRM | EMAIL |
|---|---|---|
| Jonah H. Goldstein<br>Laurie Largent<br>Regis Worley<br>Austin P. Brane | ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Tel: 619/231-1058<br>Fax: 619/231-7423 | jonahg@rgrdlaw.com<br>llargent@rgrdlaw.com<br>rworley@rgrdlaw.com<br>abrane@rgrdlaw.com |
| Frank J. Johnson, Jr. | JOHNSON & WEAVER, LLP<br>110 West "A" Street, Suite 750<br>San Diego, CA 92101<br>Tel: 619/230-0063<br>Fax: 619/255-1856 | frankj@johnsonandweaver.com |

## COUNSEL FOR DEFENDANTS:

| NAME | FIRM | EMAIL |
|---|---|---|
| Ignacio E. Salceda<br>Joni L. Ostler<br>Nina F. Locker | WILSON SONSINI GOODRICH & ROSATI<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>Tel: 650/493-9300<br>Fax: 650/565-5100 | isalceda@wsgr.com<br>jostler@wsgr.com<br>nlocker@wsgr.com |

1030731_1

3:12-cv-01737-JM-JLB

| Bahram Seyedin-Noor<br>Bryan Ketroser | ALTO LITIGATION<br>4 Embarcadero Center, Suite 1400<br>San Francisco, CA 94111<br>Tel: 415/868-5602<br>Fax: 866/654-7207 | bahram@altolit.com<br>bryan@altolit.com |
| --- | --- | --- |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 15, 2015, at San Diego, California.

_____
LISA M. MIX

1030731_1

# EXHIBIT 61

1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   JONAH H. GOLDSTEIN (193777)
    LAURIE L. LARGENT (153493)
3   REGIS C. WORLEY, JR. (234401)
    AUSTIN P. BRANE (286227)
4   655 West Broadway, Suite 1900
    San Diego, CA 92101
5   Telephone: 619/231-1058
    619/231-7423 (fax)
6   jonahg@rgrdlaw.com
    llargent@rgrdlaw.com
7   rworley@rgrdlaw.com
    abrane@rgrdlaw.com
8
    Lead Counsel for Plaintiffs
9
    [Additional counsel appear on signature page.]
10
                    UNITED STATES DISTRICT COURT
11
                  SOUTHERN DISTRICT OF CALIFORNIA
12
    In re BRIDGEPOINT EDUCATION,      )  No. 3:12-cv-01737-JM-JLB
13  INC. SECURITIES LITIGATION        )
    _____  )  CLASS ACTION
14                                    )
    This Document Relates To:         )  CITY OF ATLANTA GENERAL
15                                    )  EMPLOYEES PENSION FUND'S
         ALL ACTIONS.                 )  AMENDED RESPONSE TO
16  _____  )  DEFENDANT BRIDGEPOINT
                                      )  EDUCATION, INC.'S FIRST SET OF
17                                       INTERROGATORIES
18
19
20
21
22
23
24
25
26
27
28

1059956_1

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and applicable Local Rules for the United States District Court for the Southern District of California and the rules and orders of this Court, Lead Plaintiff City of Atlanta General Employees Pension Fund ("Lead Plaintiff") hereby amends its response to Interrogatory No. 7 of Bridgepoint Education, Inc.'s First Set of Interrogatories to Lead Plaintiffs, dated February 24, 2015. Lead Plaintiff previously responded to the first set of interrogatories on March 26, 2015.

I.    **PRELIMINARY STATEMENT**

Lead Plaintiff's amended response to Interrogatory No. 7 is based upon a reasonable investigation of the evidence currently available and reflects current knowledge, understanding and belief, based upon information known at this time. Lead Plaintiff is providing this amended response based upon review of evidence received to date and expressly reserves the right to modify its position based upon further investigation. This amended response is made without prejudice to, and is not a waiver of, Lead Plaintiff's rights to rely upon and use, at trial or otherwise, any other facts and information subsequently identified. Lead Plaintiff further reserves the right to supplement, clarify, revise or correct any or all of the objections and responses herein, and to assert additional objections or privileges, in subsequent supplemental responses.

By making the accompanying amended response to Defendant's Interrogatory No. 7, Lead Plaintiff does not waive, and hereby expressly reserves, its right to assert any and all objections as to the admissibility of such responses into evidence in this action, on any and all grounds, including, but not limited to, relevancy, materiality and admissibility, and on any ground that would require exclusion of any response herein if it were introduced in Court. All objections and grounds, including relevance, are expressly reserved and may be interposed at the time of trial.

1     Lead Plaintiff hereby incorporates into this amended response the General

2 Objections set forth in its previous responses to Bridgepoint Education, Inc.'s

3 ("Bridgepoint") first set of interrogatories.

4 **II.    RESPONSE**

5 <u>INTERROGATORY NO. 7</u>:

6     Identify which allegedly false or misleading statement(s) You contend was (or

7 were) made by Defendant Daniel Devine.

8 <u>AMENDED RESPONSE TO INTERROGATORY NO. 7</u>:

9     Lead Plaintiff objects to this Interrogatory on the grounds that the information is

10 equally available to Defendants as the alleged false and misleading statements are set

11 forth in the Complaint.  Subject to and without waiving the foregoing General

12 Objections and Specific Objections, Lead Plaintiff states as follows:

13     As alleged in the Complaint, throughout the Class Period, Defendant Daniel J.

14 Devine ("Devine") made false and misleading statements and omissions regarding

15 Ashford's failed pursuit of WASC accreditation as well as Bridgepoint's financial

16 projections.  Some of the alleged statements were dismissed in the Court's 2013 Order

17 on Defendants' motion to dismiss the Complaint (Dkt. No. 39).  However, Devine

18 remains liable for the extant misstatements and omissions made in Securities and

19 Exchange Commission filings approved and signed by Devine.  In his deposition,

20 Devine testified to his control over the contents of the Form 8-K's.  The false and

21 misleading statements responsive to this Interrogatory are contained in ¶¶84, 102, 161,

22 and 178 of the Complaint and state as follows:

23     •     "We are pleased with the results we achieved in the first quarter as

24         our new enrollments were in-line with our expectations, and I am
        particularly pleased that our year over year student persistence increased

25         for the fourth consecutive quarter.  The increased persistence not only
        resulted in better than anticipated revenue for the quarter, but it more

26         importantly reinforces that the student support initiatives we made in

27         2010 to enhance student persistence are working as we planned.  Our

28         focus will remain on continuing to improve the programs we have in

place to further enhance the academic readiness of the students who attend our institutions, and to provide students with an innovative, high quality learning experience that enriches their lives." (May 3, 2011) (¶84);

- "During the first half of 2011, our institutions continued to make progress on key initiatives to improve the academic readiness of students and to provide students with an innovative, high quality learning experience." (August 2, 2011) (¶102);

- "In 2011, I am very pleased to report that both our institutions improved the quality of the student learning experience through the increased use of innovative technologies. To this end, we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experience at our institutions. In 2011, we believe these investments in the student learning experience were responsible for improved student persistence and graduation rates, and we expect that our focus on these investments will continue to produce similar results in the future . . . ." (March 6, 2012) (¶161); and

- "We are pleased that our operating and financial results were inline with our internal expectations for the quarter, and we are particularly pleased by the strong increase in student persistence at our universities," said Andrew Clark, Chief Executive Officer of Bridgepoint Education. "Increasing persistence reflects our success with the student support and quality initiatives we are implementing, which help assure the academic readiness of students and help provide students with an innovative, high quality learning experience that enriches their lives." (May 1, 2012) (¶178).

Also, Devine remains liable under §20(a) of the Securities Exchange Act of 1934 as a control person of Bridgepoint. ¶¶244-247.

DATED: July 31, 2015

ROBBINS GELLER RUDMAN
& DOWD LLP
JONAH H. GOLDSTEIN
LAURIE L. LARGENT
REGIS C. WORLEY, JR.
AUSTIN P. BRANE

LAURIE L. LARGENT

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

ROBERT M. CHEVERIE &
   ASSOCIATES
GREGORY S. CAMPORA
Commerce Center One
333 E. River Drive, Suite 101
East Hartford, CT 06108
Telephone: 860/290-9610
860/290-9611 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: 619/230-0063
619/255-1856 (fax)

Additional Counsel for Plaintiff

## DECLARATION OF SERVICE BY E-MAIL

I, Lisa M. Mix, not a party to the within action, hereby declare that on July 31, 2015, I served the attached CITY OF ATLANTA GENERAL EMPLOYEES PENSION FUND'S AMENDED RESPONSE TO DEFENDANT BRIDGEPOINT EDUCATION, INC.'S FIRST SET OF INTERROGATORIES on the parties in the within action by e-mail addressed as follows:

**COUNSEL FOR PLAINTIFFS:**

| NAME | FIRM | EMAIL |
|---|---|---|
| Jonah H. Goldstein<br>Laurie Largent<br>Regis Worley<br>Austin P. Brane | ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Tel: 619/231-1058<br>Fax: 619/231-7423 | jonahg@rgrdlaw.com<br>llargent@rgrdlaw.com<br>rworley@rgrdlaw.com<br>abrane@rgrdlaw.com |
| Frank J. Johnson, Jr. | JOHNSON & WEAVER, LLP<br>600 West Broadway<br>Suite 1540<br>San Diego, CA 92101<br>Tel: 619/230-0063<br>Fax: 619/255-1856 | frankj@johnsonandweaver.com |

**COUNSEL FOR DEFENDANTS:**

| NAME | FIRM | EMAIL |
|---|---|---|
| Ignacio E. Salceda<br>Joni L. Ostler<br>Nina F. Locker | WILSON SONSINI GOODRICH & ROSATI<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>Tel: 650/493-9300<br>Fax: 650/565-5100 | isalceda@wsgr.com<br>jostler@wsgr.com<br>nlocker@wsgr.com |
| Bahram Seyedin-Noor<br>Bryan Ketroser | ALTO LITIGATION<br>4 Embarcadero Center, Suite 1400<br>San Francisco, CA 94111<br>Tel: 415/868-5602<br>Fax: 866/654-7207 | bahram@altolit.com<br>bryan@altolit.com |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 31, 2015, at San Diego, California.

_____
LISA M. MIX

000417
Exhibit 61

# EXHIBIT 62

Thomson StreetEvents™

## BPI - Q3 2010 Bridgepoint Education Inc. Earnings Conference Call

Event Date/Time: Nov. 02. 2010 / 3:30PM GMT

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



CONFIDENTIAL

BPI040634

EXHIBIT

534

PBNG/AD 000-631-6989

## CORPORATE PARTICIPANTS

**Paul Goodson**
*Bridgepoint Education, Inc. - Associate VP, IR*

**Andrew Clark**
*Bridgepoint Education, Inc. - CEO*

**Jane McAuliffe**
*Bridgepoint Education, Inc. - SVP and Chief Academic Officer*

**Dan Devine**
*Bridgepoint Education, Inc. - SVP and CFO*

## CONFERENCE CALL PARTICIPANTS

**Operator**

**Jeff Silber**
*BMO Capital Markets - Analyst*

**Brandon Dobell**
*William Blair & Company - Analyst*

**Andrew Steinerman**
*JPMorgan - Analyst*

**Peter Appert**
*Piper Jaffray - Analyst*

**Trace Urdan**
*Signal Hill - Analyst*

**James Samford**
*Citigroup - Analyst*

**Kelly Flynn**
*Credit Suisse - Analyst*

**Frank McEvoy**
*Craig-Hallum Capital Group - Analyst*

**Bob Wetenhall**
*RBC Capital Markets - Analyst*

## PRESENTATION

**Operator**

Good day and welcome to the Bridgepoint Education third quarter 2010 earnings conference call. Today's conference is being recorded. At this time, I would like to turn the call over to Mr. Paul Goodson, Bridgepoint's new Associate Vice President of Investor Relations, please go ahead.

---

**Paul Goodson** - *Bridgepoint Education, Inc. - Associate VP, IR*

Thank you, operator, and good morning, everyone. Bridgepoint Education's third quarter 2010 earnings release was issued earlier today and is posted on the Company's website at www.bridgepointeducation.com. Representing the Company today are Andrew Clark, Chief Executive Officer; Dan Devine, Chief Financial Officer; and Jane McAuliffe, Chief Academic Officer.

1

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

CONFIDENTIAL

BPI040635

Before we begin, we would like to remind you that the some of the statements we make today may be considered forward-looking, including statements regarding our future operating results and financial performance. These forward-looking statements are subject to a number of risks and uncertainties that could cause actual performance or results to differ materially. Please note that these forward-looking statements speak only as of the date of this presentation, and we undertake no obligation to update these forward-looking statements in light of new information or future events, except to the extent required by applicable securities laws.

Please refer to our SEC filings, including our quarterly report on Form 10-Q for the period ended September 30, 2010, which we plan to file later today, as well as our earnings press release posted this morning for a more detailed description of the factors that may affect our results. Copies may be obtained from the SEC or by visiting the Investor Relations section of our website.

This call is the property of Bridgepoint Education. Any distribution, transmission, broadcast, or a rebroadcast of this call in any form without the expressed written consent of the Company is prohibited.

A replay of this call will be available from today at 2:30 P.M. Eastern until November 9, 2010 at 12:00 A.M. Eastern. To access the replay, call 888-203-1112 in the US and Canada, or 719-457-0820 for international calls and enter the confirmation code 1337043. The webcast will be archived on the Company's website for one year.

At this time, it's my pleasure to introduce Bridgepoint Education's CEO, Andrew Clark.

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Thank you, Paul, and welcome to Bridgepoint Education's third quarter earnings call. On the call today, I will review our quarterly results, operational highlights and progress on key business initiatives, before turning the call over to Jane who will update you on academic developments; then, Dan will review our financial and operating results in greater depth, and I will update our 2010 full-year guidance and conclude with your questions.

In the third quarter, Bridgepoint Education successfully continued to meet the demand for higher education, by bringing affordable, high-quality and highly accessible post-secondary education within reach for broad segments of the US population. As of September 30, 2010, 77,179 students were enrolled in associate's, bachelor's, master's and doctoral degree programs through our two academic institutions, Ashford University and University of the Rockies.

During the third quarter, demand for a high-quality, affordable college education remains strong. We experienced increases in total student enrollment of 40.6% over the same period in 2009. In the third quarter, combined new student enrollments at Bridgepoint's Universities increased by 23.1% over the third quarter of 2009 to approximately 24,000 students. Bridgepoint's third quarter revenue increased 49.9% to $190.9 million from $127.4 million for the same period in 2009.

A highlight of the quarter was the success we achieved at Ashford University's Clinton, Iowa campus. Beginning with this fall's incoming class, Ashford has introduced a new expanded program of full-tuition President scholarships. Scholarships were granted to those incoming students who have a GPA of at least 3.5. I am pleased to say that not only has more than 40% of the incoming class earned President scholarships, but this semester's enrollment of more than [760] full-time traditional students is the largest class in the 91-year history of the Clinton campus.

More importantly, the class of more than 440 new students represents a significant increase over the previous record for an entering class of 189 students and positions us well to achieve our future growth objectives at the campus.

In addition to increasing enrollment at the campus, we're very satisfied with the improvement we have seen in the overall quality of Ashford's incoming students. The average GPA of the incoming class was 3.32, which compares with GPA's of previous classes of 2.72.

2

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



CONFIDENTIAL

BPI040636

We're especially proud of Ashford's progress, which should help you understand not only that we're fully committed to student success and academic rigor, but also that we continue to build on our track record of improving student quality.

While we focus on the statistics, it is also important to understand how powerful the role of the President's Scholarship Program is on an individual level in providing access to a quality college education. One of our students, a most deserving freshman is one of our President's scholarship recipient. Since the age of [16], this young man has worked at a local nursing home to pay all of his own expenses. His mother can only afford to pay for his school lunches, so he had to pay for everything else, like clothes and school supply. He used the same backpack since junior high. One thing he had going for himself was a passion for learning and his hard work in high school paid off resulting in a high school GPA of 3.7.

Without a scholarship, college would not have been financially feasible. His proud mother and family scrapped together the money to purchase him a laptop as a high school graduation gift. And today, he is on campus majoring in Social and Criminal Justice. This student's humble, grateful manner truly demonstrates the significance of Ashford University's President Scholarship Program. This story and others like it demonstrate our commitment to providing access to high-quality education to deserving students regardless of their financial means.

As I mentioned, we are fully committed to student success for all of our students and we believe success requires an environment that nurtures learning. In the third quarter, we made significant strides in completing the first phase of our Clinton campus expansion. We completed the development of a new athletic field on the site of the additional acreage purchased at the end of 2009. Development is continuing on our master plan for the campus, which will be presented to our students, faculty, alumni and the Clinton community soon. We anticipate that this expansion will allow us to meet our goal of growing the campus to 3,000 students over the next several years.

Now, I'd like to turn to the Department of Education's final rules, which were published five days ago. Although we are still analyzing the new rules and their potential impact on our business, I'm able to comment on state authorization. The Department adopted a final regulation that requires all institutions that offer an online program to students in a state in which it is not physically located to meet any requirement in that state regarding our secondary distance education.

We don't view this rule as adding any additional regulatory burden on our institution, as we are already required to comply with applicable state requirements regarding distance learning. Each state has different rules in this area and some states regulate distance learning more actively than others. We have a robust internal process to evaluate each state and its requirements, and we routinely work with state agencies to determine appropriate steps. If a state makes changes to requirements, we have an established process by which we can make the required changes to ensure that we are meeting the state's new requirements.

In previous calls, I had mentioned that we have taken some proactive steps in anticipation of the new rules. For example, over the past two quarters, we implemented a minimum age of 22 for online associate programs. We have also instituted a full attendance requirement for a student's first course. In addition, we recently introduced a pilot orientation program to ensure that students with fewer than 24 credits are prepared for the academic rigor of our programs. While these programs are too new to provide definitive results, we expect that these initiatives over time will result in better-prepared students as well as help improve retention, graduation, bad debt and repayment rates.

We have also mentioned in prior calls that we've been piloting new enrollment advisor compensation plans. We are continuing to refine these plans based on the initial results, a process that will continue into early 2011 and that we plan to have fully implemented prior to June 30, 2011. These initiatives demonstrate that Bridgepoint's institutions remain focused on providing high-quality and compliance programs to their students.

Before turning the call over to Jane, I would like to acknowledge two key team members Bridgepoint has added recently. Doug Abts joined us as our new Senior Vice President of Strategy and Corporate Development. In this role, he'll be working both strategically and tactically to drive innovation in support of educational outcomes and Bridgepoint's continued growth. Doug comes to us from SAIC in San Diego and brings significant corporate development and M&A experience. Doug also served in

3

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



CONFIDENTIAL

BPI040637

000421
Exhibit 62

the US Navy for six years where he was a SEAL Team Operations Officer. He has an MBA from Harvard and a Bachelor's degree from Stanford.

Next, I know many of you on the call today will be pleased to join me in welcoming Paul Goodson, our new Associate Vice President of Investor Relations. Paul is a veteran of the investor relations field, having served as the Head of IR for three different companies and as Account Group Manager for the world's largest IR agency. Paul has an MBA from UCLA, a Master's degree from the University of Wisconsin and a Bachelor's degree from Caltech.

Now, I will turn the call over to Jane for her comments.

---

**Jane McAuliffe** - *Bridgepoint Education, Inc. - SVP and Chief Academic Officer*

Thank you, Andrew. I'm going to take this opportunity to discuss Ashford University's recent decision to seek a change of regional accreditation to the Western Association of Schools and Colleges or WASC. Ashford University has matured as an institution over the past five years. Our increased presence in the WASC region, along with the complementary alignment of WASC standards with Ashford University focus, particularly in the area of assessment drove the university's academic management and Board of Trustees to make a decision to pursue accreditation through WASC at this time.

We believe this move will enhance the institution's administrative capabilities and strengthen the university's ability to succeed in its mission of providing accessible, affordable, innovative, and high-quality learning opportunities and degree programs that meet the diverse needs of our students. It should be noted that we are in good standing with our current regional accreditor and fully intend to remain so through the migration process.

Our current accreditor staff is fully aware of our decision to migrate to WASC, and have been cooperative in this transitional process. Prior to initiating the accreditation process with WASC, Ashford University notified the Department of Education of its intentions to change primary accreditors and the department responded that it had no objection. At this time, we have initiated the application process with WASC and we are hopeful that we will have a visit by a WASC team and a decision confirmed by the end of 2011.

Both accrediting bodies have agreed to transparency and collaboration through the entire process. And our expectation is that at no time during this process will the university lose or have its current accreditation, which has been in place since 1950, impaired. Once accredited by WASC, the university will be able to initiate request for new degree program approval at both the bachelor's and master's level through the well-defined process developed by WASC.

In summary, the migration to WASC accreditation at this time is an appropriate decision for the institution and our students, and we're looking forward to participating in the migration process, meeting new colleagues in the WASC region and developing a strong relationship with the WASC team.

Before I turn the call over to Dan, I'd like to take a moment to give you a brief update on Constellation and Quality Matters. Constellation continued to grow in both the number of offerings and in student utilization, and is proving to be an effective learning tool. Students are taking advantage of its features and the customized materials we provide and we expect improved educational outcomes as a result. We've had more than a million visits from our students accessing it from within the US and also from 94 other countries.

One of the unique features of our system is that you can track student behavior and we have already seen that students are taking advantage of the wealth of materials and tools we provide for them. We have seen students access more than 6.4 million page views and make nearly 700,000 highlights on those pages.

4

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

**CONFIDENTIAL**

**BPI040638**

More than 180,000 downloads of material have occurred and were able to track the most popular content, which will better inform our curricular design. We are very pleased with the metrics we've seen so far and look forward to further analysis if this model continues to grow.

Finally, I'm proud to share that we continue to grow the number of courses that are officially reviewed and endorsed by Quality Matters, a nationally recognized faculty centered peer review process certifying the quality of online education. University of the Rockies has eight courses endorsed by Quality Matters, while Ashford now has 99 courses recognized, making us the institutional leader among colleges and universities participating in this review process.

We are particularly proud of Ashford's achievements because Quality Matters sets an industry-wide standard designed to certify the quality of online courses. While our internal goal is always excellent, this independent third-party validation is a clear demonstration of our commitment to course design and the quality of our instructions, which in turn promote student learning.

Now, I will turn the call over to Dan to review our financial and operating results.

---

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Thank you, Jane. And thanks to everyone for joining us today. Let me echo Andrews's earlier comments that we're pleased with Bridgepoint's continued strong execution and overall performance in the third quarter. Before we move to the numbers, let me highlight that during the third quarter, the Company repurchased 3 million shares at a weighted average price of $14.05 for a total cost of $42.2 million, pursuant to the $60 million share repurchase program announced in August. As a result, $17.8 million remains authorized and available under the repurchase program, which is set to expire at the end of July 2011.

Now, I will provide you with an overview of the quarter. Specifically, third quarter revenue increased 49.9% to $190.9 million compared with $127.4 million for the third quarter of 2009. Revenue growth was primarily driven by a significant increase in student enrollments. As of September 30, 2010, total student enrollment increased 40.6% to 77,179 from 54,894 students at the end of the third quarter of 2009.

For the third quarter of 2010, instructional cost and services were $50.2 million or 26.3% of revenue compared with $33.1 million or 26% of revenue in the third quarter of 2009. Included in our instructional cost and services for the third quarter is bad debt expense of $10.6 million, which equates to 5.5% of revenue as compared with 5.3% of revenue for the same period in 2009. We believe, the continued weak economy is the primary contributor to this result. We remain focused on improving this operating metric.

Marketing and promotional expenses for the quarter were $55 million or 28.8% of revenue compared with $36.5 million or 28.7% of revenue in the third quarter of 2009. General and administrative expenses for the quarter were $23.3 million or 12.2% of revenue compared with $18.9 million or 14.8% of revenue for the third quarter of 2009. General and administrative expenses improved from prior year, as we continue to gain efficiencies from a larger student enrollment base.

Operating income for the third quarter increased to $62.4 million, resulting in a 32.7% operating margin. This compares with 30.5% operating margin in the third quarter of 2009. Net income for the third quarter was $36.1 million compared with $22.4 million in the third quarter of 2009. Fully diluted earnings per common share or EPS was $0.61 for the third quarter of 2010 compared with EPS of $0.37 for the same period in 2009.

EPS is calculated on a diluted share count of 59.3 million in the third quarter of 2010 and 59.8 million shares for the comparable period in 2009. The stock repurchase of 3 million shares in the quarter resulted in an increase of $0.02 to EPS in the quarter.

The Company's effective tax rate for the third quarter of 2010 was 42.4% and for the nine months ended September 30, 2010, the effective tax rate was 41.4%. In the third quarter, we recorded an increase in tax expense to revalue our net state deferred

5

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

CONFIDENTIAL

BPI040639

tax assets related to favorable California Tax Legislation effective in 2011. Our effective tax rate at September 30, 2010 excludes the impact of California Proposition 24, which could repeal these future benefits. We will record any impact of California Proposition 24 in the fourth quarter.

Now, let's turn to some key components of our cash flow and balance sheet. As of September 30, 2010, we had cash, cash equivalents and marketable securities of $229.7 million compared with $170.6 million as of December 31, 2009. Bridgepoint Education generated $115.2 million of cash from operations for the nine-month period ended September 30, 2010 compared with $115.7 million for the same period in 2009. As of September 30, 2010, our accounts receivable net of allowance for doubtful accounts was $76.1 million, which represents 36 days sales outstanding on a quarter-to-date basis compared with 37 days sales outstanding as of September 30, 2009.

For the first three quarters of 2010, capital expenditures were $18.5 million compared with $16.8 million for the same period last year. The amount spent year-to-date reflects our commitment to the campuses, as we constructed an athletic field in Iowa and continued to expand our other campus facilities. The amount also reflects leasehold improvements to certain facilities in San Diego.

Before turning the call back over to Andrew, I would like to update you on the status of the OIG audit. As we have reported before, Ashford University submitted its response to the OIG draft audit report this past July. As you are aware, the next step will be the issuance of a final audit report. Although we do not have an estimate of when this will occur, we will make announcements as developments warrant.

Now, let me turn the call back over to Andrew who will finish up with our business outlook for 2010.

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Thank you, Dan. Turning to our outlook for the remainder of the year, we expect to build on the momentum of the third quarter by significantly leveraging our student value proposition and innovation to drive positive student outcomes. We foresee continued demand for the rest of 2010 for our higher education course offerings.

As you model our performance for the full year, I want to remind you of our comments on our first quarter call about seasonality. Over the past few years, our fourth quarter enrollment and revenue growth have consistently slowed in comparison to the preceding third quarter. The seasonality reflects the impact of both the holiday break and fewer new enrollments in the fourth quarter of every year. And we expect this effect to be more pronounced in this year's fourth quarter than in prior years, which is an outcome of the normalization of our growth rate.

With this in mind, here are the financial and operating metrics we are expecting for the full year. Total student enrollment is expected to be between 71,800 and 73,800 at the end of the year. Revenue is forecast to be between $700.3 million and $702.8 million. Net income is expected to be between $120.8 million and $122.3 million. Fully diluted earnings per common share is expected to be between $2.02 and $2.05, based on an estimated fully diluted weighted average share count of 59.6 million for the year. The stock repurchase of 3 million shares in the third quarter is expected to contribute $0.04 to fully diluted EPS for the year. Bad debt as a percentage of revenue for 2010 is expected to be 5.4%. Capital expenditures for 2010 are expected to be approximately 5% of revenue and the effective tax rate for 2010 is estimated to be 41.4%.

Now, with that, I would be happy to take any of your questions.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



CONFIDENTIAL

BPI040640

## QUESTIONS AND ANSWERS

**Operator**

Thank you. (Operator Instructions) And we will now take our first question from Jeff Silber with BMO Capital Markets, please go ahead.

**Jeff Silber** - *BMO Capital Markets - Analyst*

Thanks so much. Just wanted to get a little bit more color on your outlook for the year. I know you don't officially give fourth quarter guidance, but backing out where you look to go for the year, I'm just curious what kind of starts growth in retention is implied in the fourth quarter to hit your year-end goal?

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Well, we don't give out -- obviously, as you said, we don't give out the start enrollments for the upcoming quarter and we don't give out our expected retention. I will say that we do anticipate that starts for the fourth quarter will be above the rate -- the number of starts we had. We are not going to have decelerating growth of new starts in the fourth quarter.

**Jeff Silber** - *BMO Capital Markets - Analyst*

I am sorry, you said it will not decelerate, is that what you said?

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

We will not -- we will have higher growth in the fourth quarter compared to the prior year in new enrollments. We are not decelerating growth in the fourth quarter [on new enrollments].

**Jeff Silber** - *BMO Capital Markets - Analyst*

And then, also just on bad debt and I know you are not giving quarterly guidance, but by my math it's implying bad debt expense of about 6%. I mean, is the economy getting weaker, is there something going on that I am not aware of? I'm just curious why you think it will spike up?

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Well, it only spiked up as a percentage as it was higher last fourth quarter also. So it's the growth in our bad debt, we don't expect any further deterioration in the fourth quarter due to the economy than what we saw in the third quarter, which was 20 basis points.

**Jeff Silber** - *BMO Capital Markets - Analyst*

So nothing else going on there?

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

I mean, last year's fourth quarter, I believe was also a higher number.

7

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

**CONFIDENTIAL**

**BPI040641**

000425
Exhibit 62

**Jeff Silber** - *BMO Capital Markets - Analyst*

Okay, great. All right. I'll jump back in the queue.

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Yes.

**Jeff Silber** - *BMO Capital Markets - Analyst*

Thanks so much.

**Operator**

We will now take our next question from Brandon Dobell with William Blair, please go ahead.

**Brandon Dobell** - *William Blair & Company - Analyst*

All right. Thanks. Going back to Jeff's retention question a little bit. In the third quarter, any color on how retention trends were if you look at it exclusive of the ground campus and graduations just trying to get an idea of, if any, impacts -- what impacts on the changes student quality metrics are having?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Sure, Brandon. We saw about a 70 basis point increase in our retention for the quarter, which we were pleased with. We certainly can't, as I said previously in the call, really quantify for you the effect the -- all of our initiatives are having. But we do believe strongly and we do forecast in our thinking for next year that all of these various initiatives ought to have a positive impact on retention in 2011.

**Brandon Dobell** - *William Blair & Company - Analyst*

Okay. And then over the past two weeks, you've put a number of your peers talk about all kinds of different issues, concerns, drivers, what have you, anything from the media to more expensive lead. I wonder if you could comment on the cost of a student acquisition these days or the logistics of that and say if there is any major changes for you guys, you had to change your strategy to go out and find those new students.

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Sure, Brandon. I mean I really can only tell you what it is that I see here at Bridgepoint and we continue to execute very strongly on a plan that we put in place around November of last year. And our media costs have been very consistent. Everything that we have -- that we forecasted and planned for last year has really come to fruition this year. And we've been very consistent I think each quarter this year on each earnings call about our view for the full year. And we haven't changed from that because we haven't seen anything out there in the external environment that has impacted us. Obviously, I've been talking to you almost two years now. If I thought something that I thought would negatively impact Bridgepoint and any of our metrics, I would certainly share that with you. But I don't see anything right now.

8

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

**CONFIDENTIAL**

**BPI040642**

**Brandon Dobell** - *William Blair & Company - Analyst*

Okay. Thanks. And final question, going back to the accreditation situation between HLC and WASC, you mentioned you would be open or has approved to open new programs. Is there any delay, once the final WASC decision is handed down? Is there like a cooling-off period where you're going to wait three months before you can apply for new programs or is it pretty much once that decision is handed to you, you can start the new program process?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Yes, I'll let Jane answer your question.

**Brandon Dobell** - *William Blair & Company - Analyst*

Thanks.

**Jane McAuliffe** - *Bridgepoint Education, Inc. - SVP and Chief Academic Officer*

Yes, good question. No, as soon as we have confirmed our approval status with that new accreditor, then that very next day, in fact we've had conversations about it we can submit for a new program approval. So no delay.

**Brandon Dobell** - *William Blair & Company - Analyst*

Great. Thanks a lot.

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Thanks, Brandon.

**Operator**

And we will now take our next question from Peter Appert with Piper Jaffray.

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Peter?

**Operator**

I do apologize Peter is no longer on the line, we will go to Andrew Steinerman with JPMorgan. Please go ahead, sir.

**Andrew Steinerman** - *JPMorgan - Analyst*

Hi, Andrew. I think you did a very good job, especially addressing it upfront with state authorization, but I just wanted to make sure I caught everything. I think you were saying that you're already authorized in all the states you need for Ashford. And so compliance with the new Reg formalized last week is no change, is that the message?

9

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



000427
Exhibit 62

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Yes, [especially] that's the message. I mean, as I commented, we have a very robust system. We recruit from all 50 states and we -- whenever there is changes in any of the states, we have a system -- we have about four individuals, Andrew, inside the organization that are focused just on this, that monitor any changes in regulation to make sure that our institutions are either in compliance or are in the process of submitting the paperwork to become in compliance with any changes in any case.

**Andrew Steinerman** - *JPMorgan - Analyst*

Right. And Dan, I think you said no deceleration in new enrollment. I wanted to make sure that I understood that correctly. So in the third quarter, new enrollments grew 23%, so the fourth quarter should be similar or better --

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Yes, let me clarify that. I was referring to the total number of physical new starts, not as a percentage.

**Andrew Steinerman** - *JPMorgan - Analyst*

And you mean no declines.

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

No decline in the number of new enrollments in the fourth quarter as compared to the fourth quarter of 2009.

**Andrew Steinerman** - *JPMorgan - Analyst*

But it could decelerate from the 23%.

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Yes. it could decelerate from the percentage. I was referring to gross physical number, not a percentage.

**Andrew Steinerman** - *JPMorgan - Analyst*

Okay. And the deceleration that you see here is something on your own volition. I think you had to use the word normalizing our growth rate or is this something external?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

No, this is something that really happens every single year, Andrew, every fourth quarter just because of the seasonality. We make an internal decision not to try and have students start their classes around the holidays. We just don't think that that is conducive to their academic experience and there is a lot of distractions going on that time of year and it's better off for them to wait until January. So this is just more pronounced because our growth rate is normalizing. So you see the seasonality a little more pronounced than you have in the previous years.

10

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



CONFIDENTIAL

BPI040644

000428
Exhibit 62

Nov. 02. 2010 / 3:30PM, BPI - Q3 2010 Bridgepoint Education Inc. Earnings Conference Call

**Andrew Steinerman** - *JPMorgan - Analyst*

Right. But Andrew, you must realize that pretty much all the other educational services companies have talked about value enrollments, do you think the reason why Bridgepoint is not going to see value enrollments is that you're just a younger company?

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

No. And I'm glad you asked that question. I think the reason why -- and I've been saying that going on two years almost, Andrew, is we had a differentiated value proposition that resonates tremendously with prospective students out there and affordability and the transferability of credit and the heritage of the institution just continues to allow Bridgepoint institutions to [drop students] that normally look at a community college or a four-year public university, but find that those tuition prices are increasing. The accessibility is very difficult or decreasing in some cases and they naturally turn to our institutions. That -- the differentiated value proposition is what has driven growth at our institutions. That's why we had a very strong third quarter, that's why we've raised our guidance for the full year and we've been very consistent, as I know you know, because we've been talking almost two years now about this.

---

**Andrew Steinerman** - *JPMorgan - Analyst*

Andrew, Dan, thank you so much.

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Yes.

---

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Thanks a lot.

---

**Operator**

And our next question will come from Peter Appert with Piper Jaffray. Please go ahead.

---

**Peter Appert** - *Piper Jaffray - Analyst*

Thanks. So Andrew, I was trying to ask the enrollment number is very impressive versus your peers and I was just hoping give us some color on the drivers in terms of particular degree levels where you're seeing growth or program areas that are driving this performance?

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

I don't have any real specifics for you, Peter. I think the one thing I can continue to say though about Bridgepoint and our institutions is we've experienced tremendous consistency. Again, we've been doing -- this is I think our seventh earnings call here or seventh quarter. I've been talking with folks for the last two years about our business. Our business continues to be tremendously consistent and I think it's predicated, as I mentioned just a second ago to Andrew, on the highly differentiated value proposition and really how strongly that resonates with prospective students in an economic environment that continues to be very difficult and looks to be very difficult for the foreseeable future.

11

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

**Peter Appert** - *Piper Jaffray - Analyst*

Yes. Do you have any sense if new program offerings are a particularly important driver of the enrollment growth?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

We certainly have expanded our new program offerings this year. But I don't think that that is -- you can't point to any one particular problematic area and say that that has been kind of the driver for our growth. The thing you can point to, and I'm going to sound like a broken record here, is our differentiated value proposition. That is what really is driving the growth at our institution.

**Peter Appert** - *Piper Jaffray - Analyst*

And how about the pilot orientation program, Andrew? Can you give us any added insight into how that works and how that might impact the enrollment numbers on a short-term basis?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Well, we just started it here. And so it's just really in its early phases and we'll continue it through the quarter, probably into early next year. So I really -- I don't have anything in terms of detail that I can give you. Jane can comment a little bit for you on just the orientation program itself and what it entails?

**Jane McAuliffe** - *Bridgepoint Education, Inc. - SVP and Chief Academic Officer*

Right. Our faculty who are teaching right now for the first time are really enjoying the interaction with students. So it's really focused on helping our students navigate through that online learning environment, introducing them to learning resources that are available to them through their university, assisting them with learning management skills, time management skills, providing an analysis of their English/math skills and I think it's really designed to set that stage for learning. So it's just a great [key as] to welcome them into higher education. So we're having a great time with that and we're interested to get to the point where we can start analyzing the impact.

**Peter Appert** - *Piper Jaffray - Analyst*

And is there a meaningful cost associated with offering this?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

No, that's not a material cost.

**Peter Appert** - *Piper Jaffray - Analyst*

Okay. And then one last thing for Dan, you were pretty aggressive in the repurchase in the third quarter, so you've used up a good chunk of the authorization, so presumably, you can get more on the context of your cash balance. So the question is how aggressively do you think you want to pursue buybacks on a go-forward basis, just from a strategy standpoint?

12

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



CONFIDENTIAL

BPI040646

000430
Exhibit 62

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Well, we evaluate it on a continuing basis and we do have that $17 million available to us and I don't really know [without seeing] where -- what the future prices look like.

---

**Peter Appert** - *Piper Jaffray - Analyst*

Okay. Thank you.

---

**Operator**

And we'll now take our next question from Trace Urdan with Signal Hill, please go ahead.

---

**Trace Urdan** - *Signal Hill - Analyst*

Thanks. First question, maybe for Dan, it looks like on the revenue numbers that you've outlined for the full year and the EPS numbers that you've outlined for the full year, there is the potential for margin contraction in the fourth quarter. Am I -- have I got something wrong there or is --?

---

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

No, I mean, we've made this comment before as early as the first quarter. The fourth quarter has a sequential decline in enrollments, as Andrew said, because we have an effectively holiday break as well as a shorter enrollment period in the fourth quarter as compared to other quarters. And as a result, you have a large enrollment base at the end of Q3, that large enrollment base has certain assumptions for our graduation than the people leaving the institution and that's not being fully offset by the shorter enrollment period due to the holidays. That results in lower revenue in this particular quarter. It did not do that in '09, I think revenue was up just slightly, but this year you actually -- it's more pronounced and you're going to see unfavorable revenue variance sequentially. And that all basically falls to the bottom line and creates the margin contraction. So you are correct, that's what [we're at].

---

**Trace Urdan** - *Signal Hill - Analyst*

Thank you. I'm sorry to make you [give].

---

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

No. I'm glad you asked it. It's nice to kind of reiterate it once again so that it's clear that that is the impact of the margin.

---

**Trace Urdan** - *Signal Hill - Analyst*

Okay. I wondered if -- I know you kind of -- you get asked this each quarter and maybe there is no more information to bring to bear here, but there is an intense interest now around the change in incentive comp or the removal of the Safe Harbors and I know you guys have been piloting a program already around that issue and I presumably are prepared to roll it out. I'm wondering if you could sort of describe what impact if any you see as a result of that of having to roll that pilot out in your P&L. I mean, are we going to see sort of near-term expansion in costs or will there be any change in the productivity that you can foresee? Can you give us a little bit more color around what's going to happen as a result of that?

13

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**CONFIDENTIAL**

**BPI040647**

000431
Exhibit 62

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Sure, Trace. And I might have kind of a long answer to your long question here, so bear with me. But I mean I guess I'd set the table this way. For seven years, we've built a very strong Company with a very strong management team that's executed very well. And we've predicated that upon high quality and compliance. And I believe as I've said that there is a strong demand for our value proposition. And then really the question becomes, what do we think is reasonable access to that demand, giving our two overarching guiding principles of quality and compliance?

So if you look at 2011, I can't really -- I can't comment on -- it wouldn't be appropriate for me to comment on that since we're having those discussions now. But I think it's reasonable to think that there would be some change in expense structure based around incentive comp. I think it's reasonable to think there might be some change in productivity. I think that I have a view that there are opportunities within our marketing and commercial line for improvement as well. So all of those things are going through our head, Trace, as we think about kind of the current regulatory environment and kind of the uncertainty of the political environment now and going into next year. But we will be very thoughtful and I think at the end of the day, really the focus on quality and the focus on compliance is going to drive our view of how much of that demand is created by our value proposition here we want to access.

**Trace Urdan** - *Signal Hill - Analyst*

Okay. And then, maybe the last question for Jane, I think investors are intensely interested in this transition that you're making to WASC and I appreciate you addressing it in your remarks. Will there be any milestones that we will be able to watch as the process unfolds? Are you going to be able to -- are there things that we can look for to see that everything is progressing smoothly and in good order, or is it going to be sort of a black box and we're going to have to wait till we get to the end of it?

**Jane McAuliffe** - *Bridgepoint Education, Inc. - SVP and Chief Academic Officer*

No, I'd be happy to provide updates as we go along. They have a very formal process that they go through. They kind of call it the eligibility process, then candidacy and then the initial accreditation process. And as you know, we've submitted our [intent to file], so we've passed that first phase and now we're submitting our eligibility application and working towards submitting that in the next few months. So once from there, that's when it sort of starts to develop into a full-blown self study and the team is set up to come to visit and then we can sort of update as to where we are in the timeline and keep you posted, and I certainly don't have an issue with that.

**Trace Urdan** - *Signal Hill - Analyst*

And is there sort of a back and forth process and will they -- are they likely to come back to you and say, we have these 15 questions about your practices in these areas, could you address those please and give us more information? I mean, is it that kind of a situation like a program review?

**Jane McAuliffe** - *Bridgepoint Education, Inc. - SVP and Chief Academic Officer*

No, I mean, it's a very formal process where you -- it's just like any other regional accreditor where you just make your self study and a team evaluates you and comes to your visit and then they write a report. And you do have an opportunity to provide a response and then a decision is made. So it's just a -- it's a very clean process, so it's not a matter of for months and months, you back and forth.

**14**

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**CONFIDENTIAL**

**BPI040648**

**Trace Urdan** - *Signal Hill - Analyst*

Okay. Great, thank you.

**Operator**

(Operator Instructions) We will now take our next question from James Samford from Citi. Please go ahead.

**James Samford** - *Citigroup - Analyst*

Thank you. Most of the questions have been asked at this point. But just wanted to get a sense for whether you've had any changes in your military strategy as far as how that's trended in the quarter? And any comments on your relationships with community colleges and other partnerships? How much -- how important is that to your new student acquisition channels?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Yes, thanks, James. We have not had any changes in our military strategy and I'm very pleased with kind of both of our channel developments, both the corporate strategy as well as the military strategy. Again, kind of along with our theme of consistency, those have gone really according to plan throughout 2010 here. The community college continues to be -- community colleges and articulation agreements continue to be a focus for us and we continue to expand our relationships with more and more community colleges. It is important to us. Because of our transferability of credit policy, it's a nice stead and we find that community colleges are very receptive when we approach them about an articulation agreement.

**James Samford** - *Citigroup - Analyst*

Great. And just a quick follow-up on your tuition structure. Is the technology fee still a big part of your tuition structure and any opportunities to maybe lower your tuition relative to some of your peers who are most likely facing potential tuition lowers to meet gainful employment?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Well, I mean first of all, technology fee has been something, James, that we've had for -- since 2005. We increased the fee for, I think like the first time since 2005 because we've increased so many of the services to our online students over the last five years and it was appropriate to offset some of those expenses there. In terms of lowering tuition rates, our tuition rates are lower than most of our public/private sector competitors. And our repayment rates, as you know, at least kind of on that first go around by the department, both of our institutions were at the threshold or above. So I think, there is certainly not a need for us to look at lowering tuition or anything in that regard based upon what we've seen.

Most of our students -- a lot of our prospective students look at a community college or a four-year public university before they decide to come to Ashford, for example. And what you find there because of declining state revenues is that those tuition prices continue to escalate and are very competitive now with Ashford's pricing and in some cases higher. So, our view is that we really don't need to change anything from a tuition pricing standpoint and we don't need to change what we've done in the past five years. I think it demonstrates itself in the value proposition and just in the growth that we've had certainly in this year.

**James Samford** - *Citigroup - Analyst*

That's great. Thank you. Great quarter.

15

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

**CONFIDENTIAL**

**BPI040649**

000433
Exhibit 62

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Thanks.

**Operator**

And our next question will come from Kelly Flynn with Credit Suisse, please go ahead.

**Kelly Flynn** - *Credit Suisse - Analyst*

Thanks. [I just want to go] back to the starts growth, Dan, I guess, somewhat unclear on why seasonality should really impact the year-over-year growth. Can you explain that a little more?

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

As a percentage? I thought that the original question was, I thought, is your gross number of new enrollments going to exceed the gross number of new enrollments in Q4 of 2009? And my answer to that was yes.

**Kelly Flynn** - *Credit Suisse - Analyst*

Right. Well, I guess I think that answer implies that the growth rate will be -- that answer coupled with your guidance and it implies that the new student growth will be significantly lower than 23%, which is what we saw in the third quarter. So I guess I'm trying to figure out why seasonality would be the driver of that deceleration and if it's not seasonality, I just want to go back to these initiatives, the orientation especially, do you think that the starts growth would be higher if you aren't doing the orientation?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

It's pretty straightforward, I think. This is Andrew, Kelly. It's pretty straightforward. As I mentioned, our growth rate -- the seasonality occurs every year, our growth rate is normalizing and as it normalizes, it just pronounces the seasonality to a greater extent. If there was anything from an initiative perspective or from an external perspective, as I said a few minutes ago, we would share those with you, but we don't see that. And I think we've been very transparent as a public company in the last seven quarters about what we do see.

**Kelly Flynn** - *Credit Suisse - Analyst*

Okay. I guess just to say it another way then, if your enrollment growth is implying starts probably somewhere between, I guess 0% and 20% growth year-over-year. So if we use the midpoint and put it at 10%, I mean is that -- what's your normal growth rate? Is it 10% and does it decelerate further? And how are you thinking about when will -- at what level the growth rate will normalize for your student growth?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Well, I mean, I think our full-year new enrollment growth rate is about -- on the full-year guidance is about 34%. So as I mentioned, we've set this plan a year ago, we've been very consistent every single quarter with you about what we were going to achieve. There is obviously nothing new in the fourth quarter here because we're going to do for the full year what we've been telling

16

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

**CONFIDENTIAL**

**BPI040650**

000434
Exhibit 62

you we were going to do for the full year [and] we gave you full-year guidance back in March. So there is no -- I don't know what you're looking for, but there is no surprises here, there is nothing internal or external that changes our view of the fourth quarter and the full year.

---

**Kelly Flynn** - *Credit Suisse - Analyst*

Okay. No problem. Thank you.

---

**Operator**

And our next question will come from Frank McEvoy with Craig-Hallum Capital Group, please go ahead. Mr. McEvoy, your line is open.

---

**Frank McEvoy** - *Craig-Hallum Capital Group - Analyst*

Yes, good morning, everyone.

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Good morning.

---

**Dan Devine** - *Bridgepoint Education, Inc. - SVP and CFO*

Good morning.

---

**Frank McEvoy** - *Craig-Hallum Capital Group - Analyst*

Yes, nice quarter.

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Thank you.

---

**Frank McEvoy** - *Craig-Hallum Capital Group - Analyst*

Andrew, I have a question on Constellation to start off with and can you give us a sense of what percent of courses in the third quarter had Constellation and maybe get an update on the rollout over the next year or two and just kind of touch on the revenue and potential cost benefits?

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Well, I've just talked to how many courses or books we've put out so far. We've done six so far on a plan of ten for the full year. So we are again right on course with what our plan was for the full year in terms of Constellation. I think -- what was the follow-up to that?

---

17

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

**CONFIDENTIAL**

**BPI040651**

**Frank McEvoy** - *Craig-Hallum Capital Group - Analyst*

And where do you -- how do you see it rolling out over the next couple of years? Is that -- are you still on track with the plan and all of you accelerated or --?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

We've been real consistent about saying that we expect 30% course penetration in 2011 and about 75% to 80% in 2012 and our view hasn't changed on that.

**Frank McEvoy** - *Craig-Hallum Capital Group - Analyst*

Okay, great. And then, this was asked earlier, but I was just trying to get some sense on can you talk about enrollment growth in the quarter by degree type? Was it -- or do you see more growth in say master's versus associate's, or can you give us any kind of color on that at all?

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

You know what, I don't have anything specific in front of me or off the top of my head. I would just say -- and again I'm a broken record going back to my theme here of consistency, we really continue to see growth where we've seen it traditionally, certainly in our graduate program offering that continues to do well, as well as in our bachelor's degree offerings. So, it's been very consistent, very according to plan.

**Frank McEvoy** - *Craig-Hallum Capital Group - Analyst*

Right. Very good. Thank you.

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Yes.

**Operator**

And our next question will be from Bob Wetenhall with RBC, please go ahead, sir.

**Bob Wetenhall** - *RBC Capital Markets - Analyst*

Hey guys, nice quarter.

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Thank you.

18

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

CONFIDENTIAL

BPI040652

000436
Exhibit 62

**Bob Wetenhall** - *RBC Capital Markets - Analyst*

And thanks for the transparency on what's going on. Just kind of in terms of the momentum you guys had, what's -- how much additional operating leverage do you think is achievable in G&A?

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Are you referring to going forward in the future? I assume future years. We said it before, we expect that there is some future maybe less than a point a year going forward. We could get down a little further, maybe two or three points down over time, but less than a point a year. We don't expect to keep marching down to a too lower level.

---

**Bob Wetenhall** - *RBC Capital Markets - Analyst*

Okay. And is there anything going forward that's going to change radically [ICS] as a percentage of revenues?

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

No, nothing that I would characterize in your word of radically. I think we'll continue, as I mentioned I think with Trace, we're going to continue our focus on quality and compliance. So beyond 2010, we're going to use those two guiding factors to make sure we're making the appropriate investments as we have been to reinforce academic quality.

---

**Bob Wetenhall** - *RBC Capital Markets - Analyst*

Fair enough. And just trying to put some bigger bookend [finality] where you haven't provided F'11 guidance, but is there kind of a sweet spot that you're looking to get to next year for total enrollment, maybe like 80,000 students, 85,000 or just ballpark rough -- very rough back of the envelope?

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

No. And I'm glad you asked that, Bob, because that's really not the way we think about it. And that's kind of why I provided that long answer to Trace. The two things we're most focused on as we have been is really the quality of our academic offerings of student experience and our regulatory compliance. And those are really the bookends. We obviously believe that we have a very differentiated and strong value proposition as demonstrated by the last seven quarters of performance. And going forward, our access to that demand will be guided by those bookends of quality and compliance.

---

**Bob Wetenhall** - *RBC Capital Markets - Analyst*

Good answer. Thanks very much.

---

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Thank you.

---

**Operator**

And we have no further questions in the queue. I'd now like to turn the call back over to Andrew Clark.

19

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

CONFIDENTIAL

BPI040653

Nov. 02. 2010 / 3:30PM, BPI - Q3 2010 Bridgepoint Education Inc. Earnings Conference Call

**Andrew Clark** - *Bridgepoint Education, Inc. - CEO*

Yes. I want to thank everyone for joining our earnings call today and we'll look forward to talking with everybody again next quarter.

---

**Operator**

And this does conclude today's conference call. Thank you for your participation. You may now disconnect your lines.

---

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2010, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2010 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



CONFIDENTIAL

BPI040654